IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a LASALLE BUSINESS CREDIT, INC., <br><br> Plaintiff, <br><br> v. <br><br> CLINTON SAVINGS BANK, <br><br> Defendant. | Case No. 05-CV10268-DPW |

**PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

Plaintiff, LaSalle Business Credit, LLC ("LaSalle"), moves, pursuant to Federal Rule of Civil Procedure 65 and Massachusetts Gen L., Chapter 109A, § 8(a)(3)(i), for a preliminary injunction enjoining Defendant, Clinton Savings Bank ("Clinton Bank"), from proceeding with the sale of real estate scheduled for February 16, 2005, because the interest of Clinton Bank was obtained through a fraudulent transfer and such interest is subject to equitable subordination. The grounds in support of this Motion are:

### Introduction

1.  This case involves a five-count Complaint by LaSalle against Clinton Bank. In Count III of the Complaint, LaSalle asserts a claim that a mortgage interest obtained by Clinton Bank from Tradex Corporation ("Tradex") should be set aside as having been obtained in violation of § 5 of the Uniform Fraudulent Transfer Act (Mass. Gen. L. Chapter 109A, § 5 ("§ 5")). Under § 5, a transfer by a debtor to a creditor is deemed a fraudulent transfer where (i) the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer, and (ii) the debtor was engaged or was about to engage in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the transaction and the

286826.2 042314-34311

debtor intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. In an action for relief under the Uniform Fraudulent Transfer Act, a creditor may obtain an injunction against further disposition of the asset transferred to the creditor-transferee. Mass. Gen. L. Ch. 109A, § 8.

2. The mortgage that Clinton Bank obtained from Tradex (the "Tradex Mortgage") was obtained to secure an $8.4 million revolving line of credit granted by Clinton Bank to Kingsdale Corporation, doing business as J&J Chemical ("J&J Chemical") that had effectively been a loan for some period of time due to Clinton's payment of checks based on uncollected funds in the J&J checking account (the "J&J Chemical Account"). This was an extraordinary loan because it memorialized Clinton Bank's agreement to allow the continued payment on uncollected funds on the J&J Chemical Account, the purpose of which Clinton Bank knew was to facilitate a check-kite scheme involving LaSalle. The property covered by the Tradex Mortgage was Tradex's only significant asset. Tradex did not receive any consideration from Clinton Bank for the Tradex Mortgage. Furthermore, at the time that Tradex provided the Tradex Mortgage, it knew, or reasonably believed, it was facing liabilities beyond its ability to pay.

3. A preliminary injunction is proper upon a showing by a plaintiff that (i) it is likely to prevail on the merits, (ii) the right claimed by the plaintiff may be defeated unless the injunction is issued, and (iii) the damages to plaintiff, if the injunction is denied, plainly outweigh any foreseeable harm to the defendant. *Garzaro v. University of Puerto Rico*, 575 F.2d 335 (1st Cr. 1978). Based upon the affidavits, deposition excerpts and other evidence presented in support of this Motion, LaSalle is likely to prevail on the merits of its claim that Tradex's transfer of the security to Clinton Bank violated § 5. LaSalle's rights as a creditor of Tradex may

be defeated unless LaSalle obtains the requested injunctive relief. LaSalle has obtained a pre-judgment attachment against the assets of Tradex. If Clinton forecloses upon the real estate, Tradex's only asset will be gone. Tradex's only source of income, rent paid by the tenant, Gitto Global Corporation, will be gone. Therefore, Tradex will be rendered judgment proof and unable to pay LaSalle. There is no foreseeable harm to Clinton Bank if the sale is postponed because the real estate will not decrease in value. LaSalle and Clinton can litigate the issues in this matter and the real estate can be sold later once a final determination has been made.

### The Facts

4. On or about July 25, 2002, LaSalle entered into a Loan and Security Agreement (the "Loan Agreement") with Gitto Global Corporation ("Gitto Global") wherein LaSalle made a revolving loan not to exceed $27,000,000, under which LaSalle would lend up to 85% of the face amount of Gitto Global's eligible accounts receivable ("LaSalle revolving loan"). (Stillwell 10/21/04 Aff., ¶ 5)*

5. The Loan Agreement provided that Gitto Global would deliver to LaSalle an executed daily loan report and a borrowing base certificate requesting a revolving loan, accompanied by information on Gitto Global's sales, cash receipts and inventory value. (Stillwell 10/21/04 Aff., ¶ 6)

6. On or about July 25, 2002, pursuant to the terms of the Loan Agreement, Gitto Global, LaSalle and Fleet National Bank ("Fleet Bank") entered into a Three-Party Blocked Account Service Agreement, which was replaced by a substantially similar Three-Party Blocked Account Service Agreement on or about February 21, 2003 (collectively "Blocked Account

---

* The citations are to documents included in the Appendix of Documents in Support of Plaintiff's Motion for a Preliminary Injunction being filed with the Motion. In some instances the documents are copies of documents filed in the related case of *LaSalle Business Credit, LLC. V. Gary C. Gitto, et al.* Case No. 04-12227-DPW, of which the Court can take judicial notice.

Agreement"). Pursuant to the terms of the Blocked Account Agreement, Gitto Global established a deposit account at Fleet ("Fleet Blocked Account"). (Stillwell 10/21/04 Aff., ¶¶ 10-12)

7. The Blocked Account Agreement provided that, on a daily basis, and as Gitto Global received payments of invoices, Gitto Global was to deposit the payments directly into the Fleet Blocked Account. Also on a daily basis, Fleet Bank was to deposit the funds from the Fleet Blocked Account to LaSalle to pay down the LaSalle revolving loan. (Stillwell 10/21/04 Aff., ¶ 13) As funds were applied to the LaSalle revolving loan, LaSalle advanced funds to Gitto Global through the loan disbursement account Gitto Global maintained at LaSalle. (Stillwell 10/21/04 Aff., ¶¶ 19, 21; Stillwell 12/6/04 Aff., ¶ 3)

### The Operation of the Check-kite Scheme

8. From July 25, 2002 through September 15, 2004, Gitto Global submitted to LaSalle daily borrowing base certificates, together with Gitto Global's purported sales, cash receipts, inventory valuation and other substantiation for loan funds. (Stillwell 10/21/04 Aff., ¶¶ 20, 25-27, 35) These borrowing base certificates were false and overstated Gitto Global's sales and other information. (Stillwell 12/06/04 Aff., ¶ 23; Stillwell 10/21/04 Aff., ¶¶ 25-37, 40-41)

9. LaSalle relied upon the representations in the borrowing base certificates to make loan advances to Gitto Global. (Stillwell 10/21/04 Aff., ¶¶ 20, 37)

10. A major portion of the purported sales supporting the borrowing base certificates was for sales that had never occurred. These sales were to fictitious customers who had been created by individuals at Gitto Global. During the period July, 2002 through September, 2004, Gitto Global represented to LaSalle that the cumulative total amount of its sales was

$1,101,204,678 when they actually were only $73,698,029—a difference of $1,027,506,649. (Stillwell 10/21/04 Aff., ¶ 39)

11. Gitto Global created a picture of increasing sales for its borrowing base certificates through a check-kiting scheme in which it deposited over 600 checks in the Fleet Blocked Account from J&J Chemical drawn on its account at Clinton Bank. The total cumulative amount of the deposits of J&J Chemical checks was $1,104,501,539. (Stillwell 10/21/04 Aff., ¶¶ 16-17, 38) Fleet Bank, on a daily basis, transferred the funds from the Fleet Blocked Account to a controlled disbursement account for Gitto Global at LaSalle, which LaSalle applied to pay down the LaSalle revolving loan. (Stillwell 10/21/04 Aff., ¶ 18) When this occurred, LaSalle, on a daily basis, advanced funds to Gitto Global in reasonable reliance upon Gitto Global's requests and the information in the borrowing base certificates. (Stillwell 10/21/04 Aff., ¶ 19-20)

**J&J Chemical**

12. J&J Chemical was not a legitimate company. It was a mailing address and telephone number at the home of a friend of one of the principals of Gitto Global. The friend was paid $5,500 a month to receive the mail and deliver it to Gitto Global. (Tersigni Aff. ¶¶ 22-25)

13. J&J Chemical was owned by Frank Miller, one of the owners of Gitto Global. (Stillwell 10/21/04 Aff., ¶ 4)

14. The J&J Account was opened at Clinton Bank in February, 2001. (CSB 1)

15. Frank Miller was a corporator of Clinton Bank (*i.e.*, an individual who represents the community for the bank). (Tenaglia Dep., p. 76)

**The Tradex Mortgage**

16. Clinton Bank's policy was to allow customers to draw against uncollected funds. (Tenaglia Dep., p. 11)

17. In late October, 2003, Clinton noticed that amounts of approximately $2.5 million were being deposited in and withdrawn from the J&J Account on a daily basis such that Clinton Bank was in effect extending significant credit to J&J Chemical on the uncollected funds. (Tenaglia Dep., pp. 20-23; Paulhus Dep., pp. 7-8)

18. In December, 2003, representatives of Clinton met with Frank Miller, the owner of J&J Chemical, to review the activity in the J&J Chemical Account. Miller explained that funds were being transferred between J&J Chemical and Gitto Global for licensing reasons. Clinton did not understand the explanation given by Miller. Miller told Clinton Bank's representatives that the company was going to be sold right after the first of the year and the J&J Account would then be closed, ending the activity the bank had observed. (Paulhus Dep., pp. 11-13)

19. In early 2004, Clinton Bank monitored the J&J Chemical Account daily and observed daily activity of $2-3 million. Clinton Bank was also aware that all checks deposited were drawn on Gitto Global whose account was at LaSalle Bank and all checks written were payable to Gitto Global. (Paulhus Dep., pp. 100-101; Tenaglia Dep., pp. 30-31) Clinton Bank continued to allow this activity on uncollected funds because of Miller's explanation about the need to transfer funds between Gitto Global and J&J Chemical. (Tenaglia Dep. p. 38)

20. In March, 2004, the amount of money going to the J&J Chemical Account was of concern to Clinton Bank. (Tenaglia Dep., p. 30) By April, 2004, the dollar amount of the

activity ($3.5 million a day) in the J&J Chemical Account required that Clinton Bank borrow money from the Federal Reserve to cover the daily activity. (Tenaglia Dep., pp. 35-36, 67-69)

21.  In a memorandum dated May 3, 2004, a Clinton Bank employee noted that a review of the J&J Account activity for April indicated that to her, "a novice," Miller was "still 'playing' games." The employee further noted: "I have printed the activity from April 30th when he had check deposits that totaled 6,758,505 and checks waiting to be cleared (presented the night before but unable to clear) for 3,362,633. 3,762,705 of the checks were deposited in the ATM at 5:55 pm April 29th. The remainder was deposited by a teller on the 30th at 5:50 pm." (Rein Dec. Ex. CSB 101)

22.  On May 18, 2004, a Clinton Bank employee commented upon Miller's position that a sale of Gitto Global would resolve Clinton Bank's concerns about the J&J Account: "I do not see what his Kiting (let's call a spade a spade) has to do with the sale of his business." (Rein Dec. Ex. CSB 102)

23.  In July, 2004, Miller sought to satisfy Clinton Bank's concerns about payment for the millions of dollars that flowed through the J&J Chemical account on uncollected funds. (CSB 10) He advised that Gitto Global (the source of all of the checks deposited by J&J Chemical) was going to be acquired by Vitrotech on August 15, 2004. (Tenaglia Dep., pp. 25-26; Paulhus Dep., p. 74) On July 23, 2004, J&J Chemical and Clinton Bank entered into an $8.4 million revolving line of credit agreement, the sole purpose of which was to provide protection for payments made on uncollected checks deposited to the J&J Chemical Account until the acquisition of Gitto Global that was to occur August 15, 2004. The initial term of the loan was to August 15, 2004. On August 18, 2004 the loan was extended to September 15, 2004. (CSB 10, CSB 15, CSB 18, CSB 33; Paulhus Dep., pp. 67-68; Tenaglia Dep., pp. 59-63)

24. Charles Gitto attended the closing in July, 2004 of the Clinton Bank loan. (Paulhus Dep., pp. 41-42) As president and treasurer of Tradex, Charles Gitto had Tradex provide to Clinton Bank as security for the line of credit facility a limited non-recourse guarantee (CSB 32), the Tradex Mortgage on the property rented by Gitto Global (the "Mortgaged Property") (CSB 34; Paulhus Dep., pp. 29-32, 60-61) and a security interest in certain inventory. (CSB 35)

25. The Mortgaged Property is Tradex's only significant asset. [In a supplement to a personal financial statement of Charles Gitto, as of January 31, 2000, the financial condition of Tradex Acquisition Corp., Tradex's name at the time, was set out. That financial statement discloses that the Mortgaged Property was the only substantive asset of Tradex, other than a note from Gitto Global for $371,143 and $4,499 in cash. (Rein Dec. Ex. C. p. 3)]

26. Based upon the proof, Tradex did not receive reasonably equivalent value from Clinton in exchange for its grant of the mortgage. The revolving loan to J&J Chemical had nothing to do with Tradex. At the time Tradex granted the mortgage, it believed or should have believed that it would incur debts beyond its ability to pay when they became due. Clearly, the grant of the mortgage constituted a fraudulent transfer as to LaSalle under Section 5 of the Uniform Fraudulent Transfer Act.

27. Charles Gitto was involved in the fraud being perpetrated on LaSalle. By providing the Tradex Mortgage, Charles Gitto made Tradex a participant in the conspiracy to defraud LaSalle that had been operating through Gitto Global. Tradex's conduct in knowingly providing the Tradex Mortgage to further the Check-kite scheme made it liable to LaSalle for the losses LaSalle suffered from the scheme.

28. Charles Gitto was the chairman of Gitto Global's board and played a prominent role in the operations of Gitto Global. (Snyder Aff. Ex. A; DeLisle Aff., ¶2). Since 1997, he conducted the company's production meetings, which were held daily during the period LaSalle advanced funds. (Merchant Aff., ¶8; Minardi Aff., ¶6; FM-01-00071) At these meetings, Charles Gitto discussed various aspects of the company's sales and orders. He also set the production and product delivery schedules. (Minardi Aff., ¶6) Charles Gitto knew who Gitto Global's actual customers were and was familiar with their needs. (DeLisle Aff., ¶6)

29. Gitto Global had been matching J&J Chemical checks to generate check-kite funds for fictitious customer invoices as a standard operating procedure since at least 2001. (Stillwell 12/6/04 Aff. ¶ 9)

30. In May, 2002, Gitto Global had a revolving credit loan from Guaranty Business Credit of Dallas, Texas. ("GBC"). At that time, GBC proposed that Gitto Global provide a reserve of $2 million based on the satisfactory performance of Gitto Global's accounts receivable. Also, GBC renewed its request for financial information "regarding several of your debtors for which public information was not available." Charles Gitto corresponded with GBC on this matter. (Rein Dec. Exs. A and B)

31. During the course of that correspondence, Charles Gitto, on or about May 24, 2002, provided GBC with a letter concerning an accompanying 3-page summary aging of Gitto Global's accounts receivable. In the letter, Charles Gitto states he is providing a summary of Gitto Global's accounts receivable aging, which showed "there are no receivables of consequence going over 90 days on May 31." Among the purported customers on the list with the largest amounts due for purchases were: Hitachi Cable, Inc. ($3,065,672.89), Hemisphere Dist. Corp. ($3,013,801.75) Zebulon Industries ($2,780,545.60), J/Tan Sales & Marketing

($2,743,746.05), Velco Chemicals, Inc. ($2,688,013.15), and Colors Compounds & Consultants ($1,079,586.29). (Snyder Aff. Ex. A) These are the same fictitious customers that were used to evidence fictitious sales supporting the borrowing base certificates presented to LaSalle. (Snyder Aff. Ex. A, Stillwell Aff. 10/21/04 Aff,. ¶¶ 28-34)

32. With his intimate knowledge of Gitto Global's customers, Charles Gitto must have known that the information he was submitting to GBC was false and that the reason why none of the fictitious customers was behind in payment was because J&J Chemical checks were being used to cover their purported purchases. The reasonable inference from Charles Gitto's letter, which was just two months before Gitto Global's Loan Agreement with LaSalle, is that Charles Gitto knew Gitto Global was fabricating its accounts receivable with nonexistent sales to obtain loans.

33. In connection with the extension of the $8.4 million line of credit to September 15, 2004 (for which Clinton charged a fee of $40,000), Charles Gitto, on or about August 18, 2004, executed a letter agreement in which it was represented that Clinton Bank would be provided with certain financial information of Gitto Global: "all financial information provided by Gitto Global Corporation to LaSalle Business Credit, Inc. (or any other party) from May 1, 2004 to August 23, 2004 pursuant to Sections 9(b) and 9(c) of that certain Loan and Security Agreement dated July 25, 2002; to the extent the same has been provided to LaSalle or any other party." (Rein Dec. Ex. CSB 106) Thus, Charles Gitto knew that LaSalle was lending money to Gitto Global and that lending relationship involved the J&J Chemical Account.

**The Collapse of the Check-Kite and Damage to LaSalle**

34. On September 24, 2004, Gitto Global filed for bankruptcy. (Stillwell 10/21/04 Aff., ¶14)

35. In September, 2004, Clinton Bank dishonored $11,890,588 in checks drawn on the J&J Chemical Account that Gitto Global had deposited in the Fleet Blocked Account, resulting in an overdraft and damage to LaSalle in that amount. (Stillwell 10/21/04 Aff., ¶¶ 14, 49-51)

## Conclusion

Based upon the foregoing facts, Plaintiff, LaSalle Business Credit LLC, requests that the Court enjoin Defendant, Clinton Savings Bank, from selling the subject real estate at an auction sale on February 16, 2005 and grant such other and further relief as is just and equitable.

Dated: February 11, 2005

Respectfully submitted,

LASALLE BUSINESS CREDIT, LLC

By: _____
One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
Phone: (617) 367-9500
Fax: (617) 742-1788

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served by overnight delivery service on February 11, 2005, upon counsel for the defendant.

_____
Patrick W. Manzo

286826.2 042314-34311

- 11 -