UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a LASSALE BUSINESS CREDIT, INC., <br><br>      Plaintiff <br><br>  v. <br><br>CLINTON SAVINGS BANK, <br><br>      Defendant | Case No. 05-CV10268-DPW |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

      Clinton Savings Bank, a Massachusetts savings bank established under the laws of the Commonwealth of Massachusetts ("Defendant"), hereby enters its opposition to the Motion of LaSalle Business Credit, LLC f/k/a LaSalle Business Credit, Inc. ("Plaintiff") for a Preliminary Injunction (the "Motion"), on the grounds (i) that the Plaintiff has adequate remedies at law; (ii) that these remedies available to the Plaintiff protect it from any harm if the Motion is denied; and (iii) that the Plaintiff is unable to demonstrate any likelihood of success on the merits of its claims in this action. In support of this Opposition, Defendant respectfully states as follows:

**Background Facts**

      1.      During July, 2002, the Plaintiff entered into a Loan and Security Agreement with Gitto Global Corporation ("Gitto Global") in which the Plaintiff made a revolving loan to Gitto Global of up to 85% of the face amount of Gitto Global's eligible accounts receivable.

      2.      Kingsdale Corporation and J&J Chemical Corporation are both Massachusetts corporations that share equity ownership with Gitto Global, and are therefore affiliates of Gitto Global.

      3.      Gitto Global filed a petition for relief from its creditors under chapter 11 of title 11 of the United States Code on September 23, 2004. Shortly before the bankruptcy filing, Gitto

Global's existing officers and directors resigned, leaving the reorganization consulting firm of Argus Management, Inc. in effective control of Gitto Global. On October 19, 2004, this Court entered an order appointing Charles L. Glerum and the law firm of Choate, Hall & Stewart to serve as the Chapter 11 Examiner of Gitto Global.

4. Based on evidence that has come to light in the context of Gitto Global's bankruptcy proceeding, it appears that Gitto Global received advances from its revolving loan with the Plaintiff that were based on a borrowing base that was comprised of fictitious accounts receivable and over-valued inventory. It does not appear that the Plaintiff took any measures to ensure that Gitto Global's accounts receivable were legitimate, or to ensure that its inventory had the value that Gitto Global claimed.

5. During the relevant time period, the Defendant had a policy of allowing its customers to draw checks upon uncollected funds. The Defendant would pay checks drawn by the customer when those checks were presented for payment, even though the customer's accounts did not contain funds sufficient to cover the checks, based on new deposits that had not yet cleared.

6. Based on evidence that has come to light in the bankruptcy proceeding, it appears that Gitto Global used the advances received under its revolving loan from the Plaintiff to make payments to an affiliate, Kingsdale Corporation ("Kingsdale"), which payments were deposited into Kingsdale's account with the Defendant. Kingsdale was also known under the name "J&J Chemical Corporation."

7. Finally, the evidence that has come to light in the bankruptcy proceeding suggests that the funds were paid by J&J Chemical/Kingsdale to Gitto Global, into a blocked account maintained by Gitto Global with Fleet National Bank. Each day, the balance of the blocked

account was transferred by Fleet Bank to the Plaintiff to be applied to the Plaintiff's revolving loan to Gitto Global.

8. In late 2003 and early 2004, the Defendant became concerned about the volume of the transfers among Gitto Global, Kingsdale Corp. d/b/a J&J Chemical.  The Defendant had several communications with Frank Miller, who was in control of Kingsdale Corp.  Mr. Miller provided an explanation for the transfers that, at the time, appeared to be reasonable to the Defendant.

9. Eventually, the Defendant notified Mr. Miller that, unless activity decreased or collected deposits increased in Kingsdale's account with the Defendant, the Defendant would close the account.  Mr. Miller explained that the arrangement had to be maintained in order to facilitate the sale of Gitto Global and the real estate owned by Tradex to a California company, Vitrotech Corporation.  As evidenced by the internal Clinton Savings Bank memorandum regarding Kingsdale (produced in discovery) and attached to the Plaintiff's documents as a portion of <u>Exhibit 11</u>, and as testified to by Mr. Robert J. Paulhus, Jr. in his deposition, a portion of which was attached to the Plaintiff's documents and the entirety of which is attached hereto as <u>Exhibit A),</u> the Defendant refrained from closing the Kingsdale bank account in order to facilitate this sale.

10. The Defendant, like every other creditor of Gitto Global and its affiliates, was duped by Mr. Miller's misrepresentations and the fraudulent activity of Gitto Global and its affiliates.

11. In order to accommodate Mr. Miller's requests that the Kingsdale account remain open, the Defendant required that Kingsdale's obligations to the Defendant in connection with its bank account be supported by guarantees and secured by collateral.  Among the guarantees

provided to the Defendant was that of another affiliate of Gitto Global, Tradex Corporation ("Tradex"), the owner of the real estate on which Gitto Global's manufacturing facilities are located and the lessor of those facilities to Gitto Global. A copy of Tradex's amended guaranty of Kingsdale's obligations is attached hereto as <u>Exhibit B</u>. Tradex's guaranty of Kingsdale's obligations to the Defendant was secured by a mortgage encumbering the real estate upon which Gitto Global has its manufacturing facilities. By providing the guaranty to the Defendant, secured by the mortgage, Tradex secured the continued existence of its single tenant, Gitto Global, and thus temporarily preserved the income stream from Gitto Global's payments on account of rent.

12. In early autumn of 2004, the fraudulent scheme orchestrated by Gitto Global, its principals and affiliates collapsed. Kingsdale proved unable to meet its obligations to the Defendant. Defendant has accordingly taken action to enforce Tradex's guaranty of Kingsdale's obligations to the Defendant.

13. The Plaintiff, which obtained a judicial attachment of Tradex's assets after Tradex granted the mortgage to the Defendant, now seeks to enjoin the Defendant from enforcing that mortgage on the grounds that the granting of the mortgage was fraudulent under Massachusetts law as to the Plaintiff as a creditor of Tradex.

14. The Bank has obtained an appraisal of the Premises, which is attached hereto as <u>Exhibit C</u>, and which indicates that as of October 11, 2004, the value of the Premises was $2,730,000.00. The holder of the first mortgage on the Premises has indicated that as of February 3, 2005, the total amount outstanding thereunder was $1,230,674.00. The net equity in the Premises, therefore, is approximately $1,500,000.00. The Bank anticipates recovering approximately $1,300,00.00 to $1,400,000.00 from a foreclosure of the Mortgage.

**Argument**

15. In order to prevail on a motion for preliminary injunction, the party seeking that injunction has the burden of demonstrating: (i) that the party seeking the preliminary injunction will likely succeed on the merits of its claim; (ii) that, without the preliminary injunction, the party seeking injunctive relief will suffer irreparable harm; (iii) that the balance of equities favors the issuance of the preliminary injunction; and (iv) that the issuance of the preliminary injunction is consistent with public policy. See Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 (1st Cir. 2003). In this case, the Plaintiff is not entitled to the requested preliminary injunction because, contrary to the Plaintiff's underlying claims, the granting of the mortgage by Tradex to the Defendant is not recoverable as a fraudulent transfer, and because the Plaintiff has an adequate remedy at law—a potential claim for money damages. See id.

I. **The Court should deny the Plaintiff's Motion for Preliminary Injunction because the Plaintiff cannot show that it is likely to succeed on its fraudulent transfer claim against the Defendant.**

   A. <u>The Plaintiff cannot show likelihood of success on the merits of its fraudulent transfer claim because Tradex received reasonably equivalent value in exchange for its mortgage and guaranty of Kingsdale's obligations to the Plaintiff.</u>

16. The Court should deny the Plaintiff's Motion for Preliminary Injunction because the Plaintiff is unlikely to demonstrate that Tradex did not receive reasonably equivalent value in exchange for its guaranty and mortgage. See Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823, 830 (5th Cir. 1959); In re Burry, 309 B.R. 130, 138 (Bankr. E.D. Pa. 2004). Tradex granted a mortgage on its property in exchange for the Defendant's forbearance from closing Kingsdale's bank account. Tradex received two benefits from this exchange. First, by inducing the Defendant to refrain from closing the Kingsdale bank account, Tradex ensured that its tenant, Gitto Global, would be able to make its monthly rent payments, thus enabling Tradex to make its

mortgage payments on the property occupied by Gitto Global. Second, by inducing the Defendant to refrain from closing the Kingsdale bank account, Tradex preserved the opportunity to complete the sale of its real estate in conjunction with the sale of Gitto Global to Vitrotech Corporation. See id.

17. A transferor receives reasonably equivalent value in exchange for a transfer, even if it is not the direct beneficiary of the consideration given for the transfer, if the transferor receives an indirect benefit of reasonably equivalent value. See Burry, 309 B.R. at 138.[1] The Burry court explained:

> Even though the debtor makes a transfer, or incurs an obligation for consideration that moves (in form or substance) directly to a third person, the debtor nevertheless receives value if she receives an economic benefit indirectly (in form or substance). The consideration need not flow directly to her to satisfy the value component of reasonably equivalent value. Value requires only that the transfer result, whether directly or indirectly, in economic benefit to her. For example, the debtor gets value though not necessarily reasonably equivalent value as an indirect beneficiary of economic benefit running directly to someone else where: … the debtor and the other person share an identity of economic interest so that the debtor got some or all of the direct benefit straightforwardly even though, in form, it passed only to the other person because what benefits one will benefit the other. Id. at 139.

18. The receipt of an indirect benefit--- i.e., a benefit conferred upon an entire enterprise-- has lead other courts to determine that a transferor received reasonably equivalent value for a transfer. See Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823, 830 (5th Cir. 1959). In Mayo, an individual borrowed money on a short-term basis from a bank, and deposited the money into a corporation, which was 100% owned by the individual, in return for stock. See id. at 828-29. The existence of the cash in the corporation's bank account enabled the corporation

to qualify financially for a construction bond. After the corporation qualified for the bond, the individual caused the corporation to repay the loan. See id. When the enterprise failed, the bankruptcy estate of the corporation sought the return of the funds from the bank, arguing that the corporation did not receive reasonably equivalent value in the exchange. The court held that the corporation benefited from the transaction, even though consideration did not flow directly to the corporation, because the corporation was enabled to receive a bond that it would not otherwise have received, and rightfully should not have received. See id.; see also In re Lawrence Paperborad Corp. v. Arlington Trust Co., 76 B.R. 866, 872 (recognizing that an indirect benefit can be reasonably equivalent value received for a cross-stream guaranty); In re Ear, Nose, and Throat Surgeons of Worcester v. Guaranty Bank & Trust (In re Ear Nose and Throat Surg.), 49 B.R. 316, 320 (recognizing potential indirect benefit received as a portion of a single economic unit can be reasonable equivalent value for a transfer).

19.    Like the transferor corporation in Mayo, Tradex received value in return for the mortgage and guaranty granted to the Defendant in this case. See id. By making the guaranty and giving the mortgage, Tradex induced the Defendant to refrain temporarily from closing Kingsdale's bank account, which allowed Gitto Global to continue to operate, which, in turn, allowed Tradex to continue to receive rent from Gitto Global. Moreover, it was the Defendant's understanding at the time that the Defendant's forbearance from closing the Kingsdale bank account would facilitate the sale of the entire enterprise as a going concern to Vitrotech, including the real estate owned by Tradex. Thus, although Tradex did not directly receive consideration from the Defendant on account of the guaranty and mortgage, it did directly receive an economic benefit. The Plaintiff, therefore, cannot show that it will likely succeed on

---

[1] The Burry court interpreted Pennsylvania's version of the Uniform Fraudulent Transfer Act, which is intended to be interpreted uniformly among the jurisdictions that adopt it. See Mass. Gen. Laws ch. 109A, § 12 (UFTA to be

its claim that Tradex did not receive fair value in exchange for the mortgage, and the Motion for Preliminary Injunction should accordingly be denied.

> B.   The Plaintiff cannot show likelihood of success on the merits because it has not adequately demonstrated that it is a creditor of Tradex.

20.   The Court should deny the Plaintiff's Motion for Preliminary Injunction because the Plaintiff has not demonstrated that it is a creditor of Tradex, and therefore will not have standing to recover an allegedly fraudulent transfer made by Tradex.  Section 8 of the Massachusetts Uniform Fraudulent Transfer Act, for example, specifies that only a *creditor* may seek recovery of or avoidance of qualifying transfers.  See MASS. GEN. LAWS ch. 109A, § 8 (2004); see also Hoult v. Hoult, 862 F.Supp. 644, 646 (D. Mass. 1994).  A "creditor" is defined by the statute to be the holder of a "claim," and a claim is a "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." MASS. GEN. LAWS ch. 109A, § 2.  Thus, in order to prevail on its Motion for Preliminary Injunction, the Plaintiff must demonstrate that it is likely to be successful on its claim against Tradex.  See Narragansett Tribe, 334 F.3d at 166.

21.   The Plaintiff has not demonstrated that it is likely to be successful on its underlying claim against Tradex.  In its action against Tradex and numerous other defendants, the Plaintiff has filed a number of documents, including an Affidavit of Matthew Stillwell and an Ex Parte Motion for Real Estate Attachment of Real Property of Defendants.  Although these documents describe a pattern of misrepresentations and deceptions perpetrated by a number of parties, they do not establish or reference any specific conduct by Tradex that supports a claim against Tradex in favor of the Plaintiff.  An unsupported allegation that Tradex was involved in

---

construed in order to make its application uniform across the adopting jurisdictions.)

the fraudulent activity of others is not a sufficient basis to show that the Plaintiff is the holder of a claim against Tradex, as defined by the statute. See MASS. GEN. LAWS ch. 109A, § 2.

**II.     The Plaintiff is not entitled to a preliminary injunction because it has not suffered irreparable harm; the Plaintiff's legal remedies can accurately and adequately compensate it for its alleged injuries.**

22.     The Court should deny the motion for preliminary injunction because the Plaintiff cannot demonstrate that it is not adequately protected by available legal remedies. Fed. R. Civ. P. 65(a), as interpreted in the First Circuit, "places the burden of demonstrating that a denial of interim relief would cause irreparable harm squarely on the movant." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir.1996). The burden is usually met "if the plaintiff shows that its legal remedies are inadequate." Id.

23.     With respect to legal remedies, "[h]istorically, equity would not supply relief where legal remedies sufficed." Ocean Spray Cranberries, Inc. v. PepsiCo, Inc., 160 F.3d 58, 61 (1st Cir.1998). This theory of law has survived and it is well established in the First Circuit that to demonstrate a risk of irreparable harm, a plaintiff must show that it has experienced "a substantial injury that is not accurately measurable or adequately compensable by money damages." Id. at 19. See also, Leisure Time Cruise Corporation v. Town of Barnstable, 62 F.Supp.2d 202, 210 (D.Mass.1999).

24.     There are rare instances in which "injunctive relief…may ordinarily be granted…where monetary damages will not afford complete relief." Ocean Spray at 61. An injunction will be granted in situations involving agreements to sell real property, or where there is a "unique or fleeting business opportunity." Starlight Sugar, Inc. v. Soto, 114 F.3d 330, 332 (1st Cir.1997). Nonetheless, courts are reluctant to grant injunctions in these circumstances unless "the defendants' proposed actions would have had an immediate adverse effect on the

plaintiffs." <u>Ocean Spray</u> at 63. The <u>Ocean Spray</u> court cited construction of an obstructing building or the cut-off of supplies as examples of immediate adverse effects.

25.     The value of the mortgage that is the object of the motion for preliminary injunction can be measured and has been estimated to be approximately one million three hundred thousand dollars ($1,300,000.00). This is an insignificant percentage of the eleven million dollar ($11,000,000.00) complaint LaSalle filed against the Bank. With its claim for treble damages, LaSalle claims to be entitled to damages in the amount of thirty-three million dollars ($33,000,000.00) if it were to succeed on the merits.

26.     Thus, the value that the Plaintiff might expect to receive from Tradex's real estate constitutes about three percent of its total claimed damages, assuming that the Plaintiff can avoid the granting of the second mortgage to the Defendant. The Plaintiff is thus in a position to be more than adequately compensated in the event it succeeds and the preliminary injunction is not granted. Additionally, this is not a circumstance in which monetary damages will not afford complete relief. There will not be an immediate adverse effect on LaSalle if the motion for preliminary injunction is not granted.

27.     The value of the mortgage and alleged injury may be accurately measured and with the potential of treble damages the Plaintiff's legal remedies are more than adequate to protect its interests; therefore, the Plaintiff cannot show it will suffer irreparable harm in the absence of an injunction, and the Court should accordingly deny the Plaintiff's Motion for Preliminary Injunction.

**III.    The Court should deny the Plaintiff's Motion for Preliminary Injunction because the balance of the equities do not favor the issuance of the preliminary injunction.**

28.     The Court should deny the Plaintiff's Motion for Preliminary Injunction because the granting of the injunction would harm the Defendant far more than the denial of the preliminary injunction would harm the Plaintiff.  See Narragansett Tribe, 334 F.3d at 166.

29.     In the first instance, as discussed above, the Plaintiff has an adequate remedy at law if it succeeds on its claims against the Defendant: it can obtain a money judgment against the Defendant.  If the Plaintiff is successful, it is likely to do this anyway, because its claim for damages far exceeds the potential $1,300,000 value of the property.  The Defendant, on the other hand, has expended considerable time and resources in preparing for the foreclosure sale of Tradex's property.  If this Court issues the preliminary injunction, then the Defendant would be compelled to restart the foreclosure proceedings, and thus lose much of the expense incurred in setting the property for foreclosure on Wednesday, February 16, 2005.  Thus, if the injunction is entered, the Defendant is certain to sustain a financial loss, but if the injunction is not entered, the Plaintiff will be able to recover this small fraction of its overall damages as monetary damages from the Defendant.

30.     Second, although the Plaintiff has made allegations that the Defendant's conduct with respect to the Kingsdale bank account caused the Plaintiff to incur losses on its credit facility with Gitto Global, it was the Plaintiff's negligence in overseeing its own borrower that enabled Gitto Global and its affiliates to begin operating their scheme.  For example, the Plaintiff failed to conduct reasonable accounts receivable audits of Gitto Global, even though the accounts receivable formed a large measure of the Plaintiff's collateral.  In his affidavit, attached to the Plaintiff's Motion as Exhibit 1, Matthew Stillwell describes the Plaintiff's accounts receivable audit of Gitto Global:

> …the examiner requested telephone verifications of Gitto Global's
> accounts receivable balance and on July 25, 2002, William Deakon

> (an employee of Gitto Global) represented to the examiner that he called the top seven customers of Gitto Global…; however, the examiner <u>was not on the phone with William Deakon</u>. William Deakon represented to the examiner that the people with whom he spoke verified the accounts receivable. William Deakon did not call those top seven customers—he misrepresented his actions to the examiner to further the check-kiting and fraud schemes.
>
> Affidavit of Matthew Stillwell (Exhibit 1 to the Plaintiff's Motion) at ¶ 45.

Had the Plaintiff engaged in any due diligence with respect to the legitimacy of its collateral, Gitto Global would not have been in a position to conduct its apparently fraudulent activity. It is inequitable for the Plaintiff to argue that the Defendant is liable because it was duped in this matter, when the Plaintiff was likewise duped even though the Plaintiff was in a better position to recognize the fraudulent activity.

31.   Because the issuance of the preliminary injunction would unfairly cause the Defendant a financial loss, and because the issuance of the injunction would unfairly permit the Plaintiff to punish the Defendant for acts or omissions similar to the Plaintiff's acts or omissions in this matter, this Court should deny the Plaintiff's Motion for Preliminary Injunction. See id.

**Conclusion**

32.   For the reasons stated above, the Defendant requests that this Court deny the Plaintiff's Motion for Preliminary Injunction.

-13-

WHEREFORE, Defendant Clinton Savings Bank respectfully requests that this Court enter an order (i) denying Plaintiff LaSalle Business Credit LLC's Motion for Preliminary Injunction; (ii) permitting the Defendant to conduct the foreclosure sale of Tradex's real property as scheduled, and (iii) granting such other relief as is just and proper.

    Respectfully submitted,

    CLINTON SAVINGS BANK

    By its attorneys,

    /s/ Kevin C. McGee
    J. Robert Seder (BBO# 450260)
    Kevin C. McGee (BBO#548923)
    Paul J. O'Riordan (BBO# 552786)
    Philip F. Coppinger (BBO# 641664)
    Seder & Chandler
    339 Main Street
    Worcester, MA 01608
    (508) 757-7721

Dated: February 14, 2005
    Worcester, Massachusett