UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC, f/k/a
LASSALE BUSINESS CREDIT, INC.,

Plaintiff

v.

CLINTON SAVINGS BANK,

Defendant

Case No. 05-CV10268-DPW

**EXHIBITS A TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

Part 1 of 2

```
 1            UNITED STATES DISTRICT COURT

 2

 3            DISTRICT OF MASSACHUSETTS

 4    - - - - - - - - - - - - - - - - -

 5    LaSALLE BUSINESS CREDIT, LLC, f/k/a

 6    LaSALLE BUSINESS CREDIT, INC.,

 7                      Plaintiff,

 8

 9      v.                      Civil Action

10                      No.  04-2227-DPW

11    GARY C. GITTO, ET AL,

12                      Defendants.

13    - - - - - - - - - - - - - - - - -  VOLUME I

14                              PAGES 1-121

15            DEPOSITION of ROBERT PAULHUS, a

16    witness called by counsel for the Plaintiff,

17    taken pursuant to Rule 30 of the Massachusetts

18    Rules of Civil Procedure before Lorraine S.

19    Foley, Registered Professional Reporter and

20    Notary Public in and for the Commonwealth of

21    Massachusetts, at the Offices of Craig and

22    Macauley, 600 Atlantic Avenue, Boston,

23    Massachusetts, on December 1, 2004, commencing

24    at 12:25 p.m.
```

Page 2

1  A P P E A R A N C E S:
2
3  SCHWARTZ, COOPER, GREENBERG & KRAUSS
4    Eric (Rick) S. Rein, Esquire
5    180 North LaSalle Street, Suite 2700
6    Chicago, Illinois 60601
7    rrein@scgk.com
8    On Behalf of the Plaintiff
9
10  STERN, SHAPIRO, WEISSBERG & GARIN, LLP
11    Max D. Stern, Esquire
12    90 Canal Street
13    Boston, Massachusetts  02114
14    mdstern&sswg.com
15    On Behalf of Gary Gitto
16
17  PERKINS SMITH & COHEN
18    Juliane Balliro, Esquire
19    One Beacon Street
20    Boston, Massachusetts  02108
21    jballiro@pscboston.com
22    On Behalf of Charles Gitto and Tradex Corp.
23
24

Page 4

1              I N D E X
2  Deposition of: Direct Cross Redirect Recross
3  ROBERT PAULHUS
4  BY MR. REIN:      5
5  BY MR. STERN:           102
6  BY MS. BALLIRO:         102
7
8
9            E X H I B I T S
10  No.                              Page
11
12  57  Letter of 8/26/04              97
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1  SEDER & CHANDLER
2    Darragh K. Kasakoff, Esquire
3    339 Main Street
4    Worcester, Massachusetts  01608
5    On Behalf of the Deponent
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1              P R O C E E D I N G S
2        MR. REIN:  Same agreements concerning
3  objections and signing and reviewing the
4  transcript?
5        MR. KASAKOFF:  Correct.
6
7        ROBERT PAULHUS,
8
9  a witness called for examination by counsel for
10  the Plaintiff, being first duly sworn, was
11  examined and testified as follows:
12
13        DIRECT EXAMINATION
14  BY MR. REIN:
15  Q. Mr. Paulhus, would you please state your full
16    name for the record?
17  A. Robert Joseph Paulhus, Junior.
18  Q. Spell your last name.
19  A. P, as in Peter, A U L H U S, as in Sam.
20  Q. And what is your home address?
21  A. Ten Larcridge, L A R C R I D G E, Lane in
22  .  Ashland, Mass.  01721.
23  Q. And your currently position at Clinton Savings
24    Bank is what?

Page 6

1   A.  Vice president commercial lending.
2   Q.  How long have you held the position of vice
3       president of commercial lending?
4   A.  At Clinton Savings Bank, a little over five
5       years.
6   Q.  How long have you been employed by Clinton
7       Savings Bank?
8   A.  A little over five years.  September of '99 is
9       when I joined the bank.
10  Q.  How many years have you been working in the
11      banking industry?
12  A.  As of last June, 22 years.
13  Q.  And with whom were you employed?  Just identify
14      the financial institutions prior to Clinton
15      Savings Bank.
16  A.  Most recently prior to Clinton Savings Bank, it
17      was First Massachusetts Bank.  Prior to that it
18      was Shawmut Bank and several of the predecessor
19      banks.  There were mergers.
20  Q.  As vice president of commercial lending, what
21      are your duties and responsibilities there?
22  A.  Primarily to manage, grow and grow the
23      commercial loan portfolio component of the
24      bank's business.

Page 7

1   Q.  When did you first become familiar with a
2       customer, Kingsdale Corporation?
3   A.  The name Kingsdale, I think I first became
4       aware of in the early fall of 2003.
5   Q.  And how did that come about?
6   A.  Primarily through hallway conversations.  I was
7       asked if what we understood the activity to be
8       in their account to be something that I had
9       come across in the past as a commercial loan
10      officer.
11  Q.  Who asked you this?
12  A.  Primarily Michael Tenaglia.
13  Q.  What did you respond to Mr. Tenaglia?
14  A.  Based on his explanation of the activity, I
15      said that it did not make -- I believe I made
16      the response that it didn't make sense to me,
17      that I couldn't understand it.
18  Q.  What did he explain to you was the activity?
19  A.  He indicated on a very frequent basis, almost
20      daily, that large deposits were being made into
21      this Kingsdale account that we had at the bank,
22      and on the same day almost the same amount of
23      dollars were presented for payment against that
24      account to a related entity and that it was

Page 8

1       supposedly -- it required, because of certain
2       competitive and licensing agreements that the
3       two entities had in their line of business that
4       required them to conduct certain sales and
5       activities through one or the other entity.
6   Q.  After you had this conversation with
7       Mr. Tenaglia, did you have any further
8       discussions with him concerning the activity in
9       the account?
10  A.  During that same conversation, yes.
11  Q.  Right.  How long after?
12  A.  I don't recall how long after other than I
13      wanted to be part of any future discussions to
14      understand it more because it didn't make sense
15      to me.
16  Q.  Did you tell somebody that you wanted to be
17      part of future discussions?
18  A.  Him and my boss.
19  Q.  Who is your boss?
20  A.  Joseph Guercio.
21  Q.  How do you spell that?
22  A.  G, as in good, U E R C, as in cat, I O.
23  Q.  What's Mr. Guercio's position?
24  A.  He's senior vice president, senior lender for

Page 9

1       the bank.
2   Q.  Were you a part of future discussions?
3   A.  Yes, I was.
4   Q.  Do you recall when the next discussion took
5       place?
6   A.  I do not recall specific dates.
7   Q.  Well, you said the fall of 2003.  Do you know
8       how long after the first discussion the second
9       such discussion took place?
10  A.  It took place sometime between early October
11      and December 1st, which is when we ultimately
12      had a meeting with one of the individuals to
13      discuss it in person.
14  Q.  That individual was Frank Miller?
15  A.  Yes.
16  Q.  How many discussions did you have, let's say,
17      early October until the December meeting?
18  A.  I would say a minimum of two, maybe four .
19  Q.  With whom?
20  A.  Primarily with Michael Tenaglia.
21  Q.  What did you discuss primarily with Michael
22      Tenaglia?
23  A.  When he first -- about when we were going to
24      have a meeting with Mr. Miller to learn more

Page 10

1    about this activity, because it had continued
2    and appeared to be increasing. So I was
3    curious as to when we were going to have the
4    opportunity to meet with him to understand it
5    further.
6  Q.  Do you know what the size of the activity was?
7  A.  As I recall, it was in the range of
8    approximately $2 million a day.
9  Q.  Anything else that you recall that you
10   discussed primarily with Mr. Tenaglia between
11   this early fall and the December meeting?
12 A.  Not in any detail, other than it seemed to be
13   unusual activity and I felt it appropriate that
14   we learn more about it to understand it, given
15   the fact that they were obviously drawing on
16   uncollected funds and, therefore, there was an
17   exposure to the bank.
18 Q.  Unusual how?
19 A.  The dollar amount and the fact that they were
20   drawing on uncollected funds.
21 Q.  Did you do any further investigation with
22   regard to the activity in the account?
23 A.  Not at that time.
24 Q.  Did you ever look at the specific activity; ie,

Page 11

1    the deposits or the withdrawals?
2  A.  No, I did not.
3  Q.  Did you discuss the account with anyone other
4    than Mr. Tenaglia between early fall and the
5    December meeting?
6  A.  I believe I discussed it with him and my direct
7    superior, Joseph Guercio.
8  Q.  When you talked to your direct superior, was
9    that with Mr. Tenaglia?
10 A.  I do not recall.
11 Q.  If it was separate, do you recall what you
12   discussed with Mr. Guercio?
13 A.  I summarized my conversations with Mr. Tenaglia
14   and further commented that I had concerns,
15   because I didn't understand why the company
16   would need to have that kind of activity.
17 Q.  Do you recall when in December this meeting
18   took place?
19 A.  I believe it was one year ago today, December
20   1st.
21 Q.  December 1, 2003 meeting, who was there?
22 A.  Myself, Mr. Tenaglia and Bobbi-Jo Parker, who
23   is now Bobbi-Jo Williams.
24 Q.  And Mr. Miller?

Page 12

1  A.  And Mr. Miller, right.
2  Q.  And what was discussed at this meeting?
3  A.  The intent of the meeting was to understand
4    first hand from Mr. Miller what the basis of
5    the account activity was all about, for us to
6    understand, have a better -- higher comfort
7    level for why he needed to do it at that level
8    and to express to him our concern with what, to
9    us, was an exposure, since he was drawing on
10   uncollected funds.
11 Q.  What did Mr. Miller explain to you?
12 A.  He explained that the activity was required due
13   to certain licensing agreements with certain
14   vendors and/or customers as well as for certain
15   competitive reasons with other vendors and
16   customers, whereby they may not be able to
17   acquire a certain material from ABC Company if
18   ABC Company knew they were going to sell it to
19   a competitor, something along those lines. So
20   they had to exchange goods between one another
21   and that the transactions went back and forth,
22   not just in one direction, and that it was
23   required for those reasons and that based upon
24   the advice of their accountants, that was the

Page 13

1    proper way to conduct the business.
2  Q.  Did you understand his explanation?
3  A.  No, I did not.
4  Q.  Because you didn't understand it, did you do
5    anything?
6  A.  I expressed my concern after the meeting with
7    Michael Tenaglia, Bobbi-Jo Parker and confirmed
8    that again with my boss, Joseph Guercio, when
9    he asked me how the meeting went.
10 Q.  Anything else that Mr. Miller said at this
11   December 1 meeting?
12 A.  I can't recall the entire conversation, but he
13   also indicated that the company was going to be
14   sold right after the first of the year and that
15   once the company was sold, the Kingsdale
16   account would be closed and, therefore, the
17   activity would cease, so he was hoping that we
18   would be able to work with him until that time.
19 Q.  And the company to be sold, we're talking about
20   Gitto Global?
21 A.  Correct.
22 Q.  Did you know anything about Kingsdale
23   Corporation prior to the December 1 meeting?
24 A.  I can't say that I -- no.

Page 14

1  Q. And after the December 1 meeting, did you do
2      any investigation into what was Kingsdale
3      Corporation?
4  A. No. It was not my responsibility.
5  Q. How was the December 1 meeting left? Were
6      there any action points?
7  A. Yes. We had asked Mr. Miller, and he agreed,
8      to provide us a letter explaining why they
9      needed to conduct business the way he had
10     verbally explained it to us. We had requested
11     that, and he agreed to provide it to us for our
12     file and that he would remain in communication
13     with us to keep us posted as to the status of
14     the pending sale of Gitto Global.
15 Q. Did you ever get that explanation for the file?
16 A. Yes, we did.
17 Q. Do you know when?
18 A. I believe there is a letter dated June 25th,
19     2004, that was on file to that effect.
20 Q. Do you know why it took six months, or so, to
21     get that letter?
22 A. I do not.
23 Q. I'll show you the letter that was CSB 7. Is
24     that the letter that you're referring to?

Page 15

1  A. Yes, it is.
2  Q. Did you see the letter when it was sent to
3      Mr. Tenaglia?
4  A. No, I did not.
5  Q. Did you see it after it was received?
6  A. Well after, yes.
7  Q. How long after?
8  A. I believe it was in -- somewhere after mid July
9      and probably before mid September.
10 Q. And how did it come about that you saw this
11     letter?
12 A. We were putting together a formal credit file,
13     and we wanted to get all the appropriate
14     correspondence in that section of the file, and
15     a copy of that was provided to me for that
16     purpose.
17 Q. Provided from whom?
18 A. I do not know the answer, because it was on my
19     desk when I came back from vacation.
20 Q. Did you read the letter upon your return?
21 A. Yes, I did.
22 Q. Did you understand it?
23 A. As much as I did from the verbal explanation.
24 Q. Did you seek any further explanation?

Page 16

1  A. No, I did not.
2  Q. After the December 1, 2003 meeting, did you
3      have any further involvement with Kingsdale,
4      Mr. Tenaglia concerning the account?
5  A. I don't recall the exact number of
6      conversations, but I would periodically ask him
7      through a hallway, side conversation -- I would
8      ask him what the status of the situation was,
9      because I was familiar, based upon another
10     report that I received, that the account was
11     still open. As I recall, his explanation to me
12     was, Yeah. The sale hasn't materialized yet.
13     It's still pending, but it has been delayed and
14     there was a need to follow-up with Frank Miller
15     to make sure that it would stay on a certain
16     schedule.
17 Q. And this report that you had received, do you
18     know what it was called?
19 A. It's our daily reject exception report.
20     Basically it includes all accounts that were
21     being drawn on insufficient funds on a daily
22     basis.
23 Q. How often did you receive this report?
24 A. Every day.

Page 17

1  Q. In the course of your duties, would you review
2      it on a daily basis?
3  A. My intent was to review it daily. I can't say
4      that I was physically able to do it everyday.
5  Q. And upon your review of this report, would you
6      take any action with regard to the accounts
7      that are listed?
8  A. The accounts or that account?
9  Q. Well, why would you receive this report?
10 A. This report included every checking account in
11     the bank, and so included in that were also
12     commercial deposit accounts that were assigned
13     to me as part of a lending relationship, so we
14     would review that to monitor their activity as
15     related to the loan relationship.
16 Q. So really the purpose of you receiving the
17     report is to monitor the customers that have
18     this lending relationship --
19 A. Yes.
20 Q. -- that you were supervising?
21 A. Yes.
22 Q. And Kingsdale was not one of those
23     relationships at that time?
24 A. No, it was not.

Page 18

1  Q. But because you were working with Mr. Tenaglia,
2      you would look at that account from time to
3      time in the report?
4  A. I would see it each time I looked at the
5      report, and from time to time I would ask him
6      what the status was.
7  Q. Did you see an increase in volume, in the
8      number of deposits or uncollected funds in the
9      account?
10 A. At that time that report only generated a
11     report on accounts that, based on the system
12     limitations, showed accounts drawing on
13     insufficient funds. But I need to explain.
14 Q. Go ahead.
15 A. Because of the way the deposits were processed,
16     where the deposits were made and then
17     processed, they showed up by default on this
18     report as insufficient until such time as the
19     account was actually settled in the morning
20     subsequent to the time that that report was
21     generated by the system. So it showed up on
22     that report appearing that it was overdrawn,
23     when, in fact, it was not overdrawn.
24 Q. What was it?

Page 19

1  A. As we understood prior to that and throughout
2      the course, it was drawing on uncollected
3      funds, but it was not insufficient funds at the
4      time.
5  Q. Did the report that you would review show an
6      increase in the size of the uncollected funds?
7  A. I never made the calculation to add up the
8      number of checks on that report.
9  Q. Do you know what percentage the uncollected
10     funds in the Kingsdale account represented to
11     the uncollected funds in all of the accounts at
12     Clinton?
13 A. Well, at that time we did not place a hold on
14     any business deposit accounts so, therefore, no
15     accounts showed up as drawing on uncollected
16     funds at that time.
17 Q. The report that you saw with regard to
18     Kingsdale, you said two, two and a half, $3
19     million?
20 A. No. I didn't say that. Earlier I said that at
21     the time we met with him in the October,
22     December time frame, it was verbally explained
23     to me that the average activity was in that
24     range.

Page 20

1  Q. And the report that you would receive, what did
2      that show with respect to Kingsdale in terms of
3      the information in the report itself?
4  A. Based upon the way the system processed the
5      deposits prior to manual intervention by branch
6      people in the morning, the system generated a
7      report that made it appear that the Kingsdale
8      account was insufficient because of the way the
9      deposits were processed the night before. So
10     that's why it showed up on that report.
11 Q. And what was the size of the insufficiency?
12 A. Again, I never made the calculation. It didn't
13     aggregate the numbers. It was a check by check
14     basis.
15 Q. Oh, I see. So it would show individual checks
16     being insufficient?
17 A. Right.
18 Q. Did that account have more insufficient
19     individual checks than any other account at
20     Clinton?
21 A. As detailed in that report, yes.
22 Q. Was it significantly more than other customers?
23 A. Yes.
24 Q. Other than reviewing the report and talking to

Page 21

1      Mr. Tenaglia from time to time, any further
2      involvement, let's say, at the beginning of
3      2004?
4  A. None whatsoever.
5  Q. Is it fair to say that your next significant
6      involvement is the credit facility?
7  A. Although there was some prior involvement
8      before the credit facility.
9  Q. Okay. What was that involvement?
10 A. In the early June, mid June time frame, I was
11     asked who would be the appropriate law firm to
12     document a secured position on the equipment of
13     Gitto Global, whose guaranty would be given to
14     back up, so to speak, provide us some level of
15     security for the exposure of Kingsdale having
16     been drawing on uncollected funds.
17 Q. And who asked you this?
18 A. I'm not sure if it was the president directly
19     or my boss, Joe Guercio, but ultimately we met
20     in the president's office to talk about it in
21     more detail, at which time we decided to have
22     the firm Seder & Chandler do the documentation
23     for us.
24 Q. The president being whom?

Page 22

1   A. Stephen Cash.
2   Q. And Mr. Cash and Mr. Guercio and you discussed
3       what in this June 2004 time frame?
4   A. As I recall, they explained to me that a second
5       security interest was being offered to the bank
6       to give us comfort, so to speak, on the
7       exposure of Kingsdale drawing on uncollected
8       funds. We had been given an appraisal to
9       support what we were told was the value of this
10      equipment. I believe we were also given
11      certain documentation to confirm what the prior
12      liens were on that equipment so that we could
13      have a comfort level that based upon the
14      appraisal, that there was equity in the
15      equipment. So we discussed that, and then my
16      charge was to work with the law firm to get the
17      documentation prepared to have a Gitto Global
18      guaranty executed guaranteeing the obligations
19      of Kingsdale Corp, which was to be secured by
20      that second lien on the equipment of Gitto
21      Global Corp.
22  Q. So you got involved in documenting the loan?
23  A. We gave the instructions to our attorney. He
24      provided us with draft copies of those. I

Page 23

1       reviewed those to the best of my ability. I
2       can't recall what changes, if any, I
3       recommended, and then the final documents were
4       prepared, but I did not witness the execution
5       of those documents.
6   Q. You didn't attend the closing?
7   A. No, not for that component.
8   Q. For what component?
9   A. For taking the second position on the machine
10      equipment. That was in June.
11  Q. All right. This second position was to secure
12      what?
13  A. What we felt was our exposure by paying checks
14      or drawing on uncollected funds in the
15      Kingsdale account.
16  Q. Well, was there going to be an obligation that
17      was going to be secured by this second
18      position?
19  A. I'm not sure how to answer that question.
20  Q. Was there a note?
21  A. No, there was not.
22  Q. So what did Gitto Global -- they executed a
23      security agreement?
24  A. Yes.

Page 24

1   Q. And that security agreement secured what?
2   A. It secured its guaranty of any obligations of
3       Kingsdale Corp. due to our bank.
4   Q. So there was a separate guaranty from Gitto
5       Global?
6   A. Yes.
7   Q. Secured by a security interest in equipment?
8   A. Yes.
9   Q. And the guaranty, did that secure an
10      obligation?
11  A. There was no note.
12  Q. Was there an agreement?
13  A. I don't know the answer to that question.
14  Q. Do you know how it came about that Gitto Global
15      agreed to give a guaranty secured by security
16      interest in equipment?
17  A. I do not know the exact sequence of events.
18  Q. Do you know who negotiated this arrangement
19      from Clinton's standpoint?
20  A. I would only be speculating if I said I knew
21      exactly.
22  Q. Do you know with whom someone at Clinton
23      negotiated this guaranty and security interest
24      in the equipment at Gitto Global?

Page 25

1   A. Frank Miller.
2   Q. But you saw these documents that were prepared
3       by counsel?
4   A. Yes.
5   Q. Did you have any communications with anyone at
6       Gitto Global concerning the documents?
7   A. No, I did not.
8   Q. Let me show you what's been marked as CSB 20.
9       Is that the security agreement to which you
10      have been referring?
11  A. Yes, it is.
12  Q. Now, was Mr. Tenaglia involved in the
13      negotiation and execution of the security
14      agreement?
15  A. He was involved in the execution of the
16      security agreement.
17  Q. How was he involved in the execution?
18  A. He had the original copies of the documents and
19      met with Mr. Miller to have them signed.
20  Q. What original documents did he have a copy of?
21  A. These documents.
22  Q. Exhibit 20?
23      MR. KASAKOFF: Exhibit 20 is a copy of
24      the original. You're referring to the

Page 26

1    original; right?
2         THE WITNESS:  I guess I'll try to
3    rephrase that.
4    A.  Once we had made whatever recommendations for
5       changes, if any, on the draft documents that I
6       seen earlier, my understanding is that then
7       documents were cleaned, said documents were
8       provided to the bank, and Mike Tenaglia saw to
9       their execution, if that clarifies it.
10   Q.  So the security agreement says it secures a
11      guaranty; correct?
12   A.  Yes.
13   Q.  And the guaranty secures what?
14   A.  Any obligations of Kingsdale Corp. due the
15      bank.
16   Q.  Now, in preparation, was any investigation made
17      into the business of Kingsdale, let's say, in
18      June of 2004?
19   A.  If it was, it wasn't done by me.
20   Q.  Did you ever do it?
21   A.  I'm not sure what you mean by "investigation,"
22      but with time, we requested tax returns for our
23      file, but other than what our counsel did in
24      preparation for the subsequent loan closing,

Page 27

1    I'm not aware of any other investigation that
2    was done.
3    Q.  Do you know whether Kingsdale had an operation,
4       a business facility?
5    A.  I'm not aware if they had one or not.
6    Q.  Do you know if anyone from the bank ever went
7       out to inspect the facility?
8    A.  I do now, yes.
9    Q.  And what do you know?
10   A.  I went -- last Wednesday I traveled to the
11      address that had been listed on their checking
12      account, which is 50 Independence Drive, in
13      Ayer, Massachusetts.  At that address what I
14      found was a very large warehouse facility.  The
15      name on the building was Cross Dock Logistics.
16      There was no number on the building, but I went
17      into a building next door, which I thought was
18      it originally.  They said, No.  They're next
19      door and identified it by name.  I couldn't
20      gain access to the building, but there were
21      several tractor trailers all around the
22      building, none of which names had any
23      connection to what I was familiar with.
24   Q.  But prior to this trip, no one, as far as you

Page 28

1    know, had sought to inspect the facilities of
2    Kingsdale?
3    A.  Right.
4    Q.  Did you ever talk or deal with Thomas Sullivan?
5    A.  No.  I never have.
6    Q.  What about John Tersigni?
7    A.  I spoke to him one time on the telephone.
8    Q.  When was that?
9    A.  It was subsequent to September 15th.  I don't
10      recall if it was prior to the actual bankruptcy
11      filing or shortly thereafter, but it was in
12      that time frame.
13   Q.  And did you call him?
14   A.  I called him as a follow up to several calls
15      that he had made to different people in the
16      bank.
17   Q.  What did you and Mr. Tersigni discuss in this
18      telephone call?
19   A.  I'm trying to recall.  He had concern about his
20      name as an authorized signer on the Kingsdale
21      account and wanted to deal with that to make
22      sure that he wasn't -- I don't want to
23      speculate.  The conversation was very short,
24      because I was very cautious to refer it to our

Page 29

1    attorney, which I, in fact, did.  I gave him
2    our attorney's name and number and suggested
3    that if he wanted to discuss the subject matter
4    any further, he should call Bob Seder.
5    Q.  And this was the one and only conversation that
6       you had with him?
7    A.  Yes.
8    Q.  After the documents were signed -- I think it's
9       dated September 16th, 2004, the security
10      agreement and the guaranty?
11   A.  June 16th.
12   Q.  I'm sorry.  After the documents were signed
13      June 16th, 2004, was this a closing that you
14      attended?
15   A.  I did not attend the closing.
16   Q.  Do you know who did on behalf of the bank?
17   A.  I believe Michael Tenaglia did.
18   Q.  After June 16th, did you have any further
19      involvement in relation to Kingsdale
20      Corporation?
21   A.  Yes.
22   Q.  What was that?
23   A.  In the mid July time frame, I was asked to get
24      involved again with working with our counsel to

Page 30

1    have additional documentation put in place.
2  Q.  Who asked you to get involved in mid July?
3  A.  I can't recall specifically if it came first
4    from Steve Cash, from Mike Tenaglia or Joseph
5    Guercio.
6  Q.  And what did one of those persons say to you?
7  A.  The explanation to me was that an offer of
8    several pieces of additional collateral had
9    been put on the table as consideration for our
10    agreement and willingness to extend the current
11    practice in the Kingsdale account until August
12    -- it was going to be the 13th, but then --
13    August 15th, but that was the Sunday, so it was
14    dated August 16th, the next business day.  So
15    in consideration for us agreeing to continue to
16    pay checks on uncollected funds, they had
17    offered up various pieces of additional
18    collateral.  My charge was to work with counsel
19    to get that document done.
20  Q.  Do you know who made this offer of additional
21    collateral?
22  A.  I would only be speculating from what I've
23    heard from third parties.
24  Q.  Do you know to who at the bank this offer was

Page 31

1    made?
2  A.  I believe I know, but I'd only know from others
3    telling me.  I did not witness it.
4  Q.  What did others tell you?
5  A.  I understood that Frank Miller offered various
6    pieces of collateral in one or more
7    conversations with Mike Tenaglia and Steve
8    Cash, maybe others.
9  Q.  Now, did you have any discussion with
10    Mr. Miller concerning this offer of additional
11    pieces of collateral?
12  A.  At that point in time, I did not.  I was
13    working primarily with our attorney trying to
14    convey to them at least what I understood to be
15    the additional collateral that was offered up.
16    As it turned out, one piece of collateral that
17    I understood had been put on the table was
18    subsequently withdrawn.
19  Q.  What was that?
20  A.  That was a mortgage position on Charlie Gitto's
21    personal residence.  We tried very hard to get
22    that, because that had been offered to us, but
23    ultimately that did not materialize.  So I'm
24    not sure if that answered the question.

Page 32

1  Q.  Let me ask it this way.  Besides this mortgage
2    position on Charlie Gitto's residence, what
3    other pieces of collateral had been offered up?
4  A.  What they had put on the table was that
5    Frank Miller would give us half a million
6    dollars in cash as collateral, that Gary Gitto
7    would also give us half a million dollars in
8    cash as collateral.  We would be -- we would
9    receive a collateral pledge of three million
10    shares of Vitrotech stocks.  We would have the
11    guaranty of Tradex Corporation secured by a
12    second mortgage on the commercial real estate
13    it owns in Lunenburg, which is occupied by
14    Gitto Global Corporation, and that we would
15    also receive a first lien on inventory valued
16    at a minimum of $3 million that was owned by
17    Tradex Corp.  This was VitroLite inventory.  As
18    I recall, those were all the pieces, inventory,
19    real estate, additional cash collateral and the
20    Vitrotech stock.
21  Q.  With respect to the offer of additional pieces
22    of collateral, do you know if anyone at the
23    bank had discussed this concept with Gary
24    Gitto --

Page 33

1  A.  I do not know that.
2  Q.  -- or with Charles Gitto?
3  A.  I do not know that.
4  Q.  The rescinding of the offer, as you will, on
5    the mortgage on Charles Gitto's residence, how
6    do you know learn that?
7  A.  As we were working with counsel to get this
8    documented, counsel had spoken with counsel on
9    the other side, and that's when we were
10    informed that we weren't going to get that.  It
11    was explained to us almost that he couldn't
12    give it to us if he wanted to because of other
13    reasons.
14  Q.  And the counsel from your side who had this
15    conversation was whom?
16  A.  There were several conversations.  I don't know
17    specifically if it came from Bob Seder or
18    Paul O'Riordan, who were both working on this
19    for us.
20  Q.  And the counsel from the other side who you
21    said the conversation was had was whom?
22  A.  Mark Bodanza and Michael Angelini.
23  Q.  And you were told of the conversation by whom?
24  A.  Either Bob Seder or Paul O'Riordan.

Page 34

1  Q. What did Bob or Paul tell you of the
2     conversations that they had with Mark or Mike
3     with respect to --
4         MR. KASAKOFF: I think I have to
5     interject with attorney/client privilege.
6     You're asking him to tell you about
7     conversations that he had with his counsel.
8         MR. REIN: Concerning the conversation
9     with other counsel. I don't believe that is
10    attorney/client privilege, because unless he's
11    talking about -- you're talking about the
12    communication of legal advice. It's the
13    communications of discussions with other
14    counsel. That is not attorney/client
15    privilege.
16        MR. KASAKOFF: I'm not sure I agree
17    with you, but I don't think that he's going to
18    answer questions about conversations he had
19    with Mr. Seder and Mr. O'Riordan in the context
20    of those, unless there were third parties
21    present at some kind of a general meeting.
22        MR. REIN: Concerning what they said
23    they were told by other counsel.
24        MR. KASAKOFF: If you're asking him to

Page 35

1     tell you about conversations that he had with
2     counsel, private conversations, I don't care
3     what the subject matter was, with the
4     exceptions of what you had for dinner, or
5     something like that.
6         MR. REIN: Really?
7         MR. KASAKOFF: This had to do with an
8     attorney/client relationship. It wasn't a
9     social relationship. It wasn't a social
10    conversation they were having.
11        MR. REIN: I'm not going to argue with
12    you, but I'm telling you, my position is unless
13    it's the -- if it's a conversation about what
14    they discussed with other counsel -- and that's
15    what I have asked him about -- what did other
16    counsel -- what did they say other counsel told
17    them, that is not legal advice. That's my
18    position. If you want to instruct him not to
19    answer, you go ahead.
20        MR. KASAKOFF: I think you're taking a
21    very narrow view of the attorney/client
22    privilege. I am going to instruct him not to
23    discuss as an attorney/client communication
24    communications that he had with Mr. Seder or

Page 36

1     Mr. O'Riordan that related to this matter. It
2     may be that the other counsel will communicate
3     with you about what it is they communicated
4     with Mr. Seder and Mr. O'Riordan. Those aren't
5     attorney/client communications, but what he had
6     and spoke to Mr. Seder and Mr. O'Riordan about
7     is.
8         MR. REIN: Let me make it clear for
9     the record.
10        MR. KASAKOFF: Sure.
11        MR. REIN: So you can object to the
12    privilege.
13        MR. KASAKOFF: Or assert the privilege
14    on my client's behalf.
15    Q. What did either Mr. O'Riordan or Mr. Seder tell
16    you that opposing counsel said in connection
17    with the withdrawal or rescinding of the
18    Charlie Gitto mortgage?
19        MR. KASAKOFF: And I'm instructing my
20    client that because those were attorney/client
21    communications, that he is not to answer
22    questions that relate to attorney/client
23    communications having to do with a matter which
24    the attorney was representing the client on.

Page 37

1     Q. And what did your counsel, either Mr. O'Riordan
2        or Mr. Seder tell you that opposing counsel
3        said in this conversation in connection with
4        the offer of additional pieces of collateral?
5            MR. KASAKOFF: And we're asserting the
6        privilege attorney/client communication.
7     A. I guess I'm not prepared to answer that.
8     Q. And you're going to follow your counsel's
9        advice; right?
10    A. Yes.
11    Q. Did you have any discussions with anyone else,
12       other than your counsel, concerning this offer
13       of additional pieces of collateral?
14    A. Yes. Other bank personnel.
15    Q. Who was that?
16    A. One or more of the three individuals I
17       mentioned before, Stephen Cash, Michael
18       Tenaglia and Joseph Guercio.
19    Q. What did one or more of those individuals say
20       to you concerning this offer of additional
21       pieces of collateral?
22    A. They were surprised with respect to the
23       mortgage on the residence that it was not
24       available, because it had been offered up to us

1  through prior communication and, in fact,
2  someone had provided us with a copy of the deed
3  to that property as an aid to preparing the
4  legal documents, so they didn't understand why
5  it was not available.
6  Q. Were you told who offered up the property?
7  A. No, I was not told that.
8  Q. Were you told who sent you the deed?
9  A. Frank Miller.
10  Q. To whom did Frank Miller send the deed?
11  A. I don't know specifically.
12  Q. Did you see the deed?
13  A. If I did, it was at a distance, like here. I
14  never reviewed the documents.
15  Q. What else did one or more of these individuals
16  say to you in connection with negotiations
17  leading up to this additional collateral that
18  was pledged?
19  A. Regarding which component of the collateral?
20  Q. Any? I mean, what else were you told by these
21  individuals other than that a deed had been
22  delivered and had been rescinded?
23  A. Well, relative to the cash deposits, we were
24  told that those would be in the bank by certain

1  dates in order to conform with the verbal
2  agreements.
3  Q. And who told the bank that that would take
4  place?
5  A. I don't know the answer to that.
6  Q. Do you know who was told at the bank that that
7  would take place?
8  A. Michael Tenaglia and/or Stephen Cash.
9  Q. And you know this from talking to them?
10  A. Yes.
11  Q. What else do you know?
12  A. It's kind of a broad question.
13  Q. I'm talking about the offer of additional
14  pieces of collateral.
15     MR. KASAKOFF: Must be a lawyer.
16  A. There was some negotiation with respect to the
17  commercial real estate, because although the
18  offer was first, as I understood it, that we
19  could have a second mortgage on the property
20  that was occupied by Gitto Global, through
21  counsel it was conveyed to me that they wanted
22  to give us --
23     MR. KASAKOFF: When you say "through
24  counsel," are you talking about Mr. O'Riordan

1  and Mr. Seder?
2     THE WITNESS: Yes.
3     MR. KASAKOFF: Any conversations that
4  you had with Mr. Seder and Mr. O'Riordan are
5  confidential and should not be disclosed.
6  A. Up until the time that I attended the closing
7  on July 23rd, I did not have any direct
8  conversations with Frank Miller, Gary Gitto and
9  Charley Gitto at that time.
10  Q. And you attended the closing?
11  A. Yes, I did.
12  Q. With whom?
13  A. Paul O'Riordan and David Harmon, who is a
14  commercial loan officer that works for me at
15  the bank.
16  Q. Who was at the closing?
17  A. Us three, Mark Bodanza, counsel for the
18  borrowers, Frank Miller, Charley Gitto and Gary
19  Gitto.
20  Q. Where was the closing held?
21  A. Mark Bodanza's Leominster office.
22  Q. And were there any discussions at this closing?
23     MR. STERN: What was the date?
24     THE WITNESS: July 23rd.

1  Q. What was discussed at the closing, if anything?
2  A. I need you to be -- I mean, we were there three
3  hours.
4     MR. KASAKOFF: If you don't understand
5  the question, say so.
6  Q. It was a three-hour closing?
7  A. Yes.
8  Q. Why did it take three hours to close the
9  transactions?
10  A. Negotiations at the table.
11  Q. What were you negotiating?
12  A. Their willingness to sign certain documents,
13  their unwillingness to sign certain documents.
14  Some documents had to be redrafted, things of
15  that sort.
16  Q. What documents were they unwilling to sign?
17  A. One of the documents that they did not agree to
18  sign was a document that -- I forget the legal
19  term for it, but it collaterally assigned us
20  the sale proceeds of Gitto Global to Vitrotech.
21  It was more extra fluff for us. We didn't need
22  to have it, but it was something that they did
23  not want to sign.
24  Q. Who is "they"?

1   A. All -- all three of those, Mr. -- two
2      Mr. Gittos and Mr. Miller all agreed that it
3      shouldn't be signed, and they were very adamant
4      about it, each of them individually.
5   Q. Did they say why?
6   A. They felt that, for whatever reason, it may put
7      a chill on this pending sale of Gitto Global to
8      Vitrotech.
9   Q. Any other documents that they refused to sign?
10  A. I don't believe so.
11  Q. What documents were changed at the closing?
12  A. Once we got to the closing, we were informed
13     that Thomas Sullivan was no longer employed by
14     Kingsdale Corp., so therefore, he wasn't going
15     to be able to sign the documents as drafted in
16     his former capacity as president.
17  Q. Who told you that?
18  A. Frank Miller and his counsel.
19  Q. Was there anything else that was changed?
20  A. There were lots of different things that you
21     can tell by the actual documents, things that
22     might have been added or deleted. I don't
23     recall the specifics without reviewing them.
24  Q. Did Gary Gitto seek to change documents?

1   A. He didn't want to sign the document or have the
2      document executed relative to applying the
3      proceeds from the sale of the business to the
4      bank.
5         Could you ask that question again,
6      please?
7   Q. Gary Gitto, what did he say concerning changing
8      of the documents?
9   A. I don't recall specifically.
10  Q. Do you recall anything that Gary Gitto said at
11     the closing?
12  A. I won't repeat the expletives, but relative to
13     the transaction at hand and the documents, no.
14     He, as well as the others, confirmed their
15     strong desire for the sale to take place and
16     that it was important for them, for their
17     companies, for it to happen, but I can't recall
18     specifics beyond that as it related to the
19     documents without thinking it over some more.
20  Q. What about Charles Gitto? Did he have any
21     comments with regard to the documents at this
22     closing?
23  A. Yes. I'm trying to remember what it was. It
24     was actually one of the very first documents

1      that he was asked to sign. He initially,
2      rather vehemently, said he wasn't going to sign
3      it and threw the pen down. Only through some
4      coercion by his counsel did he agree to sign
5      the document. But honestly, without seeing it
6      or refreshing my memory, I don't remember the
7      document.
8   Q. We'll look at the documents in a second.
9      Anything else that you recall Charles Gitto
10     said at the closing?
11  A. Relative to the nature of that business that
12     day, he confirmed the need for the sale of the
13     company to take place in order for everything
14     to come together. He talked a lot about the
15     nature of their business in terms of what they
16     did.
17  Q. What did he say?
18  A. He basically was explaining how good they were
19     in terms of the -- of the types of products
20     they manufacture and the demand for those
21     products and the potential for the product.
22  Q. "They" being who?
23  A. I lost my own train of thought here.
24  Q. You said they, their products.

1   A. Gitto Global.
2   Q. Gitto Global's products.
3   A. And made specific comments relative to this
4      VitroLite inventory or component with respect
5      to the different applications that it has and
6      how far wide ranging it was. He made comments
7      to the effect that both Gitto Global needed
8      Vitrotech and Vitrotech needed Gitto Global to
9      take advantage of the one another's strengths.
10     He confirmed that Tradex Corp. owned the
11     inventory that they were pledging to us and, in
12     fact, signed a document to that effect.
13  Q. How did he confirm? What did he say?
14  A. As I recall, and I can recall quite a bit of
15     the specifics, because during the conversation,
16     he and Frank Miller confirmed that in a couple
17     of weeks, they were planning on transferring
18     the inventory they -- they had planned on
19     transferring inventory back in the name of
20     Gitto Global, and my counsel and I looked at
21     each other and said, Why do that? You can't do
22     that if you're pledging it as collateral now.
23     We would then -- should properly redraft the
24     documents to reflect that and the decision was

```
 1      made, No.  If they own it, we might as well
 2      just keep it there.  If it doesn't matter to us
 3      if they own it or not as long as it's properly
 4      documented for today's transaction.  So it was
 5      agreed that they would keep the inventory in
 6      the Tradex Corp. name.
 7  Q.  Anything else that Charles Gitto said at this
 8      closing?
 9  A.  Other than small talk, I can't recall, unless
10      my memory is jogged as we continue.
11  Q.  Any discussion about the finances of Gitto
12      Global?
13  A.  Not that I can recall.
14  Q.  Any discussion about the finances of Kingsdale,
15      Corp?
16  A.  Not that I can recall.
17  Q.  Now, with respect to the VitroLite inventory,
18      had you gone out there to look at the inventory
19      before the closing?
20  A.  I don't think we saw it before the closing.
21  Q.  Did you ever see it after the closing?
22  A.  On two occasions.
23  Q.  When was the first one?
24          MR. KASAKOFF:  Maybe for clarification
```

```
 1      of the record, when you say "the VitroLite
 2      inventory" you are talking about a product made
 3      by VitroLite, brand named; right?
 4          MS. BALLIRO:  Made by Vitrotech.
 5          MR. REIN:  But the brand name is
 6      VitroLite.
 7          MR. KASAKOFF:  All right.
 8  A.  Without refreshing my memory and looking at my
 9      file comments, as I recall, I think it was very
10      early the following week.
11  Q.  And you went out there?
12  A.  I went out there.  Myself and Dave Harmon went
13      out there.  We had requested through Frank
14      Miller that we see and touch the inventory.  He
15      arranged it with his shipping/receiving
16      warehouse person.  He met us --
17  Q.  Dean Childs?
18  A.  Yes.  He met us as Casey Transportation in
19      Leominster.  We went inside and walked up and
20      down the rows of pallets that contained 50
21      pounds bags of this material.
22  Q.  So you looked at the bag and it had "VitroLite"
23      on the bag?
24  A.  I don't recall the specific name, but it said
```

```
 1      Vitro-something or other, so it was clear that
 2      it was related to that inventory and it was
 3      tied into what the borrowers described to us as
 4      to what their inventory was called.
 5  Q.  Did you look inside the bags?
 6  A.  We did not.  There might have been a tear here
 7      or there so we could see some material, but,
 8      you know -- we did that, but we did not rip
 9      any of the bags open.
10  Q.  Would you know what you were looking at anyway
11      if you looked inside the bags?
12  A.  No.  I assumed it was some kind of resin, but I
13      would not have known, no.
14  Q.  You said you went out a second time?
15  A.  Yes.  I don't recall the dates, but we went out
16      a second time basically to make sure that it
17      was still there.
18  Q.  Who is "we" that went out?
19  A.  Myself and David Harmon.
20  Q.  How did you get into the facility?
21  A.  The second time we went out there, the person
22      who was in the warehouse office at the time
23      wasn't there, so -- and it was wide open, so we
24      just walked in and I casually looked over where
```

```
 1      the inventory had been.  It was all still
 2      there.  Nothing that I could tell had been
 3      moved, and we left.
 4  Q.  Was this second trip before the bankruptcy?
 5  A.  I don't recall.
 6  Q.  Do you know what prompted the second trip?
 7  A.  As I mentioned earlier, to make sure that it
 8      was there.  I think our board may have
 9      questioned how we were monitoring and making
10      sure that it was still there, so we felt it
11      appropriate to go out and take a look.
12  Q.  Were you given any documentation to evidence
13      Tradex ownership of this product?
14  A.  No.
15  Q.  Did you ask for it?
16  A.  We asked not for -- we asked -- not to document
17      the ownership, no.
18  Q.  Did you make any investigation, due diligence,
19      to make sure that the product was owned by
20      Tradex?
21  A.  No.
22  Q.  Why not?
23  A.  At that point in time, it did not serve any
24      purpose.  We were offered collateral, and we
```

Page 50

1    were taking as much collateral as we were being
2    offered.
3    Q. Let me show you what's been marked as CSB 10.
4    Do you recognize this document?
5    A. Yes, I do.
6    Q. Can you tell me what it is?
7    A. The one -- this is our credit file memo,
8    something that we put in the history section of
9    the credit file, which would give us a
10   chronological history of certain things taking
11   place.
12   Q. And these are memos that were drafted by you?
13   A. Yes.
14   Q. And that's your initials?
15   A. Yes.
16   Q. Now, for July 23, 2004, the entry was to recite
17   what went on at the closing?
18   A. Yes.
19   Q. Now, in the second paragraph, it talks, The
20   sole purpose of the credit arrangement. Do you
21   see that?
22   A. Yes.
23   Q. Was that discussed at the closing, what the
24   sole purpose was?

Page 51

1    A. I don't recall.
2    Q. Any discussion at the closing concerning
3    uncollected funds in Kingsdale's account?
4    A. I do not recall.
5    Q. Any discussion at the closing as to why the
6    revolving line of credit was 8.4 million?
7    A. I don't recall it being discussed there.
8    Q. Any discussion at the closing concerning the
9    purpose of the credit arrangement?
10   A. I do not recall it being discussed there.
11   Q. Let's discuss the loan documentation. Let me
12   show you what has been marked as CSB 13, which
13   is entitled, Revolving Credit Note.
14   A. Yes.
15   Q. That's one of the documents that was signed at
16   the closing?
17   A. Yes.
18   Q. Was it also one of the documents that was
19   changed?
20   A. As I review it now, we changed the termination
21   date, because that would have been Friday, the
22   13th. We, out of the goodness of our hearts,
23   gave them until Monday, the 16th.
24   Q. Of August?

Page 52

1    A. Of August. As well as I see here on Page 4 --
2    that's the document that I was referring to
3    earlier that they refused to sign.
4    Q. That's the Roman Numeral IV?
5    A. Yes. Let me just review this. Yes. That's
6    the document that they refused to sign. We see
7    above that in the very first paragraph we put
8    in the address of where the inventory was
9    located.
10   Q. So before the closing, you didn't know where
11   the inventory was located?
12   A. No.
13   Q. And this was told to you by whom in terms of
14   where the inventory was?
15   A. By both of the Gittos and Frank Miller.
16   Q. Did anything else change?
17   A. And on the last page, Thomas Sullivan's name
18   was crossed out and Frank Miller signed as
19   president and treasurer of Kingsdale.
20   Q. Next let me show you Exhibit 14, which is a
21   line of credit facility with Clinton Bank dated
22   July 23, 2004.
23   A. Yes.
24   Q. This is, again, one of the documents signed at

Page 53

1    the closing?
2    A. Yes.
3    Q. It looks to me like this is also one of the
4    documents that was changed at the closing?
5    A. Yes.
6    Q. Can you tell me what changes were?
7    A. The first paragraph, the same date changes. In
8    the bottom paragraph labeled No. 2, we put in
9    the address of where the VitroLite inventory
10   was located similar to the other documents. At
11   the end of Paragraph 2 we added in the wording
12   about getting the landlord's waiver by a
13   certain date and then we crossed out --
14   Q. The assignment of the purchase price?
15   A. Same thing. And then we had added at the very
16   bottom, what you see as Paragraph 2 relative to
17   Tradex Corp that was signed by Charles Gitto.
18   Q. Did you know prior to the closing whether
19   Tradex Corp purportedly owned this VitroLite
20   inventory?
21   A. I was told that it did.
22   Q. You knew that?
23   A. Yes.
24   Q. And then as the last page of this document,

Page 54

1    there is a joint consent of the sole
2    stockholder and sole director of Kingsdale
3    Corp. signed by Frank Miller?
4  A. Yes.
5  Q. He signed that at the closing?
6  A. Yes.
7  Q. Is this the first time that you learned who the
8    officers and shareholders were of Kingsdale
9    Corp.?
10 A. Yes, other than prior to that I assumed it was
11   Thomas Sullivan, based on seeing draft
12   documents. We were informed he was a former
13   employee, no longer with the company, and Frank
14   had been the sole -- I can't say that I ever
15   understood Thomas Sullivan to be a stockholder.
16   I knew from what our attorney obtained from the
17   secretary of state's office that he was listed
18   as the president. We had understood Frank
19   Miller to be the sole stockholder all along.
20 Q. I then show you CSB 16 -- I'll ask you to pass
21   that down -- which is entitled, Pledge
22   Agreement. This was also signed at the
23   closing?
24 A. Yes, it was.

Page 55

1  Q. The purpose of this document was for Kingsdale
2    to pledge a certain account?
3  A. Yes. The accounts referenced there in the body
4    early on. This was the document to pledge that
5    as collateral to the bank.
6  Q. What account was that that was being pledged?
7  A. It was a money market account with a balance of
8    approximately $1,200,000.
9  Q. Do you know where those funds came from to fund
10   that money market account?
11 A. They had accumulated in the Kingsdale Corp.
12   checking account, and we transferred it from
13   the checking account into the money market
14   account.
15 Q. And when was that transfer effected?
16 A. I believe it was made this day, on the 23rd.
17 Q. Exhibit 17 is entitled Security Agreement,
18   which is a pledge by Kingsdale Corporation of
19   its assets to Clinton Savings Bank. Do you
20   recognize this document?
21 A. Yes.
22 Q. Was this document signed at the closing?
23 A. Yes, it was.
24 Q. And was this document one of the documents that

Page 56

1    was changed at the closing?
2  A. I believe the first change is on Page 12, where
3    we changed the notice address for the data to
4    the Ayer address that I described earlier. On
5    Page 13 we crossed out Thomas Sullivan and
6    Frank Miller signed as president and treasurer
7    of Kingsdale. Same on the bottom of Paragraph 7
8    a few pages later.
9  Q. Do you know what assets Kingsdale Corp. had?
10 A. No, I do not.
11 Q. Do you know what Kingsdale Corp. was pledging
12   as collateral to secure the loan?
13 A. At a minimum, the money market account.
14 Q. So as of the closing, July 23rd, the only
15   assets that you were aware of that was owned by
16   Kingsdale was the money market account?
17 A. That we were specifically aware of, yes.
18 Q. Let me show you what has been marked as Exhibit
19   No. 19. I apologize. It doesn't look like the
20   last page was copied. I know it's in that box
21   there.
22      MS. BALLIRO: What's the title on it?
23      MR. REIN: Gitto Global's guaranty.
24      MS. BALLIRO: Want me to pull it for

Page 57

1    you? I just saw it.
2       MR. REIN: Sure, if you would.
3       MS. BALLIRO: It's not the stock
4    pledge; it's the guaranty; right?
5       MR. REIN: It says, Guaranty. I'll
6    copy the last page and make it part of the
7    document.
8  Q. But I notice it's dated June 16th, 2004. Is
9    this one of the documents that we talked about
10   earlier in connection with the security
11   agreement?
12 A. Yes.
13 Q. So this wasn't a document that was signed at
14   the July 23rd closing?
15 A. No, it was not.
16 Q. Let me show you what's been marked as CSB 21,
17   which is a guaranty from Frank Miller. This
18   was one of the documents signed at the closing?
19 A. Yes.
20 Q. Exhibit No. 22 is a pledge agreement from
21   Frank Miller, one of the documents signed at
22   the closing?
23 A. Yes.
24 Q. He's pledging a certain account?