UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LASALLE BUSINESS CREDIT, LLC, f/k/a
LASSALE BUSINESS CREDIT, INC.,

　　　　　Plaintiff

　　v.

CLINTON SAVINGS BANK,

　　　　　Defendant

Case No. 05-CV10268-DPW

**EXHIBITS A TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

Part 2 of 2

Page 54

1    there is a joint consent of the sole
2    stockholder and sole director of Kingsdale
3    Corp. signed by Frank Miller?
4    A. Yes.
5    Q. He signed that at the closing?
6    A. Yes.
7    Q. Is this the first time that you learned who the
8        officers and shareholders were of Kingsdale
9        Corp.?
10   A. Yes, other than prior to that I assumed it was
11       Thomas Sullivan, based on seeing draft
12       documents. We were informed he was a former
13       employee, no longer with the company, and Frank
14       had been the sole -- I can't say that I ever
15       understood Thomas Sullivan to be a stockholder.
16       I knew from what our attorney obtained from the
17       secretary of state's office that he was listed
18       as the president. We had understood Frank
19       Miller to be the sole stockholder all along.
20   Q. I then show you CSB 16 -- I'll ask you to pass
21       that down -- which is entitled, Pledge
22       Agreement. This was also signed at the
23       closing?
24   A. Yes, it was.

Page 55

1    Q. The purpose of this document was for Kingsdale
2        to pledge a certain account?
3    A. Yes. The accounts referenced there in the body
4        early on. This was the document to pledge that
5        as collateral to the bank.
6    Q. What account was that that was being pledged?
7    A. It was a money market account with a balance of
8        approximately $1,200,000.
9    Q. Do you know where those funds came from to fund
10       that money market account?
11   A. They had accumulated in the Kingsdale Corp.
12       checking account, and we transferred it from
13       the checking account into the money market
14       account.
15   Q. And when was that transfer effected?
16   A. I believe it was made this day, on the 23rd.
17   Q. Exhibit 17 is entitled Security Agreement,
18       which is a pledge by Kingsdale Corporation of
19       its assets to Clinton Savings Bank. Do you
20       recognize this document?
21   A. Yes.
22   Q. Was this document signed at the closing?
23   A. Yes, it was.
24   Q. And was this document one of the documents that

Page 56

1    was changed at the closing?
2    A. I believe the first change is on Page 12, where
3        we changed the notice address for the data to
4        the Ayer address that I described earlier. On
5        Page 13 we crossed out Thomas Sullivan and
6        Frank Miller signed as president and treasurer
7        of Kingsdale. Same on the bottom of Paragraph 7
8        a few pages later.
9    Q. Do you know what assets Kingsdale Corp. had?
10   A. No, I do not.
11   Q. Do you know what Kingsdale Corp. was pledging
12       as collateral to secure the loan?
13   A. At a minimum, the money market account.
14   Q. So as of the closing, July 23rd, the only
15       assets that you were aware of that was owned by
16       Kingsdale was the money market account?
17   A. That we were specifically aware of, yes.
18   Q. Let me show you what has been marked as Exhibit
19       No. 19. I apologize. It doesn't look like the
20       last page was copied. I know it's in that box
21       there.
22       MS. BALLIRO: What's the title on it?
23       MR. REIN: Gitto Global's guaranty.
24       MS. BALLIRO: Want me to pull it for

Page 57

1    you? I just saw it.
2        MR. REIN: Sure, if you would.
3        MS. BALLIRO: It's not the stock
4    pledge; it's the guaranty; right?
5        MR. REIN: It says, Guaranty. I'll
6    copy the last page and make it part of the
7    document.
8    Q. But I notice it's dated June 16th, 2004. Is
9        this one of the documents that we talked about
10       earlier in connection with the security
11       agreement?
12   A. Yes.
13   Q. So this wasn't a document that was signed at
14       the July 23rd closing?
15   A. No, it was not.
16   Q. Let me show you what's been marked as CSB 21,
17       which is a guaranty from Frank Miller. This
18       was one of the documents signed at the closing?
19   A. Yes.
20   Q. Exhibit No. 22 is a pledge agreement from
21       Frank Miller, one of the documents signed at
22       the closing?
23   A. Yes.
24   Q. He's pledging a certain account?

Page 58

1    A. Yes.
2    Q. Do you know how much money was in that account?
3    A. At the closing, he gave me a check for $500,000
4       to put into this account.
5    Q. Let me show you, then, what's been marked as
6       CSB 23. Is that the check to which you're
7       referring?
8    A. Yes, it is.
9    Q. I'll show you what has been marked as Exhibit
10      25 --
11         MS. BALLIRO: Did we skip 24?
12         MR. REIN: Yes.
13   Q. -- which is a Limited Non-Recourse Guaranty
14      executed by Gary Gitto. Is this a document
15      that he signed at the closing?
16   A. Yes.
17   Q. And why was this a limited non-recourse
18      liability of Mr. Gitto's?
19   A. At that point in time, that was as much as he
20      was willing to put on the table in the
21      negotiation process.
22   Q. But this changed?
23   A. Yes.
24   Q. Let me show you what has been marked as Exhibit

Page 59

1       No. 26, which is a pledge agreement signed by
2       Gary Gitto. Was this one of the documents
3       signed by Gary Gitto at the closing?
4    A. Yes.
5    Q. And he's pledging a certain account?
6    A. Yes.
7    Q. Do you know how much money was in that account?
8    A. At that moment, there was none. During the
9       closing, he made several phone calls to arrange
10      for wires to be sent to our bank, which then
11      went into that account.
12   Q. Do you know how much money eventually went into
13      that account?
14   A. $500,000.
15   Q. Let me show you what's been marked as Exhibits
16      27, 28 and 29. Are those the wires that went
17      into that account?
18   A. Yes, they are.
19   Q. One of the wires was from an account of Charles
20      Gitto -- I'm sorry. It's three wire transfers;
21      correct --
22   A. Yes.
23   Q. -- totalling $500,000?
24   A. Yes.

Page 60

1    Q. They appear to have been made on July 23rd?
2    A. Yes.
3    Q. And these are the wire transfer confirmations
4       that I showed you?
5    A. Yes.
6    Q. I'm showing you what has been marked as Exhibit
7       No. 32, which is a limited non-recourse
8       guaranty from Tradex Corp. Do you recognize
9       that document?
10   A. Yes, I do.
11   Q. And that was a document that was signed at the
12      closing?
13   A. Yes, with a couple modifications.
14   Q. What were those modifications?
15   A. Page 2, Paragraph 4, part of Paragraph A was
16      crossed out, noted by crossing out A down below
17      and initialed by Charles Gitto.
18   Q. Was there a discussion about crossing out 4A
19      from the document?
20   A. I need to read it for a moment to refresh my
21      memory. I don't recall what the basis of the
22      discussion was for crossing it out Subparagraph
23      A.
24   Q. Showing you what has been marked as Exhibit 34,

Page 61

1       which appears to be a mortgage granted by
2       Tradex that ultimately was recorded, but it's
3       dated July 23, 2004. Was that one of the
4       documents signed at the closing?
5    A. Yes.
6    Q. And on what property was Tradex conveying a
7       mortgage?
8    A. They were giving us a second mortgage on the
9       Lunenburg property that was occupied by Gitto
10      Global Corp.
11   Q. Did you get any financial information with
12      regard to Tradex Corp.?
13   A. No, I did not.
14   Q. Did you get any documentation from Tradex Corp.
15      as to who the corporate officers, resolutions
16      with regard to the documents that were signed
17      by Tradex at the closing?
18   A. Not to my knowledge.
19   Q. Did you make any inquiry prior to the closing
20      as to who Tradex Corp. was?
21   A. I believe it was explained to me who Tradex
22      Corp. was.
23   Q. Who explained it to you?
24   A. My counsel.

16 (Pages 58 to 61)

Page 62

1    Q. Who was Tradex Corp.?
2    A. Tradex Corp., I understand, is an entity owned
3        by Charles Gitto that held title to the
4        commercial real estate in Lunenburg. It was
5        also verbally told to me that Tradex Corp.
6        owned that inventory that was pledged to the
7        bank as additional collateral.
8    Q. Other than that statement that was made to you,
9        did you do any due diligence to determine who
10       Tradex Corp. was?
11   A. No, I did not.
12   Q. I'll show you CSB 35, which is entitled,
13       Security Agreement. This is a pledge by
14       Kingsdale Corp. -- I'm sorry. By Tradex Corp.
15       of its assets to secure this obligation; is
16       that right?
17   A. I believe it's the security agreement for its
18       inventory.
19   Q. And there are changes made to this document?
20   A. Top of Page 2 description relative to
21       describing the inventory and to correct the
22       address of where it was located.
23   Q. There's a change on Page 5. Do you recall what
24       that discussion entailed?

Page 63

1    A. As I recall, the name of -- the Tradex name had
2        been changed at some time in the past and the
3        borrower and its counsel wasn't sure when the
4        last time it took effect was, so they preferred
5        to have that read as a three-year period so as
6        to not sign something that may have been
7        erroneous if, in fact, the name had been
8        changed within a five-year period. That's my
9        recollection.
10   Q. And the document is signed by whom on behalf of
11       Tradex?
12   A. Charles Gitto, Junior.
13   Q. Did you understand what his position in Tradex
14       Corp. was?
15   A. I understood him to be the president and sole
16       owner of the property.
17   Q. How did you understand that?
18   A. Verbal information conveyed to me.
19   Q. By whom?
20   A. By counsel.
21   Q. I'll show you what I've marked as Exhibits 36
22       and 37, which is a pledge agreement of stock
23       and a stock certificate. Let me show you 38,
24       too, which is an escrow agreement. They're all

Page 64

1        connected. These are documents that were also
2        signed at the closing?
3    A. Of course, this one was not signed, but these
4        two.
5    Q. So Exhibits 36 and 38 were signed at the
6        closing?
7    A. To this degree, yes, meaning this document is
8        missing a signature.
9    Q. Which exhibit?
10   A. Exhibit 38 --
11   Q. -- is missing the signature of Michael
12       Angelini?
13   A. Yes.
14   Q. Was the stock certificate itself given or
15       presented at the closing?
16   A. No, it was not.
17   Q. Do you know when that was placed into escrow?
18   A. Sometime after the 26th of July.
19   Q. And you're saying that date because that's the
20       date on the stock certificate?
21   A. Yes.
22   Q. Was there any discussion at the closing with
23       regard to the stock certificate and the
24       pledging of the stock in Vitrotech?

Page 65

1    A. There was, as I recall, as it related to a
2        prior discussion during the closing.
3    Q. What was that?
4    A. The document that they didn't want to sign
5        earlier assigning us the proceeds of Gitto
6        Global, they didn't want to sign because they
7        were concerned it would chill the sale, which
8        seemed to contradict the fact that Vitrotech
9        was willing to assign this stock to Gitto
10       Global and subsequently reported it in a filing
11       that was -- that we picked up on one of their
12       web pages. So it seemed contradictory that it
13       was okay for them to acknowledge that, but the
14       borrowers didn't want to sign a document
15       assigning us the sale proceeds. That was the
16       extent of it.
17   Q. Was there any discussion about that
18       contradiction at the closing?
19   A. Not specifically, no.
20   Q. Do you know how it came about that the stock
21       certificate was deposited into the escrow?
22   A. I'm not sure I fully understand the question.
23   Q. Were you involved in that process?
24   A. No.

1  Q. Do you know who tendered the stock certificate,
2     who delivered the stock certificate to be
3     deposited into escrow?
4  A. No, I do not.
5  Q. Do you know that it occurred?
6  A. From counsel, I understood that it occurred.
7  Q. Did you have any discussion with Miller or the
8     Gittos concerning the delivery of the stock
9     certificate?
10 A. No, not concerning delivery.
11 Q. What concerning?
12 A. Only with respect to that the deal to sell the
13    company is -- to acknowledge their commitment
14    that they want this deal to happen as well and,
15    therefore, they're willing to pledge some of
16    their stock in the meantime.
17 Q. Okay. I'll show you what's been marked as CSB
18    11. This is a loan presentation sheet dated
19    August 9, 2004. Were you involved in its
20    preparation?
21 A. Yes, I was.
22 Q. What was your role?
23 A. I reviewed this prior to it being signed and
24    being presented to our board on August 8th.

1  Q. What was the purpose of this loan presentation
2     sheet?
3  A. It was more for internal purposes, to
4     memorialize the fact that we had granted this
5     formal credit extension, so to acknowledge that
6     we had the formal approval in place for it.
7  Q. So this goes back to the July 23rd loan
8     transaction?
9  A. I need to refresh my memory.
10 Q. Sure.
11 A. I can't recall if this was the first one or if
12    -- oh, this is the first one. Yes, it is.
13    Yes, it is. It's to confirm what we closed on
14    the 23rd, yes.
15 Q. And the purpose of the loan is reflected in the
16    first paragraph?
17 A. Yes.
18 Q. And that is, this loan facility is available as
19    a back up for the bank's willingness to pay
20    checks drawn on Kingsdale account against
21    uncollected funds?
22 A. Yes.
23 Q. And the 8.4 million was the total exposure in
24    place as of July 23, 2004, with regard to those

1     uncollected funds?
2  A. As we understood it, yes.
3  Q. Subsequently it was reduced to eight million?
4  A. Yes.
5  Q. Later on?
6  A. Yes.
7  Q. And interest was being paid on this note?
8  A. We did not take it into income as interest. We
9     took it into income as fee income.
10 Q. But Kingsdale was paying interest on the note?
11 A. Yes.
12 Q. Okay. And then in addition, Kingsdale was
13    paying interest on the uncollected income in the
14    account?
15 A. No.
16 Q. That's not correct?
17 A. Maybe I can explain the way we made the
18    calculation. On a weekly basis, we calculated
19    the fee income or interest income based upon
20    the actual number of checks that we had paid on
21    uncollected funds at this stated interest rate
22    and sent him an invoice to that effect with
23    that detail backing it up and with the
24    agreement that the funds would be debited from

1     Kingsdale's checking account.
2  Q. Okay. Now, in about the fourth paragraph
3     down, starting with Kingsdale Corp. is a
4     corporation, do you see that paragraph?
5  A. Yes.
6  Q. Where did you get that information?
7  A. From Frank Miller.
8  Q. Was any effort made to confirm the information
9     told to you by Frank Miller?
10 A. Not on my part.
11 Q. On the part of anybody else at the bank?
12 A. I do not know.
13       I have a correction or clarification.
14 Q. Yes.
15 A. At some point in time we were provided with tax
16    returns on Kingsdale Corp. from Frank Miller,
17    but I don't recall without seeing them again
18    and refreshing my memory if those tax returns
19    confirmed the fact that he was 100 percent
20    owner.
21       MS. BALLIRO: That he was what?
22       THE WITNESS: 100 percent owner. I
23 don't recall if it was in there or not.
24 Q. If we turn to the third page, where it lists

1    collateral, the value for the Lunenburg
2    property, where did that value come from?
3  A. I believe it came from what was to have been
4    the purchase price of that property by
5    Vitrotech as part of its agreement to purchase
6    the assets of Gitto Global Corp. I mean, it
7    was separate from it, but it was part of the
8    same deal. They would buy the business, but
9    they would also buy from Tradex the real
10    estate, and I believe that was the price.
11  Q. In the asset purchase agreement?
12  A. Yes.
13  Q. Which you saw before the closing?
14  A. I saw it, but I did not read it in detail.
15  Q. But the figure came out of that document?
16  A. That's my understanding.
17  Q. Any effort to confirm or any due diligence to
18    see if that value was accurate and correct?
19  A. Not at that time.
20  Q. The inventory figure for Tradex Corp., where
21    did that figure come from?
22  A. At the time of this presentation, I'm not sure
23    if we had physically visited the location or
24    not, but ultimately we had a couple of pieces

1    of information, which is what we used to come
2    up with a number, and one of those documents
3    was something that resembled an invoice that
4    had a per pound price valuation for this
5    inventory. We then also received, at a
6    different time, what was something to the
7    effect of an inventory report that had detailed
8    how many pallets and bags and pounds of this
9    inventory were on hand. We then multiplied out
10    that poundage by the price on the inventory to
11    come up with a number that we felt was the
12    value of that, which ultimately turned out to
13    be higher than this number.
14  Q. The inventory report in the invoice, are those
15    documents at the bank still maintained?
16  A. Yes.
17  Q. Can I have those produced, please?
18  A. It should be in there.
19  Q. It's not in there. You're happy to look at
20    them, but it's not there.
21    MR. KASAKOFF: Tell me again, please,
22  what it is.
23    MR. REIN: He described it as an
24  inventory report and an invoice from Tradex.

1    THE WITNESS: I didn't say from
2    Tradex.
3  Q. From whom?
4  A. It was sent to us, faxed to us, from Gitto
5    Global. I can't say that I recall the name
6    Tradex being on there.
7  Q. So you have a fax from Gitto Global with an
8    invoice?
9  A. Right.
10  Q. That document, I would like produced.
11  A. Okay.
12  Q. And you have this inventory report from whom?
13  A. It was faxed to us from Gitto Global, a
14    one-page document that had it listed out in
15    terms of pallets and poundage.
16  Q. I would like that document.
17  A. Yes.
18  Q. Do you know who was faxing these documents from
19    Gitto Global?
20  A. I believe Frank Miller. In most cases, he
21    would send a cover letter along with whatever
22    he was faxing, but I can't say on a specific
23    document that that's what he sent out unless
24    it's attached to a fax cover letter.

1  Q. Whatever was faxed to you, whether it's a cover
2    page and/or a letter, I would like that
3    produced in connection with those documents.
4    The equipment figure, what equipment
5    are you referring to?
6  A. This is the equipment owned by Gitto Global
7    Corp. that prior to which time we had received
8    an appraisal on. That value there, I believe,
9    was the orderly liquidation value of that
10    equipment.
11  Q. I think it's referenced in the following
12    paragraph.
13  A. Yes.
14  Q. Let me show you Exhibit 12, which is a loan
15    presentation sheet dated August 16th, 2004. Do
16    you recognize that document?
17  A. Yes, I do.
18  Q. You were involved in its preparation?
19  A. Yes, I was.
20  Q. Can you tell me what was transpiring that
21    caused this loan presentation sheet to be
22    prepared?
23  A. Upon my return from vacation on Monday, August
24    8th, I soon thereafter got in touch with Frank

Page 74

1     Miller to determine the status of the sale,
2     which was supposed to take place a week from
3     that date.
4  Q. What did he tell you?
5  A. Without saying specifically it wasn't going to
6     happen, he indicated that they may need a few
7     more days, but no more than a week, but he
8     wasn't certain at that time. So with that
9     information, I verbally conveyed that to my
10    board the next day, I believe, on August 10th
11    to give them a heads up that we may be asked
12    for some type of short-term extension.
13  Q. When you conveyed it to the board, was there
14    any response from the board?
15  A. They were very upset, because we had understood
16    that this was going to or should have taken
17    place several times in the past. They were
18    disappointed, upset, and it was agreed that we
19    would only consider an extension if we received
20    adequate documentation from the parties
21    involved that they needed an extension and that
22    there was an extension agreement signed between
23    Vitrotech and Gitto Global Corp. and we wanted
24    to make sure that the deal was still on. In

Page 75

1    addition to that, we agreed at the board level
2    that we would only consider it for
3    consideration of some sort of additional
4    collateral, whatever that may be that we could
5    get our hands on.
6  Q. After you were told this by the board, what did
7    you do next?
8  A. I made it clear to Frank, even in my first
9    conversation before I went to the board, that
10    the board is not going to be very receptive to
11    a request to extend and should you formally
12    request for one, you need to be prepared to
13    give us some kind of additional collateral for
14    consideration of doing that; otherwise, I can't
15    see their willingness to do it.
16  Q. And did he say anything in response to that
17    statement?
18  A. Well, we don't have anything else to give. I
19    said, Well, you guys have to talk among
20    yourselves and find out what else is out there,
21    because I don't see the bank agreeing to extend
22    this without consideration.
23  Q. Was anything else said in this conversation?
24    And I'm talking about the one where you

Page 76

1    returned from vacation.
2  A. I don't recall. At that time there was daily
3    conversations with Frank, but I don't recall
4    specific conversations.
5  Q. Why were you talking on a daily basis?
6  A. Pushing him for information, trying to get a
7    heads-up as to what the status was so I could
8    report accordingly, given that we were fast
9    approaching the August 16th date.
10  Q. "The status" being sale to Vitrotech?
11  A. Right.
12  Q. After you were told what to do with the board,
13    did you get back to Frank Miller?
14  A. Yes. At some point in time during the week, to
15    let them know, to try to find out what's going
16    on and to remind them, if they were to ask us
17    for any kind of extension, we are going to need
18    some additional consideration.
19  Q. What did Frank say in response?
20  A. He hemmed and hawed as to their -- you have
21    everything. You're well secured. You're
22    oversecured. Why do you need more? Blah,
23    blah, blah, blah, blah, blah. I said, That's
24    not the point. We don't necessarily agree with

Page 77

1    your valuation of the collateral that you've
2    given us. In order for additional
3    consideration from us, we need consideration
4    from you.
5  Q. What was it that you didn't agree with in terms
6    of the collateral that had been given to you?
7  A. Having been in work-out situations in the past,
8    I realize that you can't count on values for
9    certain assets, whether it's real estate or
10    equipment whether it's a forced liquidation
11    situation.
12       We had placed no value on the stock.
13    As you said earlier, I wouldn't know what the
14    inventory was if I looked at it, nor would I
15    know what to do with it, so we discounted the
16    value of that. Generally speaking, in a
17    work-out situation, we felt that we would be
18    undersecured depending on what our exposure was
19    at that point in time. So we never felt we
20    were overly secured.
21  Q. Did Miller or anyone else get back to you with
22  .  regard to your request for additional
23    collateral?
24  A. Yes.

Page 78

1  Q. Who was it that got back to you?
2  A. I first received a voicemail message from who I
3     believe was the secretary for Charles Gitto,
4     asking me to give him a call.
5  Q. Who was that?
6  A. I forget her name.
7  Q. Helen Kozak?
8  A. I honestly don't recall her name.
9  Q. Charlie Enwright?
10 A. I wouldn't recognize it if I heard the name.
11 Q. To give Charles Gitto a call?
12 A. Yes.
13 Q. Did you call Charlie Gitto?
14 A. Yes, I called Charles Gitto.
15 Q. When did you call?
16 A. Sometime between the 9th and the 16th.
17 Q. Okay.
18 A. Between the 9th and the 18th.
19 Q. You called him. Just the two of you on the
20    phone?
21 A. At that first telephone conversation, yes.
22 Q. And what did you discuss at this first
23    telephone conversation?
24 A. As I recall, he was trying to explain to me,

Page 79

1     you know, that this deal is going to happen and
2     how important it is for them to happen and we
3     have to work for them. They want to be our
4     friends. They want to be our friends after.
5     He wants me to come out and to meet people that
6     they're doing business with, and all that. I
7     tried to stick to business and I explained that
8     in order to provide an extension, we would need
9     some additional collateral. He tried to
10    explain that, you know, there wasn't anything
11    left there. I said, Well, there is. You only
12    provided us with a limited guaranty now, as
13    does Gary. So that was the initial -- it was
14    to give him some thoughts on what he may be
15    willing to do to keep this thing alive. I
16    forget how that conversation ended.
17 Q. Anything else that you recall was discussed in
18    this conversation that you're describing?
19 A. I don't recall that, no.
20 Q. You had a subsequent conversation with Charles?
21 A. Yes, at least two others.
22 Q. The next one, when did that occur in relation
23    to the first?
24 A. Within a week's time frame. The second one was

Page 80

1     on or about the 16th of August, I believe,
2     which is when we were pressing them, because
3     that was the maturity date or the drop dead
4     date on our agreement. Somewhat through our
5     attorney and his attorney, I understood he had
6     agreed to give us his personal guaranty on the
7     obligations of the borrower or the debtor. He
8     then left another -- I think his secretary left
9     a message to call him back again, and I did.
10    At that meeting --
11 Q. Was it a meeting or a phone call?
12 A. Conference call, because I had him on speaker
13    phone and explained to him that also present
14    was Joe Guercio, my boss, and Dave Harmon, who
15    works with me as well.
16       It was a very intense session in terms
17    of going back and forth. He was trying his
18    hardest not to give me anything. I explained
19    to him that we needed something more to make
20    this work and that he was in control or had the
21    ability to make it work by giving us the
22    guaranty that we had asked for. We had gone
23    around and around on it. Finally he said that
24    he agreed to give us his unlimited personal

Page 81

1     guaranty and that he wanted to see what kind of
2     form the document -- no. That was the next
3     conversation. I said the documentation was in
4     process with our attorneys and we needed to get
5     it signed as soon as possible in order to
6     provide an extension. He agreed to do that.
7     And the other two gentlemen overheard that
8     conversation.
9  Q. Then you had a third conversation?
10 A. Yes. He called back the next day trying to
11    back out of it.
12 Q. What did you say and what did he say?
13 A. He said first he didn't see there was a need
14    for it. Can't we keep it as $500,000? How
15    about a million dollars? I said, No. It
16    doesn't work that day. He played up the value
17    of the collateral, the value of the real
18    estate, all of those things. I countered by
19    saying, If you feel that's the value, then your
20    personal guaranty should be adequately
21    protected.
22       Ultimately, when I explained to him
23    that the documents were in draft form, because
24    he wanted me to fax him a copy of what this

Page 82

1    would look like, I said Charlie, the attorneys
2    have already drafted them. They're in your
3    attorney's possession. Call Mark Bodanza and
4    find out, asked him to share that with you.
5    And he said he would. I believe that was my
6    last conversation with him.
7    Q. Did you ever have any conversation with
8        Gary Gitto?
9    A. Only at the closing on July 23rd.
10   Q. So what happened next in terms of the
11       additional collateral request?
12   A. What we had required and they agreed to give us
13       was a third mortgage on Frank Miller's personal
14       residence in Bolton, the unlimited guaranty of
15       Gary Gitto as well as that of Charlie Gitto.
16   Q. And was there a closing for the giving of this
17       additional collateral?
18   A. Not with myself present. The documents were
19       drafted by counsel. I believe they were in
20       some form sent to counsel for the borrowers and
21       the borrowers' counsel had them executed.
22   Q. Okay.
23   A. The last piece of the document, on that day
24       that they were executed, Frank Miller came to

Page 83

1    the bank with the originals of those, along
2    with his wife Maria, to execute in front of me
3    and a notary the third mortgage on their
4    residence.
5    Q. Okay. Let's go through those documents, if we
6        can, quickly. The first document is a letter
7        agreement dated August 18th, 2004. This is one
8        of the documents executed in connection with --
9    A. Yes.
10   Q. -- this change in the collateral?
11   A. Yes.
12   Q. The next document?
13   A. Do you want to review the things that were
14       handwritten in here?
15   Q. Yes, I do. How were these changes made?
16   A. They were negotiated verbally between myself
17       and counsel and our counsel and their counsel.
18       We agreed to them in principal. My
19       understanding is someone on their end wrote
20       this in when the documents were closed. I was
21       not present, nor was our counsel.
22   Q. And this conversation between the two counsel
23       and yourself, who was the counsel?
24   A. At our end?

Page 84

1    Q. Your end.
2    A. Paul O'Riordan.
3    Q. Who was on their end?
4    A. Mark Bodanza.
5    Q. What did Paul and Mark and you discuss?
6    A. I don't recall the details, other than their
7        wanting to say that they'll give us what they
8        gave LaSalle as far as financial information.
9        That's the intent of what's been added to the
10       bottom of Page 2. In other words, they'll give
11       us as much as they've given anyone else.
12   Q. Did they give you financial information?
13   A. Yes.
14   Q. What financial information did they give you?
15   A. We had internally prepared interim financial
16       information for April of '04, which was ten
17       months of their fiscal year, as well as May of
18       '04, which was 11 months of their fiscal year.
19       Prior to that we had received copies of their
20       audited statements from the prior fiscal year
21       as well as their January, seven-month interim
22       period. That's, as I recall, all the financial
23       information we had on Gitto Global.
24   Q. Anything else discussed in the telephone

Page 85

1    conference between yourself and the two
2    lawyers?
3    A. Just as I recall, it relates to these minor
4        changes here, that he -- Frank Miller was
5        having trouble, as he explained it to me,
6        getting a hold of his accountant in order to
7        get me these tax returns.
8    Q. Did he ever get you tax returns?
9    A. Yes, he did.
10   Q. Frank Miller's tax returns?
11   A. No, no. Kingsdale Corp.'s returns.
12   Q. Okay. Anything else that was discussed at this
13       conference with the two lawyers?
14   A. Not that I can recall.
15   Q. Do you know when this conference with the two
16       lawyers took place?
17   A. I believe there were multiple conversations
18       concluding with some that took place on this
19       date, the 18th.
20   Q. In the multiple conversations, was the
21       discussion always pertaining to the changes to
22       Document 15?
23   A. I don't believe so. I think, in general, it
24       had to do with, We agreed to terms. Are they

Page 86

1  willing to sign? Where do we get this done?
2  It was those kinds of things. A lot of it had
3  to do with finally getting Charlie Gitto to
4  agree to sign the guaranty. That was the last
5  sticking point, as I recall.
6  Q.  These several conversations, was it always
7  between the same two lawyers and yourself?
8  A.  I can only speak for the conversation that I
9  had with my attorney. I don't know.
10 Q.  No, no. When you were on the phone with Mark
11 --
12 A.  I wasn't on the phone with Mark.
13 Q.  I thought you said you had a conference call
14 about the changes with the two lawyers and
15 yourself.
16 A.  If I said conference call, I made a mistake. I
17 spoke with my counsel. He spoke with their
18 counsel, but we didn't have a conference call
19 between the three of us.
20      THE WITNESS: Did I say that?
21      MR. KASAKOFF: It wasn't clear to me
22 that that was the situation, but what's done is
23 done.
24      THE WITNESS: I'm sorry.

Page 87

1      MR. KASAKOFF: Nothing to be sorry
2  about.
3  Q.  I'll show you Exhibit 18, which is a guaranty
4  from Charles Gitto. That's the guaranty that
5  was negotiated with them?
6  A.  Yes.
7  Q.  And that was also signed in connection with
8  this change in collateral?
9  A.  Right.
10 Q.  And this was delivered with the other original
11 documents by Frank Miller?
12 A.  Yes.
13 Q.  Exhibit 24 is the mortgage from the Millers.
14 That's the mortgage that was signed when they
15 came into the bank and signed it in front of
16 you?
17 A.  Yes.
18 Q.  Exhibit 30 is an amended and restated guaranty
19 from Gary Gitto.
20 A.  Yes.
21 Q.  And this was changing so that he had an
22 unlimited guaranty?
23 A.  Yes.
24 Q.  Exhibit No. 33 is an amended and restated

Page 88

1  guaranty from Tradex Corporation. And what
2  were they changing with regard to their
3  guaranty obligation?
4  A.  I'm trying to recall.
5  Q.  Was it to make the guaranty unlimited?
6  A.  I don't recall if it was that or what we had to
7  liquidate first. I honestly don't recall. I
8  would have to read this in detail and digest it
9  and compare it to the other one to say
10 specifically.
11 Q.  Would it help you to look at the other one?
12 A.  Oh, it definitely would, yes.
13 Q.  Do you want to take a break while you look at
14 it and refresh your recollection?
15 A.  Okay. I'll give it a shot right here.
16      MS. BALLIRO: Would this be a good
17 time to give the court reporter a break?
18      MR. REIN: That's what I was thinking.
19 Why don't we do that right here.
20      MR. STERN: I was thinking I want to
21 ask one or two questions and then I have to
22 leave. I would like to finish up.
23      MR. REIN: I have no problem with
24 that.

Page 89

1      (Short recess was taken.)
2  BY MR. REIN:
3  Q.  Were you able to make the comparison and make
4  the determination as to what the changes were
5  in the amended and restated guaranty?
6  A.  Yes. From what I can tell, it was to make it a
7  full unlimited guaranty as compared to a
8  limited non-recourse guaranty. That's my
9  understanding.
10 Q.  There are a couple other documents that I
11 wanted to show you to identify in terms of the
12 loan transaction. One was marked Exhibit 31,
13 the landlord's consent. Was this the consent
14 that had been discussed at the closing and was
15 obtained subsequently?
16 A.  Yes.
17      MR. REIN: I found the document that
18 you didn't mark before. If you could mark
19 that?
20      (Exhibit No. 57 marked for
21 identification.)
22 Q.  I'll show you a Exhibit 57, which is a security
23 agreed from Tradex.
24 A.  We saw this already.

Page 90

1  Q.  We did see this.
2        MR. REIN:  Cancel 57.  Void Exhibit
3     No. 57.
4  Q.  After the loan is redocumented and there's
5     additional collateral given, do you have any
6     further dealings with, whether it's Miller or
7     the Gittos, let's say, between August 16th and
8     September 15th?
9  A.  Only with Frank Miller, not the Gittos.
10  Q.  What are you doing dealing with Mr. Miller?
11  A.  Periodically we were communicating to get a
12     status as to the pending sale, which at that
13     point was still supposed to take place on
14     September 15th.  I'm trying to recall the
15     sequence of events, but I can't recall them in
16     detail other than ultimately he came in at our
17     request and met with Dave Harmon and myself on
18     August 27th.  We demanded that he come in to
19     let us know what was going on, because we
20     hadn't been getting any kind of information as
21     to the status of the sale.
22        Prior to him coming in on the phone,
23     he had expressed his frustration as well,
24     indicating something to the effect that he

Page 91

1     hasn't been able to get a hold of the right
2     people at Vitrotech.  They're in conferences
3     every time he calls.  He hasn't been able to
4     make the connection.  It led to him saying that
5     that weekend, he would be on a plane with
6     Michael Angelini to meet face to face with the
7     people at Vitrotech to find out what's going on
8     and what the status of things are.
9        Some day or few days prior to when he
10     actually came in and met with us on the 27th,
11     he had also indicated that they were exploring
12     other options to take us out, so to speak, by
13     obtaining -- looking to obtain financing on
14     their equipment that they would use to
15     refinance all of the equipment that first lien
16     holders, as well as us -- so that if the sale
17     didn't take place as scheduled, they could have
18     us out of the picture.
19        So when he came in on that Friday, he
20     explained that he was going out to the west
21     coast to deal with this.  We pressed him on who
22     he was talking to about financing.  He
23     mentioned one company that I had name
24     recognition with, so it appeared to

Page 92

1     substantiate it somewhat that he was making
2     some effort at it.
3  Q.  Who was that?
4  A.  He mentioned a gentleman by the name of Frank
5     Kennedy with Salem Capital Corporation.  I had
6     met him several years ago in a different
7     situation, so I knew it was a real name and
8     company.  So that was the last time I saw Frank
9     Miller face to face.  Then ultimately I spoke
10     with him again the following Tuesday, which I
11     believe was the 31st.
12  Q.  Okay.
13  A.  Keep going?
14  Q.  What did you speak with him about on the 31st?
15  A.  Either the afternoon of the 30th or the morning
16     of the 31st -- I forget which -- we learned by
17     looking at Vitrotech's web page seeing that a
18     revised quarterly report, I believe, had just
19     been filed and within certain sections of that
20     revised quarterly report, it stated that the
21     deal to acquire Gitto Global had been
22     terminated.  And actually the effective date of
23     that, if I recall, within that publication was
24     the 27th.  Within that same document, it also

Page 93

1     stated that the chairman of the Vitrotech had
2     tendered his resignation effective the day
3     before, the 26th of August.  So when we learned
4     that, we were naturally very concerned, because
5     our understanding was this would all go away
6     with the sale of the business.
7        I was trying to get a hold of Frank
8     Miller.  I called both his cell phone number
9     and the office number.  Whoever answered at the
10     office indicated he was on a flight back from
11     California.  Ultimately he called me, I
12     believe, on the afternoon of the 31st.
13        When I explained the reason we were
14     chasing him, based on what we had learned, he
15     expressed somewhat of a surprise that they had
16     cancelled the deal and that it was off.  I
17     said, Frank, you know, they say this was
18     effective the 27th.  You met with us on the
19     27th.  You gave us no indication when you went
20     out to meet with them.  He said -- he still
21     expressed surprise that they would put that in
22     a publication.  He said, Oh, they'll be back at
23     the table.  That's probably a negotiating
24     tactic.

Page 94

1      I asked him about whether or not he
2   knew that the chairman had resigned.  He did?
3   I said, That's what it stated, effective the
4   26th.  Well, he said, I'm not surprised, only
5   because he said at our meeting over the weekend
6   that the board was very upset with him for
7   having conveyed those three million shares of
8   stock to support the deal and that he would
9   probably have to replace them from his own
10  options, or something to that effect.  But
11  Frank indicated that he did not know the
12  chairman had resigned.
13     I said, Well, Frank, the 15th is fast
14  approaching.  What's your plan?  He said, Well,
15  we're continuing to pursue other financing.
16  We've got preliminary indications that it's
17  favorable, and it can be done rather quickly.
18  I said, Well, that's less than two weeks from
19  the date.  Are you sure that that can
20  reasonably take place, given my experience as a
21  lender and knowing what time it takes for those
22  things to happen.  He indicated that based upon
23  the indications he had received so far, he
24  thought it would.  I asked him if he had or

Page 95

1   expected to receive a commitment letter to that
2   effect soon.  He said within a few days he
3   should have one and would follow up with us.
4   That was my last conversation with Frank
5   Miller.
6      On the Friday of that week, I called
7   him looking for an update, having not heard
8   from him.  He never returned the call, and I
9   never spoke with him.
10  Q.  What caused the bank to look at the website of
11      Vitrotech?
12  A.  As part of our research to try to determine
13      whether it was a real company.
14  Q.  Had you ever looked at their website before?
15  A.  Yes, we had.  I don't know how much previous to
16      that.  It was in the July, August time frame
17      that I had done it myself anyways.
18  Q.  When you couldn't get a hold of Frank, did you
19      try to get a hold of the Gittos?
20  A.  No, I did not.
21  Q.  Did you try to get a hold of anybody else?
22  A.  No, not on their end.
23  Q.  Right.  I'll show you what has been marked as
24      Exhibit 44, which is an August 3, 2004 letter

Page 96

1   from David Harmon, who worked under you, to
2   Frank Miller.  Do you recognize this letter?
3   A.  Yes.
4   Q.  And the purpose of this letter was what?
5   A.  To acknowledge debiting the account for certain
6       expenses and fees associated with the
7       arrangement that it closed on the 23rd.
8   Q.  This was the account, being Kingsdale's
9       account?
10  A.  Checking account.  This is where the money came
11      from, yes.
12  Q.  Exhibit No. 49 is an August 20 letter from you
13      to Frank Miller.  Do you recognize that?
14  A.  Yes, I do.
15  Q.  And what was the purpose of that letter?
16  A.  This was to acknowledge two weeks worth of fees
17      taken from the account based upon the checks
18      that had been paid and drawn against
19      uncollected funds as well as for 50 percent or
20      $20,000 of the 40,000 that they had agreed to
21      pay to us as consideration for extending the
22      facility to September 15th.
23  Q.  Was the full 40 ever paid?
24  A.  No.  Only 20.

Page 97

1   Q.  Why not?
2   A.  They asked if we could have that paid at the
3       closing on the sale of the business along with
4       the other termination fee that they had agreed
5       to give us.
6   Q.  I show you what's been marked as Exhibits --
7          MR. REIN:  Here's the one that wasn't
8       marked.  Sorry.  Let's make that 57.
9          (Exhibit No. 57 marked for
10      identification.)
11  Q.  I'll show you what's been marked as Exhibits 50
12      through 57, which are letters from August 26,
13      2004 through September 17, 2004, from you to
14      Frank Miller with respect to debits to the
15      Kingsdale account.  Just identify them for me,
16      please.
17  A.  Sure.  They're basically two sets of documents,
18      one being the invoice with the recapitulation
19      of the activity in the account for the prior
20      week and then a letter acknowledging debiting
21      the account to pay for those fees over that
22      time period, as well as legal fees.
23  Q.  And who made the decision to call the loan?
24  A.  There's not a simple answer to that in terms of

Page 98

1    there wasn't a loan in place.
2    Q. The $8.4 million loan, note?
3    A. There was a credit arrangement to provide for
4       the payment of checks drawn uncollected funds.
5    Q. Was there not a note in collateral?
6    A. There was.
7    Q. All right. Who made the decision to call the
8       loan, note and to set off against the
9       collateral?
10   A. With the advice of counsel on September 15th,
11      counsel advised us to return the checks that
12      were being presented for payment, any
13      subsequent checks thereafter.
14   Q. What about the subsequent decision to set off
15      against the various accounts that had been
16      pledged?
17   A. Upon the advice of counsel, we prepared notices
18      to the various owners of the cash collateral
19      that we would be exercising those rights.
20      After three days, the notice period elapsed, we
21      off set those accounts.
22   Q. Other than conversations that you've testified
23      about that you had with Frank Miller,
24      Gary Gitto, Charles Gitto, did you ever talk to

Page 99

1    anybody else at Gitto Global in connection with
2    financing arrangements or the bank account of
3    Kingsdale Corp.?
4    A. The only one conversation that I can recall was
5       a short one with a gentleman who I believe
6       Frank indicated was a controller. I believe
7       his name was Bill Deacon. That was at Frank's
8       request, to call Bill on that particular day to
9       confirm that we were paying the checks.
10   Q. Which day was that?
11   A. I don't recall the day.
12   Q. Do you remember the month?
13   A. It was right at the very end of August, early
14      September, but I could be off by a day.
15   Q. You called Deacon?
16   A. Yes.
17   Q. What did you say to Deacon and what did he say
18      to you?
19   A. All I can recall is confirming that the checks
20      being presented for payment were being paid.
21   Q. Did he say anything?
22   A. Thank you for the call. That's all that I can
23      recall.
24   Q. Had you ever called anyone at Gitto Global

Page 100

1    before to let them know the checks were being
2    paid?
3    A. Not that I recall.
4    Q. When Frank asked you to do this, give me a time
5       frame between when Frank asked you to do this
6       and your call to Deacon?
7    A. It was within the same day, and it was
8       subsequent to our conversation with Frank. He
9       asked me to do that as a courtesy so Deacon
10      knew what was going on.
11   Q. Did Frank say why he needed you to call him?
12   A. No. He didn't say why.
13   Q. Did you find that unusual, when you hadn't been
14      asked before to do that?
15   A. Well, the checks -- my understanding was they
16      were able to tell by going online if the checks
17      had been paid or not. I can only surmise that
18      they didn't see checks having been paid yet and
19      made the inquiry, and when we agreed that
20      they'd be paid, he wanted me to confirm that.
21   Q. What checks are we talking about?
22   A. These are checks that were being presented
23      against Kingsdale's checking account on that
24      particular day.

Page 101

1    Q. So therefore, checks payable to Gitto Global?
2    A. I believe so. I didn't see specific checks,
3       but since every other check was payable to
4       them, I believe so.
5    Q. You're aware that the checks written on the
6       Kingsdale account were all written to Gitto
7       Global?
8    A. I understand that more fully now, yes.
9    Q. Did you understand that when this transaction
10      was going down?
11   A. I believe that to be the case.
12   Q. And did you also understand the only deposits
13      being made into the Kingsdale account was
14      checks written on Gitto Global payable to J & J
15      Chemical?
16   A. At which time did I know that?
17   Q. When this transaction was going on.
18   A. When you say "this transaction," that day when
19      I called him to pay the checks or at any time?
20   Q. Say in 2003, 2004, you were aware of the
21      deposits of checks payable from Gitto Global to
22      J & J Chemical?
23   A. I believe I understood that to be the case
24      during that whole time period.

26 (Pages 98 to 101)

1    MR. REIN: I have nothing further.
2         CROSS EXAMINATION
3    BY MR. STERN:
4  Q. You met Gary Gitto at the closing on July 23rd?
5  A. Yes, I did.
6  Q. Had you ever met him before?
7  A. No.
8  Q. Had you ever spoken to him before?
9  A. Not to my knowledge.
10 Q. Have you ever spoken to him afterwards?
11 A. No, I have not.
12        MR. STERN: No further questions.
13        CROSS EXAMINATION
14 BY MS. BALLIRO:
15 Q. Did you meet Charlie Gitto for the first time
16    at the closing on July 23rd, 2004?
17 A. Yes.
18 Q. Had you spoken with him on the phone prior to
19    that occasion?
20 A. No, I did not.
21 Q. Had he supplied you with any financial
22    information relating either to Gitto Global,
23    Kingsdale Corporation or Tradex?
24 A. No, he did not.

1  Q. Is it fair to say all of the documentation that
2     Clinton Bank received, to the extent that you
3     received any, was received through Frank
4     Miller?
5  A. Yes.
6  Q. You testified that at the closing, none of the
7     individuals who were signing on to this line of
8     credit would sign documents, assigning the sale
9     proceeds to Clinton Bank?
10 A. That's correct.
11 Q. Now, was it your impression that Mark Bodanza
12    was representing all three of them, Frank
13    Miller, Charlie Gitto and Gary Gitto?
14 A. Yes. And he advised all of them when they had
15    questions.
16 Q. So there were no other attorneys representing
17    those individuals at that closing?
18 A. No, there were not.
19 Q. Was Mike Angelini at that closing?
20 A. No, he was not.
21 Q. Was it your understanding that Mr. Bodanza was
22    also representing the corporate entities?
23 A. That was my understanding.
24 Q. You testified that one of the first documents

1     that Charlie Gitto was asked to sign, he
2     initially refused to sign it. I think you said
3     he threw his pen down on the table?
4  A. Yes.
5  Q. Do you recall what document that was?
6  A. No, I don't. I didn't think of that when I was
7     reviewing the various documents, but there were
8     only a few that required his signature, so it
9     shouldn't be hard to figure out.
10 Q. Well, let's just try to go through them very
11    quickly.
12 A. The document that he didn't want to sign maybe
13    isn't in there. I don't know if there's a
14    blank copy of that one that we didn't get
15    signed anywhere.
16 Q. I'm not referring to the one that everyone
17    refused to sign. I'm referring to the one
18    where you said he threw his pen down on the
19    table and ultimately his attorney, I think you
20    said, coerced him into signing it. That's the
21    one that I'm trying to focus on right now.
22        MR. REIN: That's from this morning.
23    He wouldn't have seen those. That's my stuff.
24    It should be all in that pile.

1        THE WITNESS: I recall another part of
2     the conversation if it's worth trying to
3     explain it.
4  Q. What do you recall about the conversation?
5  A. I believe that was that occasion when Mark
6     Bodanza said, Well, Charlie, you don't need to
7     sign that one. This has to be signed by Gitto
8     Global. Then Charlie said, Well, that's you
9     guys, but I would recommend that you not sign
10    that document. So that may be that document
11    that wasn't signed.
12 Q. By anyone?
13 A. By anyone. So it may be that Charlie thought
14    he was being asked to sign it when he threw the
15    pen down. It was explained to him, No, that's
16    not for you to sign. That's for Frank and Gary
17    to sign on behalf of Gitto Global. He said,
18    Well, I wouldn't say that. I'd advise you guys
19    not to sign it. It's up to you guys, but I
20    wouldn't sign it if I were you. That's how I
21    recall the conversation went. So that might be
22    the document, which would be a missing document
23    because it was unsigned.
24 Q. So as you sit here today, you don't recall

Page 106

1    Charlie Gitto at first being reluctant to sign
2    a document, but ultimately Mr. Bodanza
3    persuaded him to sign?
4    A. I don't recall specifically which document that
5        was.
6    Q. Let me show you what has been marked as Exhibit
7        No. 14, CSB Exhibit 14 to this deposition.
8    A. Yes.
9    Q. Would that be the document that Mr. Bodanza
10       ultimately persuaded Charlie Gitto to sign at
11       the closing?
12   A. I don't recall.
13   Q. Well, at that closing, did Charlie Gitto
14       provide Clinton Bank with any guaranties?
15   A. I don't believe he did. He signed on behalf of
16       Tradex Corp., who was guaranteeing Kingsdale's
17       obligations, but Charlie Gitto personally, I
18       don't believe signed a personal guaranty.
19   Q. And that would have been -- the guaranty by
20       Tradex Corp. would have taken place at the July
21       23rd closing?
22   A. Yes.
23           MS. BALLIRO: Do we have that anywhere
24       in this stack of documents here?

Page 107

1           MR. REIN: He looked at the two of
2        them. He was comparing them, these two.
3    Q. Let's pull out the one that was presented on
4        July 23rd. All right. So it's a limited
5        non-recourse guaranty by Tradex to the bank
6        guaranteeing the Kingsdale obligation. Do you
7        recall if that might have been the document
8        that Mr. Bodanza ultimately persuaded Charles
9        Gitto to sign?
10   A. I can't say for sure.
11   Q. All right. But in any event, there were only
12       two documents ultimately that he signed on July
13       23rd; correct?
14   A. Well, he signed this document. He signed this
15       document. He signed the security agreement for
16       the Tradex inventory. He signed a mortgage for
17       the Tradex real estate. So there's a minimum
18       of four, just going from recollection.
19   Q. Among those four, can you give us any
20       indication as to which of those documents
21       Charles Gitto might have initially refused to
22       sign?
23   A. As I explained a few minutes ago, it may have
24       been the one that none of them signed and he

Page 108

1    initially thought he was being asked to, which
2    is why he may have said, I'm not going to sign
3    it. And then when Bodanza explained, That's
4    not for you to sign; it's for Frank and Gary to
5    sign. And he backed off. He said, Okay. But
6    I don't think you guys should sign it either.
7    You guys are Gitto Global, but I would advise
8    that you not to sign that, something to that
9    effect.
10   Q. Okay. So when you testified on direct
11       examination that one of the first documents
12       that Charlie Gitto was asked to sign, he
13       initially refused to sign, threw the pen down
14       and only as a result of coercion from his
15       counsel did he sign, you're saying that
16       testimony was incorrect?
17   A. It may be. I honestly am a bit confused about
18       it at this stage.
19   Q. Okay. Well, what caused you to give that
20       testimony on direct examination?
21   A. In general, it seemed like it was pulling teeth
22       to get anybody to sign anything. So it might
23       have been the general tenor of the situation
24       that made me say that. By virtue of the fact

Page 109

1    that certain things were changed at the closing
2    would give an indication that there were
3    negotiations that went on throughout the
4    closing to finally get to that point.
5    Q. Okay. Do you have a memory as you sit here
6        today that there were any documents that
7        Charlie Gitto initially refused to sign at the
8        closing, but ultimately did sign after having
9        been persuaded by counsel to do so?
10   A. After thinking it through right now, I cannot
11       say for certain.
12   Q. All right. I believe you testified that you
13       did not do any due diligence on the VitroLite
14       inventory prior to the closing because it would
15       serve no purpose. Do you recall that
16       testimony?
17   A. Yes, I do.
18   Q. I believe you testified that you were trying to
19       gather as much collateral as you could to
20       support the agreement?
21   A. That is correct.
22   Q. What did you mean when you said it would serve
23       no purpose to do due diligence on the VitroLite
24       inventory?

Page 110

1  A.  I can't recall the exact tenor of the question
2      about what due diligence had we do or did we do
3      any and what the basis of the question was.
4      Can anyone help me with that?
5  Q.  You were asked if you were given any
6      documentation of Tradex's ownership in the
7      VitroLite inventory, and you had indicated you
8      were not given anything; correct?
9  A.  That is true.
10 Q.  And you were asked if you did any due diligence
11     to determine whether, in fact, Tradex actually
12     owned that inventory.  Your answer was that it
13     would have served no purpose.  Do you recall
14     that testimony?
15 A.  I recall saying that, yes.
16 Q.  So is it your testimony that at least as of the
17     July 23rd closing, that the bank was simply
18     trying to get together as much collateral as it
19     could from as many sources as it could to
20     support this continuing arrangement with
21     Kingsdale Corporation?
22 A.  That's correct.  My charge was to take whatever
23     collateral was being offered as consideration
24     for our willingness to keep this arrangement in

Page 111

1      place.
2  Q.  And if Tradex Corporation had withdrawn its
3      offer to put the VitroLite inventory up as
4      collateral, can you tell me whether the bank
5      would have proceeded with the arrangement or
6      would it have called?
7  A.  That would have been a judgment call at the
8      time.  I would have called the bank to talk to
9      my superior and/or president of the bank to
10     discuss it, but it's only hypothetical now in
11     terms of what we would have done then.
12 Q.  Were you given any documents detailing the
13     assets of Tradex before the July 23rd closing?
14 A.  No.
15 Q.  Did you request any?
16 A.  No.
17 Q.  Why not?
18 A.  Again, my charge was to take whatever
19     collateral was being offered to us at the time,
20     and that's what I did.
21 Q.  But how did you know what collateral was being
22     offered to you if you didn't do the due
23     diligence on the collateral itself?
24 A.  It was based upon information that was given to

Page 112

1      me by other bank personnel who had interacted
2      directly with, I believe, Frank Miller, who
3      indicated that.  Those things were available,
4      and we pursued to document it as such.
5  Q.  What things were available?
6  A.  The Tradex inventory, the Tradex real estate,
7      the personal cash deposits, Vitrotech stock and
8      the various guaranties, which changed
9      over time.
10 Q.  What did the bank do, for example, to verify
11     the value of the Tradex property?
12 A.  We didn't do anything and there was not a need
13     to at that time, because what we were getting
14     at that time was something more than we had
15     prior to getting it.  So we were willing to
16     take anything to determine later on what we had
17     for value, but my charge was to get as much as
18     I could, because prior to that we didn't have
19     anything.
20 Q.  Well, that goes back to my earlier question to
21     you.  If your goal was to get as much as you
22     could in terms of collateral and determine
23     later what the value of it was, then had
24     Mr. Gitto refused to sign the document

Page 113

1      concerning the VitroLite inventory,
2      do you believe the deal would have still gone
3      forward not knowing what the value of that
4      inventory was?
5  A.  Again, it's only hypothetical to try to
6      determine now what we would have done then, but
7      in my experience as a lender, I would have
8      taken it as someone reneging on their deal and
9      would have questioned the character and
10     integrity of the people involved at that time
11     and tried to factor that into my recommendation
12     of what to do if that had been the case.
13 Q.  What if Frank Miller had never offered the bank
14     the VitroLite inventory in the first place?
15 A.  Then we wouldn't have known about it.
16 Q.  And would you have gone through with the deal?
17 A.  I can't say that I know the answer to that.
18 Q.  Other than the conversations that you've
19     testified to that you had with Charlie Gitto
20     before the documents were signed in mid August
21     2004 and the conversations that you described
22     taking place at the closing on July 23rd of
23     2004, did you have any other conversations with
24     Charlie Gitto?

1  A.  No, I did not.
2  Q.  What was different about the situation in mid
3      August of 2004 versus the situation on July
4      23rd, 2004 at the closing?
5  A.  In what respect?
6  Q.  In term of the bank's view of the Kingsdale
7      situation, the Kingsdale account.
8  A.  Well, I would say that the board was becoming
9      increasingly inpatient with the situation and
10     all the delays in the sale of the company to
11     that point, so there was much less willingness
12     to work with them and, therefore, the need to
13     ask for additional consideration for that
14     extension.
15 Q.  And when Charlie Gitto attempted to persuade
16     you to take perhaps a $500,000 cap or a million
17     dollar cap on his guaranty in August, had you
18     already made a determination that the bank
19     would not continue to extend credit to
20     Kingsdale if they didn't get that guaranty?
21 A.  I would say the answer to that question is yes.
22 Q.  How had you made that determination?
23 A.  Based upon presentations to the board, it was
24     explained that we would recommend for their

1      approval further extension of that facility
2      without additional consideration, which would
3      come in the form of additional guaranties or
4      collateral.  I wasn't specific as to components
5      and amounts, but that's pretty much how I
6      phrased it.
7  Q.  And back in July of 2003, would you have
8      recommended a continued extension of credit to
9      the board based upon the second mortgage on the
10     Tradex real estate, the Tradex guaranty and the
11     additional guaranties you received from Frank
12     Miller and Gary Gitto?
13 A.  You mean July of 2004?
14 Q.  Yes.
15 A.  We weren't further extending anything then.
16     There wasn't a formal agreement in place at
17     that time.  That was the initial formalization
18     of it.
19 Q.  Okay.  So would you have recommended that the
20     bank enter into that formal agreement with
21     Kingsdale Corporation back on July 23rd if you
22     had the Tradex land, the second mortgage on the
23     Tradex land -- and I think there was a pledge
24     of the equipment; correct?

1  A.  That was already in place.
2  Q.  -- the Gitto Global equipment --
3  A.  Yes.
4  Q.  --the $500,000 that had been transferred each
5      by Gary Gitto and Frank Miller --
6  A.  Yes.
7  Q.  -- and the limited recourse guaranty from
8      Charles Gitto; correct?
9  A.  He did not have a limited guaranty in that at
10     that time.
11 Q.  So there was the limited non-resource guaranty
12     from Gary Gitto; correct?
13 A.  Correct.
14 Q.  Did you have a third mortgage on the Bolton
15     house at that time?
16 A.  Not at that time, no.
17 Q.  Did you have a guaranty from Frank Miller?
18 A.  Yes.  I believe it was unlimited.
19 Q.  So with that sort of package of collateral
20     would you have recommended they be approved to
21     the board of directors in July of 2004?
22 A.  Everything except the VitroLite inventory?
23 Q.  Everything except the VitroLite inventory.  I
24     think I covered everything.

1  A.  I have to figure out a way to explain it and it
2      makes sense so you believe I'm being as
3      forthright as I can be.  It wasn't a matter of
4      extending anything from the bank because there
5      was nothing to extend and we had an exposure.
6      The charge was to take as much collateral as
7      being offered to minimize that exposure.
8  Q.  I understand that.
9  A.  So if we didn't know that inventory was
10     available at the time, we would have moved
11     forward, because we wouldn't have known it was
12     there to begin with.
13 Q.  But you say what you were trying to do is
14     minimize your exposure, but you were trying to
15     minimize your exposure by entering into formal
16     agreements with Kingsdale and Charlie Gitto,
17     Gary Gitto, Tradex, and so on and so forth in
18     order to minimize that exposure; correct?
19 A.  Correct.
20 Q.  And if you hadn't been told about the VitroLite
21     inventory by Frank Miller, you wouldn't have
22     known it was there, then you would have gone
23     forward to minimize that exposure with the
24     collateral that you had been offered?

Page 118

```
1   A.  That's a fair statement.
2           MS. BALLIRO:  I have nothing further.
3           MR. REIN:  I have nothing further.
4           (Whereupon, at 2:57 o'clock p.m., the
5       deposition was concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 120

```
1   DEPONENT'S ERRATA SHEET
2   AND SIGNATURE INSTRUCTIONS
3
4           The original of the Errata Sheet has
5       been delivered to Mr. Kasakoff, Esq.
6           When the Errata Sheet has been
7       completed by the deponent and signed, a copy
8       thereof should be delivered to each party of
9       record and the ORIGINAL delivered to Mr. Rein,
10      Esq. to whom the original deposition transcript
11      was delivered.
12
13          INSTRUCTIONS TO DEPONENT
14
15          After reading this volume of your
        deposition, indicate any corrections or changes
16      to your testimony and the reasons therefor on
        the Errata Sheet supplied to you and sign it.
17      DO NOT make marks or notations on the
        transcript volume itself.
18
19      REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20      COMPLETED AND SIGNED ERRATA SHEET WHEN
21      RECEIVED.
22
23
24
```

Page 119

```
1           C E R T I F I C A T E
2   COMMONWEALTH OF MASSACHUSETTS
3   COUNTY OF MIDDLESEX, ss.
4
5           I, Lorraine S. Foley, a Registered
6       Professional Reporter and Notary Public in and
7       for the Commonwealth of Massachusetts, do
8       hereby certify that the foregoing transcript of
9       the deposition of ROBERT PAULHUS, having been
10      duly sworn, on December 1, 2004, is true and
11      accurate to the best of my knowledge, skill and
12      ability.
13          IN WITNESS WHEREOF, I have hereunto
14      set my hand and seal this        day of
15      , 2004.
16
17
18
19              Lorraine S. Foley
20              Notary Public
21
22
23  My commission expires:  December 3, 2004
24
```

Page 121

```
1   ATTACH TO THE DEPOSITION OF ROBERT PAULHUS
    CASE:  LaSALLE BUSINESS CREDIT  V. GARY GITTO,
2   ET AL,
3           ERRATA SHEET
4   INSTRUCTIONS:  After reading the transcript of
    your deposition, note any change or correction
5   to your testimony and the reason therefor on
    this sheet.  DO NOT make any marks or notations
6   on the transcript volume itself.  Sign and
    date this errata sheet (before a Notary Public,
7   if required).  Refer to Page 120 of the
    transcript for errata sheet distribution
8   instructions.
9   PAGE    LINE
                CHANGE:
10              REASON:
                CHANGE:
11              REASON:
                CHANGE:
12              REASON:
                CHANGE:
13              REASON:
                CHANGE:
14              REASON:
                CHANGE:
15              REASON:
                CHANGE:
16              REASON:
                CHANGE:
17              REASON:
                CHANGE:
18              REASON:
                CHANGE:
19              REASON:
20
        I have read the foregoing transcript
21  of my deposition and except for any corrections
    or changes noted above, I hereby subscribe to
22  the transcript as an accurate record of the
    statements made by me.
23
24      ROBERT PAULHUS    DATE
```