IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a ) <br> LASALLE BUSINESS CREDIT, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CLINTON SAVINGS BANK, ) <br> ) <br> Defendant. ) | CIVIL ACTION 05-10268-DPW |

**LASALLE'S RESPONSE IN OPPOSITION
TO CLINTON SAVINGS BANK'S MOTION TO DISMISS COMPLAINT**

LaSalle Business Credit, LLC ("LaSalle") has set forth five claims in its Complaint against Clinton Savings Bank ("Clinton"): participation in a RICO conspiracy in which the conspirators conducted a corporation's affairs through a Check-kite (Count I); aiding and abetting the Check-kite (Count II); receipt of a fraudulent transfer (Count III); equitable subordination of Clinton's claims based upon Clinton's intentional participation in the Check-kite (Count IV); and breach of an assumed duty to contain the operation of the Check-kite (Count V). Clinton has challenged all of the Counts as supposedly failing to state claims upon which relief can be granted. In doing so, however, Clinton has misconstrued plain, straightforward allegations in the Complaint, has relied on decisions dealing with the proof required at trial rather than what needs to be alleged in a complaint and has ignored controlling decisions that repudiate the points it has raised. For the reasons set forth below (in which LaSalle responds to Clinton's arguments in the same order in which Clinton has presented them), Clinton's Motion should be denied.

# I
# COUNT I ALLEGES A VALID RICO CONSPIRACY CLAIM

Clinton, in seeking the dismissal of LaSalle's RICO claim, relies upon a misunderstanding of both RICO and conspiracy law.

**J&J Chemical Is
Identified as the Enterprise**

Clinton asserts that LaSalle "fails to plead sufficient facts to identify an 'enterprise' affecting interstate commerce; instead, Plaintiff names J&J Chemical's 'activities' as the 'enterprise,'" citing paragraph 17 of the Complaint. (Clinton Mo. p. 7) Clinton's characterization of LaSalle's allegations is incorrect.

In the Complaint, LaSalle alleges that a conspiracy existed "to conduct J&J Chemical's affairs through a 'pattern of racketeering activity' within the meaning of 18 U.S.C. § 1961(5) …" (Cmplt. ¶ 18) J&J Chemical is described as a Massachusetts corporation and as the "enterprise," within the meaning of 18 U.S.C.§ 1961(4). (Cmplt. ¶s 7, 17) Therefore, the RICO enterprise identified in the Complaint is J&J Chemical, a corporation, not J&J Chemical's activities. J&J Chemical falls within the definition of an "enterprise" in 18 U.S.C. § 1961(4). *Seville Indust. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 790 (3d Cir. 1984) (to plead existence of a RICO enterprise, it is sufficient to identify it); *In re: Lupron® Mktg. and Sales Practices Litigation*, 295 F.Supp.2d 148, 163 (D. Mass. 2003) ("An enterprise may be a legal entity…."). The fact that J&J Chemicals may have existed solely as a vehicle for the Check-kite is irrelevant. *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir. 1992).

As to J&J Chemical affecting interstate commerce, J&J Chemical and Clinton are located in Massachusetts. (Cmplt. ¶s 4, 7) LaSalle is located in New York and Illinois. (Cmplt. ¶3) J&J Chemical, through the conduct alleged in the Complaint, caused a flow of millions of dollars

through the interstate banking system between Massachusetts and Illinois, where the Gitto Global account was maintained. (Cmplt. ¶s 20-35)

Clinton declares the allegations of the Complaint are "a moving target" as to the enterprise, the pattern of racketeering activity and the Check-kite. (Clinton Mo. p. 8) Actually, the Complaint follows the basic RICO elements. First, J&J Chemical is identified as the "enterprise." (Cmplt. ¶ 17) Second, the Complaint sets out a conspiracy to conduct J&J Chemical's affairs through a pattern of racketeering activity, which consisted of the Check-kite that defrauded LaSalle, a violation of 18 U.S.C. § 1962(d). (Cmplt. ¶s 17, 20-33) Third, Clinton joined that conspiracy, thereby becoming liable for all of the acts performed in furtherance of the conspiracy. (Cmplt. ¶s 36-48)

**Clinton Participated**
**In the RICO Conspiracy**

Clinton argues that LaSalle "connects none of [Clinton's actions alleged in the Complaint] to an indictable 'predicate act' under the RICO statute…." (Clinton Mo. p. 7) Clinton mixes this argument with a claim that LaSalle must allege Clinton's "participation in two or more predicate acts under the RICO statute,"[1] for which Clinton states LaSalle must identify the particular Clinton employees involved and the communications from which Clinton's agreement may be inferred. (Clinton Mo. p. 6 & n. 2) "Participation," Clinton claims, "requires an allegation of some part in directing the enterprise's affairs." *(Id.)*

The indictable RICO predicate acts identified in the Complaint are Clinton's continued fueling of the operation of the Check-kite as described in the Complaint with hundreds of checks Clinton passed through the J&J Chemical Account. A check-kite constitutes a violation of 18

---

[1] This requirement that every participant in a RICO conspiracy must participate in two or more predicate acts imposed by the First Circuit was overruled by the Supreme Court in *Salinas v. U.S.,* 522 U.S. 52, 62-66 (1997).

U.S.C. § 1344. *Stoutt v. Rancal Corp., Ltd.*, 320 F3d 26, 28 (1st Cir. 2003); *U. S. v. Fontana*, 948 F2d 796, 802 (1st Cir. 1991). Section 1344(1) provides a basis for a RICO claim. 18 USC § 1961.

LaSalle alleges that Clinton, in violation of 18 USC § 1962(d), participated in a RICO conspiracy that operated the Check-kite through the J&J Chemical Account at Clinton. (Cmplt. ¶s 18, 30-33, 36-48) Clinton claims LaSalle's allegations are insufficient because LaSalle does not allege that Clinton had some role in "directing the enterprise's [i.e., J&J Chemical's] affairs," citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). *Reves*, however, interpreted the meaning of "participation" under 18 U.S.C. § 1962(c). *Reves*, 507 U.S. at 172, 179.

*Reves* does not deal with participation in a RICO conspiracy in violation of § 1962(d), which has different requirements than §1962(d). *Dongelewicz v. PNC Bank Nat'l Ass'n.*, 104 Fed. Appx. 811, 818 (3d Cir. 2004) ("conspiracy liability under §1962(d) does not require satisfaction of the *Reves* test, but is governed by the 'general principles of criminal conspiracy law.'"). In a conspiracy, each conspirator acting in furtherance of the conspiracy is deemed to be acting as the agent for the coconspirators. *Pinkerton v. U.S.*, 328 U.S. 640, 646 (1946). Thus, the control exercised over J&J Chemical by Clinton's coconspirators is imputed to Clinton. As the Supreme Court observed in *Salinas v. U.S.*, 522 U.S. 52, 65 (1997):

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.

Clinton's argument that LaSalle must catalog in the Complaint the who, what, when and where of the specific phony checks that went through the J&J Chemical Account is also based on cases that do not relate to the predicate acts involved here. Clinton relies upon *Ahmed v.*

- 4 -

*Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997), and *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 42 (1st Cir. 1991). The RICO claims in those cases rested upon predicate acts of mail and wire fraud. *Ahmed*, 118 F.3d at 889 (plaintiff alleged only that defendants used postal service by mailing unspecified materials and used wire communications); *Feinstein*, 942 F.2d at 42 (Plaintiffs alleged: "This pattern of racketeering activity consisted of various acts in violation of 18 U.S.C., Section 1341 relating to mail fraud, [and] 18 U.S.C. [§] 1343 relating to wire fraud….").

Obviously, when the alleged violation rests upon a particular mode of communication, such as a mailing or an interstate wire transmission, those particular communications should be specifically identified in accordance with Fed. Rule Civ. P. 9(b), requiring that fraud be pled with "particularity."

*Feinstein* also refers to the interpretation of Fed. Rule Civ. P. 9(b) as requiring that the time, place and content of communications be pled, citing *New England Data Serv., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987). 942 F.2d at 42. This specificity requirement of Rule 9(b) applies when there is an alleged false representation. *New England Data*, 829 F.2d at 288; *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980).

Rule 9(b) requires that in averments of fraud, the *circumstances* constituting the fraud be stated with particularity. "One of the main purposes of the rule is to apprise the defendant of fraudulent clams and the acts that form the basis for the claim." *Hayduk v. Lanna*, 775 F.2d 441, 442 (1st Cir. 1985). When the fraud is based upon conduct rather than a misrepresentation, the circumstances of the conduct are to be supplied. The Complaint provides the necessary information to Clinton as to the circumstances of the Check-kite and Clinton's participation in it.

As the First Circuit held in *Fontana*, a violation of 18 U.S.C. § 1344(1) does not require proof of any fraudulent misrepresentations. 948 F.2d at 798. The knowing participation in the bare act of check-kiting constitutes a fraud under § 1344(1). *U. S. v. Frydenlund*, 990 F.2d 822, 824-25 (5th Cir. 1993). Thus, employees, acting under directions to deposit checks for which they know there are insufficient funds and will further a check-kite, violate § 1344(1) even though they had no intent to harm the bank involved. *Frydenlund*, 990 F.2d at 825. Certainly, a bank that knowingly supports a check-kite must similarly be held responsible.

Clinton summarizes the allegations in the Complaint concerning its knowing participation in the use of the J&J Chemical Account for a check-kite. (Clinton Mo. pp. 6-7) Those facts set out its participation in a violation of 18 USC § 1334(1). Clinton was neither an unknowing vehicle for the Check-kite nor a mere spectator. It not only knew the Check-kite was being conducted, it knowingly sustained and supported the Check-kite's continued operation. (Cmplt. ¶s 33, 36-48) By continuing to process checks known to be employed in a check-kite, Clinton fostered an appearance that Gitto Global had legitimate sales that justified the advance of millions of dollars to Gitto Global. (Cmplt. ¶ 58) Clinton facilitated and perpetuated a check-kite, and is just as culpable as a lowly employee who knowingly deposits phony checks for a check-kite for his or her employer.

Clinton further argues that the Complaint is supposedly deficient because it does not set forth the "details of how and when … [Clinton] allegedly joined the Conspiracy or agreed to participate in an enterprise…, including dates, the particular employees of … [Clinton] involved, and the communications from which … [Clinton's] agreement to join or participate may be inferred." (Clinton Mo. p. 6, n. 2) Clinton cites *Ahmed*, 118 F.3d at 889, and *Miranda v. Ponce Fed'l Bank*, 948 F.3d 41, 48-49 (1st Cir. 1991). Neither case, however, holds that the details

sought by Clinton are required. *Ahmed* deals with the allegations concerning the pleading of a RICO enterprise and predicate acts. *Miranda* involved a "perfunctory" allegation "that the individual defendants, with others, conspired to devise a scheme of racketeering activity focused on obstruction of justice." 948 F.2d at 47-48

There are good reasons why the "details" sought by Clinton are not required for a complaint. A conspiracy claim is not comparable to an express contract claim. Conspiratorial agreements do not have to be express. *Aetna Cas. Surety Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994). The existence of an agreement in a conspiracy case is rarely proven by direct evidence. *U. S. v. Pineiro*, 389 F.3d 1359, 1369 (11th Cir. 2004). Because the details of a conspiracy are often shrouded in secrecy, conspiracies are frequently proven entirely by circumstantial evidence. *U. S. v. Barnes*, 244 F.3d 172, 175 (1st Cir.), *cert. den.*, 534 U.S. 967 (2001); *U. S. v. Mickelson*, 378 F.3d 810, 821 (8th Cir. 2004). If the details Clinton seeks are not required to prove a conspiracy, they certainly are not required to plead a conspiracy.

**LaSalle Has Standing**

LaSalle alleges that it is a second-tier wholly-owned subsidiary of LaSalle Bank National Association, "a federally insured national banking association, which provides funding to LaSalle." (Cmplt. ¶3) Clinton, in its Motion (p. 7, n. 3), observes that LaSalle "fails to allege whether its own activities or loans are subject to FDIC review or regulation, or that it is a 'financial institution' for purposes of § 1344." Clinton does not state that LaSalle is not a "financial institution" protected by § 1344. Clinton appears to merely state that LaSalle should have alleged the conclusion to be drawn from its status as a second-tier wholly owned subsidiary of a federally chartered and insured institution.

Further, there should be no question as to LaSalle's standing to invoke Clinton's violation of § 1344 as the predicate acts for a RICO conspiracy claim. As set forth in *U. S. v. Walsh*, 75

F.3d 1, 9 (1st Cir. 1996), cited by Clinton in its footnote, a party can violate § 1344 by defrauding an entity that is not itself a federally insured institution. It is sufficient that a financial institution is exposed to a risk of loss. *Id.*; *U.S. v. Gressett*, 773 F.Supp. 270, 275 (D. Kan 1991); *c.f.*, *U.S. v. Crisci*, 273 F.3d 235, 240 (2d Cir. 2001) (bank need not be immediate victim of fraudulent scheme).

**The Causal Nexus Between Clinton's
Predicate Acts and LaSalle's Damages Is Apparent**

Clinton claims that LaSalle has failed to plead facts showing how Clinton's predicate acts proximately caused the damages sought by LaSalle. (Clinton Mo. p. 8) While the damages sought under a civil RICO claim must be from the predicate acts upon which the RICO claim rests (*Beck v. Prupis*, 529 U.S. 494, 505 (2000)), LaSalle does not have to plead damages with specificity.

The Supreme Court in *NOW v. Scheidler*, 510 U.S. 249, 256 (1994), a civil RICO case, stated: "We have held that 'at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" Therefore, under Supreme Court precedent, LaSalle's allegation in paragraph 51 of the Complaint that "LaSalle has been damaged by the conduct of Clinton set forth herein in an amount in excess of $11 million" is sufficient. *Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002).

LaSalle, however, has alleged more than is required. As set out in the Complaint, checks drawn upon the J&J Chemical Account at Clinton provided the appearance of a legitimate basis for LaSalle to advance funds to Gitto Global under LaSalle's Loan Agreement with Gitto Global. (Cmplt. ¶s 20-33) Clinton participated in the operation of the Check-kite by knowingly supporting its continuance. (Cmplt. ¶s 39, 42-47) A check-kite by definition creates an illusion

that a party has funds in a bank account that really are not there. It is foreseeable that when the music stops and a check-kite collapses somebody is going to be left holding worthless checks.

## II
## COUNT II ADEQUATELY STATES A CLAIM FOR AIDING AND ABETTING

There is no dispute that two elements must be pled by LaSalle for an aiding and abetting claim against Clinton: (i) Clinton knew the J&J Chemical Account was being used to conduct a criminal check-kite; and (ii) with such knowledge, Clinton provided substantial assistance to the perpetration of the Check-kite. (Clinton Mo. p. 10) Clinton does not dispute that LaSalle has alleged both of these elements. Instead, Clinton claims that LaSalle has not alleged with sufficient particularity the requisite knowledge or a level of assistance qualifying as "substantial assistance" in the scheme. (Clinton Mo. pp. 11-12)

Knowledge. Clinton first criticizes LaSalle for failing "to make any allegation that would support Plaintiff's contention that Defendant 'knew' of the scope or extent of Gitto Global's fraudulent activities …" (Clinton Mo. p. 11) This argument ignores the express provision in Fed. R. Civ. P. 9(b) that: "Malice, intent, knowledge and other conditions of mind may be averred generally." Therefore, LaSalle's allegation in paragraph 39 of the Complaint that by April, 2004, Clinton had actual knowledge that the J&J Chemical Account was being used in the Check-kite is sufficient.

In arguing its position, Clinton relies on two cases that deal with reviews of the sufficiency of the evidence on appeals from trials.[2] Neither decision has any relevance to what must be pled as to knowledge. In the two other cases relied upon by Clinton, the plaintiffs alleged facts that failed to show the requisite knowledge. In *Spinner v. Nutt*, 417 Mass. 549,

---

[2] *United States v. Rodriguez-Alvarado*, 952 F.2d 586 (1st Cir. 1991); *Town & Country State Bank of Newport v. First State Bank of St. Paul*, 358 N.W. 2d 387 (1984).

- 9 -

556-57 (1994), the plaintiffs' allegation that the trustees of their trust acted on the advice of their counsel was held insufficient to show that counsel knew the trustees were allegedly going to breach their duties. In *Kyte v. Phillip Morris Co.*, 408 Mass. 162, 168 (1990), the complaint was held insufficient because the plaintiff minors did not allege that the defendant tobacco manufacturer knew the retail store in question was selling cigarettes to minors. Here, LaSalle has alleged that Clinton had the requisite knowledge.[3]

Substantial Assistance. The operation of a successful check-kite requires at least two banks that will allow the customer in question to draw on uncollected funds. *U.S. v. Stone*, 954 F.2d 1187, 1188 n. 1 (6th Cir. 1992). If one of the banks should end its willingness to allow the customer to draw on uncollected funds, the check-kite will collapse. The continued willingness to allow the customer to draw on uncollected funds is more than substantial assistance to a check-kite, it is the sine qua non of the check-kite.

Clinton has not presented any argument that a bank's knowing and extended facilitation of a check-kite, as alleged in paragraphs 39, 43, 55-58 of the Complaint, is not sufficient substantial assistance for a check-kite. Instead, Clinton merely concludes that LaSalle's allegations are not enough. Clinton relies on two cases for its substantial assistance argument, *Bamberg v. SG Cowen Sec. Corp.,* 236 F. Supp. 2d 79 (D. Mass. 2002), and *Landy v. FDIC*, 486 F.2d 139, 162-63 (3d Cir. 1973). Neither case is even remotely applicable to this case. *Bamberg* involved a securities claim in which plaintiffs alleged they acquired a corporation's stock based on false audited financial statements. KPMG Singapore was alleged to have aided and abetted the fraud because it had communicated doubts about some of the corporation's financings to those issuing the financial statements in Belgium. The district court held that raising doubts

---

[3] It should also be noted that *Spinner* and *Kyte* dealt with pleading requirements under state procedure, rather than under the Federal Rules of Civil Procedure.

concerning the corporation's finances was not of substantial assistance to the issuance of the false report by others. 236 F. Supp. 2d at 91. For *Bamberg* to be comparable, Clinton would have to have played no active role in the Check-kite—in stark contrast with the allegations of the Complaint.

*Landy* was also a securities fraud case brought by shareholders who purchased a bank's stock. For a federal fraud claim, the plaintiffs had to show that the fraud occurred in connection with their purchase of the bank's securities. 486 F.2d at 153-55. The stock they purchased was worthless because the bank's president was gambling with the bank's funds in the market and guessed wrong on the market. The plaintiffs sued the brokers who handled the bank president's trading, and the court considered whether the brokers could be held liable for aiding and abetting the securities fraud on the shareholders. The court correctly ruled that the brokers could not be liable for aiding and abetting the securities violation because they were not involved in any way with the sale of the bank's stock or the misrepresentations made. 486 F.2d at 162-66. Here, Clinton was not a stranger to the Check-kite but an integral player in its implementation.

### III
### COUNT V STATES A CLAIM FOR BREACH OF ASSUMED DUTY

Clinton's third argument in its Motion is that LaSalle "failed to plead a sufficient negligence claim because, as a matter of law, [Clinton] had no duty" to LaSalle with respect to the Check-kite. (Clinton Mo. p. 14) Clinton misunderstands LaSalle's claim. LaSalle does not allege that Clinton was negligent in failing to detect the Check-kite or in failing to protect LaSalle. Rather, LaSalle alleges that, due to the actions Clinton took, Clinton assumed a duty to LaSalle. It is Clinton's breach of this assumed duty that is the target of LaSalle's claim.

Clinton cites cases for the prevailing view that, normally, a bank does not have a duty to refrain from attempting to protect itself from a check-kite loss and thereby pass the loss onto

- 11 -

another bank. (Clinton Mo. p. 15) The usual factual scenario, as seen in these cases, is Bank A discovers a check-kite between it and Bank B. Bank A tries to protect itself from the check-kite through normal banking practices, by returning checks and closing the account being used. Bank B is left with the returned worthless checks and suffers a loss. Bank B sues Bank A, claiming Bank A had a duty to disclose the kite. Courts have uniformly held that, as Bank A followed normal banking practices, Bank A had no such duty to disclose the check-kite. *See, e.g. Banks v. Everett Nat'l Bank,* 305 Mass. 178, 25 N.E.2d 177 (1940); *Alta Vista State Bank v. Kobliska,* 897 F.2d 930 (8th Cir. 1990). "It appears that the only duty of a bank in this regard is to stop a kite after it has been discovered." *Mid-Cal Nat'l Bank v. Federal Reserve Bank of San Francisco,* 590 F.2d 761, 764 (9th Cir. 1979).

Clinton's conduct does not match the common factual scenario. While Clinton had a right to attempt to minimize its losses from the Check-kite, it did not have a right to abandon safe and sound banking practices by feeding and extending the Check-kite. When Clinton went beyond good faith and common decency by promoting the Check-kite, it breached a duty to LaSalle. *City Check Cashing, Inc. v. Manufacturers Hanover Trust Co.,* 166 N.J. 49, 62, 764 A.2d 411, 417-418 (2001). This is the basis of LaSalle's claim.

Upon discovering the Check-kite, Clinton did not merely attempt to shift the check-kite loss to LaSalle. It did not exercise safe and sound banking practices by immediately returning checks and closing the account. (Cmplt. ¶s 42-47) Quite the opposite, Clinton took affirmative steps to perpetuate the Check-kite, allowing it to continue for many months, and ultimately became a party to the Check-kite. (*Id.*) Clinton continued to provide J&J Chemical with an account necessary for the operation of the Check-kite, thereby representing to LaSalle, over the

course of 5 months, that J&J Chemical had funds available, when, in fact, it did not. (Cmplt. ¶ 47)

For all of this, Clinton was compensated. (Cmplt. ¶s 44, 45) Clinton entered into an $8.4 million revolving loan agreement, received security interests in certain real property and inventory and received unlimited personal guarantees. (*Id.*) By taking these affirmative steps, Clinton assumed a duty to disclose the Check-kite and created a special relationship with those reasonably foreseeable to be damaged by the Check-kite.

Clinton argues that LaSalle "has failed to allege sufficient facts that would support its conclusory statements that [Clinton] should have foreseen that [LaSalle] would be harmed." (Clinton Mo. p. 16) This argument is belied by the facts alleged in the Complaint and by other statements in Clinton's Motion. The Check-kite was operated between LaSalle, Clinton and Fleet. (Cmplt. ¶s 25-27, 30) Clinton knew that either it, Fleet or LaSalle would be harmed when the kite collapsed. (Clinton Mo. p. 16) The same is true with every check-kite. When a check-kite crashes, one or more of the banks end up with an overdraft situation. Further, Clinton even admits that "the persons who could be foreseeably harmed…were …perhaps LaSalle Bank." (Clinton Mo. p. 16) Thus, Clinton's argument that LaSalle's damages were not foreseeable is disingenuous.

Finally, Clinton argues that LaSalle has not alleged facts to support that Clinton's breach of duty was the proximate cause of LaSalle's damages. (Clinton Mo. p. 16) Clinton claims that the Fleet Blocked Account was controlled by LaSalle and was "just as integral to Gitto Global's fraud, and had as many suspicious indicators." (Clinton Mo. p. 16) The allegations in the Complaint aver otherwise. The Fleet Blocked Account was not controlled by LaSalle. It was a holding area, a depositary account at another bank. (Cmplt. ¶s 13, 14) Viewing the allegations in

the Complaint in the light most favorable to LaSalle, LaSalle had no control over this account and did not receive information from it sufficient to warn LaSalle about the Check-kite.

From April, 2004 to September, 2004, Clinton knowingly allowed the Check-kite to continue through the J&J Chemical Account. Because of this, Gitto Global was able to continue to defraud LaSalle and was able to make it appear that sufficient collateral existed to support the amount borrowed by Gitto Global, when, in fact, Gitto Global's sales and accounts receivable were becoming increasingly inflated. (Cmplt. ¶47) As a result, LaSalle suffered greater losses when the Check-kite collapsed in September, 2004 than if Clinton had stopped the Check-kite back in April, 2004. (Cmplt. ¶47)

As alleged in the Complaint, by failing to exercise safe and sound banking practices and by representing to LaSalle that the J&J Chemical Account held collected funds, Clinton assumed a duty to disclose the Check-kite to LaSalle. (Cmplt. ¶s 42-47, 78) Clinton breached its assumed duty by continuing to support, to facilitate and to reap compensation from the Check-kite and LaSalle was damaged by that breach. (Cmplt. ¶s 42-47)

## IV
## COUNT IV STATES A CLAIM FOR
## EQUITABLE SUBORDINATION AGAINST CLINTON

Clinton argues that in Count IV LaSalle fails to state a claim for the equitable subordination[4] of the mortgage Clinton received in permitting the Check-kite to continue.

First, Clinton claims equitable subordination "is a remedy found solely in bankruptcy law." (Clinton Mo. p. 17) Clinton's statement of the law is incorrect. Equitable subordination is a "well established doctrine in Massachusetts law." *Lawler Corp. v. FDIC,* 848 F. Supp. 1069, 1072 (Mass. 1994); s*ee also, O'Brien v. Wainwright Bank & Trust Co.,* 6 LCR 90 (Mass. Land

---

[4] Equitable subordination is used sometimes interchangeably with equitable subrogation.

293978.3 042314-34311

Ct. 1998). It is an equitable doctrine used to prevent unjust enrichment due to "illegal, egregious and severely unfair" actions. *Id.*

Next, Clinton argues that, even if there is an equitable subordination cause of action outside of bankruptcy, LaSalle has not stated such a claim based upon Clinton having obtained the Tradex mortgage to save itself from loss, because Clinton "had a right to protect itself from loss in the Check-kite scheme, even if others would be harmed as a result. *Frost Nat'l. Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 873-74 (7th Cir. 2001)." (Clinton Mo. p. 17)

*Frost Nat'l. Bank*, however, does not condone what Clinton did. While Clinton had a right to protect itself, as illustrated by *Frost Nat'l. Bank,* it went far beyond that by becoming a step-parent of the Check-kite. *Frost Nat'l. Bank* best illustrates what Clinton should have done.

In *Frost Nat'l. Bank,* First of America Bank became suspicious that one of its customers was using one of its accounts in a check-kite scheme. Within one month of that suspicion, First of America Bank took numerous steps to deal with the suspected check-kite – it placed a hold on the account, corresponded with the customer, closed the account, opened a holding account and refused to pay checks presented for payment. *Id. at* 865-866. In contrast, instead of taking similar steps to deal with what Clinton knew was a check-kite, it supported the continuation of the scheme at the increased risk to others.

As alleged in the Complaint, Clinton became concerned about the J&J Chemical Account in October, 2003; Clinton knew about the Check-kite by April, 2004; Clinton nevertheless aided the Check-kite's continued operation until September, 2004. (Cmplt. ¶s 36-39, 44) Clinton continued to "accept and provide good funds for the Gitto Global checks deposited into the J&J Chemical Account before they cleared Fleet Bank" (Cmplt.¶ 43); Clinton entered into an $8.4 million revolving loan agreement with J&J Chemical, facilitating the use of Clinton in the

conspiracy (Cmplt. ¶ 44); Clinton received consideration for agreeing to facilitate the fraud in the form of certain guarantees and pledges from officers and directors of Gitto Global and from Tradex. (Cmplt. ¶ 45)

Clinton's actions, as alleged in the Complaint, between October, 2003 and September, 2004 were "illegal, egregious and severely unfair." As a result, Clinton profited unjustly from the Check-kite. Accordingly, LaSalle has plead a cause of action for equitable subordination and the motion to dismiss should be denied.

## V
## TRADEX'S BANKRUPTCY FILING DOES NOT WARRANT DISMISSAL OF EITHER COUNT III OR COUNT IV

Clinton argues that because Tradex is in bankruptcy proceedings, LaSalle's equitable subordination and fraudulent transfer claims must be dismissed with prejudice. The bankruptcy filing by Tradex does affect LaSalle's equitable subordination and fraudulent transfer claims, just not in the way Clinton argues. The filing does not strip LaSalle of its standing to sue Clinton, nor does it mandate that the claims be dismissed. Rather, the only effect of the bankruptcy filing is to stay any dispositive ruling on these two causes of action, pending action by the Tradex bankruptcy trustee.

**LaSalle Has Standing to**
**Pursue Its Claims Against Clinton**

Clinton cites four cases in support of its argument, none of which is applicable to this case. *Hartford Underwriters Insur. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1 (2000) (11 U.S.C. § 506(c) does not provide an administrative claimant of a bankruptcy estate an independent right to seek payment of its claim from property encumbered by a secured creditor's lien); *Flip Mortgage Corp. v. McElhone,* 841 F.2d 531 (4th Cir. 1988) (mortgage company had no standing to pursue a claim against the officers and directors that they drained the debtor of

- 16 -

assets through a series of fraudulent conveyances); *In re Vitreous Steel Prod. Co.,* 911 F.2d 1223 (7th Cir. 1990) (the trustee is the only party with standing to assert issues on behalf of unsecured creditors); *In re Morpheus Lights,* 228 B.R. 449 (Bankr. N.D. Cal. 1998) (a creditor-plaintiff must seek court approval before bringing a claim on behalf of the estate). Once again, Clinton misses the point.

LaSalle has not filed suit against Tradex – it filed suit against Clinton. LaSalle does not seek to recover assets from Tradex – it seeks to recover from Clinton. LaSalle has not sought to bring a claim on behalf of Tradex's bankruptcy estate or Tradex's unsecured creditors – its claim is solely on behalf of LaSalle. LaSalle does not seek to redress any wrong done to Tradex – it seeks to redress a wrong done to it. LaSalle did not file any claim under the Bankruptcy Code – it filed suit under Massachusetts common law and the Uniform Fraudulent Transfer Act, as codified by Massachusetts ("UFTA").

As set out in the preceding section of this Response, LaSalle, as a creditor of Tradex, has standing to sue Clinton under the doctrine of equitable subordination to have Clinton's mortgage from Tradex subordinated to LaSalle's claims.

LaSalle also has standing to sue Clinton for Clinton's receipt of a fraudulent conveyance. Under the UFTA, one who has a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured" may file an action for relief against a transfer or obligation. Mass. GL ch. 109A, §§ 2, 8. LaSalle has a right to payment, which has not been reduced to judgment and, accordingly, may file an action for relief.

**The Effect of the Tradex Bankruptcy**
**On LaSalle's Claims Against Clinton**

The Tradex bankruptcy did not strip LaSalle of its right to sue under the UFTA or for equitable subordination, it merely shifted that right to the creditors' representative for a period of time. *City Nat'l Bank v. Chabot,* 100 B.R. 18 (C.D. Cal. 1989). Under the Bankruptcy Code, a bankruptcy trustee can bring an action to recover fraudulently conveyed property under either 11 U.S.C. § 544(b) or applicable state law. No provision of the Bankruptcy Code serves to destroy LaSalle's standing to pursue its fraudulent transfer action. *Chabot,* 100 B.R. at 21. If the bankruptcy case is closed without the trustee having pursued this action, LaSalle's right to pursue it is revested in LaSalle free of any stay. *Unisys Corp. v. Dataware Prod., Inc., et al.,* 848 F.2d 311 (1st Cir. 1988). *See also, In re Manchester Heights Assoc.,* 165 B.R. 42 (W.D. Mo. 1994); *City Nat'l Bank,* 100 B.R. 18; *Fleet Nat'l Bank v. Merriam,* 45 Mass. App. Ct. 592, 699 N.E.2d 1266 (1998); *Citizens Bank of Mass. v. Callahan, et al,* 38 Mass. App. Ct. 702, 653 N.E.2d 600 (1995). The filing of the bankruptcy, therefore, only requires that this Court stay the adjudication of the equitable subordination and fraudulent transfer claims pending the action by the trustee.[5] It does not require that this Court dismiss LaSalle's claims.

---

[5] A stay of adjudication does not mean there should be a stay of discovery with respect to these two claims because the nucleus of operative facts underlying them is the basis for LaSalle's other claims. Any order seeking to parse discovery and remove these two claims from discovery on LaSalle's other claims would only result in senseless discovery disputes.

# VI
# CONCLUSION

For the foregoing reasons, LaSalle Business Credit, LLC respectfully requests that this Court deny Clinton Savings Bank's Motion to Dismiss the Complaint.

Dated: March 31, 2005

                    Respectfully submitted,
                    LASALLE BUSINESS CREDIT, LLC


                    By:    /s/ Patrick W. Manzo
                          One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone: (312) 346-1300
Fax: (312) 782-8416