**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| LASALLE BUSINESS CREDIT. LLC f/k/a LASALLE BUSINESS CREDIT, INC.<br><br>　　　　　Plaintiff<br><br>v.<br><br>CLINTON SAVINGS BANK,<br><br>　　　　　Defendant | Case No. 05-CV10268-DPW |

## MOTION OF CLINTON SAVINGS BANK FOR SUMMARY JUDGMENT

Clinton Savings Bank ("CSB"), by and through its undersigned attorneys, hereby submits this Motion for Summary Judgment and incorporated memorandum and states as follows:

## STATEMENT OF MATERIAL UNDISPUTED FACTS

CSB refers the Court to its separate statement of material undisputed facts, as well as the exhibits attached to the Affidavits of Robert H. Paulhus, Jr. ("Paulhus") and Kevin C. McGee, all filed contemporaneously herewith. CSB also relies on the Affidavits of Matthew Stillwell, filed in *LaSalle Business Credit v. Gary Gitto, et al.*, Civil Action No. 04-12227-DPW (the "Gitto Action") on October 21, 2004 and December 6, 2004, and certain of the exhibits attached to said affidavits. Capitalized terms, to the extent not defined herein, refer to the capitalized term used in CSB's separate statement of undisputed facts.

## ARGUMENT

The Court should grant summary judgment in favor of CSB under the standards set forth in Fed. R. Civ. Proc. 56. The Court may enter summary judgment only if the record reveals no

genuine issue of material fact and the movant demonstrates an entitlement to judgment as a matter of law. Fed. R. Civ. Proc. 56(c). Not every factual dispute is sufficient to thwart summary judgment. A contested fact must be "material" and the dispute over it must be "genuine." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995). In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. *Id*. "Genuine" meansthat "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party...." *Id*. (citation omitted). Accordingly, the trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Id.*

The undisputed material facts fail to support the plaintiff LaSalle Business Credit, LLC ("LBC") on any of its claims against CSB. LBC cannot overcome the undisputed facts that: (1) all of CSB's actions were directed toward preventing CSB from becoming a victim of the activity in the J&J Account, as opposed to intentionally and knowingly lending substantial assistance to a fraud on LBC; (2) LBC was, during all relevant periods, in a better position than CSB to investigate and detect the fraud against LBC; and (3) LBC cannot show that any individual associated with CSB personally benefited from CSB's actions with respect to the J&J Account, or was motivated by some animus toward LBC. Each of these facts, taken singly or together, eliminates one or more necessary elements in LBC's claims against CSB.

Accordingly, the Court should enter summary judgment in favor of CSB.

**I.     CSB is Entitled to Summary Judgment on Counts I and II of the Complaint Because LBC Cannot Demonstrate that CSB Intended that Its Actions Facilitate a Check-Kiting Scheme by J&J Chemical**

Summary judgment is appropriate in favor of CSB on Counts I & II of the Complaint because the undisputed material facts do not, and cannot, support the conclusion that CSB possessed the requisite intent to further the goals of a check-kiting scheme or to aid and abet a check-kiting scheme.

LBC's RICO conspiracy claim in Count I and its "aiding and abetting fraud" claim in Count II share one necessary element: LBC has to demonstrate facts that indicate that CSB intended, by its actions, to promote and continue a check-kiting scheme by Kingsdale Corporation d/b/a J&J Chemical Distributors ("J&J Chemical"). Under Count I, LBC must prove that CSB both knew about J&J Chemical's check-kiting in the J&J Account, and also intended that CSB's actions facilitate J&J Chemical's check-kiting. *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997); *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 47-48 (1st Cir.1991)('each defendant in a RICO conspiracy case must have joined knowingly in the scheme …'[quoting from *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir. 1991)]); <u>see</u> *Baisch v. Gallina*, 346 F.3d 366, 377 (2nd Cir. 2003)(plaintiff in a civil RICO action must show both a defendant's knowledge of the racketeering enterprise and the defendant's willingness to promote that enterprise); <u>see</u> <u>also</u> *U.S. v. Vavlitis*, 9 F.3d 206, 212-13 (1st Cir. 1993)(defendant in criminal check kiting case must act knowingly, and with the intent to "deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself"). The First Circuit differs from some other Circuits, in that it requires that specific intent to defraud be proved in a check-kiting scheme, rather than inferring intent to defraud from the mere existence of a check-kiting scheme. <u>Compare</u> *U.S. v. Rodriguez-Alvarado*, 952 F.2d 586, 589 (1st Cir. 1991)("mere existence of a check-kiting scheme does not,

as a matter of law, imply the intent required for a bank fraud conviction … specific intent must be proved"), <u>with</u> U.S. v. Frydenlund, 990 F.2d 822, 824 (5th Cir. 1993)(11 U.S.C. §1334(1) does not require a specific intent, in a check-kiting scheme, to permanently deprive the bank of its funds).

Similarly, under Count II of LBC's Complaint, LBC can only prove its state law "aiding and abetting fraud" claims if it demonstrates that: (i) CSB gave "substantial encouragement" to J&J Chemical; and (ii) had an "unlawful intent," i.e., CSB knew that J&J Chemical was breaching a duty, and intended to assist J&J Chemical's unlawful actions. *Spinner v. Nutt*, 417 Mass. 549, 556, 631 N.E.2d 542 (1994); *Kyte v. Phillip Morris Co.*, 408 Mass. 162, 168, 556 N.E.2d 1025 (1990); *Schultz v. Rhode Island Hospital Trust National Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996); *Bamberg v. SG Cowen Securities Corp.*, 236 F.Supp.2d 79, 90- 91 (D. Mass. 2002).

LBC's allegations in Counts I and II of the Complaint, when boiled down, are based upon the premises that: (a) CSB acquired knowledge of J&J Chemical check-kiting in spring of 2004, and allowed the check-kiting to continue rather than acting to stop it immediately; and (b) in July 2004, CSB converted the "no-float" activity in the J&J Account into an $8.5 million loan with collateral, thereby promoting and continuing the J&J Chemical check-kiting scheme.

While there may be material disputed facts concerning the extent of CSB's knowledge of J&J Chemical's check-kiting scheme, the material undisputed facts indicate that LBC cannot show that CSB intended that its actions aid any check-kiting scheme. All deposition testimony indicates that CSB, after it noticed unusual activity in the J&J Chemical's business checking account number 133053050 at CSB (the "J&J Account"), gave Frank Miller ("Miller") and J&J Chemical a series of deadlines to stop or reduce the activity. These deadlines were tied to the

pending sale of Gitto Global Corporation's ("Gitto Global") business to Vitrotech Corporation ("Vitrotech"). CSB was not the only one who believed that the sale of Gitto Global was imminent; LBC delayed its November 2003 field examination, and delayed, then limited its recurring audit in July 2004 because it believed the sale was about to take place. CSB Material Undisputed Facts, ¶¶ 71, 110. After Vitrotech postponed the sale due to delays in its audit of Gitto Global, the material undisputed facts all point to the conclusion that CSB's actions thereafter were directed toward protecting its own position and limiting its exposure in the event that the sale did not occur. It set firm deadlines based upon anticipated closing dates of the Vitrotech sale, obtained collateral to protect itself, monitored the sale, and crossed its fingers.

Moreover, LBC cannot point to any evidence that any of CSB's officers or members of its board of directors personally benefited from the check-kiting scheme, or that CSB's board of directors desired that J&J Chemical continue its abuse of CSB's no-float policy for commercial accounts. While LBC might point out that CSB received some interest payments and fees as a result of its conversion of J&J Chemical account activity to a line of credit, there is no evidence that such minimal fees and interest were the primary motivating factor, or even a substantial factor, in CSB's decision to undertake such conversion. *Cf. Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 671-72 (S.D.N.Y. 1996)(if a bank is motivated by some lawful goal, such as generation of commissions, rather than the goal of assisting its accountholder's fraud on its customers through use of a bank account, then there is no "substantial assistance" and no cause of action against the bank for aiding and abetting the accountholder's torts). Instead, all undisputed material facts point to CSB's desire to protect itself from exposure if checks deposited into the J&J Account were not honored, as well as from claims by Gitto Global and J&J Chemical that it interfered with the sale of Gitto Global's business to Vitrotech.

In short, none of the undisputed material facts support the required "intent" elements in either the civil RICO conspiracy claim in Count I or the aiding and abetting fraud claim in Count II. LBC cannot point to any material facts or evidence that indicate that CSB's motivation was to assist or encourage a check-kiting scheme, or to take advantage of the check-kiting scheme for its own benefit or for the personal benefit of its officers or directors. Accordingly, CSB is entitled to judgment as a matter of law on Counts I and II of the Complaint.

### II. CSB is Entitled to Summary Judgment on Count V of the Complaint Because LBC Cannot Demonstrate that CSB Had any Duty to LBC

Count V of the Complaint alleges that CSB assumed a "duty" to LBC and created a "special relationship" with LBC because of its actions in connection with the J&J Account. The material undisputed facts, however, do not support LBC's concepts of duty and special relationship, and LBC cannot point to any material facts or evidence that would support the concept that CSB assumed a duty to LBC.

Once again, LBC bases its theory that CSB assumed a duty to LBC on CSB's failure to stop J&J Chemical's check-kiting immediately upon knowledge of the check-kiting, and on CSB's conversion of its depositor relationship with J&J Chemical (without collateral) to a lending relationship (with collateral) in June & July 2004. As pointed out above, however, LBC cannot demonstrate that CSB intended that any of its actions promote or nourish J&J Chemical check-kiting scheme; instead, the material undisputed facts indicate only that CSB intended to protect itself, both from the effects of J&J Chemical's abuse of CSB's "no-float" policy for commercial checking customers, and from possible suit by J&J Chemical and Gitto Global if CSB's actions caused Vitrotech to withdraw from its purchase of Gitto Global's business.

The cases are legion that a bank that suspects a check-kite has no obligation to disclose the suspected check kite to another bank, or to refrain from attempting to shift the check kite loss to another bank. In order to create a duty in these circumstances, LBC has to show one of the following: (a) a fiduciary or confidential relationship between CSB and LBC; (b) a contractual relationship between CSB and LBC; (c) a duty created by law; or (d) fraud or misrepresentation by CSB.  *Frost National Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 873-74 & n.7 (7th Cir. 2001); *Cumis Insurance Society, Inc. v. Windsor Bank & Trust Co.*, 736 F.Supp. 1226, 1233 (D. Conn. 1990); *Citizens National Bank v. First National Bank*, 347 So.2d 964, 968-69 (Miss. 1977); see also *City Check Cashing, Inc. v. Manufacturers Hanover Trust Co.*, 166 N.J. 49, 62, 764 A.2d 411, 418 (2001)("in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contract, that gives rise to a duty, the sole remedies are those provided in the [Uniform Commercial] Code"); *Penn National Turf Club, Inc. v. Bank of W. Jersey*, 158 N.J. Super. 196, 203, 385 A.2d 932, 936 (App.Div. 1978), certif. denied 77 N.J. 506, 391 A.2d 932 (1978)("In the absence of any agreement, undertaking, or contract between plaintiff and defendant from which any special duty can be derived, the defendant's improper handling of [its customer's] account cannot, in the abstract, serve as a stepping stone for liability to plaintiff").

In this case, CSB's inaction in handling the J&J Account also does not provide any stepping stone for LBC to hold CSB liable for its losses. LBC cannot show any contractual relationship between LBC and CSB. Moreover, LBC cannot show any fiduciary or confidential relationship between CSB and LBC, or fraud or misrepresentation by CSB. Finally, LBC's allegations that CSB failed to follow "safe and standard banking practices" do not create a duty or liability to LBC. *Penn National Turf Club, Inc. v. Bank of W. Jersey*, 158 N.J. Super. at 201-

02, 385 A.2d at 935 (bank's "patently unbusinesslike deviation from good banking practices" in giving immediate credit to checks deposited into account did not create liability, on a negligence theory, to a check-cashing service that incurred loss when bank decided to stop practice and return checks); see *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 671 (S.D.N.Y. 1996) (bank that allowed one depositor's account to become overdrawn and extended substantial credit to such depositor is not liable, on a negligence theory, to customers of the depositor who were defrauded by the depositor, because no duty existed to such customers to refrain from the bank's practices).

A recent Second Circuit case is especially instructive on the issues of duty and fraud. In *Sharp International Corp. v. State Street Bank and Trust Company (In re Sharp International Corp.)*, 403 F.3d 43 (2nd Cir. 2005), State Street Bank & Trust Company ("State Street") discovered that its borrower, like Gitto Global, was using false accounts receivable, invented customers, phony inventory, and inflated sales to obtain loans from State Street. Instead of immediately foreclosing on its loan (and presumably creating a large deficiency and loss for State Street), State Street demanded and obtained its borrower's agreement that it would secure new financing from other lenders, and use that financing to pay off State Street's loan to the borrower. While the borrower chased new financing, State Street "gave no warnings and blew no whistles, ignored inquiring calls from [new lenders], preserved [the borrower's] line of credit when it had the right to foreclose and pull the plug, and gave [the borrower] its needed consent to the new indebtedness." *In re Sharp International Corp.*, 403 F.3d at 47.

The new indebtedness paid off State Street's loans to the borrower. Within six months afterward, the new lenders filed an involuntary Chapter 11 bankruptcy petition against the borrower. The Chapter 11 debtor, after recovering judgment against its former principals,

commenced an adversary proceeding against State Street, primarily on the theory that State Street aided and abetted the fraud on the new lenders. The Second Circuit affirmed the bankruptcy court's dismissal of the Chapter 11 debtor's complaint. In so doing, the Second Circuit held that the Chapter 11 debtor's complaint alleged only State Street's omissions or failure to act. "[A] company in a position to thwart or expose a breach of fiduciary duty may protect its interests by doing neither, sitting tight, and being quiet. No doubt, State Street was hoping to be replaced by a less cautious lender, and had no intention of precipitating its own loss, but silence and forbearance do not assist the fraud *affirmatively*." Id. at 52 (emphasis in opinion).

This case is a mirror image of the *Sharp International* case. While CSB asserts that disputed facts exist regarding the extent and timing of its knowledge of J&J Chemical's check-kiting scheme, such facts are immaterial for purposes of Count V of the Complaint. Whenever CSB could be deemed knowledgeable concerning J&J Chemical's suspicious activities, CSB at that point was confronted a dilemma similar to State Street's dilemma: either shut down the J&J Account, take a significant loss, and wait for the lawsuit from Gitto Global and J&J Chemical regarding the collapse of the Vitrotech sale; or wait for the Vitrotech sale to take place, and take steps to minimize the potential losses in the event that the sale did take place.

CSB's actions to convert the relationship into a short-term lending relationship and take collateral to protect itself also do not provide a basis to imply a duty to LBC or implicate CSB in J&J Chemical's fraud. The undisputed material facts indicate that CSB's motive was to put itself in the best position to avoid losses if no sale took place and the check-kite collapsed. It made no misrepresentations to LBC, LaSalle or Fleet, had no duty to inform them of the J&J Chemical's check-kiting, and had no duty to refrain from protecting itself or refrain from trying to shift the loss to them. *Frost National Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 873-75 (7th Cir.

2001).  The Second Circuit in *In re Sharp International Corp.* is again instructive on this point, if not blunt:

> The nub of the complaint is that State Street knew that there would likely be victims of [the borrower's principals'] fraud, and arranged not to be among them. On one hand, this seems repugnant; on the other hand, [State Street's] discovery that [the borrower] was rife with fraud was an asset of State Street, and State Street had a fiduciary duty to use that asset to protect its own shareholders, if it legally could …Whatever … State Street knew about [the borrower's principals'] fraud, [it] had come by that information through diligent inquiries that any other lender could have made. [The Chapter 11 debtor] fails to identify any duty on State Street's part to precipitate its own loss in order to protect lenders that were less than diligent. All the allegations in substance are the same: that State Street was in a position to blow the whistle on [the borrower's principals'] fraud, but did not; instead, State Street arranged to extricate itself from the risk.

*In re Sharp International Corp.*, 403 F.3d at 52-53.

The material undisputed facts in this case demonstrate that LBC was in better position to detect Gitto Global's and J&J Chemical's fraud and check-kiting scheme than CSB. LBC had the right to inspect and review statements and transactions both in Gitto Global's account at LaSalle and in Gitto Global's blocked account at Fleet. CSB Material Undisputed Facts, ¶¶45-49. Moreover, LBC required regular financial reporting from Gitto Global, had the right to inspect Gitto Global's books and records, and had the right to contact Gitto Global's account debtors to verify accounts receivable. Material Undisputed Facts, ¶¶36 & 37. It is undisputed that CSB had none of these powers with respect to Gitto Global, and had much more restricted information and rights regarding J&J Chemical. The fact that CSB noticed unusual activity in the J&J Account, made inquiries, and ultimately sought to protect itself, do not create any liability to LBC, and CSB is entitled to summary judgment against LBC on Count V of the Complaint.

**III.    CSB is Entitled to Dismissal, without Prejudice, of Counts III & IV of the Complaint Because Tradex Corporation's Chapter 11 Trustee has Asserted Similar Claims against CSB, and LBC is the Primary Beneficiary of Such Claims**

Counts III and IV of the Complaint assert a fraudulent transfer claim and an equitable subordination claim against CSB, in which LCB seeks either to avoid the mortgage that Tradex Corporation ("Tradex") granted to CSB in July 2004 on Tradex's real estate, or subordinate such mortgage to LBC's later recorded attachment on the same property. As shown in the Material Undisputed Facts, M. Ellen Carpenter, the Chapter 11 trustee of Tradex, has brought similar claims against CSB in an adversary proceeding pending before the Bankruptcy Court for Tradex's bankruptcy case, with respect to CSB's mortgage and claims against Tradex. Moreover, LBC is the primary beneficiary of any recovery that Ms. Carpenter would obtain from CSB. Consequently, Counts III & IV of the Complaint are appropriate for dismissal, without prejudice.

**[The rest of this page is intentionally left blank]**

- 12 -

WHEREFORE, CSB respectfully requests that this honorable Court grant it summary judgment on Counts I, II & V of the Complaint, dismiss Counts III and IV of the Complaint, without prejudice, and grant such other and further relief is just.

Dated:  May 1, 2006

CLINTON SAVINGS BANK, Defendant

By its attorneys,

/s/ Kevin C. McGee
Kevin C. McGee (BBO #548923)
SEDER & CHANDLER
339 Main Street
Worcester, MA  01608
(508) 757-7721