## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| LASALLE BUSINESS CREDIT. LLC )<br>f/k/a LASALLE BUSINESS CREDIT, )<br>INC. )<br>Plaintiff ) | Case No. 05-CV10268-DPW |
| )<br>v. )<br>CLINTON SAVINGS BANK, )<br>)<br>Defendant ) | |

---

## STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF MOTION OF CLINTON SAVINGS BANK FOR SUMMARY JUDGMENT

Clinton Savings Bank ("CSB"), by and through its undersigned attorneys, hereby submits

the following statement of material undisputed facts in support of its Motion for Summary

Judgment, pursuant to Local Rule 56.1 of the local rules of this Court:

## STATEMENT OF UNDISPUTED FACTS[1]

### A.    Identification of Parties Involved

1.    Plaintiff LaSalle Business Credit, LLC ("LBC") is a wholly owned subsidiary of

LaSalle National Leasing Corporation, which in turn is a wholly owned subsidiary of LaSalle

Bank, N.A. ("LaSalle Bank"). Complaint, ¶3.

---

[1]  This Statement is supported by: (a) the Affidavit of Robert J. Paulhus, Jr.,. Senior Vice President of CSB (the "Paulhus Affidavit") and Exhibits "1" through "25" attached thereto; and (b) the Affidavit of Kevin C. McGee, Esq. ("McGee Affidavit"), and the pleadings and discovery documents attached thereto as exhibits. This statement is also supported by affidavits filed by Matthew Stillwell, regional audit manager and vice president of CSB, on October 21, 2004 and December 6, 2004, and certain documents attached to each such affidavit. The Stillwell affidavits are filed in a connected case, entitled *LaSalle Business Credit v. Gary Gitto, et al.*, Civil Action No. 04-12227-DPW. Pursuant to this Court's order dated December 7, 2005, discovery in such case is applicable in this case.

2.      Defendant Clinton Savings Bank is a Massachusetts savings bank established under the laws of the Commonwealth of Massachusetts. Complaint, ¶4.

3.       Gitto Global Corporation ("Gitto Global") is a Massachusetts corporation organized in 1991 and was, during all relevant times, located in Lunenburg, Massachusetts. Gitto Global, during all relevant times, was a certified premier compounder of specialty polyvinyl chloride, polyethylene, polypropylene, sterenic and thermoplastic olefin. Complaint, ¶5.

5.      Kingsdale Corporation d/b/a J&J Chemical Distributors ("J&J Chemical") is a Massachusetts corporation. Complaint, ¶7.

6.      During all relevant times, Frank Miller ("Miller") is an individual, who was the chief operating officer and president of Gitto Global, as well as the sole shareholder of J&J Chemical. Complaint, ¶6.

7.      During all relevant times, William Deakin ("Deakin") is an individual who was the controller of Gitto Global. Deakin worked directly under, and with, Miller. Deakin Depo, Vol I, p. 16, lines 2-13.

8.      During all relevant times, Steven P. Cash ("Cash") is an individual who was the president and chief operating officer at CSB. Cash Depo, p. 6, lines 15 through 22.

9.      During all relevant times, Michael Tenaglia ("Tenaglia") is an individual who was the senior vice president in charge of operations at CSB. Tenaglia Depo, p.8, lines 12 through 19; Williams Depo, p. 7, lines 3 through 23.

10.     In 2002 and during all relevant times thereafter, Bobbie Jo Williams (formerly known as Bobbie Jo Parker)("Williams") is an individual who was an assistant vice president in charge of operations, compliance, and savings compliance at CSB, as well as the security officer for CSB. Williams Depo, p 5, line 23 to p.6, line 13. In 2002 and during all relevant times

thereafter, Williams worked directly under Teneglia in the operations department. Tenaglia Depo, p.10, lines 12 through 16; Williams Depo, p. 7, lines 3 through 23.

11.    During all relevant times, Joseph D. Guercio ("Guercio") is an individual who was the senior vice president and senior loan officer at CSB. Guercio Depo, p.5, lines 6 through 12.

12.    During all relevant times, Robert J. Paulhus, Jr. ("Paulhus") is an individual who was a vice president of commercial lending at CSB. Paulhus Depo, p. 5, line 23 to p. 6, line 9. Paulhus worked under Guercio in the lending department. Paulhus Depo, p. 8, lines 19 & 20.

13.    During all relevant times, Christopher M. Gill ("Gill") is an individual who was a senior vice president and chief financial officer at CSB. Gill Depo, p. 5, lines 6 through 15.

14.    During all relevant times, Sheila A. Azorandia ("Azorandia") is an individual who was an assistant vice president and comptroller in the financial department at CSB. Azorandia Depo, p. 5, line 21 through p. 6, line 3. Azorandia worked under Gill in the financial department. Azorandia Depo, p. 6, lines 14 & 15.

**B.    Establishment of J&J Chemical Account at CSB**

15.    April 16, 1999, Miller was elected as a corporator of CSB.  Paulhus Affidavit, Exhibit  1.

16.    During all relevant times, CSB had as few as 90 corporators and as many as 110 corporators. Cash Depo, p. 19, lines 1 to 11.

17.    The role of CSB corporators was to: (a) maintain an account at CSB with a balance of at least $1,000.00; (b) attend bi-annual corporator meetings; and (c) elect directors for CSB and certain of the officers for CSB. In addition, corporators had an informal responsibility

to act as a goodwill ambassador for CSB and to identify business opportunities for CSB. Cash Depo, p. 16, line 23 to p. 18, line 8.

18.     On February 12, 2001, J&J Chemical opened business checking account number 133053050 at CSB (the "J&J Account"). Paulhus Affidavit, Exh. 2.

19.     Based upon his discussions with Miller, Cash believed that J&J Chemical was a subsidiary of Gitto Global. Cash Depo, p. 36, lines 5 through 18.

**C.     Activity in J&J Account February 2001 to November 2002.**

20.     During all relevant times, CSB permitted all holders of business checking accounts to draw against uncollected funds. Complaint, ¶31.

21.     From February 12, 2001 through and including May 29, 2002, CSB permitted J&J Chemical to draw against uncollected funds in the J&J Account, in accordance with its policy for all business checking customers. Paulhus Affidavit, ¶3.

22.      In April 2002, three checks, totaling $393,750.00 and deposited in the J&J Account, were returned to CSB because of insufficient funds. Paulhus Affidavit, Exh. 3.

23.     Upon learning that checks deposited in the J&J Account had been returned because of insufficient funds, Williams sent an e-mail, dated April 18, 2002, to Paulhus and others in the loan department, in order to determine whether anyone in that department had a relationship with Miller or Gitto Global, so that someone could contact Miller about the problem and give him an opportunity to solve it. Williams Depo, p. 14, line 11 to p. 15, line 10, & CSB Exhibit 2.

24.     After being contacted regarding the situation and the need to make deposits to cover checks being written on the J&J Account, Miller made deposits sufficient to cover the checks. Paulhus Affidavit, Exh. 3; Williams Depo, p. 15, line 14 to p. 16, line 6.

25.     In May 2002, multiple checks, totaling $1,118,250.00 and deposited in the J&J Account, were returned to CSB because of insufficient funds. Paulhus Affidavit, Exh. 4.

26.     Although Miller was again contacted in each instance and made deposits sufficient to cover checks, Williams, on May 29, 2002 and with the approval of Guercio, notified J&J Chemical and Miller that CSB would require checks deposited in the J&J Account to "float" and that there had to be funds present in the J&J Account to cover each check drawn on the J&J Account prior to CSB's honor of each such check. Paulhus Affidavit, Exh. 5; Williams Depo, p. 16, line 11 to p. 17, line 6 & p.18, lines 8 to 14; Tenaglia Depo, p. 10, line17 to p.11, line 21.

27.     For a period of approximately six (6) months from and after May 29, 2002, Williams monitored the J&J Account, and required proof of good funds prior to honoring any checks in the J&J Account. Williams Depo, p. 18, line 23 to p. 19, line 8 & p.20, line 12 ; Tenaglia Depo, p. 13, lines 3 through 8.

28.     In the course of monitoring the J&J Account, Williams noticed that checks being deposited in the J&J Account were made by Gitto Global from one bank account, and checks being written on the J&J Account were payable to Gitto Global and deposited in a different bank. Williams Depo, p.21, lines 8-16.

29.     Williams spoke to Miller regarding this activity, and Miller told her that all of the checks were for specific invoices between the two companies. Williams Depo., p. 22, line 4 through p. 23, line 4.

30.     In the period May 29, 2002 through November 26, 2002, the daily activity in the J&J Account was approximately $300,000.00 per day. Williams Depo., p. 25, line 18 through p. 26, line 1.

31.     Subsequent to May 2002, Williams did not see another returned item in the J&J Account. Williams Depo, p. 37, lines 14-17

32.     On November 26, 2002, after request by Miller, CSB restored the J&J Account to the same "no-float" status as other commercial checking accounts at CSB. Paulhus Affidavit, Exh. 6; Williams Depo, p. 18, line 23 to p. 19, line 8; Tenaglia Depo, p. 13, lines 9 through 24.

**D.     July 2002 LBC Loan to Gitto Global.**

33.     On July 25, 2002, LBC and Gitto Global closed a $30 million credit facility, pursuant to which LBC agreed to loan Gitto Global up to $27 million as evidenced by a revolving credit note and $3 million as evidenced by a term note. 10/21/04 Stillwell Affidavit, Exhs. B & C.

34.     Also, on July 25, 2002, LBC and Gitto Global executed a loan and security agreement (the "Loan Agreement"), in which agreement Gitto Global granted a security interest in substantially all of Gitto Global's assets, including inventory and account receivable. 10/21/04 Stillwell Affidavit, Exh. A, Section 5(a).

35.     Pursuant to the Loan Agreement, LBC agreed to make revolving loans (up to a maximum of $27 million) in amounts equal to up to eighty-five (85%) percent of face value of Gitto Global's eligible accounts receivable, and up to sixty five (65%) percent of the lower of cost or market value of Gitto Global's eligible inventory. 10/21/04 Stillwell Affidavit, Exh. A, Section 2(a).

36.     Pursuant to the Loan Agreement, Gitto Global was required to deliver to LBC:

(a)     daily or weekly loan reports and borrowing base certificates requesting loans, together with copies of Gitto Global's sales journal, cash receipts journal and credit memo journal for the period reported (Loan Agreement, Section 9(a));

(b)    within a defined period after the end of the month: (i) Gitto Global's detailed trial balance showing aged accounts receivable, with names and addresses of each account debtor; (ii) summary and detail of accounts payable, including held checks; (iii) inventory reports; and (iv) copies of Gitto Global's internally prepared financial statements, certified by Gitto Global's chief financial officer (Loan Agreement, Sections 9(b) & (c));

(c)    within thirty (30) days after the end of the first three quarters of Gitto Global's fiscal year, copies of Gitto Global's internally prepared financial statements, certified by Gitto Global's chief financial officer  (Loan Agreement, Section 9(c)); and

(d)    within ninety (90) days after the end of Gitto Global's fiscal year, an audited annual financial statement for Gitto Global, with an unqualified opinion by a certified public accountant (Loan Agreement, Section 9(c)).

10/21/04 Stillwell Affidavit, Exh. A.

37.    Pursuant to the Loan Agreement, LBC also had the right, at any reasonable time, to inspect and audit Gitto Global's books and records, and to contact Gitto Global's account debtors to "verify the validity, amount, or any other matter relating to" Gitto Global's accounts receivable. (Loan Agreement, Section 12(d)).  10/21/04 Stillwell Affidavit, Exh. A.

38.    On July 24, 2002, or shortly thereafter, LBC disbursed at least $28,841,980.22 to pay off Gitto Global's obligations to its prior lender, Guaranty Business Credit Corporation. McGee Affidavit, Exh. 1

39.    On July 23, 2002 to July 26, 2002, in connection with making its loans to Gitto Global, LBC conducted a field examination of Gitto Global's financial condition. 10/21/04 Stillwell Affidavit, ¶44; 12/6/04 Stillwell Affidavit, Exh. Q.

40.    As a part of the July 2002 field examination, the field examiner requested telephone verifications of Gitto Global's accounts receivable balance. On July 25, 2002, Deakin represented to the field examiner that he had called the top seven customers of Gitto Global, including Hitachi Cable, Inc. ("Hitachi"), Zebulon Industries, Inc. ("Zebulon"), J-Tan Sales & Marketing, Inc. ("J-Tan"), Velco Chemicals, Inc. ("Velco"), and Color Compounds & Consultants, Inc. ("CCC") (collectively, the "False Gitto Customers"); however, the field examiner was not on the phone with Deakin. Deakin represented to the field examiner that the people with whom he spoke verified the account receivable balances; however, Deakin never called any of the False Gitto Customers and misrepresented his conversations with False Gitto Customers to the examiner. 10/21/04 Stillwell Affidavit, ¶45; 12/6/04 Stillwell Affidavit, Exh. Q.

41.    At the direction of Miller, Gary Gitto, and Deakin, on or about July 25, 2002, Louis Pellegrine, Gitto Global's accountant ("Pellegrine"), sent to LBC by facsimile letters from Hitachi and Zebulon purportedly confirming account receivable balances due to Gitto Global of $2,960,058.40 and $4,440,999.21, respectively. 10/21/04 Stillwell Affidavit, ¶46.

42.    Neither the field examiner nor LBC, in July 2002, took any action to verify accounts receivable balances beyond the phone calls reported to the field examiner by Deakin and the faxed letters received from Pellegrine.  12/6/04 Stillwell Affidavit, Exh. Q, p.21.

43.    LBC relied on the July 2002 field examination to begin its lending relationship with Gitto Global. 10/21/04 Stillwell Affidavit, ¶47.

44.    During all relevant times from and after July 2002, Gitto Global employees created false invoices, bills of lading, and checks for each of the False Gitto Customers, misrepresented to LBC that the False Gitto Customers were account debtors of Gitto Global who

owed eligible accounts receivable to Gitto Global, and inflated Gitto Global's sales figures using the False Gitto Customers. 10/21/04 Stillwell Affidavit, ¶¶28 – 34, 36, 37, 39, 45, 52, 54, 56, 57, 60, & 62.

**E.      Fleet Blocked Account Agreement.**

45.      On July 25, 2002, LBC, Gitto Global, and Fleet National Bank ("Fleet") entered into a three party blocked account service agreement (the "2002 Fleet Blocked Account Agreement"), pursuant to which agreement the parties had Fleet establish account no. 9418564867 (the "Initial Fleet Account") to receive payments from Gitto Global's account debtors. 10/21/04 Stillwell Affidavit, ¶¶11; McGee Affidavit, Exh. 2.

46.      Pursuant to Section 8 of the Loan Agreement and Section 4 of the 2002 Fleet Blocked Account Agreement, Gitto Global was required, on a daily basis, and as Gitto Global received payments of invoices, to deposit all such payments into the Initial Fleet Account. Also, on a daily basis, Fleet was required to transfer all collected and available funds in the Initial Fleet Account to an account designated by LBC. 10/21/04 Stillwell Affidavit, ¶13; 10/21/04 Stillwell Affidavit, Exh. A; McGee Affidavit, Exh. 2.

47.      Pursuant to Sections 7 & 8 of the 2002 Fleet Blocked Account Agreement, LBC was entitled, without prior consent or notice to Gitto Global, to monitor transactions in the Initial Fleet Account, to receive any and all information about the Initial Fleet Account, and to receive periodic statements regarding the Initial Fleet Account. McGee Affidavit, Exh. 2.

48.      On February 21, 2003, LBC, Gitto Global, and Fleet entered into a substituted three party blocked account service agreement (the "2003 Fleet Blocked Account Agreement"), pursuant to which agreement the parties had Fleet establish account no. 9429271277 (the

"Replacement Fleet Account") to receive payments from Gitto Global's account debtors. 10/21/04 Stillwell Affidavit, ¶¶11 & 12; McGee Affidavit, Exh. 3.

49.     The 2003 Fleet Blocked Account Agreement had substantially the same terms as the 2002 Fleet Blocked Account Agreement, including the provisions regarding LBC's right to demand, monitor and review information regarding the Replacement Fleet Account and periodic statements concerning the Replacement Fleet Account, without Gitto Global's prior consent or approval. 10/21/04 Stillwell Affidavit, ¶11; McGee Affidavit, Exhs. 2 & 3.

50.     One significant difference between the 2002 Fleet Blocked Account Agreement and the 2003 Fleet Blocked Account Agreement was that Section 1 of the 2003 Fleet Blocked Account Agreement clarified that the Replacement Fleet Account and the funds credited thereto were, at all times, under the exclusive dominion and control of LBC. McGee Affidavit, Exhs. 2 & 3.

51.     During all relevant times from and after April 2003 through September 15, 2004, and with the consent of LBC, Fleet floated any and all checks deposited in the Replacement Fleet Account for one day prior to wiring the deposited funds to LBC. McGee Affidavit, Exh. 4, LBE000780 (S&C 000060); 12/6/04 Stillwell Affidavit, Exh. U (Section III, Cash Diagram III-A) & Exh. V (Section III, Cash Diagram III-A).

**F.     November 2002, April 2003 & August 2003 LBC Field Examinations.**

52.     On November 11, 2002 through November 15, 2002, LBC conducted its second field examination of Gitto Global. 10/21/04 Stillwell Affidavit, ¶48; 12/6/04 Stillwell Affidavit, Exh. R.

53.     As a part of LBC's November 2002 field examination, LBC's field examiner reviewed false invoices, bills of lading, and checks for various False Gitto Customers. LBC's

field examiner did no independent verification of the existence of the False Gitto Customers or the amounts allegedly owed by False Gitto Customers to Gitto Global, but relied solely on documents and representations provided by Gitto Global employees. 10/21/04 Stillwell Affidavit, ¶49; 12/6/04 Stillwell Affidavit, Exh. R.

54.    On April 14, 2003 through April17, 2003, LBC conducted its third field examination of Gitto Global. 10/21/04 Stillwell Affidavit, ¶53; 12/6/04 Stillwell Affidavit, Exh. S.

55.    As a part of LBC's April 2003 field examination, LBC's field examiner reviewed false invoices, bills of lading, and checks for various False Gitto Customers. LBC's field examiner did no independent verification either of the existence of the False Gitto Customers or the amounts allegedly owed by False Gitto Customers to Gitto Global, but relied solely on documents and representations provided by Gitto Global employees. 10/21/04 Stillwell Affidavit, ¶¶49 & 51; 12/6/04 Stillwell Affidavit, Exh. S.

56.    On August 19, 2003 through August 22, 2003, LBC conducted its fourth field examination of Gitto Global. 10/21/04 Stillwell Affidavit, ¶55; 12/6/04 Stillwell Affidavit, Exh. T.

57.    As a part of LBC's August 2003 field examination, LBC's field examiner reviewed false invoices, bills of lading, and checks for various False Gitto Customers. LBC's field examiner did no independent verification either of the existence of the False Gitto Customers or the amounts allegedly owed by False Gitto Customers to Gitto Global, but relied solely on documents and representations provided by Gitto Global employees. 10/21/04 Stillwell Affidavit, ¶56; 12/6/04 Stillwell Affidavit, Exh. T.

58.     The August 2003 field examination is the first field examination of Gitto Global that contains a section analyzing cancelled vendor checks. Compare 12/6/04 Stillwell Affidavit, Exh. T, p. 33 with 12/6/04 Stillwell Affidavit, Exhs. Q-S.

59.     The August 2003 field examination records that cancelled checks to J&J Chemical total $277,900.00, in the period June 17, 2003 to July 25, 2003, while other vendor checks (to nine other vendors) aggregate $286,855.45. 12/6/04 Stillwell Affidavit, Exh. T, p. 33.


**G.     Activity in J&J Account December 2002 to March 2004.**

60.      In late October 2003, Cash noticed fluctuations in deposit balances and requested that Tenaglia look into such fluctuations. Cash Depo, p. 24, lines 8-21; Tenaglia Depo, p. 20, line 22 to p. 21, line 12.

61.     Tenaglia reviewed daily activity reports and discovered that daily deposits and withdrawals in the J&J Account were substantial. Tenaglia Depo, p. 21, line 13 to p. 22, line 9.

62.     Tenaglia reported the activity in the J&J Account to Cash, and Cash requested that Tenaglia meet with Miller to obtain an explanation for the large daily deposits and withdrawals. Tenaglia Depo, p. 23, lines 4-20; Cash Depo, p. 27, line 23 to p.29, line 1.

63.     Tenaglia requested that Williams contact Miller to schedule a meeting to discuss the activity in the J&J Account; however, she was unable to get in touch with him for several weeks. Tenaglia Depo, p. 23, lines 21 to 24; Williams Depo, p. 28, line 23 to p. 29, line 13.

64.     When Williams did speak to Miller, he told her that he was in California and that he was in the process of selling Gitto Global. Williams Depo, p.29, lines 13-20.

65.     Williams, Tenaglia, Paulhus and Miller had a face-to-face meeting on or around December 1, 2003. Williams Depo, p.29, line 20 to p.30, line 10; Tenaglia Depo, p. 24, lines 8-16; Paulhus Depo, p. 11, line 17 to p. 12, line 1.

66.    At such meeting, Miller stated that the reason for the daily activity in the J&J Account was Gitto Global's need to have J&J Chemical process certain materials for Gitto Global because Gitto Global was prohibited, under certain licensing agreements, from processing the material itself. Miller also stated that Gitto Global's accountants had advised Gitto Global to structure the activity as sales of the goods to J&J Chemical, and then repurchase of the goods from J&J Chemical after processing. Miller also informed the CSB participants that Gitto Global's business would be sold to Vitrotech after January 1, 2004, and that the J&J Account would be closed after the sale. Paulhus Depo, p.12, line 11 to p. 13, line 21; Tenaglia Depo, p. 25, line 3 to p. 26, line 16.

67.    Paulhus and Tenaglia requested that Miller provide a written explanation of the need for the large daily activity in the J&J Account, and that Miller provide them with regular updates on the status of the Vitrotech purchase of Gitto Global's business. Paulhus Depo, page 14, lines 5-14.

68.    From and after the December 2003 meeting through and including the beginning of March 2004, Tenaglia called Miller several times to find out the status of the prospective sale of Gitto Global's business to Vitrotech, and continued to request that Miller decrease the level of activity in the J&J Account. Tenaglia also continued to monitor the level of the daily activity in the J&J Account, with the assistance of Williams. Tenaglia Depo, p.26, line 23 to p.29, line 23; Williams Depo, p. 34, lines 1-17.

69.    In one or more of his telephone conversations with Tenaglia in early 2004, Miller told Tenaglia that Vitrotech had been delayed in its due diligence because it had made a public offering of its stock, and thus was required to look at three (3) years' worth of Gitto Global's

financial data before going through with a purchase of Gitto Global's business. Tenaglia Depo, p.28, line 19 to p.29, line 4.

70.     Tenaglia reported to Cash regarding his discussions with Miller. Cash told Tenaglia to continue to press Miller to reduce the activity in the J&J Account. Cash Depo, p.35, lines 1-15 & p.38, lines 8-13; Tenaglia Depo, p. 30, lines 4-9.

**H.     LBC Activity from August 2003 to March 2004.**

71.     LBC delayed its field examination of Gitto Global scheduled to be performed in late 2003, because Gitto Global notified LBC that it was being acquired and represented that it would pay out LBC by the end of January 2004. McGee Affidavit, Exh. 4, LBE001031 (S&C 00061) & LBC 001901.

72.     In January 2004, Gitto Global was in default of reporting covenants in the Loan Agreement because it had not submitted financial information for periods after August 2003, and covenant compliance certificates for the periods ended June 30, 2003, September 30, 2003, and December 31, 2003. In addition, Gitto Global owed a year-end audited financial statement to LBC. McGee Affidavit, Exh. 4, LBC 001892.

73.     In or around January of 2004, LBC received, from Pellegrine, copies of false responses to letters send by Gitto Global to several of the False Gitto Customers, to confirm account receivable balances, in advance of LBC's February 2004 field examination of Gitto Global. 10/21/04 Stillwell Affidavit, ¶57 & Exhibit S through W to 10/21/04 Stillwell Affidavit.

74.     On February 10, 2003 through February 13, 2004, LBC conducted its fifth field examination of Gitto Global. 10/21/04 Stillwell Affidavit, ¶59; 12/6/04 Stillwell Affidavit, Exh. U.

75.     As a part of LBC's February 2004 field examination, LBC's field examiner reviewed the false responses to Pellegrine's requests for confirmation of accounts receivable balances, as well as false invoices, bills of lading, and checks for various False Gitto Customers. LBC's field examiner did no independent verification either of the existence of the False Gitto Customers or the amounts allegedly owed by False Gitto Customers to Gitto Global, but relied solely on documents and representations provided by Gitto Global employees. 10/21/04 Stillwell Affidavit, ¶60; 12/6/04 Stillwell Affidavit, Exh. U.

76.     In the February 2004 field examination, the field examiner noted that J&J Chemical was Gitto Global's largest vendor, was paid on "cash on delivery" terms by Gitto Global, and "didn't seem to have a relationship" with anyone at Gitto Global. McGee Affidavit, Exh. 4, LBC 002244; 12/6/04 Stillwell Affidavit, Exh. U, Section VI(C).

77.     In the February 2004 field examination, the field examiner reviewed a sampling of cancelled checks and recorded that J&J Chemical had been paid $396,550.00 in the period October 14, 2003 through November 3, 2003, while twelve (12) other vendors had been paid an aggregate of $432,916.27. McGee Affidavit, Exh. 4, LBC 002244; 12/6/04 Stillwell Affidavit, Exh. U, Attachment B-1.

78.     In the February 2004 field examination, the field examiner noted that Gitto Global had received a letter of intent from Vitro Corporation to purchase Gitto Global's business, with an anticipated closing date in ninety (90) days. McGee Affidavit, Exh. 4, LBC 002244; 12/6/04 Stillwell Affidavit, Exh. U, Field Examination Summary.

79.     On or about March 11, 2004, Thomas F. Furst, a Vice President at LBC and the loan officer for Gitto Global ("Furst"), placed a memorandum in the Gitto Global credit file

noting that the results of the February 2004 field examination were "satisfactory" and that "It is anticipated that the company will be sold by 6/30/04." McGee Affidavit, Exh. 4, LBC 002019.

**I.      CSB Activity from March 2004 to July 2004.**

80.     On March 11, 2004, Tenaglia sent an e-mail to Cash, reporting Miller's representations that a purchase and sale agreement for the sale of Gitto Global was about to be signed, and that the purchases of raw materials between J&J Chemical and Gitto Global were expected to "wind down and close after the sale." Paulhus Affidavit, Exh. 7 (Exhibit CSB 3 dated 12/10/04 [partially redacted]); Tenaglia Depo., p. 29, line 24 to p.32, line 22.

81.     Subsequent to his March 11, 2004 e-mail, Tenaglia continued to review the activity in the J&J Account, and continued to ask Miller to reduce the activity. Tenaglia Depo, p. 34, lines 6-13.

82.     In March 2004, the J&J Account activity had increased compared to its activity in October 2003, and fluctuated with different amounts deposited each day. Cash Depo, p. 52, line 24 to p.53, line 14.

83.     In March 2004, Cash had suspicions about the use of the J&J Account for check-kiting, but concluded that the use of J&J Account was probably legitimate because of Miller continued provision of information regarding the activity and the pending sale, his perception of Miller as an individual, and the fact that the activity and balance in the J&J Account seemed to fluctuate rather than steadily increase. Cash Depo, p.53, line 20 to p.57, line 22.

85.     In April 2004, CSB was required to borrow money from the Federal Reserve to cover the daily activity in the J&J Account. Azorandia Depo, p.23, line 17, to p. 24, line 24.

86.     Prior to May 17, 2004, Miller provided Tenaglia with copies of Gitto Global financial statements and the signed Vitrotech Asset Purchase Agreement with Gitto Global. Paulhus Affidavit, Exhs. 8, 10 & 11; Tenaglia Depo, p.90, line 13 to p.92, line 13.

87.     On or around May 17, 2004, Tenaglia again requested to Miller that J&J Chemical stop the activity in the J&J Account. He also asked Miller to either increase the level of the balance kept in the J&J Account, or to open a separate account with a sufficient balance to cover the J&J Account activity. Tenaglia Depo, p.40, line 22 to p.42, line 17.

87.     In May 2004, Gill disagreed with Cash and Tenaglia regarding whether the J&J Account was being used to kite checks. Paulhus Affidavit, Exhs. 8 & 9; Gill Depo, p. 13, line 21 to p.18, line 19; Tenaglia Depo, p. 43, line18 to p.46, line 3; Cash Depo, p. 60, line 11 to p. 64, line 24; Paulhus Affidavit, Exhs. 8 & 9.

88.     On or around the end of May 2004, Gill spoke to John Davis ("Davis"), the chairman of CSB's board of directors regarding the J&J Account and his perception of the activity in the J&J Account. Gill Depo, p. 18, line 20 to p.20. line 1.

89.     On May 25, 2004, the CSB Executive Committee met, which meeting Davis, Cash, Gill, Guercio, Tenaglia and Paulhus attended. In such meeting, Davis requested and received a history and status from Cash and Tenaglia regarding the J&J Account. In such meeting, Tenaglia also represented that he would contact Miller and tell him that CSB would require sufficient collected funds available in the J&J Account. Paulhus Affidavit, Exh. 12, pp. 3167-3169 (redacted).

90.     On June 1, 2004, the CSB Board of Directors (the "Board") held its monthly meeting, which meeting Davis, Cash, Gill, Guercio and Tenaglia attended. In such meeting, Tenaglia stated that J&J Chemical had increased the funds in the J&J Account to $1.2 million.

He also discussed the pending Gitto Global sale with the Board, and told the Board that the sale had a closing date of July 1, 2004. The Board directed Tenaglia to request collateral and/or increased deposits for the activity in the J&J Account. Paulhus Affidavit, Exh. 13, pp. 004, 007 & 009 (redacted).

91.     On June 15, 2004, the CSB Executive Committee met, which meeting Davis, Cash, Gill, Guercio, and Tenaglia attended. In such meeting, Cash represented that Gitto Global had agreed to provide a guarantee and a lien on equipment to CSB. Tenaglia also represented to the Executive Committee that $1.2 million was now on a "hold" in the J&J Account, and that the equipment to be liened had approximately $8 million in unencumbered value. The Executive Board set a deadline of June 18, 2004 to obtain Gitto Global's signature on the proposed security agreement and guarantee. Paulhus Affidavit, Exh. 12, pp. 3175 & 3177 (redacted).

92.     On June 16, 2004, Gitto Global executed a guaranty of J&J Chemical's obligations to CSB, and executed a security agreement granting a security interest in certain equipment, to secure such guaranty. Paulhus Affidavit, Exhs. 14 & 15.

93.     On June 22, 2004, the CSB Executive Committee met, which meeting Davis, Cash, Gill, Guercio, Tenaglia and Paulhus attended. In such meeting, Tenaglia confirmed that Gitto Global had signed the proposed guaranty and security agreement. Paulhus Affidavit, Exh. 12, p. 3178 (redacted).

94.     On June 25, 2004, Miller faxed a letter to Tenaglia, on Gitto Global letterhead, in which he requested that CSB refrain from acting until a sale of Gitto Global could take place. He also sent a letter to Tenaglia, with same date, offering an explanation of the transactions in the J&J Account , and reflecting his representations to Tenaglia in the December 1, 2003 meeting. Paulhus Affidavit, Exh. 16.

95.     On June 28, 2004, the Board held its monthly meeting, which meeting Davis, Cash, Gill, Tenaglia and Paulhus attended. In such meeting, Cash informed the Board that the Gitto Global sale closing had been postponed to mid-July 2004. He told the Board that Miller had again requested that CSB refrain from acting against the J&J Account until counsel for CSB and Gitto Global had a chance to have discussions. Tenaglia informed the Board that Miller had agreed to pay CSB $30,000.00 in order to obtain the additional time. The Board deferred decision on the requests until the Executive Committee meeting scheduled for July 1, 2004. Paulhus Affidavit, Exh. 13, pp. 010, 014 & 015 (redacted).

96.     On June 29, 2004, Gitto Global faxed a copy of a letter agreement, between Gitto Global and Vitrotech and dated May 27, 2004, reflecting the closing date of July 15, 2004, as well as a letter, dated June 28, 2004, from Vitrotech's auditors to Vitrotech, summarizing work done and to be done on Vitrotech's audit of Gitto Global. Paulhus Affidavit, Exh. 17.

97.     On July 1, 2004, the CSB Executive Committee held a special meeting, which meeting Davis, Cash, Gill, Guercio, and Tenaglia attended. In such meeting, Cash distributed financial information for Gitto Global, a copy of May 27, 2004 letter agreement between Gitto Global and Vitrotech, the June 28, 2004 letter from Vitrotech's auditors, and a draft letter agreement with Gitto Global and J&J Chemical regarding the J&J Account. After discussion of its options, the Executive Board voted to send the letter agreement to J&J Chemical and Gitto Global, with certain changes, and agreed to the July 15, 2004 deadline. Paulhus Affidavit, Exh. 12, pp. 3182-3184 (redacted).

98.     On July 1, 2004, Tenaglia sent a letter agreement to Miller, in which CSB notified J&J Chemical and Gitto Global that it would cease its "no-float" policy on the J&J Account, effective July 15, 2004, that it would require J&J Chemical to maintain a minimum balance of

$1.2 million in the J&J Account, and that it would pay checks presented against the J&J Account in excess of $4 million. It also requested that CSB be paid a fee of $36,000.00, on or before July 7, 2004, and a fee of $300.00 per check from and after July 1, 2004. Both J&J Chemical and Gitto Global signed such letter agreement, on July 1, 2004. Paulhus Affidavit, Exh. 18.

99.    On July 6, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Gill, and Guercio attended. In such meeting, Cash confirmed that Gitto Global and J&J Chemical had signed CSB's proposed letter agreement. He stated that Tenaglia would also send out a certified letter to J&J Chemical and Miller, stating that CSB's practice of paying against uncollected funds in the J&J Account would cease on July 15, 2004. Paulhus Affidavit, Exh. 12, pp. 3185-3187 (redacted).

100.    On July 13, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Tenaglia and Guercio attended. In such meeting, Tenaglia stated that the fees requested in the July 1, 2004 letter agreement had been paid, and that he had informed Miller orally and in writing, by certified mail, that CSB's practice of paying against uncollected funds in the J&J Account would cease on July 15, 2004. He also described a new proposal from Miller to CSB for an extension of the July 15, 2004 deadline, in which proceeds from an anticipated July 23, 2004 sale of the land and buildings on which Gitto Global operated would be put in escrow for CSB's benefit. Notwithstanding such offer, the Board voted to maintain the July 15, 2004 deadline. Paulhus Affidavit, Exh. 12, pp. 3188 & 3191 (redacted).

101.    On or around July 14, 2004, Cash participated in a conference call with Davis, Tenaglia, two other CSB directors (Paul Cherrabini and Robert Farragher), CSB's counsel, Miller, Walter Carlson of Vitrotech, and Alex Kabitoff from Vitrotech. In such conference call, the individuals from Vitrotech confirmed its continued interest in purchasing Gitto Global, and

discussed whether it would pledge certain Vitrotech stock to CSB as additional security and in order to obtain more time to complete the sale. Cash Depo, p. 83, line 7 to p. 87, line 24.

102.    On July 15, 2004, Tenaglia informed Cash that Charles Gitto, the chairman of Gitto, had offered a mortgage on his personal residence, and that Miller and Gary Gitto, another shareholder of Gitto Global, had offered to deposit $500,000.00 each in cash collateral, in order to obtain more time to complete the Vitrotech sale. Cash Depo, p. 90, line 22 to p.91, line 20.

103.    Based on the conference call and offers of additional collateral, Cash made the decision to not to enforce the July 15, 2004 deadline with respect to cessation of CSB's practice of paying against uncollected funds in the J&J Account. Cash Depo, p. 90, line 11 to p. 91, line 20; Paulhus Affidavit, Exh. 12, pp. 3192--3194 (redacted).

104.    On July 20, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Tenaglia and Guercio attended. In such meeting, Cash confirmed that he had agreed to extend the deadline to J&J Chemical, based upon the promise of additional collateral. The CSB Executive Board authorized CSB management to "take the necessary actions it deemed necessary to protect" CSB, and to negotiate a new agreement with J&J Chemical to obtain the additional collateral. Paulhus Affidavit, Exh. 12, pp. 3192--3194 (redacted).

105.    On July 23, 2004, CSB entered into the following agreements and transactions with respect to its continued practice of paying against uncollected funds in the J&J Account:

a.    A revolving credit note made by J&J Chemical in the original principal amount of up to $8.4 million, due and payable on or before August 16, 2004 and terminating August 16, 2004 (the "J&J Chemical Note");

      b.      A letter agreement with J&J Chemical and Tradex describing the credit facility evidenced by the J&J Chemical Note and the collateral and guaranties required for the J&J Chemical Note;

      c.      A pledge agreement with J&J Chemical, in which J&J Chemical pledged $1.2 million held in a separate account at CSB, to secure the J&J Chemical Note;

      d.      A security agreement with J&J Chemical, in which J&J Chemical granted a security interest in substantially all of its assets to secure the J&J Chemical Note;

      e.      Miller's unconditional guaranty of the J&J Chemical Note;

      f.      A mortgage from Miller and his wife, Maria Miller, on their personal residence at 95 Kettle Hole Road, Bolton, Massachusetts to secure Miller's guaranty of the J&J Chemical Note;

      g.      A pledge agreement with Miller, in which Miller pledged $500,000.00 held in a separate account at CSB, to secure Miller's guaranty of the J&J Chemical Note;

      h.      Gary C. Gitto's limited, non-recourse guaranty of the J&J Chemical Note;

      i.      A pledge agreement with Gary C. Gitto, in which he pledged $500,000.00 held in a separate account at CSB, to secure his guaranty of the J&J Chemical Note;

      j.      Tradex's limited, non-recourse guaranty of the J&J Chemical Note;

      k.      A security agreement with Tradex, in which Tradex granted a security interest in certain inventory to secure the J&J Chemical Note;

      l.      A mortgage from Tradex on Tradex's real estate located at 140 Leominster-Shirley Road, Lunenburg, Massachusetts to secure Tradex's limited, non-recourse guaranty;

        m.      A pledge agreement with Gitto Global, in which Gitto Global granted 3 million shares of Vitrotech stock, as evidenced by a certificate held in escrow; and

        n.      An escrow agreement between Gitto Global, CSB, and Michael P. Angelini regarding the escrow terms of the Vitrotech stock certificate pledged by Gitto Global to CSB.

Paulhus Affidavit, Exh. 19.

106.    On July 26, 2004, the Board held its monthly meeting, which meeting Davis, Cash, Gill, and Tenaglia attended. In such meeting, Cash informed the Board that CSB had closed the July 23, 2004 transaction with J&J Chemical and described the collateral obtained. He also stated that J&J Chemical would pay a $40,000.00 fee in connection with the transaction, and a $150,000.00 exit fee to release the collateral. Cash admitted that CSB would not have entered this loan transaction in different circumstances, and that CSB management had erred in not informing the Board of CSB's problems with the J&J Account earlier than June 2004.  Paulhus Affidavit, Exh. 13, pp. 016, 017 & 017-C (redacted).

**J.     LCB Activity from April 2004 to August 2004.**

107.    As of May 27, 2004, Gitto Global was in default of reporting covenants in the Loan Agreement because it had not submitted financial information for February 2004 and March 2004,  and had not submitted a covenant compliance certificate for the periods ended March 31, 2004. McGee Affidavit, Exh. 4, LBC 001866.

108.    On May 27, 2004 and June 3, 2004, Furst sent e-mails to Deakin and Miller demanding that Gitto Global comply with its financial reporting requirements under the Loan Agreement. In the June 3, 2004 e-mail, Furst also requested a copy of Gitto Global's purchase and sale agreement with Vitrotech. McGee Affidavit, Exh. 4, LBC 001863.

109.    On July 7, 2004, Furst sent an e-mail to Stillwell in which he rescheduled a planned July 12, 2004 field examination of Gitto Global to July 19, 2004, based upon Miller's representation that Vitrotech's auditors were "wrapping up" by July 8, 2004 and the scheduled July 15, 2004 sale and payout of LBC was "still viable." McGee Affidavit, Exh. 4, LBC-E 000010 (S&C 00002).

110.    On July 8, 2004, based upon Vitrotech's letter to Furst dated July 8, 2004 and concern that LBC's field examination would disrupt Vitrotech's due diligence, Furst notified Stillwell that, instead of a full field examination, LBC should conduct only a two (2) day limited scope examination of Gitto Global, focusing on cash and collateral. McGee Affidavit, Exh. 4, LBC-E 000011 (S&C 000003), LBC 001959, LBC 001960, & LBC 001826.

111.    From July 22,2004 to July 23, 2004, LBC conducted a field examination and recurring audit of Gitto Global. 10/21/04 Stillwell Affidavit, ¶61; 12/6/04 Stillwell Affidavit, Exh. V.

112.    As a part of LBC's July 2004 field examination and recurring audit, LBC's field examiners reviewed false invoices and checks for various False Gitto Customers. LBC's field examiners did no independent verification either of the existence of the False Gitto Customers or the amounts allegedly owed by False Gitto Customers to Gitto Global, but relied solely on documents and representations provided by Gitto Global employees. 10/21/04 Stillwell Affidavit, ¶62; 12/6/04 Stillwell Affidavit, Exh. V.

113.    In LBC's July 2004 field examination and recurring audit, LBC's field examiners waived phone verification of Gitto Global's account receivable, and relied Pellegrine's letter confirmations obtained in January 2004. 12/6/04 Stillwell Affidavit, Exh. V, Field Examination Summary, Attachment A-2.

114.    As a part of LBC's July 2004 field examination and recurring audit, LBC's field examiners also examined cash application by reviewing checks, bank statements and cash reconciliations. 10/21/04 Stillwell Affidavit, ¶62; 12/6/04 Stillwell Affidavit, Exh. V.

115.    In the July 2004 field examination and recurring audit, the field examiners noted that J&J Chemical was a "critical supplier" of product and was paid on a COD basis. 12/6/04 Stillwell Affidavit, Exh. V, Field Examination Summary, Section IV(B).

116.    In the July 2004 field examination and recurring audit, the field examiners failed to perform a review of cancelled checks. 12/6/04 Stillwell Affidavit, Exh. V, Field Examination Summary, Attachment B-1.

117.    In the July 2004 field examination and recurring audit, the field examiners noted that, with respect to the Vitrotech sale, "due diligence has taken longer than expected …[and] the sale is expected to consummate by 8/15/04." 12/6/04 Stillwell Affidavit, Exh. V, Recurring Audit Summary, p.2.

118.    On August 11, 2004, Furst placed a memorandum in the Gitto Global credit file noting that the results of the July 2004 field examination were "satisfactory". He also noted that Gitto Global's internal financial statement production was late due to the "pending sale of the company and the level of SEC due diligence." Finally, he noted that "It is anticipated that the company will be sold by 9/30/04." McGee Affidavit, Exh. 4, LBC 001968.

119.    On August 12, 2004, LBC obtained the April 30, 2004 internal financial statements and general ledger for Gitto Global. McGee Affidavit, Exh. 4, LBC 001734.

120.    On August 27, 2004, Furst prepared an annual loan review of Gitto Global, in which he recommended no change, pending determination of whether the Vitrotech sale would close. McGee Affidavit, Exh. 4, LBC 002179--002216.

**K.     CSB Activity in August 2004.**

121.     On August 2, 2004, Vitrotech announced its intention to acquire Gitto Global for a purchase price of $50 million, subject to satisfaction of due diligence requirements. Paulhus Affidavit, Exh. 20.

122.     On August 3, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Gill, Guercio, and Tenaglia attended. In such meeting, David A. Harmon ("Harmon"), of CSB's loan department, updated the Executive Committee on the closing of the July 23, 2004 transactions with J&J Chemical and its guarantors, and that the deadline date for J&J Chemical was August 16, 2004. Harmon also related that Miller believed that the Vitrotech auditors were close to finishing their audit, and that Vitrotech had made a public announcement regarding the sale. Paulhus Affidavit, Exh. 12, pp. 3195--3197 (redacted).

123.     On August 10, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Gill, Guercio, Tenaglia, Paulhus and Harmon attended. In such meeting, Paulhus made a loan presentation regarding the July 23, 2004 transactions with J&J Chemical, and informed the Executive Committee that Miller had told him that the Vitrotech's anticipated closing date of August 15, 2004 would be delayed. The Executive Committee approved the July 23, 2004 loan, and authorized CSB management to extend the deadline date for J&J Chemical to August 27, 2004, if necessary.  Paulhus Affidavit, Exh. 12, pp. 3198 & 3201 (redacted) & Exh. 21.

124.     On August 17, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Gill, Guercio, Paulhus and Harmon attended. In such meeting, Paulhus made a new loan presentation regarding J&J Chemical, due to Vitrotech's and Gitto Global's extension of the sale closing date to September 15, 2004. In such presentation, he recommended

extension of the deadlines under the J&J Chemical Note and related agreements to September 15, 2004. The Executive Committee approved the loan extension to September 15, 2004, contingent upon receipt of unlimited guaranties of the amended J&J Chemical Note from Gary Gitto, Charles Gitto, and Tradex. Paulhus Affidavit, Exh. 12, pp. 3202 -- 3204 (redacted) & Exh. 22.

125.    On August 18, 2004, CSB entered into the following agreements and transactions with respect to its amendment and extension of the J&J Chemical Note:

      a.    A letter agreement, dated August 18, 2004, amending the maturity date of the J&J Chemical Note to September 15, 2004, and the terms and conditions of such extension;

      b.    Gary C. Gitto's amended and restated guaranty of the J&J Chemical Note, as revised;

      c.    Charles N. Gitto, Jr.'s guaranty of the J&J Chemical Note;

      d.    Tradex's amended and restated guaranty of the J&J Chemical Note, as revised.

Paulhus Affidavit, Exh. 23.

126.    On August 24, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Gill, Guercio, Paulhus and Harmon attended. In such meeting, Paulhus disclosed the terms of the August 17, 2004 amendment of the J&J Chemical Note, and the new guaranties signed in connection with such amendment. Paulhus also described the status of various information requests made to Miller, and his review of the Tradex inventory. Paulhus Affidavit, Exh. 12, pp. 3205 -- 3207 (redacted).

127.    On August 27, 2004, Paulhus and Harmon met with Miller regarding the progress of the Vitrotech sale, at which meeting Miller told him that he was having trouble reaching individuals at Vitrotech, and planned to go to California to speak to Vitrotech executives face to face. He also discussed new efforts to refinance Gitto Global's debt. Paulhus Depo, p. 90, line 10 to p. 92, line 9.

128.    On August 30, 2004, the Board held its monthly meeting, which meeting Davis, Cash, Gill, Tenaglia and Paulhus attended. In such meeting, Paulhus gave a similar presentation as the one he gave at the August 24, 2004 Executive Committee meeting, added in information derived from his August 27, 2004 meeting with Miller, and answered questions regarding the possible delays in the Vitrotech sale and the effect on CSB if CSB begins to return checks drawn on the J&J Account.  Paulhus Affidavit, Exh. 13, pp. 039, 041, 042 & 044 (redacted).

129.    On August 30, 2004 or August 31, 2004, Paulhus viewed Vitrotech's web page, on which Vitrotech had revised its quarterly report to state that its deal to acquire Gitto Global had been terminated, effective August 27, 2004, and that its chairman had resigned. Paulhus Depo, p. 92, line 15 to p. 93, line 3; Paulhus Affidavit, Exh. 24.

130.    On August 31, 2004, Paulhus spoke by telephone to Miller and informed him of Vitrotech's statements on its revised quarterly report. Miller expressed surprise at the statements and restated his plan to pursue other financing to be put in place by September 15, 2004. Paulhus Depo, p. 93, line 7 to p. 95, line 5.

**L.    September 2004.**

131.    On September 7, 2004, the CSB Executive Committee held a meeting, which meeting Davis, Cash, Gill, Guercio, and Paulhus attended. In such meeting, Paulhus apprised the Executive Committee of the statements in Vitrotech quarterly report regarding termination of the

Vitrotech asset purchase agreement with Gitto Global. Paulhus, on questioning from the

Executive Committee, stated management's belief that the agreements with J&J Chemical

required CSB to wait until September 15, 2004 either for a commitment letter from another

lender or to cease CSB's practice of paying against uncollected funds in the J&J Account.

Paulhus Affidavit, Exh. 12, pp. 3208, 3209 & 3211 (redacted).

132.    On September 14, 2004, the CSB Executive Committee held a meeting, which

meeting Davis, Cash, Gill, Guercio, Tenaglia and Paulhus attended. In such meeting, Paulhus

told the Executive Committee that there had been no communication from Gitto Global or any of

its principals for two weeks. Paulhus repeated his belief that September 15, 2004 was the

deadline either for Gitto Global and J&J Chemical to obtain a commitment letter from another

lender or for CSB to cease its practice of paying against uncollected funds in the J&J Account.

Paulhus Affidavit, Exh. 12, pp. 3212, 3213 & 3215 (redacted).

133.    From and after September 16, 2004, CSB dishonored $11,890,588.00 in checks

drawn on the J&J Account and deposited in the Replacement Fleet Blocked Account, due to

insufficient funds in the J&J Account to cover such checks. Complaint & Answer, ¶49; 12/6/04

Stillwell Affidavit, Exhibit P.

134.    On September 20, 2004, CSB set off against the $1.2 million pledged by J&J

Chemical and held in a CSB account, the $500,000.00 pledged by Gary C. Gitto and held in a

CSB Account, and the $500,000.00 pledged by Miller and held in a CSB Account. Paulhus

Affidavit, Exh. 25.

135.    On September 23, 2004, Gitto Global filed a Chapter 11 bankruptcy petition.

Complaint & Answer, ¶34.

136.     On September 24, 2004, CSB made demand for payment of $1,943,195.26 on J&J Chemical and each of its guarantors, other than Gitto Global. Paulhus Affidavit, Exh. 26.

**M.     Events Post-September 2004.**

137.     Tradex filed its own Chapter 11 petition, on February 14, 2005, with the United States Bankruptcy Court, D. Mass. (the "Bankruptcy Court"), thereby commencing Case No. 05-40748-JBR. McGee Affidavit, Exh. 5.

138.     On April 7, 2005, the Bankruptcy Court entered an order directing that the United States Trustee to appoint a Chapter 11 trustee for Tradex. McGee Affidavit, Exh. 6.

139.     On April 12, 2004, the United States Trustee appointed M. Ellen Carpenter ("Carpenter") as the Chapter 11 trustee of Tradex. McGee Affidavit, Exh. 7.

140.     On or about January 26, 2006, Carpenter filed an amended complaint against CSB in the Bankruptcy Court, adversary proceeding no. 05-04056, in which she sought avoidance of Tradex's guaranty and mortgage to CSB as fraudulent transfers under M.G.L. c. 109A and 11 U.S.C. §548 (the "Carpenter Amended Complaint"). McGee Affidavit, Exh. 8.

141.     The Carpenter Amended Complaint is still pending and has not been adjudicated. McGee Affidavit, ¶4.

142.     LBC is the major unsecured creditor in Tradex bankruptcy case, with a claim in excess of $30 million against Tradex.

Dated:  May 2, 2006

                                    CLINTON SAVINGS BANK, Defendant

                                    By its attorneys,


                                    /s/ Kevin C. McGee
                                    Kevin C. McGee (BBO #548923)
                                    SEDER & CHANDLER
                                    339 Main Street
                                    Worcester, MA  01608
                                    (508) 757-7721


### CERTIFICATE OF SERVICE

I, Kevin C. McGee, hereby certify that, on May 2, 2006, I served the foregoing Statement of Material Undisputed Facts in Support of Motion for Summary Judgment, as well as Defendant's Motion for Summary Judgment, on the parties below, who do not otherwise receive electronic notice of filing, via first class mail, postage prepaid.

Eric S. Rein, Esq.
John L. Cordon, Esq.
Bethany N. Schols, Esq.
Schwartz, Cooper, Greenberger & Krauss, Chtd.
180 N. LaSalle Street, Suite 2700
Chicago, IL 60601


                                    /s/ Kevin C. McGee
                                    Kevin C. McGee