# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LASALLE BUSINESS CREDIT. LLC f/k/a LASALLE BUSINESS CREDIT, INC.<br><br>           Plaintiff<br><br>v.<br><br>CLINTON SAVINGS BANK,<br><br>           Defendant | Case No.  05-CV10268-DPW |

## AFFIDAVIT OF KEVIN C. McGEE, ESQ. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Kevin C. McGee, Esq,., first being sworn, states:

1.      I, Kevin C. McGee, am a partner of the Worcester, Massachusetts law firm of Seder & Chandler, LLP ("Seder & Chandler").  Seder & Chandler represents the Defendant Clinton Savings Bank ("CSB"), in this civil action.

2.      The information set forth herein is of my own personal knowledge, except where stated to be on information and belief, which information I believe to be true.  I make this affidavit in connection with Defendant's Motion for Summary Judgment.  All capitalized terms in this affidavit that are not otherwise defined herein have the same definition as provided in the Motion for Summary Judgment.

3.      Each of the following documents or compilations of documents, which have been attached hereto as Exhibits "1" and "4" is a copy of a document or documents provided to CSB by the Plaintiff, LaSalle Business Credit, LLC ("LBC"), pursuant to the *Plaintiff's Response to First Request for Production of Documents,* dated as of September 8, 2005. Exhibits "2" and "3"

are documents produced in response to CSB's subpoena, dated September 16, 2005, to Bank of America f/k/a Fleet National Bank. Exhibits "5" through "8" are pleadings filed in the United States Bankruptcy Court, D. Mass.(the "Bankruptcy Court"), in the Chapter 11 case of *In re Tradex Corp.*, Case No. 05-40748-JBR (the "Tradex Bankruptcy Case"). In addition, Exhibits _ through ____ are true and correct copies of pages of transcripts of depositions taken in connection with this civil action and in connection with *LaSalle Business Credit v. Gary Gitto, et al.*, Civil Action No. 04-12227-DPW.

Exh.1    Letter Agreement dated July 25, 2002 regarding Loan and Security Agreement between Guaranty Business Credit Corporation and Gitto Global Corporation, by and among Guaranty Business Credit Corp., LaSalle Business Credit, Inc., and Gitto Global Corporation (produced by LBC to CSB).

Exh.2    Three-Party Blocked Account Service Agreement, dated as of July 25, 2002 by and among Gitto Global Corporation, LaSalle Business Credit, Inc., and Fleet National Bank (produced by Bank of America to CSB).

Exh.3    Three-Party Blocked Account Service Agreement, dated as of February 21, 2003 by and among Gitto Global Corporation, LaSalle Business Credit, LLC, and Fleet National Bank  (produced by Bank of America to CSB).

Exh.4    E-mails and documents produced by LBC to CSB from LBC's business records, with various bate-stamp numbers beginning with "LBC" and/or "LBC-E".

Exh.5    Tradex Corporation's ("Tradex") Chapter 11 petition, filed February 14, 2005 in the Tradex Bankruptcy Case.

Exh.6    Order of Bankruptcy Court in the Tradex Bankruptcy Case, dated April 7, 2005, allowing U.S. Trustee motion for appointment of Chapter 11 Trustee.

Exh.7    Notice of U.S. Trustee in the Tradex Bankruptcy Case, dated April 14, 2005, appointing M. Ellen Carpenter as Chapter 11 Trustee of Tradex.

Exh 8    Carpenter's Amended Complaint against CSB, dated January 26, 2006, filed in the Bankruptcy Court in Adversary Proceeding No. 05-04056.

Exh.9    Pages from the following deposition transcripts: Stephen P. Cash (9/13/05), Michael Tenaglia (12/1/04), Robert Paulhus ((12/1/04), Bobbi

Jo A. Williams (9/13/05), Christopher Gill (9/14/05), Joseph D. Guercio (9/14/05), Sheila A. Azorandia (9/13/05), and Vol I. of William Deakin (11/15/05).

4.    The Amended Complaint attached hereto as Exhibit 8 is still pending and  has not been adjudicated, as of the date of this Affidavit.


SIGNED UNDER PAIN AND PENALTY OF PERJURY THIS  2nd DAY OF MAY, 2006.


/s/ Kevin C. McGee
Kevin C. McGee, Esq.

Dated:  May 1, 2006
        Worcester, Massachusetts

Exhibit 1

Letter Agreement dated July 25, 2002 regarding Loan and Security Agreement between Guaranty Business Credit Corporation and Gitto Global Corporation, by and among Guaranty Business Credit Corp., LaSalle Business Credit, Inc., and Gitto Global Corporation (produced by LBC to CSB)



July 25, 2002

VIA TELECOPY
Mr. Kevin Copenspire
LaSalle Business Credit, Inc.


Mr. Frank Miller
Gitto Global Corporation
140 Leominster Shirley Road
Lunenburg, Massachusetts 01462-1660

Re:   Loan and Security Agreement, dated as of August 3, 2001, between Guaranty Business
      Credit Corporation ("GBCC") and Gitto Global Corporation ("Borrower") (the "Loan
      Agreement"); capitalized terms used but not defined herein have the meanings given to
      them in the Loan Agreement

Gentlemen:

1.      Borrower has informed GBCC that it desires to repay in full on July 25, 2002 (the
"Payoff Date") the indebtedness evidenced by the Loan Agreement (the "GBCC Obligations")
from the proceeds of a loan (the "New Loan") to Borrower from LaSalle Business Credit, Inc.
("Lender"). To induce Lender to make the New Loan to Borrower, GBCC agrees that the GBCC
Obligations, other than indemnifications and other obligations that expressly survive termination
of the Loan Agreement, shall be paid in full, by wire transfer the sum of $28,841,980.22 (the
"Payoff Amount") on the Payoff Date as follows:

| | |
|---|---|
| Bank: | Guaranty Bank |
| ABA #: | 314970664 |
| Account #: | 3800436598 |
| Account Name: | Guaranty Business Credit Corporation |
| Reference: | Gitto Global Corporation |

If the Payoff Amount is not received by GBCC prior to 4:00 PM, Dallas, Texas, time, on
the Payoff Date, it shall be deemed to have been received on the next business day and a new
payoff amount will be provided adjusted for additional interest accrued and collections received.

2.      Upon the receipt of the Payoff Amount as aforesaid, all GBCC Obligations (other
than indemnifications and other obligations that expressly survive termination of the Loan
Agreement) will be satisfied, security interests and liens upon any of the assets of Borrower in
favor of GBCC shall terminate and GBCC authorizes Borrower and Lender to file and promptly

8333 Douglas Avenue, Suite 690
Dallas, Texas 75225
ph: 214.360.8989 / fax: 214.360.3464
website: www.gbcc.guarantygroup.com

FDIC

Mr. Kevin Copenspire
Mr. Frank Miller
July 25, 2002
Page 2

shall deliver to Lender, at the cost and expense of Borrower, all termination statements necessary to terminate any financing statements previously filed with respect to Borrower in favor of GBCC. GBCC also agrees to execute and deliver, at the cost and expense of Borrower, such other and further documents and agreements as may be reasonably requested by Borrower in order to effect and evidence more fully the termination and release of the security interests and liens of GBCC provided for herein.

3.     To the extent GBCC receives payments from Borrower's customers on Borrower's accounts receivable on or after the date hereof, GBCC agrees to remit the amount of such payments to Lender for the account of Borrower, other than collected funds received on or after the Payoff Date for which GBCC previously gave Borrower credit against the outstanding loan balance as deposited funds and which deposited funds were used in determining the Payoff Amount. Lender and Borrower agree to pay GBCC, on demand, together with any fees and expenses associated therewith, (a) the amount of any such remittance made by GBCC to Lender and (b) the amount of any payment received by GBCC from Borrower's customers on Borrower's accounts receivable prior to the date hereof and applied to Borrower's account with GBCC in determining the Payoff Amount if, in either case, the payment made by the customer of Borrower to GBCC is returned to GBCC unpaid on or before September 15, 2002, for any reason. In the event that any payment on Borrower's accounts receivable received by GBCC and either remitted to Lender or applied to Borrower's account with GBCC is sought to be recovered by the payor or a representative thereof (including a trustee in bankruptcy or assignee for the benefit of creditor), then GBCC shall promptly so advise Lender and Borrower in writing. Following the aforementioned written notice, Lender and Borrower shall have the exclusive right and obligation, at their sole cost and expense, to contest, defend or settle such claim. Lender and Borrower hereby agree to indemnify and hold GBCC harmless from any loss, damage or expense arising out of the assertion of such claim.

4.     In consideration of the agreements contained herein, each of Borrower, Frank Miller, and Gary Gitto hereby releases GBCC and its officers, directors, shareholders, affiliates and employees from any and all claims, suits, damages, costs or liabilities of any nature arising in whole or in part under or in connection with the Loan Agreement or the transactions contemplated thereby, including, without limitation, any such claims, suits, damages, cost or liabilities arising out of or relating to a claim of breach of contract, fraud, lender liability or misconduct, breach of fiduciary duty, usury, unfair bargaining position, unconscionably, violation of law, negligence, error or omission in accounting or calculations, misappropriation of funds, tortious conduct or reckless or willful misconduct, whether known or unknown.

5.     GBCC enters into this agreement under the express assumption that Lender has conducted an independent and thorough investigation of the creditworthiness of Borrower and the genuineness or quality of Borrower's accounts receivable, inventory and/or any other collateral of Borrower upon which Lender may be relying.

Gitto Payoff Letter Revised3

Mr. Kevin Copenspire
Mr. Frank Miller
July 25, 2002
Page 3

6.    · GBCC makes no representations, warranties, agreements and statements concerning Borrower, its business, financial condition, creditworthiness, prospects, the nature of the relationship between Borrower and its customers, the accuracy, genuineness or quality of Borrower's accounts receivable or inventory or the financial condition of Borrower's customers.

If the foregoing is in accordance with your understanding of our agreement, please so indicate by signing in the place and manner provided below.

Sincerely,

**GUARANTY BUSINESS CREDIT CORPORATION**

By: _James E. Carper_
Name: _James E. Carper_
Title: _Senior Vice President_

**ACKNOWLEDGED AND AGREED:**

**LASALLE BUSINESS CREDIT, INC.**

By: _Kevin D. Copenspire_
Name: _KEVIN D. COPENSPIRE_
Title: _VICE PRESIDENT_

**GITTO GLOBAL CORPORATION**

By:_____
Name:_____
Title:_____

**FRANK MILLER**
_____

**GARY GITTO**
_____

Gitto Payoff Letter Revised3

Mr. Kevin Copenspire
Mr. Frank Miller
July 25, 2002
Page 3

6.    GBCC makes no representations, warranties, agreements and statements concerning Borrower, its business, financial condition, creditworthiness, prospects, the nature of the relationship between Borrower and its customers, the accuracy, genuineness or quality of Borrower's accounts receivable or inventory or the financial condition of Borrower's customers.

If the foregoing is in accordance with your understanding of our agreement, please so indicate by signing in the place and manner provided below.

Sincerely,

**GUARANTY BUSINESS CREDIT CORPORATION**

By: _James E. Casper_
Name: _James F. Casper_
Title: _Senior Vice President_

**ACKNOWLEDGED AND AGREED:**

**LASALLE BUSINESS CREDIT, INC.**

By: _____
Name: _____
Title: _____

**GITTO GLOBAL CORPORATION**

By: _Frank Miller_
Name: _FRANK MILLER_
Title: _PRESIDENT_

_Frank Miller_
**FRANK MILLER**

_Gary Gitto_
**GARY GITTO**

Gitto Payoff Letter Revised3

Mr. Kevin Copenspire
Mr. Frank Miller
July 25, 2002
Page 4

GARY GITTO

EXHIBIT 2

THREE-PARTY BLOCKED ACCOUNT SERVICE AGREEMENT,
DATED AS OF JULY 25, 2002 BY AND AMONG GITTO GLOBAL
CORPORATION, LASALLE BUSINESS CREDIT, INC., AND FLEET
NATIONAL BANK
(PRODUCED BY BANK OF AMERICA TO CSB)



## THREE-PARTY BLOCKED ACCOUNT
## SERVICE AGREEMENT

**THIS THREE-PARTY BLOCKED ACCOUNT SERVICE AGREEMENT** (the "Agreement") is dated as of ___July 25___, 20 02, and is among ___Gitto Global Corporation___, having its notice address at ___140 Leominster - Shirly Road, Lunenburg, Massachusetts 01462___ Attention: ___Frank Miller___ ("Depositor"), ___LaSalle Business Credit, Inc.___, having its notice address at _____

Attention: ___Kevin Coteway___ ("Lender"), and **FLEET NATIONAL BANK**, having its notice address at ___100 Front Street Worcester, MA 01608___ Attention: ___John Palen___ ("Bank").

## BACKGROUND

A.    Lender has made, or is making, loans, or otherwise extending credit and/or making other financial accommodations to, Depositor, which are secured by, among other things, Depositor's assets and the proceeds thereof.

B.    Depositor has established, at Bank, the Blocked Account (as defined herein).

C.    Depositor desires to grant to Lender control of, and dominion over, and further perfect Lender's security interest in, the Blocked Account, and the proceeds thereof.

**ACCORDINGLY**, for good and valuable consideration, the receipt of which is hereby acknowledged, Depositor, Lender, and Bank hereby agree as follows:

1.    **Blocked Account.** Depositor has established the following deposit account (the "Blocked Account") at Bank: "___Fleet Bank___, FBO _____ Blocked Account" bearing Account Number ___9418564867___) Depositor and Lender agree promptly to provide Bank with any documents, resolutions and instructions needed to establish or maintain the Blocked Account. Subject to the terms and provisions of this Agreement, the Blocked Account shall be governed by Bank's standard terms and conditions applicable to such accounts, as amended from time to time, and Bank is hereby authorized to follow its usual operating procedures in connection with the Blocked Account.

2.    **Blocked Account Restrictions on Depositor.** Depositor, by executing this Agreement and related documents, resolutions and account instructions, irrevocably authorizes and instructs Bank to comply *only* with Lender's standing order set forth in Section 4 to transfer funds from the Blocked Account to Lender's Account (as defined herein).

3.    **Depositor's Waiver of Authority.** In order further to establish the control and dominion contemplated hereby, and in order further to perfect by control Lender's security interest in the Blocked Account and the proceeds thereof, until either (a) Bank receives Lender's written instructions to the contrary, or (b) this Agreement shall terminate, in accordance with the terms hereof, whichever shall occur first, Bank shall comply with instructions originated by Lender directing disposition of the funds in the Blocked Account without further consent from Depositor, and Depositor irrevocably waives Depositor's authority to transfer, withdraw or otherwise disburse funds from the Blocked Account, and acknowledges that Lender shall have exclusive control of funds credited to the Blocked Account. Depositor agrees promptly to pay directly and immediately to Lender any and all funds that Depositor transfers, withdraws or otherwise disburses from the Blocked Account in contravention of this Agreement.

4.    **Transfers from the Blocked Account to Lender's Account.** Lender instructs Bank to initiate a daily transfer of all collected and available funds in the Blocked Account to Lender's Account Number _____ at _____ ABA Routing Number _____ ("Lender's Account").

5.    **Bank's Setoff Waiver and Subordination of Security Interest.** Bank (a) waives any right of setoff or recoupment against Depositor that Bank may have with respect to funds credited to the Blocked Account, and (b) subordinates in favor of Lender, any security interest in the Blocked Account and in any proceeds thereof. The parties agree that the foregoing setoff and recoupment waiver and subordination of security interest shall not affect Bank's right or ability to make account adjustments, charge-back or otherwise seek reimbursement for any deposit items that are returned to the Blocked Account, and/or to charge the Blocked Account, for unpaid fees and expenses relating to the Blocked Account, as provided in this Agreement.

6.    **Blocked Account Fees, Expenses, and Returns.** Depositor and Lender instruct Bank to charge any and all account adjustments, returned deposit items and overdrafts associated with the Blocked Account (the "Blocked Account Charges") to the Blocked Account; or, if sufficient collected and available funds do not exist in the Blocked Account to cover the Blocked Account Charges, any other of Depositor's accounts at Bank. Promptly after, or contemporaneously with, Bank's notice to Lender that any of the Blocked Account Charges have not been paid or reimbursed, Bank may seek reimbursement *directly from Lender* for all such amounts, which reimbursement shall be made immediately by Lender, without cost to Bank.

Any fees or miscellaneous expenses (including reasonable attorneys' fees incurred by Bank in connection herewith) charged in connection with the Blocked Account (the "Fees") shall be charged to Depositor's Account No. _____ with Bank. Promptly after, or contemporaneously with, Bank's notice to Lender that the Fees have not been paid or

2

reimbursed, Bank may seek reimbursement *directly from Lender* for all such amounts, which reimbursement shall be made immediately by Lender, without cost to Bank.

7.    **Release of Account Information; Periodic Statements.**    Depositor authorizes Bank to release any and all information about the Blocked Account, and any other account of Depositor at Bank, to Lender upon Lender's request. Bank may elect, but shall not be required, to release information to Lender about Depositor's other accounts at Bank. Depositor and Lender instruct Bank, and Bank agrees, to send an original or a copy of Blocked Account periodic statements to Depositor and to Lender at their respective notice addresses.

8.    **Duty to Inspect.**    Lender and Depositor shall utilize one of Bank's online transaction reporting systems, or a comparable online monitoring system of mother bank, to monitor, on a daily basis, transactions posting against the Blocked Account and immediately notify Bank of any errors, discrepancies and/or irregularities, such notice to take place no later than the time frames specified in the following table (unless a longer period is required by applicable law) after the transaction containing or reflecting an error, discrepancy and/or irregularity becomes available for viewing online:

| Type of Transaction | Notification Period |
| --- | --- |
| Disputed ACH Transactions | Within 24 hours of transaction posting to account |
| Paid Check Transactions | Within 24 hours of transaction posting to account |
| Analysis/Service Fees Disputes | Within 14 days of receipt of Analysis Statement |
| All other errors, discrepancies and/or irregularities | Within 14 days of transaction posting to account |

Except to the extent otherwise required by applicable law, failure by Lender or Depositor to notify Bank of errors, discrepancies and/or irregularities within the time frame indicated shall relieve Bank of any and all liability associated with or arising from such errors, discrepancies and/or irregularities.

9.    **Security Procedures.**    Lender and Depositor shall each be responsible for maintaining the confidentiality of all present and future security procedures of Bank and for ensuring that all such security procedures are followed with respect to the Blocked Account. Lender and Depositor agree that Bank shall not be liable for any losses sustained by Lender or Depositor that result from Lender's or Depositor's breach of such security procedures. Lender and Depositor shall promptly notify Bank in writing of any known or suspected breach of such security procedures. Lender and Depositor recognize that Bank may, from time to time, as part of such security procedures, refuse any authorized representative access to the Blocked Account.

10.    **Force Majeure.**    Bank shall not be responsible for actions or omissions caused by events beyond Bank's control, including, without limitation, fire, casualty, breakdown in

5

equipment or failure of telecommunications or data processing services of vendors, act or omissions of third parties, lockout, strike, unavoidable accidents, Acts of God, riot, war, acts of terrorism or the issuance or operation of any adverse governmental law, ruling, regulation, order or decree, or an emergency that prevents Bank from operating normally.

11.    **Indemnification by Depositor.** Depositor hereby agrees to indemnify and hold harmless Bank, and Bank's directors, officers, employees, agents and affiliates (collectively, the "Fleet Parties") from and against, any and all claims, demands, liabilities, actions, causes of action, losses, setoff, recoupment and expenses (including, without limitation, attorneys' fees and court costs), both legal and equitable, associated with, or connected to the Blocked Account and the services performed by Bank under this Agreement; provided that the Fleet Parties have not been proven to have engaged in willful misconduct or gross negligence. This Section shall survive the termination of this Agreement.

12.    **Limits on Bank's Liability to Lender and to Depositor.** Lender and Depositor agree that Bank's liability to Lender and/or to Depositor for failing to perform in accordance with the terms of this Agreement shall be limited to the actual, direct damages proximately caused by Bank's error or omission resulting from Bank's gross negligence or willful misconduct, and, in any event, shall not exceed the Blocked Account service fees charged by Bank in connection with the Blocked Account for the most recent twelve-month period. BANK SHALL NOT BE LIABLE, IN ANY EVENT, TO LENDER AND/OR TO DEPOSITOR, FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH LENDER AND/OR DEPOSITOR MAY INCUR OR SUFFER IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF WHETHER BANK KNEW OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE, AND REGARDLESS OF THE BASIS, THEORY OR NATURE OF THE ACTION UPON WHICH LENDER AND/OR DEPOSITOR, AS APPLICABLE, ASSERTS A CLAIM. This Section shall survive the termination of this Agreement.

13.    **Term and Termination.** Except as otherwise expressly provided herein, the parties agree that this Agreement shall terminate only after (a) Bank receives Lender's notice to terminate this Agreement and return the right to withdraw available funds in the Blocked Account to Depositor; or (b) Bank sends written notice to Depositor and Lender thirty (30) days prior to terminating this Agreement, closing the Blocked Account and disbursing the remaining Blocked Account funds to Lender or pursuant to Lender's instructions. No such termination shall affect any right or obligation arising under this Agreement prior to the effective date of termination, nor shall it affect any right or obligation which, by its terms, is intended to survive such termination. No such termination shall render unperfected Lender's security interest in the Blocked Account and its proceeds. Depositor shall not have power unilaterally to instruct Bank to terminate this Agreement and/or to close the Blocked Account.

14.    **Insolvency of Depositor.** In the event that (a) Depositor becomes subject to a voluntary or involuntary proceeding under the United States Bankruptcy Code, or (b) Bank is otherwise served with legal process which Bank believes affects funds deposited in the Blocked Account, Bank shall have the right to place a hold on funds deposited in the Blocked Account until such time as Bank receives an appropriate court order or other assurances satisfactory to Bank establishing that the funds may continue to be disbursed according to the instructions

4

contained in this Agreement.

15.    **Court Orders; Indemnification.** Nothing contained in this Agreement shall prevent Bank from complying with any legal process or other order of a court of competent jurisdiction affecting funds in the Blocked Account. If, notwithstanding the issuance of any such order or legal process, Bank continues to perform its obligations in favor of Lender pursuant to this Agreement, Lender shall indemnify and hold harmless the Fleet Parties from and against any and all claims, demands, liabilities, actions, causes of action, losses and expenses (including, without limitation, attorneys' fees and court costs), both legal and equitable, incurred or sustained by Bank that arise from, or are related to, the continuing performance by Bank of its obligations under this Agreement.

16.    **Modification of Agreement.** This Agreement may not be modified, altered or amended, except by an agreement in writing, signed by each of the parties hereto; provided, however, that Bank and Lender may agree jointly to amend Section 4 of this Agreement without the consent of Depositor.

17.    **Severability.** If a court of competent jurisdiction deems any part of this Agreement to be unenforceable, the parties agree that only the offending part shall be stricken and that the remaining parts shall be unaffected.

18.    **Choice of Law.** This Agreement shall be governed by, and interpreted in accordance with, the laws of the Commonwealth of Massachusetts (the "Jurisdiction") without reference to its laws governing conflicts of law. Notwithstanding any other agreement to the contrary, with respect to the Blocked Account, the Jurisdiction is Bank's jurisdiction for purposes of the Uniform Commercial Code.

19.    **Governing Agreements.** The duties and obligations of Bank hereunder shall be determined solely by the express provisions of this Agreement. Bank shall not be liable except for the performance of its duties and obligations specifically set forth in this Agreement, and no implied covenants or obligations on the part of Bank shall be read into this Agreement. In the event of a conflict between the terms and provisions of this Agreement, and the terms and provisions of any lockbox or other agreement relating to the provision by Bank of depository or cash management services, the terms of this Agreement shall control but only to the extent necessary to resolve such conflict.

20.    **Independent Contractor.** Lender and Depositor agree that, in performing the services under this Agreement, Bank will be acting as an independent contractor and not as an employer, employee, partner or agent of Lender or Depositor.

21.    **Miscellaneous Provisions.** Bank may rely, and shall be protected in acting or refraining from acting, upon any communication (including but not limited to electronically confirmed facsimiles of communications) believed by it to be genuine and to have been signed or presented by the proper party or parties. Nothing contained in this Agreement, nor any course of dealing between or among the parties hereto, shall constitute a commitment or other obligation by Bank to extend credit to Depositor or to Lender. The parties may, but shall not be obligated

5

to, use any reasonable means to record and/or retain any and all telephone conversations and/or data transmissions between or among the parties to this Agreement. This Agreement is for the benefit of the parties hereto and is not intended to grant, and shall not be construed as granting, any rights to or otherwise benefiting any third parties. This Agreement shall be binding upon, and shall inure to the benefit of, the permitted successors and assigns of the parties. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, and all of which counterparts taken together shall constitute but one and the same instrument. Each of the parties hereto intends that a facsimile transmission of a duly executed counterpart shall be as valid, in all respects, as an original. This Agreement embodies the entire understanding and agreement of the parties hereto with respect to the subject matter hereof, and supercedes all prior agreements, understandings and inducements, whether express or implied, oral and written, on the subject matter hereof. No provision of this Agreement shall be construed against, or interpreted to the disadvantage of, any party hereto by any court or other governmental or judicial authority by reason of such party having, or being deemed to have, structured or dictated such provision.

22. **JURY TRIAL WAIVER. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT AND/OR THE BLOCKED ACCOUNT. EACH PARTY ACKNOWLEDGES THAT THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO EACH PARTY TO ENTER THIS AGREEMENT, AND THAT EACH PARTY IS RELYING UPON THE FOREGOING WAIVER IN ITS FUTURE DEALINGS WITH EACH OTHER PARTY WITH RESPECT TO THE SUBJECT MATTER HEREOF. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED WITHOUT AUTHENTICATION AS A WRITTEN CONSENT TO TRIAL BY THE COURT.**

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective officers, each duly authorized, on the day and year specified at the beginning of this Agreement.

Gitto Global Corporation ("Depositor")

By: _____

Title: _____ PRESIDENT

La Salle Business Credit Inc. ("Lender")

6

By: _____

Title: Vice President

**FLEET NATIONAL BANK ("Bank")**

By: _____

Title: _____

 **Fleet**

February 21, 2003

Gitto Global Corporation
Frank Miller, President
140 Leominster–Shirley Road
Lunenburg, MA 01462

LaSalle Business Credit, Inc.
Thomas Furst, Vice President
565 Fifth Ave, Suite 27
New York, NY 10017

RE: The Blocked Account for Gitto Global Corporation

Dear Frank and Mr Furst:

We entered into a Three-Party Blocked Service Agreement as of July 25, 2002 with both Gitto Global and LaSalle Business Credit on our account number 9418564867. We would like to close that account and provide the service from a new account numbered 9429271277. In order to make this happen, we have enclosed a new Three-Party Blocked Account Agreement that is a more recent version of the agreement we had signed. It is similar in spirit. I have enclosed the older executed form to allow you to compare it. I have included different enclosures and suggested actions for each of you to aid the process.

<u>To Mr. Furst at LaSalle Business Credit</u>:
I have included three original agreements executed by Gitto and Fleet and three leters to release us from the prior account. I have included an old executed agreement as a comparison. Please review and sign all three copies and two of each document back to my attention in the envelope enclosed. I will have already gone to Gitto and signed the other necessary documents to open the new account. I will forward a complete package to Frank.

<u>To Frank:</u>
I have sent a draft of the new agreement and a copy of the old blocked account agreements for your review. After the new account is opened and the agreements are fully executed, I will create the automatic standing wire order to LaSalle to remove the manual process.

Please call me with any questions or thoughts. I would like to complete this as quickly as possible to eliminate the manual daily wire process. You can reach me at (508) 770 7134.

Regards,

Alden F. Harris II
Senior Vice President

EXHIBIT 3

THREE-PARTY BLOCKED ACCOUNT SERVICE AGREEMENT, DATED AS OF FEBRUARY 21, 2003 BY AND AMONG GITTO GLOBAL CORPORATION, LASALLE BUSINESS CREDIT, LLC, AND FLEET NATIONAL BANK
(PRODUCED BY BANK OF AMERICA TO CSB)



## THREE-PARTY BLOCKED ACCOUNT
## SERVICE AGREEMENT

**THIS THREE-PARTY BLOCKED ACCOUNT SERVICE AGREEMENT** (the "**Agreement**") is dated as of _February 21, 2003, and is among Gitto Global Corporation, a corporation organized and/or existing under the laws of Massachusetts and having a principal place of business at 140 Leominster-Shirley Road, Lunenberg, MA. 01462 ("**Depositor**"), LaSalle Business Credit, Inc., a corporation organized and/or existing under the laws of ~~New York~~ and having a principal place of business at 565 Fifth Avenue, Suite 27, New York, NY. 10017 ("**Lender**"), and **FLEET NATIONAL BANK**, a national banking association organized under the laws of the United States and having a principal place of business at 100 Federal Street, Boston, Massachusetts ("**Bank**").

### BACKGROUND

A.    Lender has made, or is making, loans, or otherwise extending credit and/or making other financial accommodations to, Depositor, which are secured by, among other things, Depositor's assets and the proceeds thereof.

B.    Depositor has established, at Bank, the Blocked Account (as defined herein).

C.    Depositor desires to grant to Lender control of, and dominion over, and further perfect Lender's security interest in, the Blocked Account, and the proceeds thereof.

**ACCORDINGLY**, for good and valuable consideration, the receipt of which is hereby acknowledged, Depositor, Lender, and Bank hereby agree as follows:

1.    **Blocked Account.** Depositor has established the following deposit account at Bank:  "Gitto Global Corporation, FBO LaSalle Business Credit, Inc. -Blocked Account" bearing Account Number 9429271277 (the "**Blocked Account**"). The parties acknowledge and agree that the Blocked Account shall be, at all times until the termination of this Agreement, under the sole dominion and control of Lender. Depositor further acknowledges and agrees that Lender shall have exclusive dominion and control of funds credited from time to time to the Blocked Account. Depositor and Lender shall promptly provide Bank with any and all documents, resolutions and instructions that Bank deems necessary or appropriate to establish or maintain the Blocked Account. Except as otherwise provided herein, the Blocked Account shall

11/19/2002

be governed by Bank's deposit account agreement for business accounts, as amended from time to time, and Bank is hereby authorized to follow its usual operating procedures in connection with the Blocked Account.

2.     **Blocked Account Restrictions on Depositor.**  Depositor, by executing this Agreement and related documents, resolutions and account instructions, irrevocably authorizes and instructs Bank to comply *only* with Lender's standing order set forth in Section 4 to transfer funds from the Blocked Account to Lender's Account (as defined herein) or such other orders or instructions as Lender may issue.  Bank shall act only upon the instructions of Lender with respect to the Blocked Account until such time as Lender gives written notice to Bank that control of the Blocked Account should be restored to Depositor.  Bank may require Depositor to complete signature cards and/or other documentation at such time in order to restore control of the Blocked Account to Depositor.

3.     **Depositor's Waiver of Authority.**  In order further to establish the control and dominion contemplated hereby, and in order further to perfect by control Lender's security interest in the Blocked Account and the proceeds thereof, until either (a) Bank receives Lender's written notice to the contrary, given at the notice address in Section 17 below, or (b) this Agreement shall terminate, in accordance with the terms hereof, whichever shall occur first, Bank shall comply with instructions originated by Lender directing disposition of the funds in the Blocked Account without further consent from Depositor, and Depositor irrevocably waives Depositor's authority to transfer, withdraw or otherwise disburse funds from the Blocked Account. Depositor agrees promptly to pay directly and immediately to Lender any and all funds that Depositor transfers, withdraws or otherwise disburses from the Blocked Account in contravention of this Agreement.

4.     **Transfers from the Blocked Account to Lender's Account.**  Lender instructs Bank to initiate a standing daily wire transfer of all available funds in the Blocked Account to Lender's Account Number 5800370974 at LaSalle Bank (name of institution), ABA Routing Number 071000505 and holding the account title  Gitto Global Corporation ("**Lender's Account**").  Such standing daily wire transfer shall be subject to the terms and conditions of the Funds Transfer Agreement entered into between Bank and Depositor, which shall not be subject to modification or termination by Depositor.

5.     **Bank's Setoff Waiver and Subordination of Security Interest.**  Bank (a) waives any right of setoff or recoupment against Depositor that Bank may have with respect to funds credited to the Blocked Account, and (b) subordinates in favor of Lender, any security interest in the Blocked Account and in any proceeds thereof.  The parties agree that the foregoing setoff and recoupment waiver and subordination of security interest shall not affect Bank's right or ability to make account adjustments, charge-back or otherwise seek reimbursement for any deposit items that are returned to the Blocked Account, and/or to charge the Blocked Account, for unpaid fees and expenses relating to the Blocked Account, as provided in this Agreement.

6.     **Blocked Account Fees, Expenses, and Returns.**  Depositor and Lender instruct Bank to charge any and all account adjustments, returned deposit items and overdrafts associated with the Blocked Account (the "**Blocked Account Charges**") to the Blocked Account; or, if

sufficient collected and available funds do not exist in the Blocked Account to cover the Blocked Account Charges, any other of Depositor's accounts at Bank. Promptly after, or contemporaneously with, Bank's notice to Lender that any of the Blocked Account Charges have not been paid or reimbursed, Bank may seek reimbursement *directly from Lender* for all such amounts, which reimbursement shall be made immediately by Lender, without cost to Bank. Depositor and Lender further instruct Bank to charge any and all account fees, service fees or miscellaneous expenses (including reasonable attorneys' fees incurred by Bank in connection herewith) associated with the Blocked Account (the "Fees") to Depositor's Account No. _9429271277 with Bank, or, if sufficient collected and available funds do not exist in such account, to the Blocked Account.

   7.    **Release of Account Information; Periodic Statements.**  Depositor authorizes Bank to release any and all information about the Blocked Account, and any other account of Depositor at Bank, to Lender upon Lender's request. Bank may elect, but shall not be required, to release information to Lender about Depositor's other accounts at Bank. Depositor and Lender instruct Bank, and Bank agrees, to send an original or a copy of Blocked Account periodic statements to Depositor and to Lender at their respective notice addresses.

   8.    **Duty to Inspect.**  Lender and Depositor shall utilize one of Bank's online transaction reporting systems, or a comparable online monitoring system of another bank, to inspect and monitor, on a daily basis, debit transactions posting against the Blocked Account and shall notify Bank, both by telephone and in writing by facsimile, of any errors, discrepancies and/or irregularities no later than 4:00 p.m. Eastern Time on the banking day immediately following the day on which the transaction containing or reflecting the error, discrepancy and/or irregularity becomes available for viewing online (unless a longer period is required by applicable law).

Except to the extent otherwise required by applicable law, failure by Lender or Depositor to comply with their respective obligations to inspect and monitor the Blocked Account and to notify Bank, both by telephone and in writing by facsimile, of errors, discrepancies and/or irregularities within the time frame indicated above shall relieve Bank of any and all liability associated with or arising from such errors, discrepancies and/or irregularities.

   9.    **Security Procedures.**  Lender and Depositor shall each be responsible for maintaining the confidentiality of all security procedures adopted by Bank from time to time and for ensuring that all such security procedures are followed with respect to the Blocked Account. Lender and Depositor agree that Bank shall not be liable for any losses sustained by Lender or Depositor that result from Lender's or Depositor's breach of such security procedures. Lender and Depositor shall promptly notify Bank, both by telephone and in writing by facsimile, of any known or suspected breach of such security procedures. Lender and Depositor recognize that Bank may, from time to time, as part of such security procedures, refuse any authorized representative access to the Blocked Account.

   10.    **Force Majeure.**  Bank shall not be responsible for any acts or omissions caused by events beyond Bank's reasonable control, including, without limitation, fire, casualty, breakdown in equipment, failure of telecommunications or data processing services or vendors, acts or omissions of any third party, lockout, strike, unavoidable accidents, acts of God, riot, war, acts of terrorism, or the enactment, issuance or operation of any adverse governmental law,

ruling, regulation, order or decree, or an emergency that prevents Bank from operating normally. This Section shall survive the termination of this Agreement.

**11.    Indemnification by Depositor.**  Depositor shall indemnify and hold harmless Bank, and Bank's directors, officers, employees, agents and affiliates (collectively, the **"Fleet Parties"**) from and against, any and all claims, demands, liabilities, actions, causes of action, losses, setoff, recoupment and expenses (including, without limitation, attorneys' fees and court costs), both legal and equitable, associated with, or connected to the Blocked Account and the services performed by Bank under this Agreement;  provided that the Fleet Parties shall have no right to be indemnified for their own willful misconduct or gross negligence. This Section shall survive the termination of this Agreement.

**12.    Limits on Bank's Liability to Lender and to Depositor.**  Lender and Depositor agree that, except as otherwise required under applicable law, Bank's liability to Lender and/or to Depositor for failing to perform in accordance with the terms of this Agreement shall be limited to the actual, direct damages proximately caused by Bank's gross negligence or willful misconduct, and, in any event, shall not exceed the Blocked Account service fees charged by the Bank in connection with the Blocked Account for the most recent twelve month period; provided, however, that if Bank fails to exercise ordinary care or to act in good faith, nothing in this Agreement is intended to limit the amount of damages that Bank is expressly required to pay under the Uniform Commercial Code, as in effect from time to time in the Commonwealth of Massachusetts, if the Uniform Commercial Code would not permit the parties to limit the amount of damages in the manner set forth herein. BANK SHALL NOT BE LIABLE, IN ANY EVENT, TO LENDER AND/OR TO DEPOSITOR, FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHICH LENDER AND/OR DEPOSITOR MAY INCUR OR SUFFER IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF WHETHER BANK KNEW OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE, AND REGARDLESS OF THE BASIS, THEORY OR NATURE OF THE ACTION UPON WHICH LENDER AND/OR DEPOSITOR, AS APPLICABLE, ASSERTS A CLAIM. This Section shall survive the termination of this Agreement.

**13.    Term and Termination.**  Except as otherwise expressly provided herein, the parties agree that this Agreement shall terminate _only_ after **(a)** Bank receives Lender's written notice to terminate this Agreement and return full dominion and control over the Blocked Account and all available funds in the Blocked Account to Depositor; or **(b)** Bank sends written notice to Depositor and Lender thirty (30) days prior to terminating this Agreement, closing the Blocked Account and disbursing the funds remaining in the Blocked Account to Lender or pursuant to Lender's written instructions. Bank may terminate this Agreement immediately, close the Blocked Account and disburse the funds remaining in the Blocked Account to Lender or pursuant to Lender's written instructions (i) if Bank determines that Depositor has failed to maintain a financial condition deemed reasonably satisfactory to Bank to minimize any credit or other risks to Bank in providing the Blocked Account, (ii) in the event of a material breach of any agreement between Depositor and Bank, or (iii) if Bank deems immediate termination necessary or appropriate in order to prevent a financial loss to Bank. No such termination shall affect any right or obligation arising under this Agreement prior to the effective date of termination, nor shall it affect any right or obligation which, by its terms, is intended to survive



such termination, including without limitation Sections 10, 11, 12 and 13. No such termination shall render unperfected Lender's security interest in the Blocked Account and its proceeds unless Lender has instructed Bank to return full dominion and control over the Blocked Account and/or all available funds in the Blocked Account to Depositor. Depositor shall not have power unilaterally to instruct Bank to terminate this Agreement and/or to close the Blocked Account. This Section shall survive the termination of this Agreement.

14.    **Insolvency of Depositor.** In the event that **(a)** Depositor becomes subject to a voluntary or involuntary proceeding under the United States Bankruptcy Code, or **(b)** Bank is otherwise served with legal process which Bank believes affects funds deposited in the Blocked Account, Bank shall have the right to place a hold on funds deposited in the Blocked Account until such time as Bank receives an appropriate court order or other assurances satisfactory to Bank establishing that the funds may continue to be disbursed according to the instructions contained in this Agreement;  provided that any such event shall not limit Bank's rights to terminate this Agreement pursuant to Section 13 hereof.

15.    **Court Orders; Indemnification.** Nothing contained in this Agreement shall prevent Bank from complying with any legal process or other order of a court of competent jurisdiction affecting funds in the Blocked Account. If, notwithstanding the issuance of any such order or legal process, Bank continues to perform its obligations in favor of Lender pursuant to this Agreement, Lender shall indemnify and hold harmless the Fleet Parties from and against any and all claims, demands, liabilities, actions, causes of action, losses and expenses (including, without limitation, attorneys' fees and court costs), both legal and equitable, incurred or sustained by Bank that arise from, or are related to, Bank's continued performance of its obligations under this Agreement.

16.    **Modification of Agreement.** This Agreement may not be modified, altered or amended, except by an agreement in writing, signed by each of the parties hereto.

17.    **Notices to Bank.** Notices required to be given to Bank pursuant to this Agreement shall be given by telephone, by facsimile _and_ by certified mail, return receipt requested, to the three notice parties set forth below and shall be effective upon confirmation of receipt by telephone and by facsimile by at least two of the three notice parties.

RM Name    Alden F. L. Harris

**Fleet National Bank**
100 Front Street, 20th Floor

Mail Stop: MA DE 28020A
Phone: (508) 770-7134
Fax:  (508) 770-7740

**Donna Stundon**
**Deposit Account Product Manager**
**Fleet National Bank**
55 Challenger Road
Ridgefield Park, NJ  07660
Mail Stop:  NJ RP 49302E
Phone:  201-229-5360
Fax:      201-329-9741



Cash Management Account Administration
    Fleet National Bank
    575 Pigeon Hill Rd
    Windsor, CT 06095
    Mail Stop CT EH 40701B
    Phone: 860-725-2089
    Fax: 1-800-391-0617

18.    **Notices to Lender and Depositor.** Notices required to be given to Lender or Depositor pursuant to this Agreement shall be given in writing at the respective addresses set forth below and shall be effective upon receipt:

| Lender | Depositor |
|---|---|
| Thomas F. Furst, VP _____ | _Gitto Global Corporation_____ |
| LaSalle Business Credit, ~~Inc.~~ LLC | _140 Leominster-Shirley Road___ |
| 565 Fifth Avenue, Suite 27 | _Lunenberg, MA. 01462 _____ |
| New Yorkl, NY. 10017 _____ | |

19.    **Severability.** If a court of competent jurisdiction deems any part of this Agreement to be unenforceable, the parties agree that only the offending part shall be stricken and that the remaining parts shall be unaffected.

20.    **Choice of Law.** This Agreement shall be governed by, and interpreted in accordance with, the laws of the Commonwealth of Massachusetts (the **"Jurisdiction"**) without reference to its laws governing conflicts of law.

21.    **Governing Agreements.** The duties and obligations of Bank hereunder shall be determined solely by the express provisions of this Agreement. Bank shall not be liable except for the performance of its duties and obligations specifically set forth in this Agreement, and no implied covenants or obligations on the part of Bank shall be read into this Agreement. In the event of a conflict between the terms and provisions of this Agreement, and the terms and provisions of any lockbox agreement, deposit account agreement or other agreement relating to the provision by Bank of depository or cash management services, the terms of this Agreement shall control but only to the extent necessary to resolve such conflict.

22.    **Independent Contractor.** Lender and Depositor agree that, in performing the services under this Agreement, Bank will be acting as an independent contractor and not as an employer, employee, partner or agent of Lender or Depositor.

23.    **Miscellaneous Provisions.** Bank may rely, and shall be protected in acting or refraining from acting, upon any communication (including but not limited to electronically confirmed facsimiles of communications) believed by it to be genuine and to have been signed or presented by the proper party or parties. Nothing contained in this Agreement, nor any course of dealing between or among the parties hereto, shall constitute a commitment or other obligation

by Bank to extend credit to Depositor or to Lender. The Bank may, but shall not be obligated to, use any reasonable means to record and/or retain any and all telephone conversations and/or data transmissions between or among the parties to this Agreement. This Agreement is for the benefit of the parties hereto and is not intended to grant, and shall not be construed as granting, any rights to or otherwise to benefit any third parties. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, and all of which counterparts taken together shall constitute but one and the same instrument. Each of the parties hereto intends that a facsimile transmission of a duly executed counterpart shall be as valid, in all respects, as an original.   This Agreement embodies the entire understanding and agreement of the parties hereto with respect to the subject matter hereof, and supercedes all prior agreements, understandings and inducements, whether express or implied, oral and written, on the subject matter hereof. No provision of this Agreement shall be construed against, or interpreted to the disadvantage of, any party hereto by any court or other governmental or judicial authority by reason of such party having, or being deemed to have, structured or dictated such provision.

24.    JURY TRIAL WAIVER. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT AND/OR THE BLOCKED ACCOUNT.    EACH PARTY ACKNOWLEDGES THAT THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO EACH PARTY TO ENTER THIS AGREEMENT, AND THAT EACH PARTY IS RELYING UPON THE FOREGOING WAIVER IN ITS FUTURE DEALINGS WITH EACH OTHER PARTY WITH RESPECT TO THE SUBJECT MATTER HEREOF. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED WITHOUT AUTHENTICATION AS A WRITTEN CONSENT TO TRIAL BY THE COURT.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective officers, each duly authorized, on the day and year specified at the beginning of this Agreement.

**DEPOSITOR**

_____Gitto Global Corporation_____

By: _Frank Miller_

Title: _PRESIDENT_

**LENDER**

_____LaSalle Business Credit, ~~Inc.~~ L L C.
A Delaware Limited Liability company, Successor By merger Nt
To LaSalle Business credit, Inc, A Delaware corporation
By: _____

Title: _Vice President_

**FLEET NATIONAL BANK**

By: _____

Title: _Senior Vice President_

 **Fleet**

February 19, 2003

Gitto Global Corporation
Frank Miller, President
140 Leominster–Shirley Road
Lunenburg, MA  01462

LaSalle Business Credit, Inc.
Thomas Furst, Vice President
565 Fifth Ave, Suite 27
New York, NY 10017

RE:  The Blocked Account for Gitto Global Corporation

Dear Frank and Mr. Furst:

We entered into a Three-Party Blocked Service Agreement as of July 25, 2002 with both Gitto Global and
LaSalle Business Credit on our account number 9418564867.  We would like to close that account and
provide the service from a new account numbered 9429271277.

Once the new blocked account is open and being used, we ask you to release us from the prior blocked
agreement mentioned above.  Frank Miller has asked that the account remain open to catch any incoming
wire transfers that are not yet using the new account instructions.  We would be glad to transfer any funds
to the new blocked account upon your direction.  We will not be responsible for monitoring the account
for incoming credits.  We would close the account when you instruct us that the transition is complete.

Please signify your acceptance below.

Regards,

Alden F. Harris II
Senior Vice President


ACCEPTED:

LaSalle Business Credit, Inc. *LLC*
*Successor by merger to*
*LaSalle Business Credit Inc*
_____ *VP*
Its duly authorized official

Gitto Global Corporation

_____ *-Pres.*
Its duly authorized official

EXHIBIT 4

E-MAILS AND DOCUMENTS PRODUCED BY LBC TO CSB FROM
LBC'S BUSINESS RECORDS, WITH VARIOUS BATE-STAMP
NUMBERS BEGINNING WITH "LBC" AND/OR "LBC-E"



**Thomas**
**Furst/US/ABNAMRO/NL**

04/15/2003 07:16 PM

**To** Holly Sakane/US/ABNAMRO/NL@ABNAMRO

**cc** LBNA LBC/US/ABNAMRO/NL@ABNAMRO

**bcc**

**Subject** Gitto Global

Holly

Please have the float days changed from 2 days to 1. This change should be effective for the float charges calculated for the month of April 2003 and thereafter.

Thank you.

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue – 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax

LBE000780



000060



Matthew
Stilwell/US/ABNAMRO/NL
12/04/2003 05:55 PM

To   Thomas Furst/US/ABNAMRO/NL@ABNAMRO
cc   joseph.r.costanza@abnamro.com, Lawrence P
      Garni/US/ABNAMRO/NL@ABNAMRO
bcc
Subject   Re: Gitto exam 📄

I will duly note this on the Exam Frequency Report. Thanks for this supporting e-mail.

Thomas Furst



Thomas Furst
12/04/2003 12:36 PM

To:   Matthew Stilwell/US/ABNAMRO/NL@ABNAMRO
cc:   joseph.r.costanza@abnamro.com, Lawrence P
       Garni/US/ABNAMRO/NL
Subject:   Gitto exam

Matt

We have been notified by the company that they are being acquired and that we will be paid out if not by
year end, then the early part of January 2004. Therefore, I believe we can hold off on the field exam
scheduled to be performed for the time being. If the pay out date gets pushed back, we will reassess and
have one performed in January.

I'll keep you posted.

Tom

LBE001031

000061



**Thomas Furst**

12/29/2003 10:32 AM

To: fmiller@gitto-global.com
cc:
Subject: Update

Frank

Happy Holidays!

When you have a moment, please provide me with an update of the status of the acquisition with respect to timing. I will be away from the January 2nd till January 12th and will have to make arrangements for coverage should a payout or preparation for one occur during that time.

In the event the timing is delayed, there are a couple of items that will need to be addressed:

1. We received notices from Jefferson Pilot indicating the pending cancellation of the Life Insurance policies on Gary Gitto and yourself as a result of the premiums not being paid. They will lapse January 8th and 12th respectively. The policies are required under the Loan Agreement.
2. A field examination was due in November and delayed due to the pending payout. An exam will have to be performed by the end of January unless a payout occurs first.

Please let me know where the process stands as soon as possible.

Regards

Tom

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue - 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax

LBC 001901



**Thomas Furst**
01/26/2004 11:34 AM

To: fmiller@gitto-global.com
cc:
Subject: Re: Acqusition

---- Forwarded by Thomas Furst/US/ABNAMRO/NL on 01/26/2004 11:34 AM -----



**Thomas Furst**
01/26/2004 10:27 AM

To: Frank Miller <mijen@comcast.net>
cc:
Subject: Re: Acqusition

Frank

Thanks for the update. In the interim, however, we will need to get things current. A field examination due to be performed in December was postponed pending the anticipated payout at year-end which did not occur. This must be done, and it has been scheduled for the week of Feb 2nd. Bill should be getting a scheduling call shortly.

In addition, our internal auditors will be reviewing this file shortly, and at this point in time, we should have financials through 12/31/03, to be in compliance with the reporting covenants. The last received were for August 2003. In addition, the <u>audited</u> year end is needed (only an internal draft was provided) as well as covenant compliance certificates for the periods ended 6/30/03, 9/30/03, and 12/31/03. All financial reporting should be up to date and available for the examiner on 2/2/04.

If there is anything you can provide to document the pending transaction, please forward it to me.

If you have any questions, please give me a call.

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue - 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax

Frank Miller <mijen@comcast.net>



**Frank Miller**
**<mijen@comcast.net>**
01/26/2004 08:15 AM

To: <thomas.furst@abnamro.com>
cc:
Subject: Acqusition

LBC 001892



**Emerson Nobbee**

02/12/2004 08:40 PM

To: Thomas Furst/US/ABNAMRO/NL@ABNAMRO
cc:
Subject: Re: Gitto

Tom,

Got your Letter of Intent (LOI) late Thursday from Frank Miller. I will fax it to you around 8 am tomorrow when I get there.
I told Frank to call you tomorrow, I think there are other documents relating to the new company (Vitro) he wants to send you.

Audit going well, I looked at customer checks, came from them. No issues.

Checked invoices and cancelled checks from vendors, nothing unusual. J&J Chemical largest vendor paid on COD. J&J doesn't seem to have relationship with anyone.

Will be at Gitto until 2pm.

Emerson

LBC 002244

# LaSalle Business Credit

## Memorandum

| | | | | |
|---|---|---|---|---|
| **To:** | Credit File | | **From:** | Thomas F. Furst |
| **Branch:** | LBC/NY | | **Date:** | March 11, 2004 |
| **Re:** | Gitto Global Corporation | | | |

A field examination was conducted February 10th through February 13th 2004 at the Lunenberg MA headquarters and production facility. The results of the exam were satisfactory. The following are highlights:

### Accounts Receivable

- The Top 5 concentrations represent 65.9% of total AR at 1/31/04 with Velco Chemicals the largest at 14.6%.
- Dilution for the 7 ME 1/31/04 was 0.5% and turnover of 15 days compared to 2.3% and 76 days for the SPLY.
- Past dues over 90 was 1.4% of total AR at 1/31/04 compared to 1.8% for the SPLY.
- All AR testing was satisfactory.

The change in A/R and turnover statistics is due to a fundamental shift in the business that began in the first quarter in this fiscal year (6/30 FYE) and grew substantially in the second quarter. Gitto has ramped up sales volume dramatically (+277% over SPLY) with low margin commodity resins, much of which is prepackaged and simply cross-docked. Product purchased to support these sales is largely cash in advance to secure the best price, and sales are on 10 day terms. As a result of this shift in the business, the examiner was requested to review sales and cash documentation, purchases and customer payments in detail. All shipping and cash verification was satisfactory. As a result of the pending sale of the company (an LOI was signed 2/11/04), an audited statement is being prepared for the period ending 12/31/03. The examiner reviewed the results of the A/R verifications performed by the CPA.

It is anticipated that the company will be sold by 6/30/04.

### Inventory

- Inventory turnover improved to 8 days from 20 days for the SPLY due to the factors indicated above.
- Examiner indicated inventory was well managed and well controlled with all testing satisfactory.
- Examiner tested inventory stored at a public warehouse. Testing was satisfactory. LBC has the landlord waiver letter for the location.

**LBC 002019**



**Thomas Furst**

05/27/2004 10:05 AM

To: wdeakin@Gitto-Global.com
cc: fmiller@gitto-global.com
Subject:

Bill / Frank

We have not received an interim statement since the January 2004 (received April 2). Please send Feb and March 2004 along with the covenant compliance for the quarter ended March 2004. The financials are overdue and we need to get you back in compliance with the reporting requirements under the Loan Agreement.

Thanhk you

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue - 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax

LBC 001866

 **Thomas Furst**        To: wdeakin@Gitto-Global.com, fmiller@gitto-global.com
06/03/2004 11:12 AM    cc:
                       Subject: financial reporting

Bill / Frank

I need the attached <u>tomorrow</u>. **The company is not in compliance with its financial reporting requirements.** I know you have a lot going on, but if you wish to avoid the application of the default rate of interest, please get up to date with the reporting. In addition, I have not yet received a copy of the purchase & sale agreement that Frank and I spoke about last week. Please send that as well.

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue - 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax
----- Forwarded by Thomas Furst/US/ABNAMRO/NL on 06/03/2004 11:01 AM -----

**Thomas Furst**        To: wdeakin@Gitto-Global.com
05/27/2004 10:05 AM    cc: fmiller@gitto-global.com
                       Subject:

Bill / Frank

We have not received an interim statement since the January 2004 (received April 2). Please send Feb and March 2004 along with the covenant compliance for the quarter ended March 2004. The financials are overdue and we need to get you back in compliance with the reporting requirements under the Loan Agreement.

Thanhk you

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue - 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax

LBC 001863



**Thomas Furst**

07/07/2004 11:19 AM

To: Matthew Stilwell/US/ABNAMRO/NL@ABNAMRO
Subject: Gitto - status

Matt

Frank Miller has just advised that VitroTech's (buyers) auditors, Stonefield Josephson, are wrapping up today and tomorrow. He believes the scheduled July 15th payout date is still viable. That being the case, please hold off the planned commencement (July 12th) of our next field exam until July 19th, in case the payout is again delayed. I will give you an update as we get closer to the 15th.

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue - 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax

000062



**Thomas Furst**

07/08/2004 03:39 PM

To: Matthew Stilwell@ABNAMRO
Subject: Gitto/Global Corporation

Matt

Please put the attached letter from VitroTech in the Gitto file. I have spoken with Joe and rather than a full exam, plan a 2 day limited scope to focus on cash and collateral. In this way, we will limit the disruption of the buyers due diligence, which you will see in the letter, will not be fully complete till the latter part of July with an early August closing now planned.

Try to get it started no later than July 19th. I will let Frank Miller know.

Thank you

Tom
----- Forwarded by Thomas Furst/US/ABNAMRO/NL on 07/08/2004 03:29 PM -----



"Walt Carlson"
<walt.carlson@vitroco
.com>

07/08/2004 03:06 PM

To: <thomas.furst@abnamro.com>
cc: "Frank Miller" <fmiller@gitto-global.com>
Subject: Gitto/Global Corporation

```
Note:  Letter attachment

Walter E. Carlson
Vice President-Corporate Development
VitroTech Corporation
5 Hutton Centre Drive, Suite 700
Santa Ana, CA 92707
Tel: (714) 708-4700
Fax (714) 708-4701
walt.carlson@vitroco.com


This e-mail is covered by the Electronic Communications Privacy Act, 18
U.S.C. 2510-2521 and is legally privileged.

This e-mail is intended only for the use of the individual or entity to
which it is addressed, and may contain information that is privileged,
confidential and exempt from disclosure under applicable law. If you are
not the intended recipient, any dissemination, distribution or copying
of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by e-mail and
destroy the communication. Thank you.
```

Letter to LaSalle Business Credit, Inc. - July 8, 200

EDER & CHANDLER



July 8, 2004
Thomas F. Furst
Vice President
LaSalle Business Credit Inc.
565 5th Ave.
Suite 27
New York, NY 10017

SENT BY FACSIMILE – 212-986-4205
SENT BY EMAIL – thomas.furst@abnamro.com

RE: Gitto/Global Corporation Asset Acquisition

Dear Thomas,

We have been requested by Frank Miller at Gitto/Global Corporation to give you an update of the timing of the asset acquisition by VitroTech Corporation.

VitroTech Corporation, following an earlier relationship with Gitto/Global Corporation begun by its predecessor company Hi-Tech Environmental Products, LLC, entered into an asset purchase agreement, dated March 31, 2004 and amended May 27, 2004, for both the Corporation's compounding assets for a purchase price in excess of $50,000,000, as well as a separate real estate purchase agreement with Charles Gitto, Jr.'s company, Tradex Corp. for the land and building leased by Gitto/Global Corporation. To assist our Company to obtain the $35,000,000 in convertible financing required as part of the purchase, we several months ago entered into an investment banking relationship with Brean Murray & Co., Inc. in New York.

For the past several months we have conducted the necessary due diligence activities of Gitto's operations related to our asset acquisition. The final leg of the due diligence activities is currently being completed. That item is being conducted by Stonefield Josephson, Inc, our SEC approved Certified Public Accountants. The audit field work is expected to be completed on or about July 20th with the audit opinion to be issued prior to the end of July. Receipt of the audited financial statements for Calendar 2002 and 2003, with an overview of the six months ending June 30, 2004, is the last piece of information required by the funding sources that have been identified by Brean Murray to allow VitroTech Corporation to complete its acquisition.

**LBC 001959**

60

Corporate: 5 Hutton Centre Drive, Suite 700 • Santa Ana, CA 92707 • Tel: 714.708.4700 • Fax: 71



**Thomas Furst**

07/08/2004 03:56 PM

To: fmiller@gitto-global.com
cc: Matthew Stilwell@ABNAMRO, wdeakin@Gitto-Global.com
Subject: VitroTech letter / field exam

Frank

Thank you for having VT provide us with the update – it was helpful. While we will not be able to waive the overdue field exam, we will limit the scope of it with the intent to be in and out in 2 days. In this way, it will not unduly slow the process with VT. Matt Stilwell, our audit manager, will be in touch with Bill Deakin to set up the start date.

Regards

Thomas F. Furst
Vice President
LaSalle Business Credit LLC
565 Fifth Avenue - 27th floor
New York, NY 10017
212-931-9712
212-986-4205 fax

North East / MidAtlantic Division HQ
Two Commerce Square
2001 Market Street - Suite 2610
Philadelphia, PA 19103
267-386-8833
267-386-8841 - FAX

LBC 001826

## LaSalle Business Credit
## Memorandum

| | | | |
|---|---|---|---|
| **To:** | Credit File | **From:** | Thomas F. Furst |
| **Branch:** | LBC/NY | **Date:** | August 11, 2004 |
| **Re:** | Gitto Global Corporation | | |

A field examination was conducted July 22nd through July 23rd,2004 at the Lunenberg MA headquarters and production facility. The results of the exam were satisfactory. The following are highlights:

### Accounts Receivable

- The Top 5 concentrations represent 68.0% of total AR at 6/30/04 with Colors Compounds the largest at 14.6%.
- Dilution for the 12 ME 6/30/04 was 0.3% and turnover of 11 days compared to 2.3% and 60 days for the SPLY.
- Past dues over 90 was 0.6% of total AR at 6/30/04 compared to 2.1% for the SPLY.
- All AR testing was satisfactory.

The change in A/R and turnover statistics is due to a fundamental shift in the business that began in the first quarter in this fiscal year (6/30 FYE) and has grown substantially since.. Gitto has ramped up sales volume dramatically (+300% over SPLY) with low margin commodity resins, much of which is prepackaged and simply cross-docked. Product purchased to support these sales is largely cash in advance to secure the best price, and sales are on 10 day terms. As a result of this shift in the business, the examiner was requested to review sales and cash documentation, purchases and customer payments in detail. All shipping and cash verification was satisfactory. As a result of the pending sale of the company (an LOI was signed 2/11/04) and the level of SEC due diligence, internal financial statement production has been late. It is anticipated that the company will be sold by 9/30/04.

### Inventory

- Inventory turnover improved to 6 days from 35 days for the SPLY due to the factors indicated above.
- Examiner indicated inventory was well managed and well controlled with all testing satisfactory.
- Examiner tested inventory stored at a public warehouse. Testing was satisfactory. LBC has the landlord waiver letter for the location.

### Accounts Payable

- A/P was not reviewed due to time limitations necessitated by the over-lapping acquisition due diligence.

cc:    J. Lewis
       J. Costanza
       M. Sharkey

**LBC 001968**

Gitto exam 8.04.doc



LaSalle Business Credit, LLC
2001 Market Street, Suite 2610
Philadelphia, PA 19103

## FACSIMILE TRANSMISSION

### Date: August 12, 2004

| | | | |
|---|---|---|---|
| **To:** | **Thomas Furst** | **From:** | **Richard D. Allen** |
| | | | **AVP/Senior Field Examiner** |

**Phone:** (212) 931-9712          **Phone:** (267) 386-8804

**FAX:** (212) 986-4205          **FAX:** (267) 386-8843

Number of pages: 25, including this cover page.

---

MESSAGE:

Pursuant to our telephone conversation today, attached are copies of the April 30, 2004
financial statements and General Ledger for Gitto Global.

Please feel free to call if you have any questions or require additional information.

Thank you,
Richard

LBC 001734

## Gitto/Global Corporation (261966)

| | | | |
|---|---|---|---|
| Division | : LBCI (Costanza) | LCP/WCP # | : 2004/00282 |
| Committee | : Senior Loan Committee | Relationship Mgr | : Thomas Furst |
| Division Head | : Joseph Costanza | GSVP | : Joseph Costanza |
| Date | : 02-Sep-2004 | | |

| Borrower | Fac. No. | Amount | Type of Facility | Nature of Request |
|---|---|---|---|---|
| Gitto/Global Corporation | A1 | USD 27,000 thd | Revolving Credit | Amend/Review |
| Gitto/Global Corporation | A2 | USD 917 thd | Term Loan - Equal and Full Amortization Floating Rate | Decr/Review of USD 1165 thd |

| | Existing | Proposed |
|---|---|---|
| LBC Relationship OOE | USD 29,083 thd | USD 27,917 thd |
| Global Relationship OOE | USD 29,083 thd | USD 27,917 thd |
| ROC | 30.74% | 31.47% |
| Relationship's Weakest Facility Rating | 4- | 4- |
| Borrower Rating | | |
| Gitto/Global Corporation | | 4- (MRA/RiskCalc 4+ 20-Aug-2004) |

### Relationship Information

**External Ratings**

Industry                          : 326199: All Other Plastics Product Manufacturing (100%)

Nature of Business          : Manufacturer of polymer compounds
Relationship Since          : 2002
Management                     : Frank Miller, Pres & CEO; Gary Gitto, Treasurer
Banking Services            : Cash Management - Collections
Remarks                          : Annual Review - NO CHANGES REQUESTED; Obligor rating omitted when preparing Dummy LCP

CHANGE RATIONALE FOR 4-
IN OBLIGOR SECTION.

**LBC 002179**

## Facility A1

| Borrower: | Gitto/Global Corporation | Exist. Borrower Rating: | |
|---|---|---|---|
| City/State/Zip: | Lunenburg, MA 01462 | External Ratings: | |
| Industry: | 326199: All Other Plastics Product Manufacturing (100%) | Sales Concentration: | |
| Obligation #: | | Obligor #: | GITTO |

| | Existing | Proposed |
|---|---|---|
| Limit | USD 27,000 thd | |
| Syndication | No | |
| Type | Committed Secured Revolving Credit | |
| 23A Worksheet Completed | | Worksheet completed - Not a 23A |
| Cash Flow Loan | | No |
| Documentation Attorney | | |
| Loan Policy Exceptions | | a) No Trackable Loan Policy Exceptions |
| Conditions Precedent to close | | |
| Real Estate Supervisory Guideline | | N/A |
| Reg U | | No |
| Facility Rating | 4 | |
|   Recovery Category | D | |
| Facility Purpose | | Working Capital |
| Borrowing Base | | Yes – Daily |
| Maturity | 25-Jul-2005 | |
| Repayment<br>  Amortization Period<br>  Details<br>  Principal<br>  Source | Bullet<br><br><br><br>One time liquidation of Assets | |
| Rates | a) ABN AMRO's Base Rate: P+ 0.25%<br>  DEFAULT RATE +2%<br>b) LIBOR: LIBOR+2.50% DEFAULT +<br>  2% | |
| Fees | a) Unused Fee: 3/8% PA PAYABLE<br>  MONTHLY<br>b) Float Fee: 1 BUSINESS DAY<br>c) Prepayment Fee: 1% yr 1- 0.5% yr 2.<br>  Capped at $50M for change in<br>  ownership<br>d) Collateral Management Fee: $1M per<br>  month<br>e) Audit Fee: $750 per day + expenses<br>f) Closing Fee: $195M payable 1/3 @<br>  closing- 1/3 @ nine months- final 1/3<br>  @ 18 months | |
| Review Date | Oct-2003 | Aug-2005 |
| Collateral | a) Type: A/R & inventory with Borrowing<br>  Base<br>  Amount: thd<br>  Details: A/R 85% OF ELIGIBLE INV<br>  65% OF ELIGIBLE | |
| Real Estate Purpose Code | | |
| Guarantees | | |
| Conditions | | |
| CRA Tract Code | | |

PDF Generated: 27-Aug-2004 11:35 CT

LBC 002180

| CRA Address | | |
|---|---|---|
| Remarks | | |
| Facility Division | LBCI (Costanza) | |

## Sublimit 1

| | Existing | Proposed |
|---|---|---|
| Limit | USD 1,000 thd | |
| Type | Committed Standby Letter of Credit - Non Financial | |
| Maturity | 30-Jul-2005 | |
| Rates | | |
| Fees | | |
| Remarks | | |

## Sublimit 2

| | Existing | Proposed |
|---|---|---|
| Limit | USD 6,000 thd | |
| Type | Committed Revolving Credit | |
| Maturity | 30-Jul-2005 | |
| Rates | | |
| Fees | | |
| Remarks | Inventory sub-limit | |

## Facility A2

| Borrower: | Gitto/Global Corporation | Exist. Borrower Rating: | |
|---|---|---|---|
| City/State/Zip: | Lunenburg, MA 01462 | External Ratings: | |
| Industry: | 326199: All Other Plastics Product Manufacturing (100%) | Sales Concentration: | |
| Obligation #: | | Obligor #: | GITTO |

| | Existing | Proposed |
|---|---|---|
| Limit | USD 2,083 thd | USD 917 thd |
| Syndication | No | |
| Type | Committed Secured Term Loan - Equal and Full Amortization Floating Rate | |
| 23A Worksheet Completed | | Worksheet completed - Not a 23A |
| Cash Flow Loan | | No |
| Documentation Attorney<br>  Firm Name<br>  Attorney name | | Outside Counsel<br>Miles & Stockbridge |
| Loan Policy Exceptions | | a) No Borrowing Base on Conforming Loan |
| Conditions Precedent to close | | |
| Real Estate Supervisory Guideline | | N/A |
| Reg U | | No |
| Facility Rating<br>  Recovery Category | 4-<br>E | |
| Facility Purpose | | Working Capital |
| Borrowing Base | | No |
| Maturity | 25-Jul-2005 | |
| Repayment<br>  Amortization Period<br>  Details<br><br>  Principal<br>  Source | (Level P)+i<br>36 months<br>Original amount $3MM at closing 7/02; Amortizing overadvance<br>USD 83 thd (monthly)<br>Earnings Retained over more than one year | |
| Rates | a) ABN AMRO's Base Rate: P+ 2%<br>    Default + 2% | |
| Fees | | |
| Review Date | Oct-2003 | Aug-2007 |
| Collateral | a) Type: A/R & Inventory with Borrowing Base<br>   Amount: thd<br>   Details: Amortizing overadvance cross collateralized with revolving credit facility | |
| Real Estate Purpose Code | | |
| Guarantees | a) Gitto Gary<br>   Type: Personal Guaranty<br>   Rating:<br>   Amount: USD 3,000 thd<br>   Guarantee Basis:<br>   Expiration Date: --<br>   Details: Limited to term facility / joint and several with Frank Miller<br>b) Miller Frank | |

**LBC 002182**

|  | Type: Personal Guaranty Rating: Amount: USD 3,000 thd Guarantee Basis: Expiration Date: — Details: limited to term facility / joint and several with Gary Gitto |  |
|---|---|---|
| Conditions |  |  |
| CRA Tract Code |  |  |
| CRA Address |  |  |
| Remarks |  |  |
| Facility Division | LBC1 (Costanza) |  |

**LBC 002183**

## Obligor Changes
## Obligor A: Gitto/Global Corporation

| | Existing | Proposed |
|---|---|---|
| Covenants | | |
| Reporting Requirements | | |
| Reg O Provisions Apply? | No | |
| Equity Investment | No | |
| Is this company organized as an ESOP? | No | |
| Referral Source | | |
| Loan Document Exceptions Total Number | 0 | |
| Aging over 90 days | 0 | |
| Aging over 180 days | 0 | |
| Rationale for deviation from Model Rating | | Due to the high leverage and the overadvance requirement we are conservatively recommending a 4-obligor rating. |

## Guarantor Details

| Gitto, Gary (304649 A) Rating: no rating | | |
|---|---|---|
| **Issued Guarantees** | | |
| a) Borrower: Gitto/Global Corporation (261966 A) | | |
| Term Loan - Equal and Full Amortization Floating Rate (Facility Rating: 4-) | | USD 3,000 thd |
| | Total | USD 3,000 thd |

| Miller, Frank (304650 A) Rating: no rating | | |
|---|---|---|
| **Issued Guarantees** | | |
| a) Borrower: Gitto/Global Corporation (261966 A) | | |
| Term Loan - Equal and Full Amortization Floating Rate (Facility Rating: 4-) | | USD 3,000 thd |
| | Total | USD 3,000 thd |

LBC 002185

## Other Relationship OOE

Facilities

Issued Guarantees

**LBC 002186**

| CONTROL AND MONITORING (see Collateral Section for details) | | | | | |
|---|---|---|---|---|---|
| The Gitto/Global Corporation | | | | | |
| Collateral | | | | | |
| Date:8/12/04 (000's Omitted) | | | | | |
| Working Capital Assets (a) | | | Advance | | |
| | Gross | Eligible | Rate | Cap | Availability |
| Accounts Receivable (1) | 26,093 | 25,882 | 85% | 27,000 | 22,000 |
| Inventory (2) | 10,690 | 10,602 | 65% | (6,000) | 6,000 |
| Total Collateral | 36,783 | 36,484 | | 27,000 | 28,000 |
| Less: Availability Reserves (BLOCK) | | | | | 350 |
| Total Available Collateral | | | | | 27,650 |
| Less: Letters of Credit | | | | | - |
| Excess (Deficit) Collateral | | | | | 27,650 |
| Less: Suppressed Availability | | | | | 650 |
| Gross Collateral Availability | | | | | 27,000 |
| Less: Revolver Outstanding | | | | | 26,648 |
| Total Availability on line | | | | | 352 |
| Fixed Asset Term Loan A (b) | | | Eff Adv Rate | | |
| OLV of M&E | | | | | |
| Approved Overadvance | 916,700 | 916,700 | 100% | 916,700 | 916,700 |
| Less: Term Loan - (A2) | | | | | (916,700) |
| Less: Other Debt (Describe) | | | | | - |
| Excess (Deficit) Collateral M&E | | | | | |
| FMV of R/E | | | | | |
| FMV of Real Estate | | | | | |
| Less: Term Loan - (A1) | | | | | |
| Excess (Deficit) Collateral Real Estate | | | | | |
| Excess (Deficit) Collateral Total Fixed Assets | | | | | |
| Total Excess (Deficit) Collateral | | | | | 352 |

Collateral continues to perform well with A/R turnover of 11 days for the 12 ME 6/30/04, and dilution of 0.3% for the same period. While the top 5 customers account for 68% of A/R, no one account represents more than 14.6% of total A/R. Ineligibles at 6/30/04 consisted of past dues of $118M, foreign of $88M and concentration reserve of $4M.

Inventory has improved to 6 days as a result of the rapid turning of VitroTech stock. Inventory consists primarily of resins and chemical additives used in the production of plastic pellets. Ineligibles consist of containers and packaging materials.

| (a) Date of Most Recent Field Exam: | | 7/04 | Frequency: | 4x per year | |
|---|---|---|---|---|---|
| Type of Monitoring: Conforming | | Frequency: | | Within Days: | |
| Sales & Collections | | Daily | | | |
| A/R & A/P agings | | Monthly | | 15 | |
| Inventory listing | | Monthly | | 15 | |
| Internal F/S | | Monthly | | 30 | |
| CPA audited consolidated and consolidating F/S | | Annually | | 90 | |
| Field Exam | | 4X per annum | | 30 | |
| Blocked Account :   yes | | | | | |
| (Remarks): | | | | | |

(b) M&E Description:  N/A

| App. Value: | | Type of App. | | Date of App.: | |
|---|---|---|---|---|---|
| Appraiser: | | Bank Review Results: | | | |

LBC 002188

Gitto / Global Corporation (2173531) SIC Code: 5162
Summary Financial Data

Accountant: Louis J. Pellegrino, Jr.

Prepared: 1'

| | 6/30/2001 | 6/30/2002 | 6/30/2003 | 4/30/2003 | 4/30/2004 |
|---|---|---|---|---|---|
| Statement Date | 6/30/2001 | 6/30/2002 | 6/30/2003 | 4/30/2003 | 4/30/2004 |
| Months Covered | 12 | 12 | 12 | 10 | 10 |
| Audit Method | Audit-Un... | Unqualif'd | Unqualif'd | Co-Prep | Co-Prep |
| Accountant | | Louis J. ... | Louis J. ... | | |
| Analyst | Althoff | TF Furst | TF Furst | Althoff | Althoff |
| Stmt Type | Annual | Annual | Annual | FY-To-D... | FY-To-D... |
| Quick Assets | 22,728 | 31,107 | 29,359 | 30,526 | 24,526 |
| Inventory | 6,678 | 8,322 | 7,900 | 13,373 | 10,698 |
| Total Assets | 41,682 | 48,481 | 48,852 | 55,765 | 45,189 |
| | | | | | |
| Days Receivable | 65.52 | 82.96 | 58.88 | 65.52 | 11.21 |
| Days Avg Inventory | | 21.32 | 17.09 | 26.30 | 5.15 |
| Days Payable | 11.82 | 8.25 | 3.98 | 22.58 | 0.71 |
| | | | | | |
| Senior Debt | 31,080 | 39,608 | 38,609 | 39,985 | 35,529 |
| Total Unsub. Liab. | 35,906 | 42,362 | 41,945 | 49,130 | 37,390 |
| Subordinated Debt | - | - | - | - | - |
| Capital Funds | 6,776 | 6,119 | 6,907 | 6,635 | 7,799 |
| Tangible Cap. Funds (TCF) | 6,204 | 5,759 | 5,689 | 5,213 | 7,071 |
| | | | | | |
| Total Unsub. Liab. / TCF | 6.90 | 7.36 | 7.37 | 9.42 | 5.29 |
| Senior Debt / EBITDA | 5.67 | 8.77 | 7.31 | 8.43 | 8.74 |
| Total Debt / EBITDA | 5.67 | 8.77 | 7.31 | 8.43 | 8.74 |
| Total Debt/Capital. | 0.84 | 0.87 | 0.85 | 0.86 | 0.82 |
| | | | | | |
| Total Revenue | 91,232 | 120,674 | 160,066 | 122,433 | 556,859 |
| Gross Profit Margin | 10.94 | 7.76 | 5.10 | 6.98 | 1.78 |
| EBIT Margin | 4.41 | 2.57 | 2.38 | 2.13 | 0.56 |
| LIFO Reserve (Ending) | | | | | |
| Net Income | 860 | 344 | 788 | 516 | 840 |
| EBITDA | 5,480 | 4,514 | 5,282 | 3,954 | 4,394 |
| EBITDA/Total P+I | | 1.19 | 1.52 | 1.29 | 1.07 |
| | | | | | |
| TANGIBLE CAPITAL FUNDS RECONCILIATION | | | | | |
| Capital Funds (Beginning) | | 6,776 | 6,119 | 6,119 | 6,907 |
| Net Income | | 344 | 788 | 516 | 840 |
| Change in Sub. Debt | | | | | |
| Div. & Withdrawals | | - | - | - | - |
| Adjustments to Ret Earnings | | (1) | - | - | 52 |
| Dividends-Stock | | - | - | - | - |
| Other Adjustments | | | | | |
| Capital Funds (Ending) | | 6,119 | 6,907 | 6,635 | 7,799 |
| Prepaid Expenses | | 183 | 707 | 1,083 | 572 |
| Due from Affiliates | | - | - | - | - |
| Due from Officer/Stockholder | | 21 | 355 | 183 | - |
| Goodwill-Net | | - | - | - | - |
| Other Intangibles | | - | - | - | - |
| Patents, Trademarks, etc.-Net | | - | - | - | - |
| Deferred Charges | | | | | |
| Deposits | | 156 | 156 | 156 | 156 |
| Other Intangibles | | - | - | - | - |
| Tangible Capital Funds | | 5,759 | 5,689 | 5,213 | 7,071 |

LBC 002189

Gitto / Global Corporation (2173531) SIC Code: 5162
Debt Service Coverage Report                    Accountant: Louis J. Pellegrine, Jr.                    Prepared: 1

| | 8/30/2001 | 6/30/2002 | 6/30/2003 | 4/30/2003 | 4/30/2004 |
|---|---|---|---|---|---|
| Statement Date | | | | | |
| Months Covered | 12 | 12 | 12 | 10 | 10 |
| Audit Method | Audit-Un... | Unqualif'd | Unqualif'd | Co-Prep | Co-Prep |
| Accountant | | Louis J. ... | Louis J. ... | | |
| Analyst | Althoff | TF Furst | TF Furst | Althoff | Althoff |
| Stmt Type | Annual | Annual | Annual | FY-To-D... | FY-To-D... |
| Debt Service Coverage from Operations | | | | | |
| EBIT | | 3,097 | 3,816 | 2,608 | 3,141 |
| Depreciation & Amort. | | 1,417 | 1,466 | 1,346 | 1,253 |
| EBITDA | | 4,514 | 5,282 | 3,954 | 4,394 |
| Net Addition in CAPEX | | (289) | (567) | (520) | (232) |
| Increase in Long Term Debt | | 289 | 567 | 520 | 232 |
| Dividends | | - | - | - | - |
| Cash Income Taxes | | (521) | (618) | (342) | (542) |
| Cash Flow For Debt Service without Oper W/C | | 3,993 | 4,664 | 3,612 | 3,852 |
| Change in Oper W/C | | (6,420) | 442 | 609 | 1,339 |
| Cash Flow For Debt Service | | (2,427) | 5,106 | 4,221 | 5,191 |

**LBC 002190**

**EXPLANATORY NOTES**

**EXECUTIVE SUMMARY**
**Facility Purpose**

- Request approval of the annual review of the previously described facilities through July 2005. There are no changes requested.

NOTE: The Company is in the process of being acquired. The extensive due diligence requirements over the past several months has resulted in delayed financial reporting, with the latest financials provided through the 10 months ended 4/30/04. An update will be provided to committee when the year ended 6/30/04 financials are received, should the company not be sold at that time.

**DEAL OVERVIEW:** The Gitto/Global Corporation is being presented to committee for approval of a $27,916,700 credit facility consisting of a $27,000,000 fully secured revolver and a 10 month Amortizing Overadvance term loan of $917,000 remaining from an original amount of $3 million.

Gitto/Global Products Corporation was incorporated in 1985 to manufacture plastics and plastic compounds to customer's specifications. In September 1992 it acquired the assets of The Gitto Corporation. Gitto manufactured specialty polyvinylchloride, polypropolene and polyethylene plastic compounds, and thermoplastic olefinic compounds. Gitto/Global provides a number of highly engineered specialty compounds that require UL and other approvals. The length of time to qualify a compound, patent protection, proprietary knowledge, and trade secrets make Gitto/Global an integral part of their customers business.

**The Company has experienced explosive revenue growth since the fall of 2003 due to new product deployments provided by VitroTech, the company currently in the process of acquiring Gitto/Global.** For the ten months ended 4/30/04, sales increased 267% to $588 million compared to $160 million for the full fiscal year ended 6/30/03. The Company continues to be profitable with significantly reduced gross margin due to product mix of sales. Net income through 4/30/04 was $840M with a gross margin of 1.76%.

|  | Total Facility | LBCI Share |  |  |  |
|---|---|---|---|---|---|
| A) Secured Revolver | $27,000,000 | $27,000,000 | 100% | Secured | No change |
| A1) Inventory Sublimit | ($6,000,000) | ($6,000,000) | 100% | Secured | No change |
| A2) Letter of Credit Sublimit | ($1,000,000) | ($1,000,000) | 100% | Secured | No change |
| B) Amortizing Overadvance | $ 916,700 | $ 916,700 | 100% | Secured | Decrease $2.1MM |
| Total Secured Facility | $27,916,700 | $27,916,700 | 100% | Secured | Decrease $2.1MM |

**DEAL RATIONALE:**

- **Strong historic financial performance** - Gitto/Global has a consistent record of profitability and sales growth.
- **Ample cash flow** - Cash flow is more than adequate to satisfy long term needs

- **Excess availability** – There is presently $650M in suppressed availability, exclusive of the permanent availability block.
- **Permanent availability block** - $350,000 at all times. This block, together with the suppressed availability mitigates the entire amortizing overadvance.
- **Management** – Mr. Miller and Mr. Gitto have a long history of success in the compounding business.
- **Personal Guarantees** - The owners, Frank Miller and Gary Gitto each provides an unlimited guarantee of the overadvance facility. Miller's net worth (exclusive of the Company) is in excess of $3.5MM and Gitto's is in excess of $11MM.
- **Barriers to entry** – Gitto/Global possesses the UL approvals, proprietary knowledge, and patents needed to solidify its position in the industry. Approvals can take in excess of a year to obtain for new compounds. This also has the effect of tying its customers to them due to the difficulty of qualifying new sources of compound.
- **Market position** – The Company is one of the larger and more sophisticated compounders in the business.
- **Solid collateral** – All sales age generated by purchase order, nothing is made for stock. Only 0.6% of receivables are aged 90 days and bad debt history is minimal. Inventory is of a commodity like nature and can be resold or re-melted to gain maximum liquidation value.
- **Enterprise value** – As evidenced by the sale in process.

**Relationship**
**Since:**        **7/02**

| x000 | Prior Comm. Projection | Previous 12 Mos. | Projected 12 Mos. | |
|---|---|---|---|---|
| Average Available Balance: | $ | $ | $ | |
| Average Free Balances: | $ | $ | $ | |
| CPM | % | 30.74% | 31.47% | |
| | Current Outstandings | Last 12 Mo. High Balance | Last 12 Mos Low Balance | Last 12 Mos. Avg. Balance |
| Facility A1 | 26,648 | 26,648 | 25,300 | 26,249 |
| Facility A2 | 917 | 2,000 | 917 | 1,500 |

Background: Gitto/Global, founded in 1992, is the industry's premier specialty compounder. The Company is a manufacturer of specialty polyvinyl chloride, polyethylene, polypropylene, and thermoplastic olefinic compounds. The Company excels in compounding technology through the use of highly advanced production equipment, comprehensive research and development laboratories, a state-of-the-art manufacturing facility, and a skilled team of industry professionals.

Business gained/lost in past 12 months: N/A

Banking Competition: None noted

Opportunities: Increased cash management services if the company is not acquired.

**Key Risk Issues**

**Economic Downturn**

The company has been able to successfully perform during the recent downturn combined with volatile oil markets and spiraling resin prices.

**Loan Policy Exceptions**

- Amortizing overadvance

**Loan Committee Conditions and Restrictions from Prior Approval**      None

**COMPANY BACKGROUND**

Gitto/Global was founded in 1992 when Global Products Corporation (Frank Miller) acquired the assets of The Gitto Corporation. The Company has evolved to become the industry's premier specialty compounder. The Company's reputation is the result of a commitment to use only the highest quality raw materials, ship only the finest products, and provide service beyond expectation.

The Company has several patents and patent applications and proprietary processes. In addition, many of the Company's products require UL and other approvals. The approval process is timely and expensive which provides Gitto/Global protection from competition and pricing opportunities, particularly in regard to their fireproof compounds.

The business resides in a modern, 65,000 square foot manufacturing facility leased from Tradex Acquisition Corporation that is owned by the father of Gary Gitto. Rent is $5.75 a square foot NNN. The company also leases warehouse space in Fitchburg, MA.

The Gitto/Global Corporation is a customer-driven manufacturer of specialty polyvinyl chloride, polyethylene, polypropylene, and thermoplastic olefinic compounds. The Company achieves excellence in compounding technology through highly advanced production equipment, comprehensive research and development laboratories, a state-of-the-art manufacturing facility, and a skilled team of industry professionals. Gitto/Global is committed to meeting the most exacting standards by adhering to the industry's strictest SPC and SQC and ISO guidelines.

The Gitto/Global Corporation was ISO 9001:1994 Registered on April 28, 1999 to RAB and RvA. Re-certification to ISO 9001:2000 is anticipated in April 2002.

Gitto/Global's core production equipment includes the following:

–Farrell Continuous Mixers
–Long Continuous Mixer/Axial Extruder
–Banbury/ Mill
–Banbury/Extruder

The Quality System is certified to ISO9001: 1994. The QC and QA facilities are state of the art, with new equipment and technology added as they become available. In addition, the Company maintains a separate R&D facility that enables them to develop new or

modified compounds in-house in a time-efficient manner.

**Gitto/Global's capabilities include:**

–Class II Digital Control Features
–Digital Control of Bulk Additions
–Extensive database of formulation and process information
–Process control based on running history
–Fully equipped Quality Control and Assurance laboratory
–Research & Development Laboratory
–Flammability testing equipment

## Products:

Gitto/Global has evolved to become the industry's premier specialty compounder. Gitto/Global has a reputation based on a dual ability – to engineer revolutionary compounds and to customize existing products for diverse applications. With a well-defined product line to build upon, the team of highly skilled engineers at Gitto/Global uses its diverse skills to craft materials to meet the evolving needs of the industry.

Polyolefin and Specialty Compounds for:
- Wire and Cable
    o Flame Retardant Compounds for Wire & Cable
    o Flame Retardant-Specialty Wire
    o Non-Halogen, Flame Retardant
    o Flexible Cord/UL 62
- Molding/Specialty Products

Vinyl Compounds for:
- Wire and Cable
- General Purpose Molding and Extrusion
- Footwear

## Services:

*Research & Development*

Gitto/Global maintains R&D facilities designed for the capabilities demanded by evolutionary engineering. To enhance proficiency and productivity, Gitto/Global maintains two product-focused R&D operations: one for polyolefins, and one for vinyl, alloys and specialty products. Technology breakthroughs are made here - in flame retardant and low-smoke compounds; cross-linkable, colorful, expandable, and halogen-free compounds; compounds that changed industries and enhance daily life.

*On-site technical assistance*

The Company takes great pride in manufacturing products that transition smoothly into production mode. To ensure equipment is optimized for production with Gitto/Global compounds, or to troubleshoot any problems you may encounter along the way, on-site technical assistance is available 24/7/365.

LBC 002194

*Toll compounding*

As a result of Gitto/Global's advanced process controls, state of the art production equipment, and high quality standards, the Company is often requested to provide toll-compounding services for customers who need proprietary compounds manufactured in batch and large quantities alike.

## Management/Ownership

Frank Miller, President and CEO (54) – BS Northeastern University 1972, Goodyear R&D until 1974, Plymouth Rubber Company as Technical Director from 1974 until 1983, Global Plastics as VP and General Manager from 1983 to 1985 when he purchased Global and changed the name to Global Products in 1985. In 1992 Global purchased the assets of The Gitto Corporation.

Gary Gitto, Treasurer and CEO (43) – BA St. Anselms College1983, Employed by Gary Chemical from 1983 until it was sold by his father in 1990. Mr. Gitto then served as president of The Gitto Corporation from 1990 until 1992 when Global Products purchased it.

Both Mr. Miller and Mr. Gitto have spent their working lives in the plastics resin and compounding businesses. Each own 50% of the Company.

## Recent Developments

The Company is in the process of being acquired by VitroTech Corporation in an all cash deal in excess of $50 million with funding provided by Brean-Murray & Company (member NYSE, NASD) and Laurus Funds. Virtually all SEC due diligence has now been completed and funding is expected within the next few weeks. Discussions began in the summer of 2003 with an anticipated closing by 12/31/03. However, the acquisition structure was changed requiring a lengthy due diligence process for SEC requirements. In the interim, Gitto has used its clout as a specialty compounder to provide the entrée of several VitroTech proprietary product additives into Gitto's market. This has resulted in explosive sales growth for Gitto, but at severely reduced margins, per agreement with VitroTech. Gitto's attractiveness as a target is to provide market entrée for VitroTech, a developer of resin additives. End users of compounded resins are reluctant to use new additives unless they have been recommended by reputable compounding companies, such as Gitto. LBC requested and has received a copy of the executed Letter of Intent, and have been provided with an estimated closing timetable by the purchasers.

**HISTORICAL FINANCIAL ANALYSIS:** The Gitto/Global Corporation

NOTE: Due to the explosive sales growth surrounding the pending acquisition, the original projection for fiscal 2004 is no longer meaningful. The extensive due diligence has resulted in a delay in the production and issuance of interim financial statements, therefore, the 10 month interim statement through 4/30/04 is presented.

| (000s omitted) | Actual 6/30/01 | Actual 6/30/02 | Actual 6/30/03 | Actual 4/30/04 |
|---|---|---|---|---|
| Sales | 91,232 | 120,674 | 160,066 | 558,859 |
| Sales Growth | | 32.2% | 32.6% | 318.9% |
| Gross Profit Margin | 10.94 | 7.78 | 5.10 | 1.76 |
| SG&A (% of Sales) | 6.4 | 3.7 | 2.7 | 1.2 |
| EBIT | 4,027 | 3,097 | 3,816 | 3,141 |
| EBITDA | 5,480 | 4,514 | 5,282 | 4,394 |
| Net Income | 860 | 344 | 788 | 840 |
| Dividends | 0 | 0 | 0 | 0 |
| | | | | |
| Days Receivable | 85.52 | 82.98 | 58.88 | 11.21 |
| Avg. Days Inventory | | 21.32 | 17.09 | 5.15 |
| Days Payable | 11.82 | 6.25 | 3.98 | 0.71 |
| | | | | |
| Sr. Debt/EBITDA | 5.67 | 8.77 | 7.31 | 6.74 |
| Total Debt/EBITDA | 5.67 | 8.77 | 7.31 | 6.74 |
| Debt/Capitalization | 0.84 | 0.87 | 0.85 | 0.82 |
| CF/ Debt Serv. | | -3.87 | 2.03 | 1.41 |
| Covenants in Compliance? | yes | yes | yes | yes |

=> 5/8
1.2x - 1.3

**Significant Accounting Policies (if necessary)**

**Significant Income Statement Items**

**FISCAL 2003 versus FISCAL 2002**

Net Sales:  Revenue increased $39.5MM or 32.6% to $160.1MM for Fiscal 2003 compared to $120.6MM for Fiscal 2002. The majority of the increase can be attributed to Gitto/Global's expansion of its business within existing customers by the introduction of new formulas, and a number of new customers.

Gross Profit:  Gross profit decreased $1.1MM or 12% to $8,163M versus $9,338M. Gross margin decreased to 5.1% from 7.7% due largely to a shift in sales mix. The telecom industry, which uses higher margin compounds was depressed, and sales were replaced by other uses such as the shoe industry, which uses less sophisticated compounds.

Operating Expenses: Operating expenses decreased by $1,968M to $4,269M from $6,237M in the prior year.  This is the result of greater plant utilization as well as increasing plant automation.

Interest Expense:  Interest expense decreased $73M to $2,144M from $2,217M due to decreased interest rates.

Net Income:  Net income increased $444M or 129% from $344M to $788M due to increased operating efficiencies and reduced interest expense, partially offset by reduced gross profit.

INTERIM 10 months ended 4/30/04 compared 4/30/03:

Net Sales:  Revenue growth was explosive in the ten months ended 4/30/04 due to the introduction of high volume / low margin sales of product produced by VitroTech, the prospective acquirers of the borrower. The revenue growth, 318%, to $558 million from $122 million for the prior period is the direct result of sales of the products commencing in the fall of 2003.

Gross Profit:  Gross Profit increased $1,289M (15%) to $9,835M from $8,545M in the prior period. Gross Margin declined to 1.76% from 6.98% due to the high volume of VitroTech products being sold.

Operating Expenses:  SG&A percentage improved to 1.2% from 4.8% in the prior period due to the significant improvement in plant efficiencies associated with the high volume throughput of VitroTech product. In absolute dollars, SG&A increased $792M to $6,629M from $5,837M in the prior period.

Interest Expense:     Interest expense decreased $34M to $1,705M versus $1,739M due primarily to lower borrowing costs.

Net Income:  Net Income increased by $324M or 62.8% to $840M versus $516M due to the higher volume and controlled operating expense.

Significant Balance Sheet Items

At 6/30/03, the company had sufficient liquidity with working capital of $4,126M and a current ratio of 1.12x, and improvement over 6/30/02 with working capital of $3,022M and current ratio of 1.09x. The decrease in accounts receivable is the result of improved turnover performance and the increase in inventory is consistent to support increased sales.

At 4/30/04, the company continues to demonstrate adequate liquidity with working capital of $4,450M and a current ratio of 1.14x. Reduced levels of accounts receivable and inventory relative to the significant revenue increases are the result of significant improvement in turnover performance.
The Company continues to be highly leveraged with Senior Debt / EBITDA of 7.31x at 6/30/03 and 6.74x at 4/30/04 respectively, an improvement from 8.77x and 8.43x at 6/30/02 and 4/30/03 respectively.

Significant Cash Flow Items

The company continues to generate sufficient cash flow with EBITDA of $4,394M and cash taxes of $542M with a ratio of CF/DS of 1.41x at 4/30/04. Short term bank debt decreased $2.4MM from 4/30/03.

**Contingent Obligations**    None noted

**Prospects**
**Projection:** Due to the explosive sales growth surrounding the pending acquisition, the original projection for fiscal 2004 is no longer meaningful for comparative purposes. The company has not provided a projection for fiscal 2005 at this time due to the pending acquisition.

**Conclusion:**

Debt Service Schedule Assumptions: Fiscal 2005 projection not available at this time due to pending acquisition of the company.

Projected Debt Service: N/A

**RATINGS:**

- A1: 4– / D / 4
- A2: 4– / E / 4–

**Risk Code Rationale**

**Obligor**

- The company exhibits historical profitability and sufficient cash flow, with moderately high leverage. Due to the leverage, however, a "4–" is conservatively recommended compared to the MRA rating of "4+".

**Collateral**

- Facility "A1" is fully secured by reasonable advance rates with collateral performing well. There is suppressed availability due to the line cap. A "D" rating is justified.
- Facility "A2" is secured and substantially reduced from initial levels. An "E" rating is justified.

**Facility**

- Based on the above, a "4–" facility rating is justified.

**Shared National Credit**    N/A
    **Group Head:** M. Sharkey
    **Division Head:** J. Costanza
    **Senior Credit Officer:** M. Aliberto
    **Relationship Manager:** T. Furst
    **Prepared by:** T. Furst
    **File Name:** gittoexplnotes8.04.doc

**APPENDICES**

| Appendix | | Page |
|---|---|---|
| A | Collateral | 22 |
| B | Field Exam Summary | 24 |
| C | Historical Spreads | 27 |
| D | Covenants | 33 |
| E | Industry Overview | 34 |
| F | CPM | 35 |
| G | MRA | 37 |
| H | 23A | 38 |

## Appendix - Collateral

### Accounts Receivable

Accounts receivable perform well with dilution of 0.3% and turnover of 11 days for the 12 months ending 6/30/04. Concentrations in excess of 15% are ineligible.

| As of June 30, 2004 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Concentration by Customer | | | | | | | | | |
| Rank | Customer | Total | 1-30 | | 31-60 | | 61-90 | | Over 90 |
| 1 | 17% Total All Other Customers ( | 3,495,395 | 2,556,952 | 73.2% | 672,468 | 19.2% | 156,583 | 4.5% | 109,392 | 3.1% |
| 2 | 16% Colors, Compounds, and Consult (*1) | 3,032,271 | 2,985,004 | 98.4% | 44,103 | 1.5% | 0 | 0.0% | 3,074 | 0.1% |
| 3 | 14% Pirachi Cable Inc. - Manchester (*3) | 2,858,464 | 2,846,820 | 99.6% | 5,021 | 0.2% | 0 | 0.0% | 5,583 | 0.2% |
| 4 | 13% JITan Sales & Marketing - Leom (*4) | 2,789,535 | 2,789,538 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| 5 | 13% Hemisphere Dist Corp. - Marlbo (*10) | 2,751,267 | 2,751,267 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| 6 | 13% Zebulon Industries (*7) | 2,724,926 | 2,724,926 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| 7 | 13% Velco Chemicals, Inc. - Elmsfo (*8) | 2,603,282 | 2,603,282 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |

| Accounts Receivable | June 2004 | | Accounts Receivable | June 2003 | |
|---|---|---|---|---|---|
| 1-30 | 19,586,049 | 94.1% | 1-30 | 20,692,058 | 80.3% |
| 31-60 | 947,622 | 4.6% | 31-60 | 3,377,921 | 13.1% |
| 61-90 | 156,583 | 0.8% | 61-90 | 1,150,182 | 4.5% |
| Over 90 | 116,029 | 0.6% | Over 90 | 541,910 | 2.1% |
| Other | 0 | 0.0% | Other | 0 | 0.0% |
| Future/Dating | 0 | 0.0% | Future/Dating | 0 | 0.0% |
| Total Accounts Receivable | 20,806,282 | 100% | Total Accounts Receivable | 25,762,073 | 100% |

| Ineligibles by Reason | June 2004 | | Ineligibles by Reason | June 2003 | |
|---|---|---|---|---|---|
| Past Due | 116,029 | 0.6% | Past Due | 541,910 | 2.1% |
| Crossage@ 25% | 0 | 0.0% | Crossage@ 25% | 63,872 | 0.2% |
| Affiliates | 0 | 0.0% | Affiliates | 0 | 0.0% |
| Service Charges | 0 | 0.0% | Service Charges | 0 | 0.0% |
| Retainage | 0 | 0.0% | Retainage | 0 | 0.0% |
| Credits In Prior | 0 | 0.0% | Credits In Prior | 0 | 0.0% |
| Contras | 0 | 0.0% | Contras | 0 | 0.0% |
| Ineligible | 86,116 | 0.4% | Ineligible | 104,110 | 0.4% |
| Ineligible invoice | 0 | 0.0% | Ineligible invoice | 0 | 0.0% |
| Concentrations | 4,789 | 0.0% | Concentrations | 0 | 0.0% |
| Reserves | 0 | 0.0% | Reserves | 0 | 0.0% |
| Ineligible other | 0 | 0.0% | Ineligible other | 0 | 0.0% |
| Total Ineligibles | 210,934 | 1% | Total Ineligibles | 709,893 | 2.7% |
| Adjustments | | 0 | Adjustments | | 0 |
| Net Ineligibles | | 210,934 | Net Ineligibles | | 709,893 |

LBC 002200

## Inventory

- Inventory consists of specialty polyvinyl chloride, polyethylene, polypropylene, and thermoplastic olefinic compounds.
- All of the raw materials are of a commodity nature and can readily be resold.
- Finished Goods may be re-melted and blended into other products or resold as raw.
- All finished goods are prepared to purchase order only; no inventory is built for stock.
- Inventory is valued at FIFO, actual cost plus overhead.
- No obsolete, stale, seasonal or slow-moving inventory was noted on the audit.
- Cycle counts are done continuously and a full physical is taken annually.

Inventory performs well with turnover of 6 days compared to 35 days last year. The improvement is largely due to the rapid turnover and comparative volume of the new additives associated with the pending purchase of the company. This inventory is often cross docked through the facility rapidly after receipt.

| Comparative Analysis: | (000's) | | | |
|---|---|---|---|---|
| | 6/30/2004 | | 6/30/2003 | |
| Description | FYE | | FYE | |
| Raw Materials | 6,912,851 | 62.6% | 4,468,279 | 56.6% |
| Packaging(Containers) | 87,956 | 0.8% | 79,222 | 1.0% |
| Finished Goods | 4,034,521 | 36.6% | 3,351,548 | 42.4% |
| Total | $11,035,328 | 100.0% | $7,899,049 | 100.0% |
| Less: Reserve | 0 | | 0 | |
| Total | $11,035,328 | | $7,899,049 | |

| | |
|---|---|
| Loanable collateral value based on? | Cost |
| Circumstances by which Inventory is marked to market. | FIFO |
| Frequency with which commodity like inventory needs to be reappraised. | N/A |
| How advance rates over 60% are fixed. | Customary for product |

Field Examination Summary
Field Exam Date: 7/22/04
Recurring LBC Audit

| Credit Strengths | Credit Weaknesses |
|---|---|
| - A Letter of Intent (LOI) from a California company has been received. Gitto/Global is expected to be sold within the next 30 days. <br> - A/R turnover has improved to 11 days for the 12 months period ended 6/30/04 from 60 days for the like period in 2003. <br> - Dilution continue to be low at 0.2% for the 12 months ended 6/30/04. <br> - Sales for the 10 months ended 4/30/04 improved $437 million or 358% to $559 million verses the like period in 2003 which totaled $122 million. <br> - Net income increased to $839M for 10 months ended 4/30/04 from $516M for prior year. <br> - Test Count, price test and all other inventory testing proved satisfactory. <br> - The shipping test noted no pre-billings or fictitious invoices. <br> - Review of cash noted no exceptions. <br> - Inventory turns improved to 6 days compared to 35 days for prior year. | - The A/R is concentrated with the top 10 customer balance totaling $18.5 million or 88.8% of the total A/R as at 6/30/04. The largest account was 14.6% of total receivables and top six customer accounted for 80.5% of the total. <br> - <br> - <br> - <br> - <br> - |

Availability Comparison

| Most Recent Date | Loan Availability | Loan Balance | Excess |
|---|---|---|---|
| Per Recommended | $27,900,639 | $26,471,808 | $78,831 |
| Per Able | $28,000,000 | $26,471,808 | $178,192 |

Accounts Receivable Statistics

|   X   Invoice Date | | Due Date |

| 000's | Current 6/30/2004 | | Comparable Interim 6/30/2003 | | Fiscal year End 6/30/2003 | |
|---|---|---|---|---|---|---|
| Current | 19,586 | 94.1% | 20,692 | 80.3% | 20,692 | 80.3% |
| 31-60 Days | 948 | 4.6% | 3,378 | 13.1% | 3,378 | 13.1% |
| 61-90 Days | 157 | 0.8% | 1,150 | 4.5% | 1,150 | 4.5% |
| Over 90 | 118 | 0.6% | 542 | 2.1% | 542 | 2.1% |
| Total | $20,808 | 100.0% | $25,762 | 100.0% | $25,762 | 100.0% |

Top 5 Customer Concentration    As of:    6/30/2004

| Customer | D&B | Total | | Current | 31-60 Days | 61-90 Days | Over 90 |
|---|---|---|---|---|---|---|---|
| Colors Compounds | 1R3 | $3,032 | 14.6% | 2,985 | 44 | - | 3 |
| Hitachi | 4A2 | $2,858 | 13.7% | 2,847 | 6 | - | 6 |
| J/Tax Sales | NL | $2,790 | 13.4% | 2,790 | - | - | - |
| Hemisphere | NL | $2,751 | 13.2% | 2,751 | - | - | - |
| Zebulon Industries | NL | $2,725 | 13.1% | 2,725 | - | - | - |
| Total | | $14,156 | 68.0% | $14,098 | $50 | $0 | $9 |

| Date | | | Turnover | Dilution | Any unusual changes in AR performance during past 3-month period?   Yes. A/R turnover has improved dramatically since the last exam. |
|---|---|---|---|---|---|
| 6/30/2004 | ( 12 months) | YTD | 11 | 0.3% | |
| 6/30/2003 | ( 12 months) | YTD | 60 | 2.3% | |
| 6/30/2003 | ( 12 months) | FYE | 60 | 1.8% | |

Standard Terms Offered:        Net 10, Net 30, Net 45 and Net 90
Any Extended or Dating Terms?

**Inventory Statistics**

| Date | | Total FIFO Inventory | Turnover |
|------|------|------|------|
| 4/30/2004 | (10 months) | $10,698,670 | 6 |
| 4/30/2003 | (10 months) | $13,372,240 | 35 |
| 6/30/2003 | FYE -12 months | $6,322,174 | 20 |

**Accounts Payable Statistics**

| Date | | Total AP | 61+ Days | 61+ Days % |
|------|------|------|------|------|
| 5/31/2004 | | $1,631 | $0 | 0.0% |
| 5/31/2003 | | $1,507 | $0 | 0.0% |
| 6/30/2003 | | $1,657 | $0 | 0.0% |

Did we analyze the Accrued Liability Accounts? Y Any offsets to AR?           Yes    X   No

Were any problems noted in collateral testing or reconciliations? (If Yes - explain)    Yes    X   No

How is cash remitted to LBC?            Lockbox

                                 Customer Deposits to Fleet Blocked Account

            X        Deposit sent directly to client then deposit made to the Fleet account.

Has all cash been applied against the LBC revolver?
for the past 4-month period?           X   Yes        No

Do the systems of the company allow for accurate financial and collateral reporting? (If No - explain)      X   Yes        No

Does the audit support the existing advance rates? (If No - explain)      X   Yes        No

| Summary of Issues and Recommendations |
|---|

*Examiners Comments:*
-The Company is expected to be sold within the next 30 days to Vitro Corporation, a California based company. A letter of intent has been received.
-Net sales for the 10 months ended 4/30/04 increased $437MM or 358% to $559MM. Management has been focusing on sales of its lower margin products in anticipation of selling the Company.
-As a result of improved collections A/R turnover averaged 11 days for the 12 month period ended 6/30/04 compared with 60 days for the like period in 2003.
-Dilution continues to be low at 0.3% for the 12 month period ended 6/30/04.
- The A/R is highly concentrated with the top 10 customer balance amounting to $18.5MM or 88.8% of the A/R as at 6/30/04.

*Examiners Recommendations:*
-Continue to monitor the proposed sale of the company.

| Loan Officer: | Tom Furst |
|------|------|
| Examiner: | David Sweeney, Durkin Group, LLC |
| Date written: | 7/26/2004 |

3_gittoexplnotes8.04.doc                                           Page 17 of 30
PDF Generated: 27-Aug-2004 11:35 CT

LBC 002203

## LaSalle Business Credit

# Memorandum

| | | | | |
|---|---|---|---|---|
| **To:** | Credit File | | **From:** | Thomas F. Furst |
| **Branch:** | LBC / NEMA | | **Date:** | August 18, 2004 |

**Re:**    The Gitto/Global Corporation. (Field Exam dated 7/24/04) – Summary of Issues

The field examination performed indicated that all testing was satisfactory. The weaknesses cited by the examiner were as follows:

1. The accounts receivable are concentrated with the top 10 representing 89% of total A/R, with the largest single account at 14.6%.

The customer base is stable with concentrations in excess of 15% reserved as ineligible. Turnover is 11 days and dilution is 0.3%.

# Appendix -- Historical Financials

Gitto / Global Corporation (2173531) SIC Code: 5162
Balance Sheet/Income Statement/Ratio's

Accountant: Louis J. Pellegrine, Jr.

Prepared: 11:48, 8/17/
Pa
Thous

| Statement Date | 6/30/2001 | | 6/30/2002 | | 6/30/2003 | | 4/30/2003 | |
|---|---|---|---|---|---|---|---|---|
| Months Covered | 12 | | 12 | | 12 | | 10 | |
| Audit Method | Audit-Un... | | Unqualif'd | | Unqualif'd | | Co-Prep | |
| Accountant | | | Louis J. ... | | Louis J. ... | | | |
| Analyst | Althoff | | TF Furst | | TF Furst | | Althoff | |
| Stmt Type | Annual | % | Annual | % | Annual | % | FY-To-D... | % |
| | Balance Sheet | | | | | | | |
| Cash | 1,350 | | 3,674 | | 3,537 | | 4,154 | |
| Accounts Receivable | 21,376 | | 27,433 | | 25,822 | | 26,372 | |
| Inventory | 6,678 | | 6,322 | | 7,900 | | 13,973 | |
| CURRENT ASSETS | 29,404 | | 37,429 | | 37,259 | | 43,899 | |
| | | | | | | | | |
| Gross Fixed Assets | 18,909 | | 20,198 | | 20,765 | | 20,718 | |
| Accum. Depreciation | 8,614 | | 9,980 | | 11,373 | | 11,279 | |
| Net Fixed Assets | 11,295 | | 10,218 | | 9,392 | | 9,439 | |
| Other Non-Current Assets | 411 | | 474 | | 983 | | 1,005 | |
| Intangibles | 572 | | 360 | | 1,218 | | 1,422 | |
| NON-CURRENT ASSETS | 12,278 | | 11,052 | | 11,593 | | 11,866 | |
| | | | | | | | | |
| TOTAL ASSETS | 41,682 | | 48,481 | | 48,852 | | 55,765 | |
| | | | | | | | | |
| Short Term Bank Debt | 23,723 | | 28,299 | | 27,681 | | 28,677 | |
| Other Short Term Debt | 948 | | 2,157 | | - | | - | |
| Current Maturities | 1,587 | | 1,326 | | 2,404 | | 1,326 | |
| Accounts Payable | 2,631 | | 1,907 | | 1,657 | | 8,454 | |
| Accruals | 366 | | 371 | | 1,030 | | 423 | |
| Other Current Liabilities | 695 | | 367 | | 361 | | 268 | |
| CURRENT LIABILITIES | 29,950 | | 34,407 | | 33,133 | | 39,148 | |
| | | | | | | | | |
| Long Term Debt | 4,802 | | 7,846 | | 8,524 | | 9,982 | |
| Deferred Taxes | 1,154 | | - | | - | | - | |
| Other Long Term Liab. | - | | 109 | | 288 | | - | |
| TOTAL UNSUB. LIAB. | 35,906 | | 42,362 | | 41,945 | | 49,130 | |
| | | | | | | | | |
| TOTAL LIABILITIES | 35,906 | | 42,362 | | 41,945 | | 49,130 | |
| | | | | | | | | |
| Common Stock | 150 | | 150 | | 150 | | 150 | |
| Paid In Capital | 2,100 | | 2,100 | | 2,100 | | 2,100 | |
| Retained Earnings | 3,526 | | 3,869 | | 4,657 | | 4,385 | |
| NET WORTH | 5,776 | | 6,119 | | 6,907 | | 6,636 | |
| | | | | | | | | |
| TOTAL LIAB. + NET WORTH | 41,682 | | 48,481 | | 48,852 | | 55,765 | |

Gitto / Global Corporation (2173531) SIC Code: 5162
Balance Sheet/Income Statement/Ratio's                    Accountant: Louis J. Pellegrina, Jr.

Prepared: 11:48, 8/17/
P.
Thous

| | | |
|---|---|---|
| Statement Date | 4/30/2004 | |
| Months Covered | 10 | |
| Audit Method | Co-Prep | |
| Accountant | | |
| Analyst | Althoff | |
| Stmt Type | FY-To-D. | % |

**Balance Sheet**

| | |
|---|---|
| Cash | 3,934 |
| Accounts Receivable | 20,592 |
| Inventory | 10,698 |
| CURRENT ASSETS | 35,224 |
| | |
| Gross Fixed Assets | 20,997 |
| Accum. Depreciation | 12,836 |
| Net Fixed Assets | 8,161 |
| Other Non-Current Assets | 1,076 |
| Intangibles | 728 |
| NON-CURRENT ASSETS | 9,965 |
| | |
| TOTAL ASSETS | 45,189 |
| | |
| Short Term Bank Debt | 26,509 |
| Other Short Term Debt | - |
| Current Maturities | 2,404 |
| Accounts Payable | 1,296 |
| Accruals | 308 |
| Other Current Liabilities | 267 |
| CURRENT LIABILITIES | 30,774 |
| | |
| Long Term Debt | 6,616 |
| Deferred Taxes | - |
| Other Long Term Liab. | - |
| TOTAL UNSUB. LIAB. | 37,390 |
| | |
| TOTAL LIABILITIES | 37,390 |
| | |
| Common Stock | 150 |
| Paid in Capital | 2,100 |
| Retained Earnings | 5,549 |
| NET WORTH | 7,799 |
| | |
| TOTAL LIAB. + NET WORTH | 45,189 |

3_gittoexplnotes8.04.doc
PDF Generated: 27-Aug-2004 11:35 CT

Page 20 of 30

LBC 002206

Gitto / Global Corporation (2173531) SIC Code: 5162
Balance Sheet/Income Statement/Ratio's

Accountant: Louis J. Pellegrine, Jr.

Prepared: 11:48, 8/17/
P:
Thous

| Statement Date | 6/30/2001 | | 6/30/2002 | | 6/30/2003 | | 4/30/2003 | |
|---|---|---|---|---|---|---|---|---|
| Months Covered | 12 | | 12 | | 12 | | 10 | |
| Audit Method | Audit-Un... | | Unqualif'd | | Unqualif'd | | Co-Prep | |
| Accountant | | | Louis J. ... | | Louis J. ... | | | |
| Analyst | Althoff | | TF Furst | | TF Furst | | Althoff | |
| Stmt Type | Annual | % | Annual | % | Annual | % | FY-To-D... | % |
| | Income Statement | | | | | | | |
| Total Revenue | 91,232 | 100.0 | 120,674 | 100.0 | 160,086 | 100.0 | 122,433 | 100.0 |
| | | | | | | | | |
| Gross Profit (excl. Depr.) | 11,343 | 12.4 | 10,751 | 8.9 | 9,551 | 6.0 | 9,791 | 8.0 |
| Selling, Gen. & Adm. Exp. | 5,863 | 6.4 | 6,237 | 5.2 | 4,269 | 2.7 | 5,837 | 4.8 |
| EBITDA | 5,480 | 6.0 | 4,514 | 3.7 | 5,282 | 3.3 | 3,954 | 3.2 |
| | | | | | | | | |
| Depreciation & Amort. | 1,453 | 1.6 | 1,417 | 1.2 | 1,466 | 0.9 | 1,346 | 1.1 |
| EBIT | 4,027 | 4.4 | 3,097 | 2.6 | 3,816 | 2.4 | 2,608 | 2.1 |
| | | | | | | | | |
| Div. from Subs/Min. Own. | - | | - | | - | | - | |
| Interest Exp. | 2,535 | 2.8 | 2,217 | 1.8 | 2,144 | 1.3 | 1,739 | 1.4 |
| Other Income/Exp. | 20 | | 95 | 0.1 | 21 | | (11) | |
| Extraordinary Gains (Losses) | - | | - | | - | | - | |
| EARNINGS BEFORE TAXES | 1,512 | 1.7 | 975 | 0.8 | 1,693 | 1.1 | 858 | 0.7 |
| | | | | | | | | |
| Income Tax Exp. | 652 | 0.7 | 631 | 0.5 | 905 | 0.6 | 342 | 0.3 |
| Minority Interest | - | | - | | - | | - | |
| NET INCOME | 860 | 0.9 | 344 | 0.3 | 788 | 0.5 | 516 | 0.4 |
| Dividend / Payout Ratio | | | | | | | | |
| | Cash Flow Statement | | | | | | | |
| Net Income | | | 344 | | 788 | | 516 | |
| Depreciation & Amort. | | | 1,417 | | 1,466 | | 1,346 | |
| Deferred Taxes | | | (1,154) | | - | | - | |
| FUNDS FROM OPERATIONS | | | 607 | | 2,254 | | 1,862 | |
| | | | | | | | | |
| Accounts Receivable | | | 6,057 | | (1,611) | | (1,061) | |
| Inventory | | | (356) | | 1,576 | | 7,051 | |
| OPERATING CASH NEEDS | | | 5,701 | | (33) | | 5,990 | |
| | | | | | | | | |
| Accounts Payable | | | (724) | | (250) | | 6,547 | |
| Accrued Exp. | | | 5 | | 659 | | 52 | |
| Other Current Liabilities | | | (328) | | (6) | | (99) | |
| OPERATING CASH SOURCES | | | (1,047) | | 403 | | 6,500 | |
| | | | | | | | | |
| NET OPER. CASH FLOW (NOCF) | | | (6,141) | | 2,690 | | 2,372 | |
| | | | | | | | | |
| CMLTD (previous year) | | | 1,587 | | 1,326 | | 1,326 | |
| CASH BEFORE LT USES | | | (7,728) | | 1,364 | | 1,046 | |
| | | | | | | | | |
| Capital Expenditure | | | 289 | | 566 | | 519 | |
| Other Non-Current Assets | | | (98) | | 1,441 | | 1,641 | |
| Other Non-Current Liab. | | | 109 | | 179 | | (109) | |
| CASH BEFORE FINANCING | | | (7,810) | | (484) | | (1,223) | |
| | | | | | | | | |
| Short Term Debt | | | 5,765 | | (2,755) | | (1,759) | |
| Long Term Debt | | | 4,370 | | 3,082 | | 3,462 | |
| Adj in R/E & Stock Div | | | (1) | | - | | - | |
| Net Change in Cash & Marketable Securities | | | 2,324 | | (137) | | 480 | |

3_gittoexplnotes8.04.doc
PDF Generated: 27-Aug-2004 11:35 CT

Page 21 of 30

Page 29 of 38

Gitto / Global Corporation (2173531) SIC Code: 5162
Balance Sheet/Income Statement/Ratio's

Accountant: Louis J. Pellegrine, Jr.

Prepared: 11:43, 8/17/
Pe
Thous

| | | |
|---|---|---|
| Statement Date | 4/30/2004 | |
| Months Covered | 10 | |
| Audit Method | Co-Prep | |
| Accountant | | |
| Analyst | Althoff | |
| Simi Type | FY-To-D... | % |
| **Income Statement** | | |
| Total Revenue | 558,859 | 100.0 |
| | | |
| Gross Profit (excl. Depr.) | 11,023 | 2.0 |
| Selling, Gen. & Adm. Exp. | 6,629 | 1.2 |
| EBITDA | 4,394 | 0.8 |
| | | |
| Depreciation & Amort. | 1,253 | 0.2 |
| EBIT | 3,141 | 0.6 |
| | | |
| Div. from Subs/Min. Own. | - | |
| Interest Exp. | 1,705 | 0.3 |
| Other Income/Exp. | (54) | |
| Extraordinary Gains (Losses) | - | |
| EARNINGS BEFORE TAXES | 1,382 | 0.2 |
| | | |
| Income Tax Exp. | 542 | 0.1 |
| Minority Interest | - | |
| NET INCOME | 840 | 0.2 |
| Dividend / Payout Ratio | - | |
| **Cash Flow Statement** | | |
| Net Income | 840 | |
| Depreciation & Amort. | 1,253 | |
| Deferred Taxes | - | |
| FUNDS FROM OPERATIONS | 2,093 | |
| | | |
| Accounts Receivable | (5,230) | |
| Inventory | 2,798 | |
| OPERATING CASH NEEDS | (2,432) | |
| | | |
| Accounts Payable | (371) | |
| Accrued Exp. | (722) | |
| Other Current Liabilities | (94) | |
| OPERATING CASH SOURCES | (1,187) | |
| | | |
| NET OPER. CASH FLOW (NOCF) | 3,338 | |
| | | |
| CMLTD (previous year) | 2,404 | |
| CASH BEFORE LT USES | 934 | |
| | | |
| Capital Expenditure | 22 | |
| Other Non-Current Assets | (397) | |
| Other Non-Current Liab. | (288) | |
| CASH BEFORE FINANCING | 1,021 | |
| | | |
| Short Term Debt | (1,172) | |
| Long Term Debt | 496 | |
| Adj in R/E & Stock Div | 52 | |
| Net Change in Cash & Marketable Securities | 397 | |

3_gittoexplnotes8.04.doc
PDF Generated: 27-Aug-2004 11:35 CT

**LBC 002208**

Gitto / Global Corporation (2173531) SIC Code: 5162
Balance Sheet/Income Statement/Ratio's                    Accountant: Louis J. Pellegrine, Jr.                    Prepared: 11:48, 8/17/
Thous

| Statement Date | 6/30/2001 | | 6/30/2002 | | 6/30/2003 | | 4/30/2003 | |
|---|---|---|---|---|---|---|---|---|
| Months Covered | 12 | | 12 | | 12 | | 10 | |
| Audit Method | Audit-Un... | | Unqualif'd | | Unqualif'd | | Co-Prep | |
| Accountant | | | Louis J. ... | | Louis J. ... | | | |
| Analyst | Althoff | | TF Furst | | TF Furst | | Althoff | |
| Stmt Type | Annual | % | Annual | % | Annual | % | FY-To-D... | % |
| | Ratios | | | | | | | |
| **LIQUIDITY** | | | | | | | | |
| Working Capital | (546) | | 3,022 | | 4,126 | | 4,751 | |
| Current Ratio | 0.98 | | 1.09 | | 1.12 | | 1.12 | |
| Quick Ratio | 0.76 | | 0.90 | | 0.89 | | 0.78 | |
| Days Receivable | 85.52 | | 82.98 | | 53.88 | | 65.52 | |
| Days Avg Inventory | | | 21.32 | | 17.09 | | 26.30 | |
| Days Payable | 11.82 | | 6.25 | | 3.98 | | 22.56 | |
| | | | | | | | | |
| **LEVERAGE AND CAPITALIZATION** | | | | | | | | |
| Tangible Capital Funds (TCF) | 5,204 | | 5,759 | | 5,889 | | 5,213 | |
| Senior Debt | 31,060 | | 39,608 | | 36,609 | | 39,985 | |
| Total Debt | 31,060 | | 39,608 | | 36,609 | | 39,985 | |
| LIFO Reserve (Ending) | | | | | | | | |
| Total Unsub. Liab./TCF | 6.90 | | 7.36 | | 7.37 | | 9.42 | |
| Senior Debt / Capitalization | 0.84 | | 0.87 | | 0.85 | | 0.86 | |
| Total Debt / Capitalization | 0.84 | | 0.87 | | 0.85 | | 0.86 | |
| Senior Debt / EBITDA | 5.67 | | 8.77 | | 7.31 | | 8.43 | |
| Total Debt / EBITDA | 5.67 | | 8.77 | | 7.31 | | 8.43 | |
| Contingent Liabilities | | | | | | | | |
| Lease Adj.Total Debt* / EBITDAR | 5.67 | | 8.77 | | 7.31 | | 8.43 | |
| *8x Ann. Operating Lease Exp. | | | | | | | | |
| | | | | | | | | |
| **DEBT SERVICE COVERAGE** | | | | | | | | |
| EBIT / Interest Exp. | 1.59 | | 1.40 | | 1.78 | | 1.50 | |
| EBITDA / P & I Exp. (actual) | | | 1.19 | | 1.52 | | 1.29 | |
| EBITDA - CAPEX / P + I Exp. | | | 1.11 | | 1.36 | | 1.14 | |
| EBITDAR / Lease & P + I Exp. | | | 1.19 | | 1.52 | | 1.29 | |
| Annual Operating Lease Exp. | | | | | | | | |
| NOCF/ CMLTD & Div. | | | (3.87) | | 2.03 | | 1.79 | |
| NOCF / CMLTD & Div. & CAPEX | | | (3.27) | | 1.42 | | 1.32 | |
| | | | | | | | | |
| **PERFORMANCE** | | | | | | | | |
| Return on Assets | 2.06 | | 0.71 | | 1.61 | | 1.11 | |
| Return on Average Equity | | | 5.78 | | 12.10 | | 9.751 | |
| Sales Growth | | | 32.27 | | 32.64 | | 21.75 | |
| Same Stores Sales Growth | | | N/A | | N/A | | N/A | |
| Revenues / Total Assets | 2.19 | | 2.49 | | 3.26 | | 2.63 | |

Gitto / Global Corporation (2173531) SIC Code: 5162
Balance Sheet/Income Statement/Ratio's                    Accountant: Louis J. Pellegrine, Jr.                    Prepared: 11:46, 8/17/
                                                                                                                                Pt
                                                                                                                              Thous

| | |
|---|---|
| Statement Date | 4/30/2004 |
| Months Covered | 10 |
| Audit Method | Co-Prep |
| Accountant | |
| Analyst | Althoff |
| Stmt Type | FY-To-D... % |

| Ratios | |
|---|---|
| **LIQUIDITY** | |
| Working Capital | 4,450 |
| Current Ratio | 1.14 |
| Quick Ratio | 0.80 |
| Days Receivable | 11.21 |
| Days Avg. Inventory | 5.15 |
| Days Payable | 0.71 |
| | |
| **LEVERAGE AND CAPITALIZATION** | |
| Tangible Capital Funds (TCF) | 7,071 |
| Senior Debt | 35,529 |
| Total Debt | 35,529 |
| LIFO Reserve (Ending) | - |
| Total Unsub. Liab./TCF | 5.29 |
| Senior Debt / Capitalization | 0.82 |
| Total Debt / Capitalization | 0.82 |
| Senior Debt / EBITDA | 6.74 |
| Total Debt / EBITDA | 6.74 |
| Contingent Liabilities | |
| Lease Adj.Total Debt* / EBITDAR | 6.74 |
| *8x Ann. Operating Lease Exp. | - |
| | |
| **DEBT SERVICE COVERAGE** | |
| EBIT / Interest Exp. | 1.84 |
| EBITDA / P & I Exp. (actual) | 1.07 |
| EBITDA - CAPEX / P + I Exp. | 1.08 |
| EBITDAR / Lease & P + I Exp. | 1.07 |
| Annual Operating Lease Exp. | - |
| NOCF / CMLTD & Div. | 1.39 |
| NOCF / CMLTD & Div. & CAPEX | 1.41 |
| | |
| **PERFORMANCE** | |
| Return on Assets | 2.23 |
| Return on Average Equity | 13.71 |
| Sales Growth | 318.97 |
| Same Stores Sales Growth | N/A |
| Revenues / Total Assets | 14.84 |

## Appendix - Covenants

The Gitto/Global Corporation

| Covenants | Time Frame | Required | Actual (3/31/04) |
|---|---|---|---|
| Fixed Charge Coverage (EBITDA / Fixed Charges) | Quarterly | Fiscal Year 2002: 1.0x Fiscal Year 2003: 1.1x Thereafter: 1.25x | 1.25 |
| Interest Coverage (EBITDA / Interest Expense) | Quarterly | June 30, 2002 and thereafter: 1.5x | 2.77 |
| Maximum Capex | Annually | $350,000 maximum | $ 232,000 |
| Tangible Net Worth | At all times | $5,500,000 + 80% net income | $ 7,812,050 |

**Appendix – Industry Overview**

<u>INDUSTRY/COMPETITION:</u>

Gitto/Global is a high-end mid-sized compounder and it is one of the more sophisticated in the business. The Company differentiates itself with its technical capabilities, proprietary knowledge and processes, and patents. The Industry is large given that the use of plastics is endemic in our society and continues to replace metal in the automotive and household markets, and increasingly as a replacement for wood. The industry journal lists approximately 200 North American Compounders. The largest competitors are public companies such as GE.

**Customer:** Gitto/Global Corporation-1128984-IP-MM
**Servicing Officer:** FURST, THOMAS-TFF
**Division:** NY Regional
**Account Data as of:** Jun-04    **Cost Data:** 12/31/2002
**Date Prepared:** 8/12/2004    **TP Data:** 6/30/2004

|  | Historic | | Projection | |
|---|---|---|---|---|
|  | Actual | After Tax | | After Tax |
| RELATIONSHIP PROFITABILITY | Income | RO Capital | Income | RO Capital |
| **GROSS MARGIN** | | | | |
| Loan Spread to Transfer Rate | $1,008,671 | 50.6% | $1,002,034 | 52.0% |
| Non-Usage Fee | 3,146 | 0.2% | 185 | 0.0% |
| Existing Deferred and Other Fees | 12,000 | 0.6% | 0 | 0.0% |
| New Deferred and Other Fees | N/A | N/A | 0 | 0.0% |
| Liquidity Premium | 0 | 0.0% | 0 | 0.0% |
| Credit for Funds Provided (Equity) | 80,451 | 4.0% | 76,022 | 3.9% |
| Gross Margin | $1,104,268 | 55.4% | $1,078,241 | 56.0% |
| | | | | |
| **CASH MANAGEMENT PROFIT** | | | | |
| Earnings Credit on Available Balances | $455 | 0.0% | $467 | 0.0% |
| Account Analysis Deficiency Fee (APX) | 25,423 | 1.3% | 25,423 | 1.3% |
| Total Account Analysis Revenue | $25,878 | 1.3% | $25,890 | 1.3% |
| | | | | |
| less: Costed Services Expense | (20,736) | -1.0% | (20,736) | -1.1% |
| Total Cash Management Profit | $5,142 | 0.3% | $5,154 | 0.3% |
| | | | | |
| **OTHER REVENUE** | | | | |
| Credit Related Fees | $10,061 | 0.50% | $10,061 | 0.52% |
| Trust Revenue | $0 | 0.0% | $0 | 0.0% |
| FX Revenue | 0 | 0.0% | 0 | 0.0% |
| L/C and IRR Product Revenue | 0 | 0.0% | 0 | 0.0% |
| Cost of Trust, FX, L/C Other Services | 0 | 0.0% | 0 | 0.0% |
| Total Other Revenue | $10,061 | 0.5% | $10,061 | 0.5% |
| | | | | |
| Credit for Interest Bearing Deposits | $0 | 0.0% | $0 | 0.0% |
| Loan Loss Provision | (377,766) | -19.0% 4- Satisfy-Low | (358,070) | -18.6% 4- Satisfy-Low |
| Total Overhead | (129,112) | -6.5% | (129,112) | -6.7% |
| | | | | |
| Pre-tax Contribution | $612,593 | 48.4% | $606,274 | 49.6% |
| | | | | |
| Capital | $1,265,321 | | $1,223,523 | |
| Total Assets | $27,855,063 | | $26,450,350 | |
| | | | | |
| **Aftertax Return on Capital** | **30.74%** | | **31.47%** | |

| ASSUMPTIONS AND SUMMARY STATISTICS | | | |
|---|---|---|---|
| Loan Spread to Transfer Rate (%) | 3.17% | 3.32% | |
| Loan Spread including fees(%) | 3.23% | 3.32% | |
| Average Transfer Price | 1.17% | 1.00% | |
| Earnings Credit Rate | 1.00% | 1.03% | |
| Unadvised Lines | $0 | $0 | |
| Total Commitments (advised) | $28,621,461 | $28,083,333 | |
| Total Loans and Leases | $27,855,063 | $26,402,805 | |
| Total LC's | $0 | $0 | |
| Unused Advised Commitments - GT1Y | $766,398 | $1,680,528 | |
| - LE1Y | $0 | $0 | |
| Free DDA Balances | ($2,551,946) | ($2,483,198) | |

| LOAN SPREADS | | Amount | Basis Spread | TP Spread |
|---|---|---|---|---|
| Prime Loans | | $26,402,805 | 0.32% | 3.32% |
| LIBOR Loans | | $0 | 0.00% | 0.00% |
| Fixed-Rate Loans | | $0 | N/A | 0.00% |
| Total Loans | | $26,402,805 | N/A | 3.32% |

Borrower Name:      Gitto/Global Corporation-1128984-IP-MM
Servicing Officer:  FURST, THOMAS-TFF
RC:                 2945-045
Division:           NY Regional
Analyst's Name:     gitto
Date:               08/12/04

-CM: Commitment
-1: Prime Loan
-2: LIBOR Loan
-3: Fixed-Rate Loan
-ASCH: Treas Mgmt
Int. Br. Dep: Interest Bearing Deposit

| INCLUDED Customers, Accounts, and Products: | | | EXCLUDED Customers, Accounts, and Products: | | |
|---|---|---|---|---|---|
| Account/Customer | Type | 12-Mo. Amount | Account/Customer | Type | 12-Mo. Amount |
| Gitto/Global Corporation-1128984-IP-MM | | | | | |
| 5590055512-AAD-96-ACSH | Treas Mgmt | $    (10,534) | | | |
| 5800370974-AAD-96-ACSH | Treas Mgmt | $     61,181 | | | |
| 5590055512-AAF-96-ACSH | Treas Mgmt | $     25,920 | | | |
| 0-GITTO-ABL-45-GITTO-CM | CM > 1 Yr. | $ 26,621,461 | | | |
| GITTO-ABL-45-00117101000000000000-1 | Float Loan | $ 26,305,895 | | | |
| GITTO-ABL-45-00117102000000000000-1 | Float Loan | $  1,549,168 | | | |

| INCLUDED Customers, Accounts, and Products: | | | EXCLUDED Customers, Accounts, and Products: | | |
|---|---|---|---|---|---|
| Account/Customer | Type | Current Amount | Account/Customer | Type | Current Amount |

# Summary Key Assessments

## Gitto / Global Corporation

Analysis case type: LNC

Financial Assessments  Jun 2003 – ANNUAL

Peer Selection:                                                          IndustryClassification: -
Peer Database: RMA Database (2002)                           Industry Code: -
Peer Description: WHOLESALE TRADE, Plastic materials, basic forms and shapes



*Financials Only*                    ——————— FINANCIAL ASSESSMENT ———————
RiskCalc                                          *Subjectives*
                                                   Operations

                                                   Liquidity
                                                   Cap Structure
                         FINANCIAL ASSESSMENT                    (57.7)

**Business Analysis Assessments**
Industry                                           Management
Company
                         BUSINESS ANALYSIS                       (34.2)

**Borrower Rating Summary**

                Preliminary Borrower Rating                     (57.1)        4+

                BORROWER RATING (Constrained)                   (57.1)        4+

## LASALLE BANK / STANDARD FEDERAL BANK
### FEDERAL RESERVE ACT 23 A&B – CONFIRMATION WORKSHEET

The questions are designed to help assess whether a proposed transaction is a "Covered Transaction" within the meaning of section 23 A & B of the Federal Reserve Act. Respond to each question in section 1. If your response is "yes," provide a detailed explanation at the end of the section. Also complete section 2 and section 3 (if applicable). This worksheet is required to be completed and attached to EAGLE LCP for each new facility.

| SECTION I – COMPLETED BY LENDER | YES | NO |
|---|---|---|
| 1.  Does the proposed transaction contemplate an extension of credit to or for the benefit of an ABN AMRO affiliate (as defined in the FRA 23 A&B Policy)? |  | X |
| 2.  Is an ABN AMRO affiliate currently a lender (including as part of a syndicate) to the customer, and if so, will LaSalle/SFB be extending credit to replace that of the affiliate prior to the original expiration? |  | X |
| 3.  Will any of the loan or letter of credit proceeds go (directly or indirectly) to an ABN AMRO affiliate? Example: loan proceeds used to purchase securities from an ABN AMRO affiliated broker-dealer or securities issued by an ABN AMRO affiliate (ABN AMRO proprietary mutual fund shares, ABN AMRO ADR's, or ABN AMRO or LaSalle commercial paper). |  | X |
| 4.  Are you relying on the credit of an ABN AMRO affiliate in recommending this transaction? Example, is an ABN AMRO affiliate providing a guaranty or indemnity, issuing a letter of credit to support the transaction, or requesting a credit extension without credit underwriting? |  | X |
| 5.  Does an ABN AMRO affiliate have an equity or other ownership interest in the customer or its affiliates? |  | X |
| 6.  Is any of the proposed collateral issued or underwritten by an ABN AMRO affiliate? Example: proposed collateral of ABN AMRO ADR's, ABN AMRO Reverse Exchangeable Securities (REXS), ABN AMRO Proprietary Mutual Fund shares or either ABN AMRO or LBC commercial paper or a pledge of bank, securities or trust account held with us or an ABN AMRO affiliate? |  | X |

### EXPLANATION IF ANY ABOVE QUESTIONS WERE ANSWERED YES

### SECTION II –THE FOLLOWING SECTION MUST BE COMPLETED IF ANY ABOVE QUESTIONS WERE ANSWERED YES

| | |
|---|---|
| CLOSING DATE (ESTIMATE) | |
| AFFILIATE CODE (available on Credit Policy Department web site under "Other References") | |
| MATURITY DATE OF ORIGINAL AFFILIATE TRANSACTION (IF APPLICABLE) | |

### SECTION III – LENDER AFFIRMATION –SELECT ONE

__X__  I have reviewed the FRA 23 A&B Policies (available on Credit Policy Department web site under "Other References") and do not believe the proposed transaction constitutes a "Covered Transaction" as described therein.

_____  One of the answers in Section 1 is "yes" and this transaction may constitute a "Covered Transaction". Refer to Credit Policy Department for a determination of Section 23A applicability, prior to submission for approval.

EXHIBIT 5

TRADEX CORPORATION'S ("TRADEX") CHAPTER 11 PETITION,
FILED FEBRUARY 14, 2005 IN THE TRADEX BANKRUPTCY CASE.

(Official Form 1) (12/03)

| FORM B1 | United States Bankruptcy Court | Voluntary Petition |
|---|---|---|

Western District of __Masschusetts__

| Name of Debtor (if individual, enter Last, First, Middle):<br>Tradex Corp. | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>N/A |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>N/A |
| Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D.<br>No. (if more than one, state all): | Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No.<br>(if more than one, state all): N/A |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br><br>18 Nancy Court<br>Leominster, MA  01453 | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br>N/A<br>FEB16'05 AM10:00 |
| County of Residence or of the<br>Principal Place of Business:    Worcester | County of Residence or of the<br>Principal Place of Business:  N/A |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | Gitto Global Corporation<br>140 Leominster-Shirley Road<br>Lunenburg, MA  01462 |

*FILING FEE PAID*

### Information Regarding the Debtor (Check the Applicable Boxes)

**Venue** (Check any applicable box)
- [ ] Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- [ ] There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | | **Chapter or Section of Bankruptcy Code Under Which<br>the Petition is Filed** (Check one box) | |
|---|---|---|---|
| [ ] Individual(s) | [ ] Railroad | [ ] Chapter 7 | [X] Chapter 11 | [ ] Chapter 13 |
| [X] Corporation | [ ] Stockbroker | [ ] Chapter 9 | [ ] Chapter 12 | |
| [ ] Partnership | [ ] Commodity Broker | [ ] Sec. 304 - Case ancillary to foreign proceeding | | |
| [ ] Other _____ | [ ] Clearing Bank | | | |

| **Nature of Debts** (Check one box) | **Filing Fee** (Check one box) |
|---|---|
| [ ] Consumer/Non-Business    [ ] Business | [ ] Full Filing Fee attached |
| **Chapter 11 Small Business** (Check all boxes that apply)<br>[ ] Debtor is a small business as defined in 11 U.S.C. § 101<br>[ ] Debtor is and elects to be considered a small business under<br>11 U.S.C. § 1121(e) (Optional) | [ ] Filing Fee to be paid in installments (Applicable to individuals only)<br>Must attach signed application for the court's consideration<br>certifying that the debtor is unable to pay fee except in installments.<br>Rule 1006(b). See Official Form No. 3. |

**Statistical/Administrative Information** (Estimates only)

- [ ] Debtor estimates that funds will be available for distribution to unsecured creditors.
- [ ] Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |

| Estimated Assets | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | [ ] | [ ] | [ ] | [ ] | [X] | [ ] | [ ] | [ ] |

| Estimated Debts | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | [ ] | [ ] | [ ] | [ ] | [X] | [ ] | [ ] | [ ] |

(Official Form 1) (12/03)                                                           FORM B1, Page 2

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Tradex Corp. |
|---|---|

| **Prior Bankruptcy Case Filed Within Last 6 Years** (If more than one, attach additional sheet) | | |
|---|---|---|
| Location<br>Where Filed: | Case Number: | Date Filed: |

| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

| **Signature(s) of Debtor(s) (Individual/Joint)**<br>I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>   Signature of Debtor<br><br>X _____<br>   Signature of Joint Debtor<br><br>_____<br>Telephone Number (If not represented by attorney)<br><br>_____<br>Date | **Exhibit A**<br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)<br>☐ Exhibit A is attached and made a part of this petition. |
|---|---|
| | **Exhibit B**<br>(To be completed if debtor is an individual whose debts are primarily consumer debts)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.<br>X _____<br>   Signature of Attorney for Debtor(s)        Date |
| **Signature of Attorney**<br><br>X /s/ _____<br>   Signature of Attorney for Debtor(s)<br>   Lawrence G. Green<br>   Printed Name of Attorney for Debtor(s)<br>   Perkins Smith & Cohen LLP<br>   Firm Name<br>   One Beacon Street, 30th Fl.<br>   Address Boston, MA  02108<br><br>   (617)854-4000<br>   Telephone Number<br>   2/  /05<br>   Date | **Exhibit C**<br>Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br>☐ Yes, and Exhibit C is attached and made a part of this petition.<br>☐ No |
| | **Signature of Non-Attorney Petition Preparer**<br>I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.<br><br>_____<br>Printed Name of Bankruptcy Petition Preparer<br><br>_____<br>Social Security Number (Required by 11 U.S.C.§ 110)<br><br>_____<br>Address |
| **Signature of Debtor (Corporation/Partnership)**<br>I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _Charles N Gitto Jr_<br>   Signature of Authorized Individual<br>   Charles Gitto<br>   Printed Name of Authorized Individual<br>   President<br>   Title of Authorized Individual<br>   2/  /05<br>   Date | Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>X _____<br>   Signature of Bankruptcy Petition Preparer<br><br>_____<br>   Date<br>A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. §110; 18 U.S.C. §156. |

## MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS
## OF TRADEX CORPORATION

FEB16'05 AM10:00

### February 15, 2005

There were present at the meeting the following:

Charles Gitto

Being all of the Directors of the Corporation

Charles Gitto called the meeting to order.

It was moved, seconded and unanimously carried that Charles Gitto act as

Chairman and as Secretary.

The Board unanimously approved the Chairman's filing of the appropriate papers

to cause the company to enter into Chapter 11 bankruptcy. Further, the Board

unanimously approved the retention of Perkins, Smith & Cohen, LLP and Lawrence

Green, Esquire in particular to act as counsel.

There being no further business to come before the meeting, upon motion duly

made, seconded and unanimously carried, it was adjourned.

_____
Secretary

Attest:

Board of Directors

_____
Charles Gitto

## Declaration Under Penalty of Perjury on Behalf of a Corporation or Partnership

I, Charles Gitto, President of Tradex Corp., declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: 2/ /05

Signature: _____
Charles Gitto, President

FEB 16 '05 AM10:40 US

FEB16'05 AM10:59 RE'D

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:                              )
                                    )
TRADEX CORP.                        )         Chapter 11
                                    )         Case No.
                  Debtor            )
                                    )

## MATRIX

Richard T. King, Esq.
Office of the United States Trustee
446 Main Street, 1st Floor
Worcester, MA  01608

Clinton Savings Bank
c/o Robert Seder, Esq.
Seder & Chandler
339 Main Street
Worcester, MA  01608

LaSalle Business Credit, LLC
c/o Christopher J. Panos, Esq.
Craig and Macauley, PC
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210

Lawrence Savings Bank
30 Massachusetts Avenue
North Andover, MA  01845

EXHIBIT 6

ORDER OF BANKRUPTCY COURT IN THE TRADEX BANKRUPTCY
CASE, DATED APRIL 7, 2005, ALLOWING U.S. TRUSTEE MOTION
FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### Proceeding Memorandum/Order

In Re: Tradex Corp.

Case Number:   05-40748 ( JBR )

Chapter:    11

**MOVANT/APPLICANT/PARTIES**

#62   Motion of the United States Trustee to Appoint a Chapter 11
Trustee
Lisa D. Tingue for the UST
Lawrence G. Green for Debtors

## COURT ACTION:

Show Cause Order _____ **Released** _____ **Enforced**
#62 Granted _____ **Approved** _____ **Moot**
_____ **Denied** _____ **Denied without Prejudice**
_____ **Withdrawn in Open Court**
_____ **Sustained** _____ **Overruled**
_____ **Continued to:** _____
_____ **Proposed Order to be Submitted by:**_____
_____ **Stipulation to be Submitted by:**_____
_____ **Taken Under Advisement**

## DECISION SET OUT MORE FULLY BY COURT AS FOLLOWS:

**SO ORDERED:**

*Joel B. Rosenthal*                Dated: 4/7/05

Joel B. Rosenthal

EXHIBIT 7

NOTICE OF U.S. TRUSTEE IN THE TRADEX BANKRUPTCY CASE,
DATED APRIL 14, 2005, APPOINTING M. ELLEN CARPENTER
AS CHAPTER 11 TRUSTEE OF TRADEX

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Tradex Corp.** | ) | **Chapter 11** |
| | ) | **Case No.  05-40748-JBR** |
| **Debtor** | ) | |
| | ) | |

## CERTIFICATE OF APPOINTMENT OF CHAPTER 11 TRUSTEE

     Ellen M. Carpenter, Esq.  is hereby appointed as Chapter 11 trustee of the above-captioned case, and the amount of the bond is set at $100,000.00.

          Respectfully submitted,

          PHOEBE MORSE
          United States Trustee, Region 1

          By: /s/Richard T. King

Dated: April 12 , 2005          Richard T. King, Esq. - BBO #549382
          Assistant U.S. Trustee
          Office of the United States Trustee
          U.S. Department of Justice
          446  Main Street, 14th Floor
          Worcester, MA 01608
          Telephone: (508) 793-0555
          Facsimile:  (508) 793-0558

## TRUSTEE'S ACCEPTANCE

     The undersigned accepts the foregoing appointment, the duties and responsibilities of the trustee, and obligates herself and her sureties under the terms of the bond to be filed with the United States Bankruptcy Court.

Dated: _____

          Ellen M. Carpenter

Approved under Section 1104(d):

The Honorable Joel B. Rosenthal
Bankruptcy Judge

EXHIBIT 8

CARPENTER'S AMENDED COMPLAINT AGAINST CSB, DATED
JANUARY 26, 2006, FILED IN THE BANKRUPTCY COURT IN
ADVERSARY PROCEEDING NO. 05-04056

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TRADEX CORP.,<br><br>       Debtor. | Chapter 11<br>Case No. 05-40748-JBR |
| M. ELLEN CARPENTER, as Chapter 11<br>Trustee of TRADEX CORP.,<br><br>       Plaintiff,<br><br>       v.<br><br>CLINTON SAVINGS BANK.<br><br>       Defendant | Adversary No. 05-04056 |

## <u>AMENDED COMPLAINT</u>

M. Ellen Carpenter, as Chapter 11 Trustee ("Trustee"), through her undersigned counsel, hereby brings this Amended Complaint. In support of the Amended Complaint, the Trustee alleges the following:

### <u>Parties</u>

1.     The Trustee is an individual and a shareholder with the law firm of Roach & Carpenter, P.C., having a usual place of business in Boston, Massachusetts. The Trustee was appointed on April 13, 2005.

2.     The Debtor, Tradex Corporation ("Tradex"), is a Massachusetts corporation which had a principle place of business in Leominster, Worcester County, Massachusetts.

3.     The Defendant, Clinton Savings Bank ("CSB"), is a Massachusetts savings bank established under the laws of the Commonwealth of Massachusetts, having a principle place of business in Clinton, Worcester County, Massachusetts.

## Jurisdiction

4.     This Court has jurisdiction over the claims asserted in this matter pursuant to 28 U.S.C. §§1331 and 1334.

5.     This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

## Venue

6.     Venue exists under 28 U.S.C. §1391(b), as a substantial part of the events giving rise to the Amended Complaint occurred in this District; and under 28 U.S.C. 1408, as Tradex's principle place of business was in Massachusetts.

## Facts

7.     Tradex filed a voluntary Chapter 11 petition on February 16, 2005.

8.     On or about February 12, 2001, Kingsdale Corporation ("Kingsdale") d/b/a J&J Chemical Distributors ("J&J Chemical"), acting by and through its Vice President of Finance, Frank Miller ("Miller"), established a bank account at CSB (the "Kingsdale account"). *Ex. A.*

9.     Miller had a special relationship with CSB. He had been a CSB corporator since 1999. *Ex. B.* He had also been a depositor and borrower with CSB since 1997. *Id.*, at 85. In fact, from 1997-2003, Miller obtained and paid off mortgages totaling over two million dollars to CSB.

10.     Commencing on or about April 2002, after a number of checks drawn on the Kingsdale account were returned for insufficient funds, Senior Vice President of CSB, Michael Tenaglia, notified Miller that CSB would not clear checks drawn on uncollected funds in the Kingsdale account. *Ex. B at 12-14.*

11.     On June 10, 2002, Miller paid off a mortgage to CSB in the approximate sum of $740,000.00. *Ex. C.*

12.     Commencing in late October or early November of 2002, CSB began allowing Miller to draw checks on the Kingsdale account against uncollected funds. *Ex. B at 14-15.* CSB was extending credit to Kingsdale for as much as $2 to $2.5 million per day by clearing checks on uncollected funds in the Kingsdale account. *Id., at 21-22.*

13.     CSB's extension of credit allowed Miller to use the Kingsdale account to execute a check kiting scheme through which he would write checks against uncollected funds in the Kingsdale account, deposit them into a separate account at another bank ("Gitto Global account") held in the name of Gitto Global Corporation ("Gitto Global"), and then re-circulate the same funds back into the Kingsdale account by writing checks drawn on the Gitto Global account before those funds cleared for deposit back into the Kingsdale account.

14.     Miller was also the Chief Financial Officer and part owner of Gitto Global. As a result, Miller had the authority to sign checks drawn on both the Kingsdale and Gitto Global accounts.

15.     When asked to provide an explanation for the large volume of check activity between the Kingsdale and Gitto Global accounts, Miller explained that the funds had to go back and forth between the companies for licensing and competitive reasons. *Ex. B at 32.* CSB did not understand Miller's explanation, but did not do any due diligence to verify the accuracy of his statement. *Ex. M at 12-13.*

16.     On March 11, 2004, a CSB employee began the process of preparing a Suspicious Activity Report. *Ex. D.*

17.     On May 3, 2004, CSB Comptroller, Sheila Azorandia, notified Christopher Gill ("Gill"), CSB's Treasurer, that it looked as if Miller was "still playing games". *Ex. E.* CSB continued to clear checks on uncollected funds after May 3, 2004.

18.    On May 18, 2004, Gill referred to the activity on the Kingsdale account as "kiting" and remarked that he did not see what the activity had to do with the sale of the business. *Ex. F.* CSB continued to clear checks on uncollected funds after May 18, 2004.

19.    By letter dated June 25, 2004, Miller provided Tenaglia with a false explanation of the reason for activity between the Kingsdale and Gitto Global accounts. Miller informed CSB at that time that the account would be closed after the acquisition of Gitto Global "within the next few weeks". *Ex. G.*

20.    The acquisition did not take place within the next few weeks. CSB took no action to attempt to verify the false explanation contained in Miller's letter of June 25, 2004. *Ex. B at 46-48.*

21.    In June 2004, CSB notified Miller that it intended to close the Kingsdale account unless the activity decreased and deposits increased. *Ex. B at 49.* In early July 2004, CSB reached an agreement with Miller to close the account on July 15, 2004. *Id., at 53-55.*

22.    CSB did not close the account on July 15, 2004. Instead, CSB entered into an $8.4 million Revolving Credit Note (the "Note") with Kingsdale on July 23, 2004. *Ex. H.*

23.    Robert Pelhaus ("Pelhaus"), CSB's Vice President of Commercial Lending, represented CSB at the closing on the Note on July 23, 2004. *Ex. M at 40.* The Note was secured by (1) a security interest in all of Kingsdale's corporate assets; (2) Kingsdale's pledge of $1.2 million in cash held in a blocked CSB money market account; (3) Miller's unlimited guaranty secured by his pledge of $500,000 in cash held in a blocked CSB money market account; (4) Gary Gitto's guaranty limited to his pledge of $500,000 held in a blocked CSB money market account; (5) the unlimited guaranty of Gitto Global secured by a pledge of 3,000,000 shares of Vitrotech stock and a secured position in all machinery and equipment; (6)

guaranty of Tradex secured by a first security interest in $3,000,000 of Vitrolite inventory; and (7) a limited, non-recourse, deficiency guaranty secured by a second mortgage on real estate owned by Tradex at 140 Leominster-Shirley Road, Lunenburg, Massachusetts. *Ex. I "Debtor Guaranty"; Ex. J. "Mortgage".*

24.     At the time CSB took Tradex's guarantees, CSB knew or should have known that Kingsdale was insolvent.

25.     Paragraph 4 of Tradex's Guaranty provides that, prior to instituting any foreclosure action under the Mortgage, CSB shall have liquidated substantially the entire Inventory and substantially all of the other collateral granted to CSB by Kingsdale and the other guarantors.

26.     There were two exceptions to the protections afforded Tradex in paragraph 4 of the Guaranty; the filing of a bankruptcy action, or the filing of an action against CSB to marshal assets.

27.     On or about August 18, 2004, Tradex executed an Amended and Restated Guaranty. *Ex. K "Amended Guaranty".*

28.     Also on August 18, 2004, (1) Gary Gitto executed an unlimited guaranty of Kingsdale's obligations to CSB *(Ex. L)*; (2) Charles Gitto executed an unlimited deficiency guaranty of the same obligations; and (3) Miller and his wife executed and delivered a mortgage securing his obligations under the guaranty dated July 23, 2004.

29.     The Amended Guaranty, like the July 23, 2004 Guaranty, provides that, prior to instituting any foreclosure action under the Mortgage, CSB shall have liquidated substantially all of the Inventory and substantially all of the other collateral granted to CSB by Kingsdale and the other guarantors.

30.    There were three exceptions to the protections afforded Tradex in paragraph 4 of the Amended Guaranty; the filing of a bankruptcy action, the filing of an action against CSB to marshal assets, and an agreement by Tradex not to transfer any of its assets.

31.    On or about September 24, 2004, Gitto Global filed for bankruptcy protection.

32.    On or about January 18, 2004, CSB gave notice, via certified mail, return receipt requested, of CSB's intent to foreclose on the Mortgage granted by Debtor on July 23, 2004 by public auction to take place on February 16, 2004.

33.    On February 16, 2005, the same day that Tradex filed its Chapter 11 petition, CSB filed an Emergency Motion for Relief from Stay requesting relief to foreclose on Tradex's real estate located at 140 Lancaster-Shirley Road in Lunenberg, Massachusetts.

34.    After an evidentiary hearing, by Order and Memorandum of Decision dated March 18, 2005, this Court denied CSB's request to foreclose on the real estate but ordered Tradex to pay CSB monthly adequate protection payments in the amount of $9,000.

35.    Tradex and the Trustee made the monthly adequate protection payments to CSB through August 31, 2005.

**COUNT I**
**FRAUDULENT TRANSFER**
**Mass. Gen. L.ch. 109A, § 5(a)(1)**
**(Uniform Fraudulent Transfer Act)**

36.    Trustee realleges and incorporates as though fully set forth herein the allegations set forth in paragraphs 1-35 of the Complaint.

37.    Granting the Mortgage and guarantees to CSB to secure a Kingsdale obligation was not in the ordinary course of Tradex's business.

38.    Upon information and belief, CSB was not acting in good faith when it obtained both the Mortgage and guarantees from Tradex.

39.     Tradex granted the Mortgage and guarantees to CSB with an actual intent to hinder, delay or defraud its present or future creditors.

40.     Tradex's granting of the Mortgage and guarantees to CSB were fraudulent transfers pursuant to Mass. Gen. L. ch. 109A, §5(a)(1).

## COUNT II
## FRAUDULENT TRANSFER
**Mass. Gen. L.ch. 109A, § 5(a)(2)**
**(Uniform Fraudulent Transfer Act)**

41.     Trustee realleges and incorporates as though fully set forth herein the allegations set forth in paragraphs 1-40 of the Complaint.

42.     Tradex gave the Mortgage to CSB to secure the revolving loan to Kingsdale without receiving a reasonably equivalent value in exchange for the obligation.

43.     Tradex gave guarantees to CSB to secure the revolving loan to Kingsdale without receiving a reasonably equivalent value in exchange for the obligation.

44.     Tradex, at the time it gave CSB the Mortgage and guarantees believed, or reasonably should have believed, that it would incur debts beyond its ability to pay when they became due.

45.     Tradex's granting of the Mortgage and guarantees to CSB were fraudulent transfers pursuant to Mass. Gen. L. ch. 109A, §5(a)(2).

## COUNT III
## FRAUDULENT TRANSFER
**Mass. Gen. L.ch. 109A, § 6**
**(Uniform Fraudulent Transfer Act)**

46.     Trustee realleges and incorporates as though fully set forth herein the allegations set forth in paragraphs 1-45 of the Complaint.

47.     Upon information and belief, Tradex was insolvent on the date of the transfer, or was rendered insolvent as a result of the transfer.

48.     Tradex gave CSB the Mortgage and guarantees without receiving a reasonably equivalent value in exchange, and it was insolvent at the time of the transfer or became insolvent thereby.

49.     The Mortgage and guarantees granted by Tradex to CSB constituted a fraudulent transfer pursuant to Mass. Gen. L.ch. 109A, §6.

## COUNT IV
## FRAUDULENT TRANSFER
### 11 U.S.C. §§544(b), 548

50.     The Trustee realleges and incorporates as though fully set forth herein the allegations set forth in paragraphs 1-49 of the Complaint.

51.     Tradex gave the Mortgage to CSB to secure the revolving loan to Kingsdale without receiving a reasonably equivalent value in exchange for the obligation.

52.     Tradex gave guarantees to CSB to secure the revolving loan to Kingsdale without receiving a reasonably equivalent value in exchange for the obligation.

53.     Upon information and belief, CSB was not acting in good faith when it obtained both the Mortgage and guarantees from Tradex.

54.     Granting the Mortgage and guarantees to CSB to secure a Kingsdale obligation was not in the ordinary course of Tradex's business.

55.     Tradex, at the time it gave CSB the Mortgage and guarantees, intended to incur, or reasonably believed or should have believed, that it would incur debts beyond its ability to pay when they became due.

56.     Upon information and belief, Tradex was insolvent on the date of the transfer, or was rendered insolvent as a result of the transfer.

57.     The Mortgage and guarantees provided by Tradex to CSB constituted a fraudulent transfer pursuant to 11 U.S.C. §548.

## COUNT V
## DISGORGEMENT

58.     The Trustee realleges and incorporates as though fully set forth herein the allegations set forth in paragraphs 1-57 of the Complaint.

59.     Tradex gave the Mortgage to CSB to secure the revolving loan to Kingsdale without receiving a reasonably equivalent value in exchange for the obligation.

60.     Tradex gave guarantees to CSB to secure the revolving loan to Kingsdale without receiving a reasonably equivalent value in exchange for the obligation.

61.     Upon information and belief, CSB was not acting in good faith when it obtained both the Mortgage and the guarantees from Tradex.

62.     Pursuant to the Court's Order dated March 18, 2005, Tradex and the Trustee made six (6) monthly adequate protection payments of $9,000 to CSB for a total of $54,000 on the Mortgage.

63.     CSB should be ordered to disgorge of all payments made by either Tradex or the Trustee to CSB as the Mortgage should be set aside as a fraudulent conveyance, and therefore no adequate protection payments should have been made to CSB.

## COUNT VI
## DECLARATORY RELIEF -VOIDANCE OF MORTGAGE

64.     The Trustee realleges and incorporates as though fully set forth herein the allegations set forth in paragraphs 1-63 of the Complaint.

65.     Tradex gave the Mortgage to CSB to secure the revolving loan to Kingsdale without receiving any consideration in exchange for the obligation.

66.    The lack of consideration for the Mortgage given by Tradex to CSB to secure the revolving loan to Kingsdale renders the obligation null and void.

67.    The Trustee seeks a declaratory judgment pursuant to Fed.R.Bank.P. 7001(9) and 28 U.S.C. § 2201 that the Mortgage given by Tradex to CSB to secure the revolving loan to Kingsdale is void and unenforceable.

## COUNT VII
### DECLARATORY RELIEF -VOIDANCE OF GUARANTEES

68.    The Trustee realleges and incorporates as though fully set forth herein the allegations set forth in paragraphs 1-67 of the Complaint.

69.    Tradex gave the guarantees to CSB to secure the revolving loan to Kingsdale without receiving any consideration in exchange for the obligation.

70.    The lack of consideration for the guarantees given by Tradex to CSB to secure the revolving loan to Kingsdale renders the obligation null and void.

71.    The Trustee seeks a declaratory judgment pursuant to Fed.R.Bank.P. 7001(9) and 28 U.S.C. § 2201 that the guarantees given by Tradex to CSB to secure the revolving loan to Kingsdale are void and unenforceable.

WHEREFORE, Chapter 11 Trustee M. Ellen Carpenter requests that this Court:

a.    On Count I, enter an order declaring that Tradex's granting of the Mortgage and guarantees to CSB were fraudulent transfers pursuant to Mass. Gen. L. ch. 109A, §5(a)(1).

b.    On Count II, enter an order declaring that Tradex's granting of the Mortgage and guarantees to CSB were fraudulent transfers pursuant to Mass. Gen. L. ch. 109A, §5(a)(2);

c.  On Count III, enter an order declaring that Tradex's granting of the Mortgage and

guarantees to CSB were fraudulent transfers pursuant to Mass. Gen. L. ch. 109A,

§5(a)(6);

d.  On Count IV, enter an order declaring that Tradex's granting of the Mortgage and

guarantees to CSB were fraudulent transfers pursuant to 11 U.S.C. §548.

e.  On Count V, Order the disgorgement of the adequate protection payments paid to CSB

on the Mortgage in the total amount of $54,000.

f.  On Count VI, enter a Declaratory Judgment that the Mortgage given by Tradex to CSB is

null and void;

g.  On Count VII, enter a Declaratory Judgment that the guarantees given by Tradex to CSB

are null and void;

h.  Award the Trustee her attorney's fees, costs and expenses herein; and

i.  Grant the Trustee such other and further relief as is this Court deems just and equitable.

Respectfully submitted,

M. Ellen Carpenter,
Chapter 11 Trustee of Tradex Corp.

By her counsel,

/s/ M. Ellen Carpenter
M. Ellen Carpenter (BBO # 554142)
ROACH & CARPENTER, P.C.
24 School Street
Boston, MA 02108
(617) 720-1800
mec@rc-law.com

Dated:  January 26, 2006

EXHIBIT 9

PAGES FROM THE FOLLOWING DEPOSITION TRANSCRIPTS:
STEPHEN P. CASH (9/13/05),
MICHAEL TENAGLIA (12/1/04),
ROBERT PAULHUS ((12/1/04),
BOBBI JO A. WILLIAMS (9/13/05),
CHRISTOPHER GILL (9/14/05),
JOSEPH D. GUERCIO (9/14/05),
SHEILA A. AZORANDIA (9/13/05),
AND VOL I. OF WILLIAM DEAKIN (11/15/05).

Page 1

VOLUME: I

PAGES: 1 to 134

EXHIBITS: 30 to 38

COPY

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10268-DPW

| | |
|---|---|
| LASALLE BUSINESS CREDIT, | ) |
| LLC, f/k/a LASALLE BUSINESS | ) |
| CREDIT, INC., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CLINTON SAVINGS BANK, | ) |
| Defendant. | ) |

DEPOSITION OF STEVEN P. CASH, called
as a witness on behalf of the Plaintiff,
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jeanette N. Maracas, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices
of Craig and Macauley, P.C., Federal Reserve
Plaza, 600 Atlantic Avenue, Boston,
Massachusetts, on Tuesday, September 13,
2005, commencing at 9:40 a.m.

Page 2

1

2      APPEARANCES:

3

4


              SCHWARTZ, COOPER, GREENBERGER,

5      KRAUSS (by Eric S. Rein, Esq.), 180 N.

       LaSalle Street, Suite 2700, Chicago, Illinois

6      60601, for the Plaintiff.

       E-mail: Rrein@schwartzcooper.com

7

8

9              SEDER & CHANDLER (by Kevin C.

       McGee, Esq.), 339 Main Street, Worcester,

10     Mass. 01608, for the Defendant.

       E-mial: Kcmcgee@sederlaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 16

1               MR. McGEE:  Attorneys from?

2    Q.   I don't know "from."  Any attorneys.

3    A.   I was subpoenaed and I couldn't tell you

4         exactly when it was.  I spoke very briefly

5         with Attorney Balliro at one of the hearings

6         regarding Tradex, I believe.  She asked me

7         several questions outside the courtroom before

8         the proceeding began.

9    Q.   What did she ask you?

10   A.   She asked me if I knew Mr. Gitto personally

11        or any of the Gittos personally, asked me if

12        I knew Mr. Miller outside of the business

13        context, did I socialize with Mr. Miller, to

14        which I said no.  I believe she asked me if

15        I introduced or proposed Mr. Miller to be a

16        corporator of Clinton Savings Bank, to which

17        I said no.

18   Q.   Did you know that Mr. Miller was a

19        corporator?

20   A.   Oh, absolutely.  That was another one of my

21        functions, was to act as a liaison with

22        corporators of the bank.

23   Q.   What role does a corporator take at the bank?

24   A.   They have per state statute a responsibility

1       regarding corporate governance, not

2       dissimilar, I would say, to what a common

3       stockholder would have in a corporate

4       public company, except, obviously, there's

5       no ownership interest, that type of meet

6       at the annual meetings and vote to elect

7       directors, vote to elect certain of the

8       officers, the president and a couple of

9       others, I can't remember, vice presidents, I

10      believe.

11              Their other responsibilities are

12      more informal to act as goodwill ambassadors

13      for the company.  To the extent they can

14      identify opportunities, business

15      opportunities for the bank, they're

16      encouraged to do so.  They have no formal

17      responsibility or requirement to do so.

18  Q.  Do you know when Mr. Miller became a

19      corporator?

20  A.  You'd have to check the corporate records,

21      but I would only be able to guess it would

22      be sometime in 1999, 2000 time frame perhaps.

23  Q.  Did you see him at these corporator meetings?

24  A.  He attended some of the corporator meetings,

Page 18

```
 1        yes.
 2   Q.   How often were these meetings on a yearly
 3        basis?
 4   A.   There were two meetings per year.  In 2003
 5        there was a special meeting for the
 6        corporators to consider changing the
 7        corporate structure to a mutual holding
 8        company.
 9   Q.   What was the decision?
10   A.   The decision was to move forward with that.
11   Q.   Why was a change made to a mutual holding
12        company?
13   A.   For strategic reasons, to be able to have
14        the bank access greater levels of capital so
15        that it would be able to grow, respond to
16        the opportunities in the marketplace.
17   Q.   Did you have any dealings with Mr. Miller
18        at these meetings?
19   A.   I would have greeted him, as was my custom,
20        to try to speak to as many of the corporators
21        that were in attendance as possible, so that
22        I would speak with him and engage in
23        small-talk.
24   Q.   In the '99, 2000 time frame, how many
```

Page 24

```
 1            connection with these additional loans at

 2            Clinton?

 3      A.    Mr. Perkins.  That was his responsibility.

 4      Q.    You said you told the board that you became

 5            aware of -- was it Kingsdale, J&J Chemical

 6            in October 2003; is that right?

 7      A.    I believe that's correct.

 8      Q.    And what occurred to cause you to become

 9            aware of Kingsdale?

10      A.    I had noticed that there had been some

11            fluctuations in our deposit balances, I

12            think in the checking account, in particular,

13            and I inquired of Mr. Tenaglia if he knew

14            or had any idea what had caused or what was

15            causing the fluctuations.  He said he didn't

16            know, but subsequently he ran some reports

17            through our computer system and as a result

18            of those reports became aware of the

19            activity in the Kingsdale account, or

20            activity in the Kingsdale account that was

21            large.

22      Q.    How large?

23      A.    I'm sorry.  At that time it was fluctuating

24            between in the hundred thousands on a daily
```

1        exactly what it was, what the threshold

2        was that he used, but it was sort of in

3        something so that he would be able to

4        differentiate the goal or the objective

5        was to identify large transactions.

6    Q.  Was there a name to this report?

7    A.  No.  It was a report that he created in

8        response to my question, I believe.

9    Q.  So when you initially noticed the fluctuation

10       and asked Mr. Tenaglia if he knew what this

11       was caused by, did you have any discussion

12       as to whether he knew of Kingsdale?

13   A.  I'm not sure.

14   Q.  At the time you noticed the fluctuation and

15       then contacted Mr. Tenaglia, did you have

16       any conversation at that time concerning

17       the identity of Kingsdale?

18   A.  No.

19   Q.  Did you have any discussion at that time

20       concerning whether he had any interaction

21       with Kingsdale prior to October of 2003?

22   A.  No, I did not.

23   Q.  Now, after Mr. Tenaglia ran the report,

24       did you then have further discussions with

Page 28

1    him?

2    A.    Yes.   He brought the information to me to

3          point out the transactions and the size and

4          we were both immediately concerned.

5    Q.    And this information he brought with him,

6          did he leave that with you?

7    A.    I don't recall if did he or not.

8    Q.    Do you know what happened with that

9          information?

10   A.    No.

11   Q.    What happened next then after you reviewed

12         this information with him?

13   A.    I remember telling him that and my

14         recollection is that he agreed and he was

15         just as concerned and surprised as I was

16         in seeing this, that this type of activity

17         is not that type of activity that we are,

18         A, comfortable with or in the business to

19         be servicing.

20   Q.    What action, if any, then was taken after

21         this discussion with Mr. Tenaglia?

22   A.    I believe that I asked him to do more

23         research to find out more information about

24         the situation and about the activity with

1         the objective of having it cease.

2    Q.   Do you know what research Mr. Tenaglia then

3         did?

4    A.   I do not know specifically.  I know at one

5         point -- well, I know that he eventually

6         was in contact with Mr. Miller, I believe it

7         was, but I can't tell you exactly when that

8         was.  I remember that I was concerned that

9         the possibility existed that there may be a

10        defalcation within, or some type within the

11        Gitto Global organization, some type of

12        misappropriation of funds.  That might have

13        been subsequent to maybe -- one of the

14        things that Mr. Tenaglia did is he would

15        have gone, collected some of the checks

16        that supported the transactions that he

17        identified in the computer report that he

18        ran.

19                   I think during that time frame

20        in looking at those, I know I had a feeling

21        that there could be a problem at Gitto

22        because I believe the signatures were

23        stamped, they were stamped signatures on

24        the checks.  At some point after that

1   Q.  So what's the next event that you do recall

2       with regard to the Kingsdale account?

3   A.  I recall that in mid January inquiring as to

4       the status of the situation, and I remember

5       being very disheartened to hear that it had

6       not been resolved.

7   Q.  Who did you ask?

8   A.  Mr. Tenaglia.

9   Q.  What prompted you to ask him in mid January

10      about the status?

11  A.  I have no idea what specifically prompted me.

12  Q.  What did Mr. Tenaglia tell you?

13  A.  He told me it wasn't resolved and that he's

14      been in contact with Mr. Miller and they

15      were still working to get it resolved.

16  Q.  In January of '04, do you know what kind

17      of business Kingsdale was involved in?

18  A.  I think so.  I knew -- I obviously learned

19      more after that.  I'm trying to put it in

20      the context of January for you.  I knew

21      that they had purchased or that they were

22      purchasing raw materials for Gitto Global

23      in some capacity.

24  Q.  How were you aware of this?

Page 36

1   A.   I remember when the account was first

2       opened, the Kingsdale account, which I can't

3       tell you when.

4   Q.   2001.

5   A.   2001.  That I spoke with Mr. Miller about

6       the account at that time.

7   Q.   How did that happen?

8   A.   I think it was either shortly after a

9       corporators meeting, and I believe he called

10      me to say that he was looking to do things

11      to support the bank but that their business

12      account was too big, their operating account

13      and their requirements were too big for

14      Clinton Savings Bank, to which I agreed,

15      but he did say that he had a subsidiary

16      account that he uses sometimes to purchase

17      raw materials and that he could support the

18      bank by using that account.

19   Q.   And this subsidiary was Kingsdale?

20   A.   I believe so.

21   Q.   Now, were you familiar with Gitto Global

22      in 2001 when Mr. Miller spoke to you?

23   A.   I'm not sure I know, I understand what

24      your definition of "familiar" is.  I knew

Page 38

```
 1            Kingsdale at that point in time.
 2     Q.    Let me ask it again.  Your knowledge about
 3            Kingsdale was based upon conversation you
 4            had with Mr. Miller when he sought to open
 5            an account for a subsidiary of Gitto Global?
 6     A.    I would say the answer to that question is
 7            yes.
 8     Q.    So when you had this conversation with
 9            Mr. Tenaglia in January 2004, was there any
10            action taken?
11     A.    Not specific action, only to continue to do
12            whatever was in his power to be able to
13            reduce the activity.
14     Q.    Do you know what the size of the activity
15            was in January of '04?
16     A.    I couldn't tell you specifically, but I
17            believe that it was even higher than it was
18            in November, which was another reason why
19            I was not very happy with the news.
20     Q.    Did you look at this daily activity report
21            in January of '04?
22     A.    Yes, I would look at the daily activity
23            report, yes.
24     Q.    Was Kingsdale on this daily activity report?
```

Page 52

1    Q.  Do you know who was buying the company?

2    A.  I believe at that point that I knew the

3        name of the company.

4    Q.  So in March of 2004, who did you know was

5        the name of the company?

6    A.  I believe the name was VitroTech.

7    Q.  How did you become aware of the name?

8    A.  Mr. Tenaglia shared that with me as a result

9        of his conversations with Mr. Miller.  We

10       subsequently -- I went and found a -- let

11       me, because I'm not absolutely sure.  Either

12       I or Mr. Tenaglia found a reference to the

13       sale on the Internet.

14   Q.  How was it that you or Mr. Tenaglia were

15       looking on the Internet with regard to

16       VitroTech?

17   A.  Because VitroTech was, I guess, the solution

18       to the issue, that the sale of the company,

19       which at this point in time I'm pretty

20       sure we were told was imminent, was going

21       to eliminate the need to have Kingsdale

22       transactions take place, that the Kingsdale

23       account would no longer be necessary.

24   Q.  And in March of 2004, do you know what the

Page 53

1           size of the activity in the account was on

2           a daily basis?

3    A.    I'm sure I did.

4    Q.    Was it more than in October of 2003?

5    A.    It was.

6    Q.    Do you know how much more?

7    A.    I would say that it fluctuated between --

8           I remember at one point that it was

9           fluctuating between 1.7 million and 2.8

10          million, I believe.  And that when we looked

11          at the activity that there was, one day it

12          was a-million-seven and the next day it was

13          two-million-eight and the next day it was

14          a-million-seven and so on and so forth.

15   Q.    Are you familiar with the term "check kite"?

16   A.    Yes.

17   Q.    What's your understanding of that term?

18   A.    It is an activity to write checks when no

19          funds are available to cover them.

20   Q.    Did you have a concern that there was

21          check kiting going on with regard to the

22          Kingsdale account?

23   A.    There was a concern.

24   Q.    When did you have that initial concern?

Page 54

1    A.   The first time I saw that first memo.

2    Q.   You're talking about in October of 2003?

3    A.   I'm sorry.  Yes.  Not the first report

4         from -- I apologize.  The report that Mr.

5         Tenaglia ran in response to my inquiry

6         about activity.  When we saw the activity,

7         we were concerned about the potential for

8         check kiting and that concern never fully

9         went away, but it actually became less of

10        a concern as we had more information.

11   Q.   What more information did you have to give

12        you less of a concern?

13   A.   There were several things.  There was first,

14        in my mind at least, the fact that the

15        customer was communicating with us.  I

16        guess I was under the assumption that if

17        there was check kiting or some other type

18        of malfeasance, that once a light is shined

19        on it from outside, that the people would --

20        the wrongdoing would become apparent and

21        the people would say "you got me."

22   Q.   Okay.  So...

23   A.   So we had -- that's why I said earlier that

24        ·I had actually been relieved to a certain

1        degree when I heard that Mr. Miller was

2        involved and was aware of the processing of

3        these transactions.  He was an individual

4        that I was acquainted with and familiar

5        with and I didn't have a concern, I guess,

6        at that point in time about his ethics.  So

7        that was one thing. To my mind, at least,

8        the fluctuating pattern of the transactions

9        didn't seem to fit what I thought would be

10       a check kiting scenario.

11           I was also, unfortunately, not aware

12       that there were transactions taking place on

13       a daily basis, that it was my understanding

14       that there were transactions taking place

15       four days out of five.

16  Q.  So you weren't aware that these transactions

17      were taking place on a daily basis?

18  A.  Each and every day, no.

19  Q.  And if you had known that, would that have

20      changed your opinion?

21  A.  I don't know that that one piece of

22      information would have changed my opinion

23      other than the explanation of the business

24      purpose of the transactions, though I

1       couldn't fully comprehend them, seemed

2       feasible at least.

3    Q.  What fluctuating patterns gave you reason

4       to believe that it was not a check kite?

5    A.  They were going up by a million dollars or

6       more one day and then back down the next.

7       I guess I was -- what I had in my mind is

8       a continuing spiral of ever-increasing

9       transactions.

10   Q.  So what kind of fluctuation would give you

11      reason to think it is a check kite?

12   A.  That there were continual daily transactions

13      that were going, continuing to escalate in

14      value, go up in the amount.

15   Q.  On a daily basis?

16   A.  Or thereabouts, I guess.

17   Q.  Since there wasn't an increase in

18      fluctuation, you didn't think then it was

19      a check kite?

20   A.  Well, there was an increase in fluctuation,

21      but there was a fluctuation between getting

22      higher and getting, and then going down

23      on a daily basis.  But the low balance and

24      the high balance were, if you go back and

1       look at the history, did go up.

2   Q.  In March of 2004, did you have a concern

3       that there was a crime being committed by

4       Kingsdale?

5   A.  I had a concern.

6   Q.  What was that concern?

7   A.  That there was a crime being committed.

8   Q.  Did you communicate that concern to anyone

9       at the bank?

10  A.  Only to the extent that we were baffled by

11      this and that, as I thought about it, that

12      there were things that didn't add up and

13      there were things that did add up, but

14      there were things that made sense and

15      there were things that caused question and

16      concern.

17              I came down on the side that there

18      was more information available that seemed

19      to indicate that this was legitimate, but I

20      can't tell you that I put out of my mind

21      the potential that there was going to be

22      some problem.

23  Q.  Did you try to put together some information

24      with.respect to your suspicions that a

1    Q.   Let me show you what we previously marked

2         as CSB 5.  Let me specifically refer you

3         to the May 17, 2004 e-mail that's at the

4         bottom.  Do you recall receiving that e-mail

5         from Mr. Tenaglia?

6    A.   Yes.

7    Q.   When you received the e-mail, what, if

8         anything, did you do?

9    A.   I don't recall that I did anything specific

10        out of the ordinary in response to the memo.

11   Q.   The next e-mail went from Mr. Gill to Mr.

12        Tenaglia to which you're copied.  Do you

13        recall receiving that?

14   A.   Yes, I do.  I'm sorry.

15   Q.   Did you agree with Mr. Gill's statement in

16        the first sentence?

17   A.   I did not agree with that.

18   Q.   So you did not agree that this was kiting?

19   A.   Correct.

20   Q.   And why did you disagree with that?

21   A.   Because I was unsure as to whether it was

22        or not.  Several other of the things that

23        we spoke about was the fact that, or in my

24        mind, at least, and I think I spoke about

1      this with Mr. Tenaglia, was that even though

2      we did not like what the customer was doing

3      and that we wished that it would end at

4      the earliest possible opportunity, that

5      technically they were operating within the

6      guidelines of how the account was structured.

7   Q.  Did you communicate to Mr. Gill that you

8      did not agree that this was kiting?

9   A.  Mr. Gill came in and spoke with me to express

10      his concerns.

11   Q.  When was that?

12   A.  It has to be shortly after this, around the

13      same time of this memo.

14   Q.  What did Mr. Gill say to you and what did

15      you say to him?

16   A.  He was -- he expressed, I think, the concern

17      that you see in here and that regarding the

18      activity in the account, and I believe it

19      was his opinion that we should end activity

20      at the earliest possible opportunity.

21   Q.  What did you say?

22   A.  He spoke -- he described some of the activity

23      in the account in a way that, as I understood

24      him at least, that checks were being

1          presented -- no, let me rephrase that.

2          Checks were waiting to be paid for deposits

3          to arrive to cover them.

4                    By example, I think the cut-off

5          time typically was around eleven o'clock or

6          so in the morning, that if your check had

7          come in and there was insufficient or

8          uncollected funds, then that decision was

9          made at eleven o'clock that you had until

10         that period of time, if you will, to come

11         in and bring the account balance to the

12         appropriate level.  I understood him to be

13         saying that the deposits were coming in after

14         that cut-off date, which I believed to have

15         been erroneous information, so I disagreed

16         with him on that count.  I didn't believe

17         that he had his facts fully correct.

18    Q.   Anything else discussed in this conversation

19         with Mr. Gill?

20    A.   No, not that I can recall specifically.

21         I know that I took his concern and asked

22         Mr. Tenaglia about the situation to make

23         sure that that wasn't the case, that those

24         facts were, as I understood Mr. Gill to be

Page 63

1      telling me, were not correct, and I believe

2      that he did indeed verify that.  And my

3      understanding is that the deposits were

4      being made prior to the time, that cut-off

5      time, and because the accounts were for

6      businesses, allowed to clear or to take and

7      withdraw funds, immediate availability I

8      guess is the proper term, that technically

9      that was okay.  Not that we liked it or not

10     that we wanted it to continue, but that was

11     another reason why I thought we had to

12     proceed carefully.

13  Q.  So you're aware based upon confirmation

14     from Mr. Tenaglia that in this middle of

15     May 2004 time frame, Kingsdale was writing

16     checks to Gitto Global and the amount of

17     those checks were being covered by deposits

18.    of checks written by Gitto Global to

19     Kingsdale, right?

20  A.  I believe that's correct.  I would agree

21     with that statement.

22  Q.  And since the amount of checks written was

23     being covered by the amount of the deposits,

24     you didn't consider that to be check kiting?

Page 64

1    A.  Correct.

2    Q.  And then so in the May 18th e-mail from

3        Mr. Tenaglia to Mr. Gill, where it says, "if

4        all of management is in agreement, we must

5        terminate," all of management wasn't in

6        agreement and so the account was left open;

7        is that right?

8    A.  That's what I infer from that.

9    Q.  And management being you and anyone else who

10       allowed the account to be open?

11   A.  I'm not sure I can answer that because that

12       e-mail wasn't addressed to me.

13   Q.  I understand that.  But the decision to keep

14       the account open, was that your decision?

15   A.  I agreed -- I supported the strategy.  I

16       agreed with the strategy to keep it open

17       pending the closing of the transaction.

18   Q.  Was anybody else in agreement with you to

19       handle it in that manner in management?

20   A.  Mr. Tenaglia.

21   Q.  Anyone else?

22   A.  Mr. Tenaglia was really the single person

23       that I had discussions with about it until

24       June.

1    I did not -- my recollection is that I didn't

2    feel comfortable making that decision.

3  Q.  Do you know who participated in this

4    telephone call besides the chairman?

5  A.  My understanding was that it was just a

6    two-person conversation.

7  Q.  Do you know whether there was a conference

8    call with the chairman, Michael Tenaglia,

9    Bob Seder, Bob Farragher, Paul Cherrabini,

10    Mr. Miller and two folks from VitroTech,

11    Alex Kabatoff and Walter Carlson?

12  A.  I do.

13  Q.  Is that the same phone call or a different

14    one?

15  A.  That's a different one.

16  Q.  Do you know when that phone call took place,

17    the one I'm describing with all these

18    participants?

19  A.  Shortly before July 15th.  I don't recall

20    the exact date.

21  Q.  Was it before or after the phone call

22    between Mr. Miller and Mr. Davis?

23  A.  It was before.

24  Q.  And how were you aware of this initial

1       conference call before July 15th?

2   A.  It was scheduled and coordinated by, I

3       don't know if it was Mr. Tenaglia or Mr.

4       Paulhus.  I don't think Mr. Paulhus was

5       present, so...

6   Q.  Do you know what was discussed in this

7       conference call?

8   A.  Well, I can provide you with my best

9       recollection as to that there were

10      discussions first and foremost, I guess,

11      about VitroTech's interest in purchasing

12      the company, meaning Gitto Global.

13              My recollection is Mr. Carlson,

14      who was in California, I believe, did the

15      majority of the speaking on behalf of

16      VitroTech.  Mr. Kabatoff, I believe that

17      is correct, that it was Mr. Kabatoff was

18      with Mr. Miller, wherever they were taking

19      the call.  I recall Mr. Carlson reiterating

20      that VitroTech was indeed still interested

21      in purchasing Gitto Global and that I

22      remember a comment about how much they have

23      invested in the proposed transaction.  I

24      think they even went so far as to say that

1    they had invested I'm going to say 90 days --

2    I may be wrong, but up to 90 days plus of

3    Mr. Kabatoff's time to be the senior

4    executive to be on site at Gitto Global to

5    help facilitate a consummation of the

6    transaction.

7            There was a discussion regarding

8    whether VitroTech would put up additional

9    collateral to support lending agreements

10   with Clinton Savings Bank, and I recall that

11   there was some confusion on that, that the

12   understanding at the Clinton Savings Bank

13   was that they were not positive but -- that

14   it was not positive as far as providing

15   additional support.

16           I recall later that Mr. Miller

17   either by fax and/or by telephone called

18   to Mr. Tenaglia, I think, tried to correct

19   that, saying that they would indeed put

20   up some of their stock as collateral and

21   ultimately that came about.  I can't remember

22   exactly when that happened.

23   Q.  Now, this conference call we're talking

24       about, where you were on the call?

Page 86

1   A.   I was present at the call, Mr. Davis, Mr.

2        Farragher, Mr. Cherrabini, Mr. Tenaglia.  I

3        don't believe Mr. Paulhus was there.  I

4        may be incorrect.  And then the only other

5        people I recall is Mr. Kabatoff.  I'm not

6        even sure he spoke.  Mr. Miller and Mr.

7        Carlson.

8   Q.   What, if anything, did Mr. Miller say during

9        this conference call?

10  A.   I'm sure he mentioned something regarding

11       the stock and pledging the stock, but I

12       don't have a specific recollection.

13  Q.   What, if anything, did you say during the

14       conference call?

15  A.   I don't recall that I had any specific

16       input.  I pretty much listened.

17  Q.   Do you recall anybody speaking on behalf

18       of the bank?

19  A.   I'm sure there was, but -- well, I think

20       my sense is that probably counsel spoke for

21       the bank, did most of the communication on

22       behalf of the bank and we were listening.

23  Q.   What did Mr. -- Mr. Seder we're talking

24       about?

Page 87

1    A.    Correct.

2    Q.    What did Mr. Seder say?

3          THE WITNESS:  Can I say what Mr.

4          Seder said?

5          MR. McGEE:  Yes, you may, in this

6          conversation.

7    A.    If I can remember what he was saying.  I'm

8          assuming.  I don't have a specific

9          recollection, but I'm sure he expressed

10         our concern so that it was clear to Mr.

11         Carlson and Mr. Kabatoff that we were not

12         comfortable with our relationship with

13         Gitto Global.

14   Q.    Were there some action items that were to

15         take place as a result of this phone call?

16         How was the call concluded?

17   A.    I don't recall that there were any specific

18         action items that came out of the call.

19   Q.    You said --

20   A.    I think it was more to gain a sense of

21         confidence or that VitroTech was there and

22         continued to be there and was still a very

23         interested and active party in a potential

24         sale transaction.

1      conversation all took place on the 15th of

2      July?

3   A.  The ones I'm referring to now, yes, late in

4      the afternoon on the 15th of July.

5   Q.  And they all had the concern as to whether

6      to extend the agreement for another period

7      of time?

8   A.  And even more specifically, whether the

9      bank should return the checks to the Federal

10     Reserve that day.

11  Q.  And ultimately a decision was made not to

12     return the checks and to extend the credit

13     agreement for another month?

14  A.  Ultimately there was a decision not to

15     return the checks based on a call that

16     Mr. Tenaglia, I believe, received from

17     Mr. Seder, who had received a call from --

18     am I okay here?

19          MR. McGEE:  I'm going to object

20     to you testifying about anything that was

21     said in that telephone call.

22  Q.  Well, what did Mr. Tenaglia tell you?

23  A.  He brought the news that Mr. Charles Gitto

24     would be willing to put his personal

1         residence up for collateral, as additional

2         collateral.

3    Q.   Anything else Mr. Tenaglia told you?

4    A.   I think that that was the -- I think that

5         was the essence of the most important

6         communication that took place, and that was

7         the catalyst for the final decision not to

8         send the checks back on that day.

9              There was also -- he also brought,

10        I guess, the news that there was verbal

11        agreement that the parties would agree to

12        several other stipulations that we had

13        requested, such as, I believe, that at

14        this negotiation we were seeking cash

15        collateral from Mr. Gary Gitto and Mr.

16        Frank Miller and that they had agreed to

17        provide I believe it was cash collateral

18        in the amount of $500,000 each within a

19        certain number of days after the 15th upon

20        execution of a new extension agreement.

21   Q.   And Mr. Tenaglia is negotiating this

22        additional collateral on behalf of the

23        bank?

24   A.   No.  This would have been information --

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -

LaSALLE BUSINESS CREDIT, LLC, f/k/a

LaSALLE BUSINESS CREDIT, INC.,

                    Plaintiff,


    v.                          Civil Action

                                No.   04-2227-DPW

GARY C. GITTO, ET AL,

                    Defendants.

- - - - - - - - - - - - - - - - -   VOLUME I

                                PAGES 1-106

        DEPOSITION of MICHAEL TENAGLIA, a

witness called by counsel for the Plaintiff,

taken pursuant to Rule 30 of the Massachusetts

Rules of Civil Procedure before Lorraine S.

Foley, Registered Professional Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Offices of Craig and

Macauley, 600 Atlantic Avenue, Boston,

Massachusetts, on December 1, 2004, commencing

at 10:01 a.m.

Page 2

1  A P P E A R A N C E S :

2

3  SCHWARTZ, COOPER, GREENBERG & KRAUSS

4     Eric (Rick) S. Rein, Esquire

5     180 North LaSalle Street, Suite 2700

6     Chicago, Illinois 60601

7     rrein@scgk.com

8     On Behalf of the Plaintiff

9

10  STERN, SHAPIRO, WEISSBERG & GARIN, LLP

11     Max D. Stern, Esquire

12     90 Canal Street

13     Boston, Massachusetts  02114

14     mdstern&sswg.com

15     On Behalf of Gary Gitto

16

17  DONOGHUE BARRETT & SINGAL

18     Carl Fumarola, Esquire

19     One Beacon Street, Suite 1320

20     Boston, Massachusetts  02108-3113

21     cfumarola@dbslawfirm.com

22     On Behalf of Kathleen Carland

23

24

Page 3

1  PERKINS SMITH & COHEN

2     Juliane Balliro, Esquire

3     One Beacon Street

4     Boston, Massachusetts  02108

5     jballiro@pscboston.com

6     On Behalf of Charles Gitto and Tradex Corp.

7

8  SEDER & CHANDLER

9     Darragh K. Kasakoff, Esquire

10     339 Main Street

11     Worcester, Massachusetts  01608

12     On Behalf of the Deponent

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1                 I N D E X

2  Deposition of:  Direct Cross Redirect Recross

3  MICHAEL TENAGLIA

4  BY MR. REIN:      7

5  BY MR. STERN          76

6                 101

7  BY MS. BALLIRO        80

8

9

10

11            E X H I B I T S

12  No.                        Page

13

14   1  Document of 2/12/01            7

15   2  Email of 4/18/02             7

16   3  Email of 3/11/04             7

17   4  Email of 5/3/04              7

18   5  Email of 5/18/04             7

19   6  Email of 5/19/04             7

20   7  Letter of 6/25/04            7

21   8  Letter of 6/25/04            7

22   9  Email of 7/14/04             7

23  10  Document of 7/23/04            7

24  11  Loan Presentation Sheet 8/9/04     7

Page 5

1  12  Loan Presentation Sheet 8/16/04    7

2  13  Revolving Credit Note of 7/23/04    7

3  14  Letter of 7/23/04             7

4  15  Letter of 8/18/04             7

5  16  Pledge Agreement             7

6  17  Security Agreement of 7/23/04      7

7  18  Guaranty                   7

8  19  Guaranty                   7

9  20  Security Agreement of 6/16/04      7

10  21  Guaranty                   7

11  22  Pledge Agreement             7

12  23  Copy of Check No. 121 for $500,000   7

13  24  Copy of Receipt              7

14  25  Limited Non-Recourse Guaranty      7

15  26  Pledge Agreement             7

16  27  Document                   7

17  28  Document                   7

18  29  Document                   7

19  30  Amended & Restated Guaranty       7

20  31  Landlord's Consent            7

21  32  Limited Non-Recourse Guaranty      7

22  33  Amended & Restated Guaranty       7

23  34  Receipt                    7

24  35  Security Agreement

Page 6

| | | |
|---|---|---|
| 1 | 36 Pledge Agreement | 7 |
| 2 | 37 Stock Certificate | 7 |
| 3 | 38 Escrow Agreement of 7/23/04 | 7 |
| 4 | 39 Letter of 9/20/04 | 7 |
| 5 | 40 Letter of 9/20/04 | 7 |
| 6 | 41 Letter of 9/20/04 | 7 |
| 7 | 42 Letter of 9/20/04 | 7 |
| 8 | 43 Document | 7 |
| 9 | 44 Letter of 8/3/04 | 7 |
| 10 | 45 Letter of 8/4/04 | 7 |
| 11 | 46 Letter of 8//9/04 | 7 |
| 12 | 47 Letter of 8/16/04 | 7 |
| 13 | 48 Letter of 8/20/04 | 7 |
| 14 | 49 Letter of 8/20/04 | 7 |
| 15 | 50 Letter of 8/27/04 | 7 |
| 16 | 51 Letter of 9/1/04 | 7 |
| 17 | 52 Letter of 9/7/04 | 7 |
| 18 | 53 Letter of 9/7/04 | 7 |
| 19 | 54 Letter of 9/10/04 | 7 |
| 20 | 55 Letter of 9/10/04 | 7 |
| 21 | 56 Letter of 9/17/04 | 7 |
| 22 | | |
| 23 | | |
| 24 | | |

Page 7

1 　　　　　P R O C E E D I N G S
2 　　　(Exhibit No. 1 through 56 marked for
3 identification.)
4 　　　MR. REIN: We'll be reserving all
5 objections except as to form, and I assume
6 you're going to want to read and sign the
7 transcript.
8 　　　MR. KASAKOFF: Reading and signing are
9 not waived.
10 　　　MS. BALLIRO: Right. And are you
11 ordered ordering this expedited?
12 　　　MR. REIN: I don't know.　We'll
13 figure that out at the end.
14 　　　MS. BALLIRO: All right. So if you
15 get --
16 　　　MR. REIN: Off the record.
17 　　　(Discussion off the record.)
18
19 　　　MICHAEL TENAGLIA,
20
21 a witness called for examination by counsel for
22 the Plaintiff, being first duly sworn, was
23 examined and testified as follows:
24

Page 8

1 　　　　　DIRECT EXAMINATION
2 BY MR. REIN:
3 Q. Could you please state your name?
4 A. Michael D. Tenaglia.
5 Q. And spell your last name.
6 A. T E N A G L I A.
7 　　　MR. KASAKOFF: You're going to have to
8 speak up just a little.
9 Q. Mr. Tenaglia, what is your home address?
10 A. 15 Olcott, O L C O T T, Street, Watertown,
11 Massachusetts.
12 Q. You're currently employed by Clinton Savings
13 Bank?
14 A. That is correct.
15 Q. In what capacity?
16 A. Senior vice president.
17 Q. How long have you held that position?
18 A. As senior vice president, approximately six
19 years.
20 Q. When did you join Clinton?
21 A. In December of 1994.
22 Q. When you joined Clinton Savings Bank in
23 December of '94, what was your position?
24 A. Assistant vice president branch administrator.

Page 9

1 Q. And the positions that you've held between
2 assistant vice president and senior vice
3 president were what?
4 A. Vice president.
5 Q. You don't have first vice president, and so on?
6 A. No.
7 Q. How many years have you worked in the banking
8 industry?
9 A. Approximately 34 years, approximately 34 years.
10 　　　MS. BALLIRO: I'm sorry. Did you say
11 "30 to 40" or "34"?
12 　　　THE WITNESS: 34, approximately 34.
13 Q. So ten years at Clinton and 24 years at other
14 financial institutions?
15 A. That's correct.
16 　　　(Attorney Stern entered the room.)
17 　　　MS. BALLIRO: Off the record for one
18 minute.
19 　　　(Discussion off the record.)
20 Q. Can you just identify for me the banks -- the
21 other banks that you've worked for for the
22 other 24 years?
23 A. Previous to Clinton Savings Bank, I was with
24 the Salem Five Cent Savings Bank. Previous to

Page 10

1   that I was at First Mutual of Boston.
2   Q. You're familiar with a company by the name of
3      Kingsdale Corporation?
4   A. Yes.
5   Q. When did you first learn of that company?
6   A. It came to my attention in 2002.
7   Q. And why did it come to your attention?
8   A. Because the operations manager at the time
9      informed me that there were several checks that
10     had been returned to us for insufficient funds
11     from that company.
12  Q. Who was the operations manager?
13  A. Bobbi-Jo Parker at the time. She is currently
14     Bobbi-Jo Williams.
15  Q. And why did she come to you?
16  A. She reports to me.
17  Q. After she reported to you about these checks
18     that had been returned NSF, what if anything
19     did you do?
20  A. I was informed. I did not take any action
21     because it was being handled by Bobbi-Jo and
22     another officer of the bank.
23  Q. Who was that other officer?
24  A. Joseph Guercio.

Page 11

1   Q. How do you spell that last name?
2   A. G U E R C I O.
3   Q. And did the matter get handled?
4   A. Yes.
5   Q. Do you know how?
6   A. There was a meeting with Frank Miller, and
7      based on the evidence that they had, if you
8      will, they decided -- because of the
9      transactions that were taking place, the
10     returned checks for insufficient funds, they
11     decided to start floating checks until such
12     time as we were more comfortable with the
13     account.
14  Q. What do you mean, "floating checks"?
15  A. The bank had a policy of allowing businesses to
16     draw against uncollected funds, which was also
17     being provided to Kingsdale and Frank Miller.
18     But because of the returned checks, it was
19     decided that we would place a hold on check
20     deposits, for any check deposits that we
21     accepted.
22  Q. Is there a limit in terms of a business being
23     able to draw on uncollected funds?
24  A. No, there is not.

Page 12

1   Q. So could a check be for a million dollars and
2      be able to draw on the uncollected funds?
3   A. Yes.
4   Q. This meeting with Miller, do you know who was
5      there?
6   A. Bobbi-Jo Williams and Joseph Guercio.
7   Q. And how do you know about this meeting?
8   A. Bobbi-Jo informed me.
9   Q. Okay. And what did she tell you about the
10     meetings?
11  A. Just that the -- they met. Frank Miller
12     related the fact that he was having problems
13     with his bank in Texas, that that was the
14     reason why it was occurring, that the bank in
15     Texas could not handle his needs and that he
16     was looking for another bank.
17  Q. And what did that have to do with NSF checks?
18  A. Well, because of the way -- my understanding
19     was, the way that he was doing his
20     transactions, the bank could not accommodate
21     him. I'm not sure of anything else at that
22     time.
23  Q. Anything else that you were told by Bobbi-Jo
24     about the meeting with Miller?

Page 13

1   A. Only that they decided to, again, float checks
2      and to review the account.
3   Q. And do you know how long the review of the
4      account continued?
5   A. For six months.
6   Q. So for the six-month period there would be no
7      draw on the uncollected funds?
8   A. That's correct.
9   Q. And did that change after six months?
10  A. Yes.
11  Q. Do you know why?
12  A. Based on the activity that took place during
13     the six-month period, based on discussions that
14     they had with Frank Miller, they felt
15     comfortable that he could, again, have the
16     opportunity to draw on uncollected funds like
17     other business accounts that we had.
18  Q. What was the activity that you felt comfortable
19     with that allowed them to now draw on
20     uncollected funds?
21  A. The activity was that he continued to make
22     deposits and withdrawals, but there was a time
23     lag between the deposit and the withdrawal
24     allowing the checks to clear.

Page 18

1  Q. Pardon?
2  A. No, I have not.
3  Q. Did you ever have any communications with
4     Mr. Tersigni with respect to Kingsdale Corp.?
5  A. I have not.
6  Q. The only person that you had any communication
7     with was Mr. Miller?
8  A. That's correct.
9  Q. Now, the J & J Chemical checks that were either
10    being held until funds cleared during the
11    six-month period or prior to that and after
12    that, they could draw on uncollected funds, do
13    you know who was signing those checks?
14       MR. KASAKOFF: When?
15 Q. Do you know who was signing the J & J checks on
16    the opening of the account?
17 A. I believe it to be Frank Miller.
18 Q. What do you base your belief on?
19 A. It was a very casual review of the checks. I
20    did not look at the checks constantly or with
21    any -- so I believe it to be Frank Miller.
22 Q. Okay. Let me show you what's been marked as
23    CSB two. That's an e-mail from Bobbi-Jo
24    Williams, Bobbi-Jo Parker, same person?

Page 19

1  A. Yes.
2  Q. April 18th, 2002, is this the time frame when
3     you were informed about the NSF checks?
4  A. Yes.
5  Q. Were you informed by e-mail or in person?
6  A. In person, verbally.
7  Q. Did you ever see this e-mail?
8  A. Yes, I have.
9  Q. You saw it before today?
10 A. Yes.
11 Q. You saw it on or about the time it was created?
12 A. No.
13 Q. When did you first see it?
14 A. During some of the review of the documentation,
15    very recently.
16 Q. Were you aware of the e-mail before you had
17    reviewed it?
18 A. Verbally.
19 Q. Bobbi-Jo had told you she had sent an e-mail
20    out?
21 A. Yes.
22 Q. Bob Paulhus -- and I think I'm pronouncing his
23    name correctly.
24 A. Paulhus.

Page 20

1  Q. Paulhus. What is his position?
2  A. He's vice president of commercial lending.
3  Q. Do you know why he was being sent this e-mail?
4  A. Because it was a business account and we
5     thought that he might have some knowledge of
6     the business.
7  Q. David Harmon, what is his position?
8  A. Commercial loan officer.
9  Q. Why was he getting this e-mail?
10 A. Again, for the same reason.
11 Q. And Janet Scott, what's her position?
12 A. Business development coordinator.
13 Q. And was she getting it because she had opened
14    up the account?
15 A. And also because she may have an understanding
16    of the business.
17 Q. Okay. So when was the next occasion, then,
18    that you had any involvement with Kingsdale
19    Corp. after, I think we're talking about,
20    November of 2002?
21 A. It was late October of 2003.
22 Q. What were the circumstances, then, in late
23    October of 2003 that you had some involvement?
24 A. I was reviewing bank deposits, the fluctuations

Page 21

1     of bank deposits, trying to understand why the
2     fluctuations were occurring.
3  Q. Explain to me what you mean by you were
4     reviewing fluctuations in bank deposits.
5  A. We were just simply trying to determine if
6     there were customers that were leaving the
7     bank, deposits that were being made. We
8     weren't attracting business, if they were
9     leaving the bank, what was the reason for that,
10    just as a business standpoint to review what
11    the activities were overall in the bank as far
12    as the deposit collection process.
13 Q. So what was it that you were reviewing
14    specifically?
15 A. A report that gave -- told me what the
16    activities were on a daily basis on deposits
17    and withdrawals.
18 Q. Is this called something like a daily activity
19    report?
20 A. Yes.
21 Q. And what was it upon your review of the daily
22    activity report that brought to your attention
23    Kingsdale Corp.?
24 A. I just saw a large deposit and then a series of

Page 22

1    checks being withdrawn on the same day.
2    Q. Do you recall how large the deposit was?
3    A. I believe it to be in the two to two and a half
4    million dollar range.
5    Q. Was this substantial?
6    A. Yes.
7    Q. So the credit would be extending credit, if you
8    will, for two, two and a half million dollars
9    that day based on uncollected funds?
10   A. That's correct.
11   Q. At the time that you were reviewing, in late
12   October of 2003, the daily activity report,
13   this two, two and a half million dollars, what
14   did that represent with regard to the activity
15   of other customers at the bank? Could you
16   place it in a percentage basis?
17        MS. BALLIRO: I object to the form.
18        MR. KASAKOFF: Do you understand the
19   question?
20        THE WITNESS: I understand the
21   question.
22   A. I'm not sure that I can provide you with a
23   percentage. I do not recall what that was.
24   Q. When you reviewed the report, did that disclose

Page 23

1    on a daily basis what the bank is extending on
2    uncollected funds in total?
3    A. No.
4    Q. So when you saw this two, two and a half
5    million dollars in deposits, what if anything
6    did you do?
7    A. I informed the president of the bank.
8    Q. And who was that?
9    A. Stephen Cash.
10   Q. And what did you tell Mr. Cash?
11   A. That I was seeing a large activity in the name
12   of Kingsdale Corp. and that we expressed a
13   concern that it was a high amount on a daily
14   basis.
15   Q. What, if anything, happened next?
16   A. We had a very brief conversation. He was also
17   aware of the review that took place in the
18   spring of 2002. We agreed that we would try to
19   contact Mr. Miller to have a discussion to see
20   what was going on.
21   Q. And was Mr. Miller contacted?
22   A. Yes.
23   Q. By whom?
24   A. Bobbi-Jo Parker.

Page 24

1    Q. Was this in a telephone conversation or a
2    face-to-face meeting with Mr. Miller?
3    A. Telephone conversation.
4    Q. Do you know what Mr. Miller and Ms. Parker
5    discussed?
6    A. At that time the discussion was to ask him to
7    come in and meet with us.
8    Q. Did he come in?
9    A. He did.
10   Q. With whom did he meet?
11   A. He met with me, Bobbi-Jo Parker and
12   Bob Paulhus.
13   Q. This is, again, late October of 2003?
14   A. No. The meeting actually took place -- I don't
15   have the exact date. I would say approximately
16   December 1st.
17   Q. Could you tell me what was discussed at this
18   meeting with Mr. Miller?
19        MS. BALLIRO: This is '02? I'm sorry.
20        MR. REIN: '03.
21        THE WITNESS: '03.
22   A. We reviewed the activity with him. We thought
23   that it was unusual. We thought that it was
24   larger. For a bank of our size, it was too

Page 25

1    large of a transaction. We asked him to
2    explain the nature of the activity.
3    Q. What if anything did Mr. Miller say?
4    A. He informed us that they were very busy, that
5    the accounts had been set up and the nature of
6    the activity and the funds that had to go
7    between Kingsdale and Gitto Global were the
8    result of licensing on a competitive issue.
9    And I don't know the exact circumstances, but
10   something in line of one company was licensed
11   to purchase certain raw materials and another
12   company was licensed to process and to add
13   compounds to that raw material and that the
14   funds had to go between the two companies for
15   competitive and licensing reasons.
16   Q. Was there any discussion as to who was involved
17   in Kingsdale Corp.?
18   A. Not at that time.
19   Q. Okay. What else, if anything, was discussed at
20   this December 1 -- approximately December 1,
21   2003 meeting?
22   A. We expressed a concern because of the activity.
23   We asked that it be stopped, and he informed us
24   that he was in the process of selling the

Page 26

1   company and he wanted us to wait until the
2   company was sold.
3   Q. What was the size of the activity that you were
4     discussing at or around December 1?
5   A. It fluctuated anywhere between two, three
6     million dollars, sometimes above, sometimes
7     below.
8   Q. Anything else that you recall was discussed at
9     this meeting?
10  A. He informed us that the buyer was Vitrotech,
11    from California. He informed us that the
12    reason for the delay in the meeting was because
13    he had been in California trying to negotiate
14    the sale of the company and he told us the sale
15    of the company was expected to take place in
16    January of 2004.
17  Q. Okay. Anything else that anyone from Clinton
18    said with respect to Mr. Miller's statement?
19  A. Not to my recollection.
20  Q. Anything else that you recall that was
21    discussed?
22  A. No.
23  Q. What if anything happened next after this
24    meeting in connection with your involvement?

Page 27

1   A. I had telephone conversations with Mr. Miller
2     with regard to the sale and as to the timing
3     and whether or not it was going to happen
4     within the estimated time frame.
5   Q. Can you give me a time frame when these
6     conversations took place?
7   A. December, January, February.
8   Q. Do you know how many conversations you had with
9     him?
10  A. I do not.
11  Q. Would you call him or would he call you?
12  A. Both.
13  Q. Would you initiate the call and then he would
14    call you back, or would he call you
15    uninitiated?
16  A. Typically he responded to my calls.
17  Q. And what do you recall you discussed in this
18    December, January, early, let's say, 2004 time
19    period on the telephone with Mr. Miller?
20  A. The level of activity and the prospective sale
21    to Vitrotech.
22  Q. Had the level of activity changed during this
23    time period?
24  A. Slight increases, but not a great amount.

Page 28

1   Q. Were you monitoring the activity?
2   A. Not everyday.
3   Q. How often would you look at the activity?
4   A. Perhaps weekly.
5   Q. Was anybody else monitoring the activity at
6     Clinton?
7   A. Bobbi-Jo Parker.
8   Q. What would she do to monitor the activity?
9   A. Just look at the daily report.
10  Q. And you would get this report on a weekly basis
11    and review it?
12  A. We didn't set up a specific time frame. I
13    would ask for it periodically to look at what
14    was going on, had things changed, things of
15    that nature.
16  Q. Okay. What else did you discuss with
17    Mr. Miller besides the daily activity?
18  A. The sale to Vitrotech.
19  Q. What if anything was he telling you?
20  A. That it was being delayed because Vitrotech had
21    gone public at the time, that now he would have
22    to undergo more audits. The SEC was involved.
23    I recall that he told me at the current year's
24    activity, financials, they would have to,

Page 29

1   because it is a public company, they would have
2   to look at three years' activity, which caused
3   delays in the audit and the due diligence that
4   Vitrotech was doing.
5   Q. Okay. Anything else that you recall you were
6     discussing with him in these telephone
7     conversations?
8   A. I asked him to decrease the activity or to
9     increase the balance that he was maintaining in
10    the account.
11  Q. What did Mr. Miller say in response, if
12    anything?
13  A. That he would do what he could.
14  Q. And was that done?
15  A. No.
16  Q. Did you have any conversations that you weren't
17    doing what I was asking?
18  A. Yes.
19  Q. What did Mr. Miller say?
20  A. That he had been very busy, that he was very
21    involved in the audits, that he was trying to
22    tell his staff to do, what they could to
23    decrease it.
24  Q. Let me show you CSB 3. This is an e-mail from

8 (Pages 26 to 29)

Page 30

1   you dated March 11, 2004. Do you recognize
2   this e-mail?
3   A. Yes.
4   Q. What prompted you to send it to Mr. Cash?
5   A. I was trying to keep him aware of my
6      conversations. Sometimes I would do it
7      verbally. Sometimes I would do it by e-mail
8      if the time of day was not conducive to a
9      face-to-face meeting.
10  Q. As of, let's say, March 11, 2004, did you think
11     that this was a significant concern for the
12     bank at that time?
13  A. I felt it was a concern because of the level of
14     the dollars that were going through the
15     account.
16  Q. Now, this e-mail says you just had a
17     conversation with Mr. Miller regarding the
18     activity in his account. "The activity,"
19     meaning the exposure of the uncollected funds
20     in the account and the drawing of the checks?
21  A. The drawing of the checks. At that time I was
22     not as keenly discussing uncollected funds at
23     that time. It was just the velocity of the
24     dollars going in and out of the account.

Page 31

1   Q. What was that velocity? Is this on a daily
2      basis?
3   A. Yes.
4   Q. What was the velocity?
5   A. As I said, we were getting deposits in the
6      various amounts and checks were being presented
7      against them.
8   Q. Did you take a look at the specific deposits
9      that were being made?
10  A. On occasion.
11  Q. And what did you see?
12  A. I saw that checks were being drawn on Gitto
13     Global and being deposited into the account of
14     Kingsdale.
15  Q. Did you see deposits from any other parties
16     other than Gitto Global?
17  A. Not to my recollection.
18  Q. Did you look at checks being written on the
19     account?
20  A. Yes.
21  Q. What did you see there?
22  A. That checks were going back to Gitto Global.
23  Q. Did that raise a concern with you?
24  A. Yes.

Page 32

1   Q. What was that concern?
2   A. As to why funds were coming from Gitto and
3      going back to Gitto through the Kingsdale
4      account.
5   Q. Did you do anything because of this concern?
6   A. I discussed it with Mr. Miller.
7   Q. With Mr. Miller?
8   A. Yes.
9   Q. And these are the discussion that we've been
10     talking about by telephone?
11  A. Yes.
12  Q. This e-mail says, I again asked him about the
13     size and nature of the expense. What expense
14     are you talking about?
15  A. At that time it was the volume of the deposit.
16     It was not an expense that I was talking about.
17     I think that's probably a poor choice of words.
18  Q. Okay. What did Mr. Miller say in response to
19     your question?
20  A. That the funds had to go back and forth between
21     the two companies because of licensing and
22     competitive reasons.
23  Q. Did that satisfy your question?
24  A. Yes. I believed what he told me.

Page 33

1   Q. The next paragraph says, Bobbi-Jo is in the
2      process of preparing an SAR. What's an SAR?
3             MR. KASAKOFF: We're not going to
4      answer any questions relating to that. I'm
5      instructing my client, so ...
6             MS. BALLIRO: I'm sorry. Would you
7      repeat the question?
8             MR. REIN: It says, Bobbi-Jo is in the
9      process of preparing an SAR. What's an SAR?
10            MR. KASAKOFF: And I'm telling you,
11     we're not answering any questions regarding
12     that.
13  Q. Was an SAR prepared?
14            MR. KASAKOFF: We're not going to
15     answer any questions about that.
16            MS. BALLIRO: Could we have a basis
17     for that?
18            MR. KASAKOFF: The law is the basis
19     for it. It's privileged. It cannot be
20     discussed, disclosed, dealt with. We are
21     answering no questions regarding it. When I
22     say "we," I'm instructing my client not to
23     answer any questions regarding it. I apologize
24     for the royal "we".

Page 34

1  MS. BALLIRO: Does the privilege arise
2  under the federal banking --
3  MR. KASAKOFF: There is a federal
4  statute. There are federal regulations and
5  there are federal cases.
6  Q. After March 11, 2004, what if anything did you
7  do next in relation to Kingsdale, March 11th
8  being this e-mail?
9  A. Yes. I continued to have discussions with
10  Frank Miller. We continued to review the
11  activity. We kept asking Mr. Miller to reduce
12  the activity, to have more cash, collected
13  funds, on deposit in the bank. We reviewed it
14  with our auditors. That took place between
15  March and April.
16  Q. Reviewed "it," what's "it"?
17  A. The activity, the transactions.
18  Q. All right. Let me show you CSB 4. Who is
19  Christopher Gill?
20  A. He is the senior vice president, chief
21  financial officer, treasurer.
22  Q. And Sheila --
23  A. -- Azorandia?
24  Q. Who is she?

Page 35

1  A. She's the controller.
2  Q. Did you see Exhibit 4?
3  MS. BALLIRO: When?
4  MR. REIN: I don't know.
5  MR. STERN: Since I can't see it, it
6  appears to be an e-mail from.
7  MR. REIN: It's an e-mail from
8  Azorandia to Gill.
9  A. I'm sorry. What was your question.
10  Q. Have you ever seen this e-mail before?
11  MR. STERN: And the date of that is?
12  THE WITNESS: May 3.
13  MR. REIN: May 3, 2004.
14  A. I don't recall seeing it.
15  Q. Did you have any conversations with Sheila
16  Azorandia on or around May 2004 concerning her
17  review of the Kingsdale account?
18  A. Yes.
19  Q. What if anything did you discuss with Sheila?
20  A. I'm sorry. I'm just trying to read the e-mail
21  to see if this is the area of our discussion.
22  And it was. Sheila and I discussed the nature
23  and the level of activity that was going
24  through the Kingsdale account.

Page 36

1  Q. Do you know why Sheila was looking at the
2  activity?
3  A. Because at that time the checks that were
4  clearing on the Kingsdale account was causing a
5  draw on the funds that we had at the Federal
6  Reserve.
7  THE WITNESS: May I have a glass of
8  water, if you don't mind?
9  MR. REIN: Sure.
10  THE WITNESS: My mouth is getting dry.
11  Thank you.
12  A. We discussed the level of activity. We
13  discussed the fact that around that time the
14  checks that were being presented for payment
15  was causing us to have to borrow from the
16  Federal Reserve on an overnight basis in order
17  to pay all of our checks, including Kingsdale
18  checks.
19  Q. What was the level of activity that was
20  requiring you to borrow it from the Fed?
21  A. On the Kingsdale account?
22  Q. Right.
23  A. Three and a half million, approximately.
24  Q. What did that represent in terms of a

Page 37

1  percentage of the total borrowings that were
2  needed to cover the daily activity?
3  A. I don't know. I don't have that information.
4  Q. What else did you discuss with Sheila?
5  A. That fact, and we discussed that he was drawing
6  checks on a daily basis and that he was using
7  his account according to our policy.
8  MS. BALLIRO: Was using?
9  MR. REIN: Was using.
10  THE WITNESS: Yes.
11  Q. This e-mail talks about playing games. Was
12  this something that was discussed between
13  Sheila and you?
14  A. At one time it was, yes.
15  Q. What is it that you discussed with Sheila
16  concerning playing games?
17  A. The perception of playing games was related to
18  the fact that the checks were coming from Gitto
19  Global and going back to Gitto Global.
20  Q. Are you familiar with the term "check kiting"?
21  A. Yes.
22  Q. What is your understanding of the term "check
23  kiting"?
24  A. Writing checks on one account without having a

Page 38

1    sufficient balance and making a deposit in
2    another bank to cover those checks.
3    Q. Did you think that that was what the account of
4    Kingsdale was being used to do?
5    A. No.
6    Q. Is that what you understood Sheila to mean as
7    playing games?
8    A. That was part of our discussion.
9    Q. So you discussed check kiting?
10   A. Yes.
11   Q. What did you discuss with Sheila regarding
12   check kiting?
13   A. Well, she indicated as playing games, what she
14   thought she was seeing. I related to her that
15   based on the conversations that I had had with
16   Mr. Miller and based on his explanation of the
17   need to transfer funds between the two
18   companies, that I felt that he was using our
19   policy, if you will, but that there were
20   legitimate reasons to transfer funds between
21   the two companies.
22   Q. Based upon what Mr. Miller had said to you?
23   A. That's correct.
24   Q. Now, were you aware that the deposits into the

Page 39

1    Kingsdale account were being made through ATMs?
2    A. Yes.
3    Q. Was that the way that the deposits were being
4    made on a regular basis?
5    A. On a regular basis, yes. I don't know if all
6    deposits were.
7    Q. Right. Do you know how many checks were being
8    deposited into the Kingsdale account, let's
9    say, in early 2004 on a daily basis?
10   A. Approximately 30.
11   Q. When you make a deposit through an ATM, you put
12   checks in an envelope?
13   A. Yes.
14   Q. How many checks in one envelope can there be to
15   make a deposit?
16   A. There's no set amount. It depends on the
17   thickness of the envelope.
18   Q. So you could put 30 checks in an envelope and
19   deposit it through the ATM?
20   A. Yes.
21   Q. The fact that deposits were being made in an
22   ATM, did that raise a concern with you?
23   A. No.
24   Q. Anything else that you recall you discussed

Page 40

1    with Sheila on or around early May of 2004?
2    A. No. Just what I've indicated.
3    Q. As a result of the conversation with Sheila,
4    did anything occur?
5    A. No.
6    Q. I'll show you CSB 5, which is an e-mail from
7    you to Mr. Gill dated May 18th, 2004. Do you
8    recognize this e-mail?
9    A. Yes.
10        MS. BALLIRO: When you say -- can you
11   send No. 4 down this way?
12        MR. KASAKOFF: Oh, I'm sorry. I
13   apologize.
14        MS. BALLIRO: Thanks.
15   Q. And this is a string of e-mails. Why don't we
16   start from the bottom up, because that's the
17   chronology of it. There's an e-mail dated May
18   17, 2004 sent to Mr. Gill by you. It's talking
19   about a phone conversation that you had with
20   Mr. Miller. Do you see that?
21   A. Yes.
22   Q. What did you discuss with Mr. Miller on or
23   about May 17th, 2004?
24   A. I repeated the need for the activity to stop or

Page 41

1    to increase the level of the balance that would
2    be kept at Clinton Savings Bank.
3    Q. Your e-mail says, I told him -- and I assume
4    that's Mr. Miller -- that the amount of
5    deposits is causing many problems and concerns?
6    A. Yes.
7    Q. What problems and concerns did you discuss with
8    Mr. Miller?
9    A. The situation that I described earlier with the
10   Federal Reserve account.
11   Q. Then at the bottom of that paragraph, you say,
12   The deposit will be in a different account,
13   which we would the (sic) ability to monitor and
14   have advanced knowledge if a withdrawal was
15   attempted. What are you talking about here?
16   A. We had asked Frank Miller, as I stated, to
17   maintain a sufficient balance and at that time
18   our thinking was that we would keep a deposit
19   in a different account other than the checking
20   account that he had with us where all this
21   activity was taking place. We had asked him --
22   our intent, at least our thought, was to keep
23   that reserve, if I may call it that, in a
24   separate account, something that would allow us

Page 42

1     to hold and to have as a collected balance in
2     the bank.
3 Q. So this would be a separate account of
4     Kingsdale or Mr. Miller?
5 A. Kingsdale.
6 Q. Was there a discussion as to how much money
7     would be placed in the separate account?
8 A. At that time -- with Mr. Miller?
9 Q. Right.
10 A. At that time I was asking him to increase his
11     deposit, decrease the activity so that the gap
12     between the activity and the collected balance
13     would be zero or close to zero, if I could.
14 Q. Well, this deposit in a different account that
15     you're referring to on May 17th, did you have a
16     discussion of how much you wanted deposited
17     into a separate account?
18 A. Not at that time.
19 Q. Then on May 18th you were responding to an
20     e-mail from Mr. Gill. You were referencing, I
21     had a very lengthy conversation with him -- I
22     assume Frank Miller -- last night. Do you see
23     that?
24 A. On May 18th? Oh, up at the top. I'm sorry.

Page 43

1     Yes.
2 Q. What was your very lengthy conversation with
3     Mr. Miller? What did you discuss?
4 A. Just, again, the need to stop, the need to
5     increase his deposit, the need to decrease the
6     activity so that it would be -- so that the
7     collected funds would match the activity.
8 Q. And what is it that caused this to be a very
9     lengthy conversation?
10 A. We were trying to -- we were trying to --
11     again, the discussions revolved around
12     decreasing activity. By "very lengthy," I
13     think the conversation may have taken 15
14     minutes. I don't think it took much longer
15     than that, but again, we were trying to get him
16     to make more deposits -- greater deposits into
17     the bank.
18 Q. Now, Mr. Gill says to you in an e-mail, I do
19     not see what his kiting -- let's call a spade a
20     spade -- has to do with the sale of his
21     business. Did you respond to that statement?
22 A. I did.
23 Q. Orally or in writing?
24 A. Orally.

Page 44

1 Q. To Mr. Gill?
2 A. Yes.
3 Q. Was this in a face to face or a telephone call?
4 A. I do not recall.
5 Q. What did you discuss with Mr. Gill in
6     connection with this statement?
7 A. That I didn't see it as kiting, because of the
8     nature of the transactions, because of his
9     explanation as to why funds had to go between
10     the two companies and as far as a sale of the
11     company, we would -- we were being given reason
12     to believe that it was imminent and that it
13     would be -- the activity would cease with the
14     sale of the company.
15 Q. What if anything did Mr. Gill say in response
16     to that?
17 A. I don't recall what he said.
18 Q. Anything else that you recall that you
19     discussed with Mr. Gill concerning his
20     statement to you?
21 A. No.
22 Q. I'll show you CSB 6, which is an e-mail from
23     you to Mr. Gill dated May 19, 2004. Do you
24     recognize that e-mail?

Page 45

1 A. Yes.
2 Q. Was that an e-mail sent in response to
3     Mr. Gill's statement to you about, Isn't this
4     check kiting?
5 A. Yes. I believe it is.
6 Q. Now, you say in here, If it is kiting, it's not
7     a classic case, because usually you see the
8     same amounts and usually in escalating amounts.
9     What did you mean by that?
10 A. Well, I was reacting to the fact that he
11     deposited three million dollars and withdrew
12     two and a half million, leaving half million
13     dollars behind, so I didn't see it as kiting
14     because you're trying to cover the same amounts
15     in a typical situation.
16 Q. When you reviewed the activity in the account,
17     did you see that the amount being deposited and
18     the amount being withdrawn would match?
19 A. No.
20 Q. So you saw it being differing amounts?
21 A. Yes.
22 Q. Then you make the statement, I know it still
23     smells, and I agree. What did you mean by
24     that?

Page 46

1  A. I smell it. I mean, the frequency and the
2     level of activity and funds being transferred
3     between the two companies on a daily basis.
4  Q. Let me show you CSB 7, which is a letter dated
5     June 25, 2004, from Frank Miller to you.
6  A. Yes.
7  Q. Do you recognize that letter?
8  A. Yes.
9  Q. Do you know why it was sent to you?
10  A. We asked him for a written explanation for the
11     activity.
12  Q. And when you got this letter, did you
13     understand the explanation?
14  A. Yes.
15  Q. Did you discuss the letter with anyone?
16  A. The president of the bank.
17  Q. What did you discuss with him?
18  A. We reviewed it and agreed that it was
19     consistent with his oral explanation.
20  Q. And what if anything did you do result of
21     receiving this letter?
22  A. Nothing. We didn't take any action based on
23     this letter.
24  Q. Did you do any investigation in terms of

Page 47

1     Kingsdale Corporation, let's say, as of June
2     2004?
3  A. No.
4  Q. Do you know where they were operating?
5  A. I remember the address that was on the
6     signature card, but I don't know of a ...
7  Q. Do you know if they had any employees?
8  A. No.
9  Q. Did you run a D & B?
10  A. No.
11  Q. Did you get any financial information?
12  A. No.
13  Q. Did anybody go out to the business address to
14     see if it was operating?
15  A. Kingsdale?
16  Q. Right.
17  A. No.
18  Q. So all you and others knew was what Mr. Miller
19     was telling you as of June 2004?
20  A. That's correct.
21  Q. So when he makes the statement, We sell some of
22     our compounds to J & J, who then processes this
23     additive into our compounds, you didn't know if
24     that was true or not?

Page 48

1  A. No.
2  Q. And you didn't make an investigation to see if
3     they were, in fact, processing the additive?
4  A. I did not.
5  Q. I'll show you CSB 8, which is a letter from
6     Miller to you dated June 25, 2004. Do you know
7     why this letter was sent?
8       MR. STERN: What's the date of that
9     letter?
10       MR. REIN: Same date as the prior
11     letter.
12       MR. STERN: That's CSB 8?
13       MR. REIN: Yes.
14  A. This is in response to our requests for funds
15     and to cease the activity. We were at that
16     time -- at that time I was telling him that
17     unless he did that, we would close the account,
18     so he responded by this letter.
19  Q. Do you know why two letters were sent to you on
20     the same date?
21  A. The initial letter was in response to a request
22     that I have written explanation for the
23     activity. This one was a result of a telephone
24     conversation. I don't recall the date of our

Page 49

1     telephone conversation that prompted this
2     letter.
3  Q. Was that a telephone conversation that predated
4     the letter?
5  A. Yes.
6  Q. Just between Mr. Miller and you?
7  A. Yes.
8  Q. Had there been some intimation of termination
9     of the banking relationship?
10  A. Could you repeat that?
11  Q. Sure. In your discussions with Mr. Miller, had
12     you, as Mr. Miller describes it, intimated that
13     the bank would terminate the banking
14     relationship with Kingsdale?
15  A. Yes.
16  Q. What did you tell Mr. Miller?
17  A. That we were -- that our thought at that time
18     was to close the account unless activity
19     decreased and deposits increased.
20  Q. Okay. Now, in Mr. Miller's letter to you, he
21     talks about Kingsdale and Gitto Global
22     cooperating?
23  A. Yes.
24  Q. How had Gitto Global at this point been

Page 90

1 the bank concerning whether an investigation
2 should be conducted?
3 A. No.
4 Q. Were you ever asked to obtain any documentation
5 from Mr. Miller in the form of financial
6 statements or profit and loss statements or
7 balance sheets, or anything of that nature,
8 concerning Kingsdale Corporation?
9 A. No, I was not.
10 Q. Have you ever seen any financial documentation
11 from Kingsdale Corporation?
12 A. No.
13 Q. Do you know if any financial documentation on
14 behalf of Gitto Global was ever supplied to
15 Clinton Savings Bank?
16 A. Yes.
17 Q. When was that supplied?
18 A. Approximately the spring of 2004. I don't know
19 the exact date.
20 Q. And what was the purpose of that?
21 A. Just to -- just an attempt to, on the nature of
22 the business, the length of the business, the
23 level of the business that was being conducted.
24 Q. What documentation from Gitto Global was

Page 91

1 supplied to the bank?
2 A. A financial statement. I believe June of 2003
3 was the one that we saw.
4 Q. June of 2003 was the last financial statement
5 that you saw?
6 A. That's correct.
7 Q. So the bank never requested an updated
8 financial statement in 2004 from Gitto Global?
9 A. If it was done, it was not in my presence. I
10 don't know.
11 Q. What was the bank's purpose in requesting a
12 financial statement from Gitto Global
13 Corporation back in June of 2003?
14 MR. STERN: Excuse me. When was it
15 that you said you received it?
16 THE WITNESS: Approximately the spring
17 of 2004. I don't know the exact date.
18 MR. STERN: 2004.
19 MS. BALLIRO: I see. Okay.
20 Q. What was the date on the financial statements
21 that you recall from the Gitto Global?
22 A. June 2003.
23 Q. So you received a financial statement dated
24 June 2003 in the spring of 2004; is that

Page 92

1 correct?
2 A. Yes.
3 Q. Did you ever request an updated financial
4 statement from Gitto Global?
5 A. No, I didn't.
6 Q. Who made the request of Gitto Global for the
7 financial statements?
8 A. I did.
9 Q. Who did you make that request to?
10 A. Frank Miller.
11 Q. And who supplied you with the financial
12 statements?
13 A. Frank Miller.
14 Q. Were they audited?
15 A. I don't recall.
16 Q. Do you recall seeing the signature of any
17 accountant, CPA or any accountant in connection
18 with those financial statements?
19 A. No.
20 Q. Were they signed by Frank Miller?
21 A. I don't recall.
22 Q. Have you produced those financial statements in
23 response to the subpoena that you received?
24 A. To the best of my knowledge, they have been

Page 93

1 supplied.
2 Q. When you first made the request of Mr. Miller
3 that funds be deposited into a separate account
4 in order to cover the deficiency in those
5 checks, did he comply with that request?
6 A. Yes. Not immediately, but he did.
7 Q. How much money was deposited in the separate
8 account?
9 A. 1.2 million.
10 Q. Do you know where this 1.2 million came from?
11 A. I don't.
12 Q. Did you see the checks?
13 A. I did not.
14 Q. Do you know when those deposits were made?
15 A. I believe they were made in late May.
16 Q. Of 2004?
17 A. Yes.
18 Q. What happened with those deposits? What
19 happened with the money in that account?
20 A. They were eventually withdrawn.
21 Q. Who withdrew them?
22 A. We did.
23 Q. The bank did?
24 A. Yes.

1              UNITED STATES DISTRICT COURT

2

3              DISTRICT OF MASSACHUSETTS

4        - - - - - - - - - - - - - - - - -

5    LaSALLE BUSINESS CREDIT, LLC, f/k/a

6    LaSALLE BUSINESS CREDIT, INC.,

7                          Plaintiff,

8

9        v.                         Civil Action

10                          No.   04-2227-DPW

11   GARY C. GITTO, ET AL,

12                          Defendants.

13   - - - - - - - - - - - - - - - - -   VOLUME I

14                          PAGES 1-121

15            DEPOSITION of ROBERT PAULHUS, a

16   witness called by counsel for the Plaintiff,

17   taken pursuant to Rule 30 of the Massachusetts

18   Rules of Civil Procedure before Lorraine S.

19   Foley, Registered Professional Reporter and

20   Notary Public in and for the Commonwealth of

21   Massachusetts, at the Offices of Craig and

22   Macauley, 600 Atlantic Avenue, Boston,

23   Massachusetts, on December 1, 2004, commencing

24   at 12:25 p.m.

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   SCHWARTZ, COOPER, GREENBERG & KRAUSS

 4     Eric (Rick) S. Rein, Esquire

 5     180 North LaSalle Street, Suite 2700

 6     Chicago, Illinois 60601

 7     rrein@scgk.com

 8     On Behalf of the Plaintiff

 9

10   STERN, SHAPIRO, WEISSBERG & GARIN, LLP

11     Max D. Stern, Esquire

12     90 Canal Street

13     Boston, Massachusetts  02114

14     mdstern&sswg.com

15     On Behalf of Gary Gitto

16

17   PERKINS SMITH & COHEN

18     Juliane Balliro, Esquire

19     One Beacon Street

20     Boston, Massachusetts  02108

21     jballiro@pscboston.com

22     On Behalf of Charles Gitto and Tradex Corp.

23

24
```

```
 1    SEDER & CHANDLER

 2       Darragh K. Kasakoff, Esquire

 3       339 Main Street

 4       Worcester, Massachusetts  01608

 5       On Behalf of the Deponent

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                  P R O C E E D I N G S

2              MR. REIN:  Same agreements concerning

3        objections and signing and reviewing the

4        transcript?

5              MR. KASAKOFF:  Correct.

6

7                  ROBERT PAULHUS,

8

9        a witness called for examination by counsel for

10       the Plaintiff, being first duly sworn, was

11       examined and testified as follows:

12

13                 DIRECT EXAMINATION

14       BY MR. REIN:

15   Q.  Mr. Paulhus, would you please state your full

16       name for the record?

17   A.  Robert Joseph Paulhus, Junior.

18   Q.  Spell your last name.

19   A.  P, as in Peter, A U L H U S, as in Sam.

20   Q.  And what is your home address?

21   A.  Ten Larcridge, L A R C R I D G E, Lane in

22       Ashland, Mass.   01721.

23   Q.  And your currently position at Clinton Savings

24       Bank is what?
```

Page 6

```
 1   A.   Vice president commercial lending.

 2   Q.   How long have you held the position of vice

 3        president of commercial lending?

 4   A.   At Clinton Savings Bank, a little over five

 5        years.

 6   Q.   How long have you been employed by Clinton

 7        Savings Bank?

 8   A.   A little over five years.  September of '99 is

 9        when I joined the bank.

10   Q.   How many years have you been working in the

11        banking industry?

12   A.   As of last June, 22 years.

13   Q.   And with whom were you employed?  Just identify

14        the financial institutions prior to Clinton

15        Savings Bank.

16   A.   Most recently prior to Clinton Savings Bank, it

17        was First Massachusetts Bank.  Prior to that it

18        was Shawmut Bank and several of the predecessor

19        banks.  There were mergers.

20   Q.   As vice president of commercial lending, what

21        are your duties and responsibilities there?

22   A.   Primarily to manage, grow and grow the

23        commercial loan portfolio component of the

24        bank's business.
```

```
 1        the deposits or the withdrawals?

 2    A.  No, I did not.

 3    Q.  Did you discuss the account with anyone other

 4        than Mr. Tenaglia between early fall and the

 5        December meeting?

 6    A.  I believe I discussed it with him and my direct

 7        superior, Joseph Guercio.

 8    Q.  When you talked to your direct superior, was

 9        that with Mr. Tenaglia?

10    A.  I do not recall.

11    Q.  If it was separate, do you recall what you

12        discussed with Mr. Guercio?

13    A.  I summarized my conversations with Mr. Tenaglia

14        and further commented that I had concerns,

15        because I didn't understand why the company

16        would need to have that kind of activity.

17    Q.  Do you recall when in December this meeting

18        took place?

19    A.  I believe it was one year ago today, December

20        1st.

21    Q.  December 1, 2003 meeting, who was there?

22    A.  Myself, Mr. Tenaglia and Bobbi-Jo Parker, who

23        is now Bobbi-Jo Williams.

24    Q.  And Mr. Miller?
```

Page 12

1    A.    And Mr. Miller, right.

2    Q.    And what was discussed at this meeting?

3    A.    The intent of the meeting was to understand

4          first hand from Mr. Miller what the basis of

5          the account activity was all about, for us to

6          understand, have a better -- higher comfort

7          level for why he needed to do it at that level

8          and to express to him our concern with what, to

9          us, was an exposure, since he was drawing on

10         uncollected funds.

11   Q.    What did Mr. Miller explain to you?

12   A.    He explained that the activity was required due

13         to certain licensing agreements with certain

14         vendors and/or customers as well as for certain

15         competitive reasons with other vendors and

16         customers, whereby they may not be able to

17         acquire a certain material from ABC Company if

18         ABC Company knew they were going to sell it to

19         a competitor, something along those lines.  So

20         they had to exchange goods between one another

21         and that the transactions went back and forth,

22         not just in one direction, and that it was

23         required for those reasons and that based upon

24         the advice of their accountants, that was the

1      proper way to conduct the business.

2   Q.  Did you understand his explanation?

3   A.  No, I did not.

4   Q.  Because you didn't understand it, did you do

5      anything?

6   A.  I expressed my concern after the meeting with

7      Michael Tenaglia, Bobbi-Jo Parker and confirmed

8      that again with my boss, Joseph Guercio, when

9      he asked me how the meeting went.

10  Q.  Anything else that Mr. Miller said at this

11     December 1 meeting?

12  A.  I can't recall the entire conversation, but he

13     also indicated that the company was going to be

14     sold right after the first of the year and that

15     once the company was sold, the Kingsdale

16     account would be closed and, therefore, the

17     activity would cease, so he was hoping that we

18     would be able to work with him until that time.

19  Q.  And the company to be sold, we're talking about

20     Gitto Global?

21  A.  Correct.

22  Q.  Did you know anything about Kingsdale

23     Corporation prior to the December 1 meeting?

24  A.  I can't say that I -- no.

Page 14

1 Q. And after the December 1 meeting, did you do

2   any investigation into what was Kingsdale

3   Corporation?

4 A. No.  It was not my responsibility.

5 Q. How was the December 1 meeting left?  Were

6   there any action points?

7 A. Yes.  We had asked Mr. Miller, and he agreed,

8   to provide us a letter explaining why they

9   needed to conduct business the way he had

10   verbally explained it to us.  We had requested

11   that, and he agreed to provide it to us for our

12   file and that he would remain in communication

13   with us to keep us posted as to the status of

14   the pending sale of Gitto Global.

15 Q. Did you ever get that explanation for the file?

16 A. Yes, we did.

17 Q. Do you know when?

18 A. I believe there is a letter dated June 25th,

19   2004, that was on file to that effect.

20 Q. Do you know why it took six months, or so, to

21   get that letter?

22 A. I do not.

23 Q. I'll show you the letter that was CSB 7.  Is

24   that the letter that you're referring to?

Page 90

1  Q. We did see this.
2        MR. REIN: Cancel 57. Void Exhibit
3     No. 57.
4  Q. After the loan is redocumented and there's
5     additional collateral given, do you have any
6     further dealings with, whether it's Miller or
7     the Gittos, let's say, between August 16th and
8     September 15th?
9  A. Only with Frank Miller, not the Gittos.
10  Q. What are you doing dealing with Mr. Miller?
11  A. Periodically we were communicating to get a
12     status as to the pending sale, which at that
13     point was still supposed to take place on
14     September 15th. I'm trying to recall the
15     sequence of events, but I can't recall them in
16     detail other than ultimately he came in at our
17     request and met with Dave Harmon and myself on
18     August 27th. We demanded that he come in to
19     let us know what was going on, because we
20     hadn't been getting any kind of information as
21     to the status of the sale.
22        Prior to him coming in on the phone,
23     he had expressed his frustration as well,
24     indicating something to the effect that he

Page 91

1     hasn't been able to get a hold of the right
2     people at Vitrotech. They're in conferences
3     every time he calls. He hasn't been able to
4     make the connection. It led to him saying that
5     that weekend, he would be on a plane with
6     Michael Angelini to meet face to face with the
7     people at Vitrotech to find out what's going on
8     and what the status of things are.
9        Some day or few days prior to when he
10     actually came in and met with us on the 27th,
11     he had also indicated that they were exploring
12     other options to take us out, so to speak, by
13     obtaining -- looking to obtain financing on
14     their equipment that they would use to
15     refinance all of the equipment that first lien
16     holders, as well as us -- so that if the sale
17     didn't take place as scheduled, they could have
18     us out of the picture.
19        So when he came in on that Friday, he
20     explained that he was going out to the west
21     coast to deal with this. We pressed him on who
22     he was talking to about financing. He
23     mentioned one company that I had name
24     recognition with, so it appeared to

Page 92

1     substantiate it somewhat that he was making
2     some effort at it.
3  Q. Who was that?
4  A. He mentioned a gentleman by the name of Frank
5     Kennedy with Salem Capital Corporation. I had
6     met him several years ago in a different
7     situation, so I knew it was a real name and
8     company. So that was the last time I saw Frank
9     Miller face to face. Then ultimately I spoke
10     with him again the following Tuesday, which I
11     believe was the 31st.
12  Q. Okay.
13  A. Keep going?
14  Q. What did you speak with him about on the 31st?
15  A. Either the afternoon of the 30th or the morning
16     of the 31st -- I forget which -- we learned by
17     looking at Vitrotech's web page seeing that a
18     revised quarterly report, I believe, had just
19     been filed and within certain sections of that
20     revised quarterly report, it stated that the
21     deal to acquire Gitto Global had been
22     terminated. And actually the effective date of
23     that, if I recall, within that publication was
24     the 27th. Within that same document, it also

Page 93

1     stated that the chairman of the Vitrotech had
2     tendered his resignation effective the day
3     before, the 26th of August. So when we learned
4     that, we were naturally very concerned, because
5     our understanding was this would all go away
6     with the sale of the business.
7        I was trying to get a hold of Frank
8     Miller. I called both his cell phone number
9     and the office number. Whoever answered at the
10     office indicated he was on a flight back from
11     California. Ultimately he called me, I
12     believe, on the afternoon of the 31st.
13        When I explained the reason we were
14     chasing him, based on what we had learned, he
15     expressed somewhat of a surprise that they had
16     cancelled the deal and that it was off. I
17     said, Frank, you know, they say this was
18     effective the 27th. You met with us on the
19     27th. You gave us no indication when you went
20     out to meet with them. He said -- he still
21     expressed surprise that they would put that in
22     a publication. He said, Oh, they'll be back at
23     the table. That's probably a negotiating
24     tactic.

24 (Pages 90 to 93)

Page 1

# COPY

VOLUME: I
PAGES: 1 to 43
EXHIBITS: None

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10268-DPW

LASALLE BUSINESS CREDIT,     )
LLC, f/k/a LASALLE BUSINESS   )
CREDIT, INC.,              )
        Plaintiff,        )
                          )
v.                        )
                          )
CLINTON SAVINGS BANK,       )
        Defendant.       )

      DEPOSITION OF BOBBI JO A. WILLIAMS,
called as a witness on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Jeanette N. Maracas,
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Offices of Craig and
Macauley, P.C., Federal Reserve Plaza, 600
Atlantic Avenue, Boston, Massachusetts, on
Tuesday, September 13, 2005, commencing at
2:55 p.m.

Page 2

1

2      APPEARANCES:

3

4              SCHWARTZ, COOPER, GREENBERGER,
       KRAUSS (by Eric S. Rein, Esq.), 180 N.
5      LaSalle Street, Suite 2700, Chicago, Illinois
       60601, for the Plaintiff.
6      E-mail: Rrein@schwartzcooper.com

7

8

               SEDER & CHANDLER (by Kevin C.
9      McGee, Esq.), 339 Main Street, Worcester,
       Mass. 01608, for the Defendant.
10     E-mial: Kcmcgee@sederlaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    I N D E X

2

        Testimony of:                    Direct      Cross

3

        Bobbi Jo A. Williams

4            (by Mr. Rein)                    4

5

6

7                    E X H I B I T S

8

        NONE.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1        me to finish and I'll try to wait for you

2        to answer.  If you have a question, you

3        don't understand what I'm asking, let me

4        know.  If you answer, I assume you do.

5   A.   Mm-hmm.

6   Q.   You need to say yes or no for the record,

7        audible responses, because a nod of the

8        head doesn't work here, nor does mm-hmm or

9        uh-huh because we don't know what that

10       means on a piece of paper.  Okay?

11   A.   I understand.

12   Q.   Good.  What's your home address?

13   A.   My home address is 128 Parker Road in

14       Lancaster, Massachusetts.

15   Q.   How long have you resided there?

16   A.   Since the end of April 2005.

17   Q.   What's the highest level of education

18       you've achieved?

19   A.   GED.

20   Q.   You're currently employed by Clinton Savings

21       Bank?

22   A.   That's correct.

23   Q.   What's your position?

24   A.   My position is assistant vice president in

1       charge of the operations department,

2       compliance, savings compliance and security

3       officer.

4   Q.  How long have you been employed by Clinton?

5   A.  I have been employed by Clinton a little

6       over 20 years.

7   Q.  How long have you held the position of

8       assistant VP operations compliance and

9       security officer?

10  A.  Some of those titles kind of carried with

11      me, so the security, I became security

12      officer in 1995, compliance I got in '97,

13      and then operations in 2002.

14  Q.  And AVP?

15  A.  I have been AVP I want to say since 1991

16      maybe.

17  Q.  What other positions have you held during

18      your 20-year employment?

19  A.  I started off as a part-time teller.  I

20      became full-time, a line supervisor,

21      assistant manager, branch manager and then

22      security officer, compliance.

23  Q.  You've always been in the operations side?

24  A.  On the savings side.

Page 7

1   Q.   Were you employed anywhere before Clinton?

2   A.   No.

3   Q.   What are your duties and responsibilities

4        in terms of operations?

5   A.   In terms of operations, I'm in charge of

6        in-clearing work.  That would be your -- how

7        would I explain that?  Checks that clear

8        the system, checks that reject out of the

9        system drawn on personal, all the accounts

10       of the bank, also in charge of Internet

11       banking, ATM department, ACH.  So that's

12       the savings operation side of the bank.

13  Q.   And on the compliance side, what are your

14       duties?

15  A.   I'm in charge of savings compliance which

16       would include disclosures for all the

17       accounts.  I'm also in charge of daily

18       functions of the bank's secrecy act.

19  Q.   And the Patriot Act?

20  A.   Yup.  I share those responsibilities with

21       my boss.

22  Q.   And your boss is Michael Tenaglia?

23  A.   Correct.

24  Q.   As security officer since 1995, what was

Page 14

1      specific, I may go into our system under

2      reports to see if there is a report available

3      for something specific.

4   Q.  Let me show you what's been previously marked

5      Clinton Exhibit No. 2.  Do you recognize that

6      e-mail?

7   A.  Yes, I do.

8   Q.  Now, this says you'd received three large

9      returned items?

10  A.  Mm-hmm.

11  Q.  You can take a look at it.  Was that in a

12     report, or what prompted you to send this

13     e-mail?

14  A.  I'm also in charge of any deposited items,

15     i.e. checks that get deposited to customer

16     accounts.  If those checks come back to the

17     bank and we're unable to then go in and

18     withdraw them from the customer's account,

19     then they come to me.  I would assume

20     that's probably under my security officer

21     responsibilities.

22          In this particular situation, when

23     they do come to me, one of the things that I

24     like to do or that I always do is I would

1       put an e-mail out to either the branch that

2       was involved with the customer.  In this

3       case, this is a business customer, as you

4       can see from the subject line.  Therefore,

5       I went to our commercial department to see

6       if anybody knew this gentleman.  By doing

7       that, it makes my job easier hoping that

8       somebody knows so they can contact the

9       customer and help me collect on the returned

10      items.

11  Q.  Do you know how much these very large items

12      were?

13  A.  I do not recall.

14  Q.  After you sent this e-mail, do you recall

15      what happened next?

16  A.  Yup.  I got a response back from Joe Guercio.

17      And Joe Guercio is in charge of the lending

18      department, and he had informed me that they

19      had done I believe it was a construction

20      loan for Mr. Miller personally and he was

21      going to have, I believe it was Janet Scott,

22      one of the individuals that I e-mailed, get

23      in contact with Mr. Miller and let him know

24      that these returned items were in so we can

Page 16

1    take care of them.  And he did mention to

2    me that he did get in touch with him and

3    there was going to be enough money deposited

4    to the account so we can take care of them,

5    which that happened and I was able to clear

6    the items.

7    Q.  What account did this involve?

8    A.  It was the J&J Chemical account.

9    Q.  Kingsdale?

10   A.  Yup, mm-hmm, correct.

11   Q.  Did you have any further involvement after

12       April 18th with regard to the Kingsdale

13       account and Mr. Miller?

14   A.  Yes, I did.  There were additional items

15       that got returned, I believe, the following

16       month.  And the same thing, I followed up

17       with -- probably at this time I didn't

18       follow up with an e-mail.  I probably called

19       Mr. Guercio to let him know that I did

20       have some more items and I was going to be

21       placing what we call a hold on the account

22       stating that any items going forward were

23       going to be floated or held, meaning they

24       weren't going to be immediately available

1       for withdrawal.

2              The type of account that this J&J

3       Chemical account, it was a business account,

4       and previous to last year we were not

5       floating or holding any items that were

6       deposited in any of our business accounts.

7   Q.  When you told Mr. Guercio this, what, if

8       anything, did he say?

9   A.  He went back to either -- I don't recall

10      if it was Jan Scott or if he himself went

11      directly to Mr. Miller, told him that we

12      were going to be holding the items.  Mr.

13      Miller spoke to whomever and said once

14      again that he was going to clear the items

15      up.

16             Apparently at the time, the

17      explanation that I received was that he was

18      in the process of switching his bank accounts

19      over from one bank to another bank and the

20      checks that were being deposited, the new

21      account had not been established yet and,

22      therefore, the checks had gotten returned.

23      Based off of his explanation, I believe that

24      they felt comfortable with that, "they"

1    meaning Mr. Guercio, felt comfortable with

2    that, so I then released that no float from

3    the account and continued to let the account

4    function as normal.

5  Q.  Do you know what the size of the items were

6    in May?

7  A.  I do not recall.

8  Q.  What, if anything, then happened next in

9    terms of your involvement with Mr. Miller?

10  A.  It happened again.  Now, this time when it

11    happened, there was no ifs ands or buts

12    about it.  I was not going to allow any

13    deposits to the account unless they were

14    being held.  Mr. Guercio agreed with me.

15    I know that in the interim Mr. Guercio had

16    mentioned that he was going to inform

17    Steve Cash, the president at the time,

18    because Mr. Miller was also a corporator

19    of the bank and they wanted to make sure

20    that Steve was aware that a corporator of

21    the bank was conducting this type of business

22    of depositing returned items.

23        We kept the hold on the account for

24    six months and during that six months it was

Page 19

1    monitored.  We would actually receive an

2    account statement from LaSalle Bank or,

3    actually, I should say Gitto Global would

4    receive an account statement from LaSalle

5    Bank on a regular basis showing when the

6    items that were deposited had cleared, and

7    when those items had cleared, the funds

8    would become available in the J&J account.

9    We kept that on there for six months, and

10   once we saw we weren't having any problems

11   within that six months, Frank Miller did

12   contact me directly to ask if we could

13   remove the float status from his account.

14   I contacted Mr. Guercio with Mr. Miller's

15   request, he had asked me had there been

16   any more activity, any returned items.  I

17   verified that no, there had not and,

18   therefore, we lifted the float status on

19   the account.

20   Q.  Let's back up a little bit.  How long after

21       the May returned items did the third time

22       occur?

23   A.  I would probably have to say it might have

24       been within a couple of months, but I'm not

G&M Court Reporters, Ltd.
617-338-0030

Page 20

1     completely positive on the time frame.

2  Q.  Did you ever attend a meeting with Mr.

3     Guercio with Mr. Miller?

4  A.  No, I did not.  I attended a meeting with

5     Mr. Miller, Mr. Tenaglia and Bob Paulhus.

6  Q.  That's later on in the year?

7  A.  Correct.  Myself, Joe and Mr. Miller did

8     not meet together.

9  Q.  Did you ever have any telephone conference

10    with Mr. Miller and Mr. Guercio?

11 A.  No, I did not.

12 Q.  Now, when you would monitor the account,

13    you said you would get a bank statement

14    from LaSalle with regard to Gitto Global?

15 A.  That's correct.

16 Q.  How did that come up?

17 A.  They would fax over a statement on pretty

18    much a daily basis showing the checks

19    that had cleared the account, meaning the

20    LaSalle account.  Once we knew that those

21    checks had cleared the account, then we

22    would go ahead and release the funds in

23    the J&J account.

24 Q.  Had you taken a look at the account to

Page 21

1   determine that the deposits were only coming

2   from Gitto Global?

3 A. Yes.

4 Q. Did you take a look at the account to see

5   where the checks being written on the

6   Kingsdale account were going?

7 A. Yes.

8 Q. What did you see?

9 A. We saw that they were all coming from the

10   same bank, meaning all the checks that were

11   deposited into the J&J Chemical account

12   were all from the same bank in different

13   denominations, and the checks that were

14   written out of the J&J account were all

15   being deposited to another bank, all to the

16   same company, which was Gitto Global.

17 Q. So J&J or Kingsdale was writing checks to

18   Gitto Global?

19 A. Correct.

20 Q. And all the deposits to Kingsdale came from

21   Gitto Global?

22 A. Correct.

23 Q. Did you find that unusual?

24 A. Yes, I did.

Page 22

1    Q.   Did you question that with anyone?

2    A.   Yes, I did.

3    Q.   Who?

4    A.   Joe Guercio and I spoke about it and the

5         explanation that we had received from --

6         actually, I also did speak to Mr. Miller

7         about it, too, because Mr. Miller

8         occasionally would call me if his office

9         worker wasn't in to fax me information.  I

10        don't recall who he was.

11   Q.   Bill Deacon?

12   A.   The name sounds familiar.  I do recall the

13        name, but I don't recall in what capacity

14        I spoke with him.  When he was asked, the

15        explanation that was received was that

16        separate checks were written for each

17        invoice that the company received, therefore,

18        myself not being a business person, I

19        passed that information back down to, I

20        believe it was either Joe or Mike at the

21        time, because I let Mike know that I was

22        speaking with Joe even though Joe wasn't

23        within my department because I wanted

24        Mike to know, being my boss, what I was

Page 23

1      questioning.  So not being a business person,

2      I was told that that is normal, I guess it

3      can be normal practice for that to take

4      place.

5  Q.  What did you discuss with Joe Guercio

6      concerning your questioning of the account?

7  A.  Just what I mentioned right now, just that

8      did you notice that these checks are coming

9      from and going to?  Does that look kind of

10     odd?  Yeah, that looks a little strange.  And

11     then when Mr. Miller was questiond, the

12     response was in regard to the invoice.

13 Q.  Do you know if Mr. Guercio had conversations

14     separately from you with Mr. Miller?

15 A.  I do not know that.

16 Q.  Did Mr. Tenaglia comment to you about the

17     account when you said this looks unusual?

18 A.  He was ensuring that I was following up

19     with someone.  In that case I had been

20     dealing directly with Joe so there was

21     no reason at the time for Mike to get

22     involved.

23 Q.  So in monitoring the account, you would get

24     faxed what kind of document?

G&M Court Reporters, Ltd.
617-338-0030

Page 24

1   A.   It was an account statement.  It looks

2        similar to an account statement and it

3        would show debits and the day that they

4        cleared the account.  So it would give a

5        check number, it would give a date, it

6        would give the dollar amount and the date

7        that it would clear the account.

8   Q.   And it was a statement being generated by

9        LaSalle?

10  A.   Correct.

11  Q.   It was faxed to you, and what did you do

12       with the fax and the statement?

13  A.   I would go through the statement and I

14       would review each check that had been

15       deposited into the account, tally up the

16       dollar amount and then remove that hold

17       from the account.

18  Q.   What did you do with the document itself

19       after you went through and looked at it

20       and did this tally?

21  A.   Destroyed it.

22  Q.   Did you ever keep any of these faxes with

23       the account statements?

24  A.   I don't believe that I did.  This is normal

Page 25

1        practice for a situation like this.  We've

2        had customers, if they need a hold removed

3        from an account prior to the system letting

4        it off, we would tell the customer if you

5        supply us with a statement or verification

6        from your bank, we'll go ahead and lift it.

7        Therefore, no documents like that were

8        shredded as opposed to kept on file.

9   Q.  How long were you reviewing these statements?

10  A.  Six months.

11  Q.  Is that an unusual period of time?

12  A.  No, not for this type of a situation.  We

13       have -- we work very closely with our

14       business customers; and if we come into a

15       situation similar to this where someone

16       may have a problem managing their account

17       or have returned items, this is not unusual.

18  Q.  What about the size of the daily activity?

19       Do you recall how much we're talking about?

20  A.  In the beginning it wasn't very large, if

21       I'm not mistaken.  I would probably say

22       when I first saw it, it might have been

23       200, $300,000 a day.

24  Q.  What about through the six-month period?

Page 26

```
 1    A.   It pretty much stayed about the same.

 2    Q.   And after the hold was lifted, did the size

 3         of the activity increase on a daily basis?

 4    A.   When you say the "hold was lifted," you mean

 5         the six-month hold or the daily hold?

 6    Q.   The six-month hold.

 7    A.   It was not brought to my attention again.  I

 8         didn't even look at the account after that

 9         until the deposits reached a million-dollar

10         mark at that time.  At that time deposits

11         were being made through the automated teller

12         machine, and they were rejecting out because

13         the machines only allow deposits up to

14         $999,000.  So after that six-month hold

15         came off, the account wasn't being reviewed

16         again unless something unusual came back.

17    Q.   When did the ATM issues arise?

18    A.   I want to say that that was in 2003, probably

19         the beginning of 2003, because I believe the

20         six-month hold came off the account sometime

21         in November 2002.

22    Q.   So if we back that up by six months, are we

23         talking May?

24    A.   That would sound correct because the first
```

1      how long?

2  A.  It had been quite some time after that.  I

3      really didn't get involved until Mike

4      approached me sometime in 2003 asking for

5      account statements, copies of checks.  When

6      I questioned at that time why he was looking

7      at it, because he had said to me isn't this

8      the customer that, you know, so many months

9      back we were floating?  Yup, this is him.

10      So that was sometime in 2003 and that's

11      because they noticed the fluctuation in the

12      dollar amounts, is what I was told.  So at

13      that point Mike came to me looking for

14      account documentation, so that was the next

15      time that it came back up.

16  Q.  What account documentation did you pull

17      for Mike?

18  A.  Account statements and copies of the checks

19      that were being deposited.

20  Q.  And what did you then do with that

21      information?

22  A.  I just gave it to Mike.

23  Q.  After you gave it to Mike, did you have any

24      further discussion, contact with Mike

Page 29

1        concerning the Kingsdale account?

2    A.   Occasionally he would come to me to ask

3        questions on the account.  He did ask me if

4        I could get in touch -- Mike did ask me if

5        I could get in touch with Mr. Miller so

6        that we could bring him in to the bank and

7        discuss the activity on the account.  He

8        felt where I had spoken with him before,

9        that hearing me request this, that he would

10       be okay with it.  I did try to get in touch

11       with Mr. Miller.

12            We went back and forth probably

13       for a few weeks when he finally got back in

14       touch with me.  I recall it was the fall

15       of 2003, and I recall Mr. Miller telling me

16       that the reason why he hadn't gotten back

17       in touch with me is because he was in

18       California, and he said between him and I,

19       he was in the process of selling his

20       business, so he had been out of town.  When

21       he came back into town, Mike, we got together

22       with him, Mike and myself, and we asked

23       Bob Paulhus to be present.  Again, not

24       understanding business activity, we felt

Page 30

1   by having someone from the commercial

2   department be there and present, they would

3   understand better the business logistics.

4 Q. So this meeting then took place with the

5   four of you, Mr. Paulhus, Mr. Tenaglia,

6   Frank Miller and you?

7 A. Correct.

8 Q. Do you recall when that meeting was?

9 A. I want to say it was either November or

10   December of 2003.

11 Q. Do you recall what was discussed at the

12   meeting?

13 A. A lot of business jargon.  Again, Mr. Miller

14   recounting, talking about invoices and how

15   this account is used to pay this invoice

16   and this account is used to pay -- again,

17   business stuff that I don't understand.

18 Q. You didn't understand.  Anything else you

19   recall was discussed concerning the handling

20   of the account?

21 A. Just the nature of the business, what he

22   does; he's a chemical distribution company.

23   It was a lengthy meeting.

24 Q. Any discussion as to what Kingsdale was?

Page 34

1    Q.   After the meeting in November, December,

2         did you have any further conversations with

3         Mike Tenaglia in connection with the

4         Kingsdale account?

5    A.   My conversations with Mike were probably

6         just to -- he would either ask me for

7         additional documentation.  Again, being in

8         the operations department, I'm the one who

9         has access to copies of checks and whatnot.

10        He may have -- he probably kept me abreast

11        of what was going on in his conversations

12        with Mr. Miller, but that's pretty much it.

13   Q.   Were you asked to generate any report

14        that Mike needed in connection with the

15        Kingsdale account?

16   A.   Not really any reports.  Again, it would be

17        more or less just account statements.

18   Q.   Let me show you what we've marked as

19        Exhibit 39.  Do you recognize this document?

20   A.   It's not something that I review, no.  I'm

21        not even sure what it is.

22   Q.   Do you know in the fourth column under

23        minor type CD -- I don't know what that

24        means.  Minor type code perhaps?

Page 37

1          in agreement that what he said sounded

2          logical or made sense, similar to Bob being

3          in commercial saying what he said wasn't

4          out of line.  So pretty much, like I said,

5          everything that he was telling us seemed

6          practical.

7     Q.   After this November, December meeting, that

8          was the end of your involvement?

9     A.   My involvement in the sense of sitting down

10         and discussing anything with Mr. Miller.

11         Again, I was aware of what was going on

12         and I was involved by preparing or giving

13         account statements and whatnot, yes.

14    Q.   And after the third occasion in May of

15         2002, there weren't any other returned

16         items?

17    A.   I never saw a returned item, no.

18    Q.   Did you ever have any discussion with

19         anyone at the bank concerning check kiting

20         occurring in the Kingsdale account?

21    A.   No, not -- no, those words didn't come up

22         in my discussions.

23    Q.   Do you know what check kiting is?

24    A.   Yes, I do.

Page 1

# COPY

VOLUME: I

PAGES: 1 to 47

EXHIBITS: None

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10268-DPW

LASALLE BUSINESS CREDIT,　　　）
LLC, f/k/a LASALLE BUSINESS　　）
CREDIT, INC.,　　　　　　　　　　）
　　　　　　　Plaintiff,　　　　　）
　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　）
CLINTON SAVINGS BANK,　　　　　　）
　　　　　　　Defendant.　　　　　）

DEPOSITION OF CHRISTOPHER M. GILL,
called as a witness on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Jeanette N. Maracas,
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Offices of Craig and
Macauley, P.C., Federal Reserve Plaza, 600
Atlantic Avenue, Boston, Massachusetts, on
Wednesday, September 14, 2005, commencing at
10:00 a.m.

Page 2

1    APPEARANCES:

2

3

          SCHWARTZ, COOPER, GREENBERGER,
4    KRAUSS (by Eric S. Rein, Esq.), 180 N.
     LaSalle Street, Suite 2700, Chicago, Illinois
5    60601, for the Plaintiff.
     E-mail: Rrein@schwartzcooper.com

6

7

8          SEDER & CHANDLER (by Kevin C.
     McGee, Esq.), 339 Main Street, Worcester,
9    Mass. 01608, for the Defendant.
     E-mial: Kcmcgee@sederlaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1       University.

2   Q.  Where did you get your college degree?

3   A.  Northeastern University.

4   Q.  What did you get your degree in?

5   A.  Business administration, management.

6   Q.  You're currently employed by Clinton Savings

7       Bank?

8   A.  That's correct.

9   Q.  In what capacity?

10  A.  I'm the senior vice president and chief

11      financial officer.

12  Q.  How long have you held that position?

13  A.  I've been chief financial officer for

14      13 years, senior vice president for about

15      six or seven of those years.

16  Q.  How long have you been employed by Clinton?

17  A.  13 years.

18  Q.  Before your employment at Clinton, can you

19      briefly describe to me your business

20      employment history?

21  A.  Before Clinton I worked for my father-in-law

22      at his screw machine company in Danvers for

23      about a year and a half as a finance manager.

24      Before that I worked at Wakefield Savings

Page 6

1   Bank, which is now changed their name to The

2   Savings Bank.  I was there for five years,

3   and prior to that I was in Boston at First

4   Mutual for 19 years.

5 Q. In what capacity?

6 A. All in the finance area starting as a

7   bookkeeper and working my way up to

8   accounting officer, controller, investment

9   officer, assistant treasurer, vice treasurer.

10 Q. Have your duties and responsibilities

11   changed in the 13 years you've been CFO at

12   Clinton?

13 A. Yes, they have.

14 Q. Can you tell me how they've changed?

15 A. Additional responsibilities in the area of

16   human resources and non-deposit investment

17   products, as well as ongoing responsibilities

18   for finance, insurance and asset liability

19   management.

20 Q. How many direct reports are there to you?

21 A. To me?

22 Q. Yes.

23 A. Four.

24 Q. Has that been the case, say, for the last

Page 13

1    with Mike.

2  Q.  Now, in the e-mail she says, "still playing

3      games."  Did you understand what that meant?

4  A.  I understood that it meant to me at that

5      point that he was making deposits in a way

6      that delayed the payment of checks.

7  Q.  By use of this term "still," that meant he

8      had been doing that before?

9  A.  I would say no, I wouldn't say that I took

10     that meaning.

11  Q.  So after you got this e-mail, what did you

12      do?

13  A.  I talked to Mike.

14  Q.  What did you say to Mike?

15  A.  I'm sure I asked Mike just what the nature

16      of all of this was, and he indicated to

17      me that he had been in touch with Frank

18      Miller, that Steve Cash had been in touch

19      with Frank Miller and that nothing was

20      being done without Steve's knowledge.

21  Q.  After this conversation, what, if anything,

22      happened next in terms of any involvement

23      that you had with the Kingsdale account?

24  A.  Probably a week later or so we were still

Page 14

1     seeing high levels of transactions.  I

2     don't know at what point I learned that

3     there was a sale of Kingsdale to a company

4     in California, but it was around this same

5     period, but we are now monitoring our

6     Federal Reserve transactions on a daily

7     basis at this point.

8  Q.  Because you're borrowing money from the

9     Fed?

10  A.  Yeah, well, from another agency, yes.  Mike

11     went to Vegas, I think, for a seminar but

12     was in touch with the bank, and I e-mailed

13     him with what I felt was an analysis of my

14     opinion of what was going on.

15  Q.  Let me show you what had been marked as

16     CSB 5.  Is that the analysis of your opinion

17     to which you're referring?

18  A.  This would have been an e-mail from Mike to

19     me to which I responded to and then he

20     responded to that.

21  Q.  Right.

22  A.  That's correct.

23  Q.  So your analysis was that this was check

24     kiting?

Page 15

1    A.   That's what my opinion was.

2    Q.   And why was that your opinion?

3    A.   Because the checks drawn on Clinton Savings

4         Bank were being presented for payment before

5         a deposit was being made to the account.

6    Q.   Did you discuss your opinion with anyone

7         other than Mike?

8    A.   Yes.

9    Q.   With whom?

10   A.   Steve Cash.

11   Q.   What did you discuss with Mr. Cash?

12   A.   I told Mr. Cash that I felt it was kiting.

13   Q.   What, if anything, did he say to you?

14   A.   He stated that he wasn't sure whether it was

15        kiting or good business.

16   Q.   Did he say why?

17   A.   He did not.

18   Q.   Did you say anything in response to that?

19   A.   I did not.

20   Q.   When did that conversation with Mr. Cash

21        take place?

22   A.   I would say if those e-mails were the first

23        week of May, second week of May.

24   Q.   Did you talk to Mike Tenaglia about your

1          opinion that it was check kiting?

2     A.   Beyond the e-mail?

3     Q.   Beyond the e-mail.

4     A.   Yes, yes.

5     Q.   When did that conversation take place?

6     A.   That would have taken place when he came

7          back from his seminar.

8     Q.   And what did the two of you say in that

9          conversation?

10    A.   I felt that a little company in Lunenberg

11         could not possibly generate a billion

12         dollars in sales and that it just didn't

13         make sense.

14    Q.   The little company being Kingsdale?

15    A.   Yes.

16    Q.   What did Mike say in response?

17    A.   That Steve is aware of everything that's

18         going on and Steve is making the decisions.

19         Steve has been in touch with Miller.  Mike

20         was talking to Miller on a daily basis.

21    Q.   And when you had this conversation in the

22         middle of March, what was the size of the

23         activity going through -- I'm sorry, the

24         middle of May, what was the size of the

Page 17

1       activity on a daily basis?

2   A.  $4 million.

3   Q.  Had you had experience in the past in dealing

4       with check kites?

5   A.  Not in the past at Clinton Savings Bank, no.

6   Q.  I understand.  In your banking past?

7   A.  Yes.

8   Q.  How often -- where were you when you had that

9       experience?

10  A.  I'm looking at 35-plus years of banking

11      experience and I couldn't tell you exactly

12      when, but I can tell you a typical kite is

13      deposits that continue to increase in number

14      and in volume against either insufficient

15      funds or no funds.

16  Q.  Is there a typical response as to how a

17      bank would handle a situation when a kite

18      is discovered?

19  A.  Typically you would identify the customer

20      and talk to the customer.

21  Q.  How would you deal with the account that

22      the kiting is occurring through?

23  A.  Well, typically there may be reason for

24      discussions with the account holder because

Page 18

1          there may be legitimate issues.

2     Q.   Isn't that what Clinton did here, they talked

3          to the account holder?

4     A.   That's correct.

5     Q.   And based upon the discussion with the

6          account holder, Steve Cash made a

7          determination that it was not check kiting;

8          is that your understanding?

9     A.   That's my understanding.

10    Q.   If, in your experience, you have a discussion

11         with the account holder and you're not

12         satisfied with the response, what is the

13         usual recourse then that the bank would

14         take with regard to check kiting?

15    A.   Monitor the account, or tell the account

16         holder that the activity has to stop and

17         monitor the account; and if it continue,

18         there has to be a determination made as to

19         whether you want to close the account.

20    Q.   Other than Mike Tenaglia and Steve Cash,

21         did you talk to anyone else at the bank

22         about your opinion that it was check kiting?

23    A.   Later on in May I did.

24    Q.   With whom?

Page 1

**COPY**

VOLUME: I

PAGES: 1 to 49

EXHIBITS: See Index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10268-DPW

LASALLE BUSINESS CREDIT,　　　)
LLC, f/k/a LASALLE BUSINESS　　)
CREDIT, INC.,　　　　　　　　　)
　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
CLINTON SAVINGS BANK,　　　　　)
　　　　　　Defendant.　　　　　)

　　　　DEPOSITION OF JOSEPH D. GUERCIO,
called as a witness on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Jeanette N. Maracas,
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Offices of Craig and
Macauley, P.C., Federal Reserve Plaza, 600
Atlantic Avenue, Boston, Massachusetts, on
Wednesday, September 14, 2005, commencing at
12:25 p.m.

Page 2

1    APPEARANCES:

2

3

             SCHWARTZ, COOPER, GREENBERGER,

4    KRAUSS (by Eric S. Rein, Esq.), 180 N.

     LaSalle Street, Suite 2700, Chicago, Illinois

5    60601, for the Plaintiff.

     E-mail: Rrein@schwartzcooper.com

6

7

8            SEDER & CHANDLER (by Kevin C.

     McGee, Esq.), 339 Main Street, Worcester,

9    Mass. 01608, for the Defendant.

     E-mial: Kcmcgee@sederlaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1    Q.   From where?

2    A.   U. Mass., Amherst.

3    Q.   You're currently employed with Clinton

4         Savings Bank?

5    A.   I am.

6    Q.   What's your position?

7    A.   Senior vice president, senior loan officer.

8    Q.   How long have you held those positions?

9    A.   Senior vice president and senior -- I've

10        been senior loan officer for my full time

11        there, 13 years.  Senior vice president, I

12        would say probably ten years.

13   Q.   Prior to Clinton, can you describe to me

14        briefly your work experience?

15   A.   Immediately prior to Clinton I worked for

16        the FDIC, department of liquidation, and

17        prior to that I was with a bank in western

18        Massachusetts, Heritage Bank for Savings.

19   Q.   How long did you work for Heritage?

20   A.   Heritage had -- it ultimately became

21        Heritage.  I worked for different entities

22        which merged and became Heritage for

23        approximately 15 years.

24   Q.   How long were you with the FDIC?

Page 1

**COPY**

VOLUME: I

PAGES: 1 to 31

EXHIBITS: See Index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10268-DPW

LASALLE BUSINESS CREDIT,       )
LLC, f/k/a LASALLE BUSINESS    )
CREDIT, INC.,                  )
       Plaintiff,          )
                               )
v.                             )
                               )
CLINTON SAVINGS BANK,          )
       Defendant.          )

     DEPOSITION OF SHEILA A. AZORANDIA,
called as a witness on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Jeanette N. Maracas,
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Offices of Craig and
Macauley, P.C., Federal Reserve Plaza, 600
Atlantic Avenue, Boston, Massachusetts, on
Tuesday, September 13, 2005, commencing at
2:25 p.m.

G&M Court Reporters, Ltd.
617-338-0030

Page 2

1    APPEARANCES:

2

3

            SCHWARTZ, COOPER, GREENBERGER,
4    KRAUSS (by Eric S. Rein, Esq.), 180 N.
     LaSalle Street, Suite 2700, Chicago, Illinois
5    60601, for the Plaintiff.
     E-mail: Rrein@schwartzcooper.com

6

7

8            SEDER & CHANDLER (by Kevin C.
     McGee, Esq.), 339 Main Street, Worcester,
9    Mass. 01608, for the Defendant.
     E-mial: Kcmcgee@sederlaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    series of questions.  If you don't understand

2    what I'm asking, please let me know and I'll

3    rephrase it.

4  A.  Okay.

5  Q.  Please wait for me to finish and I'll try

6    to wait for you to finish and we won't

7    interrupt each other so the court reporter

8    can take down an accurate statement from

9    both of us.  You need to answer audibly.

10  A.  You can't do this?

11  Q.  You can't shake your head, and try to avoid

12    the mm-hmms because we don't know if that's

13    a yes or no.  So maybe in the course of the

14    deposition we'll ask is that a yes or no.

15    Do you understand?

16  A.  No problem.

17  Q.  What's your home address?

18  A.  71 Lancaster Road, Clinton, Massachusetts.

19  Q.  How long have you resided there?

20  A.  26 years.

21  Q.  And you're currently employed by Clinton

22    Savings Bank?

23  A.  Correct.

24  Q.  What is your position?

Page 6

1    A.    AVP comptroller.

2    Q.    How long have you held that position?

3    A.    I'm guessing ten years.

4    Q.    Is that how long you've been employed by

5          Clinton?

6    A.    No.  I've been at Clinton Savings Bank

7          almost 19.

8    Q.    What position or positions did you hold in

9          the prior nine years?

10   A.    I started off as returned items clerk,

11         worked up to staff accountant or staff

12         accounting supervisor, and then eventually

13         the comptroller.

14   Q.    To whom do you report?

15   A.    Chris Gill.

16   Q.    What's the highest level of education you've

17         achieved?

18   A.    Bachelor's degree.

19   Q.    From where?

20   A.    Assumption College in Worcester.

21   Q.    Prior to your employment at Clinton, were

22         you employed anywhere else?

23   A.    Prior to having children, I was home seven

24         years prior to going to the bank, and then

Page 18

1    Q.    When you received it, did you talk to Mike

2          about the content of it?

3    A.    He wasn't in the state.  He was at a

4          conference out in Arizona, I believe.

5    Q.    When he came back, did you talk to him

6          about it?

7    A.    Yeah.  He was mad.  Again, he was still mad.

8    Q.    What did he say to you?

9    A.    "You're a boss," quote, unquote.  He says

10         that a lot.

11   Q.    Let me show you Exhibit 6.

12   A.    Okay.  I don't remember this.  Oh, I

13         didn't get this one, no, because my name

14         is spelled wrong.  I never got it.

15   Q.    So even though you're CC'd --

16   A.    Name's spelled wrong so it didn't --

17   Q.    It didn't get to you?

18   A.    Right.

19   Q.    Did you know about the content of it?

20   A.    No, I didn't see this one before.

21   Q.    I understand.  Did you talk to Mike about

22         the e-mail he sent to Chris Gill on May 19?

23   A.    Not that one, no.

24   Q.    Did you ever talk to Chris Gill about e-mails

1        he was getting from Mike Tenaglia?

2   A.  No, no.

3   Q.  Did you ever talk to Mr. Gill after May 19th

4       concerning the handling of the account of

5       Kingsdale?

6   A.  I'm not sure.  I may have said, you know,

7       hey, again, repeating, reiterating what

8       Mike had told me.  There are reasons for

9       the action, so, you know, trying to calm

10      things down.

11  Q.  Did you have any further involvement with

12      regard to the Kingsdale account after you

13      did this spreadsheet and these couple of

14      e-mails?

15  A.  No, no, no direct involvement.

16  Q.  Did you have any conversation with Mike

17      Tenaglia as to what was going on?

18  A.  He kept me abreast of stuff.  And then when

19      the FDIC came in to do their annual exam,

20      he just kept me abreast of things,

21      conversations with them, et cetera.

22  Q.  Who kept you abreast?  Mike did?

23  A.  Mike.

24  Q.  Of conversations he had with the examiners?

1   A.  Mm-hmm.

2   Q.  What did Mike tell you about conversations

3       he had with the examiners?

4   A.  Basically, the examiners didn't know what

5       was going on either.  They could not call

6       it kiting at that time when they were in.

7       The team that was there, they didn't know

8       what it was.  The old saying, looks like a

9       duck, walks like a duck, it didn't quack.

10  Q.  What else did Mike tell you?

11  A.  I don't know.  We talked a lot about it.

12  Q.  Did he talk to you about what he talked to

13      the examiners about, what information he

14      showed them?

15  A.  No.  He didn't get into detail.  He was

16      very like you and I sitting here talking

17      with a cup of coffee between us rather

18      than the water.  It was very laid back

19      chit-chat.

20  Q.  As the comptroller, are there reports that

21      you would get on a daily or monthly basis

22      concerning these accounts?

23  A.  For this particular account, probably not

24      because it was a no-float product, immediate

Page 23

1    A.   No.

2    Q.   Bob Paulhus?

3    A.   No.

4    Q.   Joe Guercio?

5    A.   No.

6    Q.   So other than -- what about Bobbi Jo?

7    A.   No, not really.  The only involvement was

8         through Chris when I got the e-mail, and

9         that's how I basically got involved with

10        it it all.

11   Q.   Do you know what prompted Chris'

12        investigation or look at the account?

13   A.   Covering his backside.  His job is to

14        protect the assets of the bank.  He's chief

15        financial officer, so that's what I assume

16        would be his reasoning.

17   Q.   Was there a point in time where the bank

18        had to go borrow money from the Fed to

19        cover the interest carry?

20   A.   In April our liquidity did dry up, yes.

21        We were very flush with liquidity prior to

22        that, and in April things changed and our

23        cash, not total liquidity, our cash dried up.

24   Q.   Were you involved in --

Page 24

1    A.   In that?

2    Q.   In that, yes.

3    A.   Yes.

4    Q.   Can you tell me what your involvement was?

5    A.   On a daily basis we would have to borrow

6         from the Federal Home Loan Bank because of

7         no cash for various accompaniments.

8    Q.   Was that borrowing in order to cover the

9         uncollected funds in the Kingsdale account?

10   A.   That's how, what we found out afterwards.

11        This is my own assumption.  I think that's

12        what may have prompted Mr. Gill, too,

13        is because of the cash, but that's an

14        assumption on my part.

15   Q.   Well, what prompted or started you to have

16        to go to the Fed to borrow money?

17   A.   Our cash was gone.  Our Fed funds were gone,

18        our liquid cash.

19   Q.   Do you recall when that first occurred?

20   A.   I believe it was April of last year.  April

21        of last year.

22   Q.   April 1?  April 15?

23   A.   No, I don't know what date.  The month of

24        April.  That's all I know.

Page 1

# COPY

VOLUME:    I
PAGES:    1-223
EXHIBITS:    1-35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. 04-12227-DPW

LASALLE BUSINESS CREDIT, LLC,　)
f/k/a LASALLE BUSINESS　)
CREDIT, INC.,　)
    Plaintiff,　)
　)
vs.　)
　)
GARY C. GITTO, ET AL.,　)
    Defendants,　)
　)
AND　)
　)
FLEET NATIONAL BANK, ET AL.,　)
    Trustee Process　)
    Defendants,　)
　)
AND　)
　)
FIDELITY INVESTMENTS, INC.,　)
ET AL.,　)
    Reach-and-Apply　)
    Defendants.　)

       DEPOSITION OF WILLIAM DEAKIN, a
witness called on behalf of the Plaintiff,
pursuant to the provisions of the Federal
Rules of Civil Procedure, before Jill
Shepherd, Registered Professional Reporter
and Notary Public, in and for the
Commonwealth of Massachusetts, at the offices
of Craig & Macauley, 600 Atlantic Avenue,
Boston, Massachusetts, on Tuesday,
November 15, 2005, commencing at 9:43 a.m.

Page 2

APPEARANCES:

SCHWARTZ, COOPER, GREENBERGER, KRAUSS
    (By Eric S. Rein, Esquire)
    180 N. LaSalle Street
    Suite 2700
    Chicago, Illinois 60601
    Tel:  312.845.5106
    Fax:  312.264.2467
    E-mail:  rrein@schwartzcooper.com
    On Behalf of the Plaintiff.

STERN, SHAPIRO, WEISSBERG & GARIN, LLP
    (By Max D. Stern, Esquire)
    90 Canal Street
    Boston, Massachusetts 02114-2022
    Tel:  617.742.5800
    Fax:  617.742.5858
    E-mail:  mdstern@sswg.com
    On Behalf of the Defendant,
    Gary C. Gitto.

BALLIRO & MONDANO
    (By Frank Mondano, Esquire)
    99 Summer Street
    Suite 1800
    Boston, Massachusetts  02110
    Tel:  617.737.8442
    Fax:  617.737.8443
    On Behalf of the Defendant,
    Charlie Gitto.

ROACH & CARPENTER, P.C.
    (By Eve Piemonte Stacey, Esquire)
    24 School Street
    Boston, Massachusetts  02108
    Tel:  617.720.1800
    Fax:  617.720.0720
    E-mail:  eps@rc-law.com
    On Behalf of the Trustee,
    Tradex Corporation

APPEARANCES, CONTINUED

GLYNN, LANDRY, HARRINGTON & RICE, LLP
    (By William T. Harrington, Esquire)
    10 Forbes Road
    Braintree, Massachusetts  02184
    Tel:  781.356.1749
    Fax:  781.356.3393
    On Behalf of the Witness,
    William Deakin.

SEDER & CHANDLER
    (By Kevin C. McGee, Esquire)
    339 Main Street
    Worcester, Massachusetts  01608
    Tel:  508.757.7721
    Fax:  508.831.0955
    On Behalf of Clinton Savings Bank.

DWYER & COLLORA, LLP
    (By Jacob T. Elberg, Esquire)
    600 Atlantic Avenue
    Boston, Massachusetts  02210-2211
    Tel:  617.371.1000
    Fax:  617.371.1037
    E-mail:  jelberg@dwyercollora.com
    On Behalf of Defendant,
    Frank Miller.

ALSO PRESENT:  Gary C. Gitto, Defendant

* * * * *

believe it was.

Q. Now, as controller, did you supervise anyone?

A. Frank was really the -- basically the
controller, even though I had the title,
because everything that -- he directed
everybody to do whatever it was.  I provided
him the information and he did the direction.

Q. So is that a no, that you didn't supervise
anyone?

A. Yes, pretty much.  I didn't have any
authority to do anything.  You know, I
couldn't fire anybody unless Frank or Gary
wanted me to fire anybody.

Q. Was there a receivables clerk?

A. Yes, there was.

Q. Who was that?

A. Janice Chaisson, C-H-A-I-S-S-O-N.

Q. Was Janice Chaisson the receivables clerk
throughout your employment at Gitto Global?

A. No, there were probably two before her.

Q. Who was that?

A. I can't think of the first girl's name.  Then
there was a Tracy Kerry who came after her.

Q. Is that K-E-R-R-Y?