**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                          )
LASALLE BUSINESS CREDIT. LLC              )
f/k/a LASALLE BUSINESS CREDIT,            )
INC.                                      )
                       Plaintiff          )        Case No.  05-CV10268-DPW
                                          )
v.                                        )
                                          )
CLINTON SAVINGS BANK,                     )
                                          )
                       Defendant          )
_____)


**AFFIDAVIT OF ROBERT J. PAULHUS, JR. IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

Robert J. Paulhus, Jr., first being sworn, states:

1.      I, Robert J. Paulhus, Jr. am a Vice President of the Defendant, Clinton Savings

Bank ("CSB").

2.      The information set forth herein is of my own personal knowledge, except where

stated to be on information and belief, which information I believe to be true.  I make this

affidavit in connection with Defendant's Motion for Summary Judgment.  All capitalized terms

in this affidavit that are not otherwise defined herein have the same definition as provided in the

Motion for Summary Judgment.

3.      From February 12, 2001 through and including May 29, 2002, CSB permitted

Kingsdale Corporation d/b/a J&J Chemical Distributors ("J&J Chemical") to draw against

uncollected funds in business checking account number 133053050 at CSB (the "J&J Account"),

in accordance with its policy for all business checking customers at the time.  CSB also

permitted J&J Chemical to draw against uncollected funds n the J&J Account from November

23, 2002 through and including July 23, 2004, in accordance with its policy for all business

checking customers at the time.  From July 23, 2004 through and including September 15, 2004,

J&J Chemical was permitted to draw against uncollected funds in the J&J Account pursuant to a revolving credit note in the original principal amount of $8.4 million, which note was dated July 23, 2004.

4.     Each of the following documents or compilations of documents, which have been attached hereto as Exhibits "1" through "19," and Exhibits "21" through "23," is a record of an event or act or series of events or acts, and was made or received by an employee of CSB that was knowledgeable with respect to such events or acts.  Each such document or compilation of documents was either created or received by CSB in the ordinary course of its banking business, and has been kept by CSB in the ordinary course of its banking business.  Exhibits "20" and "24," a media report regarding VitroTech Corporation and Vitrotech Corporation's 10-Q for Quarter Ending June 30, 2004, are public documents that CSB acquired in the course of its due diligence regarding the credit-worthiness of Gitto Global Corporation.

(A)     Exhibit 1:  Minutes of April 16, 1999 Annual Meeting of Corporators of Clinton Savings Bank

(B)     Exhibit 2:  J&J Chemical Account Opening Resolution

(C)     Exhibit 3:  April 2002 J&J Chemical Account Statement

(D)     Exhibit 4:  May 2002 J&J Chemical Account Statement

(E)     Exhibit 5:  May 29, 2002 Notice of Delayed Availability

(F)     Exhibit 6:  November 26, 2002 Account Change

(G)     Exhibit 7:  March 11, 2004 E-Mail from Tenaglia to Cash

(H)     Exhibit 8:  May 18, 2004 E-Mail from Tenaglia to Gill

(I)      Exhibit 9:  May 19, 2004 E-Mail from Tenaglia to Gill

(J)     Exhibit 10:  CSB File regarding Gitto Global Corporation financial statements

(K)     Exhibit 11:  CSB File regarding Gitto Global asset purchase agreement with Vitrotech

(L)     Exhibit 12:  CSB Executive Committee Meeting Minutes May 2004 -- September 2004 (redacted)

(M)    Exhibit 13:  CSB Monthly Directors' Meeting Minutes June 2004 – August 2004 (redacted)

(N)    Exhibit 14:  Guaranty, dated as of June 16, 2004, by Gitto Global Corporation to CSB

(O)    Exhibit 15:  Security Agreement, dated as of June 16, 2004, by and between Gitto Global Corporation and CSB

(P)    Exhibit 16:  Letters from Frank Miller to Michael Tenaglia dated June 25, 2004

(Q)    Exhibit 17:  Correspondence Regarding Audit of Gitto Global Corporation in connection with Vitrotech Sale.

(R)    Exhibit 18: Letter Agreement dated June 30, 2004 by and among CSB, J&J Chemical., and Gitto Global Corporation

(S)    Exhibit 19:  July 2004 Note and Related Documents

(T)    Exhibit 20:  Media Report Regarding Vitrotech Corporation

(U)    Exhibit 21:  August 9, 2004 CSB Loan Presentation Sheet

(V)    Exhibit 22:  August 16, 2004 CSB Loan Presentation Sheet

(W)    Exhibit 23:  August, 2004 Letter Agreement regarding Amendment of Revolving Credit Note

(X)    Exhibit 24:  VitroTech Form 10-Q for Quarter Ending June 30, 2004 (as revised)

SIGNED UNDER PAIN AND PENALTY OF PERJURY THIS $\underline{1^{st}}$ DAY OF MAY, 2006.

Robert J. Paulhus, Jr.

Dated: May 1, 2006
     Worcester, Massachusetts

EXHIBIT 1

MINUTES OF APRIL 16, 1999 ANNUAL MEETING
OF CORPORATORS OF CLINTON SAVINGS BANK

LEGAL NOTICE
CLINTON SAVINGS BANK
The Annual Meeting of the Corporators of the
Clinton Savings Bank will be held at the Sterling
Country Club, 33 Albright Road, Sterling, MA on
Thursday, April 29, 1999 at 6:45 p.m. for the
transaction of any business that may legally
come before it.
Clerk: John A. Schmidt
Date: April 16, 1999
4/16/99

LEGAL NOTICE
CLINTON SAVINGS BANK
The Annual Meeting of the
Corporators of the Clinton
Savings Bank will be held at the
Sterling Country Club, 33 Albright
Road, Sterling, MA on Thursday,
April 29, 1999 at 6:45 p.m. for the
transaction of any business that
may legally come before it.
Clerk: John A. Schmidt
Date: April 16, 1999
4/20/99

## ANNUAL CORPORATORS MEETING
## CLINTON SAVINGS BANK
## APRIL 29, 1999

The ANNUAL MEETING of the Corporators of the Clinton Savings Bank the Sterling Country Club, 33 Albright Road, Sterling, Massachusetts on Thursday, April 29, 1999 at 6:45 p.m. for the transaction of any business that may legally come before it.

_____
CLERK

### April 16, 1999

I have served the foregoin
Member of the Corporatio
Clinton Daily Item.

*Mr. Miller was elected as a Corporator on April 29, 1999. These are copies of the minutes.*

/ thereof, to each
:ation in the

_____
ERK

## CLINTON SAVINGS B.
## ANNUAL MEETING MI

The Annual Meeting of the Corporators of Clinton Savings Bank was called to order at 6:55 p.m. by Chairman Davis.

The Call of the Meeting was read by Clerk John Schmidt.

A motion was made and seconded to dispense with the roll call and use the badges to record attendance. It was so voted.

MEMBERS PRESENT:    Corporators M. Audette, S. Azorandia, A. Barbieri, J. Bergen, V. Bhakta, K. Bodwell, J. Boquist, W. Burton, F. Butler, C. Cannon, S. Cash, D. Chandler, P.B. Cherubini, W. Clarke, F. Coleman, W. Curley, J. Davis, R. Davis, L. Ducharme, D. Dunn, S. Duvarney, S. Duvarney II, C. Dziurgot, R. Farragher, C. Frost, M. Georgeson, C. Gill, G. Griffin, J. Guercio, D. Haarman, R. Heinold, F. Hewitt, J. Hogan, A. Innamorati, J. Innamorati, J. Kilcoyne, B. King, M. Kleinknecht, C. Llanso, J. Listowich, R. Lowe, J. McLaughlin, R. McNally, J. Mitchell, E. Mudgett, W. O'Neil, R. Ordung, M. Quill, D. Ross, G. Sanginario, R. Sawyer, J. Scanlon, J. Schmidt, H. Schonbeck, D. Stadtherr, M. Tenaglia, W. Tuttle, H. Vanasse, W. Vazquez-Pol, D. Wheeler, T. Wheeler, and B. Weichmann.

The Minutes of the Semi-Annual Meeting held on October 19, 1998 were read by Clerk Schmidt. A motion was made to accept the minutes as read and it was seconded. So Voted.

Paul Cherubini presented the slate of Corporators for election. A motion was made to elect the Corporators as presented, seconded and so Voted.

Paul Cherubini presented the slate of Trustees to be re-elected. A motion was made to elect, seconded and so Voted.

Paul Cherubini presented Timothy H. Wheeler for election as a new Trustee. A motion was made to elect, seconded, and so Voted.

Annual Corporators Meeting
4/26/99
-2-

Paul Cherubini presented the slate of Officers for election for the coming year. A motion was made to elect as presented, seconded and so Voted.

The Treasurer's report was presented by SVP/Treasurer Chris Gill. Chris stated that CSB has assets of $176.2 million at year end. He then presented several charts that depicted improving trends in various operating ratios over time. He also indicated that there was no real estate owned at year end, and presented the capital ratio at 7.56%. In his update of the first Quarter of 1999, he pointed out that closed lending activity was at the $15 million level, which was on track with strategic goals.

Chairman John Davis reflected on how many Corporators and Trustees retired at the last Annual Corporators meeting. John went on to speak about the results of our recent FDIC audit and how proud he was of the job that the management team, employees, Trustees and Corporators had done.

President Steve Cash highlighted the past years accomplishments, how we are #1 in mortgage lending in six communities that we service. Also he talked about our ATM network, upgrading our computer terminals and software. He talked about Y2K issues, the banks preparations, and the need to be aware of Y2K scams. He discussed the ever changing face of the financial service market place and how we must change to service our customers and take advantage of new customers disillusioned by larger banks. He spoke of the banks Internet banking project and our initiatives to expand our small business client base. Steve went on to thank our employees, Trustees and Corporators for a job well done.

Michael Tenaglia gave a slide presentation on our new Website and Internet banking in general.

The Meeting adjourned at 9:30 p.m.

_____
CLERK

# CLINTON SAVINGS BANK
## LIST OF OFFICERS - 1999

**PRESIDENT/CEO**
Steven P. Cash
**SVP/TREASURER/CFO**
Christopher M. Gill
**SVP/LENDING**
Joseph D. Guercio
**VP/COMMERCIAL LENDING**
Michael L. Andette
**VP/RETAIL BANKING**
Michael D. Tenaglia
**AVP/COMPTROLLER**
Sheila A. Azorandia
**AVP/LOAN OPERATIONS OFFICER**
Joan E. Moran
**AVP/MORTGAGE ORIGINATIONS**
Jeffrey G. Perkins
**AVP/BRANCH MANAGER**
Bobbi-Jo A. Parker
**AT/BRANCH MANAGERS**
Kristen L. DiMeco
Linda M. Nicholson
K. Joy Sullivan
**ADMINISTRATIVE OFFICERS**
Patricia A. Florio
Catherine M. Frost
**CHAIRMAN OF THE BOARD**
John M. Davis
**VICE CHAIRMAN**
Robert M. Farragher

| BOARD OF INVESTMENT | AUDITORS |
|---|---|
| Paul B. Cherubini | Cynthia A. Dziurgot |
| John M. Davis | William E. O'Neil Jr. |
| Robert M. Farragher | Maureen K. Quinn |
| Barbara E. King | John A. Schmidt |
| David E. Ross | |

**CLERK OF THE CORPORATION**
John A. Schmidt

**TRUSTEES**

| TERM EXPIRES 2000 | TERM EXPIRES 2001 | TERM EXPIRES 2002 |
|---|---|---|
| Cynthia A. Dziurgot | Steven P. Cash | John M. Davis |
| Barbara E. King | Paul B. Cherubini | Robert M. Farragher |
| William E. O'Neil Jr. | John F. Kilcoyne | Maureen K. Quill |
| John A. Schmidt | Timothy H. Wheeler | David E. Ross |

## CLINTON SAVINGS BANK
## MEMBERS OF THE CORPORATION – 1999

| | TERM EXPIRES | | TERM EXPIRES |
|---|---|---|---|
| Michael L. Andette | 2007 | Joseph W. Listowich Jr. | 2001 |
| Sheila A. Azorandia | 2004 | Cathleen E. Llanso | 2007 |
| Atty. Robert M. Bailey | 2004 | Paul F. Lowe | 2006 |
| Atty. Albert A. Barbieri | 2007 | Richard H. Lowe | 2004 |
| Joanne Bergen | 2005 | Allan H. MacQuarrie | 2004 |
| Vitthal Bhakta | 2007 | Peter B. Marshall | 2002 |
| Kirk W. Bodwell | 2007 | David R. Masiello | 2009 |
| Jane D. Boquist | 2006 | Atty. William T. McGrail | 2009 |
| Wilton S. Burton | 2006 | Atty. James. T. McLaughlin | 2004 |
| Francis J. Butler | 2001 | Brian J. McNally | 2009 |
| Cynthia E. Cannon | 2005 | Robert J. McNally | 2006 |
| Phillips M. Carlisle | 2005 | Frank Miller | 2006 |
| Steven P. Cash | 2005 | Atty. John J. Mitchell | 2005 |
| David Chandler | 2000 | Joan E. Moran | 2009 |
| Paul A. Cherubini | 2008 | Dennis G. Morrissey | 2009 |
| Paul B. Cherubini | 2002 | Elaine A. Mudgett | 2006 |
| Warren W. Clarke | 2004 | Atty. Harold P. Naughton Jr. | 2009 |
| George J. Colangelo | 2009 | Atty. William E. O'Neil Jr. | 2008 |
| Francis J. Coleman Jr. | 2006 | Robert Ordung | 2008 |
| Charles P. Conroy | 2005 | Bobbi-Jo A. Parker | 2009 |
| Laurence T. Crossman | 2009 | Jeffrey G. Perkins | 2009 |
| William F. Curley | 2006 | Paul Q. Polewarczyk | 2009 |
| Douglas A. Davis | 2006 | Maureen K. Quill | 2005 |
| John M. Davis | 2004 | Kenneth W. Ranscher | 2002 |
| Robert S. Davis | 2004 | David E. Ross | 2003 |
| Edward M. DeFeudis | 2009 | Ellen M. Salmon | 2006 |
| Thomas B. Devius | 2008 | Walter M. Sanders | 2004 |
| Frank J. DiGiorno | 2007 | Atty. Gary P. Sanginario | 2005 |
| Pamela D. Dobeck | 2009 | Atty. Dennis P. Sargent | 2007 |
| Lawrence J. Ducharme | 2006 | Jane L. Sawyer | 2009 |
| George W. Ducknowski | 2009 | Richard B. Sawyer | 2002 |
| David M. Dunn | 2001 | Jeanette M. Scanlon | 2007 |
| Steven H. Duvarney | 2008 | John A. Schmidt | 2001 |
| Steven H. Duvarney II | 2007 | Harold Schonbeck | 2007 |
| Atty. Cynthia A. Dziurgot | 2005 | Mario Shapastan | 2009 |
| Robert M. Farragher | 2003 | Dr. Param B. Singh | 2002 |
| Catherine M. Frost | 2002 | Virginia J. Smith | 2009 |
| Dr. Peter A. Garofoli | 2007 | Dr. William R. Southworth | 2009 |
| Mark C. Georgeson | 2002 | David K. Sixdtherr | 2000 |
| Christopher M. Gill | 2004 | Carolyn C. Stimpson | 2009 |
| Atty. Sherill R. Gould | 2004 | George A. Stowe | 2008 |
| R. Gary Griffin | 2006 | Michael D. Tenaglia | 2007 |
| Joseph D. Guercio | 2004 | Edward J. Troisi | 2007 |
| Diane C. Haarman | 2008 | William B. Tuttle | 2007 |
| Robert D. Heinold | 2002 | Harold A. Vanasse | 2007 |
| Frank R. Hewitt | 2002 | Wilfredo Vazquez-Pei | 2006 |
| John F. Hogan Jr. | 2008 | Phyllis K. Vetras | 2004 |
| Arthur T. Innamorati Jr. | 2004 | James P. Waldron | 2006 |
| Atty. Jean K. Innamorati | 2005 | Denise C. Wheeler | 2008 |

1389

## THIS IS TO CERTIFY THAT I HAVE ADMINISTERED THE OATH OF OFFICE TO:

### *OPERATING OFFICERS*

#### One Year Term

| | |
|---|---|
| Steven P. Cash | President |
| Christopher M. Gill | SVP/Treasurer/CFO |
| Joseph D. Guercio | SVP Lending |
| Michael L. Audette | VP Commercial Lending |
| Michael D. Tenaglia | VP Retail Banking |
| John A. Schmidt | Clerk |
| Robert M. Farragher | Vice President |

### *TRUSTEES*

#### Three Year Term – Expires 2002

John A. Davis

Robert M. Farragher

Maureen K. Quill

David E. Ross

### *ELECT NEW TRUSTEE*

#### Term Expires – 2001

Timothy H. Wheeler

Certification Date:
May 3, 1999

Notary Public

PAUL B. CHERUBINI
Notary Public
My Commission Expires March 28, 2003

CLINTON SAVINGS BANK

1999 ANNUAL MEETING

April 29, 1999

## ELECTION OF CORPORATORS

### TERMS TO EXPIRE 2009

### REELECT

NONE

### ELECT

| | |
|---|---|
| GEORGE COLANGELO | W. BOYLSTON |
| LAWRENCE CROSSMAN | LANCASTER |
| EDWARD DEFEUDIS | BOYLSTON |
| PAMELA DOBECK | BOLTON |
| GEORGE DUCHNOWSKI | CLINTON |
| DAVID MASIELLO | PRINCETON/BOYLSTON |
| WILLIAM MCGRAIL | CLINTON |
| BRIAN MCNALLY | CLINTON |
| FRANK MILLER | BOLTON |
| JOAN MORAN | CLINTON |
| DENNIS MORRISSEY | BOYLSTON |
| HAROLD NAUGHTON JR | CLINTON |
| BOBBI-JO PARKER | CLINTON |
| JEFFREY PERKINS | W. BOYLSTON |
| PAUL POLEWARCZYK | STERLING |
| JANE SAWYER | BERLIN |
| VIRGINIA SMITH | W. BOYLSTON |
| DR. WILLIAM SOUTHWORTH | LANCASTER |
| CAROLYN CROWLEY STIMPSON | PRINCETON |

CORPOFF/CATHY

EXHIBIT 2

J&J CHEMICAL ACCOUNT OPENING RESOLUTION

ACCESS YOUR ACCOUNTS 24 HOURS A
DAY WITH ON-LINE BANKING, BANK-BY
PHONE, CSB ATMS OR WHEREVER YOU
SEE THE CIRRUS, NYCE OR SUM  LOGOS.

```
        ----   ----
               ----

    KINGSDALE CORP DBA
    J&J CHEMICAL DISTRIBUTORS                    ACCOUNT 01-33-53050
    THOMAS J SULLIVAN
    77 SNEAD DR                        ----
    MASHPEE MA 02649-3259

   41   PAGE   1
     STATEMENT END DATE        ACCOUNT      ENDING     R-E-M-A-R-K-S           PAGE
                               NUMBERS      BALANCES   AS OF: 30-APR-02         1
 SUMMARY:
          CHECKING     01-33-53050       264,266.18   LAST TRAN. DATE 30-APR-02
```

```
**************************        CHECKING        ********************************
                                 01-33-53050
   DATE    DESCRIPTION                                                    BALANCE
   ------  -----------                         DEPOSITS  WITHDRAWALS      -------
  1-APR-02  "PREVIOUS BALANCE" -------------------------------------->   21,344.43
  1 APR   CHECK DEPOSIT-BOLTON               393,750.00                 415,094.43
            1 ITEMS
  1 APR   CHECK DEPOSIT-BOLTON               656,250.00                1071,344.43
            2 ITEMS
  1 APR     CHECK#  1646                                  125,490.00    945,854.43
  1 APR     CHECK#  1645                                  125,556.75    820,297.68
  1 APR     CHECK#  1648                                  125,714.00    694,583.68
  1 APR     CHECK#  1647                                  126,500.00    568,083.68
  1 APR     CHECK#  1644                                  251,125.55    316,958.13
  1 APR     CHECK#  1643                                  251,380.50     65,577.63
  2 APR   CHECK DEPOSIT-BOLTON               393,750.00                 459,327.63
            1 ITEMS
  2 APR     CHECK#  1652                                   78,200.00    381,127.63
  2 APR     CHECK#  1650                                  125,529.90    255,597.73
  2 APR     CHECK#  1651                                  125,556.75    130,040.98
  2 APR     CHECK#  1649                                  125,623.50      4,417.48
  3 APR   CHECK DEPOSIT-BOLTON               525,000.00                 529,417.48
            2 ITEMS
  3 APR   CHECK DEPOSIT-BOLTON               393,750.00                 923,167.48
            1 ITEMS
  3 APR     CHECK#  1656                                  125,703.60    797,463.88
  3 APR     CHECK#  1654                                  251,072.95    546,390.93
  3 APR     CHECK#  1653                                  251,273.70    295,117.23
  3 APR     CHECK#  1655                                  254,512.50     40,604.73
  4 APR   CHECK DEPOSIT-BOLTON               393,750.00                 434,354.73
            1 ITEMS
  4 APR   CHECK DEPOSIT-BOLTON               393,750.00                 828,104.73
            1 ITEMS
  4 APR     CHECK#  1661                                   70,000.00    758,104.73
  4 APR     CHECK#  1660                                  125,690.25    632,414.48
  4 APR     CHECK#  1659                                  125,757.00    506,657.48
  4 APR     CHECK#  1657                                  251,099.25    255,558.23
  4 APR     CHECK#  1658                                  251,447.25      4,110.98
```

ACCESS YOUR ACCOUNTS 24 HOURS A
DAY WITH ON-LINE BANKING, BANK-BY
PHONE, CSB ATMS OR WHEREVER YOU
SEE THE CIRRUS, NYCE OR SUM  LOGOS.

```
---- ----
---- ----
```

KINGSDALE CORP DBA
J&J CHEMICAL DISTRIBUTORS                    ACCOUNT 01-33-53050
THOMAS J SULLIVAN
77 SNEAD DR                        ----
MASHPEE MA 02649-3259

41   PAGE   2
STATEMENT END DATE                                             PAGE
30-APR-02                                                      2
                                01-33-53050

| DATE | DESCRIPTION | DEPOSITS | WITHDRAWALS | BALANCE |
|------|-------------|----------|-------------|---------|
| 5 APR | CHECK DEPOSIT-BOLTON | 656,250.00 | | 660,360.98 |
| | 3 ITEMS | | | |
| 5 APR | CHECK# 1665 | | 55,714.00 | 604,646.98 |
| 5 APR | CHECK# 1666 | | 77,350.00 | 527,296.98 |
| 5 APR | CHECK# 1662 | | 251,206.95 | 276,090.03 |
| 5 APR | CHECK# 1663 | | 251,625.00 | 24,465.03 |
| 8 APR | CHECK DEPOSIT-BOLTON | 525,000.00 | | 549,465.03 |
| | 2 ITEMS | | | |
| 8 APR | CHECK# 1667 | | 251,260.35 | 298,204.68 |
| 8 APR | CHECK# 1668 | | 251,313.75 | 46,890.93 |
| 9 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 440,640.93 |
| | 1 ITEMS | | | |
| 9 APR | CHECK# 1670 | | 125,648.25 | 314,992.68 |
| 9 APR | CHECK# 1671 | | 125,650.20 | 189,342.48 |
| 9 APR | CHECK# 1669 | | 127,875.00 | 61,467.48 |
| 10 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 455,217.48 |
| | 1 ITEMS | | | |
| 10 APR | CHECK# 1673 | | 125,582.50 | 329,634.98 |
| 10 APR | CHECK# 1672 | | 251,230.75 | 78,404.23 |
| 11 APR | CHECK DEPOSIT-BOLTON | 525,000.00 | | 603,404.23 |
| | 2 ITEMS | | | |
| 11 APR | CHECK# 1678 | | 79,200.00 | 524,204.23 |
| 11 APR | CHECK# 1677 | | 125,490.00 | 398,714.23 |
| 11 APR | CHECK# 1674 | | 125,490.00 | 273,224.23 |
| 11 APR | CHECK# 1675 | | 125,648.25 | 147,575.98 |
| 11 APR | CHECK# 1676 | | 125,690.25 | 21,885.73 |
| 12 APR | INSUFF FUNDS CHRG | | 20.00 | 21,865.73 |
| | 125,582.50 CHECK # 1680 | | | |
| 12 APR | INSUFF FUNDS CHRG | | 20.00 | 21,845.73 |
| | 251,580.00 CHECK # 1679 | | | |
| 12 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 415,595.73 |
| | 1 ITEMS | | | |
| 15 APR | CHECK DEPOSIT-CLINTON | 525,000.00 | | 940,595.73 |
| | 2 ITEMS | | | |
| 15 APR | CHECK# 1680 | | 125,582.50 | 815,013.23 |
| 15 APR | CHECK# 1679 | | 251,580.00 | 563,433.23 |
| 15 APR | CHECK# 1681 | | 251,165.00 | 312,268.23 |
| 15 APR | CHECK# 1682 | | 251,287.05 | 60,981.18 |

```
                                    ACCESS YOUR ACCOUNTS 24 HOURS A        3
                                    DAY WITH ON-LINE BANKING, BANK-BY      3
                                    PHONE, CSB ATMS OR WHEREVER YOU        3
                                    SEE THE CIRRUS, NYCE OR SUM  LOGOS.    3
                                                                          3
                                                                          3
                                                                          3
                                                                          3
                                                                          3
                                                                          3
                                                                          3
                            ---- ----                                     3
                            ---- ----                                     3
                                                                          3
        KINGSDALE CORP DBA                                                3
        J&J CHEMICAL DISTRIBUTORS            ACCOUNT 01-33-53050          3
        THOMAS J SULLIVAN                                                  3
        77 SNEAD DR              ----                                      3
        MASHPEE MA 02649-3259                                             3
```

```
 41  PAGE   3
    STATEMENT END DATE                                              PAGE
      30-APR-02                                                      3
                               01-33-53050
 DATE    DESCRIPTION                                             BALANCE
 ------  -----------                        DEPOSITS  WITHDRAWALS -------
 16 APR  CHECK DEPOSIT-CLINTON              196,875.00            257,856.18
         2 ITEMS
 16 APR     CHECK#  1684                               125,623.50 132,232.68
 16 APR     CHECK#  1683                               125,714.00   6,518.68
 19 APR  CHECK DEPOSIT-BOLTON               500,000.00            506,518.68
         2 ITEMS
 26 APR  CASH WITHDRAWAL-BOLTON                        393,752.50 112,766.18
         RET CK AND FEE
 30 APR  CHECK DEPOSIT-BOLTON               151,500.00            264,266.18
         3 ITEMS
 30-APR-02  "NEW BALANCE" --------------------------------------->  264,266.18

         AVERAGE COLLECTED BALANCE    199,501

 **********************************************************************************

 TOTAL AMOUNT OF CREDITS    7,410,875.00   TOTAL AMOUNT OF DEBITS   7,167,953.25
         NUMBER OF CREDITS          17          NUMBER OF DEBITS            44
```

| ITEM | DATE | AMOUNT | ITEM | DATE | AMOUNT | ITEM | DATE | AMOUNT |
|------|------|--------|------|------|--------|------|------|--------|
| 1643 | 01APR | 251,380.50 | 1657 | 04APR | 251,099.25 | 1672 | 10APR | 251,230.75 |
| 1644 | 01APR | 251,125.55 | 1658 | 04APR | 251,447.25 | 1673 | 10APR | 125,582.50 |
| 1645 | 01APR | 125,556.75 | 1659 | 04APR | 125,757.00 | 1674 | 11APR | 125,490.00 |
| 1646 | 01APR | 125,490.00 | 1660 | 04APR | 125,690.25 | 1675 | 11APR | 125,648.25 |
| 1647 | 01APR | 126,500.00 | 1661 | 04APR | 70,000.00 | 1676 | 11APR | 125,690.25 |
| 1648 | 01APR | 125,714.00 | 1662 | 05APR | 251,206.95 | 1677 | 11APR | 125,490.00 |
| 1649 | 02APR | 125,623.50 | 1663 | 05APR | 251,625.00 | 1678 | 11APR | 79,200.00 |
| 1650 | 02APR | 125,529.90 | * 1665 | 05APR | 55,714.00 | 1679 | 15APR | 251,580.00 |
| 1651 | 02APR | 125,556.75 | 1666 | 05APR | 77,350.00 | 1680 | 15APR | 125,582.50 |
| 1652 | 02APR | 78,200.00 | 1667 | 08APR | 251,260.35 | 1681 | 15APR | 251,165.00 |
| 1653 | 03APR | 251,273.70 | 1668 | 08APR | 251,313.75 | 1682 | 15APR | 251,287.05 |
| 1654 | 03APR | 251,072.95 | 1669 | 09APR | 127,875.00 | 1683 | 16APR | 125,714.00 |
| 1655 | 03APR | 254,512.50 | 1670 | 09APR | 125,648.25 | 1684 | 16APR | 125,623.50 |
| 1656 | 03APR | 125,703.60 | 1671 | 09APR | 125,650.20 | | | |

EXHIBIT 3

APRIL 2002 J&J CHEMICAL
ACCOUNT STATEMENT

ACCESS YOUR ACCOUNTS 24 HOURS A
DAY WITH ON-LINE BANKING, BANK-BY
PHONE, CSB ATMS OR WHEREVER YOU
SEE THE CIRRUS, NYCE OR SUM  LOGOS.

KINGSDALE CORP DBA
J&J CHEMICAL DISTRIBUTORS                              ACCOUNT 01-33-53050
THOMAS J SULLIVAN
77 SNEAD DR
MASHPEE MA 02649-3259

41  PAGE   1
      STATEMENT END DATE       ACCOUNT        ENDING     R-E-M-A-R-K-S          PAGE
                               NUMBERS        BALANCES   AS OF: 30-APR-02         1
  SUMMARY:
         CHECKING      01-33-53050      264,266.18   LAST TRAN. DATE 30-APR-02

****************************        CHECKING        ****************************
                                   01-33-53050

| DATE | DESCRIPTION | DEPOSITS | WITHDRAWALS | BALANCE |
|------|-------------|----------|-------------|---------|
| 1-APR-02 | "PREVIOUS BALANCE" --------------------------------------------------> | | | 21,344.43 |
| 1 APR | .CHECK DEPOSIT-BOLTON | 393,750.00 | | 415,094.43 |
|  | 1 ITEMS | | | |
| 1 APR | CHECK DEPOSIT-BOLTON | 656,250.00 | | 1071,344.43 |
|  | 2 ITEMS | | | |
| 1 APR | CHECK#  1646 | | 125,490.00 | 945,854.43 |
| 1 APR | CHECK#  1645 | | 125,556.75 | 820,297.68 |
| 1 APR | CHECK#  1648 | | 125,714.00 | 694,583.68 |
| 1 APR | CHECK#  1647 | | 126,500.00 | 568,083.68 |
| 1 APR | CHECK#  1644 | | 251,125.55 | 316,958.13 |
| 1 APR | CHECK#  1643 | | 251,380.50 | 65,577.63 |
| 2 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 459,327.63 |
|  | 1 ITEMS | | | |
| 2 APR | CHECK#  1652 | | 78,200.00 | 381,127.63 |
| 2 APR | CHECK#  1650 | | 125,529.90 | 255,597.73 |
| 2 APR | CHECK#  1651 | | 125,556.75 | 130,040.98 |
| 2 APR | CHECK#  1649 | | 125,623.50 | 4,417.48 |
| 3 APR | CHECK DEPOSIT-BOLTON | 525,000.00 | | 529,417.48 |
|  | 2 ITEMS | | | |
| 3 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 923,167.48 |
|  | 1 ITEMS | | | |
| 3 APR | CHECK#  1656 | | 125,703.60 | 797,463.88 |
| 3 APR | CHECK#  1654 | | 251,072.95 | 546,390.93 |
| 3 APR | CHECK#  1653 | | 251,273.70 | 295,117.23 |
| 3 APR | CHECK#  1655 | | 254,512.50 | 40,604.73 |
| 4 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 434,354.73 |
|  | 1 ITEMS | | | |
| 4 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 828,104.73 |
|  | 1 ITEMS | | | |
| 4 APR | CHECK#  1661 | | 70,000.00 | 758,104.73 |
| 4 APR | CHECK#  1660 | | 125,690.25 | 632,414.48 |
| 4 APR | CHECK#  1659 | | 125,757.00 | 506,657.48 |
| 4 APR | CHECK#  1657 | | 251,099.25 | 255,558.23 |
| 4 APR | CHECK#  1658 | | 251,447.25 | 4,110.98 |

ACCESS YOUR ACCOUNTS 24 HOURS A
DAY WITH ON-LINE BANKING, BANK-BY
PHONE, CSB ATMS OR WHEREVER YOU
SEE THE CIRRUS, NYCE OR SUM  LOGOS.

KINGSDALE CORP DBA
J&J CHEMICAL DISTRIBUTORS                    ACCOUNT 01-33-53050
THOMAS J SULLIVAN
77 SNEAD DR
MASHPEE MA 02649-3259

41  PAGE   2
STATEMENT END DATE                                              PAGE
30-APR-02                                                        2
                              01-33-53050

| DATE | DESCRIPTION | DEPOSITS | WITHDRAWALS | BALANCE |
|------|-------------|----------|-------------|---------|
| 5 APR | CHECK DEPOSIT-BOLTON | 656,250.00 | | 660,360.98 |
| | 3 ITEMS | | | |
| 5 APR | CHECK# 1665 | | 55,714.00 | 604,646.98 |
| 5 APR | CHECK# 1666 | | 77,350.00 | 527,296.98 |
| 5 APR | CHECK# 1662 | | 251,206.95 | 276,090.03 |
| 5 APR | CHECK# 1663 | | 251,625.00 | 24,465.03 |
| 8 APR | CHECK DEPOSIT-BOLTON | 525,000.00 | | 549,465.03 |
| | 2 ITEMS | | | |
| 8 APR | CHECK# 1667 | | 251,260.35 | 298,204.68 |
| 8 APR | CHECK# 1668 | | 251,313.75 | 46,890.93 |
| 9 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 440,640.93 |
| | 1 ITEMS | | | |
| 9 APR | CHECK# 1670 | | 125,648.25 | 314,992.68 |
| 9 APR | CHECK# 1671 | | 125,650.20 | 189,342.48 |
| 9 APR | CHECK# 1669 | | 127,875.00 | 61,467.48 |
| 10 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 455,217.48 |
| | 1 ITEMS | | | |
| 10 APR | CHECK# 1673 | | 125,582.50 | 329,634.98 |
| 10 APR | CHECK# 1672 | | 251,230.75 | 78,404.23 |
| 11 APR | CHECK DEPOSIT-BOLTON | 525,000.00 | | 603,404.23 |
| | 2 ITEMS | | | |
| 11 APR | CHECK# 1678 | | 79,200.00 | 524,204.23 |
| 11 APR | CHECK# 1677 | | 125,490.00 | 398,714.23 |
| 11 APR | CHECK# 1674 | | 125,490.00 | 273,224.23 |
| 11 APR | CHECK# 1675 | | 125,648.25 | 147,575.98 |
| 11 APR | CHECK# 1676 | | 125,690.25 | 21,885.73 |
| 12 APR | INSUFF FUNDS CHRG | | 20.00 | 21,865.73 |
| | 125,582.50 CHECK # 1680 | | | |
| 12 APR | INSUFF FUNDS CHRG | | 20.00 | 21,845.73 |
| | 251,580.00 CHECK # 1679 | | | |
| 12 APR | CHECK DEPOSIT-BOLTON | 393,750.00 | | 415,595.73 |
| | 1 ITEMS | | | |
| 15 APR | CHECK DEPOSIT-CLINTON | 525,000.00 | | 940,595.73 |
| | 2 ITEMS | | | |
| 15 APR | CHECK# 1680 | | 125,582.50 | 815,013.23 |
| 15 APR | CHECK# 1679 | | 251,580.00 | 563,433.23 |
| 15 APR | CHECK# 1681 | | 251,165.00 | 312,268.23 |
| 15 APR | CHECK# 1682 | | 251,287.05 | 60,981.18 |

ACCESS YOUR ACCOUNTS 24 HOURS A
DAY WITH ON-LINE BANKING, BANK-BY
PHONE, CSB ATMS OR WHEREVER YOU
SEE THE CIRRUS, NYCE OR SUM  LOGOS.

---- ----
---- ----

KINGSDALE CORP DBA
J&J CHEMICAL DISTRIBUTORS                    ACCOUNT 01-33-53050
THOMAS J SULLIVAN
77 SNEAD DR                        ----
MASHPEE MA 02649-3259

41  PAGE    3
STATEMENT END DATE                                          PAGE
  30-APR-02                                                   3
                              01-33-53050

| DATE | DESCRIPTION | DEPOSITS | WITHDRAWALS | BALANCE |
|------|-------------|----------|-------------|---------|
| 16 APR | CHECK DEPOSIT-CLINTON | 196,875.00 | | 257,856.18 |
| | 2 ITEMS | | | |
| 16 APR | CHECK# 1684 | | 125,623.50 | 132,232.68 |
| 16 APR | CHECK# 1683 | | 125,714.00 | 6,518.68 |
| 19 APR | CHECK DEPOSIT-BOLTON | 500,000.00 | | 506,518.68 |
| | 2 ITEMS | | | |
| 26 APR | CASH WITHDRAWAL-BOLTON | | 393,752.50 | 112,766.18 |
| | RET CK AND FEE | | | |
| 30 APR | CHECK DEPOSIT-BOLTON | 151,500.00 | | 264,266.18 |
| | 3 ITEMS | | | |
| 30-APR-02 | "NEW BALANCE" ----------------------------------------------> | | | 264,266.18 |

          AVERAGE COLLECTED BALANCE    199,501

******************************************************************************

TOTAL AMOUNT OF CREDITS   7,410,875.00   TOTAL AMOUNT OF DEBITS   7,167,953.25
        NUMBER OF CREDITS            17         NUMBER OF DEBITS            44

| ----------CHECKS---------- | | | ----------CHECKS---------- | | | ----------CHECKS---------- | | |
|------|------|--------|------|------|--------|------|------|--------|
| ITEM | DATE | AMOUNT | ITEM | DATE | AMOUNT | ITEM | DATE | AMOUNT |
| 1643 | 01APR | 251,380.50 | 1657 | 04APR | 251,099.25 | 1672 | 10APR | 251,230.75 |
| 1644 | 01APR | 251,125.55 | 1658 | 04APR | 251,447.25 | 1673 | 10APR | 125,582.50 |
| 1645 | 01APR | 125,556.75 | 1659 | 04APR | 125,757.00 | 1674 | 11APR | 125,490.00 |
| 1646 | 01APR | 125,490.00 | 1660 | 04APR | 125,690.25 | 1675 | 11APR | 125,648.25 |
| 1647 | 01APR | 126,500.00 | 1661 | 04APR | 70,000.00 | 1676 | 11APR | 125,690.25 |
| 1648 | 01APR | 125,714.00 | 1662 | 05APR | 251,206.95 | 1677 | 11APR | 125,490.00 |
| 1649 | 02APR | 125,623.50 | 1663 | 05APR | 251,625.00 | 1678 | 11APR | 79,200.00 |
| 1650 | 02APR | 125,529.90 | * 1665 | 05APR | 55,714.00 | 1679 | 15APR | 251,580.00 |
| 1651 | 02APR | 125,556.75 | 1666 | 05APR | 77,350.00 | 1680 | 15APR | 125,582.50 |
| 1652 | 02APR | 78,200.00 | 1667 | 08APR | 251,260.35 | 1681 | 15APR | 251,165.00 |
| 1653 | 03APR | 251,273.70 | 1668 | 08APR | 251,313.75 | 1682 | 15APR | 251,287.05 |
| 1654 | 03APR | 251,072.95 | 1669 | 09APR | 127,875.00 | 1683 | 16APR | 125,714.00 |
| 1655 | 03APR | 254,512.50 | 1670 | 09APR | 125,648.25 | 1684 | 16APR | 125,623.50 |
| 1656 | 03APR | 125,703.60 | 1671 | 09APR | 125,650.20 | | | |

EXHIBIT 4

MAY 2002 J&J CHEMICAL
ACCOUNT STATEMENT

WHAT IS PFI? STOP BY YOUR NEAREST
BRANCH AND ASK ABOUT PFI AND THE
REWARDS AT CLINTON SAVINGS BANK.
PLUS, ASK HOW YOU CAN
GET $25 IN CASH!

---- ----

---- 

KINGSDALE CORP DBA
J&J CHEMICAL DISTRIBUTORS                    ACCOUNT 01-33-53050
THOMAS J SULLIVAN
77 SNEAD DR
MASHPEE MA 02649-3259

2   PAGE   1
STATEMENT END DATE      ACCOUNT      ENDING     R-E-M-A-R-K-S             PAGE
   31-MAY-02            NUMBERS      BALANCES   AS OF: 31-MAY-02           1
SUMMARY:
      CHECKING       01-33-53050      644,137.90    LAST TRAN. DATE 31-MAY-02

*****************************         CHECKING        *****************************
                                    01-33-53050

| DATE | DESCRIPTION | DEPOSITS | WITHDRAWALS | BALANCE |
|------|-------------|----------|-------------|---------|
| 1-MAY-02 | "PREVIOUS BALANCE" --------------------------------------------> | | | 264,266.18 |
| 1 MAY | CASH WITHDRAWAL | | 262,502.50 | 1,763.68 |
| | THIRD PARTY RET'D CHECK & FEE | | | |
| 6 MAY | CHECK DEPOSIT-BOLTON | 131,250.41 | | 133,014.09 |
| | 4 ITEMS | | | |
| 7 MAY | CHECK DEPOSIT-BOLTON | 131,250.41 | | 264,264.50 |
| | 4 ITEMS | | | |
| 9 MAY | CASH WITHDRAWAL | | 262,502.50 | 1,762.00 |
| | 3RD PARTY RETURN PLUS FEE | | | |
| 14 MAY | CHECK DEPOSIT-BOLTON | 131,250.00 | | 133,012.00 |
| | 4 ITEMS | | | |
| 14 MAY | CASH WITHDRAWAL | | 131,252.50 | 1,759.50 |
| | THIRD PARTY RET'D CHECK & FEE | | | |
| 18 MAY | CHECK DEPOSIT-BOLTON | 131,250.00 | | 133,009.50 |
| | 4 ITEMS | | | |
| 21 MAY | CHECK DEPOSIT-BOLTON | 131,250.00 | | 264,259.50 |
| | 4 ITEMS | | | |
| 22 MAY | CHECK DEPOSIT-BOLTON | 131,250.00 | | 395,509.50 |
| | 4 ITEMS | | | |
| 22 MAY | CASH WITHDRAWAL | | 393,752.50 | 1,757.00 |
| | RETURNED CHECK PLUS FEE | | | |
| 24 MAY | CHECK DEPOSIT | 249,990.00 | | 251,747.00 |
| | INCOMING WIRE LESS $10.00 FEE | | | |
| 24 MAY | CHECK DEPOSIT | 249,990.00 | | 501,737.00 |
| | INCOMING WIRE LESS $10.00 FEE | | | |
| 28 MAY | CHECK DEPOSIT-BOLTON | 262,500.00 | | 764,237.00 |
| | 7 ITEMS | | | |
| 28 MAY | CHECK# 1685 | | 125,608.80 | 638,628.20 |
| 28 MAY | CHECK# 1686 | | 125,730.30 | 512,897.90 |
| 30 MAY | CHECK DEPOSIT-BOLTON | 262,500.00 | | 775,397.90 |
| 31 MAY | CASH WITHDRAWAL-BOLTON | | 26,777.50 | 748,620.40 |
| | RET CK AND FEE | | | |
| 31 MAY | CASH WITHDRAWAL-BOLTON | | 38,502.50 | 710,117.90 |
| | RET CK AND FEE | | | |

```
                                    WHAT IS PFI? STOP BY YOUR NEAREST        3
                                    BRANCH AND ASK ABOUT PFI AND THE         3
                                    REWARDS AT CLINTON SAVINGS BANK.         3
                                    PLUS, ASK HOW YOU CAN                    3
                                    GET $25 IN CASH!                         3
                                                                            3
                                                                            3
                                                                            3
                                                                            3
                                                                            3
                                    ---- ----                               3
                                    ----                                    3
        KINGSDALE CORP DBA                   ----                           3
        J&J CHEMICAL DISTRIBUTORS            ACCOUNT 01-33-53050             3
        THOMAS J SULLIVAN                                                   3
        77 SNEAD DR                                                        3
        MASHPEE MA 02649-3259                                              3
                                                                            3
    2   PAGE   2                                                            3
    STATEMENT END DATE                                          PAGE        3
        31-MAY-02                                                2          3
                                01-33-53050                                 3
    DATE     DESCRIPTION                                        BALANCE     3
    ------   -----------              DEPOSITS  WITHDRAWALS     -------     3
    31 MAY     CASH WITHDRAWAL-BOLTON            44,627.50      665,490.40  3
               RET CK AND FEE                                               3
    31 MAY     CASH WITHDRAWAL-BOLTON            21,352.50      644,137.90  3
               RET CK AND FEE                                               3
    31-MAY-02  "NEW BALANCE" --------------------------------->  644,137.90 3
                                                                            3
           AVERAGE COLLECTED BALANCE     187,267                            3
                                                                            3
    ****************************************************************************  3
                                                                            3
    TOTAL AMOUNT OF CREDITS   1,812,480.82   TOTAL AMOUNT OF DEBITS  1,432,609.10 3
           NUMBER OF CREDITS           10         NUMBER OF DEBITS          10    3
                                                                            3
    ----------CHECKS----------   ----------CHECKS----------  ----------CHECKS----------  3
    ITEM   DATE    AMOUNT      ITEM   DATE    AMOUNT      ITEM   DATE    AMOUNT   3
                                                                            3
    1685  28MAY  125,608.80     1686  28MAY  125,730.30                     3
                                                                            3
```

EXHIBIT 5

MAY 29, 2002 NOTICE OF
DELAYED AVAILABILITY

**CLINTON SAVINGS BANK**
200 CHURCH STREET, P.O. BOX 770
CLINTON, MASSACHUSETTS 01510-0770
(978) 365-3700

# NOTICE OF DELAYED AVAILABILITY

Date: _5-29-02_

### DESCRIPTION OF DEPOSIT

Account Number: _13305 3050_

Date of Deposit: _5-28-02_

[ Kingsdale Corp DBA
J & J Chemical Distributors ]

We are delaying the availability of ☒ $_2,262,500_ — from the deposit described above. ☒ the funds you deposited by the following check:

_2 Checks Totaling $2,262,500_
(description of check, such as amount and drawer)

_____ These funds will be available on the _9th_ business day after the day of your deposit.

*We are taking this action because:*

☐ A check you deposited was previously returned unpaid.

☐ You have overdrawn your account repeatedly in the last six months.

*We believe a check you deposited will not be paid for the following reasons:*

☐ We received notice that the check is being returned unpaid.

☐ We have confidential information that indicates that the check may not be paid.

☐ The check is drawn on an account with repeated overdrafts.

☐ We are unable to verify the endorsement of a joint payee.

☐ Some information on the check is not consistent with other information on the check.

☐ Other: _____

☒ The checks you deposited on this day exceed $5,000.00.

☐ An emergency, such as failure of communications or computer equipment, has occurred.

☐ There are erasures or other apparent alterations on the check.

☐ The routing number of the paying bank is not a current routing number.

☐ The check is postdated or has a stale date.

☐ Information from the paying bank indicates that the check may not be paid.

☐ We have been notified that the check has been lost or damaged in collection.

If you did not receive this notice at the time you made the deposit and the check you deposited is paid, we will refund you any fees for overdrafts or returned checks that result solely from the additional delay that we are imposing. To obtain a refund of such fees, call us at (978) 365-3700 or write to us at the above listed address.

EXHIBIT 6

NOVEMBER 26, 2002
ACCOUNT CHANGE

**ACCOUNT HOLD CODE**



*1851*

# CLINTON
## SAVINGS BANK
*Customers 1st, for Generations*

Account Number ____ 133053050

Account Name ____ Kingsaale Corp DBA
____ J+J Chemicals

Place Hold Code # _____

Remove Hold Code ____ Lock out Flag  —  Float all checks

Reason For Placement or Removal of Hold Code

____ Account back to proper handling No problems

____ w/ Checks being deposited

Authorized by ____ Dr R Vle _____ Date ____ 11-26-02

Placed/Removed by ____ B Faine _____ Date ____ 11-26-02

_____

_____

_____

"28 HOLDS"

Main Office _____    Bolton Office _____

Date/Time _____    Date/Time _____

Sterling Office _____    Berlin Office _____

Date/Time _____    Date/Time _____

Nashoba _____    Deposit Servicing _____

Date/Time _____    Date/Time _____

CLS-405 4/01

EXHIBIT 7

MARCH 11, 2004 E-MAIL
FROM TENAGLIA TO CASH

## Michael Tenaglia

| | |
|---|---|
| **From:** | Michael Tenaglia |
| **Sent:** | Thursday, March 11, 2004 6:20 PM |
| **To:** | Steven P. Cash |
| **Cc:** | Christopher M. Gill; Bobbi Jo Parker |
| **Subject:** | Frank Miller |

**Tracking:** Recipient    Read

Steven P. Cash    Read: 3/12/2004 8:22 AM

Christopher M. Gill

Bobbi Jo Parker    Read: 3/12/2004 5:18 PM

I just had a conversation with Frank Miller regarding the activity in his account. As of 6:15 PM Thursday, he is still in California on his way to Korea to handle the sale of the company. As he stated before, the signing of the P & S agreement is to occur in Korea the beginning of the week of March 15th and he expects to be back here on Wednesday and in the office by Thursday, March 18th. I asked that he call me on his return and he promised that he would. I will have this on my calendar to call him in case we don't hear from him.

I again asked him about the size and nature of the expense. It is for the purchase of raw materials which he expects to wind down and close after the sale of the company. He started to tell me about the sale of the product and the volume is sales that is being generated.

I or Bobbi-J will let you know if there are any further developments.

*Michael D. Tenaglia*
*Sr. Vice President*
*Retail Banking*
*978-365-3700 ext. 229*
*mtenaglia@clintonsavings.com*



10/12/2004

EXHIBIT 8

MAY 18, 2004 E-MAIL
FROM TENAGLIA TO GILL

Message

# Christopher M. Gill

**From:** Mike Tenaglia
**Sent:** Tuesday, May 18, 2004 6:09 PM
**To:** Christopher M. Gill
**Cc:** Sheila Azorandia
**Subject:** RE: Miller

**If all of management is in agreement that we must terminate this now, I will.** He is making deposits within the scope of the account that we have opened for him.

I had a VERY LENGTHY conversation with him last night and frankly I have had it. Steve has been privy to every conversation, document, etc.

Notice that I have not copied Steve on this.

> -----Original Message-----
> **From:** Christopher M. Gill
> **Sent:** Tue 5/18/2004 10:32 AM
> **To:** Mike Tenaglia
> **Cc:** Steven P. Cash
> **Subject:** RE: Miller
>
> Mike,
>
> I do not see what his Kiting (let's call a spade a spade) has to do with the sale of his business. And the sufficient amount would have to be in excess of 4 million ! If he deposits that, I'll back off.
>
> Chris
>
>> -----Original Message-----
>> **From:** Mike Tenaglia
>> **Sent:** Monday, May 17, 2004 9:37 PM
>> **To:** Christopher M. Gill
>> **Cc:** Steven P. Cash
>> **Subject:** Miller
>>
>> Chris,
>>
>> I received this e-mail about 15 minutes ago and have been on the phone with Frank Miller since then. AS you kow he has provided us with copies of his financial reports and the P&S agreement. He reinterated that he is trying to bring the amount of deposits to more reasonable numbers. He again assured me that he is doing the best he can to do so.
>>
>> I told him that the amount of deposits is causing many problems and concerns. After discussion about the sale of the company, I again explained the concerns and asked that he speak with representatives of the buyer. Since everyone there is very comfortable that all is proceeding with the sale, I asked that they deposit a sufficient amount to cover the daily activity. The deposit will be in a different account which we would the ability to monitor and have advance knowledge if a withdrawal is attempted.

CSB
EXHIBIT NO. 5
4/1/04 L. FOLEY

Message

He promised that he will discuss this with them on Wednesday.

Let me know what happens today (Tuesday ).

Thank you.

EXHIBIT 9

MAY 19, 2004 E-MAIL
FROM TENAGLIA TO GILL

## Christopher M. Gill

**From:** Mike Tenaglia
**Sent:** Wednesday, May 19, 2004 9:17 AM
**To:** Christopher M. Gill
**Cc:** sazoeandia@clintonsavings.com
**Subject:** Miller

I just got off the phone with Lori who tells me that there was a deposit of $3.065 million and approximtely $2.5 in checks are clearing this morning. If it is kiting, it's not a classic case because usually you see the same amounts and usually in escalating amounts. I know, it still smells and I agree.

I will call Miller again before we baord the plane this afternoon.



EXHIBIT 10

CSB FILE REGARDING
GITTO GLOBAL CORPORATION

GITTO/GLOBAL
CORPORATION

| Gitto Global Corporation<br>August 26, 2004<br>Statement in Thousands $ | Review<br>Jun. 30<br>2002<br>David A. Harmon<br>Louis J. Pellegrino, Jr., CPA. | | Review<br>Jun. 30<br>2003<br>David A. Harmon<br>Louis J. Pellegrino, Jr., CPA. | | Co. Prep.<br>May. 31<br>2004 (11)<br>David A. Harmon<br>Management Prepared | |
|---|---|---|---|---|---|---|
| **ASSETS    Common Sized** | | | | | | |
| Cash | 3,674 | 7.6 | 3,537 | 7.2 | 4,490 | 9.8 |
| Trade Accounts Receivable | 27,433 | 56.6 | 25,822 | 52.9 | 20,916 | 45.6 |
| Raw Materials | 2,959 | 6.1 | 4,548 | 9.3 | 6,164 | 13.4 |
| Finished Goods | 3,383 | 6.9 | 3,351 | 6.9 | 4,526 | 9.9 |
| Total Inventory | 6,322 | 13.0 | 7,899 | 16.2 | 10,690 | 23.3 |
| **Total Current Assets** | 37,429 | 77.2 | 37,268 | 76.3 | 36,096 | 78.6 |
| Due from Officers | 22 | 0.0 | 355 | 0.7 | 0 | 0.0 |
| Due from Employees | 0 | 0.0 | 0 | 0.0 | 1 | 0.0 |
| Machinery & Equipment | 14,352 | 29.6 | 14,854 | 30.4 | 15,096 | 32.9 |
| Furniture & Fixtures | 889 | 1.8 | 900 | 1.8 | 904 | 2.0 |
| Leasehold Improvements | 4,957 | 10.2 | 5,012 | 10.3 | 5,003 | 10.9 |
| Gross Fixed Assets | 20,198 | 41.7 | 20,766 | 42.5 | 21,003 | 45.8 |
| Accumulated Depreciation (-) | (9,981) | (20.6) | (11,373) | (23.3) | (12,966) | (28.2) |
| Net Fixed Assets | 10,217 | 21.1 | 9,393 | 19.2 | 8,037 | 17.5 |
| Prepaid Expenses - Non current | 183 | 0.4 | 707 | 1.4 | 538 | 1.2 |
| Deposits | 156 | 0.3 | 156 | 0.3 | 156 | 0.3 |
| Intangibles | 474 | 1.0 | 993 | 2.0 | 1,078 | 2.3 |
| **TOTAL ASSETS** | **48,481** | **100.0** | **48,862** | **100.0** | **45,906** | **100.0** |
| **LIABILITIES    Common Sized** | | | | | | |
| Notes Payable - Banks | 25,799 | 53.2 | 26,568 | 54.4 | 26,384 | 57.5 |
| Notes Payable | 2,167 | 4.5 | 0 | 0.0 | 0 | 0.0 |
| Current Portion Long Term Debt | 1,326 | 2.7 | 2,404 | 4.9 | 2,404 | 5.2 |
| Trade Accounts Payable | 4,378 | 9.0 | 2,771 | 5.7 | 1,425 | 3.1 |
| Other Accruals | 738 | 1.5 | 1,391 | 2.8 | 667 | 1.5 |
| **Total Current Liabilities** | 34,408 | 71.0 | 33,134 | 67.8 | 30,880 | 67.3 |
| Long Term Debt | 7,845 | 16.2 | 8,523 | 17.4 | 6,416 | 14.0 |
| Due to Officers | 0 | 0.0 | 0 | 0.0 | 843 | 1.8 |
| Deferred Income Taxes | 109 | 0.2 | 288 | 0.6 | 0 | 0.0 |
| Total Liabilities | 42,362 | 87.4 | 41,945 | 85.9 | 38,139 | 83.1 |
| Common Stock | 150 | 0.3 | 160 | 0.3 | 150 | 0.3 |
| Additional Paid-in Capital | 2,100 | 4.3 | 2,100 | 4.3 | 2,100 | 4.6 |
| Retained Earnings | 3,869 | 8.0 | 4,657 | 9.5 | 5,517 | 12.0 |
| Total Net Worth | 6,119 | 12.6 | 6,907 | 14.1 | 7,767 | 16.9 |
| **TOTAL LIABILITIES & NET WORTH** | **48,481** | **100.0** | **48,862** | **100.0** | **45,906** | **100.0** |

| Gitto Global Corporation August 26, 2004 Statement in Thousands $ | Review Jun. 30 2002 David A. Harmon Louis J. Pellegrine, Jr., CPA. | | Review Jun. 30 2003 David A. Harmon Louis J. Pellegrine, Jr., CPA. | | Co. Prep. May 31 2004 (11) David A. Harmon Management Prepared | |
|---|---|---|---|---|---|---|
| **INCOME STATEMENT    Common Sized** | | | | | | |
| Sales #1 | 120,874 | 100.0 | 160,067 | 100.0 | 632,994 | 100.0 |
| Cost of Goods Sold #1 | 109,545 | 90.8 | 150,130 | 93.8 | 623,119 | 98.4 |
| Rent in COGS | 449 | 0.4 | 448 | 0.3 | 386 | 0.1 |
| Depreciation | 1,295 | 1.1 | 1,331 | 0.8 | 1,370 | 0.2 |
| Gross Profit | 9,385 | 7.8 | 8,160 | 5.1 | 8,119 | 1.3 |
| Selling, General & Admin. Exp. | 4,171 | 3.5 | 2,182 | 1.4 | 3,088 | 0.5 |
| Officers' Salaries | 510 | 0.4 | 1,136 | 0.7 | 1,282 | 0.2 |
| Lease/Rent Expense | 373 | 0.3 | 373 | 0.2 | 0 | 0.0 |
| Professional Fees | 1,112 | 0.9 | 507 | 0.3 | 472 | 0.1 |
| Depreciation | 71 | 0.1 | 61 | 0.0 | 58 | 0.0 |
| Amortization | 52 | 0.0 | 75 | 0.0 | 0 | 0.0 |
| Bad Debt Expense | 0 | 0.0 | 12 | 0.0 | 0 | 0.0 |
| Operating Expenses | 6,289 | 5.2 | 4,346 | 2.7 | 4,880 | 0.8 |
| Operating Profit | 3,096 | 2.6 | 3,814 | 2.4 | 3,239 | 0.5 |
| Other Income | 94 | 0.1 | 22 | 0.0 | 2 | 0.0 |
| Interest Expense | 2,217 | 1.8 | 2,144 | 1.3 | 1,884 | 0.3 |
| Profit Before Tax | 973 | 0.8 | 1,692 | 1.1 | 1,357 | 0.2 |
| Current Taxes (-) | (520) | (0.4) | (617) | (0.4) | (542) | (0.1) |
| Deferred Taxes (-) | (109) | (0.1) | (287) | (0.2) | 0 | 0.0 |
| Profit Before Extraord. Items | 344 | 0.3 | 788 | 0.5 | 815 | 0.1 |
| **NET INCOME** | 344 | 0.3 | 788 | 0.5 | 815 | 0.1 |
| **RECON. OF NET WORTH    Common Sized** | | | | | | |
| Beginning Net Worth | 5,775 | 94.4 | 6,119 | 88.6 | 6,907 | 88.9 |
| Changes in Retained Earnings: | | | | | | |
| Net Income (Loss) | 344 | 5.6 | 788 | 11.4 | 815 | 10.5 |
| Unreconciled Difference | 0 | 0.0 | 0 | 0.0 | 45 | 0.6 |
| Ending Total Net Worth | 6,119 | 100.0 | 6,907 | 100.0 | 7,767 | 100.0 |

| Gitto Global Corporation | Review | Review | Co. Prep. |
|---|---|---|---|
| August 26, 2004 | Jun. 30 | Jun. 30 | May 31 |
| Statement in Thousands $ | 2002 | 2003 | 2004 (11) |
| | David A. Harmon | David A. Harmon | David A. Harmon |
| | Louis J. Pellegrino, Jr., CPA, | Louis J. Pellegrino, Jr., CPA, | Management Prepared |

**Highlights**

| | | | |
|---|---|---|---|
| **INCOME STATEMENT:** | | | |
| Sales | 120,874 | 160,057 | 632,994 |
| Gross Margin | 9,385 | 8,169 | 8,119 |
| Operating Expenses | 8,289 | 4,348 | 4,880 |
| NPBT | 973 | 1,692 | 1,357 |
| NPAT | 344 | 788 | 816 |
| Cash Dividends | 0 | 0 | 0 |
| **BALANCE SHEET:** | | | |
| Total Current Assets | 37,429 | 37,258 | 38,096 |
| Net Fixed Assets | 10,217 | 9,393 | 9,037 |
| Total Assets | 48,481 | 46,852 | 46,906 |
| Short Term Obligations | 29,292 | 28,972 | 28,788 |
| Total Current Liabilities | 34,408 | 33,134 | 30,880 |
| Long Term Debt | 7,845 | 8,523 | 6,416 |
| Total Liabilities | 42,392 | 41,945 | 38,139 |
| Net Worth | 6,119 | 6,907 | 7,767 |
| **RATIOS:** | | | |
| Sales Growth | | 32.64% | 331.41% |
| Gross Margin | 7.75% | 6.10% | 1.28% |
| Profit Margin | 0.29% | 0.49% | 0.13% |
| Current Ratio | 1.09 | 1.12 | 1.17 |
| Quick Ratio | 0.90 | 0.89 | 0.82 |
| Working Capital | 3,021 | 4,124 | 5,216 |
| Age of Receivables | 53 | 59 | 11 |
| Days Supply in Inventory | 21 | 19 | 6 |
| Age of Payables | 15 | 7 | 1 |
| Debt/Tangible Net Worth | 7.50 | 7.08 | 5.70 |
| Breakeven Sales - Cash Basis | | 155,281 | 593,542 |
| Actual Sales/Breakeven Sales | | 1.02 | 1.07 |
| CASH FLOW: Incr (Decr) in Cash | | | |
| Cash From Sales | | 161,666 | 637,900 |
| Cash From Trading | | 7,906 | 10,256 |
| Net Cash After Operations | | 3,858 | 4,727 |
| Cash After Financing Costs | | 1,514 | 2,843 |
| Cash After Debt Amortization | | 488 | 839 |
| Capital Expenditures | | (568) | (72) |
| Financing Surplus (Requirement) | | (1,821) | 995 |

**Gitto Global Corporation**
August 26, 2004
Statement in Thousands $

| | Review<br>Jun. 30<br>2002<br>David A. Harmon<br>Louis J. Pellegrine, Jr., CPA. | Review<br>Jun. 30<br>2003<br>David A. Harmon<br>Louis J. Pellegrine, Jr., CPA, | Co. Prep.<br>May 31<br>2004  (11)<br>David A. Harmon<br>Management Prepared |
|---|---|---|---|
| **Ratios** | | | |
| **Operating Ratios:** | | | |
| Sales Growth | | 32.64% | 331.41% |
| Pre-Tax Profit Margin | 0.81% | 1.08% | 0.21% |
| Profit Margin | 0.29% | 0.49% | 0.13% |
| Return on Assets (ROA) | 0.71% | 1.61% | 1.94% |
| Return on Equity (ROE) | 8.09% | 13.30% | 13.29% |
| Asset Turnover | 2.49 | 3.28 | 15.04 |
| **Current Position:** | | | |
| Current Ratio | 1.09 | 1.12 | 1.17 |
| Quick Ratio | 0.90 | 0.89 | 0.82 |
| Working Capital | 3,021 | 4,124 | 5,216 |
| Working Capital/Assets | 6.23% | 8.44% | 11.36% |
| Working Capital Turnover | 39.95 | 36.61 | 132.39 |
| Receivable Turnover | 4.40 | 6.20 | 33.01 |
| Age of Receivables | 83 | 59 | 11 |
| Inventory Turnover | 17.40 | 19.06 | 63.63 |
| Days Supply in Inventory | 21 | 19 | 6 |
| Payable Turnover | 25.12 | 54.34 | 477.32 |
| Age of Payables | 15 | 7 | 1 |
| **Equity Position:** | | | |
| Owner Equity/Assets | 12.62% | 14.14% | 16.92% |
| Creditor Equity/Assets | 87.38% | 85.86% | 83.08% |
| Debt/Tangible Net Worth | 7.56 | 7.08 | 5.70 |
| Fixed Assets/Long Term Debt | 128.45% | 108.61% | 110.72% |
| Fixed Assets/Tangible Net Worth | 180.99% | 158.56% | 120.15% |
| Plant Turnover | 11.81 | 17.04 | 85.92 |
| **Other:** | | | |
| Interest Coverage (NPBT) | 1.44 | 1.79 | 1.72 |
| Prin & Interest Coverage (NPBT) | | 1.11 | 0.79 |
| Interest Coverage (Operating Cash) | | 1.71 | 2.51 |
| Prin & Interest Coverage (OC) | | 1.05 | 1.18 |
| Sustainable Growth Rate | 6.42% | 14.99% | 14.92% |
| Breakeven Sales - Cash Basis | | 156,281 | 593,542 |
| Actual Sales/Breakeven Sales | | 1.02 | 1.07 |
| Basic Defense Interval | (10) | (9) | (3) |
| Bankruptcy Ratio: Z value<br>    Z < 1.23  Weak;  > 2.90 Strong | 2.86 | 3.72 | 15.52 |

| Gitto Global Corporation<br>August 26, 2004<br>Statement in Thousands $ | Review<br>Jun. 30<br>2003<br>David A. Harmon<br>Louis J. Pellegrine, Jr., CPA, | Co. Prep.<br>May. 31<br>2004 (11)<br>David A. Harmon<br>Management Prepared |
|---|---|---|
| **UCA Cash Flow** | | |
| Net Sales | 160,087 | 632,994 |
| Change in Current Receivables | 1,599 | 4,906 |
| **Cash from Sales** | 161,666 | 637,900 |
| Cost of Goods Sold (Less Depr.) | (150,576) | (623,505) |
| Change in Inventories | (1,577) | (2,799) |
| Change in Accounts Payable | (1,607) | (1,345) |
| **Cash Production Costs** | (153,760) | (627,649) |
| **CASH FROM TRADING** | 7,906 | 10,268 |
| Selling, General & Admin. Exp. | (2,182) | (3,088) |
| Other Operating Expenses | (2,016) | (1,734) |
| Change in Prepaids | 0 | 0 |
| Change in Accrued Expenses | 653 | (724) |
| Chg in Oth. Curr. Assets/Liab. | 0 | 0 |
| **Cash Operating Costs** | (3,545) | (6,546) |
| **CASH AFTER OPERATIONS** | 4,361 | 4,712 |
| Other Income (Expense) | 22 | 2 |
| Change in Other Liabilities | 0 | 843 |
| Income Tax Expense | (904) | (542) |
| Change in Deferred Income Taxes | 179 | (288) |
| Change in Income Taxes Payable | 0 | 0 |
| **Taxes Paid & Other Inc (Exp)** | (703) | 15 |
| **NET CASH AFTER OPERATIONS** | 3,658 | 4,727 |
| Dividends or Owners Withdrawals | 0 | 0 |
| Change in Dividends Payable | 0 | 0 |
| Interest Expense | (2,144) | (1,884) |
| Change in Interest Payable | 0 | 0 |
| **Cash Financing Costs** | (2,144) | (1,884) |
| **CASH AFTER FINANCING COSTS** | 1,514 | 2,843 |
| Current Portion Long Term Debt | (1,326) | (2,204) |
| **CASH AFTER DEBT AMORTIZATION** | 188 | 639 |
| Capital Expenditures | (568) | (72) |
| Change in Long Term Investments | 0 | 0 |
| Change in Intang/Other Assets | (1,441) | 428 |
| **Cash Used for Plant/Invest** | (2,009) | 356 |
| **FINANCING SURPLUS/REQUIREMENT** | (1,821) | 995 |
| Change in Short Term Debt | (1,398) | (184) |
| Change in Long Term Debt | 3,082 | 97 |
| Change in Contributed Capital | 0 | 0 |
| Oth. Chgs In Retained Earnings | 0 | 45 |
| **Total External Financing** | 1,684 | (42) |
| **FINANCING SURPLUS (REQUIREMENT)**<br>**+ TOTAL EXTERNAL FINANCING** | (137) | 953 |
| Change in Cash & Equivalents | (137) | 953 |

GITTO GLOBAL CORPORATION
DRAFT BALANCE SHEET
AS OF MAY 31, 2004

DATE:   8/25/04   19:56
PGM:   GL023
PAGE:   1

MONTH OF
MAY 2004

### ASSETS
#### CURRENT ASSETS

| | |
|---|---:|
| CASH | 4,490,145.75 |
| ACCOUNTS RECEIVABLE | 20,074,077.02 |
| INVENTORY | 10,689,747.35 |
| PREPAID INSURANCE | 240,476.30 |
| PREPAID EXPENSES | 297,361.51 |
| **TOTAL CURRENT ASSETS** | 35,791,807.93 |

#### PROPERTY, PLANT & EQUIPMENT

| | |
|---|---:|
| FURNITURE & FIXTURES | 903,816.13 |
| LEASEHOLD IMPROVEMENTS | 5,002,786.85 |
| MACHINERY & EQUIPMENT | 15,096,797.78 |
| CAPITAL LEASE - COMPUTERS | .00 |
| | 21,003,400.76 |
| ~ULATED DEPRECIATION | 12,966,108.00 |
| **NET PROPERTY, PLANT & EQUIP** | 8,037,292.76 |

#### OTHER ASSETS

| | |
|---|---:|
| DEPOSITS | 156,371.67 |
| PATENTS & PROCESS | 223,432.04 |
| UL PATENT APPROVALS | 854,488.99 |
| ORGANIZATION EXPENSE | .00 |
| **TOTAL OTHER ASSETS** | 1,234,312.70 |

| | |
|---|---:|
| **TOTAL ASSETS** | 45,063,413.39 |

GITTO GLOBAL CORPORATION
DRAFT BALANCE SHEET
AS OF MAY 31,2004

DATE: 8/25/04 15:56
PGM: GL023
PAGE: 2

MONTH OF
MAY 2004

**LIABILITIES**
**CURRENT LIABILITIES**

| | |
|---|---|
| ACCOUNTS PAYABLE | 1,031,329.97 |
| CASH OVERDRAFT | 393,572.35 |
| NOTE PAYABLE LINE OF CREDIT | 26,384,409.48 |
| EMPLOYEE WITHHOLDINGS | 11,768.57 |
| ACCRUED EXPENSES | 302,028.63 |
| ACCRUED MA EXCISE TAX | 86,595.60 |
| FEDERAL INCOME TAX PAYABLE | 267,073.60 |
| CURRENT PORTION L T DEBT | 2,404,085.15 |

TOTAL CURRENT LIABILITIES    30,880,859.35

**LONG TERM LIABILITIES**

| | |
|---|---|
| NOTE PAYABLE-WELLS FARGO | 808,671.97 |
| NOTE PAYABLE - ORIX FINANCIAL | 5,400,909.18 |
| NOTE PAYABLE - CIT GROUP | 1,443,750.00 |
| LASALLE TERM LOAN | 1,166,666.74 |
| CAPITALIZED LEASES | .00 |
| | 8,819,997.89 |
| LESS: CURRENT PORTION | 2,404,085.15- |

TOTAL LIABILITIES    37,296,772.09

DEFERRED INCOME TAXES    .00

**STOCKHOLDERS' EQUITY**

| | |
|---|---|
| COMMON STOCK | 150,000.00 |
| NET INCOME Y-T-D | 798,518.33 |
| RETAINED EARNINGS | 4,718,122.97 |
| ADDITIONAL PD IN CAPITAL | 2,100,000.00 |

TOTAL STOCKHOLDERS' EQUITY    7,766,641.30

TOTAL LIABILITIES & EQUITY    45,063,413.39

GITTO GLOBAL CORPORATION
DRAFT BALANCE SHEET
AS OF MAY 31,2004

DATE:   8/25/04  15:56
PGM:    GL023
PAGE:      3

MONTH OF
MAY 2004

### CASH

| | |
|---|---|
| CASH IN FLEET BLOCKED ACCOUNT | .00 |
| CASH IN LASALLE BLOCKED ACCT | 4,455,271.97 |
| CASH IN MELLON BANK | .00 |
| CASH - U S TRUST OPERATING | 425.72 |
| CASH IN PAYROLL ACCOUNT | 34,448.06 |
| PETTY CASH | .00 |
| | ---------------- |
| **TOTAL CASH** | 4,490,143.75 |

### ACCOUNTS RECEIVABLE

| | |
|---|---|
| ACCOUNTS RECEIVABLE - TRADE | 20,970,764.86 |
| DUE FROM OFFICERS | 842,654.21- |
| DUE FROM EMPLOYEES | 966.37 |
| ALLOWANCE FOR BAD DEBTS | 55,000.00- |
| | ---------------- |
| **NET ACCOUNTS RECEIVABLE** | 20,074,077.02 |

### INVENTORY

| | |
|---|---|
| RAW MATERIAL - GLOBAL | 6,163,974.85 |
| FINISHED GOODS - GLOBAL | 4,525,772.50 |
| | ---------------- |
| **TOTAL INVENTORY** | 10,689,747.35 |

GITTO GLOBAL CORPORATION

DRAFT BALANCE SHEET

AS OF MAY 31, 2004

DATE:   8/25/04  15:56

PGM:    GL023

PAGE:      4

MONTH OF

MAY 2004

| ACCRUED EXPENSES | |
|---|---|
| ACCRUED INSURANCE | 42,384.15 |
| ACCRUED SELF INS MEDICAL CHGS | .00 |
| ACCRUED AUTO LEASES | .00 |
| ACCRUED PAYROLL | 110,212.65 |
| ACCRUED PAYROLL TAXES | 8,450.94 |
| ACCRUED INTEREST | 27,058.62 |
| ACCRUED RENT | 7,832.00 |
| ACCRUED MARKETING EXPENSES | .00 |
| SNOW REMOVAL ACCRUAL | .00 |
| ACCRUED WATER CHARGES | .00 |
| ACCRUED ENVIRONMENTAL FEES | 5,583.32 |
| ACCRUED ELECTRIC CHARGES | 82,592.16 |
| ACCRUED ACCOUNTING & AUDITING | .00 |
| ACCRUED EXPENSES | 17,914.79 |
| | -------------- |
| TOTAL ACCRUED EXPENSE - OTHER | 302,028.63 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 11 MONTHS ENDING MAY 31,2004

DATE:  8/25/04  15:37
PGM:   GL023
PAGE:    1

| | MONTH OF MAY 2004 | | YTD FY 2004 | |
|---|---|---|---|---|
| **SALES** | | | | |
| TOTAL SALES | 74,262,676.06 | 100.17 | 635,067,936.47 | 100.33 |
| SALES RETURNS & ALLOWANCES | 128,370.89 | .17 | 2,074,183.28 | .33 |
| TOTAL SALES | 74,134,305.17 | 100.00 | 632,993,753.19 | 100.00 |
| **COST OF GOODS SOLD** | | | | |
| RAW MATERIALS | 72,782,076.07 | 98.18 | 617,254,141.77 | 97.51 |
| PACKAGING | 60,503.58 | .08 | 625,609.49 | .10 |
| SCRAP | .00 | | 72,309.88 | .01 |
| FREIGHT-IN | 10,299.13 | .01 | 155,346.90 | .02 |
| PURCHASE DISCOUNTS | .00 | | 6,670.06- | |
| CHANGE IN INVENTORY | 8,922.41 | .01 | 1,726,698.42- | .27- |
| TOTAL MATERIALS | 72,861,801.19 | 98.28 | 616,374,039.56 | 97.37 |
| **DIRECT LABOR** | | | | |
| WAGES | 94,575.44 | .13 | 1,042,748.57 | .16 |
| PAYROLL TAXES | 12,396.62 | .02 | 111,186.42 | .02 |
| MEDICAL INSURANCE | 13,304.95 | .02 | 165,498.62 | .03 |
| DISABILITY INS-DIRECT LABOR | 499.08 | | 5,213.31 | |
| WORKMANS COMPENSATION | 2,824.73 | | 32,435.63 | .01 |
| SUBCONTRACT LABOR | 14,731.37 | .02 | 147,140.40 | .02 |
| TOTAL DIRECT LABOR | 138,332.19 | .19 | 1,504,132.95 | .24 |
| GROSS PROFIT | 1,134,171.79 | 1.53 | 15,115,580.68 | 2.39 |

GITTO/GLOBAL CORPORATION

DRAFT INCOME STATEMENT

FOR THE 11 MONTHS ENDING MAY 31,2004

DATE: 8/25/04 15:57
PGM: GL023
PAGE: 2

| | MONTH OF MAY 2004 | % | YTD FY 2004 | % |
|---|---|---|---|---|
| **FACTORY OVERHEAD** | | | | |
| SALARIES & WAGES-INDIRECT | 87,605.92 | .12 | 999,843.75 | .15 |
| PAYROLL TAXES-INDIRECT LABOR | 6,870.33 | .01 | 88,023.14 | .01 |
| HEALTH INSURANCE-INDIRECT | 2,364.20 | | 19,087.41 | |
| WORKMANS COMP-INDIRECT LABOR | 1,772.72 | | 19,015.01 | |
| EMPLOYEE ACTIVITIES | .00 | | 1,268.25 | |
| OSHA PENALTY EXPENSE | .00 | | 25,000.00 | |
| DISABILITY INS-INDIRECT LABOR | 227.47 | | 2,456.74 | |
| EMPLOYEE PHYSICALS EXPENSE | 2,291.00 | | 22,547.00 | |
| FACTORY SUPPLIES & EXPENSES | 13,471.30 | .02 | 212,833.10 | .03 |
| PLANT CLEANING EXPENSES | 1,220.80 | | 9,895.04 | |
| SECURITY EXPENSE | 396.00 | | 2,766.96 | |
| UNIFORMS | 2,471.56 | | 28,531.65 | |
| MACHINERY REPAIRS & MAINT | 6,039.88 | .01 | 75,472.78 | .01 |
| STORAGE TRAILOR EXPENSE | 2,724.00 | | 18,130.58 | |
| TRASH REMOVAL | 6,658.19 | .01 | 77,825.26 | .01 |
| WASTE WATER REMOVAL | 650.00 | | 12,404.12 | |
| P/U TRUCK TELEPHONE EXPENSE | 288.95 | | 2,185.52 | |
| BUILDING MAINTENANCE | .00 | | 33,591.17 | .01 |
| SNOW REMOVAL | .00 | | 6,640.00 | |
| GROUNDS MAINTENANCE | .00 | | 6,250.34 | |
| PLANT FUEL OIL | 17,914.79 | .02 | 121,351.09 | .02 |
| PROPANE FUEL EXPENSE | 1,012.46 | | 8,117.89 | |
| ELECTRIC EXPENSE | 57,592.17 | .08 | 701,255.01 | .11 |
| WATER | .00 | | 12,406.96 | |
| ENVIRONMENTAL CONSULTING FEES | .00 | | 26,354.60 | |
| GAS, OIL & GREASE | 156.35 | | 1,597.38 | |
| TRAVEL EXPENSE-VEH MAINT | .00 | | 661.53 | |
| TRAVEL EXPENSE-AIRFARE | .00 | | 784.50 | |
| TRAVEL EXPENSE-AUTO RENTAL | 36.00 | | 1,004.24 | |
| TRAVEL EXPENSE-MISCELLANEOUS | .00 | | 377.14 | |
| **FIXED FACTORY OVERHEAD** | | | | |
| MASS TOXIC USE FEE | 630.00 | | 6,930.00 | |
| LEASED AUTOS | 673.73 | | 6,815.36 | |
| TRUCK INSURANCE-FACTORY | 150.00 | | 1,630.00 | |
| OHSA CONSULTING FEES | 2,791.66 | | 30,708.26 | |
| RENT-LUNENBURG | 31,085.93 | .04 | 341,945.23 | .05 |
| RENT-STORAGE | 4,004.00 | .01 | 44,133.50 | .01 |
| REAL ESTATE TAXES | 2,500.00 | | 27,500.00 | |
| INSURANCE EXPENSE | 20,000.00 | .03 | 204,200.00 | .03 |
| LEASED FORKLIFT EXPENSE | 1,675.00 | | 16,979.25 | |
| LEASED FLOOR CLEANING MACHINE | .00 | | 9,400.43 | |
| AMORTIZATION OF LEASEHOLD IMPR | 4,500.00 | .01 | 49,500.00 | .01 |
| DEPRECIATION-MACH & EQUIPMENT | 120,000.00 | .16 | 1,320,000.00 | .21 |
| **TOTAL FACTORY OVERHEAD** | 399,772.41 | .54 | 4,557,440.97 | .72 |
| | 734,399.38 | .54 | 10,558,139.71 | .72 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 11 MONTHS ENDING MAY 31,2004

DATE:   8/25/04  15:57
PGM:    GL023
PAGE:    3

| | MONTH OF MAY 2004 | % | YTD FY 2004 | % |
|---|---|---|---|---|
| **LABORATORY EXPENSES** | | | | |
| SALARIES & WAGES | 64,455.78 | .09 | 734,725.04 | .12 |
| PAYROLL TAXES | 5,158.39 | .01 | 37,578.89 | .01 |
| WORKMANS COMPENSATION | 624.89 | | 7,066.38 | |
| MEDICAL INSURANCE | 2,267.53 | | 25,793.91 | |
| DISABILITY INSURANCE | .00 | | 3,065.98 | |
| GROUP TERM LIFE INSURANCE | 355.47 | | 710.96 | |
| LAB OUTSIDE TESTING EXPENSE | .00 | | 4,283.00 | |
| LAB SUPPLIES & EXPENSES | 832.95 | | 24,837.00 | |
| TELEPHONE- R & D | 478.20 | | 8,082.93 | |
| AUTO INSURANCE | .00 | | 260.00 | |
| LEASED AUTO EXPENSE | .00 | | 2,581.91 | |
| TRAVEL-GAS & OIL | 65.20 | | 1,554.13 | |
| TRAVEL-VEHICLE MAINTENANCE | 169.14 | | 1,155.95 | |
| TRAVEL-TOLLS & PARKING | 3.00 | | 1,178.87 | |
| TRAVEL-AIRFARE | .00 | | 10,213.62 | |
| TRAVEL-AUTO RENTAL | 201.77 | | 1,401.13 | |
| TRAVEL-MEALS | 113.85 | | 4,711.22 | |
| TRAVEL-ENTERTAINMENT | 125.00 | | 1,252.68 | |
| TRAVEL-LODGING | 537.97 | | 10,398.38 | |
| MISCELLANEOUS TRAVEL EXPENSES | 793.50- | | 4,040.89 | |
| LEASED LAB EQUIPMENT | 209.92 | | 2,298.76 | |
| DEPRECIATION-LAB EQUIPMENT | .00 | | .00 | |
| TOTAL LABORATORY EXPENSES | 74,805.56 | .10 | 907,171.61 | .14 |
| | 659,593.82 | .10 | 9,650,968.10 | .14 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 11 MONTHS ENDING MAY 31,2004

DATE:   8/25/04  15:57
PGM:    GL023
PAGE:      6

| | MONTH OF MAY 2004 | % | YTD FY 2004 | % |
|---|---|---|---|---|
| **DELIVERY EXPENSES** | | | | |
| DRIVER WAGES | 11,726.85 | .02 | 128,264.32 | .02 |
| PAYROLL TAXES-DRIVERS | 869.08 | | 11,673.74 | |
| WORKMANS COMP-DRIVERS | 608.15 | | 6,864.26 | |
| MEDICAL INSURANCE-DRIVERS | 2,407.00 | | 26,233.28 | |
| DISABILITY INSURANCE | 81.57 | | 897.27 | |
| FEDERAL EXPRESS DELIVERIES | .00 | | .00 | |
| DELIVERY FUEL | 2,429.05 | | 22,626.05 | |
| DELIVERY TOLLS | .00 | | 3,384.25 | |
| DELIVERY MEALS | 194.63 | | 940.31 | |
| DELIVERY LODGING | .00 | | .00 | |
| FREIGHT OUT | 82,617.35 | .11 | 1,140,688.06 | .18 |
| UPS DELIVERIES | 5,365.95 | .01 | 51,606.73 | .01 |
| TRUCK REPAIRS & MAINTENANCE | .00 | | 3,100.06 | |
| TRUCK LEASE EXPENSE | 10,888.39 | .01 | 136,020.56 | .02 |
| DEPRECIATION-TRUCKS | .00 | | .00 | |
| **TOTAL DELIVERY EXPENSES** | 117,188.00 | | 1,532,298.89 | |
| | 542,405.82 | | 8,118,669.21 | |

GITTO/GLOBAL CORPORATION          DATE:  8/25/04 15:57
DRAFT INCOME STATEMENT            PGM:   GL023
FOR THE 11 MONTHS ENDING MAY 31,2004    PAGE:    5

|                                 | MONTH OF MAY 2004 | %   | YTD FY 2004 | %   |
|---------------------------------|-------------------|-----|-------------|-----|
| **SELLING EXPENSES**            |                   |     |             |     |
| SALES SALARIES                  | 41,664.68         | .06 | 478,674.22  | .08 |
| PAYROLL TAXES-SALES             | 3,092.88          |     | 30,147.46   |     |
| WORKMANS COMP-SALES             | 157.66            |     | 1,803.97    |     |
| MEDICAL INSURANCE-SALES         | 4,330.06          | .01 | 39,813.75   | .01 |
| DISABILITY INSURANCE            | 229.54            |     | 2,200.52    |     |
| COMMISSIONS                     | 71,921.76         | .10 | 652,809.38  | .10 |
| TELEPHONE-SALES                 | 1,740.09          |     | 33,313.93   | .01 |
| ADVERTISING                     | 390.00            |     | 3,689.51    |     |
| PUBLIC RELATION FEES            | 615.00            |     | 8,590.61    |     |
| BAD DEBTS EXPENSE/RECOVERY      | 5,000.00          | .01 | 55,000.00   | .01 |
| SALES MEETINGS & CONVENTIONS    | .00               |     | 2,941.00    |     |
| STORAGE OF CONVENTION BOOTH     | .00               |     | 1,464.72    |     |
| SALES INCENTIVES                | .00               |     | 59,613.93   | .01 |
| DUES & SUBSCRIPTIONS            | 1,621.02          |     | 5,242.26    |     |
| SELLING EXPENSES                | .00               |     | 4,025.59    |     |
| LEASED AUTOS EXPENSE-SALES      | 1,995.69          |     | 34,737.98   | .01 |
| AUTO INSURANCE                  | 380.00            |     | 4,160.00    |     |
| TRAVEL-GAS & OIL-SALES          | 960.51            |     | 7,706.43    |     |
| TRAVEL-VEHICLE MAINT-SALES      | .00               |     | 809.62      |     |
| TRAVEL-TOLLS-SALES              | 43.00             |     | 670.94      |     |
| TRAVEL-AIRFARE-SALES            | .00               |     | 9,768.50    |     |
| TRAVEL-AUTO RENTAL-SALES        | 186.28            |     | 3,907.26    |     |
| TRAVEL-MEALS-SALES              | 517.13            |     | 11,386.60   |     |
| TRAVEL-ENTERTAINMENT-SALES      | .00               |     | 2,473.39    |     |
| TRAVEL-HOTEL-SALES              | .00               |     | 11,271.10   |     |
| TRAVEL-MISCELLANEOUS-SALES      | .00               |     | 2,459.23    |     |
| **TOTAL SELLING EXPENSES**      | 134,845.30        | .18 | 1,468,661.92| .23 |
|                                 | 407,560.52        | .18 | 6,650,007.29| .23 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 11 MONTHS ENDING MAY 31,2004

DATE: 8/25/04 15:57
PGM: GL023
PAGE: 6

| | MONTH OF MAY 2004 | % | YTD FY 2004 | % |
|---|---|---|---|---|
| **ADMINISTRATIVE EXPENSES** | | | | |
| SALARIES-OFFICE | 23,550.05 | .03 | 300,026.49 | .05 |
| PAYROLL TAXES-OFFICE | 1,988.35 | | 23,109.36 | |
| WORKMANS COMPENSATION-OFFICE | 51.29 | | 581.25 | |
| MEDICAL INSURANCE-OFFICE | 2,549.63 | | 40,959.66 | .01 |
| DISABILITY INSURANCE | 162.49 | | 1,765.94 | |
| OFFICE SUPPLIES & EXPENSES | 2,667.38 | | 35,798.95 | .01 |
| BOTTLED WATER EXPENSE | 292.24 | | 2,573.67 | |
| POSTAGE | 4.00 | | 6,172.23 | |
| FEDERAL EXPRESS-OFFICE | 1,273.15 | | 18,171.18 | |
| COURIER CHARGES | .00 | | .00 | |
| OFFICE CLEANING EXPENSE | .00 | | .00 | |
| BANK CHARGES | 21,329.70 | .03 | 244,658.99 | .04 |
| BANK AUDIT FEES | .00 | | 10,061.13 | |
| DUES & SUBSCRIPTIONS | 46.10 | | 5,297.43 | |
| PAYROLL PROCESSING FEES | 928.82 | | 12,199.46 | |
| COMPUTOR SUPPLIES & EXPENSES | .00 | | 761.28 | |
| PROFESSIONAL FEES | 194.45 | | 7,822.79 * | |
| ACCOUNTING & AUDITING FEES | 23,600.00 | .03 | 178,233.60 * | .03 |
| INSURANCE ADMIN FEES | .00 | | 66,460.00 | .01 |
| : FEES | 2,131.00 | | 179,654.42 * | .03 |
| BANK LEGAL FEES | .00 | | 1,948.30 | |
| CONSULTING FEES | 11,916.60 | .02 | 286,265.32 * | .05 |
| OFFICE CAR PHONES | 147.05 | | 3,293.25 | |
| TELEPHONE-OFFICE | 320.22 | | 1,852.38 | |
| DONATIONS | 850.00 | | 30,482.50 | |
| EQUIPMENT RENTAL | .00 | | 708.84 | |
| MISCELLANEOUS EXPENSES | .00 | | 6,510.24 | |
| TRAVEL-GAS & OIL | 739.15 | | 7,226.40 | |
| VEHICLE MAINTENANCE | .00 | | .00 | |
| TRAVEL-AUTO RENTAL | .00 | | .00 | |
| TRAVEL-LODGING | .00 | | .00 | |
| MISCELLANEOUS TRAVEL EXPENSES | .00 | | .00 | |
| TELEPHONE SYSTEM LEASE | 754.74 | | 10,963.24 | |
| OFFICE COPIER LEASE | 1,039.97 | | 20,209.91 | |
| COMPUTOR SERVICE CONTRACT | .00 | | 2,810.06 | |
| COMPUTOR SOFTWARE SERVICE | 789.88 | | 19,069.29 | |
| MAILING MACHINE LEASE | .00 | | 3,221.19 | |
| LEASED AUTO EXPENSE | 500.00 | | 8,207.82 | |
| LEASED AUTO INSURANCE EXPENSE | .00 | | 240.00 | |
| DEPRECIATION-OFFICE EQUIPMENT | 5,300.00 | .01 | 58,300.00* | .01 |
| **TOTAL ADMINISTRATIVE EXPENSES** | 103,126.26 | .14 | 1,595,576.57 | .25 |
| | 304,434.26 | .14 | 5,054,430.72 | .25 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 11 MONTHS ENDING MAY 31,2004

DATE:    8/25/04  15:57
PGM:     GLO23
PAGE:    7

| | MONTH OF MAY 2004 | % | YTD FY 2004 | % |
|---|---|---|---|---|
| **OFFICERS EXPENSES** | | | | |
| SALARIES | 109,019.12 | .15 | 1,261,629.44 | .20 |
| PAYROLL TAXES | 3,284.70 | | 58,182.02 | .01 |
| WORKMANS COMPENSATION | 211.06 | | 2,432.07 | |
| MEDICAL INSURANCE | 8,047.30 | .01 | 46,414.21 | .01 |
| LIFE INSURANCE EXPENSE | 5,099.00 | .01 | 58,455.00 | .01 |
| DISABILITY INSURANCE | 377.38 | | 4,151.18 | |
| TELEPHONE | 1,302.63 | | 18,721.15 | |
| LEASED AUTO EXPENSE | 2,303.73 | | 56,598.93 | .01 |
| LEASED AUTO INSURANCE EXPENSE | 980.00 | | 11,180.00 | |
| TRAVEL-GAS & OIL | 690.36 | | 12,292.91 | |
| VEHICLE MAINTENANCE | 1,242.79 | | 26,549.30 | |
| TRAVEL-TOLLS & PARKING | .00 | | 466.55 | |
| TRAVEL-AIRFARE | 1,257.95 | | 52,646.50 | .01 |
| TRAVEL-AUTO RENTAL | .00 | | 9,259.07 | |
| TRAVEL-MEALS | 1,248.76 | | 30,001.38 | |
| TRAVEL-ENTERTAINMENT | .00 | | 14,902.68 | |
| TRAVEL-LODGING | 736.41 | | 33,910.36 | .01 |
| MISCELLANEOUS TRAVEL EXPENSES | 1,744.00 | | 49,673.38 | .01 |
| | ---------------- | | ---------------- | |
| TOTAL OFFICER EXPENSES | 137,545.19 | .19 | 1,747,066.13 | .28 |
| | ---------------- | | ---------------- | |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 11 MONTHS ENDING MAY 31, 2004

DATE: 8/25/04 15:57
PGM: GL023
PAGE: 8

| | MONTH OF MAY 2004 | % | YTD PV 2004 | % |
|---|---|---|---|---|
| **OTHER INCOME & EXPENSES** | | | | |
| **OTHER INCOME** | | | | |
| INTEREST INCOME | .00 | | .00 | |
| MISCELLANEOUS INCOME | .00 | | 2,008.06- | |
| INSURANCE RECOVERY | .00 | | .00 | |
| BID RECOVERY | .00 | | .00 | |
| TOTAL OTHER INCOME | .00 | | 2,008.06- | |
| **OTHER EXPENSES** | | | | |
| INTEREST EXPENSE | 179,257.98 | .24 | 1,884,316.74 | .30 |
| FINANCE CHARGES | 11,702.37 | .02 | 68,037.56 | .01 |
| LOSS ON DISPOSALS | .00 | | .00 | |
| MISCELLANEOUS EXPENSE | .00 | | .00 | |
| EFFECT OF ACCOUNTING CHANGE | .00 | | .00 | |
| TOTAL OTHER EXPENSES | 190,960.35 | | 1,952,354.30 | |
| NET INCOME(LOSS) BEFORE TAX | 24,071.28- | | 1,357,018.35 | |
| **INCOME TAXES** | | | | |
| TAX EFFECT OF ACCOUNT CHANGE | .00 | | .00 | |
| STATE INCOME TAX EXPENSE | .00 | | 131,000.00 | .02 |
| FEDERAL INCOME TAX EXPENSE | .00 | | 411,000.00 | .06 |
| TOTAL INCOME TAXES | .00 | | 542,000.00 | .06 |
| NET INCOME(LOSS) | 24,071.28- | | 815,018.35 | .06 |

GITTO GLOBAL CORPORATION
DRAFT BALANCE SHEET
AS OF APR 30, 2004

DATE: 7/22/04  9:
PGM: GL023
PAGE: 1

|  | MONTH OF APR 2004 | MONTH OF APR 2003 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| CASH | 3,934,362.16 | 4,154,690.38 |
| ACCOUNTS RECEIVABLE | 20,592,434.30 | 26,554,844.11 |
| INVENTORY | 10,698,669.76 | 13,372,239.84 |
| PREPAID INSURANCE | 255,647.23 | 178,142.26 |
| PREPAID EXPENSES | 314,253.78 | 643,004.36 |
| TOTAL CURRENT ASSETS | 35,795,397.23 | 44,902,920.95 |
| | | |
| **PROPERTY, PLANT & EQUIPMENT** | | |
| FURNITURE & FIXTURES | 903,816.13 | 899,854.71 |
| LEASEHOLD IMPROVEMENTS | 5,002,786.85 | 5,011,906.85 |
| MACHINERY & EQUIPMENT | 15,089,900.04 | 14,806,597.80 |
| CAPITAL LEASE - COMPUTERS | .00 | .00 |
| | 20,996,503.02 | 20,718,359.36 |
| ULATED DEPRECIATION | 12,836,308.00 | 11,278,708.00 |
| NET PROPERTY, PLANT & EQUIP | 8,160,195.02 | 9,439,651.36 |
| | | |
| **OTHER ASSETS** | | |
| DEPOSITS | 156,371.67 | 156,371.67 |
| PATENTS & PROCESS | 223,452.04 | 223,452.04 |
| UL PATENT APPROVALS | 852,021.73 | 781,575.77 |
| ORGANIZATION EXPENSE | .00 | 5,291.15- |
| TOTAL OTHER ASSETS | 1,231,845.44 | 1,156,108.33 |
| | | |
| TOTAL ASSETS | 45,187,437.69 | 55,498,680.64 |

GITTO GLOBAL CORPORATION
DRAFT BALANCE SHEET
AS OF APR 30,2004

DATE:  7/22/04  9:1
PGM:  GL023
PAGE:  2

|  | MONTH OF APR 2004 | MONTH OF APR 2003 |
|---|---|---|
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| ACCOUNTS PAYABLE | 1,286,245.74 | 8,453,848.12 |
| CASH OVERDRAFT | 128,750.77 | 2,671,958.35 |
| NOTE PAYABLE LINE OF CREDIT | 26,379,546.48 | 26,005,461.48 |
| EMPLOYEE WITHHOLDINGS | 1,259.45- | 11,309.89 |
| ACCRUED TAXES-OTHER | .00 | 261,550.25- |
| ACCRUED EXPENSES | 221,330.13 | 301,717.87 |
| ACCRUED MA EXCISE TAX | 86,595.60 | 103,596.60 |
| FEDERAL INCOME TAX PAYABLE | 267,073.60 | 268,462.92 |
| CURRENT PORTION L T DEBT | 2,404,085.15 | 1,325,815.60 |
| TOTAL CURRENT LIABILITIES | 30,772,368.02 | 38,880,800.58 |
| **LONG TERM LIABILITIES** | | |
| NOTE PAYABLE-WELLS FARGO | 815,109.35 | 894,813.99 |
| NOTE PAYABLE - ORIX FINANCIAL | 5,484,565.48 | 6,378,295.07 |
| NOTE PAYABLE - CIT GROUP | 1,470,000.00 | 1,785,000.00 |
| LASALLE TERM LOAN | 1,250,000.07 | 2,250,000.03 |
| JALIZED LEASES | .00 | .00 |
|  | 9,019,674.90 | 11,308,109.09 |
| LESS: CURRENT PORTION | 2,404,085.15- | 1,325,815.60- |
| TOTAL LIABILITIES | 37,387,957.77 | 48,863,094.07 |
| DEFERRED INCOME TAXES | .00 | .00 |
| **STOCKHOLDERS' EQUITY** | | |
| COMMON STOCK | 150,000.00 | 150,000.00 |
| NET INCOME Y-T-D | 831,356.95 | 516,134.81 |
| RETAINED EARNINGS | 4,718,122.97 | 3,869,451.76 |
| ADDITIONAL PD IN CAPITAL | 2,100,000.00 | 2,100,000.00 |
| TOTAL STOCKHOLDERS' EQUITY | 7,799,479.92 | 6,635,586.57 |
| TOTAL LIABILITIES & EQUITY | 45,187,437.69 | 55,498,680.64 |

GITTO GLOBAL CORPORATION

DRAFT BALANCE SHEET

AS OF APR 30, 2004

DATE: 7/22/04    9:1?

PGM:    GL023

PAGE:    3

|  | MONTH OF APR 2004 | MONTH OF APR 2003 |
|---|---|---|
| **CASH** | | |
| CASH IN FLEET BLOCKED ACCOUNT | .00 | .00 |
| CASH IN LASALLE BLOCKED ACCT | 3,914,405.15 | 3,988,507.43 |
| CASH IN MELLON BANK | .00 | .07 |
| CASH - U S TRUST OPERATING | 524.72 | 37.28- |
| CASH IN PAYROLL ACCOUNT | 19,432.29 | 166,220.16 |
| PETTY CASH | .00 | .00 |
| | ---------------- | ---------------- |
| TOTAL CASH | 3,934,362.16 | 4,156,690.38 |
| | ================ | ================ |
| | | |
| **ACCOUNTS RECEIVABLE** | | |
| ACCOUNTS RECEIVABLE - TRADE | 21,526,246.57 | 26,368,559.32 |
| DUE FROM OFFICERS | 883,734.21- | 179,449.94 |
| DUE FROM EMPLOYEES | 8.06- | 4,351.45 |
| ALLOWANCE FOR BAD DEBTS | 50,000.00- | 22,483.40 |
| | ---------------- | ---------------- |
| NET ACCOUNTS RECEIVABLE | 20,592,484.30 | 26,554,844.11 |
| | ================ | ================ |
| | | |
| **INVENTORY** | | |
| RAW MATERIAL - GLOBAL | 6,811,311.92 | 9,834,704.01 |
| FINISHED GOODS - GLOBAL | 3,887,357.84 | 3,537,535.83 |
| | ---------------- | ---------------- |
| TOTAL INVENTORY | 10,698,669.76 | 13,372,239.84 |
| | ================ | ================ |

GITTO GLOBAL CORPORATION

DRAFT BALANCE SHEET

AS OF APR 30,2004

DATE:    7/22/04    9:19
PGM:    GL023
PAGE:    4

|  | MONTH OF<br>APR 2004 | MONTH OF<br>APR 2003 |
|---|---|---|
| **ACCRUED EXPENSES** | | |
| ACCRUED INSURANCE | 36,133.65 | 18,645.71 |
| ACCRUED SELF INS MEDICAL CHGS | .00 | .00 |
| ACCRUED AUTO LEASES | .00 | .00 |
| ACCRUED PAYROLL | 110,509.89 | 161,493.28 |
| ACCRUED PAYROLL TAXES | 9,221.14 | 12,295.92 |
| ACCRUED INTEREST | 30,966.14 | .00 |
| ACCRUED RENT | 3,916.00 | .00 |
| ACCRUED MARKETING EXPENSES | .00 | .00 |
| SNOW REMOVAL ACCRUAL | .00 | .00 |
| ACCRUED WATER CHARGES | .00 | .00 |
| ACCRUED ENVIRONMENTAL FEES | 5,583.32 | 2,791.66 |
| ACCRUED ELECTRIC CHARGES | 24,999.99 | 81,916.44 |
| ACCRUED ACCOUNTING & AUDITING | .00 | 24,575.46 |
| ACCRUED EXPENSES | .00 | .00 |
| | ---------------- | ---------------- |
| TOTAL ACCRUED EXPENSE - OTHER | 221,330.13 | 301,717.87 |

CITTO/GLOBAL CORPORATION

DRAFT INCOME STATEMENT

FOR THE 10 MONTHS ENDING APR 30,2004

DATE:   7/22/04    9:16
PGM:   GL023
PAGE:    1

| | MONTH OF APR 2004 | | MONTH OF APR 2003 | | YTD- FY 2004 | | YTD FY 2003 | |
|---|---|---|---|---|---|---|---|---|
| **SALES** | | | | | | | | |
| TOTAL SALES | 86,225,029.64 | 100.16 | 17,685,344.56 | 101.05 | 560,805,260.41 | 100.35 | 124,519,206.19 | 101.70 |
| SALES RETURNS & ALLOWANCES | 135,337.23 | .16 | 184,582.82 | 1.05 | 1,945,812.39 | .35 | 2,085,304.60 | 1.70 |
| TOTAL SALES | 86,089,692.41 | 100.00 | 17,500,761.74 | 100.00 | 558,859,448.02 | 100.00 | 122,433,901.59 | 100.00 |
| **COST OF GOODS SOLD** | | | | | | | | |
| RAW MATERIALS | 84,754,016.48 | 98.45 | 15,933,955.19 | 91.05 | 544,472,065.70 | 97.43 | 107,674,341.31 | 87.94 |
| PACKAGING | 90,110.90 | .10 | 37,873.83 | .22 | 565,105.91 | .10 | 642,723.36 | .52 |
| SCRAP | .00 | | .00 | | 72,309.88 | .01 | 188,170.87 | .15 |
| FREIGHT-IN | 11,263.85 | .01 | 23,072.21 | .13 | 145,047.77 | .03 | 189,827.91 | .16 |
| PURCHASE DISCOUNTS | 3,997.72- | | .00 | | 6,670.06- | | 18,088.32- | .01- |
| CHANGE IN INVENTORY | 321,790.29- | .37- | 40,115.33 | .23 | 1,735,620.83- | .31- | 77,920.68 | .06 |
| TOTAL MATERIALS | 84,529,603.22 | 98.19 | 16,035,016.56 | 91.62 | 543,512,238.37 | 97.25 | 108,754,895.81 | 88.83 |
| **DIRECT LABOR** | | | | | | | | |
| WAGES | 101,862.18 | .12 | 106,274.78 | .61 | 948,173.13 | .17 | 1,010,926.96 | .83 |
| PAYROLL TAXES | 13,267.10 | .02 | 14,104.13 | .08 | 98,789.80 | .02 | 102,462.36 | .08 |
| MEDICAL INSURANCE | 16,089.94 | .02 | 12,482.17 | .07 | 152,103.67 | .03 | 121,217.60 | .10 |
| DISABILITY INS-DIRECT LABOR | 499.08 | | 555.48 | | 4,714.23 | | 4,127.25 | |
| WORKMANS COMPENSATION | 3,097.39 | | 2,923.25 | .02 | 29,610.90 | .01 | 31,222.98 | .03 |
| SUBCONTRACT LABOR | 14,460.01 | .02 | 4,863.35 | .03 | 132,409.03 | .02 | 24,872.40 | .02 |
| TOTAL DIRECT LABOR | 149,275.70 | .17 | 141,203.16 | .81 | 1,365,800.76 | .24 | 1,294,829.55 | 1.06 |
| GROSS PROFIT | 1,410,813.49 | 1.64 | 1,324,542.02 | 7.57 | 13,981,408.89 | 2.50 | 12,384,176.23 | 10.11 |

GITTO/GLOBAL CORPORATION

DRAFT INCOME STATEMENT

FOR THE 10 MONTHS ENDING APR 30,2004

DATE:    7/22/04    9:1
PGM:    GL023
PAGE:    2

| | MONTH OF APR 2004 | % | MONTH OF APR 2003 | % | YTD FY 2004 | % | YTD FY 2003 | % |
|---|---|---|---|---|---|---|---|---|
| **FACTORY OVERHEAD** | | | | | | | | |
| SALARIES & WAGES-INDIRECT | 111,378.71 | .13 | 91,733.11 | .52 | 872,239.83 | .16 | 784,430.69 | .64 |
| PAYROLL TAXES-INDIRECT LABOR | 10,749.95 | .01 | 11,836.76 | .07 | 81,152.81 | .01 | 71,470.61 | .06 |
| HEALTH INSURANCE-INDIRECT | 1,120.97 | | 2,119.82 | .01 | 16,723.21 | | 25,914.69 | .02 |
| WORKMANS COMP-INDIRECT LABOR | 2,302.64 | | 1,679.51 | .01 | 17,242.29 | | 14,847.84 | .01 |
| EMPLOYEE ACTIVITIES | .00 | | .00 | | 1,268.25 | | 1,329.50 | |
| OSHA PENALTY EXPENSE | .00 | | .00 | | 25,000.00 | | .00 | |
| DISABILITY INS-INDIRECT LABOR | 227.47 | | 224.84 | | 2,229.27 | | 2,364.02 | |
| EMPLOYEE PHYSICALS EXPENSE | 2,245.00 | | 620.00 | | 20,256.00 | | 11,583.53 | .01 |
| FACTORY SUPPLIES & EXPENSES | 16,700.69 | .02 | 14,531.23 | .08 | 199,361.80 | .04 | 208,703.71 | .17 |
| PLANT CLEANING EXPENSES | 1,265.24 | | .00 | | 8,675.24 | | 9,156.83 | .01 |
| SECURITY EXPENSE | .00 | | .00 | | 2,370.96 | | 2,899.40 | |
| UNIFORMS | 2,232.34 | | 1,557.84 | .01 | 26,060.09 | | 26,154.59 | .02 |
| MACHINERY REPAIRS & MAINT | 4,235.51 | | 9,693.56 | .06 | 69,432.90 | .01 | 95,463.30 | .08 |
| STORAGE TRAILOR EXPENSE | 1,140.00 | | 157.50 | | 15,406.50 | | 2,541.25 | |
| TRASH REMOVAL | 7,491.54 | .01 | 11,837.30 | .07 | 71,167.07 | .01 | 61,632.36 | .05 |
| WASTE WATER REMOVAL | .00 | | 2,748.40 | .02 | 11,754.12 | | 12,470.23 | .01 |
| P/U TRUCK TELEPHONE EXPENSE | 55.57 | | 586.17 | | 1,896.57 | | 2,882.70 | |
| BUILDING MAINTENANCE | 3,067.44 | | .00 | | 33,591.17 | .01 | 13,219.34 | .01 |
| SNOW REMOVAL | .00 | | .00 | | 6,640.00 | | 9,905.00 | .01 |
| IDS MAINTENANCE | 148.06 | | .00 | | 6,250.34 | | 40,791.24 | .03 |
| PLANT FUEL OIL | 11,939.36 | .01 | 1,321.58 | .01 | 105,436.30 | .02 | 47,747.65 | .04 |
| PROPANE FUEL EXPENSE | 921.06 | | .00 | | 7,105.43 | | 6,965.84 | .01 |
| ELECTRIC EXPENSE | 59,437.48 | .07 | 56,994.76 | .33 | 643,662.84 | .12 | 519,485.07 | .42 |
| WATER | 3,144.46 | | .00 | | 12,406.96 | | 7,146.00 | .01 |
| SEPTIC SERVICE EXPENSE | .00 | | .00 | | .00 | | 38,715.00 | .03 |
| ENVIRONMENTAL CONSULTING FEES | .00 | | 16,000.00 | .09 | 26,354.60 | | 13,624.52 | .01 |
| GAS, OIL & GREASE | 143.64 | | 117.23 | | 1,441.03 | | 1,452.12 | |
| TRAVEL EXPENSE-VEH MAINT | .00 | | .00 | | 661.33 | | .00 | |
| TRAVEL EXPENSE-TOLLS & PARKING | .00 | | .00 | | .00 | | 33.00 | |
| TRAVEL EXPENSE-AIRFARE | .00 | | .00 | | 784.50 | | 182.19 | |
| TRAVEL EXPENSE-AUTO RENTAL | .00 | | 508.36 | | 968.24 | | 1,532.37 | |
| TRAVEL EXPENSE-MISCELLANEOUS | .00 | | .00 | | 377.14 | | 508.72 | |
| **FIXED FACTORY OVERHEAD** | | | | | | | | |
| MASS TOXIC USE FEE | 630.00 | | 630.00 | | 6,300.00 | | 6,300.00 | .01 |
| LEASED AUTOS | 78.04 | | 777.73 | | 6,141.61 | | 5,442.14 | |
| TRUCK INSURANCE-FACTORY | 150.00 | | 150.00 | | 1,500.00 | | 1,500.00 | |
| OHSA CONSULTING FEES | 2,791.66 | | 2,791.66 | .02 | 27,916.60 | | 27,916.60 | .02 |
| RENT-LUNENBURG | 31,085.93 | .04 | 31,085.93 | .18 | 310,859.30 | .06 | 310,859.30 | .25 |
| RENT-STORAGE | 3,916.00 | | 3,972.00 | .02 | 40,129.50 | .01 | 35,680.00 | .03 |
| REAL ESTATE TAXES | 2,500.00 | | 2,500.00 | .01 | 25,000.00 | | 25,000.00 | .02 |
| INSURANCE EXPENSE | 20,000.00 | .02 | 12,100.00 | .07 | 184,200.00 | .03 | 121,000.00 | .10 |
| LEASED FORKLIFT EXPENSE | 1,675.00 | | 1,675.00 | .01 | 15,304.25 | | 17,451.08 | .01 |
| LEASED FLOOR CLEANING MACHINE | 801.59 | | 524.45 | | 9,400.43 | | 5,900.80 | |
| AMORTIZATION OF LEASEHOLD IMPR | 4,500.00 | .01 | 4,500.00 | .03 | 45,000.00 | .01 | 45,000.00 | .04 |
| DEPRECIATION-MACH & EQUIPMENT | 120,000.00 | .14 | 120,000.00 | .69 | 1,200,000.00 | .21 | 1,200,000.00 | .98 |
| **TOTAL FACTORY OVERHEAD** | 426,073.15 | .50 | 406,974.74 | 2.31 | 4,157,668.56 | .74 | 3,837,183.23 | 3.13 |
| | 982,740.34 | .50 | 919,567.28 | 2.31 | 9,823,740.33 | .74 | 8,546,993.00 | 3.13 |

GITTO/GLOBAL CORPORATION

DRAFT INCOME STATEMENT

FOR THE 10 MONTHS ENDING APR 30,2004

DATE: 7/22/04  9:

PGM: GL023

PAGE: 3

| | MONTH OF APR 2004 | % | MONTH OF APR 2003 | % | YTD FY 2004 | % | YTD FY 2003 | % |
|---|---|---|---|---|---|---|---|---|
| **LABORATORY EXPENSES** | | | | | | | | |
| SALARIES & WAGES | 79,911.94 | .09 | 76,026.39 | .43 | 670,269.26 | .12 | 821,350.08 | .67 |
| PAYROLL TAXES | 7,296.69 | .01 | 5,970.07 | .03 | 52,420.50 | .01 | 60,841.26 | .05 |
| WORKMANS COMPENSATION | 801.05 | | 600.16 | | 6,441.49 | | 8,854.85 | .01 |
| MEDICAL INSURANCE | 2,467.90 | | 2,928.94 | .02 | 23,526.38 | | 27,403.29 | .02 |
| DISABILITY INSURANCE | 355.47 | | 384.56 | | 3,065.98 | | 3,617.37 | |
| GROUP TERM LIFE INSURANCE | .00 | | .00 | | 355.47 | | .00 | |
| LAB OUTSIDE TESTING EXPENSE | .00 | | .00 | | 4,283.00 | | 1,968.00 | |
| LAB SUPPLIES & EXPENSES | 2,080.57 | | 2,195.74 | .01 | 24,004.05 | | 26,405.51 | .02 |
| TELEPHONE- R & D | 377.25 | | 826.20 | | 7,604.73 | | 11,034.17 | .01 |
| AUTO INSURANCE | .00 | | 120.00 | | 240.00 | | 1,200.00 | |
| LEASED AUTO EXPENSE | 857.89 | | 1,362.01 | .01 | 2,581.91 | | 13,620.10 | .01 |
| TRAVEL-GAS & OIL | .00 | | 209.01 | | 1,418.93 | | 4,328.43 | |
| TRAVEL-VEHICLE MAINTENANCE | .00 | | 169.00 | | 986.81 | | 2,254.34 | |
| TRAVEL-TOLLS & PARKING | 48.00 | | 282.00 | | 1,175.87 | | 2,131.80 | |
| TRAVEL-AIRFARE | 673.40 | | 4,452.36 | .03 | 10,213.62 | | 18,989.73 | .02 |
| TRAVEL-AUTO RENTAL | 193.25 | | 128.64 | | 1,199.36 | | 128.64 | |
| TRAVEL-MEALS | 379.84 | | 237.56 | | 4,597.37 | | 8,859.58 | .01 |
| TRAVEL-ENTERTAINMENT | .00 | | 355.00 | | 1,127.68 | | 3,138.32 | |
| TRAVEL-LODGING | .00 | | 3,081.44 | .02 | 9,868.41 | | 12,807.41 | .01 |
| MISCELLANEOUS TRAVEL EXPENSES | 50.00 | | 400.00 | | 4,834.39 | | 6,602.76 | .01 |
| LEASED LAB EQUIPMENT | 1,397.03 | | .00 | | 2,088.84 | | 2,664.20 | |
| DEPRECIATION-LAB EQUIPMENT | .00 | | .00 | | .00 | | .00 | |
| **TOTAL LABORATORY EXPENSES** | 96,890.30 | .11 | 99,729.13 | .57 | 832,366.05 | .15 | 1,038,199.84 | .85 |
| | 885,850.04 | .11 | 819,838.15 | .57 | 8,991,374.28 | .15 | 7,508,793.16 | .85 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 10 MONTHS ENDING APR 30,2004

DATE:   7/22/04   9:1
PGM:   GL023
PAGE:   4

| | MONTH OF APR 2004 | % | MONTH OF APR 2003 | % | YTD FY 2004 | % | YTD FY 2003 | % |
|---|---|---|---|---|---|---|---|---|
| **DELIVERY EXPENSES** | | | | | | | | |
| DRIVER WAGES | 12,356.17 | .01 | 13,402.76 | .08 | 116,537.49 | .02 | 121,324.77 | .10 |
| PAYROLL TAXES-DRIVERS | 1,347.63 | | 974.98 | .01 | 10,804.66 | | 10,319.85 | .01 |
| WORKMANS COMP-DRIVERS | 658.01 | | 621.53 | | 6,256.11 | | 6,463.16 | .01 |
| MEDICAL INSURANCE-DRIVERS | 2,301.84 | | 2,280.72 | .01 | 23,826.28 | | 21,508.99 | .02 |
| DISABILITY INSURANCE | 81.57 | | 81.57 | | 815.70 | | 766.43 | |
| FEDERAL EXPRESS DELIVERIES | .00 | | .00 | | .00 | | .00 | |
| DELIVERY FUEL | 2,357.28 | | 162.42 | | 20,197.00 | | 19,341.72 | .02 |
| DELIVERY TOLLS | 394.65 | | .00 | | 3,384.25 | | 588.71 | |
| DELIVERY MEALS | .00 | | 94.26 | | 745.68 | | 878.61 | |
| DELIVERY LODGING | .00 | | .00 | | .00 | | .00 | |
| FREIGHT OUT | 85,978.71 | .10 | 110,220.88 | .65 | 1,058,070.71 | .19 | 971,199.53 | .79 |
| UPS DELIVERIES | 3,260.16 | | 7,217.05 | .04 | 46,240.78 | .01 | 56,209.36 | .04 |
| TRUCK REPAIRS & MAINTENANCE | 691.27 | | 497.87 | | 3,100.06 | | 701.31 | |
| TRUCK LEASE EXPENSE | 12,195.25 | .01 | 15,769.62 | .09 | 125,132.17 | .02 | 116,674.42 | .10 |
| DEPRECIATION-TRUCKS | .00 | | .00 | | .00 | | .00 | |
| | ---------------- | | ---------------- | | ---------------- | | ---------------- | |
| **TOTAL DELIVERY EXPENSES** | 121,422.56 | | 151,323.66 | | 1,415,110.89 | | 1,323,976.84 | |
| | ---------------- | | ---------------- | | ---------------- | | ---------------- | |
| | 764,427.50 | | 668,514.49 | | 7,576,263.39 | | 6,184,816.32 | |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 10 MONTHS ENDING APR 30,2004

DATE:    7/22/04    9:16
PGM:    GLG23
PAGE:    5

| | MONTH OF APR 2004 | % | MONTH OF APR 2003 | % | YTD FY 2004 | % | YTD FY 2003 | % |
|---|---|---|---|---|---|---|---|---|
| **SELLING EXPENSES** | | | | | | | | |
| SALES SALARIES | 52,080.85 | .06 | 37,310.37 | .21 | 437,809.54 | .08 | 396,235.54 | .32 |
| PAYROLL TAXES-SALES | 3,942.70 | | 2,778.60 | .02 | 27,054.58 | | 24,539.81 | .02 |
| WORKMANS COMP-SALES | 197.07 | | 128.35 | | 1,646.31 | | 1,515.14 | |
| MEDICAL INSURANCE-SALES | 3,593.36 | | 3,847.83 | .02 | 35,483.69 | .01 | 33,078.82 | .03 |
| DISABILITY INSURANCE | 229.54 | | 175.47 | | 1,978.98 | | 1,898.92 | |
| COMMISSIONS | 89,719.72 | .10 | 26,587.42 | .15 | 580,887.62 | .10 | 302,433.57 | .25 |
| TELEPHONE-SALES | 5,337.50 | .01 | 3,149.63 | .02 | 31,573.84 | .01 | 32,319.59 | .03 |
| ADVERTISING | 431.25 | | 2,070.58 | .01 | 3,299.51 | | 15,278.19 | .01 |
| PUBLIC RELATION FEES | .00 | | 318.01 | | 7,975.61 | | 4,861.09 | |
| BAD DEBTS EXPENSE/RECOVERY | 5,000.00 | .01 | 5,000.00 | .03 | 50,000.00 | .01 | 50,000.00 | .04 |
| SALES MEETINGS & CONVENTIONS | .00 | | 2,011.42 | .01 | 2,941.00 | | 5,618.17 | |
| STORAGE OF CONVENTION BOOTH | .00 | | 732.36 | | 1,464.72 | | 2,075.02 | |
| SALES INCENTIVES | 24,360.00 | .03 | .00 | | 59,613.93 | .01 | 2,803.37 | |
| DUES & SUBSCRIPTIONS | .00 | | .00 | | 3,621.24 | | 4,744.03 | |
| SELLING EXPENSES | .00 | | .00 | | 4,025.59 | | 1,212.64 | |
| LEASED AUTOS EXPENSE-SALES | 6,047.09 | .01 | 5,142.77 | .03 | 32,742.29 | .01 | 30,612.69 | .03 |
| AUTO INSURANCE | 380.00 | | 370.00 | | 3,780.00 | | 3,700.00 | |
| TRAVEL-GAS & OIL-SALES | 523.73 | | 1,030.76 | .01 | 6,745.92 | | 5,286.90 | |
| TRAVEL-VEHICLE MAINT-SALES | 56.00 | | 22.25 | | 809.62 | | 3,914.03 | |
| TRAVEL-TOLLS-SALES | 80.51 | | 106.18 | | 627.94 | | 585.11 | |
| TRAVEL-AIRFARE-SALES | 1,191.90 | | 3,575.79 | .02 | 9,748.50 | | 20,265.37 | .02 |
| TRAVEL-AUTO RENTAL-SALES | 357.98 | | 405.10 | | 3,720.98 | | 4,517.32 | |
| TRAVEL-MEALS-SALES | 473.92 | | 2,511.72 | .01 | 10,869.47 | | 18,187.14 | .01 |
| TRAVEL-ENTERTAINMENT-SALES | .00 | | 1,106.05 | .01 | 2,473.39 | | 4,681.05 | |
| TRAVEL-HOTEL-SALES | 816.17 | | 722.76 | | 11,271.10 | | 15,010.76 | .01 |
| TRAVEL-MISCELLANEOUS-SALES | 320.80 | | 183.05 | | 2,459.25 | | 2,766.93 | |
| **TOTAL SELLING EXPENSES** | 195,140.01 | .23 | 99,286.47 | .57 | 1,333,816.62 | .24 | 988,161.20 | .81 |
| | 569,287.49 | .23 | 569,228.02 | .57 | 6,242,446.77 | .26 | 5,196,655.12 | .81 |

CITY/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 10 MONTHS ENDING APR 30, 2004

DATE:    7/22/04    9:1-
PGM:    GL023
PAGE:    6

| | MONTH OF APR 2004 | % | MONTH OF APR 2003 | % | YTD FY 2004 | % | YTD FY 2003 | % |
|---|---|---|---|---|---|---|---|---|
| **ADMINISTRATIVE EXPENSES** | | | | | | | | |
| SALARIES-OFFICE | 47,547.01 | .06 | 23,322.59 | .13 | 276,476.44 | .05 | 240,825.87 | .20 |
| PAYROLL TAXES-OFFICE | 4,538.66 | .01 | 1,873.29 | .01 | 21,121.01 | | 17,265.54 | .01 |
| WORKMANS COMPENSATION-OFFICE | 91.89 | | 41.05 | | 529.96 | | 475.40 | |
| MEDICAL INSURANCE-OFFICE | 2,413.40 | | 2,411.32 | .01 | 38,410.03 | .01 | 45,248.62 | .04 |
| EMPLOYER 401K MATCH | .00 | | .00 | | .00 | | 1,424.03 | |
| DISABILITY INSURANCE | 162.49 | | 158.20 | | 1,603.45 | | 1,496.88 | |
| OFFICE SUPPLIES & EXPENSES | 2,372.88 | | 2,219.41 | .01 | 33,131.57 | .01 | 55,080.18 | .04 |
| BOTTLED WATER EXPENSE | 241.50 | | 268.97 | | 2,281.43 | | 3,416.87 | |
| POSTAGE | 279.78 | | 35.64 | | 6,168.23 | | 7,437.55 | .01 |
| FEDERAL EXPRESS-OFFICE | 1,807.31 | | 1,554.25 | .01 | 16,899.03 | | 22,260.28 | .02 |
| COURIER CHARGES | .00 | | .00 | | .00 | | .00 | |
| OFFICE CLEANING EXPENSE | .00 | | .00 | | .00 | | .00 | |
| BANK CHARGES | 21,238.92 | .02 | 26,316.28 | .14 | 223,329.29 | .04 | 232,173.45 | .19 |
| DUES & SUBSCRIPTIONS | .00 | | .00 | | 10,061.13 | | 4,322.99 | |
| PAYROLL PROCESSING FEES | 62.00 | | 283.00 | | 5,211.33 | | 5,174.81 | |
| COMPUTOR SUPPLIES & EXPENSES | 1,235.25 | | 921.50 | .01 | 11,270.64 | | 11,445.31 | .01 |
| PROFESSIONAL FEES | 147.12 | | 115.00 | | 761.28 | | 740.37 | |
| ACCOUNTING & AUDITING FEES | 1,087.79 | | 745.00 | | 7,628.34 | | 5,059.33 | |
| FINANCE ADMIN FEES | 15,000.00 | .02 | 15,000.00 | .09 | 154,633.60 | .03 | 149,650.00 | .12 |
| LEGAL FEES | 36,535.00 | .04 | 3,325.00 | .02 | 66,460.00 | .01 | 26,460.00 | .02 |
| BANK LEGAL FEES | 27,230.22 | .03 | 2,222.45 | .01 | 177,523.42 | .03 | 65,471.55 | .05 |
| CONSULTING FEES | .00 | | .00 | | 1,948.30 | | .00 | |
| OFFICE CAR PHONES | 49,127.76 | .06 | 15,500.00 | .09 | 274,348.72 | .05 | 122,114.22 | .10 |
| TELEPHONE-OFFICE | 645.33 | | 152.03 | | 3,146.20 | | 1,820.91 | |
| DONATIONS | 55.61 | | 332.72 | | 1,532.16 | | 1,723.53 | |
| EQUIPMENT RENTAL | 1,500.00 | | 1,095.00 | .01 | 29,632.50 | .01 | 20,240.00 | .02 |
| MISCELLANEOUS EXPENSES | .00 | | 298.66 | | 708.84 | | 895.98 | |
| TRAVEL-GAS & OIL | .00 | | 225.00 | | 6,510.24 | | 284.36 | |
| VEHICLE MAINTENANCE | 553.26 | | 560.60 | | 6,487.25 | | 6,209.82 | .01 |
| TRAVEL-AUTO RENTAL | .00 | | .00 | | .00 | | .00 | |
| TRAVEL-ENTERTAINMENT | .00 | | .00 | | .00 | | .00 | |
| TRAVEL-LODGING | .00 | | 561.00 | | .00 | | 561.00 | |
| MISCELLANEOUS TRAVEL EXPENSES | .00 | | .00 | | .00 | | .00 | |
| TELEPHONE SYSTEM LEASE | .00 | | .00 | | .00 | | .00 | |
| OFFICE COPIER LEASE | 753.74 | | 1,021.34 | .01 | 10,208.50 | | 9,464.49 | .01 |
| COMPUTOR LEASE EXPENSE | 2,544.63 | | 1,575.91 | .01 | 19,169.94 | | 15,157.76 | .01 |
| COMPUTOR SERVICE CONTRACT | .00 | | .00 | | .00 | | 1,202.25 | |
| COMPUTOR SOFTWARE SERVICE | 709.04 | | 249.50 | | 2,810.06 | | 3,120.78 | |
| MAILING MACHINE LEASE | 2,914.88 | | 281.26 | | 18,279.41 | | 11,916.36 | .01 |
| LEASED AUTO EXPENSE | 826.09 | | 812.64 | | 3,221.19 | | 3,196.19 | |
| LEASED AUTO INSURANCE EXPENSE | 500.00 | | 500.00 | | 7,707.82 | | 12,735.12 | .01 |
| AMORTIZATION EXPENSE | .00 | | 120.00 | | 240.00 | | 1,200.00 | |
| DEPRECIATION-OFFICE EQUIPMENT | .00 | | 4,800.00 | .03 | .00 | | 48,000.00 | .04 |
| | 5,300.00 | .01 | 5,300.00 | .03 | 53,000.00 | .01 | 53,000.00 | .04 |
| **TOTAL ADMINISTRATIVE EXPENSES** | 227,435.56 | .26 | 112,198.61 | .64 | 1,492,450.31 | .27 | 1,208,411.79 | .99 |
| | 341,851.93 | .26 | 457,029.41 | .64 | 4,749,996.46 | .27 | 3,988,243.33 | .99 |

GLYCO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 10 MONTHS ENDING APR 30,2004

DATE: 7/22/04
PGM: GL023
PAGE: 7

| OFFICERS EXPENSES | MONTH OF APR 2004 | % | MONTH OF APR 2003 | % | YTD FY 2004 | % | YTD FY 2003 |
|---|---|---|---|---|---|---|---|
| SALARIES | 136,273.90 | .16 | 96,161.03 | .55 | 1,152,610.32 | .21 | 952,627.80 |
| PAYROLL TAXES | 6,816.20 | .01 | 5,349.46 | .03 | 54,897.32 | .01 | 49,991.15 |
| WORKMANS COMPENSATION | 263.83 | | 169.24 | | 2,221.01 | | 1,861.18 |
| MEDICAL INSURANCE | 4,290.59 | | 5,393.70 | .03 | 38,366.91 | .01 | 41,792.70 |
| LIFE INSURANCE EXPENSE | 5,099.00 | .01 | 2,016.60 | .01 | 53,356.00 | .01 | 33,991.80 |
| DISABILITY INSURANCE | 377.38 | | 377.38 | | 3,773.80 | | 3,830.36 |
| TELEPHONE | 816.22 | | 3,133.82 | .02 | 17,413.52 | | 21,898.38 |
| LEASED AUTO EXPENSE | 7,511.71 | .01 | 23,998.78 | .14 | 54,295.20 | .01 | 85,580.41 |
| LEASED AUTO INSURANCE EXPENSE | 980.00 | | 1,180.00 | .01 | 10,200.00 | | 11,800.00 |
| TRAVEL-GAS & OIL | 476.98 | | 1,163.65 | .01 | 11,602.55 | | 14,690.18 |
| VEHICLE MAINTENANCE | 229.95 | | 133.05 | | 25,306.51 | | 15,394.46 |
| TRAVEL-TOLLS & PARKING | .00 | | 1,144.25 | .01 | 466.55 | | 5,404.05 |
| TRAVEL-AIRFARE | 6,129.70 | .01 | 2,847.23 | .02 | 51,388.55 | .01 | 25,008.71 |
| TRAVEL-AUTO RENTAL | 1,575.95 | | 939.98 | .01 | 9,259.07 | | 12,288.54 |
| TRAVEL-MEALS | 3,598.50 | | 4,264.09 | .02 | 28,752.62 | .01 | 37,582.74 |
| TRAVEL-ENTERTAINMENT | .00 | | 470.96 | | 14,502.68 | | 11,220.76 |
| TRAVEL-LODGING | 2,079.66 | | 4,698.08 | .03 | 33,173.95 | .01 | 26,129.64 |
| MISCELLANEOUS TRAVEL EXPENSES | 2,848.10 | | 5,220.50 | .03 | 47,929.38 | .01 | 29,237.38 |
| TOTAL OFFICER EXPENSES | 179,367.76 | .21 | 158,661.80 | .91 | 1,609,520.94 | .29 | 1,380,330.24 | 1.13 |

GLUTADIDMAC CORPORATION
DRAFT INCOME STATEMENT
FOR THE 10 MONTHS ENDING APR 30, 2004

DATE: 7/22/04
PGM: GL023
PAGE: 8

| OTHER INCOME & EXPENSES | MONTH OF APR 2004 | % | MONTH OF APR 2003 | % | YTD FY 2004 | % | YTD FY 2003 | |
|---|---|---|---|---|---|---|---|---|
| **OTHER INCOME** | | | | | | | | |
| INTEREST INCOME | | | | | | | | |
| MISCELLANEOUS INCOME | .00 | | .00 | | .00 | | .00 | |
| INSURANCE RECOVERY | 140.26- | | 168.27- | | 2,008.06- | | 21,984.23- | |
| BID RECOVERY | .00 | | .00 | | .00 | | .00 | |
| | .00 | | .00 | | .00 | | .00 | |
| TOTAL OTHER INCOME | 140.26- | | 168.27- | | 2,008.06- | | 21,984.23- | |
| **OTHER EXPENSES** | | | | | | | | |
| INTEREST EXPENSE | | | | | | | | |
| FINANCE CHARGES | 165,783.49 | .19 | 164,142.26 | .94 | 1,705,058.76 | .31 | 1,738,631.99 | 1.47 |
| LOSS ON DISPOSALS | 1,679.22 | | 9,428.33 | .05 | 56,335.19 | .01 | 33,347.52 | .03 |
| MISCELLANEOUS EXPENSE | .00 | | .00 | | .00 | | .00 | |
| EFFECT OF ACCOUNTING CHANGE | .00 | | .00 | | .00 | | .00 | |
| | .00 | | .00 | | .00 | | .00 | |
| TOTAL OTHER EXPENSES | 167,462.71 | | 173,570.59 | | 1,761,393.95 | | 1,771,979.51 | |
| NET INCOME(LOSS) BEFORE TAX | 4,838.28- | | 124,965.29 | | 1,387,089.63 | | 857,917.81 | |
| **INCOME TAXES** | | | | | | | | |
| TAX EFFECT OF ACCOUNT CHANGE | | | | | | | | |
| STATE INCOME TAX EXPENSE | .00 | | .00 | | .00 | | .00 | |
| FEDERAL INCOME TAX EXPENSE | .00 | | 11,000.00 | .06 | 131,000.00 | .02 | 80,783.00 | .07 |
| | .00 | | 36,000.00 | .21 | 411,000.00 | .07 | 261,000.00 | .21 |
| TOTAL INCOME TAXES | .00 | | 47,000.00 | .21 | 542,000.00 | .07 | 341,783.00 | .21 |
| NET INCOME(LOSS) | 4,838.28- | | 77,965.29 | .21 | 839,089.63 | .07 | 516,134.81 | .21 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:  3/17/04  15:48
PGM:   GLD23
PAGE:      1

| | MONTH OF JAN 2004 | | MONTH OF JAN 2003 | | YTD FY 2003 | | YTD FY 2002 | |
|---|---|---|---|---|---|---|---|---|
| **SALES** | | | | | | | | |
| TOTAL SALES | 62,540,786.49 | 100.21 | 11,179,225.01 | 101.12 | 326,906,601.98 | 100.48 | 75,516,626.27 | 102.06 |
| SALES RETURNS & ALLOWANCES | 130,443.94 | .21 | 123,936.08 | 1.12 | 1,575,854.90 | .48 | 1,523,700.70 | 2.06 |
| TOTAL SALES | 62,410,342.55 | 100.00 | 11,055,288.93 | 100.00 | 325,330,747.08 | 100.00 | 73,992,925.57 | 100.00 |
| **COST OF GOODS SOLD** | | | | | | | | |
| RAW MATERIALS | 59,844,130.86 | 95.89 | 9,622,192.56 | 87.04 | 315,713,798.55 | 97.04 | 63,821,781.09 | 86.25 |
| PACKAGING | 51,319.44 | .08 | 45,356.46 | .41 | 368,152.94 | .11 | 472,513.11 | .64 |
| SCRAP | 48,026.92 | .08 | 7,621.44 | .07 | 48,026.92 | .01 | 179,113.59 | .24 |
| FREIGHT-IN | 15,396.33 | .02 | 17,632.76 | .16 | 112,670.42 | .03 | 129,256.34 | .17 |
| PURCHASE DISCOUNTS | .00 | | .00 | | 2,622.34- | | 18,088.32- | .02- |
| CHANGE IN INVENTORY | 944,000.09 | 1.51 | 20,540.74- | .19- | 1,771,764.59- | .54- | 65,060.31- | .09- |
| TOTAL MATERIALS | 60,902,873.64 | 97.58 | 9,672,262.48 | 87.49 | 314,468,261.90 | 94.66 | 64,519,515.50 | 87.20 |
| **DIRECT LABOR** | | | | | | | | |
| WAGES | 89,870.66 | .14 | 98,884.90 | .89 | 681,753.95 | .21 | 700,058.75 | .95 |
| PAYROLL TAXES | 11,894.86 | .02 | 12,134.50 | .11 | 64,305.15 | .02 | 64,343.43 | .09 |
| MEDICAL INSURANCE | 13,980.00 | .02 | 13,258.03 | .12 | 103,520.25 | .03 | 84,124.11 | .11 |
| DISABILITY INS-DIRECT LABOR | 499.08 | | 398.60 | | 3,216.99 | | 2,603.19 | |
| WORKMANS COMPENSATION, | 2,451.59 | | 3,337.30 | .03 | 21,502.01 | .01 | 22,253.27 | .03 |
| SUBCONTRACT LABOR | 27,394.22 | .04 | .00 | | 96,381.68 | .03 | 12,957.72 | .02 |
| TOTAL DIRECT LABOR | 146,090.41 | .23 | 128,013.33 | 1.16 | 970,680.03 | .30 | 886,340.47 | 1.20 |
| GROSS PROFIT | 1,361,378.50 | 2.18 | 1,255,013.12 | 11.35 | 9,891,805.15 | 3.04 | 8,587,069.60 | 11.61 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:   3/17/04  15:48
PGM:    GL023
PAGE:      2

| | MONTH OF JAN 2004 | % | MONTH OF JAN 2003 | % | YTD FY 2003 | % | YTD FY 2002 | % |
|---|---|---|---|---|---|---|---|---|
| **FACTORY OVERHEAD** | | | | | | | | |
| SALARIES & WAGES-INDIRECT | 91,283.22 | .15 | 75,593.45 | .68 | 585,344.87 | .18 | 530,580.96 | .72 |
| PAYROLL TAXES-INDIRECT LABOR | 12,153.23 | .02 | 9,300.43 | .08 | 50,351.59 | .02 | 44,710.65 | .06 |
| HEALTH INSURANCE-INDIRECT | 1,712.85 | | 2,412.23 | .02 | 11,116.97 | | 19,012.69 | .03 |
| WORKMANS COMP-INDIRECT LABOR | 1,658.51 | | 1,461.40 | .01 | 11,395.28 | | 10,120.49 | .01 |
| EMPLOYEE ACTIVITIES | .00 | | .00 | | 1,268.25 | | 1,329.50 | |
| OSHA PENALTY EXPENSE | 25,000.00 | .04 | .00 | | 25,000.00 | .01 | .00 | |
| DISABILITY INS-INDIRECT LABOR | 227.47 | | 207.62 | | 1,546.66 | | 1,689.50 | |
| EMPLOYEE PHYSICALS EXPENSE | 822.00 | | 1,096.00 | .01 | 14,666.00 | | 5,761.53 | .01 |
| FACTORY SUPPLIES & EXPENSES | 21,879.81 | .04 | 18,128.69 | .16 | 142,845.30 | .04 | 156,230.17 | .21 |
| PLANT CLEANING EXPENSES | 875.00 | | 1,119.99 | .01 | 6,010.00 | | 7,581.83 | .01 |
| SECURITY EXPENSE | .00 | | 500.00 | | 1,285.96 | | 2,214.40 | |
| UNIFORMS | 1,228.17 | | 2,899.86 | .03 | 16,888.83 | .01 | 18,903.66 | .03 |
| MACHINERY REPAIRS & MAINT | 12,934.43 | .02 | 6,408.34 | .06 | 55,445.48 | .02 | 71,518.83 | .10 |
| STORAGE TRAILOR EXPENSE | 1,701.00 | | 157.50 | | 11,866.58 | | 2,068.75 | |
| TRASH REMOVAL | 8,082.30 | .01 | 3,734.33 | .03 | 49,210.01 | .02 | 39,001.47 | .05 |
| WASTE WATER REMOVAL | 1,747.25 | | 525.23 | | 12,559.31 | | 7,696.95 | .01 |
| P/U TRUCK TELEPHONE EXPENSE | 171.33 | | 290.89 | | 1,385.26 | | 1,830.75 | |
| BUILDING MAINTENANCE | 292.45 | | 376.50 | | 25,176.21 | .01 | 13,219.34 | .02 |
| SNOW REMOVAL | 2,730.00 | | 5,875.00 | .05 | 4,270.00 | | 5,875.00 | .01 |
| DS MAINTENANCE | .00 | | .00 | | 6,102.28 | | 40,078.59 | .05 |
| PLANT FUEL OIL | 10,060.61 | .02 | 8,083.63 | .07 | 67,504.89 | .02 | 37,199.69 | .05 |
| PROPANE FUEL EXPENSE | 669.15 | | 799.03 | .01 | 5,327.70 | | 5,333.36 | .01 |
| ELECTRIC EXPENSE | 58,860.09 | .09 | 46,315.46 | .42 | 458,681.04 | .14 | 346,859.66 | .47 |
| WATER | .00 | | .00 | | 9,262.50 | | 5,821.00 | .01 |
| SEPTIC SERVICE EXPENSE | .00 | | 9,570.00 | .09 | .00 | | 32,190.00 | .04 |
| ENVIRONMENTAL CONSULTING FEES | 2,242.22 | | 10,000.00 | .09 | 26,354.60 | .01 | 70,480.00 | .10 |
| GAS, OIL & GREASE | 234.53 | | 126.67 | | 1,140.91 | | 1,098.25 | |
| TRAVEL EXPENSE-VEH MAINT | .00 | | .00 | | 661.33 | | .00 | |
| TRAVEL EXPENSE-TOLLS & PARKING | .00 | | .00 | | .00 | | 33.00 | |
| TRAVEL EXPENSE-AIRFARE | .00 | | .00 | | 784.50 | | 182.19 | |
| TRAVEL EXPENSE-AUTO RENTAL | 100.40 | | .00 | | 968.24 | | 724.31 | |
| TRAVEL EXPENSE-MISCELLANEOUS | .00 | | .00 | | 377.14 | | 508.72 | |
| **FIXED FACTORY OVERHEAD** | | | | | | | | |
| MASS TOXIC USE FEE | 630.00 | | 630.00 | .01 | 4,410.00 | | 4,410.00 | .01 |
| LEASED AUTOS | .00 | | 478.86 | | 4,716.11 | | 3,352.02 | |
| TRUCK INSURANCE-FACTORY | 150.00 | | 150.00 | | 1,050.00 | | 1,050.00 | |
| OHSA CONSULTING FEES | 2,791.66 | | 2,791.66 | .03 | 19,541.62 | .01 | 19,541.62 | .03 |
| RENT-LUNENBURG | 31,085.93 | .05 | 31,085.93 | .28 | 217,601.51 | .07 | 217,601.51 | .29 |
| RENT-STORAGE | 4,020.50 | .01 | 3,972.00 | .04 | 27,811.50 | .01 | 23,820.00 | .03 |
| REAL ESTATE TAXES | 2,500.00 | | 2,500.00 | .02 | 17,500.00 | .01 | 17,500.00 | .02 |
| INSURANCE EXPENSE | 20,000.00 | .03 | 12,100.00 | .11 | 124,200.00 | .04 | 84,700.00 | .11 |
| LEASED FORKLIFT EXPENSE | 1,675.00 | | 1,742.00 | .02 | 11,725.00 | | 12,258.58 | .02 |
| D FLOOR CLEANING MACHINE | 524.45 | | .00 | | 6,667.52 | | 2,761.26 | |
| AMORTIZATION OF LEASEHOLD IMPR | 4,500.00 | .01 | 4,500.00 | .04 | 31,500.00 | .01 | 31,500.00 | .04 |
| DEPRECIATION-MACH & EQUIPMENT | 120,000.00 | .19 | 120,000.00 | 1.09 | 840,000.00 | .26 | 840,000.00 | 1.14 |
| **TOTAL FACTORY OVERHEAD** | 446,543.56 | .71 | 384,907.70 | 3.48 | 2,913,461.15 | .90 | 2,738,290.23 | 3.70 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:    3/17/04  15:48
PGM:    GL023
PAGE:     3

| | MONTH OF JAN 2004 | % | MONTH OF JAN 2003 | % | YTD FY 2003 | % | YTD FY 2002 | % |
|---|---|---|---|---|---|---|---|---|
| **LABORATORY EXPENSES** | | | | | | | | |
| SALARIES & WAGES | 67,404.54 | .11 | 89,116.88 | .81 | 463,904.92 | .14 | 592,560.70 | .80 |
| PAYROLL TAXES | 8,665.18 | .01 | 9,824.40 | .09 | 31,654.18 | .07 | 40,777.35 | .06 |
| WORKMANS COMPENSATION | 557.16 | | 1,093.44 | .01 | 4,369.27 | | 6,701.93 | .01 |
| MEDICAL INSURANCE | 1,908.28 | | 4,057.65 | .04 | 15,519.83 | | 17,878.17 | .02 |
| DISABILITY INSURANCE | 355.47 | | 355.95 | | 2,355.04 | | 2,463.69 | |
| LAB OUTSIDE TESTING EXPENSE | 700.00 | | .00 | | 4,283.00 | | 1,968.00 | |
| LAB SUPPLIES & EXPENSES | 7,227.03 | .01 | 2,377.97 | .02 | 18,329.60 | .01 | 15,714.84 | .02 |
| TELEPHONE- R & D | 691.29 | | 1,608.09 | .01 | 6,218.63 | | 8,282.27 | .01 |
| AUTO INSURANCE | .00 | | 120.00 | | 240.00 | | 840.00 | |
| LEASED AUTO EXPENSE | .00 | | 500.00 | | 1,724.02 | | 8,672.06 | .01 |
| TRAVEL-GAS & OIL | .00 | | 353.05 | | 1,448.49 | | 3,117.21 | |
| TRAVEL-VEHICLE MAINTENANCE | .00 | | 180.00 | | 986.81 | | 1,411.84 | |
| TRAVEL-TOLLS & PARKING | .00 | | 16.00 | | 1,127.87 | | 1,627.80 | |
| TRAVEL-AIRFARE | .00 | | 1,601.97 | .01 | 9,540.22 | | 12,333.72 | .02 |
| TRAVEL-AUTO RENTAL | .00 | | .00 | | 1,006.11 | | .00 | |
| TRAVEL-MEALS | .00 | | 91.93 | | 4,217.51 | | 7,875.28 | .01 |
| TRAVEL-ENTERTAINMENT | .00 | | .00 | | 1,127.68 | | 2,783.32 | |
| TRAVEL-LODGING | .00 | | 226.76 | | 9,860.41 | | 8,098.48 | .01 |
| MISCELLANEOUS TRAVEL EXPENSES | .00 | | .00 | | 3,284.39 | | 6,188.96 | .01 |
| D LAB EQUIPMENT | 104.96 | | .00 | | 1,876.70 | | 2,056.18 | |
| DEPRECIATION-LAB EQUIPMENT | .00 | | .00 | | .00 | | .00 | |
| TOTAL LABORATORY EXPENSES | 87,613.91 | .16 | 111,524.09 | 1.01 | 583,074.68 | .18 | 741,351.40 | 1.00 |
| | 829,221.03 | .14 | 758,581.33 | 1.01 | 6,395,269.32 | .18 | 5,107,427.97 | 1.00 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:    3/17/04  15:48
PGM:     GL023
PAGE:       4

| DELIVERY EXPENSES | MONTH OF JAN 2004 | % | MONTH OF JAN 2003 | % | YTD FY 2003 | % | YTD FY 2002 | % |
|---|---|---|---|---|---|---|---|---|
| DRIVER WAGES | 11,951.07 | .02 | 13,028.30 | .12 | 82,623.74 | .03 | 83,246.61 | .11 |
| PAYROLL TAXES-DRIVERS | 1,560.71 | | 1,576.97 | .01 | 6,731.43 | | 6,817.31 | .01 |
| WORKMANS COMP-DRIVERS | 565.21 | | 744.24 | .01 | 4,440.36 | | 4,586.55 | .01 |
| MEDICAL INSURANCE-DRIVERS | 2,080.36 | | 2,055.65 | .02 | 16,657.86 | .01 | 14,666.83 | .02 |
| DISABILITY INSURANCE | 81.57 | | 79.32 | | 570.99 | | 521.72 | |
| FEDERAL EXPRESS DELIVERIES | .00 | | .00 | | .00 | | .00 | |
| DELIVERY FUEL | 989.96 | | 3,355.23 | .03 | 13,675.38 | | 14,571.47 | .02 |
| DELIVERY TOLLS | .00 | | 5.90 | | 2,937.55 | | 505.81 | |
| DELIVERY MEALS | .00 | | 91.27 | | 604.09 | | 581.10 | |
| DELIVERY LODGING | .00 | | .00 | | .00 | | .00 | |
| FREIGHT OUT | 83,590.69 | .13 | 61,386.00 | .56 | 800,024.69 | .25 | 671,513.65 | .91 |
| UPS DELIVERIES | 1,719.14 | | 135.81 | | 30,130.23 | .01 | 40,002.68 | .05 |
| TRUCK REPAIRS & MAINTENANCE | 444.31 | | .00 | | 2,091.93 | | 203.44 | |
| TRUCK LEASE EXPENSE | 11,008.80 | .02 | 12,335.41 | .11 | 86,875.53 | .03 | 82,845.93 | .11 |
| DEPRECIATION-TRUCKS | .00 | | .00 | | .00 | | .00 | |
| TOTAL DELIVERY EXPENSES | 113,991.82 | | 96,790.10 | | 1,049,361.78 | | 920,062.90 | |
| | 715,229.21 | | 663,791.23 | | 5,345,907.56 | | 4,187,365.07 | |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:    3/17/04  15:48
PGM:     GL023
PAGE:    5

| | MONTH OF JAN 2004 | % | MONTH OF JAN 2003 | % | YTD FY 2003 | % | YTD FY 2002 | % |
|---|---|---|---|---|---|---|---|---|
| **SELLING EXPENSES** | | | | | | | | |
| SALES SALARIES | 45,831.15 | .07 | 39,011.10 | .35 | 301,599.33 | .09 | 289,392.20 | .39 |
| PAYROLL TAXES-SALES | 4,792.26 | .01 | 3,729.89 | .03 | 16,171.84 | | 16,296.40 | .02 |
| WORKMANS COMP-SALES | 157.66 | | 161.63 | | 1,133.92 | | 1,130.09 | |
| MEDICAL INSURANCE-SALES | 3,493.76 | .01 | 3,780.02 | .03 | 24,086.21 | .01 | 24,740.41 | .03 |
| DISABILITY INSURANCE | 229.54 | | 191.40 | | 1,282.36 | | 1,339.80 | |
| COMMISSIONS | 99,107.47 | .16 | 43,725.09 | .40 | 364,512.97 | .11 | 198,435.31 | .27 |
| TELEPHONE-SALES | 1,353.09 | | 3,358.37 | .03 | 21,137.43 | .01 | 22,445.08 | .03 |
| ADVERTISING | 512.00 | | 993.75 | .01 | 2,868.26 | | 10,995.11 | .01 |
| PUBLIC RELATION FEES | 1,066.63 | | 915.00 | .01 | 7,975.61 | | 1,644.00 | |
| BAD DEBTS EXPENSE/RECOVERY | 5,000.00 | .01 | 5,000.00 | .05 | 35,000.00 | .01 | 35,000.00 | .05 |
| SALES MEETINGS & CONVENTIONS | .00 | | .00 | | 2,941.00 | | 3,606.75 | |
| STORAGE OF CONVENTION BOOTH | .00 | | .00 | | 1,464.72 | | 1,342.66 | |
| SALES INCENTIVES | 10,000.00 | .02 | .00 | | 15,253.93 | | 1,681.37 | |
| DUES & SUBSCRIPTIONS | .00 | | 91.50 | | 1,962.26 | | 3,852.11 | .01 |
| SELLING EXPENSES | .00 | | .00 | | 1,546.42 | | 1,094.16 | |
| LEASED AUTOS EXPENSE-SALES | 2,076.40 | | 3,000.52 | .03 | 21,205.33 | .01 | 19,225.81 | .03 |
| AUTO INSURANCE | 380.00 | | 370.00 | | 2,640.00 | | 2,590.00 | |
| TRAVEL-GAS & OIL-SALES | 538.60 | | 374.35 | | 5,241.36 | | 3,471.40 | |
| TRAVEL-VEHICLE MAINT-SALES | .00 | | 25.43 | | 730.62 | | 3,640.76 | |
| TRAVEL-TOLLS-SALES | 59.60 | | 106.39 | | 482.93 | | 366.23 | |
| TRAVEL-AIRFARE-SALES | .00 | | 3,028.18 | .03 | 8,556.60 | | 16,023.08 | .02 |
| TRAVEL-AUTO RENTAL-SALES | 143.72 | | 794.68 | .01 | 3,011.17 | | 3,885.91 | .01 |
| TRAVEL-MEALS-SALES | 420.14 | | 855.87 | .01 | 9,068.59 | | 12,815.04 | .02 |
| TRAVEL-ENTERTAINMENT-SALES | 154.56 | | 582.84 | .01 | 2,356.88 | | 3,095.00 | |
| TRAVEL-HOTEL-SALES | 420.18 | | 2,277.91 | .02 | 10,203.76 | | 12,631.78 | .02 |
| TRAVEL-MISCELLANEOUS-SALES | 368.38 | | 265.51 | | 1,993.45 | | 2,373.88 | |
| TOTAL SELLING EXPENSES | 176,105.14 | .28 | 112,637.43 | 1.02 | 864,426.91 | .27 | 693,115.34 | .94 |
| | 539,124.07 | .28 | 551,153.80 | 1.02 | 4,481,480.63 | .27 | 3,494,249.73 | .94 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:   3/17/04  15:48
PGM:    GL023
PAGE:      6

| ADMINISTRATIVE EXPENSES | MONTH OF JAN 2004 | % | MONTH OF JAN 2003 | % | YTD FY 2003 | % | YTD FY 2002 | % |
|---|---|---|---|---|---|---|---|---|
| SALARIES-OFFICE | 25,082.60 | .04 | 24,382.71 | .22 | 180,240.78 | .06 | 174,038.44 | .24 |
| PAYROLL TAXES-OFFICE | 3,276.55 | .01 | 2,775.93 | .03 | 11,656.79 | | 11,108.40 | .02 |
| WORKMANS COMPENSATION-OFFICE | 44.15 | | 51.31 | | 349.34 | | 352.25 | |
| MEDICAL INSURANCE-OFFICE | 5,006.05 | .01 | 5,743.74 | .05 | 28,132.18 | .01 | 35,648.15 | .05 |
| EMPLOYER 401K MATCH | .00 | | 1,424.08 | .01 | .00 | | 1,424.08 | |
| DISABILITY INSURANCE | 162.49 | | 146.04 | | 1,115.98 | | 1,022.28 | |
| OFFICE SUPPLIES & EXPENSES | 1,015.79 | | 2,045.00 | .02 | 24,740.90 | .01 | 45,706.42 | .06 |
| BOTTLED WATER EXPENSE | 811.12 | | .00 | | 1,796.57 | | 2,463.10 | |
| POSTAGE | 1,000.00 | | 66.61- | | 4,856.57 | | 5,192.93 | .01 |
| FEDERAL EXPRESS-OFFICE | 833.38 | | 2,220.40 | .02 | 13,151.69 | | 18,046.86 | .02 |
| COURIER CHARGES | .00 | | .00 | | .00 | | .00 | |
| OFFICE CLEANING EXPENSE | .00 | | .00 | | .00 | | .00 | |
| BANK CHARGES | 21,722.37 | .03 | 22,634.11 | .20 | 159,550.02 | .05 | 165,634.60 | .22 |
| BANK AUDIT FEES | .00 | | 4,322.95 | .04 | 5,027.53 | | 4,322.95 | .01 |
| DUES & SUBSCRIPTIONS | 38.00 | | 606.68 | .01 | 1,175.33 | | 3,964.81 | .01 |
| PAYROLL PROCESSING FEES | 1,245.63 | | 1,395.62 | .01 | 7,568.77 | | 8,338.71 | .01 |
| COMPUTOR SUPPLIES & EXPENSES | .00 | | .00 | | 476.77 | | 411.42 | |
| PROFESSIONAL FEES | 857.50 | | 181.86 | | 6,219.27 | | 3,245.95 | |
| ACCOUNTING & AUDITING FEES | 15,000.00 | .02 | 15,000.00 | .14 | 109,633.60 | .03 | 103,150.00 | .14 |
| ANCE ADMIN FEES | 3,325.00 | .01 | 3,325.00 | .03 | 23,275.00 | .01 | 16,625.00 | .02 |
| LEGAL FEES | 10,400.00 | .02 | 18,684.27 | .17 | 95,885.58 | .03 | 31,898.14 | .04 |
| BANK LEGAL FEES | .00 | | .00 | | 1,948.30 | | .00 | |
| CONSULTING FEES | 1,000.00- | | 15,500.00 | .14 | 152,634.85 | .05 | 83,975.18 | .11 |
| OFFICE CAR PHONES | 352.93 | | 328.98 | | 2,278.09 | | 1,459.43 | |
| TELEPHONE-OFFICE | 151.98 | | 212.49 | | 1,203.38 | | 1,235.05 | |
| DONATIONS | 3,587.50 | .01 | 400.00 | | 23,982.50 | .01 | 18,350.00 | .02 |
| EQUIPMENT RENTAL | .00 | | 298.66 | | .00 | | 597.32 | |
| MISCELLANEOUS EXPENSES | .00 | | .00 | | .00 | | .00 | |
| TRAVEL-GAS & OIL | 157.47 | | 661.53 | .01 | 4,889.14 | | 4,185.28 | .01 |
| VEHICLE MAINTENANCE | .00 | | .00 | | .00 | | .00 | |
| TRAVEL-AUTO RENTAL | .00 | | .00 | | .00 | | .00 | |
| TRAVEL-LODGING | .00 | | .00 | | .00 | | .00 | |
| MISCELLANEOUS TRAVEL EXPENSES | .00 | | .00 | | .00 | | .00 | |
| TELEPHONE SYSTEM LEASE | 553.58 | | 1,021.34 | .01 | 8,077.78 | | 6,400.47 | .01 |
| OFFICE COPIER LEASE | 2,648.19 | | 957.22 | .01 | 13,461.90 | | 9,668.77 | .01 |
| COMPUTOR LEASE EXPENSE | .00 | | .00 | | .00 | | 1,202.20 | |
| COMPUTOR SERVICE CONTRACT | 249.50 | | 249.50 | | 1,746.50 | | 2,372.28 | |
| COMPUTOR SOFTWARE SERVICE | 4,696.13 | .01 | 281.26 | | 13,512.15 | | 10,510.06 | .01 |
| MAILING MACHINE LEASE | .00 | | .00 | | 2,395.10 | | 1,649.60 | |
| LEASED AUTO EXPENSE | 500.00 | | 500.00 | | 6,207.82 | | 8,334.45 | .01 |
| LEASED AUTO INSURANCE EXPENSE | .00 | | 120.00 | | 240.00 | | 840.00 | |
| AMORTIZATION EXPENSE | .00 | | 4,800.00 | .04 | .00 | | 33,600.00 | .05 |
| DEPRECIATION-OFFICE EQUIPMENT | 5,300.00 | .01 | 5,300.00 | .05 | 37,100.00 | .01 | 37,100.00 | .05 |
| TOTAL ADMINISTRATIVE EXPENSES | 107,017.91 | .17 | 135,504.07 | 1.23 | 944,530.18 | .29 | 853,874.66 | 1.15 |
| | 432,106.16 | .17 | 415,649.73 | 1.23 | 3,536,950.45 | .29 | 2,640,375.07 | 1.15 |

GITTO/GLOBAL CORPORATION
DRAFT INCOME STATEMENT
FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:    3/17/04  15:48
PGM:     GL025
PAGE:      7

| OFFICERS EXPENSES | MONTH OF JAN 2004 | % | MONTH OF JAN 2003 | % | YTD FY 2003 | % | YTD FY 2002 | % |
|---|---|---|---|---|---|---|---|---|
| SALARIES | 119,921.03 | .19 | 100,531.99 | .91 | 798,298.18 | .25 | 677,257.57 | .92 |
| PAYROLL TAXES | 12,340.92 | .02 | 9,347.39 | .08 | 32,560.31 | .01 | 30,543.88 | .04 |
| WORKMANS COMPENSATION | 211.06 | | 211.55 | | 1,535.06 | | 1,353.46 | |
| MEDICAL INSURANCE | 2,340.10 | | 4,011.47 | .04 | 25,295.38 | .01 | 27,560.77 | .04 |
| LIFE INSURANCE EXPENSE | 5,099.60 | .01 | 2,256.60 | .02 | 38,059.00 | .01 | 19,327.00 | .03 |
| DISABILITY INSURANCE | 377.38 | | 388.69 | | 2,641.66 | | 2,720.83 | |
| TELEPHONE | 871.76 | | 2,298.93 | .02 | 14,943.39 | | 15,238.00 | .02 |
| LEASED AUTO EXPENSE | 7,296.49 | .01 | 3,974.75- | .04- | 40,376.97 | .01 | 51,927.35 | .07 |
| LEASED AUTO INSURANCE EXPENSE | 980.00 | | 1,180.00 | .01 | 7,260.00 | | 8,260.00 | .01 |
| TRAVEL-GAS & OIL | 1,797.20 | | 1,897.88 | .02 | 10,072.85 | | 10,287.58 | .01 |
| VEHICLE MAINTENANCE | 37.78 | | 3,494.12 | .03 | 17,952.12 | .01 | 11,235.85 | .02 |
| TRAVEL-TOLLS & PARKING | .00 | | 1,046.46 | .01 | 466.55 | | 3,735.10 | .01 |
| TRAVEL-AIRFARE | .00 | | 2,167.75 | .02 | 44,015.85 | .01 | 18,017.95 | .02 |
| TRAVEL-AUTO RENTAL | 1,527.50 | | .00 | | 7,683.12 | | 9,807.15 | .01 |
| TRAVEL-MEALS | 1,550.20 | | 5,330.78 | .05 | 21,629.73 | .01 | 24,164.07 | .03 |
| TRAVEL-ENTERTAINMENT | 172.46 | | 3,996.77 | .04 | 11,582.06 | | 9,904.93 | .01 |
| TRAVEL-LODGING | .00 | | 1,596.30 | .01 | 31,094.29 | .01 | 19,511.76 | .03 |
| MISCELLANEOUS TRAVEL EXPENSES | 1,880.00 | | 3,061.04 | .03 | 27,385.91 | .01 | 17,187.53 | .02 |
| TOTAL OFFICER EXPENSES | 156,402.88 | .25 | 138,842.97 | 1.26 | 1,132,852.43 | .35 | 957,960.78 | 1.29 |

GITTO/GLOBAL CORPORATION

DRAFT INCOME STATEMENT

FOR THE 7 MONTHS ENDING JAN 31,2004

DATE:  3/17/04  15:48

PGM:   GL023

PAGE:    8

| | MONTH OF JAN 2004 | % | MONTH OF JAN 2003 | % | YTD FY 2003 | % | YTD FY 2002 | % |
|---|---|---|---|---|---|---|---|---|
| **OTHER INCOME & EXPENSES** | | | | | | | | |
| **OTHER INCOME** | | | | | | | | |
| INTEREST INCOME | .00 | | .00 | | .00 | | .00 | |
| MISCELLANEOUS INCOME | .00 | | 134.03- | | 1,760.31- | | 7,082.79- | ,01- |
| INSURANCE RECOVERY | .00 | | .00 | | .00 | | .00 | |
| BID RECOVERY | .00 | | .00 | | .00 | | .00 | |
| TOTAL OTHER INCOME | .00 | | 134.03- | | 1,760.31- | | 7,082.79- | |
| **OTHER EXPENSES** | | | | | | | | |
| INTEREST EXPENSE | 175,437.13 | .28 | 182,694.52 | 1.65 | 1,203,761.14 | .37 | 1,228,154.30 | 1.66 |
| FINANCE CHARGES | 5,933.60 | ,01 | 8,159.14 | .07 | 41,247.31 | ,01 | 16,786.03 | .02 |
| LOSS ON DISPOSALS | .00 | | .00 | | .00 | | .00 | |
| MISCELLANEOUS EXPENSE | .00 | | .00 | | .00 | | .00 | |
| EFFECT OF ACCOUNTING CHANGE | .00 | | .00 | | .00 | | .00 | |
| TOTAL OTHER EXPENSES | 181,370.73 | | 190,853.66 | | 1,245,008.45 | | 1,244,940.33 | |
| NET INCOME(LOSS) BEFORE TAX | 96,332.55 | | 86,087.13 | | 1,160,849.88 | | 444,556.75 | |
| **INCOME TAXES** | | | | | | | | |
| TAX EFFECT OF ACCOUNT CHANGE | .00 | | .00 | | .00 | | .00 | |
| STATE INCOME TAX EXPENSE | 18,000.00 | .03 | 7,700.00 | .07 | 110,000.00 | .03 | 41,783.00 | .06 |
| FEDERAL INCOME TAX EXPENSE | 40,000.00 | .06 | 37,000.00 | .33 | 326,000.00 | .10 | 147,000.00 | .20 |
| TOTAL INCOME TAXES | 58,000.00 | .06 | 44,700.00 | .33 | 436,000.00 | .10 | 188,783.00 | .20 |
| NET INCOME(LOSS) | 36,332.55 | .06 | 41,387.13 | .33 | 724,849.88 | .10 | 255,773.75 | .20 |

# The Gitto/Global Corporation

*Financial Statements*
*and*
*Supplemental Information*

*June 30, 2003*

# TABLE of CONTENTS

|                                                      | *Page* |
| ---------------------------------------------------- | ------ |
| INDEPENDENT AUDITOR'S REPORT                          | 1      |
| FINANCIAL STATEMENTS                                  |        |
|   Balance Sheets                            | 2-3    |
|   Statements of Operations                 | 4      |
|   Statements of Retained Earnings          | 5      |
|   Statements of Cash Flows                 | 6-7    |
|   Notes to Financial Statements            | 8-14   |
| SUPPLEMENTARY INFORMATION                             |        |
|   Auditor's Report on Supplementary Information | 15 |
|   Supplementary Schedules                  | 16-17  |



## LOUIS J. PELLEGRINE, JR., C.P.A., P.C.

*Certified Public Accountants*
454 OLD CONNECTICUT PATH
FRAMINGHAM, MASSACHUSETTS 01701

(508) 626-0005
FAX (508) 270-0077

## INDEPENDENT AUDITOR'S REPORT

To the Board of Directors and Stockholders
**The Gitto/Global Corporation**
140 Leominster-Shirley Road
Gianna Park
P.O. Box 120
Lunenburg, MA 01462

We have audited the accompanying balance sheet of The Gitto/Global Corporation (a Massachusetts corporation) as of June 30, 2003, and the related statements of operations, retained earnings, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of The Gitto/Global Corporation as of June 30, 2003, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

Louis J Pellegrine Jr CPA PC

Framingham, Massachusetts
November 12, 2003

-1-

*Member of American Institute of Certified Public Accountants*

# THE GITTO/GLOBAL CORPORATION

Balance Sheets

June 30, 2003 and 2002

## GITTO/GLOBAL CORPORATION

### Balance Sheets
### June 30, 2003 and 2002

### ASSETS

|  | 2003 | 2002 |
|---|---|---|
| CURRENT ASSETS: |  |  |
| Cash | $  3,536,686 | $  3,674,489 |
| Accounts Receivable | 25,822,073 | 27,432,953 |
| Inventories | 7,899,049 | 6,322,174 |
| Prepaid Expenses | 707,255 | 182,677 |
| Due from Officers and Employees | 355,307 | 21,698 |
| TOTAL CURRENT ASSETS | 38,320,370 | 37,633,992 |
|  |  |  |
| PROPERTY AND EQUIPMENT |  |  |
| Machinery and Equipment | 14,853,651 | 14,352,210 |
| Furniture and Fixtures | 899,855 | 888,590 |
| Leasehold Improvements | 5,011,907 | 4,957,353 |
|  | 20,765,413 | 20,198,153 |
| Less: Accumulated Depreciation | (11,372,898) | (9,980,708) |
| TOTAL PROPERTY AND EQUIPMENT | 9,392,515 | 10,217,445 |
|  |  |  |
| OTHER ASSETS: |  |  |
| Deposits | 156,372 | 156,372 |
| Patents and Process | 213,306 | 35,841 |
| UL Approvals | 734,946 | 394,865 |
| Organization Costs | 34,960 | 42,709 |
| TOTAL OTHER ASSETS | 1,139,584 | 629,787 |
|  |  |  |
| TOTAL ASSETS | $ 48,852,469 | $ 48,481,224 |

See Accompanying Notes and Independent Auditor's Report

-2-

LIABILITIES AND STOCKHOLDERS' EQUITY

|  | 2003 | 2002 |
|---|---|---|
| **CURRENT LIABILITIES:** | | |
| Accounts Payable | 1,656,798 | 1,907,602 |
| Cash Overdraft | 1,114,387 | 2,469,700 |
| Accrued Payroll | | 112,569 |
| Accrued Payroll Taxes | 10,156 | 34901 |
| Accrued Expenses | 1,020,065 | 223,210 |
| Accrued Corporate Tax | 361,307 | 367,487 |
| Note Payable - Line of Credit | 26,567,405 | 25,799,088 |
| Equipment Construction Loan | - | - |
| Guaranty Term Loan | - | 2,166,667 |
| Current Portion Long - Term Debt | 2,404,085 | 1,325,816 |
| **TOTAL CURRENT LIABILITIES** | 33,134,203 | 34,407,040 |
| | | |
| **LONG - TERM DEBT:** | | |
| | | |
| Notes Payable - Equipment | 10,927,404 | 9,171,362 |
| Less: Current Portion | (2,404,085) | (1,325,816) |
| | | |
| **TOTAL LONG - TERM DEBT** | 8,523,319 | 7,845,546 |
| | | |
| **DEFERRED INCOME TAX** | 287,426 | 109,186 |
| | | |
| **TOTAL LIABILITIES** | 41,944,948 | 42,361,772 |
| | | |
| **STOCKHOLDERS' EQUITY** | | |
| Common Stock - No Par - 20,000 | | |
| Shares Authorized: 2,200 shares | | |
| Issued and Outstanding | 150,000 | 150,000 |
| Additional Paid - In Capital | 2,100,000 | 2,100,000 |
| Retained Earnings | 4,657,521 | 3,869,452 |
| **TOTAL STOCKHOLDERS' EQUITY** | 6,907,521 | 6,119,452 |
| | | |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $48,852,469 | $ 48,481,224 |

See Accompanying Notes and Independent Auditor's Report

-3-

## GITTO/GLOBAL CORPORATION

## Statement of Operations

## For the Years Ended June 30, 2003 and 2002

|  | 2003 | 2002 |
|---|---|---|
| Net Sales | $ 160,066,960 | $ 120,674,380 |
| Costs of Goods Sold: |  |  |
| Materials | 142,981,963 | 102,642,651 |
| Freight Out | 1,264,443 | 1,270,822 |
| Direct Labor | 1,545,243 | 1,343,582 |
| Factory Overhead | 6,135,612 | 6,032,603 |
| Costs of Goods Sold: | 151,907,261 | 111,289,658 |
| Gross Profit | 8,159,699 | 9,384,722 |
| Selling Expense | 1,148,650 | 1,441,072 |
| General and Administrative Expense | 3,121,699 | 4,796,052 |
|  | 4,270,349 | 6,237,123 |
| Income from Operations | 3,889,350 | 3,147,599 |
| Other (Income) Expense: |  |  |
| Amortization | 74,710 | 51,427 |
| Interest Expense | 2,144,142 | 2,217,477 |
| Other Income | (22,080) | (94,565) |
|  | 2,196,772 | 2,174,339 |
| Income Before Provision for Taxes | 1,692,578 | 973,260 |
| Provision for Income Taxes |  |  |
| Federal Income Tax Current | 480,000 | 408,072 |
| Federal Income Tax Deferred | 190,495 | 71,199 |
| State Income Tax Current | 137,083 | 112,359 |
| State Income Tax Deferred | 96,931 | 37,987 |
| Total Income Taxes | 904,509 | 629,617 |
| Net Income | $ 788,069 | $ 343,643 |

See Accompanying Notes and Independent Auditor's Report

-4-

# THE GITTO/GLOBAL CORPORATION

Statements of Operations

For the Years Ending June 30, 2003 and 2002

# THE GITTO/GLOBAL CORPORATION

Statements of Retained Earnings

For the Years Ended June 30, 2003 and 2002

# GITTO/GLOBAL CORPORATION

## Statement of Retained Earnings

### For the Years Ended  June 30, 2003 and 2002

|  | 2003 | 2002 |
|---|---|---|
| Retained Earnings - Beginning | $ 3,869,452 | $ 3,525,809 |
| Net Income | 788,069 | 343,643 |
| Retained Earnings - Ending | $ 4,657,521 | $ 3,869,452 |

See Accompanying Notes and Independent Auditor's Report

-5-

# THE GITTO/GLOBAL CORPORATION

Statements of Cash Flows

For the Years Ended June 30, 2003 and 2002

# GITTO/GLOBAL CORPORATION

## Statements of Cash Flows

## For the Years Ended June 30, 2003 and 2002

|  | 2003 | 2002 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** |  |  |
| Cash Received from Customers | 161,677,840 | $114,617,022 |
| Cash Received from Other Income | 22,080 | 94,565 |
| Cash Paid for Materials and Supplies | (146,144,955) | (103,262,537) |
| Cash Paid to Employees and Benefits | (5,882,901) | (5,759,563) |
| Cash Paid for Other Expenses | (5,805,593) | (7,522,017) |
| Cash Paid for Income Taxes | (623,263) | (848,039) |
| Cash Paid for Interest | (2,144,142) | (2,217,476) |
| Deferred Taxes | (109,186) | (218,372) |
| NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES | $    989,880 | $  (5,116,417) |
|  |  |  |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** |  |  |
| Purchase of Equipment | (501,441) | (237,362) |
| Purchase of Improvements | (54,554) | (31,275) |
| Purchase of Furniture and Fixtures | (11,265) | (20,410) |
| Cash Paid for Other Assets | (584,506) | (113,973) |
| (Increase) Decrease in Due to |  |  |
| Officers and Employees | (333,609) | 164,978 |
| NET CASH USED BY INVESTING ACTIVITIES | (1,485,375) | (238,042) |
|  |  |  |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** |  |  |
| Net Proceeds (Repayments) from Notes Payable | (410,625) | 2,882,146 |
| Increase - Line of Credit | 768,317 | 4,797,072 |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 357,692 | 7,679,218 |
|  |  |  |
| NET INCREASE (DECREASE) IN CASH | (137,803) | 7,679,218 |
|  |  |  |
| CASH AT BEGINNING OF YEAR | 3,674,489 | (2,529,052) |
|  |  |  |
| CASH AT END OF YEAR | $    3,536,686 | $    5,150,166 |

See Accompanying Notes and Independent Auditor's Report

# GITTO/GLOBAL CORPORATION

## Reconciliation of Net Income to Net Cash

## Provided (Used) by Operating Activities

|  | 2003 | 2002 |
|---|---|---|
| NET INCOME | $ 768,069 | $ 343,643 |
| Adjustments to Reconcile Net Income to Net Cash Provided by Operating Activities: | | |
| Depreciation | 1,392,190 | 1,366,544 |
| Amortization | 74,710 | 51,427 |
| Deferred Tax | 178,240 | 109,186 |
| (Increase) Decrease in: | | |
| Accounts Receivable | 1,610,880 | (6,057,358) |
| Inventory | (1,576,875) | 354,921 |
| Prepaid Expenses | (524,578) | 47,687 |
| Increase (Decrease) in: | | |
| Accounts Payable | (1,606,117) | (974,805) |
| Accrued Expenses | 659,541 | (30,036) |
| Accrued Corporate Income Tax | (6,180) | (327,606) |
| TOTAL ADJUSTMENTS | 201,811 | (5,460,060) |
| NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES | $  989,880 | $(5,116,417) |

See Accompanying Notes and Independent Auditor's Report

# THE GITTO/GLOBAL CORPORATION

Notes to Financial Statements

June 30, 2003

# THE GITTO/GLOBAL CORPORATION

## NOTES TO FINANCIAL STATEMENTS

### JUNE 30, 2003

## A.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

This summary of significant accounting policies of **The Gitto/Global Corporation** is presented to assist in understanding the Company's financial statements. The financial statements and notes are the representation of the Company's management, which is responsible for their integrity and objectivity.

### Business Activity:

Global Products Corporation was incorporated under the laws of the Commonwealth of Massachusetts in 1985 for the purpose of engaging in the business of manufacturing plastics and plastic compounds to customers' specifications. In September 1992, the Corporation acquired the assets of The Gitto Corporation. The Gitto Corporation was incorporated under the laws of the Commonwealth of Massachusetts in 1991 for the purpose of manufacturing specialty polyvinylchloride, polypropylene and polyethylene plastic compounds, and thermoplastic olefinic compounds. The combined companies emerged as **The Gitto/Global Corporation**. The consolidation occurred to strengthen the Company's position in the marketplace and improve the service it can provide its customers.

In the normal course of business, the Company will grant its customers credit, in the form of trade receivables. The Company's customers consist of wire and cable, construction, footwear and other consumer goods manufacturers, distributors or brokers primarily in the northeastern United States.

### Pervasiveness of Estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reported period. Actual results could differ from those estimates.

### Cash:

The Company maintains its cash in bank deposit accounts with several banks. At times, the cash account balances exceed federally insured limits. The Company has not experienced any losses in such accounts.

-8-

# THE GITTO/GLOBAL CORPORATION

## NOTES TO FINANCIAL STATEMENTS

### A.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Cont.):

Allowance for Doubtful Accounts:

Accounts receivable for the years ended June 30, 2003 and 2002 are shown net of an allowance for doubtful accounts of $108,786 and $60,200 respectively.

Inventory:

Inventories are stated at the lower of cost or market on the first-in, first-out (FIFO) basis and include material, labor and manufacturing overhead costs.

Inventories consist of the following at June 30, 2003 and 2002:

|                | 2003 | 2002 |
|----------------|------|------|
| RAW MATERIALS  | $ 4,547,501 | $ 2,958,954 |
| FINISHED GOODS | $ 3,351,548 | $ 3,363,220 |
|                | $ 7,899,049 | $ 6,322,174 |

Property and Equipment:

Property and equipment are stated at cost. Depreciation is computed using the straight-line method. Estimated useful lives used to compute depreciation are as follows:

| Machinery and Equipment | 7-20 Years |
|-------------------------|------------|
| Furniture and Fixtures | 7-12 Years |
| Leasehold Improvements | 15-40 Years |
| Data Processing Equipment | 5-10 Years |

Maintenance, repairs, and betterments, which do not extend the useful life of the assets, are charged to expense as incurred.

# THE GITTO/GLOBAL CORPORATION

## NOTES TO FINANCIAL STATEMENTS

A.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Cont.):

### Amortization of Intangible Assets:

Patents and Process

Patents and process represent the cost of certain patent applications and product processes determined to provide a future benefit. The cost of these processes of $35,841 net of amortization of $22,542 are being amortized on a straight-line basis over a fifteen-year period.

UL Approvals

UL Approvals represent costs related to formulas and UL approval of such formulas for various products the Corporation manufactures.  Management believes these UL product approvals provide a future benefit of approximately 15 years.  The cost of UL approvals is $394,865 net of amortization of $446,185.

Organization Costs

Organization Costs of $42,709 net of amortization of $73,529 relate to costs of the acquisition of The Gitto Corporation.

### Federal and State Income Taxes:

The Company maintains its accounting records and tax returns on the accrual basis. Income tax credits are recorded, under the flow-through method, as a reduction of the provision for income taxes in the year realized.

Deferred tax expense or benefit results from timing differences in the recognition of income and expense items for income tax and financial statement purposes.

-10-

# THE GITTO/GLOBAL CORPORATION

## NOTES TO FINANCIAL STATEMENTS

### B.  DUE FROM OFFICERS AND EMPLOYEES

Due from employees consists of unsecured, non-interest bearing cash advances made to various employees of the Company. The advances have no specific repayment terms. Due from officers consists of unsecured interest bearing cash loans made to various officers of the Company.

### C.  NOTES PAYABLE – BANK LINE OF CREDIT AND TERM NOTE:

On July 27th, 2002, the Company entered into a line of credit agreement with the LaSalle Bank, NA, paying off the balance in the existing line of credit with the Guaranty Business Credit Corporation. The new line of credit permits borrowing of up to $27,000,000.

The line of credit permits the Company to borrow against 85% of certain qualified accounts receivable, plus 65% of the lower of cost or market of all eligible inventory (after allowances for costs of disposition, etc.) not to exceed $5,000,000. Interest is due monthly on the line of credit at the Banks prime lending rate plus .50. Borrowings under the note are secured by the Company's inventory, accounts receivable and certain other assets.

### D.  RESEARCH AND DEVELOPMENT

Research and development cost for new products are expensed until feasibility for the product is established.

-11-

# THE GITTO/GLOBAL CORPORATION

### NOTES TO FINANCIAL STATEMENTS

### E.   LONG TERM DEBT:

At June 30, 2003 and 2002, long-term debt consisted of the following:

|  | 2003 | 2002 |
|---|---|---|
| Note payable — CIT Group, payable in 60 monthly installments of $26,250.00 plus interest at 5.88% and a balloon payment of $525,000 due on April 9, 2007. | 1,741,287 | 2,021,250 |
| Note payable — ORIX Financial, payable in 60 monthly installments of $110,530.67 including interest at 5.88% and a balloon payment of $2,100,000 due on April 9, 2007. | 6,219,353 | 7,150,112 |
| Note Payable — Wells Fargo Equipment Finance, Inc. — payable in 84 monthly installments at $12.360.01 including interest floating at 2.65% over London InterBank rate due in March 2010. Secured by equipment. | 883,449 | -0- |
| Note payable — LaSalle Bank, N.A., payable in 36 monthly installments of $83,333.00 plus interest at 2% in excess of prime rate. | 2,083,333 | -0- |

| | | |
|---|---|---|
| Sub-Totals | $ 10,927,422 | $ 9,171,362 |
| Less: Current Portion | $ 2,404,085 | $ 1,325,816 |
| TOTALS | $ 8,523,337 | $ 7,845,546 |

-12-

# THE GITTO/GLOBAL CORPORATION

### NOTES TO FINANCIAL STATEMENTS

The aggregate amounts of long-term maturities following June 30, 2002 are:

| Year Ending June 30th | Amount |
|---|---|
| 2004 | 2,404,085 |
| 2005 | 2,466,741 |
| 2006 | 2,530,277 |
| 2007 | 4,841,704 |
| Thereafter | -0- |
| Total Long-Term Debt | 12,242,807 |

## F. LEASE COMMITMENTS:

The company leases operating and office facilities under the following operating leases during the year ended June 30, 2003.

1. Gianna Park, Lunenburg, MA

    The lease with Tradex Acquisition Corporation is a 15-year non-cancelable triple net lease expiring in October 2007, with an option to extend for a 5 year period and with an option to purchase. The lease agreement, which was amended in March 1995, provides for monthly rental payments of $31,086 beginning March 1995. The lease provides the lessor with a termination fee of $120,000, which is reflected as a deposit in these financial statements. Rent expense charged to operations at June 30, 2003 and 2002 amounted to $373,031 and $373,031 respectively.

    Certain officers and shareholders of Gitto/Global Corporation are related to the officers and shareholders of Tradex Acquisition Corporation.

-13-

# THE GITTO/GLOBAL CORPORATION

### NOTES TO FINANCIAL STATEMENTS

Future minimum lease payments payable by the Company are as follows:

| Year Ending June 30 | Amount |
| --- | --- |
| 2004 | $ 373,031 |
| 2005 | 373,031 |
| 2006 | 373,031 |
| Thereafter | 497,375 |
| | $1,616,468 |

## F. LEASE COMMITMENTS (Cont.):

### 2.  Airport Road, Fitchburg, MA

The Company executed a lease for rental of warehouse space in September 1993. The Company is leasing the facility under a tenancy at will for various rates determined by the amounts of space the Company occupies. Rent expense charged to operations at June 30, 2003 and 2002 amounted to  $47,570 and $46,990 respectively.

-14-

# THE GITTO/GLOBAL CORPORATION

Auditor's Report on Supplementary Information

For the Years Ended June 30, 2003 and 2002

# *The Gitto/Global Corporation*

*Supplementary Information*

## LOUIS J. PELLEGRINE, JR., C.P.A., P.C.

*Certified Public Accountants*

494 OLD CONNECTICUT PATH
FRAMINGHAM, MASSACHUSETTS 01701

(508) 626-0005
FAX (508) 270-0077



To the Board of Directors and Stockholders
**The Gitto/Global Corporation**
140 Leominster-Shirley Road
Gianna Park
P.O. Box 120
Lunenburg, MA 01462

Our report on our audit of the basic financial statements of The Gitto/Global Corporation for June 30, 2003 appears on page 1. That audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The accompanying supplementary information contained in the following schedules for the year ended June 30, 2003 is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements for the year ended June 30, 2003, taken as a whole.

Louis J. Pellegrine Jr. CPA PC

Framingham, Massachusetts
November 12, 2003

-15-

*Member of American Institute of Certified Public Accountants*

# THE GITTO/GLOBAL CORPORATION

Supplementary Schedules

For the Years Ended June 30, 2003 and 2002

## GITTO/GLOBAL CORPORAT    )

## Supplementary Schedules

## For the Years Ended June 30, 2003 and 2002

| | 2003 | 2002 |
|---|---|---|
| **FACTORY OVERHEAD** | | |
| Factory Indirect Labor | 2,058,583 | $ 2,072,842 |
| Payroll Taxes | 170,000 | 160,318 |
| Employee Benefits | 114,140 | 122,157 |
| Workers Compensation | 36,081 | 31,602 |
| Factory Expense | 572,763 | 497,842 |
| Lab Expense | 54,096 | 74,373 |
| Machinery Repairs & Maintenance | 115,658 | 116,325 |
| Building Maintenance | 14,591 | 24,331 |
| Heat - Manufacturing | 51,742 | 68,129 |
| Electric | 633,326 | 614,503 |
| Water | 8,360 | 6,740 |
| Septic Service Expense | 39,933 | 54,375 |
| Depreciation | 1,331,385 | 1,295,342 |
| Rent | 446,115 | 449,017 |
| Subcontract | 40,733 | 3,400 |
| Insurance - Manufacturing | 145,200 | 144,853 |
| Uniforms | 31,432 | 34,230 |
| Auto Leasing | 10,859 | 10,344 |
| Travel | 82,916 | 75,753 |
| Leased Truck Expense | 170,139 | 168,567 |
| Environmental Fees | 7,560 | 7,560 |
| Total Factory Overhead | $ 6,135,612 | $ 6,032,603 |
| | | |
| **SELLING EXPENSE** | | |
| Salaries | 467,464 | $ 599,268 |
| Payroll Taxes | 29,431 | 39,929 |
| Employee Benefits | 41,532 | 42,391 |
| Workers Compensation | 1,772 | 2,228 |
| Commissions | 367,841 | 387,009 |
| Telephone | 40,476 | 86,326 |
| Advertising | 25,088 | 72,767 |
| Sales Meetings and Conventions | 32,814 | 17,001 |
| Dues and Subscriptions | 6,244 | 9,647 |
| Auto Leasing | 35,885 | 39,455 |
| Travel | 100,103 | 145,051 |
| Total Selling Expense | $ 1,148,650 | $ 1,441,072 |

See Accompanying Notes and Independent Auditor's Report

-16-

# GITTO/GLOBAL CORPORATION

## Supplementary Schedules

### For the Years Ended June 30, 2003 and 2002

|  | 2003 | 2002 |
|---|---|---|
| GENERAL AND ADMINISTRATIVE EXPENSE |  |  |
| Salaries | 286,198 | $    886,472 |
| Salaries - Officers | 1,136,208 | 509,600 |
| Payroll Taxes | 77,205 | 82,186 |
| Workers Compensation | 2,759 | 2,651 |
| Employee Benefits | 150,957 | 181,993 |
| Office Supplies and Expense | 185,473 | 191,152 |
| Bank Charges | 285,192 | 971,305 |
| Computer Supplies and Expense | 878 | 587 |
| Professional Fees | 506,676 | 1,112,200 |
| Bad Debt Expense | 12,483 | - |
| Equipment Rental | 34,360 | 48,579 |
| Maintenance | 3,869 | 12,458 |
| Depreciation | 60,805 | 71,202 |
| Donations | 22,940 | 11,504 |
| Penalties | - | 76,877 |
| Auto Leasing | 119,976 | 159,322 |
| Travel | 235,720 | 477,965 |
| Total General and Administrative | $   3,121,699 | $   4,796,052 |

EXHIBIT 11

CSB FILE REGARDING GITTO GLOBAL
SALE TO VITROTECH AND ASSET APPRAISAL

P's AGREEMENT
EQUIPMENT APPRAISAL

ASSET PURCHASE AGREEMENT

DATED MARCH 31, 2004

BY AND BETWEEN

GITTO/GLOBAL CORPORATION, AS SELLER,

GARY GITTO AND FRANK MILLER, AS SELLER SHAREHOLDERS,

CHARLES GITTO, JR.

AND

VITROTECH CORPORATION, AS PURCHASER

Table of Contents

Page

ARTICLE I  PURCHASE AND SALE
1.1    Purchased Assets .................................................................... 1
1.2    Excluded Assets ..................................................................... 2
1.3    Purchase Price ....................................................................... 3
1.4    Assumed Liabilities ............................................................... 4
1.5    Excluded Liabilities ............................................................... 4
1.6    Prorations .............................................................................. 5
1.7    Transfer Tax Payments .......................................................... 5
1.8    Purchase Price and Cash Purchase Price Component Adjustment ... 5
1.9    Escrow Amount ..................................................................... 5

ARTICLE II  DEFINITIONS
2.1    General .................................................................................. 5
2.2    Definitions ............................................................................. 5
2.3    Interpretation ........................................................................ 10

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF SELLER
3.1    Status of Seller; Enforceability; Conflicts; Consents ............ 10
3.2    Ownership of Seller ............................................................... 12
3.3    Financial Statements ............................................................. 12
3.4    Undisclosed Liabilities .......................................................... 12
3.5    Title to Properties ................................................................. 12
3.6    Real Property ......................................................................... 12
3.7    Equipment and Improvements ............................................... 13
3.8    No Commitments ................................................................... 13
3.9    Continued Use of Real Property ............................................. 13
3.10   Real Estate and Personal Property Taxes; Assessments ........ 13
3.11   Inventory ............................................................................... 13
3.12   Accounts Receivable ............................................................. 13
3.13   Contracts ............................................................................... 14
3.14   Equity Interests ..................................................................... 14
3.15   Intellectual Property ............................................................. 14
3.16   Required Assets; Sufficiency of Assets ................................. 14
3.17   Suppliers ............................................................................... 14
3.18   Personnel Identification and Compensation .......................... 15
3.19   Existing Employment Related Contracts ............................... 15
3.20   Compliance with Laws .......................................................... 15
3.21   Litigation ............................................................................... 15
3.22   Environmental ....................................................................... 15
3.23   Employee Benefit Plans ........................................................ 16
3.24   Tax Matters ........................................................................... 16
3.25   Consents ................................................................................ 17
3.26   Licenses and Permits ............................................................. 17
3.27   Occupational Safety and Health ............................................ 17
3.28   Insurance ............................................................................... 17
3.29   Certain Transactions .............................................................. 18
3.30   Regulatory Compliance ......................................................... 18
3.31   Conduct of Compounding Business Since Most Recent Balance Sheet Date ... 18
3.32   Broker's or Consultant's Fees ............................................... 19
3.33   Claims Against Insiders ......................................................... 19
3.34   Disclosure ............................................................................. 19
3.35   No Other Representations and Warranties ............................. 21

i

Table of Contents
(continued)

Page

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER
4.1     Status of Purchaser..................................................................................................    22
4.2     Authority of Purchaser..............................................................................................    22
4.3     Due Authorization.....................................................................................................    22
4.4     Enforceability............................................................................................................    22
4.5     Consents.....................................................................................................................    22
4.6     Broker's or Consultant's Fees...................................................................................    22

ARTICLE V PRE-CLOSING COVENANTS
5.1     Ordinary Conduct......................................................................................................    22
5.2     Right of Inspection; Access to Books and Personnel; Oversight of Collections
        and Expenditures.......................................................................................................    24
5.3     Notification of Material Events.................................................................................    24
5.4     Supplemental Disclosures.........................................................................................    24
5.5     Exclusivity.................................................................................................................    24
5.6     Publicity.....................................................................................................................    25
5.7     Preparation of Pre-Closing Estimated Purchase Price Certificate............................    25
5.8     Power of Attorney; Right of Endorsement, Etc.........................................................    25
5.9     Covenants Not to Compete, Solicit or Disparage......................................................    25
5.10    Post-Closing Confidentiality.....................................................................................    26
5.11    Performance of Contracts..........................................................................................    26
5.12    Employees..................................................................................................................    26
5.13    Allocation for Tax Purposes......................................................................................    26
5.14    Hi-Tech Agreement....................................................................................................    27
5.15    Real Estate Purchase Agreement...............................................................................    27
5.16    Miller Consulting Agreement....................................................................................    27
5.17    Gitto Independent Manufacturer's Representative Agreement...................................    27
5.18    Assumed Contracts....................................................................................................    27
5.19    Minimum Purchaser Financing..................................................................................    27

ARTICLE VI CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS
6.1     Obligations to be Satisfied on or Prior to Closing Date............................................    27
6.2     Procedure for Failure to Satisfy Conditions..............................................................    29

ARTICLE VII CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS
7.1     Obligations to Be Satisfied on or Prior to Closing Date...........................................    29
7.2     Procedure for Failure to Satisfy Conditions..............................................................    29

ARTICLE VIII CLOSING
8.1     Time and Place...........................................................................................................    30
8.2     Closing Transactions..................................................................................................    30
8.3     Deliveries by Seller to Purchaser..............................................................................    30
8.4     Deliveries by Purchaser to Seller..............................................................................    31
8.5     Determination of Final Purchase Price.......................................................................    31

ARTICLE IX OTHER AGREEMENTS
9.1     Further Assurances.....................................................................................................    32
9.2     Access to Records After Closing................................................................................    32
9.3     Collection of Receivables...........................................................................................    33
9.4     Third Party Consents..................................................................................................    33

Table of Contents
(continued)

Page

ARTICLE X INDEMNIFICATION
| | | |
|---|---|---|
| 10.1 | Survival of Representations, Warranties and Indemnity | 33 |
| 10.2 | Indemnification by Seller | 33 |
| 10.3 | Limits on Indemnification by Seller and Seller Shareholders | 34 |
| 10.4 | Indemnification by Purchaser | 34 |
| 10.5 | Specific Breaches | 34 |
| 10.6 | Cross-indemnification for Broker's, Consultant's or Finder's Fees | 34 |
| 10.7 | Procedure for Indemnification | 35 |
| 10.8 | Payment | 35 |
| 10.9 | Reduction for Insurance and Taxes | 35 |
| 10.10 | Remedies Exclusive | 35 |
| 10.11 | No Consequential Damages | 36 |
| 10.12 | Bulk Sales | 36 |

ARTICLE XI TERMINATION
| | | |
|---|---|---|
| 11.1 | Rights to Terminate | 36 |
| 11.2 | Effects of Termination | 36 |

ARTICLE XII MISCELLANEOUS PROVISIONS
| | | |
|---|---|---|
| 12.1 | Notices | 36 |
| 12.2 | Assignment | 37 |
| 12.3 | Benefit of the Agreement | 37 |
| 12.4 | Exhibits and Schedules | 37 |
| 12.5 | Headings | 37 |
| 12.6 | Entire Agreement | 38 |
| 12.7 | Modifications and Waivers | 38 |
| 12.8 | Counterparts | 38 |
| 12.9 | Severability | 38 |
| 12.10 | GOVERNING LAW | 38 |
| 12.11 | Expenses | 38 |
| 12.12 | JURISDICTION; WAIVER OF JURY TRIAL; VENUE | 38 |
| 12.13 | Seller Acknowledgement | 39 |

Gitto Asset Purchase Agreement 3/31/04

EXHIBITS

Exhibit A   Assumption Agreement
Exhibit B   Escrow Agreement
Exhibit C   Real Estate Purchase Agreement
Exhibit D   Miller Consulting Agreement
Exhibit E   Independent Manufacturer's Representative Agreement
Exhibit F   Final Settlement Payment Computation

SCHEDULES

Schedule 1.1(b)          Business Tangible Property
Schedule 1.1(c)          Business Inventory
Schedule 1.1(d)          Business Accounts Receivable
Schedule 1.1(e)          Business Real Property
Schedule 1.1(f)          Business Contracts
Schedule 1.1(g)          Business Governmental Authorizations
Schedule 1.1(h)          Business Intellectual Property
Schedule 1.2(a)          Excluded Brokerage Operation Assets
Schedule 1.2(c)          Excluded Contracts
Schedule 1.2(d)          Miscellaneous Excluded Assets
Schedule 1.4             Trade Payables and Other Assumed Payables
Schedule 3.1             Status of Seller; Conflicts
Schedule 3.5             Title to Properties
Schedule 3.13            Contracts
Schedule 3.15            Intellectual Property and Confidentiality
Schedule 3.17            Suppliers
Schedule 3.18            Personal Identification and Compensation
Schedule 3.19            Existing Employment Related Contracts
Schedule 3.20            Legal Compliance
Schedule 3.21            Litigation
Schedule 3.22            Environmental
Schedule 3.23            Employee Benefit Plans
Schedule 3.24            Tax Matters
Schedule 3.25            Consents
Schedule 3.26            Licenses and Permits
Schedule 3.27            Occupational Safety and Health
Schedule 3.28            Insurance
Schedule 3.29            Certain Transactions
Schedule 3.30            Regulatory Compliance
Schedule 3.31            Conduct of Business

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into this 31ˢᵗ day of March, 2004, by and between GITTO/GLOBAL CORPORATION, a Massachusetts corporation ("*Seller*"), GARY GITTO, an individual ("*Gitto*"), FRANK MILLER, an individual ("*Miller*")(Gitto and Miller, being the principal shareholders of Seller, collectively, are hereinafter referred to as the "*Seller Shareholders*"), CHARLES GITTO, JR., an individual ("*Charles Gitto*")(Seller, Seller Shareholders and Charles Gitto, collectively, are hereinafter referred to as the "*Seller Parties*") and VITROTECH CORPORATION, a Nevada corporation ("*Purchaser*").

RECITALS

WHEREAS, Seller is engaged in, among other activities, the delivery of value-added compounding services to base resins to produce, and distribute, specialty polyvinyl chloride, polyethylene, polypropylene and thermoplastic olefinic compounds (the "*Compounding Business*"); and

WHEREAS, Seller desires to sell the Compounding Business and substantially all of its assets utilized in the Compounding Business to Purchaser, and Purchaser desires to purchase the Compounding Business and substantially all of the assets of Seller utilized in the Compounding Business on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Purchaser, Seller and Seller Shareholders (collectively, the "*Parties*") hereby agree as follows:

ARTICLE I
PURCHASE AND SALE

1.1 Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Compounding Business and all of Seller's right, title and interest in and to the following properties, rights and assets (but in all cases excluding the Excluded Assets) of Seller, as and to the extent existing on the Closing Date (such properties, rights and assets are hereinafter collectively referred to as the "*Purchased Assets*"), free and clear of all Liens, claims, options, charges, encumbrances and restrictions of any kind, other than Liens relating to Assumed Liabilities:

(a) all cash and cash equivalents, including, without limitation, checking accounts, bank accounts, lock box numbers, marketable securities, commercial paper, certificates of deposit and other bank deposits, and treasury bills;

(b) all Equipment and Improvements located in, at or upon the Facilities (excluding the Facilities) and used by Seller primarily or exclusively with respect to the operation of the Compounding Business, including, but not limited to, the tangible personal property set forth on Schedule 1.1(b) (the "*Business Tangible Property*");

(c) all Inventory located in, at or upon, or in transit to, the Facilities and used by Seller primarily or exclusively with respect to the operation of the Compounding Business, including, but not limited to, those items set forth on Schedule 1.1(c) (the "*Business Inventory*");

(d) all Accounts Receivable of Seller arising exclusively out of Seller's operation of the Compounding Business, including, but not limited to, those set forth on Schedule 1.1(d) (the "*Business Accounts Receivable*");

(e) all real property (including buildings, structures and improvements located thereon, fixtures contained therein and appurtenances thereto) owned or leased by Seller and used primarily or exclusively in the conduct of the Compounding Business, including, but not limited to, the real property set forth on Schedule 1.1(e) (the "*Business Real Property*");

(f) all Contracts (other than the Excluded Contracts), including the Lease Agreements, to which Seller is a party and which relate primarily or exclusively to Seller's operation of the Compounding Business or the Facilities, including, but not limited to, those set forth on Schedule 1.1(f) (the "*Business Contracts*");

(g) to the extent transferable, all Governmental Authorizations of Seller relating primarily or exclusively to Seller's operation of the Compounding Business or necessary to Seller's use, ownership or operation of the Compounding Business or the Purchased Assets and all pending applications therefor or renewals thereof, including, but not limited to, those (to the extent transferable) set forth on Schedule 1.1(g) (the "*Business Governmental Authorizations*");

(h) the Intellectual Property used by Seller primarily or exclusively with respect to Seller's operation of the Compounding Business as set forth on Schedule 1.1(h) (the "*Business Intellectual Property*");

(i) all of Seller's claims, demands, deposits (including security deposits made under the Lease Agreements), refunds, rebates, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment (other than those excluded pursuant to Section 1.2(d)) relating primarily or exclusively to Seller's operation of the Compounding Business, including, but not limited to, rights to or claims for refunds or rebates of Taxes and other governmental charges and the benefit of net operating loss carryforwards, carrybacks or other credits of Seller other than those excluded pursuant to Section 1.2(d), in each case relating primarily or exclusively to Seller's operation of the Compounding Business;

(j) all prepaid charges, expenses, sums and fees of Seller relating primarily or exclusively to Seller's operation of the Compounding Business, including all deposits/progress payments received by Seller relating to the Business Contracts to be assigned to Purchaser which Seller, as of the Closing Date, shall not have expended for work under the Business Contracts to which such deposits/progress payments relate;

(k) all general, financial and personnel records, ledgers, sales invoices, accounts and payable records, files, books and documents, correspondence and other files and records, including customer lists and sales records and all sales contact reports, whether daily, weekly or monthly, for prospective customers or regarding expanded sales to existing customers, of Seller pertaining primarily or exclusively to Seller's operation of the Compounding Business; and

(l) all other assets and property of Seller of whatever kind and nature, real or personal, tangible or intangible, that are owned, leased or licensed by Seller on the Closing Date and which are used by Seller primarily or exclusively in Seller's operation of the Compounding Business or the Facilities, including, but not limited to all Underwriters Laboratory approvals.

Anything to the contrary notwithstanding, the term "Purchased Assets" shall mean all of the goodwill, assets, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of the Seller, which are used in, or which were acquired in connection with, the operation of the Compounding Business, including the value of the Compounding Business as a going concern, excepting only the Excluded Assets and any of the above which relate exclusively to the Excluded Assets. Notwithstanding the foregoing, Seller may retain and use in appropriate circumstances copies of any Contracts or records: (i) which relate to properties or activities of Seller other than the Compounding Business, or (ii) which are required to be retained pursuant to any legal requirement, for financial reporting purposes, for tax purposes, or otherwise in connection with the Excluded Liabilities.

1.2. Excluded Assets. Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "*Excluded Assets*") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets and shall remain the property of Seller after the Closing:

(a) all assets exclusively associated with and attributable to Seller's Excluded Operations as set forth on Schedule 1.2(a);

(b) all insurance policies and all rights of every nature (including proceeds) under or arising out of such policies;

(c) all Contracts to which Seller is a party and which (i) do not relate primarily or exclusively to the Compounding Business, or (ii) are set forth on Schedule 1.2(c) (collectively, the "*Excluded Contracts*");

(d) all claims, demands, deposits, refunds, rebates, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment to the extent relating to any of the Excluded Assets or Excluded Liabilities, including, but not limited to, rights to or claims for refunds or rebates of Taxes and other governmental charges and the benefit of net operating loss carryforwards, carrybacks or other credits of Seller and those set forth on Schedule 1.2(d);

(e) the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, shares of capital stock, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller as a corporation;

(f) all proprietary or confidential business or technical information, records and policies that relate generally to Seller and are not used primarily or exclusively in Seller's operation of the Compounding Business, including, without limitation, organization manuals, strategic plans and Tax records and related information;

(g) all personnel records and other records that Seller is required by Law to retain in its possession or is not permitted under Law to provide to Purchaser;

(h) all rights in connection with, and assets of, any Employee Plan;

(i) all rights of Seller under this Agreement, any other Transaction Document or the Transactions;

(j) all rights to the Hi-Tech Inventory to be conveyed to Hi-Tech pursuant to Section 5.14;

(k) all records prepared in connection with the sale of the Compounding Business to Purchaser; and

(l) all other properties, rights and assets of Seller which are not used by Seller primarily or exclusively in Seller's operation of the Compounding Business.

1.3 Purchase Price. Subject to the terms and conditions of this Agreement, Purchaser shall, at the Closing, pay to the Seller (or in the case of the Assumption Agreement referred to below, execute and deliver) the purchase price for the Purchased Assets, in the amount of Fifty Million Four Hundred Thousand Dollars ($50,400,000), subject to the adjustment described in Section 1.8 (the "*Purchase Price*"), consisting of:

(a) cash in the amount of the Purchase Price, as adjusted pursuant to Section 1.8, less (i) the Escrow Amount provided for in Section 1.9, (ii) $1,000,000 (the "*Holdback*"), to be retained and disbursed in accordance with Section 8.5(e), (iii) the amount of Trade Payables assumed, pursuant to Section 1.4(a), giving effect to the adjustment made pursuant to Section 1.8, and (iv) the amount of Other Assumed Payables, giving effect to the adjustment made pursuant to Section 1.8 (the "*Cash Purchase Price Component*"), which amount shall be remitted, at the sole option of Purchaser, directly to Seller or directly to pay amounts owing by Seller to creditors of Seller at the Closing Date with any excess being remitted directly to Seller; notwithstanding the foregoing, Seller may, at its sole option, elect to receive any or all of the Cash Purchase Price Component in the form of shares of common stock of Purchaser to be issued to Seller based on the average closing bid price of Purchaser common stock over the twenty trading days ending on the trading day prior to the Closing Date; and

(b) an assumption agreement in the form attached as Exhibit A hereto (the "*Assumption Agreement*") pursuant to which Purchaser assumes specific liabilities of Seller set forth in Section 1.4.

1.4 <u>Assumed Liabilities</u>. Subject to and pursuant to Section 1.6 and 1.8, Purchaser shall, at the Closing, irrevocably and absolutely, assume, agree to perform, and, when due, pay and discharge, only (a) the Trade Payables of Seller which are, as of the Most Recent Balance Sheet Date, reflected on <u>Schedule 1.4</u>, (b) other indebtedness of Seller that Purchaser shall, at its sole option and on terms acceptable to Purchaser, assume and/or refinance and/or pay (the "*Other Assumed Payables*"), such Other Assumed Payables to include, but not be limited to, the indebtedness of Seller, as of the Most Recent Balance Sheet Date, reflected on <u>Schedule 1.4</u>, and (c) the obligations and liabilities of Seller relating to the Assumed Contracts (excluding any liabilities set forth in Section 1.5), which arise after the Closing Date or are attributable to the period following the Closing Date and only to the extent such obligations and liabilities are not overdue or delinquent on the Closing Date without regard to any grace period and without the incurrence of any increase in amounts due (collectively, the "*Assumed Liabilities*").

1.5 <u>Excluded Liabilities</u>. Purchaser shall not assume or pay, and Seller shall continue to be responsible for, any debt, obligation or liability, of any kind or nature (fixed or contingent, known or unknown) of Seller whether or not relating to the Compounding Business, not expressly assumed by Purchaser pursuant to Section 1.4 (the "*Excluded Liabilities*"). Without limiting the foregoing, Purchaser shall not, except as specifically provided for in Section 1.4, assume:

(a) any action, suit or proceeding pending as of the Closing Date notwithstanding the disclosure thereof on the Most Recent Balance Sheet, or any subsequent claim, action, suit or proceeding arising out of or relating to such pending matters, any other similar event occurring on or prior to the Closing Date or, resulting from the conduct of the Compounding Business by Seller on or prior to the Closing Date;

(b) any liability of Seller for any Taxes for any periods prior to or subsequent to the Closing whether or not relating to the Compounding Business and notwithstanding the disclosure thereof on the Most Recent Balance Sheet;

(c) any obligation or liability arising from claims, proceedings or causes of action resulting from property damage or personal injuries (including death) caused by products, materials or services invoiced, sold, performed or shipped by Seller or the Compounding Business on or prior to the Closing Date;

(d) any obligation or liability arising from product warranty or product liability claims, with respect to products, materials or services invoiced, sold, performed or shipped by Seller or the Compounding Business, or disputed payables to suppliers relating to materials supplied to Seller or the Compounding Business where the materials were not in accordance with Seller specifications, on or prior to the Closing Date; provided, that the obligation or liability does not arise from acts of commission or omission by Purchaser subsequent to the Closing;

(e) any obligation or liability related to any actual or alleged violation or liability arising under any Environmental Laws, including, without limitation, any Release or threatened Release of Hazardous Substances, as those terms are defined herein, occurring prior to or, if as a result of Seller's activities, present, or if, not as a result of Seller's activities, to the extent present, on the Closing Date, regardless of whether such obligations or liabilities relate to Seller's ownership or operation of the Purchased Assets, to any predecessor, owner, tenant, occupant or user of the Purchased Assets, or to any other party unrelated to the Purchased Assets, and any Environmental Claims as herein defined, including, without limitation, any matters disclosed by Seller in <u>Schedule 3.22</u> and any matters identified in the Phase I Environmental Site Assessments provided by Seller or Charles Gitto to Purchaser (the "*Environmental Reports*");

(f) any obligation or liability of Seller arising from the transactions contemplated by this Agreement, including those (i) relating to the negotiation and preparation of this Agreement and the transactions contemplated herein and (ii) incurred by Seller with respect to its legal counsel, accounting, brokerage and investment advisors fees and expenses; or

(g) any obligation or liability arising from or related to the Retained Assets.

4                Gitto Asset Purchase Agreement 3/31/04

1.6 Prorations. All obligations and liabilities assumed by Purchaser under this Agreement shall be prorated as of the close of business on the Closing Date between Purchaser and Seller, whether or not such adjustment would normally be made as of such time. It is the intention of the parties that Seller should operate the Compounding Business for its own account pursuant to this Agreement until the close of business on the day immediately prior to the Closing Date, and that Purchaser shall operate the Compounding Business, including the Purchased Assets, for its own account from and after the Closing Date. Any overdue or delinquent obligations or liabilities of Seller on the close of business on the day immediately prior to the Closing Date, other than Trade Payables assumed by Purchaser pursuant to Section 1.3(a), shall not be prorated and shall remain the property of Seller.

1.7 Transfer Tax Payments. Seller shall pay any transfer, sales, purchase, use, value added, excise or similar Tax arising out of the transfer of any of the Purchased Assets to Purchaser.

1.8 Purchase Price and Cash Purchase Price Component Adjustment. At or prior to Closing, Seller shall prepare and deliver to Purchaser a balance sheet of Seller, including all of the Purchased Assets and Assumed Liabilities (the "*Preliminary Closing Balance Sheet*"), measured as of a date not more than three Business Days prior to the Closing. The Purchase Price shall be adjusted up to reflect the excess, or down to reflect the deficiency, in the book value of the Purchased Assets as reflected on the Preliminary Closing Balance Sheet compared to the book value of the Purchased Assets as reflected on the Most Recent Balance Sheet. The Cash Purchase Price Component will likewise be adjusted to reflect the Trade Payables and Other Assumed Payables shown on the Preliminary Closing Balance Sheet. The Preliminary Closing Balance Sheet shall be prepared in accordance with GAAP applied in a manner consistent with prior accounting practices of Seller.

1.9 Escrow Amount. On or before the Schedule Approval Date, subject to Purchaser's right to terminate this Agreement as provided in Section 3.34, Purchaser and Seller shall execute an escrow agreement, in the form attached hereto as Exhibit B (the "*Escrow Agreement*"), pursuant to which Purchaser will deposit with the escrow agent named in the Escrow Agreement (the "*Escrow Agent*") the sum of $2,000,000 (the "*Escrow Amount*") to be held and disbursed by the Escrow Agent in the manner described in the Escrow Agreement.

## ARTICLE II
## DEFINITIONS

2.1 General. Each term defined in the first Article of this Agreement and in the Recitals shall have the meaning set forth below whenever used herein, unless otherwise expressly provided or unless the context clearly requires otherwise.

2.2 Definitions. As used herein, the following terms shall have the meanings ascribed to them in this Section 2.2:

"*Accounts Receivable*." All present and future rights to payment for goods or services rendered whether or not earned by performance, including, without limitation, all accounts or notes receivable owned or held by Seller.

"*Affiliate*." As set forth in Rule 12b-2 of the general rules and regulations under the Securities Exchange Act of 1934, as amended.

"*Agreement*." This Asset Purchase Agreement, together with all Exhibits and Schedules referred to herein, as amended, modified or supplemented from time to time in accordance with the terms hereof.

"*Assumed Contracts*." All Business Contracts transferred from Seller to Purchaser pursuant to Section 1.1(f) and assumed by Purchaser pursuant to Section 1.4(b) including, but not limited to (i) the Contracts listed on Schedule 1.1(f) hereto as may be supplemented pursuant to Section 5.16, (ii) such Contracts entered into by Seller after the date hereof in the Ordinary Course of Business as Purchaser expressly agrees to assume and (iii) all Contracts entered into by Seller after the date hereof in the Ordinary Course of Business and individually in an amount not in excess of $10,000.00; provided, however, Seller shall have the right to enter into Contracts (and Purchaser shall be deemed to assume such Contracts subject to the immediately following sentence) after the date hereof in the Ordinary Course of Business and individually in an amount in excess of $10,000.00 if Purchaser does not object to Seller's entering into such Contracts within three Business Days following Purchaser's receipt from Seller of the written notification of Seller's intention to enter into such Contracts. Notwithstanding anything in this

5

Agreement to the contrary, it is expressly understood and agreed by the parties hereto that Purchaser will assume Contracts entered into by Seller after the date hereof and all purchase orders only to the extent that the delivery of services, products or other items pursuant to such Contracts or purchase orders is made to Purchaser after the Closing Date.

"*Assumed Liabilities*." As defined in Section 1.4.

"*Assumption Agreement*." As defined in Section 1.3.

"*Authority*." Any governmental, regulatory or administrative body, agency or authority, any court or judicial authority, any arbitrator or any public, private or industry regulatory authority, whether foreign, federal, state or local.

"*Business Accounts Receivable*." As defined in Section 1.1(d).

"*Business Contracts*." As defined in Section 1.1(f).

"*Business Day*." Any day other than a Saturday, Sunday or a day on which banks in California are not open for business.

"*Business Governmental Authorizations*." As defined in Section 1.1(g).

"*Business Intellectual Property*." As defined in Section 1.1(h).

"*Business Inventory*." As defined in Section 1.1(c).

"*Business Real Property*." As defined in Section 1.1(e).

"*Business Tangible Assets*." As defined in Section 1.1(b).

"*Cash Purchase Price Component*." As defined in Section 1.3(a).

"*CERCLA*." Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., as amended.

"*Closing*." The actual sale, conveyance, transfer, assignment and delivery of the Purchased Assets to Purchaser.

"*Closing Date*." The date which is the later of: (a) ninety (90) days following the execution of this Agreement or (b) three (3) Business Days following the date on which all closing conditions have been satisfied or waived, or such other date as Seller and Purchaser may mutually agree in writing, and upon which the Closing shall occur.

"*Code*." Internal Revenue Code of 1986, as it may be amended from time to time.

"*Compounding Business*." As defined in the Recitals hereto.

"*Contracts*." All contracts, leases, subleases, arrangements, commitments and other agreements of Seller relating to the Compounding Business or Purchased Assets, including, without limitation, all customer agreements, vendor agreements, purchase orders, installation and maintenance agreements, computer software licenses, hardware lease or rental agreements.

"*Disclosing Party*." As defined in Section 5.10.

"*Disputed Items Notice*." As defined in Section 8.5.

"*Employees*." As defined in Section 5.12.

6

"*Employee Benefit Plan.*" Any employee benefit plan within the meaning of Section 3(3) of ERISA which (a) is maintained for employees of Seller or any of its ERISA Affiliates or (b) has at any time within the preceding six (6) years been maintained for employees of Seller or any current or former ERISA Affiliates, and any bonus or other incentive compensation, deferred compensation, salary continuation, sick or disability pay, severance, stock award, stock option, stock purchase, tuition assistance, vacation, vacation pay or other benefit plan or arrangement, and each employment, termination or other compensation arrangement or agreement, in each case with respect to current or former employees or consultants of or to Seller or any ERISA Affiliate, and under which Seller or any ERISA Affiliate could reasonably be expected to have any liability.

"*Environmental Claims.*" As defined in Section 3.22.

"*Environmental Laws.*" Each and every Law, Order, Permit, or similar requirement of each and every Authority and common law, pertaining to (A) the protection of human health, safety, the environment, natural resources and wildlife or (B) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Substance or (C) pollution, including without limitation, as amended, CERCLA, the Solid Waste Disposal Act, 42 U.S.C. Section 6901 et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq. and the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, et seq.

"*Environmental Reports.*" As defined in Section 1.5.

"*Equipment and Improvements.*" All facilities and structures, buildings, installations, fixtures, improvements, betterments, additions, spare parts, stores, supplies, fuel and lubes, machinery, equipment, cranes, forklifts, platforms, vehicles, trucks, chassis, generators, containers, spare tires and parts, tools, appliances, furniture, office furniture, fixtures, office supplies and office equipment, computers, computer terminals and printers, computer software, telephone systems, telecopiers and photocopiers, and other tangible personal property of every kind and description, which are owned or leased by Seller, or are utilized in connection with Seller's operation.

"*ERISA.*" The Employee Retirement Income Security Act of 1974, as it may be amended from time to time, and the regulations promulgated thereunder.

"*ERISA Affiliate.*" Any corporation, partnership or trade or business which is a member of a group that includes Seller and is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"*Escrow Agent.*" As defined in Section 1.9.

"*Escrow Agreement.*" As defined in Section 1.9.

"*Escrow Amount.*" As defined in Section 1.9.

"*Excluded Assets.*" As defined in Section 1.2.

"*Excluded Liabilities.*" As defined in Section 1.5.

"*Excluded Operations.*" All operations and activities of Seller not relating, partly or wholly, to the Compounding Business.

"*Facilities.*" The Purchased Real Estate and the Leased Warehouse constituting the sole physical locations at which the Compounding Business is conducted.

"*Final Assumed Trade Payables.*" As defined in Section 8.5.

"*Final Net Assets Acquired.*" As defined in Section 8.5.

"*Final Other Assumed Payables.*" As defined in Section 8.5.

"*Final Purchase Price.*" As defined in Section 8.5.

7

"*Final Purchase Price Certificate*." As defined in Section 8.5.

"*Final Settlement Date*." As defined in Section 8.5.

"*Final Settlement Payment*." As defined in Section 8.5.

"*Financial Statements*." The financial statements of Seller for the fiscal years ended on December 31, 2002, and 2003, each audited by Stonefield Josephson, Inc., independent certified public accountants, and accompanied by the opinion of such accountants relating to such statements, and for the most recently completed fiscal quarter prior to the Closing Date, each together with the notes thereto, which are included in the consolidated financial statements of Seller.

"*GAAP*." Generally accepted accounting principles.

"*Gitto Independent Manufacturer's Representative Agreement*." As defined in Section 5.17.

"*Governmental Authorizations*." Any consent, license, registration, authorization or permit issued, granted, given or otherwise made available by or under the authority of any Governmental or Regulatory Body or pursuant to any Law.

"*Hazardous Substance*." Any substance which is (A) defined as a hazardous substance, hazardous material, hazardous waste, pollutant or contaminant under any Environmental Laws, (B) a petroleum hydrocarbon, including crude oil or any fraction thereof, (C) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive or carcinogenic or (D) regulated pursuant to any Environmental Laws.

"*Hi-Tech*." As defined in Section 5.14.

"*Hi-Tech Agreement*." As defined in Section 5.14.

"*Hi-Tech Inventory*." As defined in Section 5.14.

"*Hi-Tech Notes*." As defined in Section 5.14.

"*Holdback*." As defined in Section 1.3(a).

"*Indemnified Party*." As defined in Section 10.7.

"*Indemnifying Party*." As defined in Section 10.7.

"*Indemnity Basket*." As defined in Section 10.3.

"*Intellectual Property*." Trade names, trademarks, trademark registrations, trademark applications, service marks, service mark registrations, service mark applications; all copyrights, copyright registrations, copyright applications; patent rights (including, without limitation, issued patents, applications, divisions, continuations and continuations-in-part, reissues, patents of addition, utility models and inventors' certificates); licenses with respect to any of the foregoing; trade secrets, proprietary manufacturing information and know-how; inventions, inventors' notes, drawings and designs; and, customer and vendor lists and the goodwill associated with any of the foregoing.

"*Inventories*." All of Seller's raw materials, packaging, service parts, supplies, work-in-process and finished goods and any and all other inventories of Seller, plus any replacements for or additions to such inventories acquired on or before the Closing Date, and minus any items of inventory consumed, sold or otherwise disposed of in the Ordinary Course of Business by Seller on or before the Closing Date.

"*IRS*." Internal Revenue Service.

"*Law*." Any law, statute, regulation, rule, ordinance, requirement, announcement or other binding action or requirement of an Authority.

8                                   Gitto Asset Purchase Agreement 3/31/04

"*Leased Warehouse*." The leased warehouse property, described more fully in Schedule 1.1(e), located at 232 Airport Road, Lunenberg, MA.

"*Legal Provisions*." As defined in Section 3.1(d).

"*Lien*." Any lien (statutory or other), mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance or preference, priority or security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement).

"*Miller Consulting Agreement*." As defined in Section 5.16.

"*Minimum Purchase Financing*." As defined in Section 5.19.

"*Most Recent Balance Sheet*." The balance sheet of Seller dated February 29, 2004.

"*Most Recent Balance Sheet Date*." February 29, 2004.

"*Multiemployer Plan*." A "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which Seller or any ERISA Affiliate is making, or is accruing an obligation to make, contributions or has made, or been obligated to make, contributions within the preceding six (6) years.

"*Net Due to Purchaser on Final Settlement*." As defined in Section 8.5.

"*Net Due to Seller on Final Settlement*." As defined in Section 8.5.

"*Nonconsenting Third Party*." As defined in Section 6.2.

"*Order*." Any decree, order, judgment, writ, award, injunction, stipulation or consent of or by an Authority.

"*Ordinary Course of Business*." The ordinary course of business of Seller, in accordance with past custom and practice (including, without limitation, with respect to quantity and frequency).

"*Other Assumed Payables*." As defined in Section 1.4.

"*PBGC*." The Pension Benefit Guaranty Corporation.

"*Pension Plan*." At any time an employee pension benefit plan that is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code and is maintained either: (i) by Seller or any ERISA Affiliate or (ii) pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and, with respect to either (i) or (ii), Seller or any ERISA Affiliate is then making or accruing an obligation to make contributions or has within the preceding six (6) plan years made contributions.

"*Permits*." As defined in Section 3.26.

"*Person*." Any natural person, corporation, limited liability company, partnership, firm, joint venture, joint-stock company, trust, association, unincorporated entity or organization of any kind, Authority or other entity of any kind.

"*Preliminary Closing Balance Sheet*." As defined in Section 1.8.

"*Preliminary Closing Net Assets*." As defined in Section 8.5.

"*Purchase Price*." As defined in Section 1.3.

"*Purchased Assets*." As defined in Section 1.1.

"*Purchased Real Estate.*" The parcels of land and improvements, described more fully on Schedule 1.1(e), located at 140 Leominster-Shirley Road, Lunenberg, Massachusetts utilized by Seller pursuant to a lease from Charles Gitto and to be conveyed pursuant to the Real Estate Purchase Agreement.

"*Purchaser.*" As defined in the heading hereto.

"*Purchaser Losses.*" As defined in Section 10.2.

"*Real Estate Purchase Agreement.*" As defined in Section 5.15.

"*Real Property Leases.*" The leases pursuant to which Seller leases the Purchased Real Estate from Charles Gitto and the Leased Warehouse from a non-affiliated third party.

"*Receivable Settlement Date.*" As defined in Section 9.3.

"*Release.*" Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including without limitation the abandonment or discarding of barrels, containers, and other receptacles containing any Hazardous Substance).

"*Schedule Delivery Due Date.*" As defined in Section 3.34.

"*Scheduled Approval Date.*" As defined in Section 3.34.

"*Seller.*" As defined in the heading hereto.

"*Seller Parties.*" As defined in the heading hereto.

"*Seller Schedules.*" As defined in Section 3.34.

"*Seller Shareholders.*" As defined in the heading hereto.

"*Subsidiary.*" A Subsidiary of any Person means (i) a corporation more than 50% of the combined voting power of the outstanding stock of which is owned, directly or indirectly, by such Person or by one or more other Subsidiaries of such Person or by such Person and one or more Subsidiaries thereof, or (ii) any other Person (other than a corporation) in which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, has the power to direct the policies, management and affairs thereof.

"*Taxes.*" All net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, employment, excise, goods and services, severance, stamp, occupation, premium, property, assessments, or other governmental charges of any kind whatsoever, together with any interest, fines and any penalties, additions to tax or additional amounts incurred or accrued under applicable federal, state, local or foreign tax law or assessed, charged or imposed by any Authority, domestic or foreign; provided that any interest, penalties, additions to tax or additional amounts that relate to Taxes for any taxable period (including any portion of any taxable period ending on or before the Closing Date) shall be deemed to be Taxes for such period, regardless of when such items are incurred, accrued, assessed or charged. For the purposes of Section 3.24, Seller shall be deemed to include any predecessor to Seller, or any Person from which Seller incurs a liability for Taxes as a result of transferee liability, joint and several liability, or otherwise.

"*Third-Party Claim.*" As defined in Section 10.7.

"*Third-Party Notice.*" As defined in Section 10.7.

"*Time Covenant.*" As defined in Section 5.9.

"*Trade Payables.*" All accounts payable properly reflected on the balance sheet of Seller in accordance with GAAP and arising in connection with the provision of goods or services to Seller relating to the Compounding Business.

"*Uncollected Business Accounts Receivable.*"  As defined in Section 8.5.

2.3 Interpretation. Unless otherwise expressly provided or unless the context requires otherwise, (a) all references in this Agreement to Articles, Sections, Schedules and Exhibits shall mean and refer to Articles, Sections, Schedules and Exhibits of this Agreement; (b) all references to statutes and related regulations shall include all amendments of the same and any successor or replacement statutes and regulations; (c) words using the singular or plural number also shall include the plural and singular number, respectively; (d) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement (including the Schedules and Exhibits hereto); and (e) references to any Person shall be deemed to mean and include the successors and permitted assigns of such Person (or, in the case of an Authority, Persons succeeding to the relevant functions of such Person).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER AND SELLER PARTIES

As an inducement to Purchaser to enter into and perform this Agreement, and in consideration of the covenants of Purchaser contained herein, Seller and Seller Parties represent and warrant to Purchaser (which representations and warranties shall survive the Closing (subject to Section 10.1) regardless of any examinations, inspections, audits and other investigations Purchaser has heretofore made, or may hereafter make, with respect to such representations and warranties) as follows:

3.1 Status of Seller; Enforceability; Conflicts; Consents.

(a) Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts. Seller has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to use its name and to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, except where the failure to possess any such franchise, license, permit, authorization or approval would not have a material adverse effect on Seller or the Compounding Business. Seller is duly qualified and in good standing to do business in each jurisdiction in which the nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary, except where the failure to be so duly qualified and in good standing would not have a material adverse effect on Seller or the Compounding Business. Seller has no Subsidiaries.

(b) Seller has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery by Seller of this Agreement, and the performance by Seller of its obligations hereunder, have been duly and validly authorized and approved by all necessary action on the part of Seller and the Seller Shareholders.

(c) This Agreement is binding upon, and enforceable against, Seller and Seller Parties in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally and by general principles of equity (whether in a proceeding at law or in equity).

(d) Except as set forth on Schedule 3.1, neither the execution or delivery of this Agreement by Seller or Seller Parties nor the performance by Seller or Seller Parties of their obligations under this Agreement will (assuming the receipt of all consents and approvals referred to in Section 3.25), conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, any contract, lease, license, franchise, permit, indenture, mortgage, deed of trust, note agreement or other agreement or instrument to which Seller or Seller Parties are parties or are bound or any judgment, order or decree, statute, law, ordinance, rule or regulation applicable to Seller or Seller Parties or the property or assets of Seller or Seller Parties (including, without limitation, the Purchased Assets) or the certificate of incorporation or by-laws of Seller, or any applicable Law or Order (collectively, "*Legal Provisions*"), except for conflicts, breaches or defaults which would not have a material adverse effect on Seller or the Compounding Business.

11                    Gitto Asset Purchase Agreement 3/31/04

(e) No consent, approval, license, Permit, Order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, is required to be obtained or made by or with respect to Seller or Seller Parties in connection with (i) the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, or (ii) the conduct by Seller of its business following the Closing as conducted on the date hereof other than (A) the consents and approvals referred to in Section 3.25, (B) those that may be required solely by reason of Purchaser's (as opposed to any other third party's) participation in the transactions contemplated hereby, and (C) such other consents or approvals the failure of which to obtain would not have a material adverse effect on Purchaser or the ability of any party to consummate the transactions contemplated hereby.

(f) Seller has delivered to Purchaser true and complete copies of its certificate of incorporation and by-laws, as amended to date.

3.2 Ownership of Seller.

(a) The Seller Shareholders are the sole shareholders of Seller and each such shareholder is the registered and beneficial owner of the shares of Seller free and clear of all Liens of any nature whatsoever; and each such shareholder has the sole right to vote and to sell the shares owned by such shareholder.

(b) There are no outstanding warrants, options, agreements, convertible or exchangeable securities, phantom stock or other commitments pursuant to which Seller is or may become obligated to issue, sell, purchase, return or redeem any shares of capital stock or other securities of Seller and no equity securities of Seller are reserved for issuance for any purpose.

3.3 Financial Statements. The Most Recent Balance Sheet has been prepared, and the Preliminary Closing Balance Sheet will be prepared, in accordance with GAAP, consistently applied during the periods covered thereby, fairly present, or will fairly present, in all material respects the financial condition and the results of operations for the periods covered thereby, and are, or will be, in accordance with the books and records of Seller. Seller has provided Purchaser with the Financial Statements and the Most Recent Balance Sheet and will provide, prior to Closing, Financial Statements through the end of the last completed fiscal quarter preceding the Closing Date and the Preliminary Closing Balance Sheet.

3.4 Undisclosed Liabilities. On the Most Recent Balance Sheet Date and on the date of the Preliminary Closing Balance Sheet, Seller had, and will have, no debts, liabilities, Liens, claims, encumbrances or other obligations of any nature (whether accrued, absolute, contingent or otherwise) of the type which should be reflected in balance sheets (including the notes thereto) prepared in accordance with GAAP consistently applied in accordance with the prior Financial Statements of Seller, which were not, or are not, disclosed, reflected or reserved against on the Most Recent Balance Sheet or the Preliminary Closing Balance Sheet; and, except for liabilities which have been incurred since the Most Recent Balance Sheet Date in the Ordinary Course of Business, since the Most Recent Balance Sheet Date Seller has not incurred any liability of any nature (whether accrued, absolute, contingent or otherwise) of the type which should be reflected on the Most Recent Balance Sheet prepared in accordance with GAAP consistently applied in accordance with the Financial Statements.

3.5 Title to Properties. Except as set forth on Schedule 3.5, Seller has good and marketable title to all of the assets and properties reflected on the Most Recent Balance Sheet and used in the Compounding Business constituting Purchased Assets free and clear of all Liens of any nature.

3.6 Real Property.

(a) Schedule 1.1(d), listing the Facilities, contains an accurate description of each parcel of real property leased or occupied under Permit by Seller. No other real property is used in the Compounding Business or occupied by Seller. The Seller owns no real property. The Real Property Leases are valid and in full force and effect, and there does not exist any default or event that with notice or lapse of time, or both, would constitute a default by Seller under the Real Property Leases, and to the knowledge of Seller, there does not exist any default or event that with notice or lapse of time, or both, would constitute a default by any other party under the Real Property Leases.

12                               Gitto Asset Purchase Agreement 3/31/04

(b) All the buildings, fixtures and leasehold improvements used by Seller in the Compounding Business are located on the Facilities and, to Seller's knowledge, none of such buildings, fixtures or improvements encroach on any adjoining property owned by others or public rights of way. The Facilities abut on at least one side a public street or road in a manner so as to permit reasonable, customary and adequate vehicular and pedestrian ingress, egress and access to such parcel, or has adequate easements across intervening property to permit reasonable, customary and adequate vehicular and pedestrian ingress, egress and access to such parcel from a public street or road. There are no restrictions on entrance to or exit from the Facilities to adjacent public streets and, to Seller's knowledge, no conditions that will result in the termination of the present access from the Facilities to existing highways or roads.

(c) Seller has good and marketable leasehold interests in the Facilities, free and clear of all Liens, except for Liens for taxes not yet due and payable and any Liens on the underlying fee interest in the Facilities. Subject to the Real Property Leases, Seller has enjoyed the continuous and uninterrupted quiet possession, use and operation of the Facilities without any material complaint or objection by any Person.

3.7 Equipment and Improvements. The Equipment and Improvements, whether or not located on the Facilities, are in compliance with all applicable Laws and Orders, and, except as set forth in Schedule 1.1(b), are in reasonable and serviceable condition and repair, normal wear and tear excepted, except for any such non-compliance that would not have a material adverse effect on Seller or the Compounding Business. Neither the Facilities nor the use or occupancy thereof by Seller violates in any way any applicable Laws, Orders, Permits, covenants, conditions and restrictions, whether federal, state, local or, to Seller's knowledge, private, except for any such violation which would not have a material adverse effect on Seller or the Compounding Business.

3.8 No Commitments. There are no outstanding, defaulted or unsatisfied contracts, commitments, agreements or understandings which have been made to, with or for the benefit of any utility companies, school districts, water districts, improvement districts or other Authorities which could reasonably be expected to impose any obligation, liability or condition on Seller or, to the knowledge of Seller, the owners of the Facilities to grant any easements or to make any payments, contributions or dedications of money or land or to construct, install or maintain or to contribute to the construction, installation or maintenance of any improvements of a public or private nature, whether on or off the Facilities.

3.9 Continued Use of Facilities. There are no claims, governmental investigations, litigation or proceedings which are pending against Seller, or, to the knowledge of Seller, threatened against Seller, or, to the knowledge of Seller, pending or threatened against the owners of the Facilities which could reasonably be expected to affect the continued use of the Facilities in substantially the same manner as presently used by Seller.

3.10 Real Estate and Personal Property Taxes; Assessments.

(a) All obligations of Seller with respect to real estate taxes and personal property taxes and assessments which may be due and payable with respect to the Purchased Assets have been paid.

(b) Seller has not received any notice of any special tax assessment affecting any property owned or leased by it, and, to Seller's knowledge, no such assessments are pending or threatened.

3.11 Inventory. All Inventory, including without limitation all Inventory shown on the Most Recent Balance Sheet and all Inventory thereafter created or acquired by Seller prior to the Closing Date but excluding the Hi-Tech Inventory, has been created or acquired in the ordinary course of business and is of a quality usable and saleable in the ordinary course of business, except to the extent of normal obsolescence and subject, in the case of raw materials and work-in-progress, to the completion of the production process.

3.12 Accounts Receivable. The Business Accounts Receivable reflected on the Most Recent Balance Sheet: (a) were acquired by Seller in the Ordinary Course of Business and represent fully completed bona fide transactions that require no further act on the part of Seller to make such Accounts Receivable payable by the account debtors; (b) except as reserved against on the Most Recent Balance Sheet, are not subject to any claim, counterclaim, set-off or deduction and are fully collectible at the face amounts thereof; (c) represent valid obligations owing to Seller by account debtors that are not Affiliates of Seller, which are enforceable in accordance with their respective terms; and (d) are owned by Seller free and clear of all Liens.

Gitto Asset Purchase Agreement 3/31/04

3.13 Contracts. (a) Schedule 3.13 to this Agreement contains a complete list of all material Contracts (including, without limitation, all Assumed Contracts) entered into or agreed to by Seller or by which Seller is currently bound and true and complete copies of such written Contracts have been provided to Purchaser or its counsel. Identified with an asterisk on Schedule 3.13 are those Contracts that contain a prohibition on assignment. All such Contracts are valid and binding upon Seller, and to Seller's knowledge, the other parties thereto except as limited by bankruptcy and insolvency laws and by other laws affecting the rights of creditors generally. There is no default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of such Contracts, and to the knowledge of Seller, there is no default or event that with notice or lapse of time, or both, would constitute a default by any other party under any of such Contracts. Seller has not received notice that any party to any of such Contracts intends to cancel or terminate any of such agreements or to exercise or not exercise any options under any of such agreements. True, correct and complete copies (or, if oral, written summaries) of each Contract, including all outstanding purchaser orders, have been delivered to Purchaser, a complete and accurate list of which is set forth on Schedule 3.13.

(b) The Assumed Contracts are adequate and appropriate for the continued conduct of the Compounding Business as conducted in the Ordinary Course of Business since January 1, 2004. The purchase commitments and other agreements for the provision of raw materials for use in the manufacture of Compounding Business products to be assumed by Purchaser will provide Purchaser with a supply of each raw material necessary in such manufacture which is not materially excessive or materially inadequate for the continued manufacture of such products in the Ordinary Course of Business in the quantities in which they have been produced since January 1, 2004.

3.14 Equity Interests. Seller does not directly or indirectly own any capital stock of, or other equity interests in, any corporation, partnership, joint venture or other entity.

3.15 Intellectual Property. Schedule 3.15 contains a true and complete list and brief description of all patents, trademarks, service marks, trade names, and copyrights (whether or not such trademarks, trade names, service marks and copyrights are registered), and all pending applications therefor, if any, owned by Seller or in which Seller has any rights or licenses. No other patents, trademarks, trade names, service marks or copyrights are reasonably necessary for the conduct of the Compounding Business in substantially the same manner as presently operated by Seller. To Seller's knowledge, there is no infringement or alleged infringement by any Person of any such trademark, service mark, trade name, copyright or patent. Seller has not received any notice from any Person alleging Seller is infringing upon, and, to Seller's knowledge, Seller has not infringed and is not now infringing on, any trademark, service mark, trade name, copyright or patent belonging to any other Person. Schedule 3.15 also contains (a) a true and complete list of all agreements between each employee of Seller and Seller relating to confidential information of Seller, including but not limited to patents, trademarks, service marks, trade names, and copyrights, and the ownership of any intellectual property developed by such employee under the scope of his employment and (b) a true and complete list of (i) all Underwriter's Laboratory Approvals received, and held, by Seller with respect to compounds manufactured by Seller, and (ii) all compounds manufactured by Seller during the five year period ending on the date hereof, including a detailed list of the formulation and procedures utilized to manufacture such compounds.

3.16 Required Assets; Sufficiency of Assets. There are no significant assets used or required by Seller in the conduct of the Compounding Business as presently conducted by Seller that are not either owned by it or licensed or leased to it and, in each case conveyed to Purchaser under this Agreement. The Purchased Assets constitute all of the assets, goodwill, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, necessary to conduct the Compounding Business in substantially the same manner as presently conducted by Seller.

3.17 Suppliers. Schedule 3.17 sets forth the lists of all suppliers whose supplies to Seller and the Compounding Business as presently conducted exceeded $25,000 during the most recent calendar year.  During the period from January 1, 2004 through the date hereof, none of such suppliers has canceled or substantially modified its agreement or commitment with Seller to supply products or services (or threatened in writing to do any of the foregoing). To the knowledge of Seller, the relationship of Seller with each of such suppliers of Seller is a good commercial working relationship. Seller has no knowledge that any such supplier intends to cancel or otherwise substantially modify its relationship with Seller or limit materially its services, supplies or materials to Seller either as a result of the transactions contemplated hereby or otherwise, or has any pending or threatened controversy with any Authority with respect to its relationship with Seller, except for such controversy that would not have a material adverse effect on Seller.

3.18 <u>Personnel Identification and Compensation</u>. Schedule 3.18 contains a true and complete list of the names, titles and compensation of all current officers, directors and employees of Seller whose compensation from Seller exceeded $40,000.00 during the most recent calendar year of Seller.

3.19 <u>Existing Employment Related Contracts</u>. Schedule 3.19 contains a list of all written and oral (with a short description thereof) arrangements or contracts relating to employment, compensation, bonuses, severance, pension and other related issues and collective bargaining agreements to which Seller is a party or by which Seller is bound. All these contracts and arrangements are in full force and effect, and neither Seller nor, to Seller's knowledge, any other Person is in default under any such contract or arrangement. There have been no claims of default and there are no facts or conditions that, with the passage of time or upon notice, will result in a default by Seller, or to the knowledge of Seller, any other Person, under these contracts or arrangements. There is no pending or, to Seller's knowledge, threatened labor dispute, strike, or work stoppage affecting Seller or the Compounding Business.

3.20 <u>Compliance with Laws</u>. Except as set forth in <u>Schedule 3.20</u> and subject to the provisions of Sections 3.22, 3.26, 3.27 and 3.30, Seller, all of the products manufactured, tested, and/or distributed by the Seller, and the Purchased Assets have complied with all, and are not in violation of any, applicable Laws, Permits and Orders (including, without limitation, any applicable building, zoning, environmental protection, water use, occupational health and safety, employment, or disability rights) affecting Seller's properties, the operation of the Compounding Business, or the Purchased Assets, except for any such non-compliance or violation which would not have a material adverse effect on Seller or the Compounding Business. No material capital expenditures are required for compliance with Laws by Seller in order to conduct the Compounding Business as presently conducted by Seller.

3.21 <u>Litigation</u>. Except as set forth in <u>Schedule 3.21</u>, there are no suits, actions, arbitrations, and legal, administrative and other proceedings and governmental investigations; pending or, to Seller's knowledge, threatened, against or, to Seller's knowledge, affecting Seller or the Compounding Business, involving $10,000.00 or more in dispute or, if determined adversely to Seller, could result in the expenditure or recovery of $10,000.00 or more by Seller in connection therewith. None of the matters set forth in <u>Schedule 3.21</u>, if decided adversely to Seller would result in a material adverse change, taken individually or in the aggregate, to the Compounding Business or Seller. Seller is not presently engaged in any legal action to recover moneys due to it or damages sustained by it.

3.22 <u>Environmental</u>. Except as set forth in <u>Schedule 3.22</u>:

(a) <u>Compliance with Environmental Laws</u>. Seller, the use by Seller of the Facilities, and the Compounding Business have been and are in compliance in all material respects with all applicable Environmental Laws, and there has been and is no liability against Seller under any applicable Environmental Laws. The use by Seller of any real property formerly owned or leased by Seller or otherwise related to the Compounding Business was in compliance in all material respects with all applicable Environmental Laws during Seller's period of ownership or operation. Seller has no knowledge of any facts or circumstances concerning any alleged violation or liability arising under any Environmental Law with respect to the Facilities, the Compounding Business or any formerly owned or operated real property or any use or condition thereof.

(b) <u>No Release of Hazardous Substances</u>. Except in accordance with applicable Environmental Laws, there has been no Release or threatened Release by Seller, or to Seller's knowledge, by any other Person of any Hazardous Substance existing on, beneath or from the surface, subsurface, ground water, sediment, rivers or other bodies of water associated with the Facilities, nor is there or has there been any Release or threatened Release by Seller, or, to the knowledge of Seller, by any other Person, of any Hazardous Substances on, beneath from or in the vicinity of the Facilities currently occurring or, to the knowledge of Seller, occurring at any time in the past.

15

(c) <u>Permits</u>. All Permits required by or issued pursuant to any Environmental Law for the ownership, use or operation of the Facilities by Seller or the Compounding Business have been obtained in a timely manner and are presently maintained in full force and effect. <u>Schedule 3.22</u> contains a true and complete listing of all such Permits. The Facilities and the operations of Seller are in material compliance with all terms and conditions of such Permits. Seller has not received any notice or other communication and has no knowledge of any facts or circumstances concerning any alleged violation of any such Permits.

(f) <u>No Proceedings</u>. There exists no Order, notice of violation, nor any suit, claim, proceeding, citation, directive, summons, investigation, information request or other notice pending or, to the knowledge of Seller, threatened pursuant to any Environmental Law relating to (i) Seller's ownership, lease, occupation or use of the Facilities, or any real property formerly owned, leased, occupied or used by Seller or, to Seller's knowledge, any other present or former owner, tenant, occupant or user of the Facilities, (ii) any alleged violation of, or liability under, any Environmental Law by Seller, or (iii) to Seller's knowledge, the suspected presence, Release or threatened Release of any Hazardous Substance on, under, in or from the surface, subsurface, groundwater, sediment, rivers or other bodies of water associated with the Facilities, or any formerly owned, leased, occupied or used real property nor does there exist any valid basis for any such Order, suit, claim, proceeding, citation, directive, summons investigation, information request, notice of violation, or other notice (collectively, the "<u>Environmental Claims</u>").

(g) <u>No Tanks, Asbestos or PCB's</u>. To Seller's knowledge, there are and were no aboveground or underground storage tanks currently or formerly located on the Facilities used or formerly used for the purpose of storing any Hazardous Substance. There is no asbestos-containing building material on the Facilities, and, to Seller's knowledge, no asbestos abatement or remediation work has been performed on the Facilities. To Seller's knowledge, there is no PCB-containing equipment or PCB-containing material located on the Facilities.

(h) <u>Documents</u>. Seller has provided Purchaser with all environmental assessment reports in its possession with respect to the Facilities and with copies of all Permits required to conduct the Compounding Business as presently conducted by Seller.

3.23 <u>Employee Benefit Plans</u>.

(a) <u>Schedule 3.23</u> contains a true and complete list of all Employee Benefit Plans. There are no Multiemployer Plans.

(b) All obligations of any nature under any Employee Benefit Plan will constitute an Excluded Liability, and Purchaser shall have no obligation or duty with respect thereto.

3.24 <u>Tax Matters</u>. Except as set forth in <u>Schedule 3.24</u>:

(a) Seller has duly and timely filed (and prior to the Closing Date will duly and timely file) true, correct and complete tax returns, reports or estimates, all prepared in accordance with applicable Laws, for all years and periods (and portions thereof), for all jurisdictions (whether federal, state, local or foreign) in which any such returns, reports or estimates were due, and for all such returns, reports and estimates which are required to be filed by any applicable Law on or prior to the Closing Date. All Taxes shown as due and payable on such returns, reports and estimates have been paid (or will be paid prior to the Closing), and there is no current liability for any Taxes due and payable in connection with any such returns. Any charges, accruals and reserves for Taxes provided for on the Financial Statements are adequate. There are no existing Liens for Taxes upon any of the Purchased Assets. Seller has provided to Purchaser copies of all federal, state and foreign tax returns filed by Seller for the past three (3) years. All applicable sales and transfer taxes with respect to the Purchased Assets, to the extent due, were paid when the Purchased Assets were acquired by Seller.

(b) Seller has: (i) withheld all required amounts from its employees, agents, contractors and nonresidents and remitted such amounts to the proper Authorities; (ii) paid all employer contributions and premiums required to be remitted to proper Authorities; and (iii) filed all federal, state, local and foreign returns and reports with respect to withholding taxes, and social security and unemployment Taxes and premiums, all in compliance in all material respects with the withholding provisions of the Code, or any prior provision of the Code and other applicable Laws.

16

(c) None of the Purchased Assets is tax exempt use property under Code Section 168(h). None of the Purchased Assets is property that Seller is required to treat as being owned by any other Person pursuant to the safe harbor lease provision of former Code Section 168(f)(8).

(d) No portion of the cost of any Purchased Assets was financed directly or indirectly from the proceeds of any tax exempt state or local government obligation described in Code Section 103(a).

(e) Seller has no (and has not previously had any) permanent establishment in any foreign country and Seller does not engage (and has not previously engaged) in a trade or business within the meaning of the Code relating to the creation of a permanent establishment in any foreign country.

(f) Seller is not a foreign person within the meaning of Code Section 1445. Neither the Code nor any other provision of Law requires Purchaser to withhold any portion of the Purchase Price.

(g) Seller is not a partner in a partnership or joint venture that could be treated as a partnership for federal income tax purposes.

(h) Seller has never been a member of any consolidated, combined or unitary group for federal, state, local or foreign Tax purposes.

(i) The tax returns of Seller have not been audited for any tax period ending after December 31, 2000 and there are no current proceedings by or discussions with any Authority relating to any Taxes.

(j) Seller has not consented to the application of Code section 341(f).

3.25 <u>Consents</u>. Except as disclosed on <u>Schedule 3.25</u>, no consent, approval, order or authorization of, or registration, declaration or filing with, any Authority or any other Person is required to be obtained or made by Seller in connection with the execution and delivery of this Agreement or the performance by Seller of its obligations hereunder other than consents which have been obtained and disclosed on Schedule 3.25.

3.26 <u>Licenses and Permits</u>. Subject to the provisions of Section 3.22 and Section 3.30, <u>Schedule 3.26</u> lists and describes all qualifications, registrations, filings, privileges, franchises, immunities, licenses, permits, authorizations and approvals of Authorities which are used or required in order for Seller to own and/or operate the Compounding Business, including, without limitation, all certificates of occupancy and certificates, licenses and permits relating to building, safety, Environmental Laws, fire and health (collectively, the "<u>Permits</u>"), other than any such qualification, registration, filing, privilege, franchise, immunity, license, permit, authorization and approval of Authority where the failure of Seller to so possess such qualification, registration, filing, privilege, franchise, immunity, license, permit, authorization and approval of Authority would not have a material adverse effect on Seller or the Compounding Business. Except as set forth in <u>Schedule 3.26</u>, each Permit is in good standing, valid and subsisting, and in full force and effect in accordance with its terms.

3.27 <u>Occupational Safety and Health</u>. Except as set forth on <u>Schedule 3.27</u>, Seller has not received any notice, citation, claim, assessment or proposed assessment as to, or alleging, any violation of any federal, state or local occupational safety and health laws by it, nor has Seller, to Seller's knowledge, been subject to any investigation relating to the Compounding Business by any federal, state or local occupational safety and health agency within the three (3) years preceding the date hereof, and no such violation exists, other than any such violation which would not have a material adverse effect on Seller or the Compounding Business. Seller is not a party to any pending dispute with respect to compliance with any federal, state or local occupational safety and health law.

3.28 <u>Insurance</u>. <u>Schedule 3.28</u> contains a list of the insurance policies, other than those related to employee benefits, that Seller currently maintains with respect to the Compounding Business and its assets and properties and employees as of the date hereof, each of which is in full force and effect and a complete and correct copy of each has been delivered to Purchaser. All insurance premiums currently due with respect to such policies have been paid and Seller is not otherwise in default with respect to any such policy, nor has Seller failed to give any notice or present any claim under any such policy in a due and timely manner. Seller has not received notice of cancellation or non-renewal of any such policy. Such policies are sufficient for compliance with all requirements of law and all agreements to which Seller is a party.

3.29 <u>Certain Transactions</u>. All purchases and sales or other transactions, if any, between Seller, on the one hand, and any officer, director or employee thereof or Affiliate thereof, on the other hand, within the three (3) years immediately preceding the date hereof have been made on the basis of prevailing market rates and terms such that, from the perspective of Seller, all such transactions have been made on terms no less favorable than those which would have been available from unrelated third parties. Except as set forth on <u>Schedule 3.29</u>, neither any officer, director nor employee of Seller, nor any spouse, child or other relative of any of such persons, owns, or has any interest, directly or indirectly, in any of the real or personal property owned by or leased to Seller or any copyrights, patents, trademarks, trade names or trade secrets owned or licensed by Seller.

3.30 <u>Regulatory Compliance</u>.

(a) Seller has not received any major adverse written notice within the past two years from any Authority (i) regarding the approvability or approval of a Permit concerning, or the labeling of, any products of Seller or (ii) alleging any violation of any Legal Provision by Seller which, in the case of either clause (i) or (ii), individually or in the aggregate has had or would have a material adverse effect on Seller or the Purchased Assets. <u>Schedule 3.30</u> sets forth (i) all of Seller's regulatory correspondence received from any Authority over the last five years and (ii) all of the Permits issued to Seller by any Authority.

(b) Except as described in <u>Schedule 3.30</u>, no Permit or product of Seller has been denied, placed on hold, withdrawn, suspended or discontinued as a result of any action by any Authority, by Seller or, to the knowledge of Seller, by any licensee or customer of any product of Seller, in the United States or outside the United States (whether voluntarily or otherwise), in each case within the past five years. No proceedings in the United States or outside of the United States of which Seller has knowledge (whether completed or pending) seeking the withdrawal, suspension or seizure of any Permit, or product of Seller are pending against Seller, Seller's products, or, to the knowledge of Seller, any licensee or customer of any product of Seller, nor have any such proceedings been pending at any prior time, in each case which has had or would have a material adverse effect on Seller or the Purchased Assets.

(c) For products that Seller is currently manufacturing or testing, each of Seller's applicable Permits is complete, accurate, and up to date in all material respects, and the subject of each such Permit can be effectively, efficiently, and legally manufactured and tested in material compliance with the current version of each applicable Permit.

(d) Except for instances that have not had and would not have a material adverse effect on Seller, (i) to the knowledge of Seller, during the last five years no officer, employee or agent of Seller, has made an untrue statement of a material fact or fraudulent statement to any Authority, failed to disclose a material fact required to be disclosed to any Authority, or committed an act, made a statement, or failed to make a statement that, at the time such disclosure was made, could reasonably be expected to provide a basis for any Authority to invoke with respect to Seller its policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities", set forth in 56 Fed. Reg. 46191 (September 10, 1991) or any similar policy, and (ii) nor has, to the knowledge of Seller, any officer, Employee or agent of Seller, has been convicted of any crime or engaged in any conduct for which debarment is mandated by 21 U.S.C. Section 335a(a) or any similar Legal Provision or permitted by 21 U.S.C. Section 335a(b) or any similar Legal Provision.

(e) Seller has not received any written notice within the past two years that any Authority has commenced, or overtly threatened to initiate, any action to enjoin production of any product included within the Purchased Assets.

3.31 <u>Conduct of Compounding Business Since Most Recent Balance Sheet Date</u>. Except as set forth on <u>Schedule 3.31</u>, since the Most Recent Balance Sheet Date:

(a) the business of Seller has been conducted only in the Ordinary Course of Business;

(b) Seller has neither declared any dividends or distributions nor issued or redeemed any equity securities nor made any payments to any of its shareholders or any Affiliate thereof (other than compensation and expense reimbursement payments made in the Ordinary Course of Business consistent with past practices);

18

(c) except for supplies purchased, sold or otherwise disposed of in the Ordinary Course of the Business, Seller has not purchased, sold, leased, mortgaged, pledged or otherwise acquired or disposed of any properties or assets;

(d) Seller has not changed the terms of any receivables or cancelled any debts owed to Seller or entered into, changed, modified, cancelled or terminated any agreement or contract involving the payment by (or to) Seller of more than $5,000 in any twelve- month period other than in the Ordinary Course of Business;

(e) Seller has not sustained or incurred any loss or damage (whether or not insured against) on account of fire, flood, accident or other calamity;

(f) Seller has not increased the compensation of any employee, officer, director or consultant other than in the Ordinary Course of Business consistent with past practice and has not granted any unusual or extraordinary bonuses, benefits or other forms of direct or indirect compensation to any employee, officer, director or consultant;

(g) Seller has not adopted, increased, terminated, amended or otherwise modified any plan for the benefit of any employees other than in the Ordinary Course of Business consistent with past practice.

(h) there has been no material adverse change in or with respect to the condition (financial or otherwise), operations, business, prospects, rights, properties, assets or liabilities of Seller;

(i) Seller has not changed any accounting methods or practices (including, without limitation, any change in depreciation or amortization policies or rates); and

(j) Seller has not agreed to take any of the actions described in paragraphs (b), (c), (d), (f), (g) or (i) above and Seller has not taken any other action proscribed by Section 5.1.

3.32 Broker's or Consultant's Fees. Seller has not dealt with any broker, finder or similar consultant in connection with any of the transactions contemplated by this Agreement and no Person is entitled to any commission or finder's fee in connection with the sale of the Purchased Assets to Purchaser.

3.33 Claims Against Insiders. To the knowledge of Seller, Seller does not have any claim against, debt owing by, or cause of action against, any shareholder, officer or director of Seller.

3.34 Disclosure. None of the representations and warranties made by Seller in this Agreement contains or will contain any untrue statement of a material fact, or omits to state any material fact necessary to make the statements contained in this Agreement not misleading. There is no fact known to Seller which (so far as Seller reasonably foresees) materially adversely affects, or in the future may materially adversely affect, individually or in the aggregate, the condition (financial or otherwise), assets, liabilities, business, operations or prospects of Seller or the ability of Seller to consummate the transactions contemplated hereby that has not been set forth herein or heretofore communicated to Purchaser in writing pursuant hereto.

Seller has delivered to Purchaser the following schedules, which are collectively referred to as the "*Seller Schedules*" and which consist of separate schedules, all certified by Gitto and Miller, as officers of Seller, and by Bill Deakin, as complete, true and correct as of the Most Recent Balance Sheet Date in all material respects:

(a)     Schedule 1.1(b) containing a description of all Business Tangible Property;

(b)     Schedule 1.1(c) containing a description of all Business Inventory;

(c)     Schedule 1.1(d) containing a description of all Business Accounts Receivable;

(d)     Schedule 1.1(e) containing a description of all Business Real Property;

(e)     Schedule 1.1(f) containing a description of all Business Contracts;

(f)     Schedule 1.1(g) containing a description of all Business Governmental Authorizations;

19                    Gitto Asset Purchase Agreement 3/31/04

(g)    Schedule 1.1(h) containing a description of all Business Intellectual Property;

(h)    Schedule 1.2(a) containing a description of all Excluded Brokerage Operation Assets;

(i)    Schedule 1.2(c) containing a description of all Excluded Contracts;

(j)    Schedule 1.2(d) containing a description of all Miscellaneous Excluded Assets;

(k)    Schedule 1.4 listing, as of the Most Recent Balance Sheet Date, all Trade Payables and all Other Assumed Payables;

(l)    Schedule 3.1 setting forth the items described in Section 3.1, including any conflicts, breaches or defaults arising from the execution, delivery or performance of this Agreement by Seller or Seller Parties under any contract, lease, license, franchise, permit, indenture, mortgage, deed of trust, note agreement or other agreement or instrument to which Seller or Seller Parties are parties or are bound or any judgment, order or decree, statute, law, ordinance, rule or regulation applicable to Seller or Seller Parties or the property or assets of Seller or Seller Parties or the certificate of incorporation or by-laws of Seller, or any applicable Legal Provisions;

(m)    Schedule 3.5 setting forth the items described in Section 3.5, including any exceptions to good and marketable title to any assets and properties used in the Compounding Business constituting Purchased Assets;

(n)    Schedule 3.13 setting forth the items described in Section 3.13, including a complete list of all material Contracts entered into by Seller or by which Seller is bound identifying, by an asterisk, all Contracts containing a prohibition on assignment;

(o)    Schedule 3.15 setting forth the items described in Section 3.15, including a true and complete list and description of (i) all patents, trademarks, service marks, trade names and copyrights, and pending applications therefore, owned by Seller or in which Seller has any rights or license, (ii) all agreements between each employee and Seller relating to confidential information of Seller, and (iii) all Underwriter's Laboratory Approvals received and held by Seller with respect to compounds manufactured by Seller and all compounds manufactured by Seller during the past five years;

(p)    Schedule 3.17 setting forth the items described in Section 3.17, including a list of all suppliers to Seller and the Compounding Business whose supplies provided to Seller during the most recent calendar year exceeded $25,000;

(q)    Schedule 3.18 setting forth the items described in Section 3.18, including a list of the names, titles and compensation of all current officers, directors and employees of Seller whose compensation from Seller exceeded $40,000 during the most recent calendar year;

(r)    Schedule 3.19 setting forth the items described in Section 3.19, including a list of all written and oral (with a short description thereof) arrangements or contracts relating to employment, compensation, bonuses, severance, pension and other related issues and collective bargaining agreement to which Seller is a party or by which Seller is bound;

(s)    Schedule 3.20 setting forth the items described in Section 3.20, including a list of all items of non-compliance with, or violation of, any applicable Laws, Permits and Orders affecting Seller's properties, the operation of the Compounding Business or the Purchased Assets;

(t)    Schedule 3.21 setting forth the items described in Section 3.21, including a list of all suits, actions, arbitrations, and legal, administrative and other proceedings and governmental investigations, pending or, to Seller's knowledge, threatened, against or, to Seller's knowledge, affecting Seller or the Compounding Business, involving $10,000 or more in dispute or, if determined adversely to Seller, could result in the expenditure or recovery of $10,000 or more by Seller in connection therewith;

(u)    Schedule 3.22 setting forth the items described in Section 3.22, including a list of all Permits required by or issued pursuant to any Environmental Law for the ownership, use or operation of the Facilities by Seller or the Compounding Business;

(v)    Schedule 3.23 setting forth the items described in Section 3.23, including a list of all Employee Benefit Plans of Seller;

(w)    Schedule 3.24 setting forth the items described in Section 3.24, including exceptions to the tax compliance representations described therein;

(x)    Schedule 3.25 setting forth the items described in Section 3.25, including a list of all consents, approvals, orders or authorizations of, or registrations, declarations of filing with, any Authority or any other Person required to be obtained or made by Seller in connection with the execution and delivery of this Agreement or the performance by Seller of its obligations hereunder;

(y)    Schedule 3.26 setting forth the items described in Section 3.26, including a list and description of all qualifications, registrations, filings, privileges, franchises, immunities, licenses, permits, authorizations and approvals of Authorities which are used or required in order for Seller to own and/or operate the Compounding Business;

(z)    Schedule 3.27 setting forth the items described in Section 3.27, including a list of any notices, citations, claims, assessments or proposed assessments at to, or alleging, any violation of any federal, state or local occupational safety and health laws by Seller or any investigation relating to the Compounding Business by any federal, state or local occupational safety and health agency within the last three years;

(aa)    Schedule 3.28 setting forth the items described in Section 3.28, including a list of the insurance policies that Seller currently maintains with respect to the Compounding Business and its assets and properties and employees;

(bb)    Schedule 3.29 setting forth the items described in Section 3.29, including a list of any ownership or other interest, direct or indirect, of any officer, director or employee of Seller, or any spouse, child or other relative of any such person, in any real or personal property owned by or leased to Seller or any copyrights, patents, trademarks, trade names or trade secrets owned or licensed by Seller;

(cc)    Schedule 3.30 setting forth the items described in Section 3.30, including all of Seller's regulatory correspondence received from any Authority over the last five years, all Permits issued to Seller by any Authority, and a list any Permits or products of Seller which has been denied, placed on hold, withdrawn, suspended or discontinued within the last five years; and

(dd)    Schedule 3.31 setting forth the items described in Section 3.31,

Seller shall cause the Seller Schedules and the instruments and data delivered to Purchaser hereunder to be promptly updated after the date hereof up to and including the Closing Date.

It is understood and agreed that not all of the Seller schedules have been completed or are available to be furnished by Seller. Seller shall have thirty (30) days from the date hereof (the "*Schedule Delivery Due Date*") to provide the Seller Schedules in full. If Seller cannot, or fails to, deliver all of the Seller Schedules by the Schedule Delivery Due Date, or if Purchaser acting reasonably finds any such schedules or updates provided after the date hereof to be unacceptable according to the criteria set forth below, Purchaser may terminate this Agreement by giving written notice to Seller within fifteen (15) days after the earlier of (x) the Schedule Delivery Due Date or (y) the date Seller Schedules or updates were provided in full (the "*Schedule Approval Date*"). For purposes of the foregoing, Purchaser may consider disclosure on the Seller Schedules to be "*unacceptable*" only if that item would have a material adverse impact on the financial statements comprised of the Most Recent Balance Sheet, taken as a whole.

3.35 No Other Representations and Warranties. Except for the representations and warranties contained in this agreement, Seller makes no other representation and warranty as to any fact or matter, and no party shall be entitled to rely upon any such other representation or warranty.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into and perform this Agreement, and in consideration of the covenants of Seller contained herein, Purchaser represents and warrants to Seller (which representations and warranties shall survive the Closing (subject to Section 10.1) regardless of any examinations, inspections, audits and other investigations Seller have heretofore made, or may hereafter make, with respect to such representations and warranties) as follows:

4.1 Status of Purchaser. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and, at or prior to the Closing, will be duly qualified to do business in each state where Seller is now qualified to do business. Purchaser has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to use its name and to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, except where the failure to possess any such franchise, license, permit, authorization or approval would not have a material adverse effect on Purchaser.

4.2 Authority of Purchaser. Purchaser has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Neither the execution or delivery of this Agreement by Purchaser nor the performance by Purchaser of its obligations under this Agreement will conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, any contract, lease, license, franchise, permit, indenture, mortgage, deed of trust, note agreement or other agreement or instrument to which Purchaser is a party or is bound, its certificate of incorporation or by-laws or any applicable Law or Order.

4.3 Due Authorization. The execution and delivery by Purchaser of this Agreement, and the performance by Purchaser of its obligations hereunder, have been duly and validly authorized and approved by all necessary action on the part of Purchaser.

4.4 Enforceability. This Agreement is binding upon, and enforceable against, Purchaser in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally and by principles of equity (whether in a proceeding at law or in equity).

4.5 Consents. No consent, approval, order or authorization of, or registration, declaration or filing with, any Authority or any other Person is required to be obtained or made by Purchaser in connection with its execution and delivery of this Agreement or the performance by it of its obligations hereunder.

4.6 Broker's or Consultant's Fees. Purchaser has not dealt with any broker, finder or consultant in connection with any of the transactions contemplated by this Agreement, and no Person is entitled to any commission or finder's fee in connection with the sale of the Purchased Assets to Purchaser.

## ARTICLE V
### PRE-CLOSING COVENANTS

Seller, Seller Parties and Purchaser covenant and agree that from the date hereof through and including the Closing Date:

5.1 Ordinary Conduct. (a) From the date hereof to the Closing, Seller shall conduct the Compounding Business in the Ordinary Course of Business. Seller shall use all commercially reasonable efforts to preserve and protect its goodwill, rights, properties, assets and business, to keep available to itself and Purchaser the services of its employees, and to preserve and protect its relationships with its employees, officers, advertisers, suppliers, customers, creditors and others having business relationships with it. In addition, from the date hereof to the Closing, Seller shall not do any of the following without the prior written consent of Purchaser, such consent not to be unreasonably withheld or unreasonably delayed:

(i) fail to continue to conduct the Compounding Business of Seller in conformity with the representations and warranties set forth in Section 3.31;

(ii) amend its certificate of incorporation or bylaws;

22          Gitto Asset Purchase Agreement 3/31/04

(iii) incur any liabilities, obligations or indebtedness for borrowed money or guarantee any such liabilities, obligations or indebtedness, or increase (other than increases resulting from the calculation of reserves in the Ordinary Course of Business), or experience any change in any assumptions underlying or methods of calculating, any bad debt, contingency or other reserves;

(iv) permit, allow or suffer any of its assets, including, without limitation, the Purchased Assets, to be subjected to any mortgage, pledge, Lien, encumbrance, restriction or charge of any kind which is not disclosed in this Agreement;

(v) pay, discharge or satisfy any claims, encumbrances, liabilities or obligations (whether absolute, accrued, contingent or otherwise and whether due or to become due) other than the payment when due in the Ordinary Course of Business of liabilities and obligations reflected or reserved against in the Most Recent Balance Sheet or incurred in the Ordinary Course of Business since the date thereof;

(vi) pay, lend or advance any amount to, or sell, transfer or lease any of the Purchased Assets to, or enter into any agreement or arrangement with, any of the officers, directors or equity owners of Seller or any of its Affiliates or any family members, by blood, marriage or adoption, of any of the foregoing;

(vii) acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any assets (other than Inventory or other assets acquired in the Ordinary Course of Business);

(viii) enter into any Contract, except for Contracts entered into in the Ordinary Course of Business and individually in an amount not in excess of $100,000.00 (other than any confidentiality, non-disclosure, non-competition or similar Contract); provided, however, that Seller shall have the right to enter into Contracts in the Ordinary Course of Business and individually in an amount in excess of $100,000.00 (other than any confidentiality, non-disclosure, non-competition or similar Contract) only if Purchaser does not object to Seller's entering into such Contracts within three Business Days following Purchaser's receipt from Seller of the written notification of Seller's intention to enter into such Contracts;

(ix) make, or commit to make, any capital expenditures except to the extent that Purchaser does not object to such capital expenditures within three Business Days following Purchaser's receipt from Seller of the written notification of Seller's intention to make such capital expenditures;

(x) fail to pay any account payable when due in accordance with its terms unless contested by Seller in good faith;

(xi) make any other material change in the Compounding Business or the operation of Seller; or

(xii) agree, whether in writing or otherwise, to do any of the foregoing.

(b) From the date hereof to the Closing, Seller shall not enter into any licensing or similar arrangement with respect to or affecting the Compounding Business or the Purchased Assets.

(c) From the date hereof to the Closing, subject to the terms and conditions of this Agreement, Seller shall use its reasonable efforts (i) to preserve the Purchased Assets and the Compounding Business intact, (ii) to keep available to Purchaser the services of the employees of the Compounding Business, and (iii) to preserve the goodwill of customers and others having business relations with Seller to the extent such business relations relate to the Purchased Assets.

23                         Gitto Asset Purchase Agreement 3/31/04

5.2 Right of Inspection; Access to Books and Personnel; Oversight of Collections and Expenditures.

(a) Seller shall and shall cause each of Seller's officers, directors, employees, auditors and agents to afford to Purchaser and Purchaser's officers, directors, employees, auditors, agents and lenders the right at any time prior to the Closing, on reasonable notice during normal business hours, access to Seller's employees, auditors, agents, facilities, books and records as Purchaser reasonably shall deem necessary or desirable and subject to such reasonable restrictions as Seller may request to maintain the confidentiality of this Agreement and the transactions contemplated hereby and shall furnish such financial and operating data and other information with respect to Seller as Purchaser may reasonably require. Except as otherwise set forth herein, no such access, examination or review shall in any way affect, diminish or terminate any of the representations, warranties or covenants of Seller set forth herein.

(b) From the date hereof through the Closing, Seller shall provide to Purchaser, on the first Business Day of each week, an accounting for all financial activities of Seller during the preceding calendar week. The accounting provided for pursuant to this Section 5.2(b) shall consist of providing (i) a listing of all receipts and all expenditures of Seller during the period being reported upon, accompanied by (ii) copies of all deposit slips, all checks, all bank drafts and all other evidence of deposits to or withdrawals from any accounts of Seller, and (iii) copies of all invoices, purchase orders and other supporting documentation underlying each deposit to or withdrawal from Seller's accounts. Seller shall also provide to Purchaser, promptly following receipt of the same by Seller, copies of all bank statements, brokerage statements or similar statements relating to all accounts maintained for the benefit of Seller and copies of all vendor's monthly statements relating to Seller's accounts with vendors. The accounting and materials to be provided pursuant to this Section 5.2(b) shall relate to all activities of Seller of any and every nature and is not limited to accounts or activities relating to the Compounding Business.

5.3 Notification of Material Events.

(a) Seller shall promptly notify Purchaser in writing of any event following the date hereof of which Seller is or becomes aware that will or may reasonably be expected to have a material effect, including but not limited to a material adverse effect, on the condition (financial or otherwise), rights, properties, assets or prospects of Seller or the Compounding Business or the performance by Seller of its obligations under this Agreement.

(b) Each of the parties to this Agreement shall promptly notify the other party to this Agreement of (a) the occurrence or non-occurrence of any fact or event (regardless of the time of the occurrence or non-occurrence of such fact or event) which would be reasonably likely (i) to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing Date or (ii) to cause any material covenant, condition or agreement hereunder not to be complied with or satisfied in all material respects and (b) any failure of any party to this Agreement to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder in any material respect.

5.4 Supplemental Disclosures. Seller shall have the continuing obligation to supplement promptly and amend the Schedules as necessary or appropriate with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth or described in the Schedules; provided, however, that for the purpose of the rights and obligations of the parties hereunder, any such supplemental or amended disclosure shall not, except as Purchaser may otherwise agree in writing, be deemed to have cured any breach of any representation or warranty made in this Agreement. Notwithstanding the foregoing, if Purchaser elects to proceed with the Closing, Purchaser shall be deemed to have waived the right thereafter to assert any claim pursuant to Article X hereunder with respect to any matter specifically and accurately disclosed by Seller in such supplemental or amended disclosure.

5.5 Exclusivity. Until the earlier to occur of (i) the termination of this Agreement in accordance with Article XI or (ii) the Closing, (a) Seller shall not, and shall not permit or authorize, as the case may be, any of Seller's Affiliates, directors, officers, employees, agents or advisors to, initiate, pursue or encourage (by way of furnishing information or otherwise) any inquiries or proposals, or enter into any discussions, negotiations or agreements (whether preliminary or definitive) with any Person, contemplating or providing for any merger, acquisition, purchase or sale of stock or all or substantially all of the assets or any business combination or change in control of Seller or the Compounding Business, and (b) Seller shall deal exclusively with Purchaser with respect to the sale of the Purchased Assets or the Compounding Business or assets and properties of Seller.

24                    Gitto Asset Purchase Agreement 3/31/04

5.6 <u>Publicity</u>. Seller and Purchaser agree that no public release or announcement concerning the transactions contemplated hereby shall be issued by either party without the prior consent (which consent shall not be unreasonably withheld) of the other party, except as such release or announcement may be required by Law or the rules or regulations of any Authority, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance.

5.7 <u>Preparation of Preliminary Closing Balance Sheet</u>. At least two (2) Business Days prior to the Closing, Seller shall furnish to Purchaser the Preliminary Closing Balance Sheet setting forth Seller's estimated calculation of the adjustments to the Purchase Price as required by Section 1.8, such calculations to include an itemization of the changes in the components of the Purchased Assets from the Most Recent Balance Sheet to the Closing Date, the Trade Payables subject to assumption by Purchaser pursuant to Section 1.4(a) and a list of those Contracts entered into since the date hereof and which Seller requests Purchaser to assume in each case to be satisfactory to Purchaser.

5.8 <u>Power of Attorney; Right of Endorsement, Etc</u>. Effective as of the Closing, Seller hereby constitutes and appoints Purchaser and its successors and assigns the true and lawful attorney of Seller with full power of substitution, in the name of Purchaser or the name of Seller, on behalf of and for the benefit of Purchaser, (a) to collect all Purchased Assets, (b) to endorse, without recourse, checks, notes and other instruments attributable to the Purchased Assets, (c) to defend and compromise all actions, suits or proceedings with respect to any of the Purchased Assets (subject to Section 10.7) and (d) to do all such reasonable acts and things with respect to the Purchased Assets as Purchaser may deem advisable. Seller agrees that the foregoing powers are coupled with an interest and shall be irrevocable by Seller directly or indirectly by the dissolution of Seller or in any other manner. Purchaser shall retain for its own account any amounts lawfully collected pursuant to the foregoing powers and Seller shall promptly pay to Purchaser any amounts received by Seller after the Closing with respect to the Purchased Assets.

5.9 <u>Covenants Not to Compete, Solicit or Disparage</u>.

(a) For the period of three years after the Closing Date, or, with respect to Gitto, the earlier termination, for any reason, of the Gitto Independent Manufacturer's Representative Agreement (the "*Time Covenant*"), Seller Shareholders covenant that none of the Seller Shareholders shall, either individually or as a partner, joint venturer, consultant, shareholder, member or representative of another Person or otherwise, directly or indirectly, participate in, engage in, or have a financial or management interest in, or assist any other Person in any business operation or any enterprise if such business operation or enterprise engages, or would engage, in the Compounding Business anywhere in the world, provided, however, that the foregoing shall not prohibit a Seller Shareholder from owning up to five percent (5%) of a publicly traded company.

(b) During the Time Covenant, each of Seller Shareholders shall not, directly or indirectly, whether for its own account or for the account of any Person (other than Purchaser) that is in competition with Purchaser (A) solicit, recruit, hire, engage in any activity that would cause any Person who is as of the Closing Date, or was during the 12 months prior to the Closing Date, employed by Seller to violate any agreement with Purchaser, endeavor to entice away any such Person from Purchaser, interfere with the relationship of Purchaser with such Person or induce any such Person to reject any employment offer by Purchaser or (B) solicit, entice or induce any Person who is, or was a Customer or Supplier to (i) become a Customer or Supplier of any other Person engaged in any business activity that competes with the Compounding Business, (ii) cease doing business with Purchaser or (iii) otherwise interfere with the relationship of Purchaser with any such person, team, Customer or Supplier. For purposes of this Section 5.9, a "*Customer*" means any Person which has been during the 12-month period prior to the Closing Date a customer, distributor or agent of Seller or shall have been contacted by Seller in the six-month period prior to the Closing for the purpose of soliciting it to become a customer, distributor or agent of Seller; and a "*Supplier*" means any Person which has been during the 12-month period prior to the Closing Date a supplier, vendor, manufacturer or developer of Seller for any product or service or significant component used in any product or service. Seller Shareholders covenant that they will not, directly or indirectly, in any capacity whatsoever, make any statement, written or oral, or perform any other act or omission that is intended to be materially detrimental to the goodwill of the business of Seller, except as compelled by judicial or administrative process.

(c) If, during the Time Covenant, Seller Shareholders subject to the aforementioned restrictions are not in compliance with such restrictions, then Purchaser shall be entitled, among other remedies, to compliance by the breaching Seller Shareholder with the terms of such provisions for an additional number of days that equals the number of days during which such noncompliance occurred.

(d) The parties hereby agree that all restrictions and agreements contained in this Section 5.9, including, without limitation, those relating to the Time Covenant, are necessary and fundamental to the protection of the Compounding Business and any objections or reservations to such restrictions or agreements are hereby waived. Seller Shareholders hereby agree that the remedy at law for any breach of this Agreement will be inadequate, and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, the parties agree that upon any Seller Shareholder's breach of this Section 5.9, Purchaser shall be entitled to immediate injunctive relief and may obtain a temporary order restraining any threatened further breach. Nothing in this Agreement shall be deemed to limit Purchaser's remedies at law or in equity for any breach by any Seller Shareholder of any of the provisions of this Agreement that may be pursued by or made available to Purchaser.

(e) Each of the foregoing agreements and covenants is in addition to any other similar agreement and covenant contained in any other document entered into in connection herewith and is not intended in any way, form or fashion to limit the applicability of such other agreement or covenant.

5.10 <u>Post-Closing Confidentiality</u>. From and after the Closing, Seller Parties will, and will cause each of their Affiliates which they control to, hold in strict confidence and not use to the detriment of Purchaser or any of its Affiliates, all information with respect to the Compounding Business and the Purchased Assets. Without limiting the generality of the foregoing, Seller Parties agree, covenant and acknowledge that, from and after the Closing Date, Seller Parties will not, and will cause their Affiliates which they control not to, disclose, give, sell, use, or otherwise divulge any confidential or secret information (including but not limited to any technology, process, trade secrets, know-how, other intellectual property rights, strategies, financial statements or other financial information not otherwise publicly available, forecasts, operations, business plans, prices, discounts, products, product specifications, designs, plans, data or ideas). Notwithstanding the foregoing, Seller Parties may disclose such information (i) if compelled to disclose the same by judicial or administrative process or by other requirements of applicable Law or of any national securities exchange (but subject to the following provisions of this Section 5.10), (ii) if the same currently is, or hereafter is, in the public domain through no fault of Seller Parties, or (iii) if the same is later acquired by Seller Parties from another source and Seller Parties are not aware that such source is under an obligation to another Person to keep such information confidential. If Seller Parties or any of their Affiliates (the "<u>Disclosing Party</u>") are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any such information, the Disclosing Party shall provide Purchaser with prompt written notice of any such request or requirement so that Purchaser may seek, at its expense, a protective order or other appropriate remedy and/or waive compliance with the provisions of this Section 5.10. If, in the absence of a protective order or other remedy or the receipt of a waiver by Purchaser, the Disclosing Party nonetheless, based on the advice of counsel, is required to disclose such information to any tribunal, the Disclosing Party, without liability hereunder, may disclose that portion of such information which such counsel advises the Disclosing Party is legally required to disclose.

5.11 <u>Performance of Contracts</u>. With respect to each Contract, Seller shall duly perform and comply with all covenants, agreements and conditions required thereby to be performed or complied with by it prior to or on the Closing Date.

5.12 <u>Employees</u>. Upon the Closing, Seller shall terminate the employment of each employee, other than the Seller Shareholders and Charles Gitto (the "<u>Employees</u>"). The Purchaser shall have the right, but not the obligation, to offer employment to all the Employees on such terms as Purchaser, in its sole discretion, shall determine.

5.13 <u>Allocation for Tax Purposes</u>. The parties shall cooperate in good faith to agree on the allocation of the Purchase Price prior to the Closing and, subsequent to the Closing, shall file all federal, state and local tax returns consistent with such allocation. The parties shall complete and separately file Form 8594 with their federal income tax returns for the tax year in which the Closing occurs in accordance with such allocation, and no party hereto shall have any liability to the other arising out of any challenge to such tax allocation by any federal or state taxing authority so long as the party does not take a position inconsistent with such allocation in any tax filing or administrative or judicial proceeding.

5.14 <u>Hi-Tech Agreement</u>. Seller shall use its reasonable best efforts to enter into an agreement (the "<u>Hi-Tech Agreement</u>") with Hi-Tech Environmental Products, LLC ("<u>Hi-Tech</u>") pursuant to which Seller will sell, transfer and convey to Hi-Tech all of the inventory of products originally purchased by Seller from Hi-Tech (the "<u>Hi-Tech Inventory</u>") and held by Seller at Closing and for which Hi-Tech shall cancel certain indebtedness from Seller to Hi-Tech, evidenced by a series of promissory notes (the "<u>Hi-Tech Notes</u>"), in an amount equal to the original sales price of the Hi-Tech Inventory returned by Seller to Hi-Tech. Any portion of the Hi-Tech Notes attributable to Hi-Tech Inventory used by Seller (and, therefore, not returned to Hi-Tech) and not cancelled pursuant to the Hi-Tech Agreement will be treated as Assumed Liabilities payable by Purchaser in accordance with Section 1.4 hereof.

5.15 <u>Real Estate Purchase Agreement</u>. Seller will use its reasonable best efforts to cause Charles Gitto to enter into, and Charles Gitto will enter into, an agreement, substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Real Estate Purchase Agreement</u>"), pursuant to which Charles Gitto will sell, transfer and convey to Purchaser at Closing, free and clear of all liens, claims and encumbrances, all right, title and interest in the Purchased Real Estate for a purchase price of $3,300,000.

5.16 <u>Miller Consulting Agreement</u>. Miller and Purchaser shall enter into a consulting agreement, substantially in the form attached hereto as <u>Exhibit D</u> (the "<u>Miller Consulting Agreement</u>"), pursuant to which Miller shall provide ongoing consulting services to Purchaser on the terms set forth therein.

5.17 <u>Gitto Independent Manufacturer's Representative Agreement</u>. Gitto and Purchaser shall enter into an independent manufacturer's agreement, substantially in the form attached hereto as <u>Exhibit E</u> (the "<u>Gitto Independent Manufacturer's Representative Agreement</u>"), pursuant to which Gitto shall act as an independent manufacturer's representative of Purchaser.

5.18 <u>Assumed Contracts</u>. If after the date hereof and prior to the Closing Date, Purchaser determines that a Contract not listed on Schedule 1.1(f) shall constitute an Assumed Contract, Purchaser shall have the right, in its sole and absolute discretion, to assume such Contract and to treat such Contract as an Assumed Contract without any adjustment of the Purchase Price. Seller shall use its reasonable best efforts to obtain any necessary consent for the assignment of such Contract to Purchaser.

5.19 <u>Minimum Purchaser Financing</u>. Purchaser will use its reasonable best efforts to secure financing, from and after the date hereof, in an amount not less than $51,700,000 minus the Trade Payables reflected on the Most Recent Balance Sheet (the "<u>Minimum Purchaser Financing</u>") in order to finance the payment of the Cash Purchase Price Component, the purchase price of the Purchased Real Estate pursuant to the Real Estate Purchase Agreement and the assumption of the Other Assumed Payables. The Minimum Purchaser Financing may take the form of debt, equity or a combination of debt and equity financing, including the assumption of Other Assumed Payables, received subsequent to the date hereof and in form acceptable to Purchaser.

### ARTICLE VI
### CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS

6.1 <u>Obligations to be Satisfied on or Prior to Closing Date</u>. The obligation of Purchaser to purchase the Purchased Assets under this Agreement is subject to the satisfaction (or waiver by Purchaser), on or prior to the Closing Date, of the following conditions:

(a) <u>Accuracy of Representations and Warranties</u>. Each of the representations and warranties made by Seller and Seller Parties in this Agreement that is qualified as to materiality shall be true, correct and complete in all respects and those that are not so qualified shall be true, correct and complete in all material respects as of the date hereof and on the Closing Date as though made on such date.

(b) <u>Compliance with Agreement</u>. Seller shall have performed or complied in all material respects with the covenants, agreements and obligations required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

(c) <u>Investigation</u>. Each of Purchaser and Purchaser's agents shall have been afforded access to Seller's books and records, officers, employees, agents, facilities and personnel, as provided in Section 5.2.

27

(d) <u>Consents</u>. All consents, approvals, orders, authorizations, registrations, declarations, agreements and filings of any Person and Authorities set forth on <u>Schedule 3.25</u> shall have been obtained or made by Seller in a form reasonably satisfactory to Purchaser and delivered to Purchaser and shall be in full force and effect as of the Closing Date, and no such authorizations, agreements and consents shall impose any burdensome or, in Purchaser's reasonable determination, unsatisfactory conditions or requirements on Purchaser.

(e) <u>No Adverse Proceedings</u>. No Law shall have been enacted or promulgated, and no investigation, action, suit or proceeding shall have been threatened or instituted against Seller, Seller Parties or Purchaser as of the Closing Date, which, in any such case, in the reasonable judgment of Purchaser, challenges, or might result in a challenge to, the consummation of the transactions contemplated hereby, or which claims, or might give rise to a claim for, damages against Purchaser as a result of the consummation of such transactions.

(f) <u>No Material Adverse Change</u>. There shall have occurred no material adverse change in or with respect to the condition (financial or otherwise), business, rights, prospects, properties or assets or supplier, customer or employee relationships of Seller or the Compounding Business since the Most Recent Balance Sheet Date.

(g) <u>Schedules</u>. All amendments or supplements to the Schedules made by Seller pursuant to Section 5.4 shall be reasonably acceptable to Purchaser.

(h) <u>Closing Documents</u>. Seller shall have delivered all reports, agreements, certificates, instruments, opinions and other documents required to be delivered by Seller on the Closing Date pursuant to Section 8.3, and the form and substance of all such reports, agreements, certificates, instruments, opinions and other documents shall be reasonably satisfactory to Purchaser.

(i) <u>UCC, Tax Lien and Judgment Search Results</u>. Purchaser shall have obtained, at Seller's sole cost and expense, a report, in form and substance satisfactory to Purchaser, as to the results of an examination of financing statements filed under the Uniform Commercial Code, and tax lien and judgment records, in each office in each such jurisdiction as Purchaser shall require, and such report shall indicate no material security interests, tax liens, judgments or other Liens not previously disclosed in writing to Purchaser.

(j) <u>Environmental Matters</u>. Purchaser shall have completed such environmental audits and investigations, at Purchaser's sole cost and expense, as Purchaser may require with respect to the properties and operations of Seller, and such audits and investigations shall not have uncovered any condition or conditions which could have a material adverse effect on the Compounding Business or properties of Seller.

(k) <u>Hi-Tech Agreement</u>. Seller and Hi-Tech shall have executed and delivered to each other the Hi-Tech Agreement and, pursuant to the Hi-Tech Agreement, Seller shall have returned to Hi-Tech, or made arrangements satisfactory to Purchaser to return to Hi-Tech, the Hi-Tech Inventory and Hi-Tech shall have cancelled the principal amount of the Hi-Tech Notes equal to the purchase price of the Hi-Tech Inventory returned by Seller.

(l) <u>Real Estate Purchase Agreement</u>. Charles Gitto shall have executed and delivered to Purchaser the Real Estate Purchase Agreement and, pursuant to the Real Estate Purchase Agreement, Charles Gitto shall have sold, transferred and conveyed to Purchaser the Purchased Real Estate free and clear of all liens, claims and encumbrances.

(m) <u>Miller Consulting Agreement</u>. Miller shall have executed and delivered to Purchaser the Miller Consulting Agreement.

(n) <u>Gitto Independent Manufacturer's Representative Agreement</u>. Gitto shall have executed and delivered to Purchaser the Gitto Independent Manufacturer's Representative Agreement.

(o) <u>Purchaser Financing</u>. Purchaser shall have secured the Minimum Purchaser Financing.

28

(p) <u>Financial Statements</u>. Seller shall have delivered to Purchaser (i) audited financial statements of the Compounding Business and audited financial statements relating to the Purchased Real Estate purchased pursuant to the Real Estate Purchase Agreement at and for the periods ended December 31, 2002 and 2003, and (ii) unaudited financial statements of the Compounding Business and relating to the Purchased Real Estate at and for the interim periods from January 1, 2004 to the end of the last fiscal quarter ending prior to the Closing Date and for the same period in the prior fiscal year, which financial statements shall be prepared in accordance with GAAP and in accordance with the requirements of SEC Regulation S-X, in general, and Rule 3-05 of Regulation S-X in particular.

6.2 <u>Procedure for Failure to Satisfy Conditions</u>. In the event that any of the conditions precedent set forth above in Section 6.1 have not been satisfied, Purchaser shall notify Seller in writing indicating its election to (a) waive such condition precedent, (b) terminate this Agreement pursuant to Section 11.1, or (c) close the transactions contemplated by this Agreement, reserving its rights and remedies, without waiving such conditions precedent. In lieu of the foregoing, Purchaser and Seller may agree to consummate the transactions contemplated by this Agreement on such additional terms as are agreed to by Purchaser and Seller in writing. If, despite Seller's commercially reasonable best efforts, a third party that is not an Affiliate of Seller (the "<u>Nonconsenting Third Party</u>") refuses to grant any consent necessary for Purchaser to assume Seller's rights and obligations under a Contract listed on <u>Schedule 1.1(f)</u> hereof, Seller shall promptly notify Purchaser of its inability to obtain such consent and shall designate Purchaser as its agent for purposes of obtaining such consent. If Purchaser elects to close the transactions contemplated under this Agreement in the absence of such consent, then Purchaser shall indemnify Seller for any liability of Seller to the Nonconsenting Third Party under that Contract that arises after the Closing Date or is attributable to the period following the Closing Date or from Purchaser's decision to close in the absence of such consent.

ARTICLE VII

CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS

7.1 <u>Obligations to Be Satisfied on or Prior to Closing Date</u>. The obligations of Seller to sell the Purchased Assets under this Agreement are subject to the satisfaction (or waiver by Seller), on or prior to the Closing Date, of the following conditions:

(a) <u>Accuracy of Representations and Warranties</u>. Each of the representations and warranties made by Purchaser in this Agreement that is qualified as to materiality shall be true, correct and complete in all respects and those that are not so qualified shall be true, correct and complete in all material respects as of the date hereof and on the Closing Date as though made on such date.

(b) <u>Compliance with Agreement</u>. Purchaser shall have performed or complied in all material respects with the covenants, agreements and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c) <u>No Adverse Proceedings</u>. No Law shall have been enacted or promulgated, and no investigation, action, suit or proceeding shall have been threatened or instituted against Seller or Purchaser as of the Closing Date, which, in any such case, in the reasonable judgment of Seller, challenges, or might result in a challenge to, the consummation of the transactions contemplated hereby, or which claims, or might give rise to a claim for, damages against Seller as a result of the consummation of such transactions.

(d) <u>Closing Documents</u>. Purchaser shall have delivered all reports, agreements, certificates, instruments, opinions and other documents required to be delivered by it on the Closing Date pursuant to Section 8.4, and the form and substance of all such certificates, instruments, opinions and other documents shall be reasonably satisfactory to Seller.

7.2 <u>Procedure for Failure to Satisfy Conditions</u>. In the event that any of the conditions precedent set forth above in Section 7.1 have not been satisfied, Seller shall notify Purchaser in writing indicating its election to (a) waive such condition precedent, (b) terminate this Agreement pursuant to Section 11.1 or (c) close the transactions contemplated by this Agreement, reserving their rights and remedies, without waiving such condition precedent. In lieu of the foregoing, Purchaser and Seller may agree to consummate the transactions contemplated by this Agreement on such additional terms as are agreed to by Purchaser and Seller in writing.

29

ARTICLE VIII
CLOSING

8.1 Time and Place. The Closing shall take place at 10:00 a.m. on the Closing Date at the offices of Purchaser, 5 Hutton Centre Dr., Suite 700, Santa Ana, California 92707 or at such other time and place as Seller and Purchaser may mutually agree. The parties hereto agree to use commercially reasonable efforts to close the transactions contemplated herein within sixty (60) days from the date hereof.

8.2 Closing Transactions. All documents and other instruments required to be delivered at the Closing shall be regarded as having been delivered simultaneously, and no document or other instrument shall be regarded as having been delivered until all have been delivered.

8.3 Deliveries by Seller to Purchaser. At the Closing, Seller shall deliver or cause to be delivered to Purchaser (except insofar as the conditions related to such delivery have been waived by Purchaser):

(a) all such certificates, assignments and other documents and instruments of sale, assignment, conveyance and transfer, as Purchaser or its counsel may reasonably deem necessary or desirable to effect the transfer of the Purchased Assets to Purchaser;

(b) the certificate of incorporation of Seller, as amended, certified as of a date not earlier than twenty (20) days prior to the Closing Date by the Secretary of State of the State of Massachusetts;

(c) a certificate of the Secretary or an Assistant Secretary of Seller certifying to: (i) the bylaws, as amended, of Seller; (ii) resolutions of the board of directors of Seller authorizing and approving the execution, delivery and performance by Seller of this Agreement and any agreements, instruments, certificates or other documents executed by Seller pursuant to this Agreement; and (iii) incumbency and signatures of the officers of Seller;

(d) certificates of good standing, dated as of a recent date, for Seller from any state where Seller is required to be qualified to do business and bring down certificates of good standing in each of such jurisdictions dated the Closing Date;

(e) a certificate executed by Seller dated as of the Closing Date, certifying that all representations and warranties of Seller herein contained that are qualified as to materiality were true, correct and complete in all respects when made and are true, correct and complete in all respects as of the Closing Date as if made thereon (and to the extent that any representation or warranty herein contained refers to "the date hereof," such date shall be deemed to be the Closing Date) and those not so qualified were true, correct and complete in all material respects when made and are true, correct and complete in all material respects as of the Closing Date as if made thereon (and to the extent that any representation or warranty herein contained refers to "the date hereof," such date shall be deemed to be the Closing Date), and that Seller has performed or complied in all material respects with all of the covenants and obligations required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date;

(f) an executed original of each consent required to be obtained pursuant to Section 6.1(d);

(g) all amendments or supplements to the schedules made by Seller pursuant to Section 5.4;

(h) the Real Estate Purchase Agreement, including instruments conveying the Purchased Real Estate to Purchaser as provided for in the Real Estate Purchase Agreement;

(i) the Miller Consulting Agreement;

(j) the Gitto Independent Manufacturer's Representative Agreement; and

(k) such other instruments and documents as are required by any other provisions of this Agreement to be delivered on the Closing Date by Seller to Purchaser.

Gitto Asset Purchase Agreement 3/31/04

The foregoing shall not be construed to require Seller to use other than commercially reasonable best efforts to deliver or cause to be delivered the documents and instruments set forth in Section 8.3(f), Section 8.3(h), Section 8.3(i), Section 8.3(j) and Section 8.3(k); provided, however, that notwithstanding the foregoing, the obligations of Purchaser to purchase the Purchased Assets is subject to the delivery of each of the documents and instruments set forth in this Section 8.3.

8.4 <u>Deliveries by Purchaser to Seller</u>. At the Closing, Purchaser shall deliver or cause to be delivered to Seller (except insofar as the conditions related to such delivery have been waived by Seller):

(a) the Cash Purchase Price Component in accordance with Section 1.3(a); provided, however, that Purchaser may pay a portion, or all, of the Cash Purchase Price Component directly to creditors of Seller in payment of amounts owing by Seller at Closing;

(b) the duly executed Assumption Agreement in accordance with Section 1.3(b);

(c) a certificate executed by an officer of Purchaser, dated as of the Closing Date, certifying that all representations and warranties of Purchaser herein contained that are qualified as to materiality were true, correct and complete in all respects when made and are true, correct and complete in all respects as of the Closing Date as if made thereon and those not so qualified were true, correct and complete in all material respects when made and are true, correct and complete in all material respect as of the Closing Date as if made thereon, and that Purchaser has performed or complied in all material respects with all of the covenants and obligations required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date;

(d) the Real Estate Purchase Agreement;

(e) the Miller Consulting Agreement;

(f) the Gitto Independent Manufacturer's Representative Agreement; and

(g) such other instruments and documents as are required by any other provisions of this Agreement to be delivered on the Closing Date by Purchaser to Seller.

The foregoing shall not be construed to require Purchaser to use other than commercially reasonable best efforts to deliver or cause to be delivered the documents and instruments set forth in Section 8.4(d), Section 8.4(e), Section 8.4(f) and Section 8.4(g); provided, however, that notwithstanding the foregoing, the obligations of Seller to sell the Purchased Assets are subject to the delivery of each of the documents and instruments set forth in this Section 8.4.

8.5 <u>Determination of Final Purchase Price</u>.

(a) 60 days after the Closing Date, Purchaser shall deliver to Seller a certificate (the "*Final Purchase Price Certificate*") executed by Purchaser setting forth the calculation, in the manner reflected in <u>Exhibit F</u> attached hereto, of:

(i) the "*Final Purchase Price*", which shall be computed based on the Preliminary Closing Balance Sheet adjusted (A) up to reflect the increase, if any, in book value of Purchased Assets actually acquired at Closing as compared to the Preliminary Closing Balance Sheet, (B) down to reflect the decrease, if any, in book value of Purchased Assets actually acquired at Closing as compared to the Preliminary Closing Balance Sheet and (C) down to reflect the book value of Business Accounts Receivable acquired hereunder but remaining uncollected at the date of the Final Purchase Price Certificate (the "*Uncollected Business Accounts Receivable*");

(ii) the Trade Payables actually assumed at Closing (the "*Final Assumed Trade Payables*");

(iii) the Other Assumed Payables actually assumed at Closing (the "*Final Other Assumed Payables*");

(iv) the "*Final Net Assets Acquired*", which shall be computed based on the Final Purchase Price, less (A) the Final Assumed Trade Payables, and (B) the Final Other Assumed Payables;

(v) the "*Final Settlement Payment*", which shall be computed by subtracting the Preliminary Closing Net Assets from the Final Net Assets Acquired;

(vi) the "*Net Due to Seller on Final Settlement*", which shall be computed as the excess, if any, of the Final Net Assets Acquired over Preliminary Closing Net Assets; and

(vii) the "*Net Due to Purchaser on Final Settlement*", which shall be computed as the excess, if any, of the Preliminary Closing Net Assets over Final Net Assets Acquired.

For purposes hereof, the "*Preliminary Closing Net Assets*" shall be computed based on the Preliminary Closing Date Purchase Price, less (A) the Preliminary Closing Date Assumed Trade Payables, (B) the Preliminary Closing Date Other Assumed Payables, and (C) the Holdback.

(b) If Seller delivers written notice (the "*Disputed Items Notice*") to Purchaser within 10 days after receipt by Seller of the Final Purchase Price Certificate, stating that Seller objects to any items on the Final Purchase Price Certificate, specifying the basis for such objection and setting forth Seller's proposed modification to the Final Purchase Price, Seller and Purchaser shall attempt to resolve and finally determine and agree upon the Final Purchase Price as promptly as practicable.

(c) If Seller and Purchaser are unable to agree upon the Final Purchase Price within 10 days after delivery of the Disputed Items Notice, Seller and Purchaser will select an independent accounting firm to resolve the disputed items and make a determination of the Final Purchase Price. Such determination will be made within 30 days after such selection and will be binding upon the parties. The fees, costs and expenses of the accounting firm so selected will be borne by the party whose positions generally did not prevail in such determination, or if the accounting firm determines that neither party could be fairly found to be the prevailing party, then such fees, costs and expenses will be borne 50% by Seller and 50% by Purchaser.

(d) If Seller does not deliver the Disputed Items Notice to Purchaser within 10 days after receipt by Seller of the Final Purchase Price Certificate, the Final Purchase Price specified in the Final Purchase Price Certificate will be conclusively presumed to be true and correct in all respects and will be binding upon the parties.

(e) Not later than three Business Days after the Final Purchase Price is finally determined in accordance with this Section 8.5 (the "*Final Settlement Date*"), Purchaser shall pay to Seller any Net Due to Seller on Final Settlement and Seller will pay to Purchaser any Net Due to Purchaser on Final Settlement.

## ARTICLE IX
## OTHER AGREEMENTS

9.1 Further Assurances. At any time and from time to time from and after the Closing, Seller and Purchaser shall, at the request of the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments and other documents and perform or cause to be performed such acts and provide such information, as may reasonably be required to evidence or effectuate the sale, conveyance, transfer, assignment and delivery to Purchaser of the Purchased Assets or for the performance by Seller or Purchaser of any of their other respective obligations under this Agreement.

9.2 Access to Records After Closing. From and after the Closing Date, each party hereto and its representatives shall have reasonable access to inspect and copy all books and records relating to Seller or the Compounding Business that the other parties hereto or their respective Affiliates may retain after the Closing Date. Such access shall be afforded by the party maintaining such records upon receipt of reasonable advance notice and during normal business hours. Nothing contained in this Section 9.2 shall require Purchaser or Seller to retain any books or records longer than such books or records would otherwise have been retained in the Ordinary Course of Business but for the transactions contemplated by this Agreement; provided, however, that if the party maintaining such records shall desire to dispose of any of such books and records, such party shall, prior to such disposition, give the other party hereto a reasonable opportunity, at such other party's expense, to segregate and remove such books and records as such other party may select.

9.3 <u>Collection of Receivables</u>. From and after the Closing, Purchaser shall have the right and authority to collect for its own account all Accounts Receivable and other items that are included in the Purchased Assets and to endorse with the name of Seller, as applicable, any checks or drafts received with respect to any such Accounts Receivable or other items and Seller agrees promptly to deliver to Purchaser any cash or other property received directly or indirectly by it with respect to such Account Receivables and other items, including any amounts payable as interest. 120 days after the Closing Date (the "<u>*Receivable Settlement Date*</u>"), Purchaser shall (a) advise Seller as to the amount, if any, of Uncollected Business Accounts Receivable remaining outstanding and unpaid at the Receivable Settlement Date, (b) assign all such Uncollected Business Accounts Receivable to Seller without recourse and (c) pay to Seller an amount equal to the amount collected by Purchaser with respect to the Uncollected Business Accounts Receivable from the Final Settlement Date to the Receivable Settlement Date. From and after the Closing, through the Receivable Settlement Date, Seller agrees that if it receives any payments with respect to any Business Accounts Receivable, Seller shall promptly, and in any case within fourteen (14) days after receipt thereof by Seller, remit such amounts to Purchaser.

9.4 <u>Third Party Consents</u>. To the extent that Seller's rights under any Assumed Contract may not be assigned without the consent of another Person which has not been obtained as of the Closing Date, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Purchaser's rights under the Purchased Assets such that Purchaser would not in effect acquire the benefit of all such rights, then, Seller, to the maximum extent permitted by law and the Purchased Assets, shall act after the Closing Date as Purchaser's agent in order to obtain for it the benefits thereunder and shall cooperate with Purchaser in any other arrangement designated to provide such benefits to Purchaser.

## ARTICLE X
## INDEMNIFICATION

10.1 <u>Survival of Representations, Warranties and Indemnity</u>. The representations and warranties of the parties hereto contained in Articles III and IV and the indemnification obligations contained in this Article X shall survive the Closing and expire two years following the Closing Date; provided, however, that Purchaser's indemnification obligations pursuant to Section 10.4(a) shall not expire and shall survive the Closing indefinitely; and provided, further, that any claims which involve fraud or intentional misrepresentation shall survive the Closing indefinitely; and provided, further, that if at the stated expiration of any indemnification obligation there shall be pending any indemnification claim by a Person pursuant to which notice has been given pursuant to Section 10.7, such Person shall continue to have the right to seek such indemnification with respect to such claim notwithstanding such expiration.

10.2 <u>Indemnification by Seller and Seller Shareholders</u>. Seller and Seller Shareholders shall jointly and severally indemnify, defend and hold harmless Purchaser, its members, officers, directors, employees and agents after the Closing Date from and against any loss, liability, obligation, Lien, damage, cost and expense (including reasonable legal and accounting fees incurred in defending or prosecuting any claim for any such liability, loss or damage) ("<u>*Purchaser Losses*</u>") arising out of or resulting from:

(a) the untruth or inaccuracy as of the date hereof or on the Closing Date of any representation or warranty of Seller or Seller Shareholders contained in this Agreement or the Schedules hereto (or in any document, writing, or certificate delivered by Seller under Article VIII of this Agreement);

(b) any Excluded Liability;

(c) whether or not disclosed by Seller or Seller Shareholders in this Agreement or on Schedule 3.22, any obligation or liability of Seller or Seller Shareholders related to any actual or alleged violation or liability arising under any Environmental Laws, including, without limitation, any Release or threatened Release of Hazardous Substances occurring prior to, or if as a result of Seller's activities, present, or if, not as a result of Seller's activities, to the extent present on, the Closing Date, and any Environmental Claims arising out of events or circumstances occurring prior to or continuing on the Closing Date;

(d) any obligation or liability arising from claims, proceedings or causes of action arising from product warranty or product liability claims with respect to products, materials or services produced, invoiced, sold, performed or shipped by Seller on or prior to the Closing Date;

(e) any action, suit or proceeding pending on the Closing Date, notwithstanding disclosure thereof in this Agreement or on the Most Recent Balance Sheet or any subsequent claim, action, suit or proceeding arising out of or relating to such pending matters; or

(f) the failure by Seller or Seller Shareholders to perform any of their covenants or obligations hereunder.

10.3 <u>Limits on Indemnification by Seller and Seller Shareholders</u>. The amount of liability of Seller and Seller Shareholders for the Purchaser Losses shall be subject to the following limitations:

(a) Seller and Seller Shareholders shall have no liability under Section 10.2(a), (c), (d) or (e) until the aggregate amount of all Purchaser Losses for which Seller and Seller Shareholders would, but for this Section 10.3(a), be liable exceeds $25,000 (the "<u>*Indemnity Basket*</u>"), in which event Seller and Seller Shareholders shall, subject to Section 10.3(b), be jointly and severally liable for the total amount of all Purchaser Losses.

(b) The Indemnity Basket shall not be applicable to Purchaser Losses (i) arising or resulting from the untruth or inaccuracy of the representations made in Sections 3.1 3.2, 3.22 or 3.24, (ii) arising or relating to any breach or violation of any agreement or covenant contained in this Agreement or other documents contemplated hereby, or (iii) arising or resulting from Seller's violation of bulk sales laws.

10.4 <u>Indemnification by Purchaser</u>. Purchaser shall indemnify, defend and hold harmless Seller, its directors, officers, employees and agents after the Closing Date from and against any liability, obligation, loss, Lien, cost, damage and expense (including reasonable legal and accounting fees incurred in defending or prosecuting any claim for any such liability, loss or damage) arising out of or resulting from:

(a) the untruth or inaccuracy as of the date hereof or on the Closing Date of any representation or warranty of Purchaser contained in this Agreement (or in any document, writing or certificate delivered by Purchaser under this Agreement), or the failure by Purchaser to perform any of its covenants or obligations hereunder;

(b) any liability of Seller assumed by Purchaser hereunder and/or pursuant to the Assumption Agreement; or

(c) the operation of Purchaser and conduct of Purchaser's business following the Closing, including, without limitation, any loss, liability, obligation, Lien, damage, cost or expense arising from products produced or processed by Purchaser after the Closing.

10.5 <u>Specific Breaches</u>. The breach of a specific representation, warranty, or agreement by Seller or Purchaser, as applicable, shall be determined independently of any other representation, warranty or agreement made by Seller or Purchaser, as applicable, whether or not, apart from such specific representation, warranty or agreement, the transactions provided for in this Agreement prove to be more favorable to Purchaser or Seller, as applicable, and whether or not the facts and circumstances covered by any one or more of the other representations, warranties or agreements made by Seller or Purchaser, as applicable, prove to be more favorable than so represented and warranted.

10.6 <u>Cross-indemnification for Broker's, Consultant's or Finder's Fees</u>. Subject to the provisions of Section 3.31 and Section 4.6, Purchaser and Seller each agree to indemnify and hold harmless the other from and against any and all losses, liabilities, obligations, Liens, damages, costs and expenses of any kind or character arising from any claims for broker's, consultant's or finder's fees or commissions or other similar fees in connection with the transactions covered by this Agreement, insofar as such claims shall be based upon alleged arrangements or agreements made by such party or on its behalf, which indemnity expressly shall survive any termination of this Agreement or any Closing hereunder.

10.7 Procedure for Indemnification.

(a) If any Person shall claim indemnification (the "*Indemnified Party*") hereunder for any claim other than a third party claim, the Indemnified Party shall promptly give written notice to the other party from whom indemnification is sought (the "*Indemnifying Party*") of the nature of the claim in detail and amount of the claim. If an Indemnified Party shall claim indemnification hereunder arising from any claim or demand of a third party (a "*Third-Party Claim*"), the Indemnified Party shall promptly give written notice (a "*Third-Party Notice*") to the Indemnifying Party of the basis for such claim or demand, setting forth the nature of the claim or demand in detail and the amount of the claim.

(b) In the event that an Indemnifying Party which receives notice of an indemnification claim contests its liability for such indemnification claim, such party shall send written notice to the Indemnified Party of its dispute of indemnification within 15 days thereof. If the parties are unable to resolve such dispute of indemnification within 60 days after the date of the notice of dispute, the Indemnified Party may bring an action against the Indemnifying Party to enforce such indemnification claim.

(c) The Indemnifying Party shall have the right to compromise or, if appropriate, defend at its own cost and through counsel of its own choosing, any claim or demand giving rise to any such claim for indemnification. In the event the Indemnifying Party undertakes to compromise or defend any such claim or demand, it shall promptly (and in any event, no later than fifteen (15) days after receipt of a Third-Party Notice) notify the Indemnified Party in writing of its intention to do so. The Indemnified Party shall fully cooperate with the Indemnifying Party and its counsel in the defense or compromise of such claim or demand. After the assumption of the defense by the Indemnifying Party, the Indemnified Party shall not be liable for any legal or other expenses subsequently incurred by the Indemnifying Party, in connection with such defense (unless the Indemnifying Party disputes its liability for such indemnification claim and an arbitration pursuant to Section 12.12 determines that the Indemnifying Party is not liable to indemnify the Indemnified Party), but the Indemnified Party may participate in such defense at its own expense. No settlement of a Third-Party Claim defended by the Indemnifying Party shall be made without the written consent of the Indemnified Party, such consent not to be unreasonably withheld. The Indemnifying Party shall not, except with the written consent of the Indemnified Party, consent to the entry of a judgment or settlement of a Third-Party Claim which does not include as an unconditional term thereof, the giving by the claimant or plaintiff to the Indemnified Party of an unconditional release from all liability in respect of such Third-Party Claim.

10.8 Payment. Except for Third-Party Claims being defended in good faith by the Indemnifying Party in accordance with Section 10.7, the Indemnifying Party shall satisfy its obligations hereunder within fifteen (15) days after receipt of notice of a claim, unless the Indemnifying Party has contested its liability for indemnification pursuant to Section 10.7(b) in which case no payment shall be due from the Indemnifying Party unless its liability therefore is established by final nonappealable court order or judgment and fifteen (15) days have passed since the entry of such order or judgment. Any amount not paid to the Indemnified Party by such date shall bear interest at a rate equal to the prime as announced by Bank of America, N.A., or, if Bank of America, N.A. ceases to exist, any other major New York bank reasonably selected by the Indemnified Party.

10.9 Reduction for Insurance and Taxes. The amount of any payment to any Indemnified Party pursuant to this Article X shall be reduced by the amount of any insurance proceeds actually received by or on behalf of the Indemnified Party in reduction of the related indemnifiable loss. An Indemnified Party which subsequently receives insurance proceeds in respect of the related indemnifiable loss shall pay to the Indemnifying Party the amount of such actually received insurance proceeds. Where any tax benefit is available to the Indemnified Party with respect to an indemnifiable event, the amount of any payment with respect to such indemnifiable loss shall be reduced dollar for dollar by the amount of such tax benefit actually received.

10.10 Remedies Exclusive. The remedies provided in this Article X shall be the exclusive remedies of the parties hereto after the Closing in connection with any breach of a representation or warranty, non-performance, partial or total, of any covenant or agreement contained herein or any other matter relating to the transactions contemplated hereby. Purchaser agrees to pursue all claims for Purchaser Losses solely against Seller as provided in this Agreement. Nothing contained herein, however, shall preclude a party from seeking injunctive relief or specific performance, under circumstances where such relief might be appropriate, provided that the moving party shall not be entitled to ancillary relief in the nature of damages or fee awards unless specifically so provided for herein.

10.11 <u>No Consequential Damages</u>. The Indemnifying Party shall not be liable to the Indemnified Party for consequential, enhanced, punitive or special damages or the like unless such damages are included in a Third-Party Claim and the Indemnified Party is liable to the third party claimant for such damages.

10.12 <u>Bulk Sales</u>. Notwithstanding anything herein to the contrary, Seller and Seller Shareholders will indemnify and hold harmless Purchaser and the other Purchaser Indemnities from and against any and all Losses resulting from or arising out of any noncompliance or alleged noncompliance by Purchaser or Seller with bulk sales laws.

### ARTICLE XI
### TERMINATION

11.1 <u>Rights to Terminate</u>. This Agreement may be terminated at any time prior to the Closing only as follows:

(a) by mutual written consent of Seller and Purchaser;

(b) by Seller if Purchaser is in material breach of any representation, warranty or covenant under this Agreement (and Seller is not then in material breach of any representation, warranty or covenant);

(c) by Purchaser if Seller is in material breach of any representation, warranty or covenant under this Agreement (and Purchaser is not then in material breach of any representation, warranty or covenant);

(d) by Seller or by Purchaser if, at or before the Closing Date, any condition set forth herein for the benefit of Seller or Purchaser, respectively, shall not have been timely met and cannot be met on or before the Closing Date and has not been waived;

(e) by Purchaser in the manner described in Section 3.34; or

(f) by Purchaser or Seller if the Closing shall not have occurred on or before 90 days after the date of this Agreement.

Each party's right of termination hereunder is in addition to any of the rights it may have hereunder.

11.2 <u>Effects of Termination</u>. In the event of termination of this Agreement as permitted by Section 11.1, this Agreement shall become void and of no further force and effect, except for the following provisions, which shall remain in full force and effect: (a) Sections 3.32 and 4.6 relating to brokers or consultant's fees, (b) Section 5.6 relating to publicity, (c) this Section 11.2, and (d) Article XII. Nothing in this Section 11.2 shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement or misrepresentations made herein. Further, notwithstanding any provision herein to the contrary, nothing in this Agreement shall be deemed to impair the right of Purchaser to compel specific performance by any other party of its obligations under this Agreement. Notwithstanding any provision herein to the contrary, Seller and Seller Parties will have no rights, and hereby waive any rights, to compel specific performance by Purchaser and, in the event of termination, Purchaser liability to Seller and any Seller Parties hereunder, if any, shall in no event exceed the Escrow Amount and Seller's remedies shall be limited to rights with respect to the Escrow Amount on the terms and subject to the limitations and conditions set forth in the Escrow Agreement.

### ARTICLE XII
### MISCELLANEOUS PROVISIONS

12.1 <u>Notices</u>. All notices or other communications required or permitted by this Agreement shall be in writing and shall be deemed to have been duly received (a) if given by telecopier, when transmitted and the appropriate telephonic confirmation received if transmitted on a business day and during normal business hours of the recipient, and otherwise on the next Business Day following transmission, (b) if given by certified or registered mail, return receipt requested, postage prepaid, three Business Days after being deposited in the U.S. mails and (c) if given by courier or other means, when received or personally delivered, and, in any such case, addressed as follows:

Gitto Asset Purchase Agreement 3/31/04

(i)    if to Purchaser:

VitroTech Corporation
5 Hutton Centre Dr.
Suite 700
Santa Ana, California 92707
Attention: Jess Rae Booth, President
Telephone: (714) 708-4700
Facsimile:  (714) 708-4701

and

Michael W. Sanders, Attorney at Law
20333 S.H. 249, Suite 600
Houston, Texas 77070
Telephone: (832) 446-2599
Facsimile:  (832) 446-2424

(ii)    if to Seller:

c/o Gary Gitto
PO Box 503 ]
[Lunenbury MA 01462 ]
Telephone: (978) 685-5315 ]
Facsimile: (  ) [          ]

with a copy to:

[                    ]
[                    ]
[                    ]
Attention: [         ]
Telephone: (  ) [    ]
Facsimile: (  ) [     ]

or to such other addresses as may be specified by any such Persons to the other Persons, pursuant to notice given by such Person in accordance with the provisions of this Section 12.1.

12.2 <u>Assignment</u>. No party may assign or transfer any or all of its rights or obligations under this Agreement without the prior written approval of the other party; provided, however, that Purchaser may assign or transfer all (but not less than all) of its rights and obligations under this Agreement (a) to any Person that is wholly-owned, directly or indirectly, by Purchaser or is an Affiliate of Purchaser or (b) after the Closing, to any Person to whom Purchaser sells all or substantially all the Purchased Assets, provided further, that at any time Purchaser may collaterally assign its rights hereunder to any Person or Persons providing financing to Purchaser in connection with the transactions contemplated hereby.

12.3 <u>Benefit of the Agreement</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except as set forth in Article X with respect to indemnification of indemnified parties hereunder, nothing in this Agreement shall confer any rights upon any Person other than the parties hereto and their respective successors and assigns.

12.4 <u>Exhibits and Schedules</u>. The Exhibits and Schedules hereto shall be construed with and as an integral part of this Agreement to the same effect as if the contents thereof had been set forth verbatim herein. References in this Agreement and in the Schedules are made for convenient reference only, and all matters disclosed in any Schedule shall be deemed to be disclosed in each Schedule.

12.5 <u>Headings</u>. The headings used in this Agreement are for convenience of reference only and shall not be deemed to limit, characterize or in any way affect the interpretation of any provision of this Agreement.

37                          Gitto Asset Purchase Agreement 3/31/04

12.6 Entire Agreement. This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and no other representations, promises, agreements or understandings regarding the subject matter hereof shall be of any force or effect unless in writing, executed by the party to be bound thereby and dated on or after the date hereof.

12.7 Modifications and Waivers. No change, modification or waiver of any provision of this Agreement shall be valid or binding unless it is in writing, dated subsequent to the date hereof and signed by Purchaser and Seller. No waiver of any breach, term or condition of this Agreement by any party shall constitute a subsequent waiver of the same or any other breach, term or condition.

12.8 Counterparts. This Agreement may be executed in counterparts (including by facsimile transmission), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.9 Severability. In case any one or more of the provisions contained herein for any reason shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

12.10 GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA (EXCLUSIVE OF THE CONFLICT OF LAW PROVISIONS THEREOF).

12.11 Expenses. Other than as specifically provided in this Agreement, each party hereto shall pay all of its own costs and expenses incurred or to be incurred in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

12.12 JURISDICTION; WAIVER OF JURY TRIAL; VENUE.

(a) EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY CALIFORNIA STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN ORANGE COUNTY, CALIFORNIA, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH CALIFORNIA STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT ANY PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT IN THE COURTS OF ANY OTHER JURISDICTION.

(b) EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(c) EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY CALIFORNIA STATE OR FEDERAL COURT SITTING IN ORANGE COUNTY, CALIFORNIA. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

12.13 Seller Acknowledgement. Seller acknowledges that the representations and warranties contained in this Agreement and in any document or instrument delivered to Purchaser pursuant hereto or in connection herewith shall not be deemed waived or otherwise affected by any investigation by Purchaser, its officers, directors, employees, counsel, accountants, advisors, representatives and agents.

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement the date first written above.

GITTO/GLOBAL COPORATION

By: _____
Title: PRESIDENT

VITROTECH CORPORATION

By: _____
Name: Jess Rae Booth
Title:   Chief Executive Officer

GITTO PARTIES:

_____
GARY GITTO

_____
FRANK MILLER

_____
CHARLES GITTO, JR.

EXHIBIT 12

CSB EXECUTIVE COMMITTEE
MEETING MINUTES

3167

_CLINTON SAVINGS BANK_
_EXECUTIVE COMMITTEE MEETING_
_MAY 25, 2004_

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher and Ross. Also present were President Cash, SVP Gill, SVP Guercio and VP Paulhus. Absent was Ms. King.

**3168**

Clinton Savings Bank
Executive Committee Meeting
5/25/04

Mr. Davis asked the Committee if everyone knew that there is a policy that corporators and business owners have immediate availability of funds deposited. Mr. Cash stated that all business accounts have that service. Mr. Guercio stated that this service has given the Bank a competitive edge and that it has been a good policy, but there is the activity of one business account which is currently being monitored. Mr. Davis asked management to report on the monitoring of this account. Mr. Cash updated the Committee on what has been happening with an account from Gitto Global. After hearing the details, Mr. Cherubini felt that it was necessary to review the policy on immediate availability of funds and that it may be wise to put a cap on the amount of funds available to limit the Bank's risk. Mr. Davis asked why the Executive Committee had not been updated on this situation before. Mr. Gill responded to Mr. Davis stating that he has been informing the Committee of the large deposits being made at the Bolton ATM during the presentation of the financials but had not specifically mentioned Gitto Global. Mr. Cash stated that Mr. Tenaglia and Ms. Parker have closely monitored the account activity, met with and been in frequent telephone contact with the person responsible for this account to hopefully resolve the situation.

The Executive Committee asked SVP Tenaglia to come into the meeting.

Mr. Tenaglia entered the meeting at 8:28 a.m.

Mr. Tenaglia informed the Committee of the current status of this situation noting information provided upon the bank's request and the expectation of higher collected balance levels. Mr. Cherubini asked Mr. Tenaglia if by next meeting the Committee could have a report of how this funds availability service is being used and Mr. Tenaglia agreed to provide the information requested. Mr. Tenaglia also stated that he will contact the account holder and inform him that there must be sufficient collected funds available in the account.

Mr. Tenaglia left the meeting at 8:57 a.m.

3169

Clinton Savings Bank
Executive Committee Meeting
5/25/04

With no further business to discuss the meeting was adjourned at 10:13 a.m.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3175

_CLINTON SAVINGS BANK_
_EXECUTIVE COMMITTEE MEETING_
_JUNE 15, 2004_

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher and Ross. Also present were President Cash, SVP Gill and SVP Guercio. Absent was Ms. King.

Mr. Farragher asked about the Gitto Global situation and Mr. Cash stated that an agreement had been drafted by counsel from Seder & Chandler and sent to Gitto Global. The agreement is a guarantee secured by a lien on equipment owned by Gitto Global. Mr. Cash added that Mr. Tenaglia would update the Board on this situation. Mr. Cherubini asked who was paying for the legal services and Mr. Cash stated that Gitto Global was. Mr. Cherubini asked that this matter be addressed at the next Directors' meeting. Mr. Cash stated three options to mitigate the risk to the Bank on this matter: 1) require a hold on check deposited; 2) increase the available balance in the account or 3) institute a guarantee agreement with secured collateral.

Mr. Farragher asked if the proposed agreement would cover all the uncleared funds and Mr. Cash stated that it would. Mr. Cash also added that there could be various possible options to resolve this type of situation, one could be to change the policy and the other could be to come up with some type of measure to reduce the risk. Mr. Cherubini asked if there was any benefit to the Bank regarding Gitto Global and Mr. Cash stated that he saw no economic benefit to the Bank.

The Committee decided to table this discussion until Mr. Tenaglia comes into the meeting.

3177

Clinton Savings Bank
Executive Committee Meeting
6/15/04

Mr. Tenaglia entered the meeting at 9:45 a.m.

Mr. Tenaglia updated the Committee on the Gitto Global relationship. He stated that an agreement has been prepared by Bank's counsel to place a lien on equipment owned by Gitto Global with an estimated value of $21 million dollars and with a currently unencumbered value of approximately $13 million. Mr. Cherubini asked what would happen with the relationship after the scheduled sale of the company on July 1st, 2004 and Mr. Tenaglia stated that the transactions should cease and the lien would be released. Mr. Ross asked if the funds now in the account were frozen and Mr. Tenaglia stated that there is a hold on the account and that the balance can not go below the $1.2 million dollars of collected balances. Mr. Ross asked what the possibility would be of having the agreement signed by the end of this week and Mr. Tenaglia stated that they would have no other choice. It was voted to have the agreement signed by June 18th, 2004 or the transactions would have to cease.

With no further business to discuss the meeting was adjourned at 10:09 a.m.

_____          _____
Clerk, Executive Committee                        Chairman, Executive Committee

3178

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*JUNE 22, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross. Also present were President Cash, SVP Gill, SVP Guercio and SVP Tenaglia.

Mr. Tenaglia updated the Committee on the Gitto Global situation. He stated that last Thursday the guaranteed agreement was signed. He stated that the sale of the business is on track and scheduled to close on July 1st, 2004. Mr. Tenaglia distributed copies of a review on the Policy to Pay on Uncollected Funds (See File).

3179

**Clinton Savings Bank**
**Executive Committee Meeting**
**6/22/04**

Mr. Paulhus and Ms. Plaza entered the meeting at 8:05 a.m.

The Committee decided to table this discussion until after Mr. Paulhus and Ms. Plaza's presentation.

3180

Clinton Savings Bank
Executive Committee Meeting
6/22/04

Mr. Tenaglia continued with the discussion on the review of the Policy on Paying on Uncollected Funds previously started. He reviewed the document previously distributed to the Committee members. He explained that the last page of the document was a three (3) day report on the use of this service. Mr. Tenaglia pointed out that there are four steps that are being recommended to minimize the risk presented by the current policy (See file for details). Mr. Davis asked if Clinton Savings Bank was the only bank that had this policy and Mr. Tenaglia stated that no, Digital Credit Union has also adopted a similar policy.

Mr. Cherubini voiced his concern regarding this policy and regarding the Gitto Global relationship. He stated that he feels that even with the guarantee agreement in place the Bank is not completely covered from risk. Mr. Cash explained that all of the checks deposited to the Gitto Global account have cleared but risk existed in that if any of the checks deposited did not clear then the Bank would have to start legal procedures to collect the funds. Mr. Cash stated that some type of parameter could be inserted in the procedures to review and assess transaction activity that exceeds a certain amount. Mr. Tenaglia stated that right now an analysis is set at $10,000 for review and assessment. Ms. King asked if this analysis took into consideration all other types of accounts that are under the relationship and Mr. Tenaglia answered that if a trend is detected the corporate relationship with Clinton Savings Bank would be assessed for an appropriate decision. Mr. Cash suggested adding to the procedures a review of large deposit activity. Mr. Tenaglia stated that currently every check over $5,000 is manually reviewed. Ms. King suggested that this policy review be shared with the Board of Directors at the next meeting. Mr. Paulhus stated that he has reviewed the Policy and agrees with it. Mr. Tenaglia will make the recommended changes and present the document to the Board of Directors.

Mr. Paulhus and Ms. King left the meeting at 9:34 a.m.

3181

Clinton Savings Bank
Executive Committee Meeting
6/22/04

With no further business to discuss the meeting was adjourned at 10:40 a.m.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3182

*CLINTON SAVINGS BANK*
*SPECIAL EXECUTIVE COMMITTEE MEETING*
*JULY 1, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross. Also present were President Cash, SVP Gill, SVP Guercio and SVP Tenaglia.

Mr. Cash stated that this meeting is to inform the Committee members on the status of the Gitto-Global situation. He distributed a package of material which included a list showing a detailed update on the situation, a draft of a letter from Mr. Tenaglia to Mr. Frank Miller, a copy of a letter from the accounting firm conducting an audit of Gitto-Global and a copy of the extension from VitroTech Corporation (See file for details).

Mr. Tenaglia stated that he has had various discussions with Mr. Miller, regarding this situation. Mr. Miller has provided information tracking the checks deposited to LaSalle Bank which shows that the checks are being paid a day after the deposit. Mr. Tenaglia added that the expectation is to have the sale completed by July 15th.

Mr. Davis asked if an extension agreement had been received and Mr. Tenaglia stated that the documents that had been received were the letters from VitroTech and the accounting firm but that there is no guarantee that the sale will happen on July 15th.

Ms. King questioned the fact that the letter from the accounting firm states that they haven't been able to complete the audit procedure because the client has not provided them with the necessary information.

Mr. Tenaglia reviewed the conditions for continuance of service stating that Mr. Miller must keep him informed of the status of the sale of Gitto-Global by communicating with him at least twice a week.

Mr. Tenaglia explained that the Bank is asking Gitto-Global to pay a fee in lieu of interest for the processing of the transactions. The fee is for providing Kingsdale Corporation immediate availability of checks from January 1, 2004 through June 30, 2004. Mr. Davis asked Mr. Tenaglia to explain who Kingsdale Corporation was and Mr. Tenaglia stated that it is an affiliate company of Gitto-Global and that this is the name that appears on the Bank's account. Mr. Tenaglia stated that Mr. Miller is the Operating Officer of both companies and that in this type of industry this is not an unusual situation.

Ms. King asked if Kingsdale Corporation was part of the sale agreement and Mr. Tenaglia stated that he understood that the Corporation would be dissolved upon the execution of the sale.

Mr. Tenaglia continued to explain that there is also a request for compensation beginning on July 1st in the amount of $300 per day and the amount will be deducted from the Kingsdale account on Friday of each week. Mr. Tenaglia stated that he also reminded Mr. Miller that he must maintain a minimum collected balance of $1.2 million dollars in the account.

Mr. Cherubini asked why it was not mentioned on the letter that a cap of $4 million was the maximum amount of exposure the Bank is willing to accept and Mr. Tenaglia stated that he would amend the letter and add the cap as a condition.

3183

Clinton Savings Bank
Special Executive Committee Meeting
7/01/04

Mr. Davis brought up the point mentioned by Ms. King earlier that Mr. Miller should
have provided the accountants with all of his financial information by June 30th. He
stated that maybe this could be grounds to immediately terminate this relationship
because it may be a breach of the extension agreement. Mr. Cash responded that a
clarification may be needed.

Mr. Tenaglia stated that after Monday's Board of Director's meeting, he e-mailed Mr.
Miller with an update and that he discussed the July 1st deadline but that he did not give
Mr. Miller a formal written notification stating that the Bank would end the relationship
on that date. Mr. Tenaglia added that he understood from Monday's meeting that the
Board had decided to allow counsel from both parties to speak and that the Executive
Committee would meet after to make a decision based on the recommendation from the
Bank's counsel. This is the reason why he did not formally communicate to Mr. Miller
any final decision.

Mr. Cherubini suggested to the Committee that a date be decided on to terminate the
relationship and that a letter should be sent to Mr. Miller to inform him of the decision.

Ms. King stated that there must be another document that asks for an extension of the
June 30th deadline. Mr. Tenaglia stated that he could contact Mr. Miller to ask him if
there is such a document.

Mr. Tenaglia left the meeting at 8:15 a.m. to call Mr. Miller.

Mr. Tenaglia entered the meeting at 8:23 a.m. and stated to the Committee that he spoke
to Mr. Miller and that Mr. Miller explained that he provided the information required two
weeks ago.

Mr. Cherubini asked management why the date was set for July 15th and Mr. Tenaglia
explained that this was the date mentioned on the extension agreement.

3184

**Clinton Savings Bank**
**Special Executive Committee Meeting**
**7/01/04**

Mr. Cash recapped the information presented up to this point and stated that there were three options available. These options are: 1) End the relationship today; 2) Send Mr. Miller notification that the relationship would end in 5 – 7 days or 3) End the relationship on July 15th.

Mr. Farragher stated that he feels that ending the relationship today would produce a risk to the Bank of a lawsuit and that the best course of action would be to end it on July 15th.

Ms. King suggested that Atty. Seder speak to Atty. Angelini to verify that the extension is still valid. Ms. King also agreed with Mr. Farragher's suggestion but she added that this relationship would have to end on July 15th whether the deal consummates or not.

The Committee unanimously voted to:

1) Send the drafted letter to Mr. Miller with the changes mentioned.
2) Send a second letter to Mr. Miller stating that after July 15th the Bank would no longer continue paying checks against uncollected funds, on any Gitto/Global related entities.

With no further business to discuss the meeting was adjourned at 8:55 a.m.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3185

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*JULY 6, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross. Also present were President Cash, SVP Gill and SVP Guercio.

3186

Clinton Savings Bank
Executive Committee Meeting
7/6/04

Mr. Cash updated the Committee on the status of the Gitto-Global situation. He stated
that the drafted letter presented to the Committee last Thursday was revised and faxed to
Mr. Miller. Mr. Miller signed the letter agreeing to the terms and faxed it back to Mr.
Tenaglia. Mr. Farragher asked if all of the financial information was given to the
accountants and Mr. Cash stated that Mr. Tenaglia had said last week that Mr. Miller had
provided the information requested in the extension agreement. Mr. Cherubini asked if a
certified letter would go out to Mr. Miller stating that the practice of paying against
uncollected funds would end on July 15th and Mr. Cash stated that Mr. Tenaglia would be
sending that letter out.

**3187**

**Clinton Savings Bank**
**Executive Committee Meeting**
**7/6/04**

With no further business to discuss the meeting was adjourned at 8:25 a.m.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3188

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*JULY 13, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross. Also present were President Cash and SVP Guercio.

3191

Clinton Savings Bank
Executive Committee Meeting
7/13/04

Mr. Tenaglia gave an update on the Gitto Global situation. He stated that the fees requested had been secured on Friday, July 9th. He received a call from Mr. Miller on Saturday and at that time Mr. Tenaglia informed Mr. Miller that any checks deposited on Thursday, July 15, 2004 would not be immediately available. Mr. Cherubini asked if a certified letter had been mailed to Mr. Miller informing him of this fact and Mr. Tenaglia stated that two certified letters were sent out and have been received by Mr. Miller.

Mr. Tenaglia noted that Mr. Miller had a new proposal for the Committee, this proposal includes the sale of the building and land. He stated that Mr. Miller informed him that the buyers of Gitto Global are also buying the building and the land, the sale would take place on July 23, 2004. The proposal presented by Mr. Miller is to use the proceeds of the sale which should be about $3 million dollars and deposit it in an escrow account until the final sale of the business.

Ms. King asked why Mr. Miller couldn't wire the funds instead of depositing a paper check and Mr. Tenaglia stated that he doesn't know if that would work. He has not presented that idea to Mr. Miller but he will talk to him about that.

The Committee decided to continue with the course of action taken at the July 1st meeting.

With no further business to discuss the Committee went into Executive Session at 10:00 a.m.

_____          _____
Acting Clerk, Executive Committee         Chairman, Executive Committee

3192

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*JULY 20, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross. Also present were President Cash and SVP Guercio.

3193

Clinton Savings Bank
Executive Committee Meeting
7/20/04

Mr. Tenaglia entered the meeting at 8:30 a.m.

Mr. Cash updated the Committee on the Gitto Global/Kingsdale Corporation situation. He stated that on July 15th the checks from Kingsdale Corporation were not returned as stated on the letter mailed to Mr. Frank Miller.

3194

**Clinton Savings Bank**
**Executive Committee Meeting**
**7/20/04**

He stated that after speaking with                    the parties involved he feels
that this decision was the correct one.  He pointed out to the Committee that there are two
options to be considered.  The first one is to go forward with the decision to terminate the
relationship or the second option is to put together a new agreement that includes
securing additional collateral.

Mr. Cherubini asked if the Bank had secured additional collateral

Mr. Cash                                                  stated that it
was wise to extend the date in order to secure additional collateral to reduce or mitigate
the risk to the Bank.

After some discussion the Committee decided to authorize management to take the
necessary actions it deemed necessary to protect the Bank.  The Committee noted it
would review the loan agreement that is created.

Mr. Tenaglia and Mr. Paulhus left the meeting at 9:50 a.m.

With no further business to discuss the Committee went into Executive Session at
10:20 a.m.

_____          _____
Acting Clerk, Executive Committee          Chairman, Executive Committee

3195

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*AUGUST 3, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross. Also present were President Cash, SVP Gill and SVP Guercio.

3196

Clinton Savings Bank
Executive Committee Meeting
8/03/04

Mr. Harmon provided an update on the Gitto Global/Kingsdale Corporation situation. He stated that an agreement was signed on July 23rd setting up the Line of Credit for Kingsdale Corporation. Mr. Harmon stated that his last conversation with Mr. Frank Miller indicated that the auditors are getting close to finishing the audit. He added that a public announcement has been made by VitroTech and Mr. Cash highlighted parts of that public announcement concerning the purchase of Gitto Global.

Mr. Harmon stated that the agreement signed extends the deadline date to August 16, 2004, at that time if the sale of the business does not occur, the Bank could stop payment of the checks.

Mr. Harmon gave a detailed explanation to the Committee of the type of business VitroTech conducts and the interest they have in purchasing Gitto Global.

Mr. Cherubini asked Mr. Harmon if he felt that the Bank had enough collateral now and Mr. Harmon answered in the affirmative. Mr. Harmon gave a detailed report of the collateral that the Bank acquired by the Line of Credit agreement. Mr. Harmon pointed out that the only issue holding up the sale is the completion of the audit.

Mr. Tenaglia entered the meeting at 8:10 a.m.

Mr. Davis stated that some of the Directors not present would like to be updated on the Gitto Global/Kingsdale situation. He suggested that the next Executive Committee meeting be opened to all the Directors. Mr. Cash stated that during that meeting the Committee, Directors and Management could discuss possible steps that could be taken if the sale of the business is not completed by the August 16th date. The Committee agreed to open up the meeting to all Directors.

Ms. King asked if Mr. Harmon could provide a summary of everything that has happened with Gitto Global/Kingsdale Corporation and provide a full report to the Directors at the meeting next week. Mr. Harmon agreed to provide a full report next week.

Mr. Harmon left the meeting at 8:20 a.m.

Clinton Savings Bank
Executive Committee Meeting
8/03/04

3197

With no further business to discuss the Committee went into Executive Session without management.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3198

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*AUGUST 10, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King, Ross, Dziurgot, O'Neil, Wheeler, Kilcoyne, Schmidt and Quill. Also present were President Cash, SVP Gill, SVP Guercio, SVP Tenaglia, VP Paulhus and AVP Harmon.

Mr. Paulhus presented a loan presentation regarding **Kingsdale Corporation** (Frank Miller), 77 Snead Drive, Mashpee, MA. He highlighted the transaction, including all cash, securities and collateral pledged and secured by Kingsdale, Gitto Global Corporation and Tradex Corporation, as well as the pledge of 3,000,000 shares of VitroTech common stock. Mr. Paulhus then indicated that a phone call to Frank Miller yesterday (8/9/04) indicated that the anticipated closing on 8/15/04 will be pushed out several days. Mr. Paulhus stated that he presented the Bank's displeasure with this new development, and indicated that additional collateral and fees may be in order. He stated that Mr. Miller was not surprised by this and that at that point he did not offer anything further.

Mr. Kilcoyne asked if a conversation had taken place with VitroTech, and Mr. Tenaglia indicated that a phone call had taken place two weeks ago, and that at that time VitroTech was very positive about continuing to move forward.

Mr. O'Neil asked what collateral items could be kicked out as preference items if Kingsdale were to file bankruptcy,                                Mr. Cherubini asked about controlling the inventory, and Mr. Paulhus indicated that the inventory has not been reviewed as yet.

Mr. O'Neil left the meeting at 8:00 a.m.

Mr. Cash indicated that the Bank will still have an exposure of up to 48 hours, even if the closing date is reached. This would be the time frame that LaSalle Bank in Chicago could have to return items.

Mr. Cherubini asked what mechanism is in place to continue the checking account activity after the closing, and Mr. Paulhus indicated that Kingsdale Corporation and LaSalle Bank will go away after the closing.

Mr. Schmidt asked about Gitto Global's profitability and Mr. Paulhus stated that the 6/30/03 financials had been reviewed and although there has been dramatic growth in the past year, the profitability has not been that great. Mr. Schmidt then asked how many checks were involved on a daily basis, and Mr. Tenaglia indicated that 35 checks in denominations of $50,000 - $100,000 dollars all between Kingsdale and Gitto Global.

Mr. Kilcoyne asked Mr. Paulhus to explain the multiple delays, and Mr. Paulhus indicated that several references to Sarbanes Oxley and the due diligence to audit the inventory as well as VitroTech's decision to go public prior to the purchase of Gitto Global were major deterrents.

Mr. Guercio asked the Board to ratify the loan documents as presented, and to provide management with the ability to extend the date of the contract to August 27th, 2004 if necessary. Voted to approve.

3201

Clinton Savings Bank
Executive Committee Meeting
8/10/04

At 10:25 a.m. management was dismissed and the Board went into Executive Session.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3202

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*AUGUST 17, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross. Also present were President Cash, SVP Gill, SVP Guercio, VP Paulhus and AVP Harmon.

Mr. Paulhus presented a loan presentation regarding **Kingsdale Corporation** (Frank Miller), 50 Independence Drive, Ayer, MA. He updated the Committee on the status of this situation. He stated that he has had various telephone conversations with Mr. Miller, Mr. Charles Gitto and with the Bank's counsel. His last conversation was with Mr. Charles Gitto and he explained to the Committee the details of that conversation. He added that at that time Mr. Gitto did not pledge any additional collateral and that he has made it clear to both Mr. Miller and Mr. Gitto that Board approval is necessary today in order to continue paying on the checks.

Mr. Paulhus is recommending the extension of the existing $8,000,000 credit facility to Kingsdale Corp. through September 15, 2004. He added that this extension coincides with the most recent signed extension of the VitroTech and Gitto Global Corporation sale agreement. Mr. Paulhus added that he is requiring additional guarantees from Tradex Corporation, Mr. Charles Gitto and Mr. Gary Gitto included in the extension agreement.

Mr. Paulhus reviewed with the Committee the information requested from Mr. Frank Miller and the information that has been submitted so far. Mr. Paulhus explained that the auditing firm working on the sale, in a letter, stated the need for additional time to finish their audit and that they are waiting for information from Gitto's staff to finish testing the inventory procedures. The letter indicated a September 1st estimate for completion of their work.

Mr. Cash asked what options were available and Mr. Paulhus stated that the Bank could continue to pay checks drawn on Kingsdale's account against uncollected funds and ask that the additional information and guarantees requested be submitted or the Bank could return the checks if Kingsdale does not comply with the requested information.

3203

Clinton Savings Bank
Executive Committee Meeting
8/17/04

Mr. Farragher asked what would happen if the Bank decided to return the checks and Mr. Paulhus reviewed the return process and possible consequences.

Mr. Cherubini asked what would be the best course of action to protect the Bank and both Mr. Cash and Mr. Paulhus agreed that the best course of action would be for VitroTech and Gitto Global to finalize the deal.

Mr. Cherubini asked if the Bank would be in the same situation on September 15th if the deal is not consummated and Mr. Cash stated that it could, but that an exact answer depends on the circumstances surrounding the situation at that time. Mr. Paulhus discussed options available to the Bank.

After some discussion the Committee approved the revolving line of credit extension subject to an agreement from Kingsdale Corp. on August 17, 2004 that the Bank receives a commitment in support by unlimited guarantees from Tradex Corporation, Mr. Gary Gitto and Mr. Charles Gitto, or a deficiency guarantee as a result of a shortfall of collateral. See file for details. Voted to approve.

Mr. Paulhus and Mr. Harmon left the meeting at 9:00 a.m.

3204

Clinton Savings Bank
Executive Committee Meeting
8/16/04

With no further business to discuss, the meeting was adjourned at 10:10 a.m.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3205

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*AUGUST 24, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher, King and Ross.  Also present were President Cash, SVP Gill, SVP Guercio, VP Paulhus and AVP Harmon.

3206

**Clinton Savings Bank**
**Executive Committee Meeting**
8/24/04

Mr. Paulhus updated the Committee on the status of the Kingsdale Corporation situation.
He stated that after many negotiations an extension agreement was signed.  This
agreement extends the existing $8,000,000 credit facility to Kingsdale Corp. through
September 15, 2004 and it includes an unlimited guarantee from Gary Gitto, an unlimited
deficiency guarantee by Tradex Corp., an unlimited deficiency guarantee from Charles
Gitto and a third mortgage on Frank Miller's home.  All documents were executed on
Wednesday afternoon.  The agreement also asked that the additional information
previously requested be submitted and that a $40,000 extension fee be paid.  $20,000 of
this amount has already been paid and the other $20,000 has been added to the exiting
fee.

Mr. Paulhus explained that Mr. Miller has spoken to his accountant and that tax returns
for Kingsdale Corporation are forthcoming.  He added that inventory schedules were
received by the auditors and that they were satisfactory to them.  Mr. Paulhus also stated
that he has asked Mr. Miller to provide third party documentation to back up verbal
information provided by him.

Mr. Paulhus stated that last week, he and Mr. Harmon visited the Leominster warehouse
where the Tradex inventory is located.  He stated that there were over 300 pallets of
material with an estimated value over $3 million dollars.  Mr. Cherubini asked if this
inventory could be used by other companies and Mr. Paulhus stated that it could but he
couldn't specifically state which companies because of the special nature of this
compound.

3207

Clinton Savings Bank
Executive Committee Meeting
8/24/04

With no further business to discuss, the meeting was adjourned at 9:10 a.m.

_____
Clerk, Executive Committee

_____
Chairman, Executive Committee

3208

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*SEPTEMBER 7, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher and King. Also present were President Cash, SVP Gill, SVP Guercio and VP Paulhus. Absent was Mr. Ross.

Mr. Cash and Mr. Paulhus updated the Committee on the Gitto Global/Kingsdale situation. Mr. Cash stated that last week they became aware of a regulatory filing by VitroTech which stated that the asset purchase agreement with Gitto Global had been terminated. The filing also included a notice that the Chairman/CEO of VitroTech had resigned effective December. Management ·

concluded
that a breach of the agreement had not taken place and therefore checks were not returned.

3209

Clinton Savings Bank
Executive Committee Meeting
09/07/04

:

Mr. Cherubini asked Mr. Paulhus to explain how the termination of the asset sale agreement did not constitute a breach of the line of credit agreement. Mr. Paulhus stated that the documents as structured did not state that if the asset sale agreement was terminated that the line of credit agreement would also be terminated.

Mr. Farragher asked if the September 15th date was still the deadline date and Mr. Paulhus answered in the affirmative. Mr. Paulhus added that the only way he feels that this date could be extended is if a commitment letter from another lender is received.

3211

**Clinton Savings Bank**
**Executive Committee Meeting**
**09/07/04**

With no further business to discuss, the meeting was adjourned at 10:36 a.m.

Clerk, Executive Committee

Chairman, Executive Committee

3212

*CLINTON SAVINGS BANK*
*EXECUTIVE COMMITTEE MEETING*
*SEPTEMBER 14, 2004*

Chairman Davis called the meeting to order at 7:30 a.m.

MEMBERS PRESENT: Directors Cherubini, Davis, Farragher and King.  Also present were President Cash, SVP Gill, SVP Guercio and VP Paulhus. Absent was Mr. Ross.

3213

Clinton Savings Bank
Executive Committee Meeting
09/14/04

Mr. Cash and Mr. Paulhus updated the Committee on the Gitto Global/Kingsdale situation. Mr. Paulhus stated that there has been no official communication from Gitto Global or any of its principals. Mr. Paulhus indicated that the last time that he communicated with Mr. Frank Miller was two weeks ago when he left him a message and he has not received a reply to his message. Mr. Cash stated that there has been some conversations between counsels but nothing definitive.

Mr. Cherubini asked if the only way an extension would be granted was if a verifiable commitment letter from another lender was received and Mr. Paulhus answered in the affirmative.

Mr. Tenaglia explained that the Bank has until midnight on Wednesday to notify the Federal Reserve of the decision to return the checks and then the Federal Reserve would notify Fleet of the returned items. Mr. Tenaglia discussed the process of returning the checks.

3215

**Clinton Savings Bank**
**Executive Committee Meeting**
**09/14/04**

Mr. Cash asked the
Committee if they had any questions or concerns regarding the strategic options
management was considering regarding action to be taken on September 15th relative to
the Gitto Global/Kingsdale situation. The Committee stated that they want management
to make the decision deemed best for the bank but that they want to be informed once a
decision is made.

With no further business to discuss, the meeting was adjourned at 9:18 a.m.

Clerk, Executive Committee

Chairman, Executive Committee

EXHIBIT 13

CSB MONTHLY DIRECTORS'
MEETING MINUTES

004

*MONTHLY DIRECTORS MEETING*
*CLINTON SAVINGS BANK*
*JUNE 1, 2004*

Chairman Davis called the meeting to order at 7:45 a.m.

MEMBERS PRESENT: Directors Cash, Cherubini, Davis, Dziurgot, Farragher, Kilcoyne, O'Neil, Quill, Ross, Schmidt and Wheeler. Also present were SVP Gill, SVP Guercio and SVP Tenaglia. Absent was Ms. King.

007

Clinton Savings Bank
Monthly Board of Directors Meeting
06/01/04

volves a situation where a business customer is making daily deposits in the range of $2.5 - $4 million dollars and then drawing checks on those funds which have not yet cleared. Mr. Tenaglia explained to the Board that business customers have immediate availability of funds deposited, this is a service that the Bank offers. He also stated that this person has been contacted and has been asked to increase the funds in his account or to cease the transactions. The customer has deposited an additional .5 million dollars to the account to bring available balances to $1.2 million dollars and is in the process of getting additional funds. The customer also has stated that he is in the process of selling the business.

Mr. O'Neil asked if there was a limit to the amount of the transactions and Mr. Tenaglia stated that not at this point. He added that the Executive Committee has asked him to provide a report on how this funds availability service is being used and that the Committee will review this report and will then make a recommendation.

Mr. Tenaglia added that the account holder has provided enough evidence to show that this is a legal transaction. Mr. Kilcoyne stated that there could be great risk to the Bank and that something should be done to reduce this risk.

Mr. Cash stated that the Board could mandate some collateral. Mr. Tenaglia stated that by the time all the paperwork for the collateral is finished, the account could be closed because a sale of the business is scheduled for July 1st, 2004.

The Board asked Mr. Tenaglia to convey to the customer that he needs to increase his deposit and/or to have collateral to reduce the risk to the bank. Mr. Tenaglia is to give a report on the collateral and the deposits to the Executive Committee next week.

009

Clinton Savings Bank
Monthly Board of Directors Meeting
06/01/04

With no further business to discuss, the meeting was adjourned at 11:10 a.m.

_____
Clerk, Executive Committee

_____
Chairman of the Corporation        jv

010

### MONTHLY DIRECTORS MEETING
### CLINTON SAVINGS BANK
### JUNE 28, 2004

Chairman Davis called the meeting to order at 8:00 a.m.

MEMBERS PRESENT:  Directors Cash, Cherubini, Davis, Dziurgot, Farragher, Kilcoyne, King, O'Neil, Quill, Ross, Schmidt and Wheeler.  Also present were SVP Gill, SVP Tenaglia, Mr. Paulhus and Ms. Plaza.  Absent was SVP Guercio.

014

Clinton Savings Bank
Monthly Board of Directors Meeting
06/28/04

Mr. Cash presented an update to the Board on the Gitto Global situation. He distributed two letters from Mr. Frank Miller, President of Gitto Global (See file for details). Mr. Cash stated that the sale transaction of Gitto Global will not occur as planned on July 1st because the accountants have not finished the audit. The date for the sale is now scheduled for mid July. Mr. Cash stated that he personally spoke to Mr. Miller regarding this matter and that Mr. Miller stated that a disruption of the banking relationship would have a significant impact on the pending sale of the company. Mr. Miller is asking the Bank not to take any action until counsel from both parties can have an opportunity of discussing this matter in more detail.

Mr. O'Neil stated that he would like to see a cap placed as to the amount of deposits to minimize the risk. He suggested a cap of $4 million dollars in deposits and only paying on checks deposited up to that amount.

Mr. O'Neil suggested that maybe there should also be levels of approvals implemented in the policy going forward.

Mr. Tenaglia stated that Mr. Miller has agreed to pay the Bank a fee for this service of approximately $30,000.

The Board decided to allow the respective counsels to speak and to allow the Executive Committee to continue to monitor this situation meeting again on July 1st, 2004 at 7:30 a.m. Mr. Tenaglia will contact Mr. Miller and notify him of the decision of the Board.

015

Clinton Savings Bank
Monthly Board of Directors Meeting
06/28/04

With no further business to discuss, the meeting was adjourned at 12:05 p.m.

_____
Clerk, Executive Committee

_____
Chairman of the Corporation          jv

**016**

*QUARTERLY BOARD OF DIRECTORS MEETING*
*CLINTON SAVINGS BANK*
*JULY 26, 2004*


Chairman Davis called the meeting to order at 8:00 a.m.

MEMBERS PRESENT: Directors Cash, Cherubini, Davis, Dziurgot, Farragher, Kilcoyne, King, O'Neil, Quill, Ross, Schmidt and Wheeler. Also present were SVP Gill, SVP Guercio and SVP Tenaglia.

Mr. Cash updated the Directors a                on the Gitto Global/Kingsdale situation. He stated that an agreement was signed on Friday securing additional collateral. The agreement is structured as a Line of Credit for Kingsdale Corporation to solely cover possible overdrafts due to checks paid on uncollected funds. Mr. Cash added that right now there is $2.2 million dollars in cash in accounts as collateral. Additional collateral includes security interests in the machinery, equipment and business real estate. In addition Gitto Global has pledged 3 million shares of VitroTech stock as additional collateral and materials inventory owned by Tradex Corp.

017

Clinton Savings Bank
Quarterly Board of Directors Meeting
July 26, 2004

Ms. King asked what had happened to the 1st mortgage on the house and Mr. Cash stated that during the negotiations they were not willing to add the house as collateral but provided the Tradex real estate.

Mr. Cash added that in addition to the collateral, Kingsdale Corporation would be paying a $40,000 fee. They would also pay prime plus 4 on uncollected fund balances and a $150,000 exit fee to release all collateral.

Mr. Frackleton asked if under different circumstances the Bank would have made this loan and Mr. Cash answered that they wouldn't. Mr. Frackleton stated that in a liquidation situation you can never get the full appraised value and that this indicates that there is still great exposure to the Bank.

017-C

**Clinton Savings Bank**
**Quarterly Board of Directors Meeting**
**July 26, 2004**

At this time Mr. Davis asked Management to explain why the Directors had not been notified earlier of the situation with Gitto Global/Kingsdale Corporation. Mr. Cash and Mr. Guercio explained how the relationship with Mr. Miller, President of Kingsdale Corporation started and how it all evolved to this point. Mr. Cash acknowledged the failure of management in informing the Directors.

The Board had a lengthy discussion regarding the Gitto Global/Kingsdale Corporation matter. Mr. Cash stated that management will continue to closely monitor this situation and plan for possible future action.

Mr. O'Neil asked when a policy would be in place to prevent this from happening again and Mr. Cash stated that there is a policy in place and that internal controls were established. Those internal controls are now being utilized to detect any trends within this practice. Mr. O'Neil asked if there were any other practices that the Directors were not aware of. Mr. Tenaglia stated that he would work on putting together a package with a list of all current practices.

Mr. Kilcoyne added that the policy of paying on uncollected funds should be a topic of discussion at the next Director's meeting.

Mr. O'Neil stated that he was uncomfortable with the policy and controls as he understood them, as well as waiting a month for a new proposal.

Mr. Cash stated that management will work on outlining a policy and control procedure and will mail out the information to the Directors on Friday.

With no further business to discuss the meeting adjourned at 12:20 p.m.

_____
Clerk, Executive Committee

_____
Chairman, Board of Directors          jv

039

**_MONTHLY BOARD OF DIRECTORS MEETING_**
**_CLINTON SAVINGS BANK_**
**_AUGUST 30, 2004_**

Chairman Davis called the meeting to order at 8:00 a.m.

MEMBERS PRESENT: Directors Cash, Cherubini, Davis, Dziurgot, Farragher, Kilcoyne, King, O'Neil, Quill, Ross, Schmidt and Wheeler. Also present were SVP Gill, SVP Tenaglia and VP Paulhus.

041

Clinton Savings Bank
Monthly Board of Directors Meeting
08/30/04

Mr. Paulhus updated the Board on the Gitto Global/Kingsdale Corporation situation. He stated that the Executive Committee at their meeting of August 17th approved an extension to the existing $8,000,000 credit facility to Kingsdale Corp. through September 15, 2004. This extension included an unlimited guarantee from Gary Gitto, an unlimited deficiency guarantee by Tradex Corp., an unlimited deficiency guarantee from Charles Gitto and a third mortgage on Frank Miller's home. He added that this extension coincides with the most recent signed extension of the VitroTech and Gitto Global Corporation sale agreement. All documents were executed on August 18, 2004. This agreement also asked that the additional information previously requested be submitted and that a $40,000 extension fee be paid. $20,000 of this amount has already been paid and the other $20,000 has been added to the exiting fee. Mr. Paulhus stated that this latest agreement strengthens the Bank's position. Mr. Paulhus explained that he continues to communicate with Mr. Miller and that he had a formal meeting with him last Friday. Mr. Paulhus added that Mr. Miller is flying out to California with Atty. Angelini to meet with representatives of VitroTech to discuss and to try to get additional information on the status of the sale of Gitto Global. Mr. Paulhus explained that Mr. Miller stated that he is researching other options to get CSB out if the sale of the company does not occur before the September 15th deadline date.

Mr. Paulhus stated that two weeks ago, he and Mr. Harmon visited the Leominster warehouse where the Tradex inventory is located. He stated that there were over 300 pallets of material stored at the facility.

Mr. Kilcoyne asked what would be the maximum exposure the Bank would have if the checks were returned and Mr. Paulhus explained that they are working on determining what the net exposure would be. He added that the net exposure would depend on when the decision is made to return the checks but that there could be a potential of two days exposure at approximately $4 million dollars per day.

Mr. Paulhus stated that upon Mr. Miller's return from California he will ask for additional information regarding third party financing alternatives.

Ms. Quill asked Mr. Paulhus if he was concerned about the audit work and Mr. Paulhus stated that he was more concerned about the lack of information received from Mr. Miller. He stated that the audit is very extensive and detailed and therefore may need additional time to be completed. Ms. Quill asked about a scenario where the asset sale agreement is terminated. Mr. Paulhus responded that he was unclear if that would trigger a default in the new agreement.

Mr. Cash stated that another issue that could be holding up the sale could be that VitroTech has not secured the necessary financing.

Mr. O'Neil asked why the date of the 15th had been selected and Mr. Paulhus stated that the September 15th date coincided with the last extension agreement signed by VitroTech and Gitto Global.

Mr. Tenaglia stated that he will be meeting with a representative from the Federal Reserve to review and discuss more fully the details of the return check process.

042

**Clinton Savings Bank**
**Monthly Board of Directors Meeting**
**08/30/04**

Mr. Davis asked Mr. Paulhus if he had received financial information from Kingsdale Corporation. Mr. Paulhus explained that 2002 and 2003 tax returns were received but 2003 had not yet been filed.   The returns were signed by Mr. Miller but not his accountant.

Mr. Kilcoyne stated that at this time he feels the Bank should be proactive regarding this matter and looking at ways to minimize the exposure.

Mr. O'Neil agreed with Mr. Kilcoyne's comment that the Bank must be proactive regarding this situation but stated that it is important to have knowledge on how the Bank is best protected if bankruptcy becomes an issue.

Mr. Cherubini asked if someone was keeping track of the legal and other expenses incurred and Mr. Paulhus stated that all legal expenses have been paid by the borrower. He explained that the expenses are paid from the Kingsdale Corporation operating account.

044

Clinton Savings Bank
Monthly Board of Directors Meeting
08/30/04

With no further business to discuss the meeting adjourned at 10:55 a.m.

_____
Clerk, Executive Committee

_____
Chairman, Board of Directors          jv

EXHIBIT 14

GUARANTY, DATED AS OF JUNE 16, 2004,
BY GITTO GLOBAL CORPORATION TO CSB

## GUARANTY

TO: CLINTON SAVINGS BANK (the "Bank")

1. <u>Guaranty of Payment and Performance of Obligations</u>: In consideration of the Bank's extending credit or otherwise in its discretion giving time, financial facilities or accommodations to **KINGSDALE CORP.**, a Massachusetts corporation (the "Customer"), the undersigned, **GITTO GLOBAL CORPORATION**, a Massachusetts corporation (the "Guarantor"), hereby unconditionally guarantees to the Bank that (a) the Customer will duly and punctually pay or perform, at the place specified therefor, or if no place is specified, at the Bank's Head Office or at the branch of the Bank where this Guaranty is given, all indebtedness, obligations and liabilities, direct or indirect, matured or unmatured, primary or secondary, certain or contingent, of the Customer to the Bank now or hereafter owing or incurred, including, but not limited to, all automatic clearing house liabilities of the Customer to the Bank, all obligations of the Customer arising from any and all overdrafts in any deposit account of the Customer maintained with the Bank, arising, <u>inter alia</u>, from the issuance of checks against uncollected funds (including without limitation costs and expenses incurred by the Bank in attempting to collect or enforce any of the foregoing) to the date of payment hereunder (collectively the "Obligations" and individually an "Obligation"); and (b) if there is an agreement evidencing or executed and delivered in connection with any Obligation, the Customer will perform in all other respects strictly in accordance with the terms thereof. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Customer of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that the Bank first attempt to collect any of the Obligations from the Customer or resort to any security or other means of obtaining payment of any of the Obligations which the Bank now has or may acquire after the date hereof, or upon any other contingency whatsoever. Upon any default by the Customer in the full and punctual payment and performance of the Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option of the Bank, become forthwith due and payable to the Bank without demand or notice of any nature, all of which are expressly waived by the Guarantor. Payments by the Guarantor hereunder may be required by the Bank on any number of occasions

2. <u>Guarantor's Further Agreement to Pay</u>: The Guarantor further agrees, as the principal obligor and not as a guarantor only, to pay to the Bank forthwith upon demand, in funds immediately available to the Bank, all costs and expenses (including court costs and reasonable legal expenses) incurred or expended by the Bank in connection with this Guaranty and the enforcement hereof (the AExpenses@) together with interest on the Expenses from the time such Expenses are incurred until payment at a per annum rate of interest of ten percent (10%).

3. <u>Unlimited Liability of Guarantor</u>: The liability of the Guarantor hereunder shall be unlimited

4. <u>Security; Set-off</u>: The Guarantor grants to the Bank, as security for the full and punctual payment and performance of the Guarantor's obligations hereunder, a continuing lien on and security interest in all securities or other property belonging to the Guarantor now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Guarantor or subject to withdrawal by the Guarantor; and regardless of the adequacy of any collateral or other means of obtaining repayment of the Obligations, the Bank may at any time and without notice to the Guarantor set off the whole or any portion or portions of any or all such deposits and other sums against amounts payable under this Guaranty, whether or not any other person or persons could also withdraw money therefrom.

5. <u>Bank's Freedom to Deal with Customer and Other Parties</u>: The Bank shall be at liberty, without giving notice to or obtaining the assent of the Guarantor and without relieving the Guarantor of any liability hereunder, to deal with the Customer and with each other party who now is or after the date hereof becomes liable in any manner for any of the Obligations, in such manner as the Bank in its sole discretion deems fit, and to this end the Guarantor gives the Bank full authority in its sole discretion to do any or all of the following things: (a) extend credit, make loans and afford other financial accommodations to the Customer at such times, in such amounts and on such terms as the Bank may approve, (b) vary the terms and grant extensions or renewals to Customer or to any such other party, (c) grant time, waivers and other indulgences in respect thereto, (d) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any security or guaranty or other means of obtaining payment of any of the Obligations which the Bank now has or acquires after the date hereof, (e) accept partial payments from the Customer or any such other party, (f) release or discharge, wholly or partially, any endorser or guarantor, and (g) compromise or make any settlement or other arrangement with the Customer or any such other party.

6. <u>Unenforceability of Obligations Against Customer; Invalidity of Security or Other Guaranties</u>: If for any reason the Customer has no legal existence or is under no legal obligation to discharge any of the Obligations undertaken or purported to be undertaken by it or on its behalf, or if any of the moneys included in the Obligations have become irrecoverable from the Customer by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantor to the same extent as if the Guarantor at all times had been the principal debtor on all such Obligations. This Guaranty shall be in addition to any other guaranty or other security for the Obligations and it shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security.

7. <u>Waivers by Guarantor</u>: The Guarantor waives: notice of acceptance hereof, notice of any action taken or omitted by the Bank in reliance hereon, and any requirement

that the Bank be diligent or prompt in making demands hereunder, giving notice of any default by the Customer or asserting any other right of the Bank hereunder. The Guarantor also irrevocably waives, to the fullest extent permitted by law, all defenses which at any time may be available in respect of the Guarantor's obligations hereunder by virtue of any homestead exemption, statute of limitations, valuation, stay, moratorium law or other similar law now or hereafter in effect.

8. <u>No Contest with Bank</u>: So long as any Obligation remains unpaid or undischarged, the Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by the Bank) or by any means or on any other ground, claim any set-off or counterclaim against the Customer in respect of any liability of the Guarantor to the Customer or, in proceedings under the Bankruptcy Code or insolvency proceedings of any nature, prove in competition with the Bank in respect of any payment hereunder or be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of the Customer or the benefit of any other security for any Obligation which, now or hereafter, the Bank may hold or in which it may have any share

9. <u>Demands and Notices</u>: Any demand or notices required or permitted hereunder shall be in writing and shall be effective when delivered in hand or mailed by registered or certified mail, return receipt requested as follows

  If to Bank:      Clinton Savings Bank
            200 Church Street
            Clinton, MA 01510
            Attn: Michael Tenaglia, Senior Vice President

  If to Guarantor:     Gitto Global Corporation
            140 Leominster-Shirley Road
            Lunenburg, MA 01462
            ATTN: Chief Operating Officer

10. <u>Amendments, Waivers Etc.</u>: No provision of this Guaranty can be changed, waived, discharged or terminated except by an instrument in writing signed by the Bank and the Guarantor expressly referring to the provision of this Guaranty to which such instrument relates; and no such waiver shall extend to, affect or impair any right with respect to any Obligation which is not expressly dealt with therein. No course of dealing or delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto

11. <u>Miscellaneous Provisions</u>: This Guaranty is intended to take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall inure to the benefit of the Bank and its

successors in title and assigns, and shall be binding on the Guarantor and the Guarantor's successors in title, assigns, and legal representatives

IN WITNESS WHEREOF, **GITTO GLOBAL CORPORATION**, has caused this Guaranty to be duly executed, under seal, and delivered by its corporate officer, thereunto duly authorized this _16_ day of June, 2004.

**GITTO GLOBAL CORPORATION**

By: _____

Chief Operating Officer

Witness _____

-4-

EXHIBIT 15

SECURITY AGREEMENT, DATED AS OF JUNE 16, 2004,
BY AND BETWEEN GITTO GLOBAL CORPORATION AND CSB

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated June 16, 2004 is between GITTO GLOBAL CORPORATION, a Massachusetts corporation (herein called "Debtor"), with a place of business at 140 Leominster-Shirley Road, Lunenburg, Massachusetts 01462 and CLINTON SAVINGS BANK, a Massachusetts savings bank established under the laws of the Commonwealth of Massachusetts and having its principal place of business at 200 Church Street, Clinton, Massachusetts 01510 (herein called "Secured Party").

WHEREAS, Debtor has executed and delivered to the Secured Party an instrument of guaranty dated of even date herewith guaranteeing the obligations of its affiliate, Kingsdale Corp., a Massachusetts corporation, to and in favor of the Secured Party (the "Guaranty").

NOW THEREFORE, it is agreed as follows:

1. Definitions.

(a)  The term "State", as used herein, means the Commonwealth of Massachusetts.  All terms defined in the Uniform Commercial Code of the State ("UCC") and used herein shall have the same definitions herein as specified therein; provided, however, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term shall have the meaning herein as specified in said Article 9.

(b)  "Obligations" means the Guaranty and any and all other obligations, liabilities, indebtedness, advances and loans owing by the Debtor to the Secured Party of every kind and description, direct or indirect, absolute or contingent, primary or secondary, secured or unsecured, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money.

2. Grant of Security Interest.  To secure the timely payment, performance and observance of all of the Debtor's Obligations to Secured Party, Debtor hereby grants to Secured Party a continuing security interest in and pledges, assigns and grants to Secured Party a right of setoff against the following property of Debtor, wherever located, (including the proceeds, insurance proceeds and products thereof) whether now existing or owned by the Debtor or owned, acquired, created or arising hereafter (all of the same being hereinafter referred to as the "Collateral"):

all machinery, equipment, and furniture.

Although proceeds are covered by this Agreement, the Secured Party has not authorized and does not authorize the sale or transfer of any of the Collateral by the Debtor except for the sale of obsolete machinery, equipment and furniture in the normal course of Debtor's business.

3. Authorization to File Financing Statements.  The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral as (i) all machinery, equipment and furniture of the Debtor or words of similar effect, regardless of whether any particular asset constituting any Collateral falls within the scope of Article 9 of the UCC or the Uniform Commercial Code of such jurisdiction, or (ii) being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Debtor is an organization, the type of organization and any organization identification number issued to the Debtor.  The Debtor agrees to furnish any such information to the Secured Party promptly upon request.  The Debtor also ratifies its authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction, including the State, any like initial financing statements or amendment thereto if filed prior to the date hereof.

4. Representations, Warranties and Covenants.  Debtor represents, warrants and covenants that:

(a)   It is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has the corporate power and authority to own its properties and to transact the business in which it is engaged;

(b)   It has the corporate power and authority to perform the Obligations and to execute, deliver and perform and consummate the transactions contemplated by this Security Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance of the Guaranty and this Security Agreement;

(c)   The Guaranty and this Security Agreement constitute the legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms;

(d)   The execution, delivery and performance of the Guaranty and this Security Agreement will not violate any law or regulation, or any order or decree of any court or governmental

2

instrumentality, or any provision of the charter or by-laws of, or any securities issued by, the Debtor, and will not conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which the Debtor is a party or by which it is bound, and will not result in the creation or imposition of any lien, charge or encumbrance upon any of the property of the Debtor pursuant to the provisions of any of the foregoing;

(e)  No consent of any other person (including, without limitation, stockholders and creditors of the Debtor) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental instrumentality is required in connection with the execution, delivery, performance, validity or enforceability of the Guaranty or this Security Agreement;

(f)  The chief executive office of the Debtor and the office where Debtor keeps its books and records relating to the Collateral, and all locations of Collateral are at the addresses set forth on Exhibit "A" hereto;

(g)  Debtor will not change its state of incorporation or organization, its name, its mailing address, its organizational identification number (if it has one), its legal structure, its chief executive office, the office where its books and records are kept, or any locations of Collateral without prior written notice to and consent of Secured Party;

(h)  If the Debtor does not, as of the date hereof, have an organizational identification number but obtains one hereafter, the Debtor shall forthwith notify the Secured Party of such organization identification number;

(i)  Except for liens in favor of Secured Party and except for liens set forth on Exhibit "B" hereto annexed, the Debtor is the owner of the Collateral and the Collateral is free and clear of all liens and Debtor will not create or suffer to exist any lien on any of the Collateral;

(j)  Debtor will not assign, pledge, grant a security interest in, transfer, sell, lease or otherwise dispose of any Collateral, except for inventory sold or consumed in the ordinary course of Debtor's business;

(k)  The Collateral is being used, and will continue to be used, in Debtor's business and not for personal, family, household or farming use;

(l)  Debtor will use the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with

all applicable laws, ordinances and regulations;

(m)   The Collateral is now and shall remain personal property, and Debtor will not permit any Collateral to become a fixture without prior written notice to and consent of Secured Party at least thirty (30) days prior to the commencement of such use;

(n)   Debtor will keep the Collateral at all times insured by such insurance as Secured Party may from time to time reasonably require and in any event and without specific request by Secured Party will insure the Collateral against fire, including so-called extended coverage, theft and, in the case of any motor vehicle, collision. The Debtor also shall maintain insurance of the kinds, covering the risks and in the relative amounts usually carried by companies engaged in businesses similar to Debtor. All such insurance shall be written by such companies as Secured Party shall reasonably approve, the Secured Party and Debtor named as insureds and loss payees as their respective interests may appear. All policies of insurance shall provide for not less than twenty (20) days' notice of cancellation, change, or termination to Secured Party and, if requested by Secured Party, all policies of insurance shall be delivered to and held by it until all of the Obligations have been fully paid, performed and observed. Debtor shall provide to Secured Party, at least annually, certificates evidencing insurance;

(o)   Debtor will, at its sole cost and expense, perform all acts and execute all documents required by Secured Party from time to time to evidence, perfect, maintain or enforce Secured Party's security interest granted herein, or otherwise to carry out the provisions and purposes of this Security Agreement, including, but not limited to, all acts set forth in paragraph 5;

(p)   In its discretion, Secured Party may, at any time and from time to time, for the account of Debtor, pay any amount or do any act required of Debtor hereunder which Debtor fails to do or pay, and any such payment shall be deemed an Obligation payable on demand together with interest at the highest rate then payable on any of the Obligations;

(q)   Debtor has not, during the five-year period prior to the date hereof, been known by or used any tradename, fictitious name or any corporate name other than Debtor's name as set forth on Page 1 hereof, which is Debtor's exact legal name, and all invoices in connection with or which evidence Debtor's accounts receivable are billed under such corporate name;

(r)   If any proceeds of Collateral are received by Debtor which, pursuant to the provisions hereof are to be received by or

turned over to Secured Party, Debtor shall not commingle such proceeds with any of its other property, shall hold such proceeds in trust for Secured Party and shall immediately deliver the same to Secured Party in the form received;

(s) All statements in the Perfection Certificate annexed hereto as Exhibit "A" are true and correct; and

(t) The Debtor has at all times conducted its business and will from and after the date hereof conduct its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes, ordinances and regulations dealing with the control, shipment, storage and disposal of oil, hazardous materials and hazardous substances.

5. Other Actions. Further to insure the attachment, perfection and first priority of, and the ability of the Secured Party to enforce the Secured Party's security interest in the Collateral, the Debtor agrees, in each case at the Debtor's own expense, to take the following actions with respect to the following Collateral:

(a) Collateral in the Possession of a Bailee. If any of the Collateral is at any time in the possession of a bailee, the Debtor shall promptly notify the Secured Party thereof and, if requested by the Secured Party, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and shall act upon the instructions of the Secured Party, without the further consent of the Debtor.

(b) Other Actions as to any and all Collateral. The Debtor further agrees to take any other action reasonably requested by the Secured Party to ensure the attachment, perfection and second priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code, to the extent, if any, that the Debtor's signature thereon is required therefor, (b) causing the Secured Party's name to be noted as Secured Party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (c) complying with any provisions of the statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to

enforce, the Secured Party's security interest in such Collateral, (d) obtaining governmental and other third party consents and approvals, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to Secured Party, and (f) taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.

6. Inspection of Collateral. Debtor shall at all reasonable times and from time to time allow the Secured Party, by or through any of its officers, or agents to enter the Debtor's premises as listed on Exhibit "A" for the purpose of inspecting the Collateral.

7. Default, Remedies Upon Default. Upon the failure of the Debtor to pay, perform or observe any Obligation, and at any time thereafter, Secured Party may, without notice to or demand upon Debtor, declare any and all Obligations immediately due and payable and Secured Party shall have the following rights and remedies (to the extent permitted by applicable law), in addition to all rights and remedies of Secured Party under the Guaranty, and all rights and remedies of a secured party under the Uniform Commercial Code, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently, at such time or times as Secured Party shall deem expedient:

(a) Secured Party may at any time and from time to time, with or without judicial process or the aid and assistance of others, enter upon any premises in which any Collateral may be located and, without resistance or interference by Debtor, take possession of the Collateral, and/or dispose of any Collateral on any such premises, and/or require Debtor to assemble and make available to Secured Party at the expense of Debtor any Collateral at any place and time designated by Secured Party which is reasonably convenient to both parties, and/or remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof and/or sell, resell, lease, assign and deliver, grant options for or otherwise dispose of any Collateral in its then condition with or without following any commercially reasonable preparation or processing, at public or private sale or proceedings or otherwise, by one or more contracts, in one or more parcels or lots, at the same or different times, with or without having the Collateral at the place of sale or other disposition, for cash and/or credit, and upon any terms, at such place(s) and time(s) and to such person(s) as Secured Party deems best, all without demand, notice or advertisement whatsoever except where an applicable statute

requires reasonable notice of sale or other disposition. Debtor hereby agrees that the sending of ten (10) days' notice (as provided in paragraph 17. hereof) shall be deemed reasonable notice thereof. If any Collateral is sold by Secured Party upon credit or for future delivery, Secured Party shall not be liable for the failure of the purchaser to pay for same and in such event Secured Party may resell such Collateral. Secured Party may buy any Collateral at any public sale and, if any Collateral is of a type customarily sold in a recognized market or is of the type which is subject to widely distributed standard price quotations, Secured Party may buy such Collateral at private sale and in each case may make payment therefor by any means, provided that payment is made in full by Secured Party upon the later of the time of such sale and the taking of delivery of such Collateral.

(b) Secured Party may apply the cash proceeds actually received from any sale or other disposition of Collateral to the reasonable expense of retaking, holding, preparation for sale, selling, leasing and the like, to reasonable attorneys' fees and all legal, travel and other expenses which may be incurred by Secured Party in attempting to collect the Obligations or to enforce this Security Agreement, or in the prosecution or defense of any action or proceeding related to the subject matter of this Security Agreement; and then to the Obligations in such order and as to principal or interest as Secured Party may determine; and Debtor shall remain liable and will pay Secured Party, on demand, any deficiency remaining after the application of such cash proceeds, together with interest thereon at the rate of ten percent (10%) per annum and the balance of any expenses unpaid, with any surplus to be paid to Debtor, subject to any duty of Secured Party imposed by law to the holder of any other security interest in the Collateral known to Secured Party. Within a reasonable time following the application of cash proceeds, Secured Party shall provide Debtor with a reasonable accounting of the Obligations to which such proceeds have been applied.

8. Standards for Exercising Remedies. To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party (a) to fail to incur expenses reasonably deemed significant by the Secured Party to prepare Collateral for disposition (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to remove liens or encumbrances on or any adverse claims against Collateral, (d) to advertise dispositions of Collateral through publications or media of general circulations, whether or not the Collateral is

7

of a specialized nature, (e) to contact other persons, whether or
not in the same business as the Debtor, for expressions of
interest in acquiring all or any portion of the Collateral, (f)
to hire one or more professional auctioneers to assist in the
disposition of Collateral, whether or not the Collateral is of a
specialized nature, (g) to dispose of Collateral by utilizing
Internet sites that provide for the auction of assets of the
types included in the Collateral or that have the reasonable
capability of doing so, or that match buyers and sellers of
assets, (h) to dispose of assets in wholesale rather than retail
markets, (i) to disclaim disposition warranties, (k) to purchase
insurance or credit enhancements to insure the Secured Party
against risks of loss, collection or disposition of Collateral or
to provide to the Secured Party a guaranteed return from the
collection or disposition of Collateral, or (j) to the extent
deemed appropriate by the Secured Party, to obtain the services
of brokers, investment bankers, consultants and other
professionals to assist the Secured Party in the collection or
disposition of any of the Collateral. The Debtor acknowledges
that the purpose of this paragraph 8. is to provide nonexhaustive
indications of what actions or omissions by the Secured Party
would not be commercially unreasonable in the Secured Party's
exercise of remedies against the Collateral and that other
actions or omissions by the Secured Party shall not be deemed
commercially unreasonable solely on account of not being
indicated in this paragraph 8. Without limitation upon the
foregoing, nothing contained in this paragraph 8. shall be
construed to grant any rights to the Debtor or to impose any
duties on the Secured Party that would not have been granted or
imposed by this Security Agreement or by applicable law in the
absence of this paragraph 8.


9. <u>Power of Attorney</u>. To effectuate the terms and
provisions hereof, Debtor hereby designates and appoints Secured
Party and each of its designees or agents as attorney-in-fact of
Debtor, irrevocably and with power of substitution, with
authority to: (i) execute proofs of claim and loss; (ii) execute
endorsements, assignments or other instruments of conveyance or
transfer; (iii) adjust and compromise any claims under insurance
policies or otherwise; (iv) execute releases; and (v) do all
other acts and things necessary or advisable, in the sole
discretion of Secured Party, to carry out and enforce this
Security Agreement and the Obligations. All acts done under the
foregoing authorization are hereby ratified and approved by the
Debtor and neither Secured Party nor any designee or agent
thereof shall be liable for any acts of commission or omission,
for any error of judgment or for any mistake of fact or law
except for Secured Party's gross negligence or wilful
misconduct. This power of attorney, being coupled with an
interest, is irrevocable while any Obligations shall remain

unpaid, unobserved or unperformed.

10.   Care of Collateral.   Secured Party shall have the duty to exercise reasonable care in the custody and preservation of any Collateral in its possession, which duty shall be fully satisfied if Secured Party accords such Collateral treatment substantially the same as that which it accords similar property owned by it.  Except for any claims, causes of action or demands arising out of Secured Party's failure to perform its agreements set forth in the preceding sentence, Debtor releases Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Security Agreement, the Obligations, the Collateral and its use and/or any actions taken or omitted to be taken by Secured Party with respect thereto, and Debtor hereby agrees to hold Secured Party harmless from and with respect to any and all such claims, causes of action and demands. Secured Party's prior recourse to any Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations.

11.   Secured Party's Obligations and Duties.   Anything herein to the contrary notwithstanding, the Debtor shall remain liable under each contract or agreement comprised in the Collateral to be observed or performed by the Debtor thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Security Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which the Secured Party may be entitled at any time or times.  The Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under §9-207 of the UCC or otherwise, shall be to deal with such Collateral in the same manner as the Secured Party deals with similar property for its own account.

12.   Suretyship Waivers by Debtor.   The Debtor waives demand, notice, protest, notice of acceptance of this Security Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description (except as specifically provided for herein).  With respect to both the Obligations and the Collateral, the Debtor assents to any

extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromise or adjustment of any thereof, all in such manner and at such time or times as the Secured Party may deem advisable. The Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in paragraphs 11. and 12. hereof. The Debtor further waives any and all other suretyship defenses.

13. _Marshalling_. The Secured Party shall not be required to marshal any present or future collateral security (including, but not limited to, this Security Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, the Debtor agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights under this Security Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

14. _Secured Party's Waivers_. No act, omission or delay by Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise. No single or partial waiver by Secured Party of any default or right or remedy which it may have shall operate as a waiver of any other of said defaults, rights or remedies or of the same default, right or remedy on a future occasion.

15. _Governing Law_. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (without giving effect to the conflict of laws principles thereof).

16. _Notices_. All notices and other communications to any party hereunder shall be in writing and shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, or by a reputable courier delivery service and

C:\Documents and Settings\Mikat.C2S\Local Settings\Temporary Internet Files\OLK12\security agreement.doc

10

shall be given as follows:

if to the Debtor:                    Gitto Global Corporation
                                     140 Leominster-Shirley Road
                                     Lunenburg, MA 01462
                                     ATTN: Chief Operating Officer


if to the Secured Party:             Clinton Savings Bank
                                     200 Church Street
                                     Clinton, MA 01510
                                     ATTN: Michael Tenaglia,
                                     Senior Vice President

or such other address as such party may hereafter specify by
notice to the Secured Party and the Debtor.  Each such notice,
request or other communication shall be effective (i) if given by
certified mail, 72 hours after such communication is deposited
with the post office, addressed as aforesaid, or (ii) if given by
any other means (including, without limitation, by courier), when
delivered at the address specified in this paragraph.

   17.   Amendments and Waivers; Partial Invalidity;
Acknowledgment of Receipt.  No provision hereof shall be
modified, altered or limited except by a written instrument
expressly referring to this Security Agreement and to such
provision, and executed by the party to be charged.  If any term
of this Security Agreement shall be held to be invalid, illegal
or unenforceable, the validity of all other terms hereof shall in
no way be affected thereby.  Debtor acknowledges receipt of a
copy of this Security Agreement.

   18.   Benefit of Agreement; Continuing Security Interest.
This Security Agreement and all Obligations shall be binding upon
the heirs, executors, administrators, successors and assigns of
Debtor and shall, together with the rights and remedies of
Secured Party hereunder, inure to the benefit of Secured Party,
its successors, endorsees and assigns.  This Agreement shall
create a continuing security interest in the Collateral which
shall remain in full force and effect until payment in full of
the Obligations.

   19.   Counterparts.  This Agreement may be executed in any
number of counterparts and by the different parties hereto on
separate counterparts, each of which when so executed and
delivered shall be an original and all of which shall together
constitute one and the same agreement.

   20.   Captions.  The captions of the paragraphs of this
Security Agreement have been inserted for convenience only and
shall not in any way affect the meaning or construction of any

provision of this Security Agreement.

IN WITNESS WHEREOF, the undersigned have executed or caused

this Security Agreement to be executed as of the date first above set forth, as a sealed instrument.

GITTO GLOBAL CORPORATION

Witness

By: _Frank Walter_
    PRES + C.O.O.

CLINTON SAVINGS BANK

Witness

By: _____
    Michael Tenaglia, Senior
    Vice President

Exhibit "A"
to Security Agreement

PERFECTION CERTIFICATE

GITTO GLOBAL CORPORATION ("Debtor")

CLINTON SAVINGS BANK ("Secured Party")

The undersigned, the Chief Operating Officer of the Debtor, hereby certifies, with reference to a certain Security Agreement dated June _16th_, 2004 (terms defined in such Security Agreement having the same meanings herein as specified therein), between the Debtor and the Secured Party, to the Secured Party as follows:

1.   <u>NAME</u>.  The exact legal name of the Debtor as that name appears on its Articles of Incorporation is as follows:

**GITTO GLOBAL CORPORATION**

2.   <u>OTHER IDENTIFYING FACTORS</u>.

   (a)   The following is the mailing address of the Debtor:

**140 Leominster-Shirley Road, Lunenburg, Massachusetts 01462**

   (b)   If different from its mailing address, the Debtor's place of business or, if more than one, its chief executive office is located at the following address:

   (c)   The following is the type of organization of the Debtor: **corporation**

   (d)   The following is the jurisdiction of the Debtor's organization: **Massachusetts**

   (e)   The following is the Debtor's state issued organizational identification number {state "None" if the state does not issue such a number}: **none**

3. OTHER NAMES, ETC.

    (a) The following is a list of all other names (including trade names or similar appellations) used by the Debtor, or any other business or organization to which the Debtor became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past five (5) years:

    (b) Attached hereto as Schedule 1 is the information required in paragraph 2 of this Certificate for any other business or organization to which the Debtor became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past five (5) years:

4. OTHER CURRENT LOCATIONS.

    (a) The following are all other locations in which the Debtor maintains any books or records relating to any of the Collateral consisting of accounts, instruments, chattel paper, general intangibles or mobile goods:

    (b) The following are all other places of business of the Debtor:

    (c) The following are all other locations where any of the Collateral consisting of inventory or equipment is located:

(d)   The following are the names and addresses of all
      persons or entities other than the Debtor, such as
      lessees, consignees, warehousemen or purchasers of
      chattel paper, which have possession or are intended to
      have possession of any of the Collateral consisting of
      instruments, chattel paper, inventory or equipment:

5.   PRIOR LOCATIONS.

   (a)   Set forth below is the information required by
         paragraphs 4(a) or (b) of this Certificate with respect
         to each location or place of business previously
         maintained by the Debtor at any time during the past
         five (5) years in a state in which the Debtor has
         previously maintained a location or place of business
         at any time during the past four (4) months:

   (b)   Set forth below is the information required by
         paragraphs 4(c) or (d) of this Certificate with respect
         to each other location at which, or other person or
         entity with which, any of the Collateral consisting of
         inventory or equipment has been previously held at any
         time during the past twelve (12) months:

6.   FIXTURES.   Attached hereto as Schedule 2 is the information
required by UCC §9-502 or former UCC §9-402(5) of each state in
which any of the Collateral consisting of fixtures are or are to
be located and the name and address of each real estate recording
office where a mortgage on the real estate on which such fixtures
are or are to be located would be recorded, together with the
name of the owner of the real property on which any such fixtures
are located and a reference (by book and page and description of
document) of a deed or mortgage which describes such real
property in such recording office.

C:\Documents and Settings\Niket.CSB\Local Settings\Temporary Internet Files\OLK12\security agreement.doc

(a) Name and Address of Recording Office:

(b) Owner of Real Property:

(c) Description of Document (with date):

(d) Book and Page of Document Described in (c):

7. UNUSUAL TRANSACTIONS. Except for those purchases, acquisitions and other transactions described on Schedule 3 attached hereto, all of the Collateral has been originated by the Debtor in the ordinary course of the Debtor's business or consists of goods which have been acquired by the Debtor in the ordinary course from a person in the business of selling goods of that kind.

IN WITNESS WHEREOF, I have hereunto signed this Certificate this 16ᵗʰ day of June 2004.

_Frank Miller_

(Print Name)

FRANK MILLER

## Exhibit "B"
### Permitted liens against Collateral

| Bank | Contract # | Collateral | Orig. Loan Amount | Current Balance |
|------|-----------|-----------|------------------|-----------------|
| Orix Financial Services, Inc. 600 TownPark Lane Kennesaw, GA 40144 | 3000-0000041-000 | Prod. Line 1 Prod. Line 2 Prod. Line 4 Prod. Line 6 | 7,300,000.00 | 5,316,842.96 |
| CIT Equipment Fin. 84 State Street Boston, MA 02109 | 90085599-000 | Prod. Line 3 Prod. Line 5 | 2,100,000.00 | 1,522,500.00 |
| Wells Fargo Equip. Finance NW-8178 PO Box 1450 Minneapolis, MN 55485-8178 | 0084763-700 | 2-Farrell Mixers & Body | 900,000.00 | 802,749.34 |

# CERTIFICATE

I, Frank Miller, hereby certify that I am the Clerk of Gitto Global Corporation., a Massachusetts corporation (the "Corporation"), located in Lunenburg, Massachusetts and that I have been duly elected and am presently serving in that capacity in accordance with the By-laws of the Corporation.

I further certify that at a meeting of the Directors of the Corporation at which a quorum of Directors was present and voting throughout or by the unanimous written consent of the directors of the Corporation, the following Votes were duly adopted by the Directors.

VOTED: That this Corporation execute and deliver to Clinton Savings Bank (the "Bank"), an instrument of guaranty (the "Guaranty"), guaranteeing any and all obligations of Kingsdale Corp., a Massachusetts corporation ("Customer") to the Bank, in such form and substantially containing such terms and provisions as the officer executing the Guaranty on behalf of this Corporation shall approve, the execution thereof to be conclusive of such officer's approval thereof.

VOTED: That the Guaranty is necessary and convenient to the conduct and promotion of the business of this Corporation because, among other things, this Corporation will receive tangible benefits from the Customer in consideration of the execution of the Guaranty.

VOTED: That this Corporation secure its obligations to the Bank under the Guaranty by the grant of a security interest in its machinery, equipment and furniture to the Bank, and that this Corporation execute and deliver to the Bank, a security agreement (the "Security Agreement"), in such form and substantially containing such terms and provisions as the officer executing the Security Agreement on behalf of this Corporation shall approve, the execution thereof to be conclusive of such officer's approval thereof.

VOTED: That the President or the Treasurer or the Chief Operating Officer of this Corporation acting and signing singly, be and each of them is hereby authorized and empowered for and on behalf of this Corporation to execute and deliver the Guaranty and the Security Agreement referred to in the preceding Votes, and such other documents as may be necessary or appropriate to effectuate the foregoing Votes, upon such other terms and conditions, not inconsistent with the preceding Votes, as the officer executing said document shall determine, the execution of said documents by such officer to be conclusive of such determination.

I further certify that the foregoing Votes have not been altered or amended and are in full force and effect as of the date hereof.

I further certify that Frank Miller is the duly elected and acting President and Gary C. Gitto is the duly elected and acting Treasurer of the Corporation.

In Witness Whereof, I have hereunto set my hand and the seal of the Corporation this *16th* day of June 2004.

Frank Miller, Clerk

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Debra Wentworth
Seder & Chandler
339 Main Street
Worcester, MA 01608

dwentworth@sederlaw.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME: **GITTO GLOBAL CORPORATION**

OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 140 Leominster-Shirley Road | Lunenburg | MA | 01462 | |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | corporation | MASSACHUSETTS | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME: **CLINTON SAVINGS BANK**

OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 200 CHURCH STREET | CLINTON | MA | 01510 | |

4. This FINANCING STATEMENT covers the following collateral:

All machinery, equipment and furniture of the Debtor

GITTO GLOBAL CORPORATION

By: _[signature]_
PRES.

5. ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

EXHIBIT 16

LETTERS FROM FRANK MILLER TO MICHAEL
TENAGLIA DATED JUNE 25, 2004



*The*
# Gitto/Global
*Corporation*

June 25, 2004

Mr. Mike Tenaglia
Clinton Savings Bank
300 Church Street
Clinton, MA
Fax: 978-365-3719

Dear Mike:

I am somewhat concerned about telephone conversations intimating the potential for the bank's termination of our banking relationship between Kingsdale Corporation and Clinton Savings Bank. As you know, the bank requested additional collateralization to secure its position regarding this relationship. Kingsdale and Gitto/Global have cooperated in all respects providing the appropriate documentation and additional guarantees and collateral. It would seem that based on the bank's request and the cooperation of both Gitto/Global and Kingsdale, that an appropriate arrangement was secured until the perspective sale of Gitto/Global could be completed.

You should be aware that any disruption of the banking relationship would have significant consequences to the pending sale transaction of Gitto/Global Corporation. Council that represented Gitto/Global Corporation in the guarantee/securing transaction attempted to contact council for Clinton Savings, Attorney Robert Seder without success.

I respectfully request that the bank take no action regarding any treatment of the relationship prior to a meaningful discussion between respective council. Thank you for your understanding in this matter.

Regards,

Frank Miller

Charles N. Gitto, Jr.
*Chairman of the Board*

*Excellence in
Compounding
Technology*

140 Leominster-Shirley Road, Gianna Park
P.O. Box 120, Lunenburg, MA 01462
(978) 537-8261
Admin./Exec. Fax (978) 840-4645
Sales/General Fax (978) 534-8362
E-Mail: gitto-global.com



**The
Gitto/Global
Corporation**

June 25, 2004

Mike Tenaglia
Clinton Savings Bank
300 Church Street
Clinton, MA

Dear Mike,

Per our recent conversations, I wanted to give the bank a better understanding of what
J & J Chemicals does for us. Gitto Global Corporation is licensed to sell a chemical
additive that we are not licensed to put into our own compounds for competitive reasons.
For this reason we sell some of our compounds to J & J Chemical Distributors who then
processes this additive into our compounds and then sells our compounds back to us with
this additive included in the product. We have been advised that this is the appropriate
way to handle these transactions in order to get proper accounting treatment for it. We
appreciate the bank's understanding and the account will be closed after the acquisition
of Gitto Global Corporation within the next few weeks.

Sincerely,

Frank Miller
President.

**Excellence in
Compounding
Technology**

140 Leominster-Shirley Road, Gianna Park
P.O. Box 120, Lunenburg, MA 01462
(978) 537-8261
Admin./Exec. Fax (978) 840-4645
Sales/General Fax (978) 534-8362

The information presented here is, to our best knowledge, true and accurate. However, since conditions of use are beyond our control, all recommendations or suggestions are presented without guarantee or responsibility on our part. We disclaim all liabilities in connection with the use of information contained herein or otherwise. All risks of such use are assumed by the user. Furthermore, nothing contained herein shall be construed as an inducement to ...

EXHIBIT 17

CORRESPONDENCE REGARDING AUDIT
OF GITTO GLOBIL CORPORATION IN
CONNECTION WITH VITROTECH SALE



**STONEFIELD JOSEPHSON, Inc.**
Certified Public Accountants

June 28, 2004

Jess Rae Booth
VitroTech Corporation
5 Hutton Centre Drive, Suite 700
Santa Ana, CA 92707

Dear Jess:

As per our conversation, please find, below, a detailed summary status of our audit procedures of Gitto|Global. Corporation

**Summary:**

1) We have substantially completed work in the following areas, excluding manager and partner review:

   Cash
   Accounts receivable
   Accounts payable
   Accrued liabilities
   Long-term debt

2) We have not started on the following areas because the client has not provided us the information:

   * Inventory
   * Property and depreciation
   * Income tax liabilities and provision

3) We will start on the analytical review of the operations once we complete our open items on the balance sheet, as stated above.

If you have any questions or comments, please don't hesitate to contact me at 310-339-9901.

Best regards,

Dean S. Skupen, CPA

WWW.SJACCOUNTING.COM

| Santa Monica | Irvine | San Francisco | Walnut Creek |
| 1630 26th Street | 4 Park Plaza | 655 Montgomery Street | 1211 N. California Boulevard |
| Suite 400 South | Suite 900 | Suite 1220 | Suite 700 |
| Santa Monica, California 90404 | Irvine, California 92614 | San Francisco, California 94111 | Walnut Creek, California 94596 |
| TEL: 310.453.9400 | TEL: 949.623.9400 | TEL: 415.381.5400 | TEL: 925.930.9400 |
| FAX: 310.459.1137 | FAX: 949.833.3562 | FAX: 415.391.2310 | FAX: 925.930.0107 |

06/04/2004  17:56   7147004701              VITROCO                              PAGE  01

May 27, 2004

Mr. Gary C. Gitto
Mr. Frank Miller
Mr. Charles Gitto, Jr.
Gitto Global Corporation
P.O. Box 120
Lunenburg, MA 01462

Re:    Asset Purchase Agreement, dated March 31, 2004 (the "APA"), by and between
       VitroTech Corporation ("VitroTech"), Gitto Global Corporation ("Gitto"), Gary Gitto,
       Frank Miller (Gary Gitto and Frank Miller being referred to as "Shareholders") and
       Charles Gitto, Jr. ("Landlord")

Gentlemen:

        VitroTech, Gitto, the Shareholders and the Landlord are parties to the APA pursuant to
which, among other things, Gitto agreed to sell and VitroTech agreed to purchase substantially
all of the assets and operations constituting the Compounding Business of Gitto.

        As a condition of the APA, and the purchase and sale contemplated thereunder, Gitto was
required to deliver to VitroTech various schedules (the "Gitto Schedules") and financial
statements (the "Gitto Financial Statements") in form satisfactory to VitroTech.  Pursuant to
Section 3.34 of the APA, Gitto was permitted thirty (30) days from the date of the APA to
deliver the Gitto Schedules and Gitto Financial Statements after which VitroTech has fifteen
days to accept or reject the Gitto Schedules and Gitto Financial Statements.  The thirty (30)
period for delivery of the Gitto Schedules and the Gitto Financial Statements has since passed
without the delivery of the Gitto Schedules and the Gitto Financial Statements.  Partial
information in satisfaction of the Gitto Schedules have been delivered and an audit of the Gitto
Financial Statements is ongoing.  Notwithstanding the failure of Gitto to deliver the Gitto
Schedules and the Gitto Financial Statements within the period prescribed by Section 3.34 of the
APA, and in light of the ongoing efforts in that regard, the parties to the APA desire to affirm
their commitment to complete the transactions contemplated by the APA and, to facilitate the
same, to extend the period for delivery of the Gitto Schedules and the Gitto Financial Statements
until June 30, 2004.

It is presently contemplated that the ongoing audit will be completed and delivery of the Gitto Schedules and Gitto Financial Statements, both in form satisfactory to VitroTech, in order to facilitate a closing of the purchase and sale by July 15, 2004. VitroTech has engaged an investment banking firm to secure the necessary financing to fund the purchase of the Gitto Compounding Business and, subject to delivery of satisfactory Gitto Schedules and Gitto Financial Statements, we expect financing to be in place by that date.

In order to facilitate the foregoing, the parties desire to amend the terms of the APA as follows:

1.  The second sentence of the last paragraph of Section 3.34 is amended to read in full as follows:

    "Seller shall have until June 30, 2004 (the "*Schedule Delivery Due Date*") to provide the Seller Schedules in full, including audited financial statements of Gitto prepared in accordance with SEC Regulation S-X and covering a period of not less than two years."

2.  Section 6.1(p) is amended to read in full as follows:

    "*Financial Statements*.  Seller shall have delivered to Purchaser (i) audited financial statements of the Compounding Business and, if required by Rule 3-05 of SEC Regulation S-X, audited financial statements relating to the Purchased Real Estate purchased pursuant to the Real Estate Purchase Agreement at and for each of the two years ended December 31, 2003 or later, and (ii) unaudited financial statements of the Compounding Business and relating to the Purchased Real Estate at and for the interim periods from end of the last year covered by audited financial statements to the end of the last fiscal quarter ending prior to the Closing Date and for the same period in the prior fiscal year, which financial statements shall be prepared in accordance with GAAP and in accordance with the requirements of SEC Regulation S-X, in general, and Rule 3-05 of Regulation S-X in particular."

3.  The last sentence of Section 8.1 is amended to read in full as follows:

    "The parties hereto agree to use commercially reasonable efforts to close the transactions contemplated herein on or before July 15, 2004."

2

06/04/2004  17:56    7147084701                     VITROCO                          PAGE  03

If this letter accurately reflects our agreement to amend the APA in the manner described above, please execute below indicating your acceptance of the same.

Sincerely,

VITROTECH CORPORATION

By: _____
Jean Rae Booth, President

June 4th 2004

AGREED AND ACCEPTED:

GITTO GLOBAL CORPORATION

By: _____       JUNE 4TH
Title: PRESIDENT + C.D.O.           Dated: May ___, 2004


_____       Dated: May ___, 2004
GARY C. GITTO


_____       Dated: May ___, 2004
FRANK MILLER


_____       Dated: May ___, 2004
CHARLES GITTO, JR.

3

5  P 89879491888.ON/1#:#1.12/2#:#1 #002 62 NUU(3UT)                    NOITAROPROC LABOLG/OTTIG EHT MORF

EXHIBIT 18

LETTER AGREEMENT DATED JUNE 30, 2004
BY AND AMONG CSB, KINDSDALE CORP., AND
GITTO GLOBAL CORPORATION

12-20-04  05:06pm  From-CLINTON SAVINGS BANK          9783653718      T-451  P.02/006  F-296
Case 1:05-cv-10268-DPW      Document 37-6      Filed 05/02/2006      Page 37 of 38

07-01-2004  11:35am  From-CLINTON SAVINGS                    +9978365371D      T-278  P.002/003  F-662



1 8 5 1

Customers 1st, for Generations

June 30, 2004

Mr. Frank Miller
Gitto - Global Inc.
140 Leominster-Shirley Rd.
P.O. Box 120
Lunenburg, MA 01462

Dear Mr. Miller,

Please be advised that in Clinton Savings Bank's ("the Bank") absolute and sole discretion the Bank may cease paying checks presented against the account of Kingsdale Corporation ("Kingsdale") at any time and for any reason or no reason. To the extent the Bank does pay checks presented against Kingsdale's account where the collected funds are insufficient to cover such checks please be advised that on and after July 15, 2004 the Bank will no longer continue that practice.

The continuation of this practice will also be contingent on compliance with the following conditions:

- The Bank must remain informed on the status of the sale of Gitto -- Global at least twice a week. This can be accomplished with a conversation between you and the undersigned supplemented by copies of material and relevant correspondence.

- The Bank will be paid a fee in lieu of interest for the processing of these transactions in an amount that can fairly compensate the Bank for these services. The fee for having provided Kingsdale immediate availability for checks deposited for the period of January 1, 2004 through June 30, 2004 is $36,000.00.

  The fee must be paid on or before July 7, 2004.

- Further, the Bank requires that Kingsdale pay a fee to the Bank for the above mentioned services in the amount of $300 per deposit as long as such services continue. The aggregate of these fees will be deducted from Kingsdale's account on Friday of each week.

Discover the rewards of making CSB your PFI.

OFFICE LOCATIONS

200 CHURCH STREET
CLINTON, MA 01510
TTD: 978-365-3700
FAX: 978-365-3719

585 MAIN STREET
BOLTON, MA 01740
TEL: 978-779-2857
FAX: 978-779-6295

1 MAIN STREET
STERLING, MA 01504
TEL: 978-422-8133
FAX: 978-422-6130

35 CENTRAL STREET
BERLIN, MA 01503
TEL: 978-838-2286
FAX: 978-838-2981

231 WEST BOYLSTON STREET
WEST BOYLSTON, MA 01583
TEL: 508-835-0944
FAX: 508-835-0988

WEBSITE: www.clintonsavings.com

Gitto – Global
Page 2

- Kingsdale must maintain a minimum collected balance of $1.2 million dollars in its account.

- In any event and under no circumstances will the Bank pay checks presented against Kingsdale's account in excess of $4 million dollars, in the aggregate against uncollected funds.

If you have any questions regarding this matter or any of the conditions listed above, please do not hesitate to contact us.

Thank you.

Sincerely,

Michael D. Tenaglia,
Senior Vice President


AGREED AND ACCEPTED:

GITTO GLOBAL CORPORATION

By: _____
Frank Miller, President & COO

Dated: 7/1/04


AGREED AND ACCEPTED:

KINGDALE CORP

By: _____
Frank Miller, President

Dated: 7/1/04

EXHIBIT 19

JULY 2004 NOTE AND
RELATED DOCUMENTS

PART 1

1 8 5 1

# CLINTON
## SAVINGS BANK
*Customers 1st, for Generations*

June 30, 2004

Mr. Frank Miller
Gitto - Global Inc.
140 Leominster-Shirley Rd.
P.O. Box 120
Lunenburg, MA 01462

Dear Mr. Miller,

Please be advised that in Clinton Savings Bank's ("the Bank") absolute and sole discretion the Bank may cease paying checks presented against the account of Kingsdale Corporation ("Kingsdale") at any time and for any reason or no reason. To the extent the Bank does pay checks presented against Kingsdale's account where the collected funds are insufficient to cover such checks please be advised that on and after July 15, 2004 the Bank will no longer continue that practice.

The continuation of this practice will also be contingent on compliance with the following conditions:

- The Bank must remain informed on the status of the sale of Gitto -- Global at least twice a week. This can be accomplished with a conversation between you and the undersigned supplemented by copies of material and relevant correspondence.

- The Bank will be paid a fee in lieu of interest for the processing of these transactions in an amount that can fairly compensate the Bank for these services. The fee for having provided Kingsdale immediate availability for checks deposited for the period of January 1, 2004 through June 30, 2004 is $36,000.00.

  The fee must be paid on or before July 7, 2004.

- Further, the Bank requires that Kingsdale pay a fee to the Bank for the above mentioned services in the amount of $300 per deposit as long as such services continue. The aggregate of these fees will be deducted from Kingsdale's account on Friday of each week.

Discover the rewards of making CSB your PFI.

OFFICE LOCATIONS

200 CHURCH STREET
CLINTON, MA 01510
TEL: 978-365-3700
FAX: 978-365-3719

563 MAIN STREET
BOLTON, MA 01740
TEL: 978-779-2857
FAX: 978-779-6295

1 MAIN STREET
STERLING, MA 01564
TEL: 978-422-8133
FAX: 978-422-8130

35 CENTRAL STREET
BERLIN, MA 01503
TEL: 978-838-2286
FAX: 978-838-2801

231 WEST BOYLSTON STREET
WEST BOYLSTON, MA 01583
TEL: 508-835-9944
FAX: 508-835-9988

WEBSITE  www.clintonsavings.com

Gitto – Global
Page 2

- Kingsdale must maintain a minimum collected balance of $1.2 million dollars in its account.

- In any event and under no circumstances will the Bank pay checks presented against Kingsdale's account in excess of $4 million dollars, in the aggregate against uncollected funds.

If you have any questions regarding this matter or any of the conditions listed above, please do not hesitate to contact us.

Thank you.

Sincerely,

Michael D. Tenaglia,
Senior Vice President

AGREED AND ACCEPTED:

GITTO GLOBAL CORPORATION

By: _____
Frank Miller, President & COO

Dated: 7/1/04

AGREED AND ACCEPTED:

KINGDALE CORP

By: _____
Frank Miller, President

Dated: 7/1/04

## REVOLVING CREDIT NOTE

000344

$8,400,000.00        Worcester, Massachusetts        July 23, 2004

FOR VALUE RECEIVED, **KINGSDALE CORP.**, a Massachusetts corporation having a principal place of business at 77 Snead Drive, Mashpee, Massachusetts 02649 (the "Customer"), promises to pay to the order of **CLINTON SAVINGS BANK**, a Massachusetts savings bank established under the laws of the Commonwealth of Massachusetts and having its principal place of business at 200 Church Street, Clinton, Massachusetts 01510 (the "Lender"), on the Maturity Date (as hereinafter defined) or upon the occurrence of an Event of Default (as hereinafter defined), whichever shall first occur, the principal sum of (i) from the date hereof through and including August 1, 2004, EIGHT MILLION FOUR HUNDRED THOUSAND AND/100 ($8,400,000.00), and (ii) from August 2, 2004 through and including the Maturity Date, EIGHT MILLION AND 00/100 ($8,000,000.00) DOLLARS or, if less, the aggregate unpaid principal amount of outstanding advances made by the Lender to the Customer on account of Lender's having honored checks drawn on Customer's Demand Deposit Account No. 133053050, maintained with the Lender (the "Account"), when funds in the Account shall not have been collected at the time such checks are honored. Customer shall pay interest on amounts paid by the Lender on checks drawn on the Account against uncollected funds (the "Outstanding Principal Balance"), in arrears, from the date hereof on the Outstanding Principal Balance from time to time outstanding, payable weekly on or before the next Friday following each calendar week (except that all accrued and unpaid interest as at the Maturity Date shall be paid on the Maturity Date), commencing July 30, 2004, at a per annum rate equal to four percent (4%) over the Prime Rate of interest as such rate shall change from time to time, each such change to be effective on the effective date of such change. The "Prime Rate" is that rate of interest published in *The Wall Street Journal* (Eastern Edition), as the prevailing prime rate of interest.

Interest on the Outstanding Principal Balance shall be calculated on the basis of the actual number of days elapsed over a year assumed to have 360 days. Interest shall be calculated on a daily basis on the Outstanding Principal Balance.

In no event shall the amount of interest payable hereunder together with all amounts reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating or collection of the loans evidenced hereby exceed the maximum rate of interest hereof allowable by applicable law. All payments hereunder shall be applied first against interest and other charges then due and payable, and the balance in reduction of the Outstanding Principal Balance.

000345

Until the earlier of the occurrence of an Event of Default or the Maturity Date, the Lender will pay Customer's checks drawn on the Account, provided that, for the period from the date hereof through and including August 1, 2004, the amount of such checks paid by the Bank against uncollected funds does not exceed Eight Million Four Hundred Thousand and 00/100 ($8,400,000.00) Dollars, in the aggregate, and thereafter until the Maturity Date the amount of such checks paid by the Bank against uncollected funds does not exceed Eight Million and 00/100 ($8,000,000.00) Dollars, in the aggregate.

The Outstanding Principal Balance, all accrued and unpaid interest calculated as aforesaid, and other indebtedness due hereunder, if not sooner paid, shall be due and payable without notice or demand on August 16, 2004 (the "Maturity Date"). All sums due hereunder are payable in lawful money of the United States of America at the office of the Lender at the address shown above (unless the Lender otherwise notifies the Customer) in immediately available funds. Customer's right to draw checks on the Account against uncollected funds shall terminate on August 16, 2004, and the Lender shall not honor checks drawn on the Account (unless there are sufficient collected funds in the Account) after 9:00 a.m. on the Maturity Date.

This Revolving Credit Note evidences a line of credit from the Lender to the Customer solely with respect to payments by the Lender of checks drawn on the Account against uncollected funds (each of which payments constitutes a loan by the Lender to the Customer and upon which interest, as aforesaid, will accrue) and any and all other financial accommodations which may be extended by the Lender, in its sole discretion, to the Customer.

In consideration of the provision of the credit facilities evidenced hereby, the Customer shall pay to the Lender (i) a fee of $40,000.00 upon execution of this Note, and (ii) a fee of $150,000.00 due and payable on the Maturity Date or upon the occurrence of an Event of Default (whichever shall first occur). The sums set forth in this paragraph constitute indebtedness of the Customer owing to the Lender and evidenced by this Note.

This Note is secured by, inter alia, security interests in accounts receivable, inventory, machinery and equipment and other personal property of the Customer granted in that certain Security Agreement, dated of even date herewith between the Customer and the Lender.

The Outstanding Principal Balance, and all other unpaid indebtedness of the Customer evidenced hereby, shall become immediately due and payable at the option of the Lender without presentment, demand, protest or notice of protest, upon the

000346

occurrence of any one of the following events ("Events of Default"):

(a)   Default in the timely payment of any installment of principal and/or interest provided for hereunder.

(b)   Default of the Customer in the performance or observance of any other covenant or agreement set forth herein, in the letter agreement of even date herewith by and between the Lender and the Customer, or in any other document given to secure this Note.

(c)   If, at any time, (i) from the date hereof through and including August 1, 2004, checks exceeding $8,400,000.00 in the aggregate, are presented for payment from the Account at a time when the amount of uncollected funds in the Account is such that if such checks were paid, the Outstanding Principal Balance would exceed $8,400,000.00, and (ii) from August 2, 2004 through the Maturity Date, checks exceeding $8,000,000.00 in the aggregate, are presented for payment from the Account at a time when the amount of uncollected funds in the Account is such that if such checks were paid, the Outstanding Principal Balance would exceed $8,000,000.00.

(d)   The Customer or any guarantor hereof shall become insolvent or bankrupt or shall generally cease paying his, her or its debts as they mature or shall make an assignment for the benefit of creditors.

(e)   A trustee, receiver or liquidator shall be appointed for the Customer or any guarantor hereof or for a substantial part of the property of the Customer or any guarantor hereof, or bankruptcy, reorganization, arrangement, insolvency or similar proceedings shall be instituted by or against the Customer or any guarantor hereof under the laws of any jurisdiction.

(f)   Default in the payment or performance of any other covenant, agreement, or obligation of the Customer or any guarantor hereof, in favor of the Lender.

(g)   Failure of:

(i)   Gary C. Gitto to have executed and delivered a guaranty of the Customer's obligations to the Lender and to have delivered to the Lender by 3:00 p.m. on July 23, 2004, as security for such guaranty, the sum of $500,000.00 for deposit with the Lender; such deposit not to be subject to withdrawal.

(ii)  Tradex Corp. ("Tradex") to have executed and delivered a guaranty of the Customer's obligations to the

3

000347

Lender and to have executed and delivered to the Lender by
3:00 p.m. on July 23, 2004, as security for such guaranty
(i) a mortgage encumbering real property known and numbered
as 140 Leominster-Shirley Road, Lunenburg, Massachusetts
(the "Real Estate"), and (ii) a security agreement granting
the Lender a security interest in inventory of Vitrolite,
having a value of $3,000,000.00, at cost, located at ~~the
Real Estate.~~ 241 Willard Stre[et]
Leominster, MA [?]

(iii)    Frank Miller to have executed and delivered a
guaranty of the Customer's obligations to the Lender and to
have delivered to the Lender by 3:00 p.m. on July 23, 2004,
as security for such guaranty, the sum of $500,000.00 for
deposit with the Lender; such deposit not to be subject to
withdrawal.

~~(iv) Gitto Global Corporation ("Global") and VitroTech
Corporation ("VitroTech") to have executed and delivered to
the Lender by 3:00 p.m. on July 23, 2004 an assignment of a
portion of the purchase price under that certain Purchase
and Sale Agreement between Global and VitroTech dated March
31, 2004, as amended.~~  *J.M.*

(v)    Global to have delivered, on or before July 30 ,
2004, to the Escrow Agent (as defined in the Escrow
Agreement of even date herewith among the Lender, Global and
the Escrow Agent) 3,000,000 shares of VitroTech stock,
subject to a pledge to the Lender.

Upon the occurrence of any one of the Events of Default, the
Lender shall have the right to institute any proceedings upon
this Note and any collateral given to secure the same for the
purposes of collecting said principal and interest with costs and
expenses, or of protecting any security connected herewith, and
shall have, among other remedies, all of the rights of a secured
party under the Uniform Commercial Code of Massachusetts.

To the extent permitted by applicable law, upon and after
the occurrence of any of said Events of Default, whether or not
the Lender has accelerated payment of this Note, interest on
principal shall, at the option of the Lender, be payable, on
demand, at a rate per annum, equal to four percent (4%) per annum
above the rate of interest otherwise payable hereunder (the
"Default Rate").

Without in any way limiting the imposition by the Lender of
the Default Rate, if a payment of principal or interest hereunder
is not received by the Lender within three (3) days of the date
such payment is due, the Customer will pay to the Lender, on
demand, a late payment charge equal to five percent (5%) of the
amount of such payment.  Nothing in this or the preceding

4

000348

paragraph shall affect the Lender's right to demand payment of all outstanding amounts hereunder at any time.

The Customer shall pay all reasonable costs, including but not limited to attorneys' fees incurred by the Lender in connection with preparing, negotiating, collecting or enforcing this promissory note or the indebtedness evidenced hereby, and any other obligation of the Customer to the Lender. No course of dealing by the Lender and no delay in exercising any right under this Note will operate as a waiver by the Lender of any of its rights, and a waiver of any right on one occasion may not be construed as a waiver of the right on any future occasion.

The Customer expressly waives presentment, demand for payment, protest and notice of nonpayment.

The Customer and any guarantor of the repayment of this Note, hereby grant to the Lender, a continuing lien, security interest and right of setoff as security for all liabilities and Obligations to the Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Lender or any entity under the control of the Lender or in transit to it. At any time, without demand or notice (any such notice being expressly waived by the Customer), the Lender may setoff the same or any part thereof and apply the same to any liability or obligation of the Customer and any obligation of any guarantor even though unmatured and regardless of the adequacy of any other collateral securing the loan. **ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITORS OR OTHER PROPERTY OF THE CUSTOMER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

The Customer and each guarantor, endorser and other person now or hereafter liable for the payment of any of the indebtedness evidenced by this Note severally agree, by making, guaranteeing or endorsing this Note or by making any agreement to pay any of the indebtedness evidenced by this Note, to waive presentment for payment, protest and demand, notice of protest, demand and of dishonor and nonpayment of this Note and consent without notice or further assent to (a) the substitution, exchange or release of the collateral securing this Note or any part thereof at any time, (b) the acceptance by the Lender at any time of any additional collateral or security for or guarantors of this Note, (c) the modification or amendment at any time, and from time to time of this Note, and any instrument securing this

000349

Note, at the request of Customer, (d) the granting by the Lender of any extension of the time for payment of this Note or for the performance of the agreements, covenants and conditions contained in this Note, or any instrument securing this Note, at the request of Customer, and (e) any and all forbearances and indulgences whatsoever; and such consent shall not alter or diminish the liability of any person.

The Customer has received a copy of this Note.

This Note shall be the joint and several obligation of the Customer and all sureties, guarantors and endorsers (if any), and shall be binding upon them and their respective heirs, executors, administrators, successors and assigns and each or any of them.

The credit facilities evidenced by this Note have been made and will be made available to the Customer in Massachusetts. This Note is a Massachusetts contract and all of its terms and provisions shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (without reference to principles of conflicts of law).

The Customer represents and warrants to the Lender that the credit facilities evidenced by this Note shall be used for commercial purposes.

THE CUSTOMER HEREBY IRREVOCABLY AND UNCONDITIONALLY: (A) SUBMITS TO PERSONAL JURISDICTION IN THE COMMONWEALTH OF MASSACHUSETTS OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE, AND (B) WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY STATE TO: (I) THE RIGHT, IF ANY, TO TRIAL BY JURY, (II) OBJECT TO JURISDICTION WITHIN THE COMMONWEALTH OF MASSACHUSETTS, AND (III) THE RIGHT, IF ANY, TO CLAIM AGAINST OR RECOVER FROM THE LENDER ANY SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES OR ANY DAMAGES OTHER THAN ACTUAL AND CONSEQUENTIAL DAMAGES. NOTHING CONTAINED HEREIN, HOWEVER, SHALL PREVENT THE LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING OR EXERCISING ANY RIGHTS AGAINST ANY SECURITY AND AGAINST THE CUSTOMER, AND AGAINST ANY PROPERTY OF THE CUSTOMER, IN ANY OTHER STATE. INITIATING SUCH SUIT, ACTION OR PROCEEDING OR TAKING SUCH ACTION IN ANY STATE SHALL IN NO EVENT CONSTITUTE A WAIVER OF THE AGREEMENT CONTAINED HEREIN THAT THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS SHALL GOVERN THE RIGHTS AND OBLIGATIONS OF THE CUSTOMER AND THE LENDER HEREUNDER OR THE SUBMISSION HEREIN MADE BY THE CUSTOMER TO PERSONAL JURISDICTION WITHIN THE COMMONWEALTH OF MASSACHUSETTS.

000350

IN WITNESS WHEREOF, KINGSDALE CORP. has caused this Note to be duly executed under seal by its proper corporate officer, hereunto duly authorized on the day and year first above written.

KINGSDALE CORP.

Witness

By: _____
~~Thomas J. Sullivan~~, President
and Treasurer   FRANK MILLER

7

000338

[CLINTON SAVINGS BANK LETTERHEAD]

July 23, 2004

Kingsdale Corp.
77 Snead Drive
Mashpee, MA  02649

>     Re:  Line of Credit Facility with Clinton Savings Bank
>          (the "Lender")

Gentlemen:

This will confirm that the Lender will, subject to the terms hereof and of <u>Exhibit A</u> attached hereto, establish a line of credit facility in the maximum amount of (i) $8,400,000.00 from July 23, 2004 through and including August 1, 2004, and (ii) $8,000,000.00 from August 2, 2004 to August 16, 2004 (the "Line") for the benefit of Kingsdale Corp. ("Kingsdale"), the sole purpose of which shall be to provide for payments of checks drawn on Kingsdale's demand deposit account with the Lender against uncollected funds, each of which payments constitutes a loan by the Lender to Kingsdale, and upon which interest, at the rate of four percent (4%) over the Prime Rate of interest will accrue. The Line will terminate on August 16, 2004.

The Line will be evidenced by a Revolving Credit Note in the form of <u>Exhibit A</u> attached hereto.

The Line will be secured by, <u>inter alia</u>, $1,200,000.00 cash on deposit in an account with the Lender that is not subject to withdrawal and a security interest in all assets of Kingsdale.

The Line will be guaranteed by the following persons or entities, whose non-recourse guaranties shall be secured as follows:

1.  Gary C. Gitto, whose guaranty will be secured by $500,000.00 cash, such guaranty to be executed and delivered to the Lender and such cash to be deposited with the Lender on or before July 23, 2004;

2.  Tradex Corp., whose guaranty will be secured by a (i) mortgage encumbering real property known and numbered as 140 Leominster-Shirley Road, Lunenburg, Massachusetts (the "Real Estate"), and (ii) by a security agreement granting the Lender a security interest in Vitrolite inventory owned by Tradex and located at the Real Estate, such guaranty, mortgage and security agreement

000333

Kingsdale Corp.
July 23, 2004
Page 2

to be executed and delivered to the Lender on or before
July 23, 2004;

3.  Frank Miller, whose guaranty will be secured by
    $500,000.00 cash, such guaranty to be executed and
    delivered to the Lender and such cash to be deposited
    with the Lender on or before July 23, 2004;

4.  Gitto Global Corporation's guaranty dated June 16, 2004
    which is secured by a security agreement dated June 16,
    2004, shall be further secured by (i) an assignment of
    the purchase price under its Purchase and Sale Agreement
    with VitroTech Corporation ("VitroTech") dated March 31,
    2004, as amended, and (ii) by the pledge of 3,000,000
    shares of VitroTech common stock.  Such assignment and
    such pledge to be executed and delivered to the Lender
    on or before July 23, 2004.

    If Kingsdale agrees with the terms of this letter, please so
indicate by signing a copy of this letter below, and return the
same to me.

                        Very truly yours,

                        CLINTON SAVINGS BANK

                        By: _____
                                            , title

Accepted and Agreed
this 23rd day of July, 2004:

KINGSDALE CORP.

By: _____
                    , title

As to paragraph 2

Tradex Corp

By _____, President

## PLEDGE AGREEMENT

To:   Clinton Savings Bank (the "Bank")

The undersigned, **KINGSDALE CORP.** (hereinafter referred to as
the "Undersigned"), to secure all of the Obligations (as
hereinafter defined) of the Undersigned under and pursuant to
that certain revolving credit note executed by the Undersigned in
favor of the Bank dated the **23** day of July, 2004 in the
original principal amount of $8,000,000.00 (the "Note"), hereby
and herewith pledges with and to the Bank the following, in
addition to any and all other collateral granted to the Bank for
the Obligations (as hereinafter defined):

Account No. 800123234 maintained by the Undersigned at the
Bank (the "Account")

and hereby agrees with the Bank as follows:

1.    The Account, and all other securities and/or property
belonging to or standing in the name of the Undersigned which the
Undersigned has heretofore or may hereafter deposit with the
Bank, shall constitute collateral security for any and all
liabilities, direct or indirect, absolute or contingent, due or
to become due, now existing or hereafter arising, of the
Undersigned including, but not limited to, obligations evidenced
by the Note (the "Obligations").

2.    The Bank is hereby fully authorized and empowered, on
the non-performance or default of any of the Obligations and
after having given three (3) days' prior notice thereof to the
Undersigned, to transfer the Account to the Bank or its nominee,
and apply the proceeds thereof as provided in the next
sentence. After deducting all legal or other expenses and costs
of collection of any of the Obligations and all legal or other
expenses and costs of collection, storage, custody, sale and
delivery of any collateral held for the Obligations, the residue
of any proceeds of collection shall be applied to the payment of
principal or interest on one or more of the Obligations, due or
to become due, in such order of preference as the Bank may
determine, proper allowance for interest on Obligations not then
due being made, and any excess proceeds from said collateral
shall be returned to the Undersigned.  The Bank shall also have,
with respect to the Account, all the rights and powers that are
given to the Bank with respect to collateral in the Note.

3.    The Bank may, at its option, when the Obligations are
due, demand, sue for, collect, or make any compromise or
settlement the Bank deems desirable with reference to the

collateral held hereunder. The Bank shall have no duty as to the collection or protection of collateral held hereunder or any income thereon, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof. The Bank may exercise its rights with respect to the collateral held hereunder without resorting or regard to other security or sources of reimbursement for the Obligations. No delay or omission on the Bank's part in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement. A waiver on any one occasion shall not be construed as a bar to or waiver of any right and/or remedy on any future occasion.

4.    So long as any Obligation shall exist, the Undersigned waives any right to withdraw any sums from the Account.

5.    Except as specifically provided hereinabove, the Undersigned waives demand, notice, protest, notice of acceptance of this Agreement, notice of any additional Obligations, extensions granted, collateral received or delivered or other action taken in reliance hereon, all demands and notices in connection with the delivery, acceptance, performance, default or enforcement of any Obligation for which the Account is pledged and all other demands and notices of any description; and the Undersigned assents to any extension or postponement of the time of payment and any other indulgence, to any substitution, exchange or release of collateral and/or to the addition or release of any party or person primarily or secondarily liable on any of the Obligations.

6.    This Agreement is intended to take effect as a sealed instrument and shall inure to the benefit of the Bank and its successors and assigns and shall be binding upon the Undersigned and the successors and/or other legal representative(s) of the Undersigned. The obligations of the Undersigned under this Agreement shall continue until all Obligations hereby secured shall have been performed or paid in full.

Executed as a sealed instrument this _23_ day of July, 2004.

KINGSDALE CORP.

Witness

By: _____
Thomas J. Sullivan, President
and Treasurer  Frank Miller

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT, dated July 2̲3̲ , 2004 is between
KINGSDALE CORP., a Massachusetts corporation (herein called "Debtor"),
with a place of business at 77 Snead Drive, Mashpee, Massachusetts
02649 and CLINTON SAVINGS BANK, a Massachusetts savings bank with a
place of business at 200 Church Street, Clinton, Massachusetts 01510
(herein called "Secured Party").

WHEREAS, Debtor has executed and delivered to the Secured Party a
revolving credit note in the original principal amount of
$8,000,000.00, as may be amended, restated and/or substituted from
time to time (the "Note") (collectively, together with this Security
Agreement and all other documents executed and delivered to the
Secured Party by the Debtor in connection therewith, the "Loan
Documents").

NOW THEREFORE, it is agreed as follows:

1. Definitions.

(a)  The term "State", as used herein, means the Commonwealth
of Massachusetts.  All terms defined in the Uniform Commercial Code of
the State ("UCC") and used herein shall have the same definitions
herein as specified therein; provided, however, if a term is defined
in Article 9 of the UCC differently than in another Article of the
UCC, the term shall have the meaning herein as specified in said
Article 9.

(b)  "Obligations" means the Note, the Loan Documents and any
and all obligations, liabilities, indebtedness, advances and loans
owing by the Debtor to the Secured Party of every kind and
description, direct or indirect, absolute or contingent, primary or
secondary, secured or unsecured, due or to become due, now existing or
hereafter arising, regardless of how they arise or by what agreement
or instrument they may be evidenced or whether evidenced by any
agreement or instrument, and includes obligations to perform acts and
refrain from taking action as well as obligations to pay money,
including, but not limited to, overdrafts and automated clearing house
liabilities.

2. Grant of Security Interest.  To secure the timely payment,
performance and observance of all of the Obligations, Debtor hereby
grants to Secured Party a continuing security interest in and pledges,
assigns and grants to Secured Party a right of setoff against the
following property of Debtor, wherever located, (including the
proceeds, insurance proceeds and products thereof) whether now
existing or owned by the Debtor or owned, acquired, created or arising
hereafter (all of the same being hereinafter referred to as the
"Collateral"):

all personal and fixture property of every kind and nature,
including, without limitation, all goods (including inventory,
equipment and any and all accessions thereto), instruments (including
promissory notes), documents, accounts (including health care
insurance receivables), chattel paper (whether tangible or
electronic), deposit accounts, letter of credit rights (whether or not

the letter of credit is evidenced by a writing), commercial tort claims, securities and other investment property, supporting obligations, any and all other contract rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles (including all payment intangibles). Secured Party acknowledges that attachment of its security interest in any commercial tort claims as original collateral is subject to Debtor's compliance with the provisions of paragraph 5.(g) hereof.

Although proceeds are covered by this Agreement, the Secured Party has not authorized and does not authorize the sale or transfer of any of the Collateral by the Debtor except for the sale of inventory in the normal course of Debtor's business.

3. Authorization to File Financing Statements. The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral as (i) all assets of the Debtor or words of similar effect, regardless of whether any particular asset constituting any Collateral falls within the scope of Article 9 of the UCC or the Uniform Commercial Code of such jurisdiction, or (ii) being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Debtor is an organization, the type of organization and any organization identification number issued to the Debtor and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of the real property to which the Collateral relates. The Debtor agrees to furnish any such information to the Secured Party promptly upon request. The Debtor also ratifies its authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction, including the State, any like initial financing statements or amendment thereto if filed prior to the date hereof.

4. Representations, Warranties and Covenants. Debtor represents, warrants and covenants that:

(a)   It is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has the corporate power and authority to own its properties and to transact the business in which it is engaged;

(b)   It has the corporate power and authority to execute and deliver, and to perform its obligations under the Note and under this Security Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance of the Loan Documents;

(c)   The Note and this Security Agreement constitute the legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms;

(d)  The execution, delivery and performance of the Note and this Security Agreement will not violate any law or regulation, or any order or decree of any court or governmental instrumentality, or any provision of the charter or by-laws of, or any securities issued by, the Debtor, and will not conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which the Debtor is a party or by which it is bound, and will not result in the creation or imposition of any lien, charge or encumbrance upon any of the property of the Debtor pursuant to the provisions of any of the foregoing;

(e)  No consent of any other person (including, without limitation, stockholders and creditors of the Debtor) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental instrumentality is required in connection with the execution, delivery, performance, validity or enforceability of the Note or this Security Agreement or any of the Loan Documents;

(f)  The chief executive office of the Debtor and the office where Debtor keeps its books and records relating to the Collateral, and all locations of Collateral are at the addresses set forth on Exhibit "A" hereto;

(g)  Debtor will not change its state of incorporation or organization, its name, its mailing address, its organizational identification number (if it has one), its legal structure, its chief executive office, the office where its books and records are kept, or any locations of Collateral without prior written notice to and consent of Secured Party;

(h)  If the Debtor does not, as of the date hereof, have an organizational identification number but obtains one hereafter, the Debtor shall forthwith notify the Secured Party of such organization identification number;

(i)  Except for liens in favor of Secured Party and except for liens set forth on Exhibit "B" hereto annexed, the Debtor is the owner of the Collateral and the Collateral is free and clear of all liens and Debtor will not create or suffer to exist any lien on any of the Collateral;

(j)  Debtor will not assign, pledge, grant a security interest in, transfer, sell, lease or otherwise dispose of any Collateral, except for inventory sold or consumed in the ordinary course of Debtor's business;

(k)  The Collateral is being used, and will continue to be used, in Debtor's business and not for personal, family, household or farming use;

(l)  Debtor will use the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances and regulations;

(m)   The Collateral is now and shall remain personal property, and Debtor will not permit any Collateral to become a fixture without prior written notice to and consent of Secured Party at least thirty (30) days prior to the commencement of such use;

(n)   Debtor will keep the Collateral at all times insured by such insurance as Secured Party may from time to time reasonably require and in any event and without specific request by Secured Party will insure the Collateral against fire, including so-called extended coverage, theft and, in the case of any motor vehicle, collision.  The Debtor also shall maintain insurance of the kinds, covering the risks and in the relative amounts usually carried by companies engaged in businesses similar to Debtor.  All such insurance shall be written by such companies as Secured Party shall reasonably approve, the Secured Party and Debtor named as insureds and loss payees as their respective interests may appear.  All policies of insurance shall provide for not less than twenty (20) days' notice of cancellation, change, or termination to Secured Party and, if requested by Secured Party, all policies of insurance shall be delivered to and held by it until all of the Obligations have been fully paid, performed and observed.  Debtor shall provide to Secured Party, at least annually, certificates evidencing insurance;

(o)   Debtor will, at its sole cost and expense, perform all acts and execute all documents required by Secured Party from time to time to evidence, perfect, maintain or enforce Secured Party's security interest granted herein, and to effectuate or maintain the priority thereof or otherwise to carry out the provisions and purposes of this Security Agreement, including, but not limited to, all acts set forth in paragraph 5;

(p)   In its discretion, Secured Party may, at any time and from time to time, for the account of Debtor, pay any amount or do any act required of Debtor hereunder which Debtor fails to do or pay, and any such payment shall be deemed an Obligation payable on demand together with interest at the highest rate then payable on any of the Obligations;

(q)   Debtor has not, during the five-year period prior to the date hereof, been known by or used any tradename, fictitious name or any corporate name other than Debtor's name as set forth on Page 1 hereof, which is Debtor's exact legal name, and all invoices in connection with or which evidence Debtor's accounts receivable are billed under such corporate name;

(r)   If any proceeds of Collateral are received by Debtor which, pursuant to the provisions hereof are to be received by or turned over to Secured Party, Debtor shall not commingle such proceeds with any of its other property, shall hold such proceeds in trust for Secured Party and shall immediately deliver the same to Secured Party in the form received;

(s)   All statements in the Perfection Certificate annexed hereto as Exhibit "A" are true and correct; and

(t)   The Debtor has at all times conducted its business and will from and after the date hereof conduct its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes, ordinances and regulations dealing with the control, shipment, storage and disposal of oil, hazardous materials and hazardous substances.

5. Other Actions.   Further to insure the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in the Collateral, the Debtor agrees, in each case at the Debtor's own expense, to take the following actions with respect to the following Collateral:

(a)   Promissory Notes and Tangible Chattel Paper.   If the Debtor shall at any time hold or acquire any promissory notes or tangible chattel paper, the Debtor shall forthwith endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(b)   Deposit Accounts.   For each deposit account that the Debtor at any time opens or maintains, the Debtor shall, at the Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to the Secured Party, either (a) cause the depositary bank to agree to comply at any time with instructions from the Secured Party to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of the Debtor, or (b) arrange for the Secured Party to become the customer of the depositary bank with respect to the deposit account, with the Debtor being permitted, only with the consent of the Secured Party, to exercise rights to withdraw funds from such deposit account.   The provisions of this paragraph shall not apply to (i) any deposit account for which the Debtor, the depositary bank and the Secured Party have entered into a cash collateral agreement specially negotiated among the Debtor, the depositary bank and the Secured Party for the specific purpose set forth therein, (ii) deposit accounts for which the Secured Party is the depositary, and (iii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Debtor's employees.

(c)   Investment Property.   If the Debtor shall at any time hold or acquire any certificated securities, the Debtor shall forthwith endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify. If any securities now or hereafter acquired by the Debtor are uncertificated and are issued to the Debtor or its nominee directly by the issuer thereof, the Debtor shall immediately notify the Secured Party thereof and, at the Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to the Secured Party, either (a) cause the issuer to agree to comply with instructions from the Secured Party as to such securities, without further consent of the Debtor or such nominee, or (b) arrange for the

Secured Party to become the registered owner of the securities.  If
any securities, whether certificated or uncertificated, or other
investment property now or hereafter acquired by the Debtor are held
by the Debtor or its nominee through a securities intermediary or
commodity intermediary, the Debtor shall immediately notify the
Secured Party thereof and, at the Secured Party's request and option,
pursuant to an agreement in form and substance satisfactory to the
Secured Party, either (i) cause such securities intermediary or (as
the case may be) commodity intermediary to agree to comply with
entitlement orders or other instructions from the Secured Party to
such securities intermediary as to such securities or other investment
property, or (as the case may be) to apply any value distributed on
account of any commodity contract as directed by the Secured Party to
such commodity intermediary, in each case without further consent of
the Debtor or such nominee, or (ii) in the case of financial assets or
other investment property held through a securities intermediary,
arrange for the Secured Party to become the entitlement holder with
respect to such investment property, with the Debtor being permitted,
only with the consent of the Secured Party, to exercise rights to
withdraw or otherwise deal with such investment property.  The
provisions of this paragraph shall not apply to any financial assets
credited to a securities account for which the Secured Party is the
securities intermediary.

        (d)   Collateral in the Possession of a Bailee.  If any of
Debtor's goods are at any time in the possession of a bailee, the
Debtor shall promptly notify the Secured Party thereof and, if
requested by the Secured Party, shall promptly obtain an
acknowledgement from the bailee, in form and substance satisfactory to
the Secured Party, that the bailee holds such Collateral for the
benefit of the Secured Party and shall act upon the instructions of
the Secured Party, without the further consent of the Debtor.

        (e)   Electronic Chattel Paper and Transferable Records.  If
the Debtor at any time holds or acquires an interest in any electronic
chattel paper or any "transferable record," as that term is defined in
Section 201 of the federal Electronic Signatures in Global and
National Commerce Act, or in §16 of the Uniform Electronic
Transactions Act as in effect in any relevant jurisdiction, the Debtor
shall promptly notify the Secured Party thereof and, at the request of
the Secured Party, shall take such action as the Secured Party may
reasonably request to vest in the Secured Party control, under §9-105
of the Uniform Commercial Code, of such electronic chattel paper or
control under Section 201 of the federal Electronic Signatures in
Global and National Commerce Act or, as the case may be, §16 of the
Uniform Electronic Transaction Act, as in effect in such jurisdiction,
or such transferable record.

        (f)   Letter of Credit Rights.  If the Debtor is at any time a
beneficiary under a letter of credit now or hereafter issued in favor
of the Debtor, the Debtor shall promptly notify the Secured Party
thereof and, at the request and option of the Secured Party, the
Debtor shall, pursuant to an agreement in form and substance
satisfactory to the Secured Party, either (i) arrange for the issuer
and any confirmer of such letter of credit to consent to an assignment

to the Secured Party of the proceeds of any drawing under the letter of credit, or (ii) arrange for the Secured Party to become the transferee beneficiary of the letter of credit, with the Secured Party agreeing, in each case, that the proceeds of any drawing under the letter of credit shall, in turn, but paid to the Debtor unless the Debtor shall, when the proceeds are paid to the Secured Party, be in default of any of Debtor's Obligations.

(g)   Commercial Tort Claims.  If the Debtor shall at any time hold or acquire a commercial tort claim, the Debtor shall immediately notify the Secured Party in a writing signed by the Debtor of the details thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Security Agreement with such writing to be in form and substance satisfactory to the Secured Party.

(h)   Other Actions as to any and all Collateral.  The Debtor further agrees to take any other action reasonably requested by the Secured Party to ensure the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code, to the extent, if any, that the Debtor's signature thereon is required therefor, (b) causing the Secured Party's name to be noted as Secured Party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (c) complying with any provisions of the statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (d) obtaining governmental and other third party consents and approvals, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to Secured Party, and (f) taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.

6. Inspection of Records and Collateral.  The Debtor shall, at all reasonable times, and from time to time, allow Secured Party by or through any of its officers, agents, attorneys, or accountants, to examine, copy, inspect or make extracts from the Debtor's books and records and those of any related company, and to arrange for verification of accounts receivable, under reasonable procedures, directly with account debtors or by other methods.  Debtor shall at all reasonable times and from time to time allow the Secured Party, by or through any of its officers, or agents to enter the Debtor's Premises as listed on Exhibit "A" for the purpose of inspecting the Collateral.

7. Default, Remedies Upon Default. Upon the occurrence of any default by Debtor under the Note or under any Obligation, and at any time thereafter, Secured Party may, without notice to or demand upon Debtor, declare any and all Obligations immediately due and payable and Secured Party shall have the following rights and remedies (to the extent permitted by applicable law), in addition to all rights and remedies of Secured Party under the Note and all rights and remedies of a secured party under the Uniform Commercial Code, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently, at such time or times as Secured Party shall deem expedient:

(a)     Secured Party may at any time and from time to time, with or without judicial process or the aid and assistance of others, enter upon any premises in which any Collateral may be located and, without resistance or interference by Debtor, take possession of the Collateral, and/or dispose of any Collateral on any such premises, and/or require Debtor to assemble and make available to Secured Party at the expense of Debtor any Collateral at any place and time designated by Secured Party which is reasonably convenient to both parties, and/or remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof (and if any of the Collateral consists of motor vehicles, Secured Party may use Debtor's license plates), and/or sell, resell, lease, assign and deliver, grant options for or otherwise dispose of any Collateral in its then condition with or without following any commercially reasonable preparation or processing, at public or private sale or proceedings or otherwise, by one or more contracts, in one or more parcels or lots, at the same or different times, with or without having the Collateral at the place of sale or other disposition, for cash and/or credit, and upon any terms, at such place(s) and time(s) and to such person(s) as Secured Party deems best, all without demand, notice or advertisement whatsoever except where an applicable statute requires reasonable notice of sale or other disposition. Debtor hereby agrees that the sending of ten (10) days' notice (as provided in paragraph 17. hereof) shall be deemed reasonable notice thereof. If any Collateral is sold by Secured Party upon credit or for future delivery, Secured Party shall not be liable for the failure of the purchaser to pay for same and in such event Secured Party may resell such Collateral. Secured Party may buy any Collateral at any public sale and, if any Collateral is of a type customarily sold in a recognized market or is of the type which is subject to widely distributed standard price quotations, Secured Party may buy such Collateral at private sale and in each case may make payment therefor by any means, provided that payment is made in full by Secured Party upon the later of the time of such sale and the taking of delivery of such Collateral.

(b)     Secured Party may apply the cash proceeds actually received from any sale or other disposition of Collateral to the reasonable expense of retaking, holding, preparation for sale, selling, leasing and the like, to reasonable attorneys' fees and all legal, travel and other expenses which may be incurred by Secured Party in attempting to collect the Obligations or to enforce this Security Agreement, or in the prosecution or defense of any action or

proceeding related to the subject matter of this Security Agreement; and then to the Obligations in such order and as to principal or interest as Secured Party may determine; and Debtor shall remain liable and will pay Secured Party, on demand, any deficiency remaining after the application of such cash proceeds, together with interest thereon at the highest rate then payable on the Obligations and the balance of any expenses unpaid, with any surplus to be paid to Debtor, subject to any duty of Secured Party imposed by law to the holder of any other security interest in the Collateral known to Secured Party. Within a reasonable time following the application of cash proceeds, Secured Party shall provide Debtor with a reasonable accounting of the Obligations to which such proceeds have been applied.

8. Standards for Exercising Remedies. To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party (a) to fail to incur expenses reasonably deemed significant by the Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulations, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Secured Party against risks of loss, collection or disposition of Collateral or to provide to the Secured Party a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Secured Party, to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Secured Party in the collection or disposition of any of the Collateral. The Debtor acknowledges that the purpose of this paragraph 8. is to provide nonexhaustive indications of what actions or omissions by the Secured Party would not be commercially unreasonable in the Secured Party's exercise of remedies against the Collateral and that other actions or omissions by the Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this paragraph 8. Without limitation upon the foregoing, nothing

contained in this paragraph 8, shall be construed to grant any rights to the Debtor or to impose any duties on the Secured Party that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this paragraph 8.

9. Securities and Deposits. The Secured Party may at any time, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations. Whether or not any Obligations are due, the Secured Party may demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from the Secured Party to the Debtor may at any time be applied to or set off against any of the Obligations.

10. Power of Attorney. To effectuate the terms and provisions hereof, Debtor hereby designates and appoints Secured Party and each of its designees or agents as attorney-in-fact of Debtor, irrevocably and with power of substitution, with authority to: (i) endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders, instruments or other evidences of Collateral that may come into Secured Party's possession; (ii) sign the name of Debtor on any invoices, documents, drafts against and notices to account debtors or obligors of Debtor, assignments and requests for verification of accounts; (iii) execute proofs of claim and loss; (iv) execute endorsements, assignments or other instruments of conveyance or transfer; (v) adjust and compromise any claims under insurance policies or otherwise; (vi) execute releases; (vii) upon and after any default in any of the Obligations, receive, open and dispose of all mail addressed to Debtor and notify the Post Office authorities to change the address for delivery of mail addressed to Debtor to such address as Secured Party may designate and date and deliver to the Post Office the executed order of Debtor in the form annexed as Exhibit "C" hereto; and (viii) do all other acts and things necessary or advisable, in the sole discretion of Secured Party, to carry out and enforce this Security Agreement and the Obligations. All acts done under the foregoing authorization are hereby ratified and approved by the Debtor and neither Secured Party nor any designee or agent thereof shall be liable for any acts of commission or omission, for any error of judgment or for any mistake of fact or law except for Secured Party's gross negligence or wilful misconduct. This power of attorney, being coupled with an interest, is irrevocable while any Obligations shall remain unpaid, unobserved or unperformed.

11. Care of Collateral. Secured Party shall have the duty to exercise reasonable care in the custody and preservation of any Collateral in its possession, which duty shall be fully satisfied if Secured Party accords such Collateral treatment substantially the same as that which it accords similar property owned by it. Except for any claims, causes of action or demands arising out of Secured Party's failure to perform its agreements set forth in the preceding sentence, Debtor releases Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Security

Agreement, the Obligations, the Collateral and its use and/or any
actions taken or omitted to be taken by Secured Party with respect
thereto, and Debtor hereby agrees to hold Secured Party harmless from
and with respect to any and all such claims, causes of action and
demands. Secured Party's prior recourse to any Collateral shall not
constitute a condition of any demand, suit or proceeding for payment
or collection of the Obligations.

    12.    <u>Secured Party's Obligations and Duties</u>.  Anything herein to
the contrary notwithstanding, the Debtor shall remain liable under
each contract or agreement comprised in the Collateral to be observed
or performed by the Debtor thereunder. The Secured Party shall not
have any obligation or liability under any such contract or agreement
by reason of or arising out of this Security Agreement or the receipt
by the Secured Party of any payment relating to any of the Collateral,
nor shall the Secured Party be obligated in any manner to perform any
of the obligations of the Debtor under or pursuant to any such
contract or agreement, to make inquiry as to the nature or sufficiency
of any payment received by the Secured Party in respect of the
Collateral or as to the sufficiency of any performance by any party
under any such contract or agreement, to present or file any claim, to
take any action to enforce any performance or to collect the payment
of any amounts which may have been assigned to the Secured Party or to
which the Secured Party may be entitled at any time or times.  The
Secured Party's sole duty with respect to the custody, safekeeping and
physical preservation of the Collateral in its possession, under §9-
207 of the UCC or otherwise, shall be to deal with such Collateral in
the same manner as the Secured Party deals with similar property for
its own account.

    13.    <u>Suretyship Waivers by Debtor</u>.  The Debtor waives demand,
notice, protest, notice of acceptance of this Security Agreement,
notice of loans made, credit extended, Collateral received or
delivered or other action taken in reliance hereon and all other
demands and notices of any description (except as specifically
provided for herein).  With respect to both the Obligations and the
Collateral, the Debtor assents to any extension or postponement of the
time of payment or any other indulgence, to any substitution, exchange
or release of or failure to perfect any security interest in any
Collateral, to the addition or release of any party or person
primarily or secondarily liable, to the acceptance of partial payment
thereon and the settlement, compromise or adjustment of any thereof,
all in such manner and at such time or times as the Secured Party may
deem advisable.  The Secured Party shall have no duty as to the
collection or protection of the Collateral or any income thereon, nor
as to the preservation of rights against prior parties, nor as to the
preservation of any rights pertaining thereto beyond the safe custody
thereof as set forth in paragraphs 11 and 12 hereof.  The Debtor
further waives any and all other suretyship defenses.

    14.    <u>Marshalling</u>.  The Secured Party shall not be required to
marshal any present or future collateral security (including, but not
limited to, this Security Agreement and the Collateral) for, or other
assurances of payment of, the Obligations or any of them or to resort
to such collateral security or other assurances of payment in any

particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that it lawfully may, the Debtor agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights under this Security Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

15.    Secured Party's Waivers.  No act, omission or delay by Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise.  No single or partial waiver by Secured Party of any default or right or remedy which it may have shall operate as a waiver of any other of said defaults, rights or remedies or of the same default, right or remedy on a future occasion.

16.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (without giving effect to the conflict of laws principles thereof).

17.    Notices.  All notices and other communications to any party hereunder shall be in writing and shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, or by a reputable courier delivery service and shall be given as follows:

if to the Debtor:                    Kingsdale Corp. 50 Independen Drive
                                     ~~77 Broad Drive~~
                     Ayer Mashpee, MA ~~02649~~ 01432
                                     ATTN: ~~Thomas J. Sullivan~~, President
                                            FRANK MILLER

if to the Secured Party:             Clinton Savings Bank
                                     200 Church Street
                                     Clinton, MA  01510
                                     ATTN: Commercial Loan Department

or such other address as such party may hereafter specify by notice to the Secured Party and the Debtor.  Each such notice, request or other communication shall be effective (i) if given by certified mail, 72 hours after such communication is deposited with the post office, addressed as aforesaid, or (ii) if given by any other means (including, without limitation, by courier), when delivered at the address specified in this paragraph.

18.    Amendments and Waivers; Partial Invalidity; Acknowledgment of Receipt.  No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Security Agreement and to such provision, and executed by the party to be charged.  If any term of this Security Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.  Debtor acknowledges

receipt of a copy of this Security Agreement.

19.    Benefit of Agreement; Continuing Security Interest.    This Security Agreement and all Obligations shall be binding upon the heirs, executors, administrators, successors and assigns of Debtor and shall, together with the rights and remedies of Secured Party hereunder, inure to the benefit of Secured Party, its successors, endorsees and assigns.    This Agreement shall create a continuing security interest in the Collateral which shall remain in full force and effect until payment in full of the Obligations.

20.    Counterparts.    This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original and all of which shall together constitute one and the same agreement.

21.    Captions.    The captions of the paragraphs of this Security Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Security Agreement.

IN WITNESS WHEREOF, the undersigned have executed or caused this Security Agreement to be executed as of the date first above set forth, as a sealed instrument.

KINGSDALE CORP.

By: _____
Thomas J. Sullivan, President
and Treasurer Frank Miller

_____
Witness

CLINTON SAVINGS BANK

By: _____
                    Title
Vice President

_____
Witness

Exhibit "A"
to Security Agreement

PERFECTION CERTIFICATE

Kingsdale Corp. ("Debtor")

Clinton Savings Bank ("Secured Party")

The undersigned, the President and Treasurer of the Debtor, hereby certifies, with reference to a certain Security Agreement dated July _____, 2004 (terms defined in such Security Agreement having the same meanings herein as specified therein), between the Debtor and the Secured Party, to the Secured Party as follows:

1.    NAME.  The exact legal name of the Debtor as that name appears on its Articles of Organization is as follows:  Kingsdale Corp.

2.    OTHER IDENTIFYING FACTORS.

    (a)   The following is the mailing address of the Debtor:

        **77 Snead Drive, Mashpee, MA** 02649

    (b)   If different from its mailing address, the Debtor's place of business or, if more than one, its chief executive office is located at the following address:

| Address | County | State |
|---------|--------|-------|
|         |        |       |

    (c)   The following is the type of organization of the Debtor:

        **Domestic Profit Corporation**

    (d)   The following is the jurisdiction of the Debtor's organization:  **Massachusetts**

    (e)   The following is the Debtor's state issued organizational identification number [state "None" if the state does not issue such a number]:

3.    OTHER NAMES, ETC.

   (a)   The following is a list of all other names (including trade
         names or similar appellations) used by the Debtor, or any
         other business or organization to which the Debtor became
         the successor by merger, consolidation, acquisition, change
         in form, nature or jurisdiction of organization or
         otherwise, now or at any time during the past five (5)
         years:

   (b)   Attached hereto as Schedule 1 is the information required in
         paragraph 2 of this Certificate for any other business or
         organization to which the Debtor became the successor by
         merger, consolidation, acquisition, change in form, nature
         or jurisdiction of organization or otherwise, now or at any
         time during the past five (5) years:

4.    OTHER CURRENT LOCATIONS.

   (a)   The following are all other locations in which the Debtor
         maintains any books or records relating to any of the
         Collateral consisting of accounts, instruments, chattel
         paper, general intangibles or mobile goods:

         Address                County                State

   (b)   The following are all other places of business of the
         Debtor:

         Address                County                State

   (c)   The following are all other locations where any of the
         Collateral consisting of inventory or equipment is located:

         Address                County                State

(d)    The following are the names and addresses of all persons or
entities other than the Debtor, such as lessees, consignees,
warehousemen or purchasers of chattel paper, which have
possession or are intended to have possession of any of the
Collateral consisting of instruments, chattel paper,
inventory or equipment:

Name          Mailing Address          County      State

5.    PRIOR LOCATIONS.

(a)    Set forth below is the information required by paragraphs
4(a) or (b) of this Certificate with respect to each
location or place of business previously maintained by the
Debtor at any time during the past five (5) years in a state
in which the Debtor has previously maintained a location or
place of business at any time during the past four (4)
months:

Address                    County                State

(b)    Set forth below is the information required by paragraphs
4(c) or (d) of this Certificate with respect to each other
location at which, or other person or entity with which, any
of the Collateral consisting of inventory or equipment has
been previously held at any time during the past twelve (12)
months:

Name            Address              County            State

6.    FIXTURES.  Attached hereto as Schedule 2 is the information
required by UCC §9-502 or former UCC §9-402(5) of each state in which
any of the Collateral consisting of fixtures are or are to be located
and the name and address of each real estate recording office where a
mortgage on the real estate on which such fixtures are or are to be
located would be recorded, together with the name of the owner of the
real property on which any such fixtures are located and a reference
(by book and page and description of document) of a deed or mortgage
which describes such real property in such recording office.

(a)    Name and Address of Recording Office:

    (b)   Owner of Real Property:

    (c)   Description of Document (with date):

    (d)   Book and Page of Document Described in (c):

7.   UNUSUAL TRANSACTIONS.  Except for those purchases, acquisitions and other transactions described on Schedule 3 attached hereto, all of the Collateral has been originated by the Debtor in the ordinary course of the Debtor's business or consists of goods which have been acquired by the Debtor in the ordinary course from a person in the business of selling goods of that kind.

IN WITNESS WHEREOF, I have hereunto signed this Certificate this **23** day of July, 2004.

<del>Thomas J. Sullivan</del>

Frank Miller

Exhibit "B"
Permitted liens against Collateral

Name/Address of Lienor    Amount Secured    Property Subject to Lien

None

Exhibit "C"

_____
                              date

Postmaster
U.S. Postal Service
Mashpee, MA  02649

Gentlemen:

     Until written notice received by you from Clinton Savings Bank
and commencing immediately, please forward all mail addressed to
Kingsdale Corp., ~~77 Snead Drive, Mashpee, Massa~~chusetts ~~02649~~ or at
any other address or at any post office box to:  Clinton Savings Bank,
200 Church Street, Clinton, MA 01510 ATTN:  Commercial Loan
Department.

*50 Independence Drive Ayer MA 01452*

     Very truly yours,

     KINGSDALE CORP.

By: *Frank Miller* _____

    ~~Thomas J. Sullivan~~, President
    and Treasurer  *FRANK MILLER*

_____
date

Postmaster
U.S. Postal Service
Mashpee, MA  02649

Gentlemen:

        Until written notice received by you from Clinton Savings Bank
and commencing immediately, please forward all mail addressed to
Kingsdale Corp., 77 Snead Drive, Mashpee, Massachusetts 02649 or at
any other address or at any post office box to:  Clinton Savings Bank,
200 Church Street, Clinton, MA 01510 ATTN:  Commercial Loan
Department.

                        Very truly yours,

                        KINGSDALE CORP.


                        By:_____
                            Thomas J. Sullivan, President
                            and Treasurer

# GUARANTY

## TO: **CLINTON SAVINGS BANK** (the "Bank")

1.  Guaranty of Payment and Performance of Obligations: In consideration of the
Bank's extending credit or otherwise in its discretion giving time, financial facilities or
accommodations to **KINGSDALE CORP.,** a Massachusetts corporation (the
"Customer"), the undersigned, **FRANK MILLER** (the "Guarantor"), hereby
unconditionally guarantees to the Bank that (a) the Customer will duly and punctually
pay or perform, at the place specified therefor, or if no place is specified, at the Bank's
Head Office or at the branch of the Bank where this Guaranty is given, all indebtedness,
obligations and liabilities, direct or indirect, matured or unmatured, primary or secondary,
certain or contingent, of the Customer to the Bank now or hereafter owing or incurred,
including, but not limited to, all automated clearing house liabilities of the Customer to
the Bank, all obligations of the Customer arising from any and all overdrafts in any
deposit account of the Customer maintained with the Bank, arising, <u>inter alia</u>, from the
issuance of checks against uncollected funds (including without limitation costs and
expenses incurred by the Bank in attempting to collect or enforce any of the foregoing)
which are chargeable to the Customer either by law or under the terms of the Bank's
arrangements with the Customer accrued in each case to the date of payment hereunder
(collectively the "Obligations" and individually an "Obligation"); and (b) if there is an
agreement evidencing or executed and delivered in connection with any Obligation, the
Customer will perform in all other respects strictly in accordance with the terms thereof.
This Guaranty is an absolute, unconditional and continuing guaranty of the full and
punctual payment and performance by the Customer of the Obligations and not of their
collectibility only and is in no way conditioned upon any requirement that the Bank first
attempt to collect any of the Obligations from the Customer or resort to any security or
other means of obtaining payment of any of the Obligations which the Bank now has or
may acquire after the date hereof, or upon any other contingency whatsoever. Upon any
default by the Customer in the full and punctual payment and performance of the
Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option
of the Bank, become forthwith due and payable to the Bank without demand or notice of
any nature, all of which are expressly waived by the Guarantor. Payments by the
Guarantor hereunder may be required by the Bank on any number of occasions.

2.  Guarantor's Further Agreement to Pay: The Guarantor further agrees, as the
principal obligor and not as a guarantor only, to pay to the Bank forthwith upon demand,
in funds immediately available to the Bank, all costs and expenses (including court costs
and reasonable legal expenses) incurred or expended by the Bank in connection with this
Guaranty and the enforcement hereof (the "Expenses") together with interest on the
Expenses from the time such Expenses are incurred until payment at a per annum rate of
interest of ten percent (10%).

3.  Unlimited Liability of Guarantor: The liability of the Guarantor hereunder
shall be unlimited.



4.  Security; Set-off:  The Guarantor grants to the Bank, as security for the full and punctual payment and performance of the Guarantor's obligations hereunder, a continuing lien on and security interest in all securities or other property belonging to the Guarantor now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Guarantor or subject to withdrawal by the Guarantor; and regardless of the adequacy of any collateral or other means of obtaining repayment of the Obligations, the Bank may at any time and without notice to the Guarantor set off the whole or any portion or portions of any or all such deposits and other sums against amounts payable under this Guaranty, whether or not any other person or persons could also withdraw money therefrom.

5.  Bank's Freedom to Deal with Customer and Other Parties:  The Bank shall be at liberty, without giving notice to or obtaining the assent of the Guarantor and without relieving the Guarantor of any liability hereunder, to deal with the Customer and with each other party who now is or after the date hereof becomes liable in any manner for any of the Obligations, in such manner as the Bank in its sole discretion deems fit, and to this end the Guarantor gives the Bank full authority in its sole discretion to do any or all of the following things:  (a) extend credit, make loans and afford other financial accommodations to the Customer at such times, in such amounts and on such terms as the Bank may approve, (b) vary the terms and grant extensions or renewals to Customer or to any such other party, (c) grant time, waivers and other indulgences in respect thereto, (d) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any security or guaranty or other means of obtaining payment of any of the Obligations which the Bank now has or acquires after the date hereof, (e) accept partial payments from the Customer or any such other party, (f) release or discharge, wholly or partially, any endorser or guarantor, and (g) compromise or make any settlement or other arrangement with the Customer or any such other party.

6.  Unenforceability of Obligations Against Customer; Invalidity of Security or Other Guaranties:  If for any reason the Customer has no legal existence or is under no legal obligation to discharge any of the Obligations undertaken or purported to be undertaken by it or on its behalf, or if any of the moneys included in the Obligations have become irrecoverable from the Customer by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantor to the same extent as if the Guarantor at all times had been the principal debtor on all such Obligations.  This Guaranty shall be in addition to any other guaranty or other security for the Obligations and it shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security.

7.  Waivers by Guarantor:  The Guarantor waives:  notice of acceptance hereof, notice of any action taken or omitted by the Bank in reliance hereon, and any requirement that the Bank be diligent or prompt in making demands hereunder, giving notice of any default by the Customer or asserting any other right of the Bank hereunder.  The Guarantor also irrevocably waives, to the fullest extent permitted by law, all defenses which at any time may be available in respect of the Guarantor's obligations hereunder by

virtue of any homestead exemption, statute of limitations, valuation, stay, moratorium law or other similar law now or hereafter in effect.

8. No Contest with Bank: So long as any Obligation remains unpaid or undischarged, the Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by the Bank) or by any means or on any other ground, claim any set-off or counterclaim against the Customer in respect of any liability of the Guarantor to the Customer or, in proceedings under the Bankruptcy Code or insolvency proceedings of any nature, prove in competition with the Bank in respect of any payment hereunder or be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of the Customer or the benefit of any other security for any Obligation which, now or hereafter, the Bank may hold or in which it may have any share.

9. Demands and Notices: Any demand or notices required or permitted hereunder shall be in writing and shall be effective when delivered in hand or mailed by registered or certified mail, return receipt requested as follows:

If to Bank:                    Clinton Savings Bank
                               200 Church Street
                               Clinton, MA 01510
                               Attn: Michael D. Tenaglia, Senior Vice President

If to Guarantor:               Frank Miller
                               95 Kettlehole Road
                               Bolton, MA 01740

10. Amendments, Waivers Etc.: No provision of this Guaranty can be changed, waived, discharged or terminated except by an instrument in writing signed by the Bank and the Guarantor expressly referring to the provision of this Guaranty to which such instrument relates; and no such waiver shall extend to, affect or impair any right with respect to any Obligation which is not expressly dealt with therein. No course of dealing or delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto.

11. Miscellaneous Provisions: This Guaranty is intended to take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall inure to the benefit of the Bank and its successors in title and assigns, and shall be binding on the Guarantor and the Guarantor's successors in title, assigns, and legal representatives.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as a sealed instrument on the ___23___ day of ___July___, 2004.

_Frank Miller_
Frank Miller

-3-

Official Receipt for Recording in:

Worcester South Registry of Deeds
2 Main St.

Worcester, Massachusetts 01608

Issued To:
SEDER & CHANDLER

### Recording Fees

| Document Description | Number | Book/Page | | Recording Amount |
|---|---|---|---|---|
| MTG | 00152318 | 34411 | 234 | $175.00 |
| | | | | $175.00 |

### Collected Amounts

| Payment Type | | Amount |
|---|---|---|
| Check | 5847 | $175.00 |
| | | $175.00 |

| | | |
|---|---|---|
| Total Received : | | $175.00 |
| Less Total Recordings: | | $175.00 |
| Change Due : | | $.00 |

Thank You
ANTHONY J. VIGLIOTTI - Register of Deeds

By: A Baldino

Receipt#    Date    Time
0145879   08/19/2004  03:04p



MASSACHUSETTS **REAL ESTATE MORTGAGE** (INDIVIDUAL) 892

Frank Miller and Maria C. Miller f/k/a Mari~

of   95 Kettle Hole Road, Bolton, Worcester,                              County, Massachusetts
for consideration paid, grants to  Clinton Savings Bank

of  200 Church Street, Clinton, MA

with ~~mortgage covenants~~ to secure the payment of  that certain guaranty dated July 23, 2004 executed
by Frank Miller in favor of Clinton Savings Bank with respect to the obligations of Kingsdale
Corp., including, but not limited to, a Revolving Credit Note in the maximum principal amount    ~~Dollars~~
of $8,400,000.00.

~~in~~            ~~years with~~                                            ~~per cent interest, per annum~~
~~payable semi annually — monthly~~                                         ~~annual percentage rate~~
~~as provided in~~        ~~note  of even date,~~

the land ~~&~~ and buildings located thereon known and numbered as 95 Kettle Hole Road,
Bolton, Massachusetts, more fully described on Exhibit A attached hereto.
[~~Premises to be conveyed~~]

COPY

WORCESTER DISTRICT
REGISTRY OF DEEDS
RECEIVED & RECORDED
INST#_____
BK_____.PG_____
TIME____3:04pm_____
DATE__05-19-04_____
ANTHONY J. VIGLIOTTI, REGISTER

ANTHONY J. VIGLIOTTI, REGISTER

RETURN TO:

Paul J. O'Riordan, Esq.
SEDER & CHANDLER
339 Main Street
Worcester, MA  01608

(*Individual — Joint Tenants — Tenants in Common.)

This mortgage is upon the statutory condition,

for any breach of which the mortgagee shall have the statutory power of sale.

husband
wife . of said mortgagor.

Witness ...our. hand s and seal s this .......18 th............ day of .....August...... XX 2004

*Frank Miller*
Frank Miller

*Maria C. Miller  Maria LaFrenier*
Maria C. Miller f/k/a Maria LaFrenier

*Janet L. Scott*



JANET L. SCOTT
Notary Public
Commonwealth of Massachusetts
My Commission Expires Feb 6, 2010

The Commonwealth of Massachusetts

Worcester,          ss.                                         8 - 18              , 2004

Then personally appeared the above named   Frank Miller and Maria C. Miller f/k/a
Maria LaFrenier, proved to me through satisfactory evidence of identification
which was _Frank Miller & Maria LaFrenier_, to be the person whose name is signed
on the preceding document,       _Miller_
and acknowledged the foregoing instrument to be     their   free act and deed, before me

Janet L. Scott
Notary Public—XXXXXXXXXXXXX

My commission expires                                19



JANET L. SCOTT
Notary Public
Commonwealth of Massachusetts
My Commission Expires Feb 5, 2010

---

EXTRACT FROM GENERAL LAWS, (TER. ED.) CHAPTER 183, SECTIONS 18, 19, 20, 21.

Section 18.   A deed in substance following the form entitled "Mortgage Deed" shall when duly executed have the force and effect of a mortgage deed to the use of the mortgagee and his heirs and assigns with mortgage covenants and upon the statutory condition and with the statutory power of sale, as defined in the three following sections, to secure the payment of the money or the performance of any obligation therein specified. The parties may insert in such mortgage any other lawful agreement or condition.

Section 19.   In a conveyance of real estate the words "mortgage covenants" shall have the full force, meaning and effect of the following words, and shall be applied and construed accordingly: "The mortgagor, for himself, his heirs, executors, administrators and successors, covenants with the mortgagee and his heirs, successors and assigns, that he is lawfully seized in fee simple of the granted premises; that they are free from all encumbrances; that the mortgagee has good right to sell and convey the same; and that he will, and his heirs, executors, administrators and successors shall, warrant and defend the same to the mortgagee and his heirs, successors and assigns forever against the lawful claims and demands of all persons; and that the mortgagor and his heirs, successors or assigns, in case a sale shall be made under the power of sale, will, upon request, execute, acknowledge and deliver to the purchaser or purchasers a deed or deeds of release confirming such sale; and that the mortgagee and his heirs, executors, administrators, successors and assigns are appointed and constituted the attorney or attorneys irrevocable of the said mortgagor to execute and deliver to the said purchaser a full transfer of all policies of insurance on the buildings upon the land covered by the mortgage at the time of such sale."

Section 20.   The following "condition" shall be known as the *Statutory Condition*, and may be incorporated in any mortgage by reference:

(CONDITION)

Provided, nevertheless, except as otherwise specifically stated in the mortgage, that if the mortgagor, or his heirs, executors, administrators, successors, or assigns shall pay unto the mortgagee or his executors, administrators or assigns the principal and interest secured by the mortgage, and shall perform any obligation secured at the time provided in the note, mortgage or other instrument or any extension thereof, and shall perform the condition of any prior mortgage, and until such payment and performance shall pay when due and payable all taxes, charges and assessments to whomsoever and whenever laid or assessed, whether on the mortgaged premises or on any interest therein, or on the debt or obligation secured thereby; shall keep the buildings on said premises insured against fire in a sum not less than the amount secured by the mortgage or as otherwise provided therein for insurance for the benefit of the mortgagee and his executors, administrators and assigns in such form and at such insurance offices as they shall approve, and at least two days before the expiration of any policy on said premises, shall deliver to him or them a new and sufficient policy to take the place of the one so expiring, and shall not commit or suffer any strip or waste of the mortgaged premises or any breach of any covenant contained in the mortgage or in any prior mortgage, then the mortgage deed, as also the mortgage note or notes, shall be void.

Section 21.   The following "power" shall be known as the *Statutory Power of Sale*, and may be incorporated in any mortgage by reference:

(POWER)

But upon any default in the performance or observance of the foregoing or other condition, the mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises or such portion thereof as may remain subject to the mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises, then subject to the mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the mortgage, first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee-simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity.

**Mortgage**

REAL ESTATE

(INDIVIDUAL)

FRANK MILLER and MARIA C. MILLER f/k/a MARIA

TO

CLINTON SAVINGS BANK

---

FROM THE OFFICE OF:

Paul J. O'Riordan, Esq.
SEDER & CHANDLER
339 Main Street
Worcester, MA 01608
(508)757-7721

Attest: ...................................Register

Book.................Page.................

Received and entered with..................Deeds

at.........o'clock and.........minutes.........m

.........19.........

RETURN TO →

HOBBS & WARREN, INC.
PUBLISHERS STANDARD LEGAL FORMS
BOSTON  -  MASS.
Form 892 Revised
Chapter 757-1940

---

(Please print or type)

RETURN TO:

Paul J. O'Riordan, Esq.
SEDER & CHANDLER
339 Main Street
Worcester, MA 01608

## EXHIBIT A

A parcel of land situated on the southeasterly side of Kettle Hole Road in the Town of Bolton, County of Worcester, Commonwealth of Massachusetts, and bounded and described as follows:

BEGINNING        at a point on the southeasterly side of Kettle Hole Road at the westerly corner of Lot 10-A and the northerly corner of Lot 11-A;

THENCE           S. 38° 16' 44" W. by Kettle Hole Road seventy-four and 30/100 (74.30) feet to a point of curvature;

THENCE           Southwesterly on a curve to the right having a radius of five hundred five and 00/100 (505.00) feet, an arc distance of one hundred seventy-five and 71/100 (175.71) feet to a point at the northerly corner of land now or formerly of Dunnells Family Realty Trust;

THENCE           S. 14° 04' 56" E. by land now or formerly of Dunnells Family Realty Trust one hundred sixty-two and 24/100 (162.24) feet to a point at Parcel F and a 15 foot wide trail easement;

THENCE           N. 82° 40' 05" E. by Parcel F, a 15 foot wide trail easement and Parcel H three hundred twenty and 73/100 (320.73) feet to a point at the southerly corner of Lot 10-A;

THENCE           N. 31° 53' 00" W. by Lot 10-A three hundred forty-two and 92/100 (342.92) feet to the point of beginning.

CONTAINING     65,340 square feet or 1.50 acres, more or less.

BEING Lot 11A as shown on a plan entitled, "'Pleasant Ridge', Definitive Subdivision of Land in Bolton, Massachusetts", plan by Whitman & Bingham Associates, Inc., Scale 1" = 40', dated July 1, 1996, which plan is recorded with the Worcester District Deeds in Plan Book 716, Plan 105.

Subject to and together with easements and restrictions of record insofar as the same may be still in force and applicable.

Together with the rights to use Kettle Hole Road for all purposes for which streets and roads are commonly used in the Town of Bolton.

Subject to a Declaration of Covenants and Restrictions dated July 14, 1986 and recorded with Worcester District Registry of Deeds in Book 9609, Page 372.

BEING the same premises described in a deed dated June 30, 1997 and recorded with said Registry in Book 18959, Page 293.

## PLEDGE AGREEMENT

To:    CLINTON SAVINGS BANK (the "Bank")

The undersigned, **FRANK MILLER** (hereinafter referred to as the "Undersigned"), to secure all of the Obligations (as hereinafter defined) of the Undersigned under and pursuant to that certain Guaranty dated of even date herewith executed and delivered by the Undersigned to the Bank (the "Guaranty"), whereunder the Undersigned guaranteed all of the obligations of Kingsdale Corp. to the Bank, including, without limitation, a Revolving Credit Note dated of even date herewith in the original principal amount of $8,000,000.00, hereby and herewith pledges with and to the Bank the following, in addition to any and all other collateral granted to the Bank for the Obligations (as hereinafter defined):

Account No. 800123499 maintained by the Undersigned at the Bank (the "Account")

and hereby agrees with the Bank as follows:

1.    The Account, and all other securities and/or property belonging to or standing in the name of the Undersigned which the Undersigned has heretofore or may hereafter deposit with the Bank, shall constitute collateral security for any and all liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Undersigned including, but not limited to, obligations evidenced by the Guaranty (the "Obligations").

2.    The Bank is hereby fully authorized and empowered, on the non-performance or default of any of the Obligations and after having given three (3) days' prior notice thereof to the Undersigned, to transfer the Account to the Bank or its nominee, and apply the proceeds thereof as provided in the next sentence. After deducting all legal or other expenses and costs of collection of any of the Obligations and all legal or other expenses and costs of collection, storage, custody, sale and delivery of any collateral held for the Obligations, the residue of any proceeds of collection shall be applied to the payment of principal or interest on one or more of the Obligations, due or to become due, in such order of preference as the Bank may determine, proper allowance for interest on Obligations not then due being made, and any excess proceeds from said collateral shall be returned to the Undersigned. The Bank shall also have, with respect to the Account, all the rights and powers that are given to the Bank with respect to collateral in the Guaranty.



July 21 20044.33 PM

3.    The Bank may, at its option, when the Obligations are due, demand, sue for, collect, or make any compromise or settlement the Bank deems desirable with reference to the collateral held hereunder.  The Bank shall have no duty as to the collection or protection of collateral held hereunder or any income thereon, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.  The Bank may exercise its rights with respect to the collateral held hereunder without resorting or regard to other security or sources of reimbursement for the Obligations.  No delay or omission on the Bank's part in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right and/or remedy on any future occasion.

4.    So long as any Obligation shall exist, the Undersigned waives any right to withdraw any sums from the Account.

5.    Except as specifically provided hereinabove, the Undersigned waives demand, notice, protest, notice of acceptance of this Agreement, notice of any additional Obligations, extensions granted, collateral received or delivered or other action taken in reliance hereon, all demands and notices in connection with the delivery, acceptance, performance, default or enforcement of any Obligation for which the Account is pledged and all other demands and notices of any description; and the Undersigned assents to any extension or postponement of the time of payment and any other indulgence, to any substitution, exchange or release of collateral and/or to the addition or release of any party or person primarily or secondarily liable on any of the Obligations.

6.    This Agreement is intended to take effect as a sealed instrument and shall inure to the benefit of the Bank and its successors and assigns and shall be binding upon the Undersigned and the successors and/or other legal representative(s) of the Undersigned.  The obligations of the Undersigned under this Agreement shall continue until all Obligations hereby secured shall have been performed or paid in full.

Executed as a sealed instrument this _23rd_ day of July, 2004.

_____                   _____
Witness                                     Frank Miller



**INTON**
**NGS BANK**
*st, for Generatione*
ntonsavings.com

**CUSTOMER**
**RECEIPT**

Clinton
200 Church St.
978-365-3700

Bolton
663 Main St.
978-779-2857

West Boylston
231 West Boylston St.
508-835-9944

Sterling
1 Main St.
978-422-8133

Berlin
35 Central St.
978-838-2286

All Deposits Insured in Full    Member FDIC/Member DIF    EQUAL OPPORTUNITY LENDER

count:  800123499 NA    Amt: $500,000.00
#:    2 NN#:  300 CHK    Amt: $500,000.00
#:  136 TL#:31214
-23-2004 9:46:29
rent Balance:$500,000.00

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE



**CLINTON**
**SAVINGS BANK**
*Customers 1st, for Generatione*
www.clintonsavings.com

**CUSTOMER**
**RECEIPT**

Clinton
200 Church St.
978-365-3700

Bolton
563 Main St.
978-779-2857

West Boylston
231 West Boylston St.
508-835-9944

Sterling
1 Main St.
978-422-8133

Berlin
35 Central St.
978-838-2286

All Deposits Insured in Full    Member FDIC/Member DIF    EQUAL OPPORTUNITY LENDER

Account:  800123499 NA    Amt: $500,000.00
BR#:    2 NN#:  300 CHK    Amt: $500,000.00
CB#:  136 TL#:31214
07-23-2004 9:46:29
Current Balance:$500,000.00

CLF-118 (3/01)

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE
TERMS AND CONDITIONS OF THIS INSTITUTION'S COLLECTION AGREEMENT

**FRANK MILLER &**
**MARIA C. MILLER JT TEN**
95 KETTLEHOLE ROAD
BOLTON, MA  01740

121

50-1291/213
6614461904

DATE 7/22/04

PAY TO THE
ORDER OF _Clinton Savings Bank_            $ 500,000.00

_Five hundred Thousand_ _____ 00/100 DOLLARS

Payable through:
**TD Waterhouse**
Bank, N.A.
Member FDIC

MEMO _Acc5,800123499_            _Frank Miller_

⑈021912915⑈ 8814461904⑈ 0121

EXHIBIT 19

JULY 2004 NOTE AND
RELATED DOCUMENTS

PART 2

EXHIBIT 20

MEDIA REPORT REGARDING
VITROTECH CORPORATION

EXHIBIT 21

AUGUST 9, 2004 CSB LOAN
PRESENTATION SHEET

EXHIBIT 22

AUGUST 16, 2004 CSB LOAN
PRESENTATION SHEET

EXHIBIT 23

AUGUST, 2004 LETTER AGREEMENT
REGARDING AMENDMENT OF REVOLVING
CREDIT NOTE

EXHIBIT 24

VITROTECH FORM 10-Q FOR QUARTER
ENDING JUNE 30, 2004

EXHIBIT 20

MEDIA REPORT REGARDING
VITROTECH CORPORATION



**YAHOO! FINANCE**   Search - Finance Home - Yahoo! - Help

PRNewswire

Welcome [Sign In]                                         To track stocks & more, Regi:

## Financial News

Enter symbol(s) [        ]  [Basic  ▼]  [Get]  Symbol Lookup




$7 Trades at Scottrade
Online Market Orders ▶ GO!

HARRISdirect.
Open an account, get $100 ▶

Get 50 commission free trades
E*TRADE SECURITIES LLC

**Related Quote**



VROT.OB 2–Aug @ 2:25pm (C)Yah

VROT.OB    0.47   -0.11   Ne
**View Detailed Quote**
Delayed 20 mins
Quote data provided by Reuters

**Press Release**                          Source: VitroTech Corporation

# VitroTech Corporation Provides Update on Business Developments and Revenue Outlook for Balance of 2004 and 2005

Monday August 2, 6:01 am ET

SANTA ANA, Calif., Aug. 2 /PRNewswire-FirstCall/ VitroTech Corporation (OTC Bulletin Board: VROT - News) today provided an update on business developments at the company and management's outlook for 2004 and 2005.

ADVERTISEMENT



One-second guarantee? Nanosecond guarantee?

**Background**

VitroTech's core business was founded in 1997 to engage in the materials technology business, including the mining, processing and marketing and sale of a family of proprietary amorphous aluminosilicate-based products designed to improve the performance and quality of a broad array of manufacturing applications. VitroTech's initial products are Vitrolite® – a processing additive for use in plastics manufacturing – and Vitrocote® – a processing additive for use in the paint and coatings industries. Additional product applications and product line extensions have been identified and are undergoing product research and development.

Through December 2003, VitroTech's sales were limited with efforts concentrated on product development, testing and validation and establishing a sales and support organization with initial sales being handled via a network of distributors and representatives.

**2004 Developments**

During the first half of 2004, VitroTech began implementation of a revised sales and marketing strategy focusing on three Distribution Channels within the plastics industry and characterized as (1) application specific sales -- utilizing a focused team of sales

**Related News Stories**

· VitroTech Corporation Announces Appointment of Director - PR Newswire (Wed Jul 7)

· VitroTech Corporation Announces Investment Banking Agreement With Bre Murray & Co. and Managem Realignment - PR Newswire (Fri Jul 2)

· VitroTech Corporation Announces Distribution Agreement With Nippon Pair (America) Corporation - PR Newswire (Wed Jun 30)

· VitroTech Successfully Delis: From Berlin Stock Exchange PR Newswire (Tue Jun 15)

Mor

· By industry: Textiles

**Top Stories**

· P&G Quarterly Profit Jumps, Shares Rise - Reuters (2:32 pm)

· US Blue Chips Higher as Attack Fears Ease - Reuters (2: pm)

· RJ Reynolds Profit Jumps or Restructuring - Reuters (12:39 pm

· U.S. Factories Strong, Construction Slips - Reuters (12 pm)

Mor

· Most-emailed articles

and marketing professionals targeting larger customers with potential annual product requirements exceeding $1 million and capitalizing on VitroTech's extensive database of demonstrable results across a broad array of applications; (2) joint venture/strategic partnership sales – establishing relationships with key suppliers to the plastics industry, including resin manufacturers, masterbatchers and specialty compounders, to develop performance products wherein VitroTech products are added "up stream" at the respective resin manufacturing stage, masterbatch stage or compounding stage; and (3) strategic acquisition driven sales – acquiring companies with strategic value to VitroTech to enhance or add capabilities, resources, customers and distribution channels with a view to accelerate sales growth.

Pursuant to the restructuring of its sales and marketing approach and to take advantage of the opportunities that the company expects to result from the acquisition of a specialty compounder, VitroTech today deposited 3,000,000 shares of its common stock as a commitment with respect to the proposed acquisition of the compounding operations and assets of Gitto/Global Corporation. Gitto is primarily engaged in the delivery of value-added compounding services to base resins to produce and distribute specialty plastics such as polyvinyl chloride, polyethylene, polypropylene and thermoplastic olefinic compounds. In addition to their existing formulations, Gitto is on a run rate with the production of their specialty engineered resins incorporating Vitrolite®, which sell to customers for $1.50 to more than $2.00 per pound. The Company and Gitto believe that over the next eighteen months, they could fully utilize their existing 80 million pound capacity (revenue of $120 million +).

The purchase price of Gitto's compounding operations is approximately $50 million consisting of cash and assumption of debt. The proposed acquisition includes acquisition of a 65,000 square foot modern plant as well as state-of-the-art compounding and extrusion equipment. Gitto's facilities offer substantial opportunities for increased production, market presence and utilization of VitroTech products, specifically by leveraging Gitto's underutilized capacity for expansion. Completion of the acquisition is subject to the satisfaction of a number of due diligence items, including delivery of satisfactory financial statements with respect to the acquired operations and financing of the acquisition. There can be no assurance that the conditions of the acquisition will be satisfied and the acquisition completed. VitroTech has dedicated substantial management and other resources in connection with the proposed acquisition and, if the acquisition is not completed, VitroTech may forfeit the 3,000,000 shares deposited in escrow.

Outlook

Commenting on developments to date and the outlook through 2005, VitroTech Chairman Jess Rae Booth stated, "Since the beginning of 2004, we have devoted a tremendous amount of time and resources laying the foundation for future sales growth. While we essentially took one step backward in the first half of 2004 to restructure our sales strategy, we expect that our revised strategy will bear substantial benefits beginning in the fourth quarter 2004, in 2005 and thereafter. Over the past two years, our efforts have cultivated relationships with major suppliers to the plastics industry, strategic partners and distributors. These relationships will drive substantial sales growth going forward and we believe that the revenue estimates set forth below will be achieved. The company has spent between three to twelve months working with a number of specific customers that we believe will purchase our products in the upcoming months. Because our sales are technical in nature, the sales cycle ranges from four to eight months. Extensive testing has been completed by many of our current customers and partners, and we are now receiving initial orders from new customers and expansion in orders from selected existing customers. Each of the company's Distribution Channels is expected to produce meaningful contributions to the overall company revenue estimates."

Mr. Booth indicated that management's current expectations for revenues are as follows:

· Most-viewed articles

Inside Yahoo! Finance

Today's Markets
· Earnings Calendar
· Upgrades/Downgrades
· Most Actives
· Stock Screener

* revenue for 2004 is expected to be between $5 and $6 million

* revenue for 2005 is expected to be in excess of $25 million

This news release contains forward-looking statements that are subject to a number of risks and uncertainties. Demand for VitroTech's products, which impacts revenue, is affected by business and economic conditions as well as industry trends, customer acceptance and rapidity of adoption of VitroTech products and changes in customer ordering patterns. Revenue is also affected by competing products and technologies, pricing pressures and other competitive factors. Future revenue is also dependent on continuing technological advancement, including developing and implementing new processes and strategic products, as well as the timing of new product introductions, sustaining and growing new businesses and integrating and operating any acquired businesses. The proposed acquisition of the compounding operations of Gitto is subject to satisfaction of a number of conditions, including satisfactory completion of due diligence, delivery of audited financial statements of Gitto in form acceptable to VitroTech and VitroTech's ability to finance the acquisition, among others. Gitto's run rate, revenues and utilization of VitroTech's products are likewise subject to similar risks as faced by VitroTech in the sale of its products. If terrorist activity, armed conflict, civil or military unrest or political instability occurs in the United States or other locations, such events may disrupt production and distribution of products and could also result in reduced demand for VitroTech's products and could impair VitroTech's ability to consummate the Gitto acquisition. Results could also be affected by adverse effects associated with product defects and by litigation, as well as other risk factors listed in VitroTech's SEC reports, including the report on Form 10-QSB for the quarter ended March 31, 2004. The statements in this release are based on current expectations and do not include the potential impact of any mergers, acquisitions, divestitures or other business combinations that have not been completed by the date hereof.

For further information regarding risks and uncertainties associated with VitroTech's business, please refer to the "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors That May Affect Future Results" sections of VitroTech's SEC filings, including, but not limited to, its annual report on Form 10-KSB and quarterly reports on Form 10-QSB.

All information in this release is as of August 2, 2004. The company undertakes no duty to update any forward-looking statement to conform the statement to actual results or changes in the company's expectations.

About VitroTech Corporation

VitroTech Corporation (OTC Bulletin Board: VROT - News) is a materials technology and research company, headquartered in Santa Ana, California, with rights to purchase, process and sell approximately 35 billion pounds of rare amorphous aluminosilicate deposits which are used to produce its primary products, Vitrolite® and Vitrocote®. These products enhance both the physical qualities and production of plastics, paint/coatings, and a variety of other market segments. (www.vitrotechcorp.com)

```
CONTACT: VITROTECH CORPORATION
Walt Carlson
714-708-4700
```

Source: VitroTech Corporation

EXHIBIT 21

AUGUST 9, 2004 CSB LOAN
PRESENTATION SHEET

Commercial and Industrial Format

### CLINTON SAVINGS BANK
### Loan Presentation Sheet

| Relationship Name: | Kingsdale Corp. | Date: | 8/9/2004 |
|---|---|---|---|
| Mailing Address: | 77 Snead Drive, Mashpee, MA 02649  *50 Independence Dr Ayer, MA 01432* | Account Officer: | RJP / DAH |
| Business/Industry: | Plastics distributor | Gross Revenues >$1MM: | No |
| Year Established: | 2001 | current LQG: | N/A |
| Customer Since: | 2001 | Recommended LQG: | 4 |
| Principals: | Frank Miller, President | | |

| This Loan Presentation Sheet Involves: | | | | |
|---|---|---|---|---|
| New Loan Request(s) | √ | Increase Credit Line(s) | Renewal(s) | Covenant Waiver(s) | Amendment(s) |

| Loan Proposal(s): | #1 |
|---|---|
| Borrower (Legal Name): | Kingsdale Corp. |
| Organizational Type: | Corporation |
| Current Commitment: | N/A |
| Proposed Commitment: | $8,400,000 through August 1, 2004; $8,000,000 until August 16, 2004 |
| Facility Type: | Revolving line of credit |
| Purpose: | Provide for payments of checks drawn against uncollected funds |
| Maturity/Expiration Date: | 8/16/04 with provision to extend through 8/31/04 (See Transaction for further details) |
| Amortization: | N/A  *27* |
| Rate: | Wall Street Journal Prime plus 4.0%, floating daily |
| Fees: | $40,000 (1/2%) |
| Proposed Debt Service: | Interest only, weekly |
| Sources of Repayment: 1) | Sale of related company |
| 2) | Liquidation of collateral |
| 3) | Guarantor support |
| Security: | See Transaction |
| Guarantor: | See Transaction |
| Policy Exceptions: | None |

**Bank Exposure (000's omitted):**

| | |
|---|---|
| Total Current CL Commitment: | $0 |
| | $6,200 / |
| Total Proposed CL Commitment: | $5,800 |
| + current NonCL Commitment: | $0 |
| | $6,200 / |
| **Total Proposed Commitment** | **$5,800*** |

Bank ACH Exposure

**Credit Approval:**

Account Officer: RJP/DAH

Senior Lending Officer:

Senior Loan Committee:

Board of Investment:

**Signature/Date:**

[signatures]  Delta 7k 8/9

John M Davis  8-10-04
Robert Farrazier  8-10-04

*The total loan facility of $8,400M / $8,000M is partially secured by cash in the amount of $2,200M, thereby reducing the Bank's total exposure to $6,200 / $5,800M.

| Loan Proposal(s): | #1 |
|---|---|
| Property Type: | |
| FDIC Category: | |
| Commercial/Minor: | |
| SIC Code: | |
| Participation(s) - % Sold & Bank: | N/A |

1

**Explanation of Transaction**

To ratify a revolving line of credit facility to Kingsdale Corp. **(Kingsdale)** that was closed on July 23, 2004. The total exposure of $8,400M was in place from July 23, 2004 through August 1, 2004, then was subsequently reduced to $8,000M until the August 16, 2004 expiration date. This loan facility is available as a backup for the Bank's willingness to pay checks drawn on Kingsdale's account against uncollected funds. Pricing is at the Wall Street Journal Prime plus 4.0%, floating daily. Interest only payments will be collected weekly. A $40,000 fee was collected at closing and a $150,000 fee will be collected as an exit fee. Security consists of multiple components that include the following:

1) $1,200,000 in cash pledged by Kingsdale Corp. (held by CSB)
2) a first security interest in all business assets of Kingsdale Corp.;
3) $500,000 in cash pledged by Gary Gitto (held by CSB) via his secured limited guaranty;
4) $500,000 in cash pledged by Frank Miller (held by CSB) via his secured unlimited guaranty;
5) a second mortgage on real estate located at 140 Leominster-Shirley Road, Lunenburg, MA and security interest in Vitrolite inventory located at the Casey Transportation & Warehouse in Leominster via the secured guarantee of Tradex Corp.;
6) a security position on equipment pledged by The Gitto/Global Corporation **(GGC)** and 3,000,000 shares of Vitrotech common stock, via the secured guarantee of GGC.

The primary source of repayment is the sale of GGC, with the fallback being the liquidation of collateral and/or guarantor support.

The writer notes that with this ratification the Executive Board is granting the provision for the Loan Facility to be extended through August 31, 2004, if necessary. The extension will be allowed only with independent third party verification that it has reasonable business merit. There will also be additional consideration for such extension, in the form of additional fees and potentially additional collateral.

The writer notes that the facility is short term in nature and ultimately backs up the payment of checks drawn on Kingsdale's account against uncollected funds. The loan facility has been executed to protect the Bank from the exposure of uncollected funds. The total amounts of $8.4MM and $8.0MM were estimated utilizing the amounts of checks paid and deposits over a time frame of several months. The exposure will cease once the sale of GGC has occurred.

The $8,400M / $8,000M exposure did not and does not currently exceed the Bank's legal lending limit, in that the cash secured portion is not considered as part of the overall exposure. As of June 30, 2004, the Bank's legal lending limit was approximately $6,443M. Excluding the $2.2MM in cash held by CSB securing the line, the total exposure was and is below the Bank's current legal lending limit at $6,200M / $5,800M. The writer references a letter from Atty. J. Robert Seder's office dated July 21, 2004 in which cash secured portions of credit accommodations are addressed. It was his opinion, after review of Chapter 167E of the Massachusetts General Laws, that the cash secured portion above a savings bank's legal lending limit is not considered exposure and therefore was not a violation of the MGL.

Kingsdale Corp. is a corporation 100% owned by Frank Miller. By way of background, Global Products Corporation (incorporated 1985) was a manufacturer of plastics and plastic compounds made to customer specifications. In September of 1992 Global Products acquired the assets of the Gitto Corporation. Gitto Corporation was a fledgling entity specializing in the manufacture of polyvinylchloride, polypropylene and polyethylene plastic compounds, and thermoplastic olefinic compounds. The combined companies emerged as The Gitto/Global Corporation. Kingsdale's specific function is within the plastics market, providing the ability to purchase inventory from one or more suppliers. The writer notes that within the plastics market there can be certain barriers, where suppliers may not want to sell to competitors from both a direct and indirect basis. The Kingsdale name essentially allows GGC to purchase from multiple sources within the open market.

GGC has a $27MM line of credit with LaSalle that is asset based in nature. LaSalle Bank, NA is a $65 billion dollar bank headquartered in Chicago, Illinois. The parent company, LaSalle Bank Corporation, is headquartered in Chicago with approximately $111 billion in assets.

GGC recently signed (March 31, 2004) a purchase and sale agreement (asset sale) with Vitrotech Corporation for $50.4MM. The P & S also includes the real estate of GGC (located in Lunenburg) with a

2

purchase price of $3.3MM (in addition to the asset sale $50.4MM). VitroTech Corporation (f/k/a Star Computing Ltd.) is located in Santa Ana, California and is a materials technology and research company. VitroTech owns the rights to over 35 billion pounds of rare amorphous aluminosilicate deposits. The products produced from this material enhance the physical qualities and production of plastics (as well as a variety of other market segments). The rationale for VitroTech's purchase of GGC is the fact that GGC has the customer base and access to many other companies due to its reputation for advanced technology. According to Mr. Miller, he has been able to introduce VitroTech to larger companies that would be prime candidates for the use of VitroTech's technology to enhance their products.

## Justifications for Exceptions
There are no exceptions noted with this transaction.

## Key Credit Risks and Mitigators
The primary risk associated with the Kingsdale exposure is if the sale of GGC to VitroTech does not materialize.

In the event that the business is not sold, CSB could be facing up to $8,000M in total exposure with the need to exit the credit. In this scenario, the Bank would more than likely have to exercise its rights via liquidation of the collateral. The process could be long and drawn out, with the ultimate recovery of funds unknown at this time. The writer notes that while this could ultimately happen, there was a recent announcement made by VitroTech (August 2, 2004) in which VitroTech highlighted the fact that 3,000,000 shares of stock were deposited as a commitment with respect to the proposed acquisition of GGC's assets and operations.

The writer notes that the public announcement of VitroTech's commitment to the purchase of GGC is a sign that VitroTech's management is growing more comfortable with the financial due diligence and auditing that is typical of a large transaction of this type. In addition, the Bank has most recently received a copy of the "Estimated Closing Schedule" that indicates a flurry of activity to happen over the next week, with the projected closing date of the transaction slated for August 15, 2004.

## Collateral Analysis
As noted earlier, the collateral pool consists of the following items:

1) $1,200,000 in cash pledged by Kingsdale Corp. (held by CSB)
2) a first security interest in all business assets of Kingsdale Corp.;
3) $500,000 in cash pledged by Gary Gitto (held by CSB) via his secured limited guaranty;
4) $500,000 in cash pledged by Frank Miller (held by CSB) via his secured unlimited guaranty;
5) a second mortgage on real estate located at 140 Leominster-Shirley Road, Lunenburg, MA and security interest in Vitrolite inventory located at the Casey Transportation/Warehouse in Leominster via the secured guarantee of Tradex Corp.;
6) a security position on equipment pledged by The Gitto/Global Corporation (GGC) and 3,000,000 shares of Vitrotech common stock, via the secured guarantee of GGC.

The writer presents the following:

| Collateral | Value | Advance Rate | Eligible Value |
|---|---|---|---|
| Kingsdale Corp. CSB Account | $1,200M | 100% | $1,200M |
| Gary Gitto CSB Account | $500M | 100% | $500M |
| Frank Miller CSB Account | $500M | 100% | $500M |
| Tradex Corp. Lunenburg property | $3,300M | | $1,440M* |
| Tradex Corp. inventory | $3,000M | 50% | $1,500M |
| Equipment | $14,692M | | $2,867M** |
| Total | | | $8,007M |

*Estimated using the Purchase and Sale Agreement amount of $3.3MM (at the policy rate of 80%) less the outstanding first mortgage estimated at $1.2MM.

** The equipment value has been derived utilizing an equipment appraisal by Marshall Engineering of Middleton, MA as of August 21, 2003. This appraisal notes a fair market value of nearly $21MM, while the value of $14,692M used by the writer is the orderly liquidation value. After applying the 70% policy rate to the orderly liquidation value and removing the total loan balances on three equipment notes, the writer arrived at the $2,867M value.

Due to the fact that the VitroTech common stock is restricted, the writer has not included its value (approximately $1.3MM as of this writing as it is trading at $0.42/share) in the overall collateral pool presented below, however, it is noted that there is intrinsic value in the stock.

The writer has utilized policy advance rates for the collateral listed on the prior page. Cash security held by CSB is advanced at 100%. The inventory is known as "Vitrolite" and is a produced from a naturally occurring, non-toxic, amorphous aluminosilicate of volcanic origin. It ultimately is used in the plastics and paint industry. Within the plastics industry it enables resins to flow at lower temperatures allowing faster recovery times and cooling cycles. Assuming that this Vitrolite were available for sale within the open market, the 50% advance rate against the inventory is considered acceptable given its readily usable nature in various industries and commodity nature. The equipment value has been derived utilizing an equipment appraisal by Marshall Engineering of Middleton, MA as of August 21, 2003. This appraisal notes a fair market value of nearly $21MM, while the value of $14,692M used by the writer is the orderly liquidation value. After applying the 70% policy rate to the orderly liquidation value and removing the total loan balances on three equipment notes, the writer arrived at the $2,867M value.

**Loan Quality Grade Justification**
The writer recommends a "4" loan quality grade be assigned to this transaction, given its short term nature and what is viewed as adequate collateralization using the various components.

| Lender/Analyst: | RJPaulhus / DAHarmon |
|---|---|
| File Name and Location: | I:/Word/Dave/LoanProposals/KingsDaleCorpJuly2004 |
| Last Revision Date and Time: | 8/9/2004 9:15 AM |

  

**YAHOO! FINANCE** Search - Finance Home - Yahoo! - Help

PRNewswire

**Welcome [Sign In]**

To track stocks & more, Regis

## Financial News

Enter symbol(s) [ ] Basic [Get] Symbol Lookup

Trades *Scottrade* Online ▸ Get Info!

Get **50** commission-free trades

**Press Release**

Source: VitroTech Corporation

# VitroTech Corporation Provides Update on Business Developments and Revenue Outlook for Balance of 2004 and 2005

Monday August 2, 6:01 am ET

SANTA ANA, Calif., Aug. 2 /PRNewswire-FirstCall/ VitroTech Corporation (OTC Bulletin Board: <u>VROT</u> - <u>News</u>) today provided an update on business developments at the company and management's outlook for 2004 and 2005.

ADVERTISEMENT



Background

VitroTech's core business was founded in 1997 to engage in the materials technology business, including the mining, processing and marketing and sale of a family of proprietary amorphous aluminosilicate-based products designed to improve the performance and quality of a broad array of manufacturing applications. VitroTech's initial products are Vitrolite® -- a processing additive for use in plastics manufacturing -- and Vitrocote® -- a processing additive for use in the paint and coatings industries. Additional product applications and product line extensions have been identified and are undergoing product research and development.

Through December 2003, VitroTech's sales were limited with efforts concentrated on product development, testing and validation and establishing a sales and support organization with initial sales being handled via a network of distributors and representatives.

2004 Developments

During the first half of 2004, VitroTech began implementation of a revised sales and marketing strategy focusing on three Distribution Channels within the plastics industry and characterized as (1) application specific sales -- utilizing a focused team of sales

---

### Related Quote



VROT.OB 9-Aug @ 2:32pm (C)Yah

VROT.OB   0.39   -0.03   Ne
**View Detailed Quote**
Delayed 20 mins
Quote data provided by Reuters

### Related News Stories

- <u>VitroTech Receives FDA Let Confirming Food Contact Safety Compliance</u> - PR Newsw (6:01 am)
- <u>VitroTech Forms Joint Ventu With Iretex Group to Develop Specialty Resins</u> - PR Newswire (Wed Aug 4)
- <u>VitroTech Names New Chief Financial Officer</u> - PR Newswire (Wed Aug 4)
- <u>VitroTech Corporation Announces Appointment of Director</u> - PR Newswire (Wed Jul 7)

Mor

- By industry: <u>Textiles</u>

### Top Stories

- <u>Oil Hits Fresh Record as Irac Unrest Stops Output</u> - Reuters (4:32 pm)
- <u>Stocks Little Changed as Oil, Fed Weigh</u> - Reuters (4:46 pm)
- <u>Google to Pay Yahoo to Sett Dispute</u> - Reuters (4:42 pm)
- <u>What Fed May Consider at Tuesday Meeting</u> - Reuters (4:54 pm)

Mor

- <u>Most-emailed articles</u>
- <u>Most-viewed articles</u>

and marketing professionals targeting larger customers with potential annual product requirements exceeding $1 million and capitalizing on VitroTech's extensive database of demonstrable results across a broad array of applications; (2) joint venture/strategic partnership sales -- establishing relationships with key suppliers in the plastics industry, including resin manufacturers, masterbatchers and specialty compounders, to develop performance products wherein VitroTech products are added "up stream" at the respective resin manufacturing stage, masterbatch stage or compounding stage; and (3) strategic acquisition driven sales -- acquiring companies with strategic value to VitroTech to enhance or add capabilities, resources, customers and distribution channels with a view to accelerate sales growth.

Pursuant to the restructuring of its sales and marketing approach and to take advantage of the opportunities that the company expects to result from the acquisition of a specialty compounder, VitroTech today deposited 3,000,000 shares of its common stock as a commitment with respect to the proposed acquisition of the compounding operations and assets of Gitto/Global Corporation. Gitto is primarily engaged in the delivery of value-added compounding services to base resins to produce and distribute specialty plastics such as polyvinyl chloride, polyethylene, polypropylene and thermoplastic olefinic compounds. In addition to their existing formulations, Gitto is on a run rate with the production of their specialty engineered resins incorporating Vitrolite®, which sell to customers for $1.50 to more than $2.00 per pound. The Company and Gitto believe that over the next eighteen months, they could fully utilize their existing 80 million pound capacity (revenue of $120 million +).

The purchase price of Gitto's compounding operations is approximately $50 million consisting of cash and assumption of debt. The proposed acquisition includes acquisition of a 65,000 square foot modern plant as well as state-of-the-art compounding and extrusion equipment. Gitto's facilities offer substantial opportunities for increased production, market presence and utilization of VitroTech products, specifically by leveraging Gitto's underutilized capacity for expansion. Completion of the acquisition is subject to the satisfaction of a number of due diligence items, including delivery of satisfactory financial statements with respect to the acquired operations and financing of the acquisition. There can be no assurance that the conditions of the acquisition will be satisfied and the acquisition completed. VitroTech has dedicated substantial management and other resources in connection with the proposed acquisition and, if the acquisition is not completed, VitroTech may forfeit the 3,000,000 shares deposited in escrow.

**Inside Yahoo! Finance**

**Today's Markets**

· Earnings Calendar

· Upgrades/Downgrades

· Most Actives

· Stock Screener

EXHIBIT 22

AUGUST 16, 2004 CSB LOAN
PRESENTATION SHEET

## CLINTON SAVINGS BANK
### Loan Presentation Sheet

| | | | |
|---|---|---|---|
| **Relationship Name:** | Kingsdale Corp. | **Date:** | 8/16/2004 |
| **Mailing Address:** | 50 Independence Drive, Ayer, MA 01432 | **Account Officer:** | RJP / DAH |
| **Business/Industry:** | Plastics distributor | **Gross Revenues $MM:** | No |
| **Year Established:** | 2001 | **Current LGC:** | 4 |
| **Customer Since:** | 2001 | **Recommended LGC:** | 4 |
| **Principals:** | Frank Miller, President | | |

| | | | | | |
|---|---|---|---|---|---|
| **What This Loan Presentation Sheet Involves:** | | | | | |
| **New Commitment:** | | **Increase to Line(s):** | | **Renewal(s):** √ | **Covenant Waiver(s):** | **Amendment(s):** |

| Loan Proposal(s): | |
|---|---|
| Borrower (Legal Name): | Kingsdale Corp. |
| Organizational Type: | Corporation |
| Current Commitment: | $8,000,000 |
| Proposed Commitment: | $8,000,000 |
| Loan Type: | Revolving line of credit |
| Purpose: | Provide for payments of checks drawn against uncollected funds |
| Maturity/Expiration Date: | 9/15/04 (See Transaction for further details) |
| Amortization: | N/A |
| Rate: | Wall Street Journal Prime plus 4.0%, floating daily |
| Fees: | $40,000 (1/2%) |
| Proposed Debt Service: | Interest only, weekly |
| Sources of Repayment: 1) | Sale of related company |
| 2) | Liquidation of collateral |
| 3) | Guarantor support |
| Security: | See Transaction |
| Guarantors: | See Transaction |
| Policy Exceptions: | None |

**Bank Exposure (000's omitted):**

| | | **Credit Approval:** | **Signature/Date:** |
|---|---|---|---|
| Total Current CL Commitment: | $5,800 | Account Officer: **RJP/DAH** | |
| Total Proposed CL Commitment: | $5,800 | Senior Lending Officer: | |
| + current NonCL Commitment: | $0 | Senior Loan Committee: | |
| **Total Proposed Commitment** | **$5,800\*** | | |
| Bank ACH Exposure | | | |

Executive Board:    *John M Davis  8-17-04*
                    *Ober Jny     8-17-04*

\*The total loan facility of $8,000M is partially secured by cash in the amount of $2,200M, thereby reducing the Bank's total exposure to $5,800M.

| Loan Proposal(s): | #1 |
|---|---|
| Property Type: | |
| FDIC Category: | |
| Commercial Minor: | |
| SIC Code: | |
| Participation(s) % Sold & Bank: | N/A |

1

*Commercial and Industrial Format*

| Existing Exposure | #1 |
|---|---|
| Borrower (Legal Name) | Kingsdale Corp. |
| Organizational Type | Corporation |
| Original Commitment | $8,000,000 |
| Current Outstandings | $0 |
| Loan Type | Revolving line of credit |
| Purpose | Provide for payments of checks drawn against uncollected funds |
| Maturity | 8/16/04 |
| Amortization | N/A |
| Rate | WSJ Prime + 4.0%, floating daily |
| Fees | $40,000 |
| Proposed Debt Service | Interest only, weekly |
| Sources of Repayment | Sale of related company |
| | Liquidation of collateral |
| | Guarantor support |
| Security | See Transaction |
| Guarantors | See Transaction |
| Property Type | |
| FDIC Category | |
| Commercial Minor | |
| SIC Code | |
| Participations % Sold & Bank | N/A |

**Explanation of Transaction**

To renew the existing $8,000,000 credit facility to Kingsdale Corp. **(Kingsdale)**, that expires 8/16/04. The writer recommends extension through September 15, 2004, to allow for the purchase of the related entity, the Gitto Global Corporation (GGC) to be consummated. The September 15, 2004 extension date coincides with the most recent extension between VitroTech and Gitto Global Corporation dated August 12, 2004, which has been attached to this LPS.

On August 10, 2004 the Executive Board ratified a revolving line of credit facility to Kingsdale that was closed on July 23, 2004. Total exposure of $8,400M was in place from July 23, 2004 through August 1, 2004, then was subsequently reduced to $8,000M through the August 16, 2004 expiration date. This loan facility is available as a backup for the Bank's willingness to pay checks drawn on Kingsdale's account against uncollected funds. Pricing is at the Wall Street Journal Prime plus 4.0%, floating daily. Interest only payments have been collected weekly. A $40,000 fee was collected at closing, an additional $40,000 fee will be collected for the extension and a $150,000 fee will be collected as an exit fee. Security consists of multiple components that include the following:

1) $1,200,000 in cash pledged by Kingsdale Corp. (held by CSB)
2) a first security interest in all business assets of Kingsdale Corp.;
3) $500,000 in cash pledged by Gary Gitto (held by CSB) via his secured limited guaranty;
4) $500,000 in cash pledged by Frank Miller (held by CSB) via his secured unlimited guaranty;
5) a second mortgage on real estate located at 140 Leominster-Shirley Road, Lunenburg, MA and security interest in Vitrolite inventory located at the Casey Transportation & Warehouse in Leominster via the secured guarantee of Tradex Corp.;
6) a security position on equipment pledged by The Gitto/Global Corporation and 3,000,000 shares of Vitrotech common stock, via the secured guarantee of GGC.

The primary source of repayment is the sale of GGC, with the fallback being the liquidation of collateral and/or guarantor support.

The writer notes that with the August 10, 2004 ratification the Executive Board also granted the provision for the Loan Facility to be extended through August 27, 2004, if necessary. As of this writing, the writer recommends approval of a formal extension through September 15, 2004 to allow for the sale of GCC to be consummated by VitroTech, as noted in the extension letter dated August 12, 2004. The formal

2

extension will be subject to the terms and conditions to be negotiated with the Borrower. The extension will be allowed only with independent third party verification that it has reasonable business merit. There will also be additional consideration for such extension, in the form of the additional fee and potentially additional collateral.

## Loan Quality Grade Justification

The writer recommends the existing "4" loan quality grade be reaffirmed, given its short term nature and what is viewed as adequate collateralization using the various components.

| | |
|---|---|
| Lender/Analyst: | RJPaulhus / DAHarmon |
| File Name and Location: | I:/Word/Dave/LoanProposals/KingsDaleCorpAugust2004 |
| Last Revision Date and Time: | 8/16/2004 6:15 PM |

3



August 12, 2004

Mr. Gary C. Gitto
Mr. Frank Miller
Mr. Charles Gitto, Jr.
Gitto Global Corporation
P.O. Box 120
Lunenberg, MA 01462

Re:   Asset Purchase Agreement, dated March 31, 2004 (the "APA"), as amended by letter
      agreement dated May 27, 2004 (the "First Amendment"), letter agreement dated July 9, 2004
      (the "Second Amendment") and letter agreement dated July 28, 2004 (the "Third
      Amendment"), by and between VitroTech Corporation ("VitroTech"), Gitto Global
      Corporation ("Gitto"), Gary Gitto, Frank Miller (Gary Gitto and Frank Miller being referred
      to as "Shareholders") and Charles Gitto, Jr. ("Landlord")

Gentlemen:

       Pursuant to our ongoing discussions and efforts with respect to consummation of the
transactions contemplated in the APA, included herewith is a letter agreement further extending until
September 15, 2004 the period for delivery of the schedules and financial statements required to be
delivered by Gitto.

       As you are aware, Stonefield Josephson has devoted substantial efforts to completing an
audit of the financial statements of Gitto and we are advised that the audit is expected to be
completed and the audited statements delivered in 2 to 3 weeks. As you are also aware, we are
actively involved in discussions with multiple investors, including Laurus Master Fund, which have
made proposals to provide a combination of equity and debt financing to complete the acquisition
contemplated in the APA. All of the funding proposals under consideration are contingent upon
receipt of final audited statements of Gitto and agreeing to definitive term sheets and documentation.

       We are continuing to move forward on both the audit and arranging the necessary financing
to complete the transaction and are confident that the financing will be available and the purchase
completed once the audited financial statements have been delivered.

       Please review, sign and return the attached letter agreement accordingly.

                                    Sincerely,

                                    VITROTECH CORPORATION

                                    Jess Rae Booth, President



August 12, 2004

Mr. Gary C. Gitto
Mr. Frank Miller
Mr. Charles Gitto, Jr.
Gitto Global Corporation
P.O. Box 120
Lunenberg, MA 01462

Re:    Asset Purchase Agreement, dated March 31, 2004 (the "APA"), as amended by letter
       agreement dated May 27, 2004 (the "First Amendment"), letter agreement dated July 9, 2004
       (the "Second Amendment") and letter agreement dated July 28, 2004 (the "Third
       Amendment"), by and between VitroTech Corporation ("VitroTech"), Gitto Global
       Corporation ("Gitto"), Gary Gitto, Frank Miller (Gary Gitto and Frank Miller being referred
       to as "Shareholders") and Charles Gitto, Jr. ("Landlord")

Gentlemen:

VitroTech, Gitto, the Shareholders and the Landlord are parties to the APA and the First
Amendment pursuant to which, among other things, Gitto agreed to sell and VitroTech agreed to
purchase substantially all of the assets and operations constituting the Compounding Business of
Gitto.

        As a condition of the APA, and the purchase and sale contemplated thereunder, Gitto was
required to deliver to VitroTech various schedules (the "Gitto Schedules") and financial statements
(the "Gitto Financial Statements") in form satisfactory to VitroTech.  Pursuant to Section 3.34 of the
APA, Gitto was permitted thirty (30) days from the date of the APA to deliver the Gitto Schedules
and Gitto Financial Statements after which VitroTech has fifteen days to accept or reject the Gitto
Schedules and Gitto Financial Statements.  The thirty (30) day period for delivery of the Gitto
Schedules and the Gitto Financial Statements was extended by means of the First Amendment and
Second Amendment.  Partial information in satisfaction of the Gitto Schedules has been delivered
and an audit of the Gitto Financial Statements is ongoing.  In order to facilitate the completion of the
audit of the Gitto Financial Statements and the delivery of the Gitto Schedules in form satisfactory to
VitroTech, and in light of the ongoing efforts in that regard, the parties to the APA desire to affirm
their commitment to complete the transactions contemplated by the APA and, to facilitate the same,
to further extend the period for delivery of the Gitto Schedules and the Gitto Financial Statements
until September 15, 2004.

        It is presently contemplated that the ongoing audit will be completed and delivery of the Gitto
Schedules and Gitto Financial Statements, both in form satisfactory to VitroTech, in order to
facilitate a closing of the purchase and sale by September 15, 2004.  VitroTech has engaged an
investment banking firm to secure the necessary financing to fund the purchase of the Gitto
Compounding Business and, subject to delivery of satisfactory Gitto Schedules and Gitto Financial
Statements, we expect financing to be in place by that date.



**STONEFIELD JOSEPHSON, Inc.**

Certified Public Accountants
Business Advisors

August 16, 2004

Jess Ray Booth,
President and CEO
VitroTech Corporation
5 Hutton Centre Drive, Suite 700
Santa Ana, CA 92707

Dear Jess:

This letter is in response to your request as to our status of the audit for Gitto|Global Corporation ("Gitto"). We are in the final stages of the audit with a few outstanding items, the most important item being our inventory procedures.

Since we are auditing the December 31, 2003 and 2002 years and we did not observe Gitto's inventory count procedures, we are required to perform alternative procedures, which is a monumental task given the size and nature of Gitto's inventory. As you are aware, the most difficult audit aspect of the inventory is gaining comfort on the inventory quantities on hand at each of the balance sheet dates. Gitto's staff has been diligently working on providing the required audit workpapers; most importantly the inventory roll back. We have been working with the staff of Gitto in their preparation of the required inventory rollback schedule and they are in the final stages of completing this schedule. They have estimated that this schedule will be completed by August 18, 2004 and then we can begin our testing of the schedule. We anticipate that the audit should be competed within two weeks from the date of our receipt of the inventory roll back schedule, completed to the specification.

In conclusion, I thank you for your patience and we look forward to completing the audit in a most expedient time frame.

Best regards

Dean S. Skupen, CPA

WWW.SJACCOUNTING.COM

Santa Monica
1620 20th Street
Suite 400 South
Santa Monica, California 90404

Irvine
4 Park Plaza
Suite 900
Irvine, California 92614

San Francisco
655 Montgomery Street
Suite 1200
San Francisco, California 94111

Walnut Creek
1331 N. California Boulevard
Suite 750
Walnut Creek, California 94596

EXHIBIT 23

AUGUST, 2004 LETTER AGREEMENT
REGARDING AMENDMENT OF REVOLVING
CREDIT NOTE

CLINTON SAVINGS BANK
200 Church Street
Clinton, MA   01510

August 18, 2004

Kingsdale Corp.
50 Independence Drive
Ayer, MA   01432

Re:   Line of Credit Facility with Clinton Savings Bank
      (the "Lender") in favor of Kingsdale Corp.
      ("Kingsdale")

Gentlemen:

This will confirm that the Lender has, subject to the terms of a letter agreement dated July 23, 2004 and of a Revolving Credit Note dated July 23, 2004 (the "Note"), established a line of credit facility in the maximum amount of (i) $8,400,000.00 from July 23, 2004 through and including August 1, 2004, and (ii) $8,000,000.00 from August 2, 2004 to August 13, 2004 (the "Line") for the benefit of Kingsdale Corp. ("Kingsdale"), the sole purpose of which is to provide for payments of checks drawn on Kingsdale's demand deposit account with the Lender against uncollected funds, each of which payments constitutes a loan by the Lender to Kingsdale, and upon which interest, at the rate of four percent (4%) over the Prime Rate of interest accrues.   The Line will, in accordance with the terms of the Note, terminate on August 16, 2004 (the "Maturity Date").

Kingsdale has requested that the Lender amend the Note to extend the Maturity Date to September 15, 2004.   The Lender is willing to grant such request, but only upon the terms and conditions set forth herein.

Effective as of the date hereof, the Note is amended as follows:

Any and all references to Maturity Date shall mean September 15, 2004.

Except as amended hereby, the Note is hereby ratified, reaffirmed and confirmed.

In consideration of the extension of the Maturity Date, Kingsdale shall pay to the Lender an extension fee of $40,000.00, of which $20,000.00 is due as of the date hereof and $20,000.00 is due upon the Maturity Date or upon the occurrence of an Event



CSB
EXHIBIT NO. 15
L. FOLEY

Kingsdale Corp.
August 18, 2004
Page 2

of Default (whichever shall first occur). This extension fee is in addition to any other fees set forth in the Note. This extension fee is an obligation of Kingsdale secured by any and all security granted by Kingsdale to the Bank and guaranteed by all Guarantors of Kingsdale's obligations to the Bank.

Contemporaneously with the execution hereof and in consideration of the extension of the Maturity Date:

1. Gary C. Gitto shall execute and deliver to the Bank an unlimited guaranty of the obligations of Kingsdale to the Lender;

2. Tradex Corp. will execute and deliver to the Lender an unlimited deficiency guaranty of the obligations of Kingsdale to the Lender;

3. Charles N. Gitto, Jr. will execute and deliver to the Lender an unlimited deficiency guaranty of the obligations of Kingsdale to the Lender; and

4. Frank Miller (and his wife) will execute and deliver to the Lender a mortgage securing his obligations under his guaranty dated July 23, 2004.

Each of the Guarantors hereby consent to the extension of the Maturity Date and ratify, reaffirm and confirm their obligations under their respective guaranties.

On or before August 23, 2004, Kingsdale and/or the Guarantors shall cause to be delivered the following to the Bank:

1. an updated closing schedule (updating the document entitled "Gitto Global Estimated Closing Schedule" dated July 22, 2004, previously provided to the Bank), detailing any outstanding tasks remaining to be done with respect to the sale of assets of Gitto Global Corporation to VitroTech Corporation;

2. all financial information provided by Gitto Global Corporation to LaSalle Business Credit, Inc. (or any other party) from May 1, 2004 to August 23, 2004 pursuant to Sections 9(b) and 9(c) of that certain Loan and Security Agreement dated July 25, 2002; to the extent the same has been provided to LaSalle or any other party

Kingsdale Corp.
August 18, 2004
Page 3

3. any and all financial statements, including, without limitation, balance sheets, statements of income, retained earnings and cash flows prepared by or for Kingsdale with respect to all or any portion of fiscal 2003 and fiscal 2004, along with Kingsdale's federal and state income tax returns for the years 2002 and 2003; and to the same Extent the same has been PREPARED; AND

4. any and all proposals and/or commitments from lenders, investors and other funding sources that VitroTech Corporation may use to fund the purchase of certain assets of Gitto Global Corporation. to the extent the same are available to Gitto Global Corp.

Kingsdale and each of the Guarantors shall use their best efforts to arrange a conference call between the Lender and senior officers of VitroTech Corporation on or before August 23, 2004 to enable the Lender to inquire as to the status of the potential purchase of assets referenced above.

If Kingsdale and the Guarantors agree with the terms of this letter, please so indicate by signing a copy of this letter below, and return the same to me.

Very truly yours,

CLINTON SAVINGS BANK

By: _____
    Vice President , title

Accepted and agreed this 18th day of August, 2004:

KINGSDALE CORP.

By: _Frank Miller - PRES_,
    , title

TRADEX CORP.

By _____ Pres.
    , title

Kingsdale Corp.
August 18, 2004
Page 4

GITTO GLOBAL CORPORATION

By: _____ title

_____
Gary C. Gitto

_____
Charles N. Gitto, Jr.

_____
Frank Miller

## AMENDED AND RESTATED GUARANTY

Reference is made to that certain Guaranty executed and delivered by **GARY C. GITTO** (the "Guarantor") to **CLINTON SAVINGS BANK** (the "Bank") dated July 23, 2004 (the "Guaranty").

The Guarantor and the Bank have agreed to amend and restate the Guaranty as follows:

## "GUARANTY

## TO: CLINTON SAVINGS BANK (the "Bank")

1. <u>Guaranty of Payment and Performance of Obligations</u>: In consideration of the Bank's extending credit or otherwise in its discretion giving time, financial facilities or accommodations to **KINGSDALE CORP.**, a Massachusetts corporation (the "Customer"), the undersigned, **GARY C. GITTO** (the "Guarantor"), hereby unconditionally guarantees to the Bank that (a) the Customer will duly and punctually pay or perform, at the place specified therefor, or if no place is specified, at the Bank's Head Office or at the branch of the Bank where this Guaranty is given, all indebtedness, obligations and liabilities, direct or indirect, matured or unmatured, primary or secondary, certain or contingent, of the Customer to the Bank now or hereafter owing or incurred, including, but not limited to, all automated clearing house liabilities of the Customer to the Bank, all obligations of the Customer arising from any and all overdrafts in any deposit account of the Customer maintained with the Bank, arising, <u>inter alia</u>, from the issuance of checks against uncollected funds (including without limitation costs and expenses incurred by the Bank in attempting to collect or enforce any of the foregoing) which are chargeable to the Customer either by law or under the terms of the Bank's arrangements with the Customer accrued in each case to the date of payment hereunder (collectively the "Obligations" and individually an "Obligation"); and (b) if there is an agreement evidencing or executed and delivered in connection with any Obligation, the Customer will perform in all other respects strictly in accordance with the terms thereof. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Customer of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that the Bank first attempt to collect any of the Obligations from the Customer or resort to any security or other means of obtaining payment of any of the Obligations which the Bank now has or may acquire after the date hereof, or upon any other contingency whatsoever. Upon any default by the Customer in the full and punctual payment and performance of the Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option of the Bank, become forthwith due and payable to the Bank without demand or notice of any nature, all of which are expressly waived by the Guarantor. Payments by the Guarantor hereunder may be required by the Bank on any number of occasions.

2. <u>Guarantor's Further Agreement to Pay</u>: The Guarantor further agrees, as the principal obligor and not as a guarantor only, to pay to the Bank forthwith upon demand, in funds immediately available to the Bank, all costs and expenses (including court costs

and reasonable legal expenses) incurred or expended by the Bank in connection with this Guaranty and the enforcement hereof (the "Expenses") together with interest on the Expenses from the time such Expenses are incurred until payment at a per annum rate of interest of ten percent (10%).

3. _Unlimited Liability of Guarantor_: The liability of the Guarantor hereunder shall be unlimited.

4. _Security; Set-off_: The Guarantor grants to the Bank, as security for the full and punctual payment and performance of the Guarantor's obligations hereunder, a continuing lien on and security interest in all securities or other property belonging to the Guarantor now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Guarantor or subject to withdrawal by the Guarantor; and regardless of the adequacy of any collateral or other means of obtaining repayment of the Obligations, the Bank may at any time and without notice to the Guarantor set off the whole or any portion or portions of any or all such deposits and other sums against amounts payable under this Guaranty, whether or not any other person or persons could also withdraw money therefrom.

5. _Bank's Freedom to Deal with Customer and Other Parties_: The Bank shall be at liberty, without giving notice to or obtaining the assent of the Guarantor and without relieving the Guarantor of any liability hereunder, to deal with the Customer and with each other party who now is or after the date hereof becomes liable in any manner for any of the Obligations, in such manner as the Bank in its sole discretion deems fit, and to this end the Guarantor gives the Bank full authority in its sole discretion to do any or all of the following things: (a) extend credit, make loans and afford other financial accommodations to the Customer at such times, in such amounts and on such terms as the Bank may approve, (b) vary the terms and grant extensions or renewals to Customer or to any such other party, (c) grant time, waivers and other indulgences in respect thereto, (d) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any security or guaranty or other means of obtaining payment of any of the Obligations which the Bank now has or acquires after the date hereof, (e) accept partial payments from the Customer or any such other party, (f) release or discharge, wholly or partially, any endorser or guarantor, and (g) compromise or make any settlement or other arrangement with the Customer or any such other party.

6. _Unenforceability of Obligations Against Customer; Invalidity of Security or Other Guaranties_: If for any reason the Customer has no legal existence or is under no legal obligation to discharge any of the Obligations undertaken or purported to be undertaken by it or on its behalf, or if any of the moneys included in the Obligations have become irrecoverable from the Customer by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantor to the same extent as if the Guarantor at all times had been the principal debtor on all such Obligations. This Guaranty shall be in addition to any other guaranty or other security for the Obligations and it shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security.

-2-

7. <u>Waivers by Guarantor</u>: The Guarantor waives: notice of acceptance hereof, notice of any action taken or omitted by the Bank in reliance hereon, and any requirement that the Bank be diligent or prompt in making demands hereunder, giving notice of any default by the Customer or asserting any other right of the Bank hereunder. The Guarantor also irrevocably waives, to the fullest extent permitted by law, all defenses which at any time may be available in respect of the Guarantor's obligations hereunder by virtue of any homestead exemption, statute of limitations, valuation, stay, moratorium law or other similar law now or hereafter in effect.

8. <u>No Contest with Bank</u>: So long as any Obligation remains unpaid or undischarged, the Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by the Bank) or by any means or on any other ground, claim any set-off or counterclaim against the Customer in respect of any liability of the Guarantor to the Customer or, in proceedings under the Bankruptcy Code or insolvency proceedings of any nature, prove in competition with the Bank in respect of any payment hereunder or be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of the Customer or the benefit of any other security for any Obligation which, now or hereafter, the Bank may hold or in which it may have any share.

9. <u>Demands and Notices</u>: Any demand or notices required or permitted hereunder shall be in writing and shall be effective when delivered in hand or mailed by registered or certified mail, return receipt requested as follows:

If to Bank:               Clinton Savings Bank
                                 200 Church Street
                                 Clinton, MA 01510
                                 Attn: Michael D. Tenaglia, Senior Vice President

If to Guarantor:        Gary C. Gitto
                                 51 Meyer Hill Drive, Unit 4
                                 Acton, MA 01720

10. <u>Amendments, Waivers Etc.</u>: No provision of this Guaranty can be changed, waived, discharged or terminated except by an instrument in writing signed by the Bank and the Guarantor expressly referring to the provision of this Guaranty to which such instrument relates; and no such waiver shall extend to, affect or impair any right with respect to any Obligation which is not expressly dealt with therein. No course of dealing or delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto.

11. <u>Miscellaneous Provisions</u>: This Guaranty is intended to take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall inure to the benefit of the Bank and its successors in title and assigns, and shall be binding on the Guarantor and the Guarantor's successors in title, assigns, and legal representatives.

# GUARANTY

## TO: **CLINTON SAVINGS BANK** (the "Bank")

1. <u>Guaranty of Payment and Performance of Obligations</u>: In consideration of the Bank's extending credit or otherwise in its discretion giving time, financial facilities or accommodations to **KINGSDALE CORP.**, a Massachusetts corporation (the "Customer"), the undersigned, **CHARLES N. GITTO, JR.** (the "Guarantor"), hereby unconditionally guarantees to the Bank that (a) the Customer will duly and punctually pay or perform, at the place specified therefor, or if no place is specified, at the Bank's Head Office or at the branch of the Bank where this Guaranty is given, all indebtedness, obligations and liabilities, direct or indirect, matured or unmatured, primary or secondary, certain or contingent, of the Customer to the Bank now or hereafter owing or incurred, including, but not limited to, all automated clearing house liabilities of the Customer to the Bank, all obligations of the Customer arising from any and all overdrafts in any deposit account of the Customer maintained with the Bank, arising, *inter alia*, from the issuance of checks against uncollected funds (including without limitation costs and expenses incurred by the Bank in attempting to collect or enforce any of the foregoing) which are chargeable to the Customer either by law or under the terms of the Bank's arrangements with the Customer accrued in each case to the date of payment hereunder (collectively the "Obligations" and individually an "Obligation"); and (b) if there is an agreement evidencing or executed and delivered in connection with any Obligation, the Customer will perform in all other respects strictly in accordance with the terms thereof. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Customer of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that the Bank first attempt to collect any of the Obligations from the Customer or resort to any security or other means of obtaining payment of any of the Obligations which the Bank now has or may acquire after the date hereof, or upon any other contingency whatsoever. Upon any default by the Customer in the full and punctual payment and performance of the Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option of the Bank, become forthwith due and payable to the Bank without demand or notice of any nature, all of which are expressly waived by the Guarantor. Payments by the Guarantor hereunder may be required by the Bank on any number of occasions.

2. <u>Guarantor's Further Agreement to Pay</u>: The Guarantor further agrees, as the principal obligor and not as a guarantor only, to pay to the Bank forthwith upon demand, in funds immediately available to the Bank, all costs and expenses (including court costs and reasonable legal expenses) incurred or expended by the Bank in connection with this Guaranty and the enforcement hereof (the "Expenses") together with interest on the Expenses from the time such Expenses are incurred until payment at a per annum rate of interest of ten percent (10%).

3. <u>Unlimited Liability of Guarantor</u>: The liability of the Guarantor hereunder shall be unlimited.

4. <u>Action by Bank Against Guarantor</u>:  Notwithstanding anything to the contrary contained in this Guaranty, prior to instituting any action against the Guarantor which seeks to enforce Guarantor's liability hereunder, the Bank shall have liquidated substantially all of the collateral granted to the Bank by the Borrower and other guarantors of the Obligations (other than the mortgage granted by Frank Miller to secure his obligations under his Guaranty), provided, however, (a) that from and after the date hereof, the Guarantor shall not have transferred any of the Guarantor's assets (now or hereafter owned) in whole or in part to any other person or entity for consideration of less than fair market value; (b) there shall be no legal impediment to the Bank exercising all of its rights against any such collateral, including, but not limited to, the imposition of any automatic stay as a result of any proceedings under the Federal Bankruptcy Code or any state insolvency law affecting the Borrower or any guarantor; and (c) the Bank shall not be the subject of any action instituted against it seeking that it marshal the assets of the Borrower and the Guarantor for the benefit of any creditor of the Borrower.  If any of the events set forth in (a), (b) or (c) occur, the Bank may immediate proceed to take any and all appropriate action to enforce this Guaranty.  Subject to the foregoing provisions, the Bank shall have liquidated substantially all of the collateral pledged by Tradex Corp. to secure its obligations under its Guaranty of the Customer's obligations to the Bank prior to proceeding against the Guarantor.

5. <u>Security; Set-off</u>:  The Guarantor grants to the Bank, as security for the full and punctual payment and performance of the Guarantor's obligations hereunder, a continuing lien on and security interest in all securities or other property belonging to the Guarantor now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Guarantor or subject to withdrawal by the Guarantor; and regardless of the adequacy of any collateral or other means of obtaining repayment of the Obligations, the Bank may at any time and without notice to the Guarantor set off the whole or any portion or portions of any or all such deposits and other sums against amounts payable under this Guaranty, whether or not any other person or persons could also withdraw money therefrom.

6. <u>Bank's Freedom to Deal with Customer and Other Parties</u>:  The Bank shall be at liberty, without giving notice to or obtaining the assent of the Guarantor and without relieving the Guarantor of any liability hereunder, to deal with the Customer and with each other party who now is or after the date hereof becomes liable in any manner for any of the Obligations, in such manner as the Bank in its sole discretion deems fit, and to this end the Guarantor gives the Bank full authority in its sole discretion to do any or all of the following things:  (a) extend credit, make loans and afford other financial accommodations to the Customer at such times, in such amounts and on such terms as the Bank may approve, (b) vary the terms and grant extensions or renewals to Customer or to any such other party, (c) grant time, waivers and other indulgences in respect thereto, (d) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any security or guaranty or other means of obtaining payment of any of the Obligations which the Bank now has or acquires after the date hereof, (e) accept partial payments from the Customer or any such other party, (f) release or

-2-

discharge, wholly or partially, any endorser or guarantor, and (g) compromise or make any settlement or other arrangement with the Customer or any such other party.

7.  Unenforceability of Obligations Against Customer; Invalidity of Security or Other Guaranties:  If for any reason the Customer has no legal existence or is under no legal obligation to discharge any of the Obligations undertaken or purported to be undertaken by it or on its behalf, or if any of the moneys included in the Obligations have become irrecoverable from the Customer by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantor to the same extent as if the Guarantor at all times had been the principal debtor on all such Obligations.  This Guaranty shall be in addition to any other guaranty or other security for the Obligations and it shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security.

8.  Waivers by Guarantor:  The Guarantor waives:  notice of acceptance hereof, notice of any action taken or omitted by the Bank in reliance hereon, and any requirement that the Bank be diligent or prompt in making demands hereunder, giving notice of any default by the Customer or asserting any other right of the Bank hereunder.  The Guarantor also irrevocably waives, to the fullest extent permitted by law, all defenses which at any time may be available in respect of the Guarantor's obligations hereunder by virtue of any homestead exemption, statute of limitations, valuation, stay, moratorium law or other similar law now or hereafter in effect.

9.  No Contest with Bank:  So long as any Obligation remains unpaid or undischarged, the Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by the Bank) or by any means or on any other ground, claim any set-off or counterclaim against the Customer in respect of any liability of the Guarantor to the Customer or, in proceedings under the Bankruptcy Code or insolvency proceedings of any nature, prove in competition with the Bank in respect of any payment hereunder or be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of the Customer or the benefit of any other security for any Obligation which, now or hereafter, the Bank may hold or in which it may have any share.

10.  Demands and Notices:  Any demand or notices required or permitted hereunder shall be in writing and shall be effective when delivered in hand or mailed by registered or certified mail, return receipt requested as follows:

| If to Bank: | Clinton Savings Bank |
| | 200 Church Street |
| | Clinton, MA 01510 |
| | Attn: Robert J. Paulhus, Jr., Vice President |

| If to Guarantor: | Charles N. Gitto, Jr. |
| | 18 Nancy Court |
| | Leominster, MA 01453 |

-3-

11. <u>Amendments, Waivers Etc.</u>: No provision of this Guaranty can be changed, waived, discharged or terminated except by an instrument in writing signed by the Bank and the Guarantor expressly referring to the provision of this Guaranty to which such instrument relates; and no such waiver shall extend to, affect or impair any right with respect to any Obligation which is not expressly dealt with therein. No course of dealing or delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto.

12. <u>Miscellaneous Provisions</u>: This Guaranty is intended to take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall inure to the benefit of the Bank and its successors in title and assigns, and shall be binding on the Guarantor and the Guarantor's successors in title, assigns, and legal representatives.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as a sealed instrument on the ___18th___ day of ___August___, 2004.

_____
CHARLES N. GITTO, JR.

-4-

000333

# AMENDED AND RESTATED GUARANTY

Reference is made to that certain Guaranty executed and delivered by **TRADEX CORP.** (the "Guarantor") to **CLINTON SAVINGS BANK** (the "Bank") dated July 23, 2004 (the "Guaranty").

The Guarantor and the Bank have agreed to amend and restate the Guaranty as follows:

## "GUARANTY

## TO: CLINTON SAVINGS BANK (the "Bank")

1.  Guaranty of Payment and Performance of Obligations:  In consideration of the Bank's extending credit or otherwise in its discretion giving time, financial facilities or accommodations to **KINGSDALE CORP.**, a Massachusetts corporation (the "Customer"), the undersigned, **TRADEX CORP.**, a Massachusetts corporation (the "Guarantor"), hereby unconditionally guarantees to the Bank that (a) the Customer will duly and punctually pay or perform, at the place specified therefor, or if no place is specified, at the Bank's Head Office or at the branch of the Bank where this Guaranty is given, all indebtedness, obligations and liabilities, direct or indirect, matured or unmatured, primary or secondary, certain or contingent, of the Customer to the Bank now or hereafter owing or incurred, including, but not limited to, all automated clearing house liabilities of the Customer to the Bank, all obligations of the Customer arising from any and all overdrafts in any deposit account of the Customer maintained with the Bank, arising, inter alia, from the issuance of checks against uncollected funds  (including without limitation costs and expenses incurred by the Bank in attempting to collect or enforce any of the foregoing)  to the date of payment hereunder (collectively the "Obligations" and individually an "Obligation"); and (b) if there is an agreement evidencing or executed and delivered in connection with any Obligation, the Customer will perform in all other respects strictly in accordance with the terms thereof.  This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Customer of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that the Bank first attempt to collect any of the Obligations from the Customer or resort to any security or other means of obtaining payment of any of the Obligations which the Bank now has or may acquire after the date hereof, or upon any other contingency whatsoever.  Upon any default by the Customer in the full and punctual payment and performance of the Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option of the Bank, become forthwith due and payable to the Bank without demand or notice of any nature, all of which are expressly waived by the Guarantor.  Payments by the Guarantor hereunder may be required by the Bank on any number of occasions.

2.  Guarantor's Further Agreement to Pay:  The Guarantor further agrees, as the principal obligor and not as a guarantor only, to pay to the Bank forthwith upon demand, in funds immediately available to the Bank, all costs and expenses (including court costs and reasonable legal expenses) incurred or expended by the Bank in connection with this

-1-

000334

Guaranty and the enforcement hereof (the "Expenses") together with interest on the Expenses from the time such Expenses are incurred until payment at a per annum rate of interest of ten percent (10%).

3.  Unlimited Liability of Guarantor.  The liability of the Guarantor hereunder shall be unlimited.

4.  Action by Bank Against Guarantor and Real Estate:  Notwithstanding anything to the contrary contained in this Guaranty and except as otherwise provided herein, prior to instituting any action against the Guarantor which seeks to enforce Guarantor's liability hereunder, or a foreclosure action under the Mortgage granted by the Guarantor to secure its obligations under this Guaranty recorded with the Worcester Northern District Registry of Deeds in Book 5355, Page 345, the Bank shall have liquidated substantially all of the Inventory (as hereinafter defined) and substantially all of the other collateral granted to the Bank by the Borrower and other guarantors of the Obligations (other than the mortgage granted by Frank Miller to secure his obligations under his Guaranty), provided, however, (a) that from and after the date hereof, the Guarantor shall not have transferred any of the Guarantor's assets (now or hereafter owned) in whole or in part to any other person or entity for consideration of less than fair market value; (b) there shall be no legal impediment to the Bank exercising all of its rights against any such collateral, including, but not limited to, the imposition of any automatic stay as a result of any proceedings under the Federal Bankruptcy Code or any state insolvency law affecting the Borrower or any guarantor; and (c) the Bank shall not be the subject of any action instituted against it seeking that it marshal the assets of the Borrower and the Guarantor for the benefit of any creditor of the Borrower.  If any of the events set forth in (a), (b) or (c) occur, the Bank may immediate proceed to take any and all appropriate action to enforce this Guaranty and to or and to exercise its rights with respect to any and all collateral security this Guaranty.  Notwithstanding the foregoing, the Bank may, upon any default by Customer in the full and punctual payment and performance of the Obligations, immediately proceed to exercise its rights and remedies with respect to the inventory described in a Security Agreement from the Guarantor dated July 23, 2004.

5.  Security; Set-off:  The Guarantor grants to the Bank, as security for the full and punctual payment and performance of the Guarantor's obligations hereunder, a continuing lien on and security interest in all securities or other property belonging to the Guarantor now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Guarantor or subject to withdrawal by the Guarantor; and regardless of the adequacy of any collateral or other means of obtaining repayment of the Obligations, the Bank may at any time and without notice to the Guarantor set off the whole or any portion or portions of any or all such deposits and other sums against amounts payable under this Guaranty, whether or not any other person or persons could also withdraw money therefrom.

6.  Bank's Freedom to Deal with Customer and Other Parties:  The Bank shall be at liberty, without giving notice to or obtaining the assent of the Guarantor and without

-2-

relieving the Guarantor of any liability hereunder, to deal with the Customer and with each other party who now is or after the date hereof becomes liable in any manner for any of the Obligations, in such manner as the Bank in its sole discretion deems fit, and to this end the Guarantor gives the Bank full authority in its sole discretion to do any or all of the following things: (a) extend credit, make loans and afford other financial accommodations to the Customer at such times, in such amounts and on such terms as the Bank may approve, (b) vary the terms and grant extensions or renewals to Customer or to any such other party, (c) grant time, waivers and other indulgences in respect thereto, (d) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any security or guaranty or other means of obtaining payment of any of the Obligations which the Bank now has or acquires after the date hereof, (e) accept partial payments from the Customer or any such other party, (f) release or discharge, wholly or partially, any endorser or guarantor, and (g) compromise or make any settlement or other arrangement with the Customer or any such other party.

7.  Unenforceability of Obligations Against Customer; Invalidity of Security or Other Guaranties: If for any reason the Customer has no legal existence or is under no legal obligation to discharge any of the Obligations undertaken or purported to be undertaken by it or on its behalf, or if any of the moneys included in the Obligations have become irrecoverable from the Customer by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantor to the same extent as if the Guarantor at all times had been the principal debtor on all such Obligations. This Guaranty shall be in addition to any other guaranty or other security for the Obligations and it shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security.

8.  Waivers by Guarantor: The Guarantor waives: notice of acceptance hereof, notice of any action taken or omitted by the Bank in reliance hereon, and any requirement that the Bank be diligent or prompt in making demands hereunder, giving notice of any default by the Customer or asserting any other right of the Bank hereunder. The Guarantor also irrevocably waives, to the fullest extent permitted by law, all defenses which at any time may be available in respect of the Guarantor's obligations hereunder by virtue of any homestead exemption, statute of limitations, valuation, stay, moratorium law or other similar law now or hereafter in effect.

9.  No Contest with Bank: So long as any Obligation remains unpaid or undischarged, the Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by the Bank) or by any means or on any other ground, claim any set-off or counterclaim against the Customer in respect of any liability of the Guarantor to the Customer or, in proceedings under the Bankruptcy Code or insolvency proceedings of any nature, prove in competition with the Bank in respect of any payment hereunder or be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of the Customer or the benefit of any other security for any Obligation which, now or hereafter, the Bank may hold or in which it may have any share.

000336

10. <u>Demands and Notices</u>: Any demand or notices required or permitted hereunder shall be in writing and shall be effective when delivered in hand or mailed by registered or certified mail, return receipt requested as follows:

If to Bank:

Clinton Savings Bank
200 Church Street
Clinton, MA 01510
Attn: Michael D. Tenaglia, Senior Vice President

If to Guarantor:

Tradex Corp.
18 Nancy Court
Leominster, MA 01453
Attn: Charles N. Gitto, Jr., President

11. <u>Amendments, Waivers Etc.</u>: No provision of this Guaranty can be changed, waived, discharged or terminated except by an instrument in writing signed by the Bank and the Guarantor expressly referring to the provision of this Guaranty to which such instrument relates; and no such waiver shall extend to, affect or impair any right with respect to any Obligation which is not expressly dealt with therein. No course of dealing or delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto.

12. <u>Miscellaneous Provisions</u>: This Guaranty is intended to take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall inure to the benefit of the Bank and its successors in title and assigns, and shall be binding on the Guarantor and the Guarantor's successors in title, assigns, and legal representatives.

IN WITNESS WHEREOF, **TRADEX CORP.**, has caused this Amended and Restated Guaranty to be duly executed, under seal, and delivered by its corporate officer, thereunto duly authorized, this ⎣18⎦ day of August, 2004.

**TRADEX CORP.**

By: _____

Charles N. Gitto, Jr., President and Treasurer"

_____
Witness

-4-

Exhibit 24

VitroTech Form 10-Q for Quarter
Ending June 30, 2004

```
<DOCUMENT>
<TYPE>10QSB/A
<SEQUENCE>1
<FILENAME>v06361.txt
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-QSB/A

{Mark One}

|X| QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2004

|_| TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE EXCHANGE ACT

For the transition period from _____ to_____

Commission File No. 0-49692

VITROTECH CORPORATION
-----------------------------------------------------
(Exact name of small business issuer as specified in its charter)

Nevada                                              88-0504050
---------------------------------          ------------------------------
(State or other jurisdiction of                    (IRS Employer
 incorporation or organization)                Identification No.)

5 Hutton Centre Drive, Suite 700
Santa Ana, CA 92707
---------------------------------
(Address of principal executive offices)

(714) 708-4700
--------------------------
Issuer's telephone number}

------------------------------------------------------------------
(Former name, former address and former fiscal year,
if changed since last report)

Check whether the issuer (1) filed all reports required to be filed by Section
13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter
period that the registrant was required to file such reports), and (2) has been
subject to such filing requirements for the past 90 days. Yes |X|   No |_|

State the number of shares outstanding of each of the issuer's classes of common
equity, as of the latest practicable date:

As of August 27, 2004, the Registrant had 150,701,665 shares of common stock
outstanding.

Transitional Small Business Disclosure Format (Check one): Yes |_|  No |X|

<PAGE>

VITROTECH CORPORATION

FORM 10-QSB

TABLE OF CONTENTS

PART I - FINANCIAL INFORMATION

   ITEM 1. FINANCIAL STATEMENTS

          Condensed Consolidated Balance Sheet June 30, 2004 (restated)....... 4

          Condensed Consolidated Statements of Operations for the Three
             and Six Months Ended June 30, 2004 (restated) and 2003.......... 5

          Condensed Consolidated Statement of Stockholders' Deficit
             for the  Six Months Ended June 30, 2004 (restated).............. 6

          Condensed Consolidated Statements of Cash Flows for the
             Six Months Ended June 30, 2004 (restated) and 2003.............. 7

          Notes to Condensed Consolidated Financial Statements................ 8

   ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION.........17

   ITEM 3. CONTROLS AND PROCEDURES.........................................22

PART II - OTHER INFORMATION

     ITEM 2. CHANGES IN SECURITIES.....................................  ......22

     ITEM 3. DEFAULTS UPON SENIOR SECURITIES..............................23

     ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.......  ......23

     ITEM 5. OTHER INFORMATION...........................................23

     ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K.........................  ......23

SIGNATURES

CERTIFICATIONS

EXPLANATORY NOTE This amended quarterly report on Form 10-QSB/A is being filed
to amend the financial statements appearing in Part I, Item 1, the Management's
Discussion and Analysis in Part I, Item 2, the Controls and Procedures
disclosure in Part I, Item 3, the Exhibits filed herewith under Part II, Item 6
and to include Part II, Item 5 disclosure. The Form 10-QSB, as originally filed,
was mistakenly filed prior to completion of the outside accountant's review and
review by outside legal counsel. As of this filing, the accountants have
completed their review of the attached financial statements that appear in Item
1. All disclosures in this amendment, other than those noted above, are as of
the date of the original filing and have not been updated.

2

<PAGE>

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Audit Committee
Vitrotech Corporation
Santa Ana, California

We have reviewed the accompanying condensed consolidated balance sheet of
Vitrotech Corporation of June 30, 2004, and the related condensed consolidated
statements of operations, stockholders' deficit and cash flows for the three and
six months ended June 30, 2004 and 2003. These interim financial statements are
the responsibility of the Company's management.

We conducted our review in accordance with the standards of the Public Company
Accounting Oversight Board (United States). A review of interim financial
information consists principally of applying analytical procedures and making
inquiries of persons responsible for financial and accounting matters. It is
substantially less in scope than an audit conducted in accordance with the
standards of the Public Company Accounting Oversight Board, the objective of
which is the expression of an opinion regarding the financial statements taken
as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should
be made to the accompanying interim financial statements for them to be in
conformity with U.S. generally accepted accounting principles.

/s/ Stonefield Josephson, Inc.
CERTIFIED PUBLIC ACCOUNTANTS

Los Angeles, California                    .
August 27, 2004

                                3

<PAGE>

                    PART I - FINANCIAL INFORMATION

ITEM 1.   FINANCIAL STATEMENTS

                        VITROTECH CORPORATION
                 CONDENSED CONSOLIDATED BALANCE SHEET
                      (Unaudited and restated)
                          June 30, 2004

ASSETS

Current assets:
    Accounts receivable, net of allowance
       for doubtful accounts of $385,164          $     108,412
    Cost of materials                                 1,245,758
    Advances receivable                                   5,000
    Prepaid expenses                                    123,857
    Debt issue costs - current portion                  189,706
                                                  ------------
Total current assets                                  1,672,733

Property and equipment, net                             153,852

```
Receivable from related party                              447,964
Deposits                                                   75,939
Debt issue costs, net of current portion                   44,934
                                                     ------------

Total assets                                         $  2,395,422
                                                     ============


LIABILITIES AND STOCKHOLDERS' DEFICIT

Current liabilities:
    Cash Overdraft                                   $     61,380
    Accounts payable                                    1,720,545
    Advances from related parties                        1,131,492
    Due to related parties - material and advances         954,336
    Accrued interest                                       253,640
    Accrued expenses                                       182,598
    Capital leases payable - current portion                15,248
    Notes payable - current portion                      5,934,659
                                                     ------------
Total current liabilities                               10,253,898

Capital leases payable, net of current portion              42,101
Notes payable, net of current portion                    1,937,000
                                                     ------------

Total liabilities                                       12,232,999

Commitments and Contingencies                                 --

Stockholders' deficit
    Common stock, $.001 par value, authorized 500,000,000
      shares; 147,176,665 shares issued and outstanding    147,177
    Additional paid-in capital                          16,202,369
    Accumulated deficit                                (26,187,123)
                                                     ------------
Total stockholders' deficit                             (9,837,577)
                                                     ------------

Total liabilities and stockholders' deficit          $  2,395,422
                                                     ============
```

        See accompanying notes to condensed consolidated financial statements.


                                     4
<PAGE>

                           VITROTECH CORPORATION
                 CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
                                (Unaudited)
                 For the Six and Three Months Ended June 30, 2004 and 2003

<TABLE>
<CAPTION>

                                          Six Months Ended June 30,          Thr
                                          -------------------------          ---
                                          2004 (restated)        2003        2004
                                          ---------------    -----------     ----
<S>                                       <C>                <C>             <C>

| | | | | | |
|---|---:|---:|---:|---:|---|
| Net Revenue | $ | 133,770 | $ | 1,772,125 | $ |
| Cost of goods sold (related party) | | 112,794 | | 666,154 | --- |
| Gross profit | | 20,976 | | 1,105,971 | --- |
| Selling, general and administrative expenses | | 5,125,985 | | 2,942,782 | |
| Research and development expense | | 127,516 | | 259,665 | |
| Total | | 5,253,501 | | 3,202,447 | --- |
| Loss before other income (expense) | | (5,232,525) | | (2,096,476) | |
| Other income (expense): | | | | | |
|    Interest expense | | (445,925) | | (807,689) | |
|    Debt issue costs | | (188,140) | | (268,105) | |
|    Interest income | | 900 | | 8,513 | --- |
| Total other expense | | (633,165) | | (1,067,281) | --- |
| Net loss before taxes | | (5,865,690) | | (3,163,757) | |
| Income taxes | | -- | | -- | --- |
| Net loss | $ | (5,865,690) | $ | (3,163,757) | $ |
| Net loss per share | | | | | |
|    Basic and diluted | $ | (0.04) | $ | (0.06) | $ |
| Weighted average shares outstanding | | | | | |
|    Basic and diluted | | 141,147,852 | | 49,581,954 | 1 |

</TABLE>

See accompanying notes to condensed consolidated financial statements.

5

<PAGE>

VITROTECH CORPORATION
CONDENSED CONSOLIDATED STATEMENT OF STOCKHOLDERS' DEFICIT
(Unaudited)
For the Six Months Ended June 30, 2004

<TABLE>
<CAPTION>

| | Common Stock | | |
|---|---|---|---|
| | Shares | Amount | |
| <S> | <C> | <C> | <C |
| Balance, December 31, 2003 | 118,698,047 | $ 118,698 | $ |

| | | |
|---|---|---|
| Issuance of common stock for<br>  conversion of notes payable (Unaudited) | 801,953 | 802 |
| Issuance of common stock for<br>  acquisition of Star Computing Limited<br>  (Unaudited) | 20,000,000 | 20,000 |
| Net deficit of operations<br>  not transferred (Unaudited) | -- | -- |
| Issuance of common stock for cash (Unaudited) | 5,333,332 | 5,333 |
| Offering costs paid in cash (Unaudited) | -- | -- |
| Issuance of common stock  from<br>  the exercise of warrants (Unaudited) | 2,343,333 | 2,344 |
| Issuance of warrants for services rendered<br>  (Unaudited) | | |
| Net loss (Unaudited and restated) | | -- |
| | ------------ | ------------ | -- |
| Balance, June 30, 2004 (Unaudited and restated) | 147,176,665 | $    147,177 | $ |
| | ============ | ============ | == |

</TABLE>

See accompanying notes to condensed consolidated financial statements.

6

<PAGE>

VITROTECH CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)
For the Six Months Ended June 30, 2004 and 2003

<TABLE>
<CAPTION>

| | Six Months Ended June 30 | |
|---|---|---|
| | 2004 (restated) | 2003 |
| <S> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
|    Net loss | $(5,865,690) | $(3,163,7 |
|    Adjustments to reconcile net loss to net cash<br>    used by operating activities: | | |
|       Depreciation | 27,532 | 60,7 |
|        Warrants issued for services rendered | 160,000 | |
|       Change in allowance for bad debts | 173,740 | 582,4 |
|    Change in assets and liabilities: | | |
|    (Increase) decrease in assets | | |
|       Accounts receivable | (25,048) | (521,7 |
|       Cost of materials | (130,378) | (343,2 |
|       Receivables from related parties | (129,790) | (308,0 |
|       Prepaid expenses | (78,302) | (15,5 |

| | | |
|---|---:|---:|
| Deposits | 24,701 | (32,6 |
| Change in debt issue costs | 117,115 | 437,9 |
| Increase (decrease) in liabilities | | |
| Accounts payable | 807,946 | (4 |
| Due to related parties - material and advances | 882,031 | (358,4 |
| Accrued interest | (140,297) | 372,8 |
| Accrued expenses | 96,787 | 204,9 |
| | ----------- | --------- |
| Net cash used in operating activities | (4,079,653) | (3,084,9 |
| | ----------- | --------- |
| | | |
| CASH FLOWS USED FOR INVESTING ACTIVITIES: | | |
| Property and equipment | (57,029) | (84,3 |
| | ----------- | --------- |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds from issuance of common stock and exercise of warrants | 3,749,307 | 1,922,0 |
| Proceeds from notes and loans payable | 357,300 | 3,061,0 |
| Payments of notes payable | -- | (1,582,4 |
| Payments on capital lease obligations | (19,974) | (13,8 |
| | ----------- | --------- |
| Net cash provided by financing activities | 4,086,633 | 3,386,7 |
| | ----------- | --------- |
| | | |
| Net deficit of operations not transferred | (314,623) | (217,5 |
| | ----------- | --------- |
| | | |
| Net change in cash | (364,672) | |
| Cash, beginning of year | 303,292 | 5 |
| | ----------- | --------- |
| Cash, end of period | $   (61,380) · | $    5 |
| | =========== | ========= |
| | | |
| Supplemental cash flow information: | | |
| Cash paid for interest | $   514,779 | $   775,5 |
| | =========== | ========= |
| Cash paid for income taxes | $       -- | $ |
| | =========== | ========= |

</TABLE>

Non-cash investing and financing activities

During the six months ended June 30, 2004, the Company converted notes payable totaling $1,239,300 to common stock.

    See accompanying notes to condensed consolidated financial statements.

                                    7
<PAGE>

                          VITROTECH CORPORATION
            NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                            June 30, 2004

1.    ORGANIZATION

VitroTech Corporation ("VitroTech" or the "Company"), a Nevada corporation, originally incorporated under the name Star Computing Limited ("Star"), was

formed on July 16, 2001. The Company is engaged in the materials technology business which includes, but is not limited to, the mining, processing, marketing and sale of a family of proprietary amorphous aluminosilicate (the "Mineral") based products designed to improve performance and quality of a broad array of manufacturing applications.

On February 3, 2004, pursuant to the terms of a Stock Purchase Agreement (the "Stock Purchase Agreement"), Star acquired 100% of VitroCo Incorporated (formerly, VitroCo Materials LLC) ("VitroCo") in exchange for 15,000,000 shares (60,000,000 shares after giving effect to a March 2004 4:1 stock split) of Star common stock and also acquired 100% of the stock of VitroTech Corporation ("VitroTech Delaware") in exchange for 14,875,000 shares (59,500,000 shares after giving effect to the March 2004 4:1 stock split) of Star common stock (the "Exchange"). In conjunction with the Exchange, 6,043,496 shares (24,173,984 shares after giving effect to the March 2004 4:1 stock split) of Star common stock held by Star shareholders were redeemed for $22,500, resulting in 20,000,000 shares outstanding immediately prior to the exchange. Immediately following the Exchange, the pre-Exchange shareholders of VitroCo and VitroTech Delaware held approximately 85.7% of our common stock and the pre-Exchange shareholders of Star held approximately 14.3% of our common stock.

The Exchange has been accounted for as a recapitalization of Star with VitroCo as the acquirer (a "reverse acquisition"). On this basis, subsequent to the Exchange and going forward, the historical financial statements presented herein, prior to the Exchange on February 3, 2004, are those of VitroCo and the historical shareholders' equity as of February 3, 2004, has been presented to reflect the equivalent number of shares issued in the Exchange.

VitroCo's principal operating subsidiary, prior to and in conjunction with the Exchange, acquired the principal operations and assets, and assumed certain liabilities, of Hi-Tech Environmental Product, LLC ("Hi-Tech").

Following the Exchange, the Company assumed as our principal operations the operations of VitroCo, and changed the name, effective April 1, 2004, to VitroTech Corporation.

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Interim Financial Information - The unaudited condensed consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission. The information furnished herein reflects all adjustments (consisting of normal recurring accruals and adjustments) which are, in the opinion of management, necessary to fairly present the operating results for the respective periods. Certain information and footnote disclosures normally presented in annual consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been omitted pursuant to such rules and regulations. The condensed consolidated financial statements should be read in conjunction with the description of business and management's plan of operations, contained in the Company's Annual Report on Form 10-KSB for the year ended December 31, 2003, and the financial statement information contained in the Company's Form 8-K/A, Amendment No. 2, dated February 3, 2004, as amended on May 3, 2004 as well as the Company's quarterly report Form 10-QSB for the quarter ended March 31, 2004.

Basis of presentation - The consolidated financial statements of VitroTech as of June 30, 2004 include the accounts of the Company and its wholly-owned subsidiaries VitroCo, VitroTech Delaware and VitroCo Processing Incorporated ("VitroCo Processing"). VitroTech Delaware was incorporated on September 10, 2003, and had only minimal operations to date. VitroCo Processing was

incorporated in Nevada on March 22, 2004, and had no operations. All significant inter-company accounts and transactions have been eliminated in consolidation. The consolidated results of operations for the six months ended June 30, 2004 are not necessarily indicative of the results that may be expected for the year ending December 31, 2004, or for any future period.

8

<PAGE>

As reflected in the accompanying financial statements, the Company has incurred significant losses, has negative cash flows from operations and negative working capital. These matters raise substantial doubt about the Company's ability to continue as a going concern.

In view of the matters described in the preceding paragraph, the continued operations of the Company is dependent upon the Company's ability to raise capital and generate positive cash flows from operations. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or amounts and classifications of liabilities that might be necessary should the Company be unable to continue its existence. Management's intentions are as follows:

    o    Following the Exchange through July 2004, VitroTech raised approximately $4.1 million in equity capital.

    o    Management is actively pursuing raising additional capital.

Cash and Cash Equivalents - The Company considers all highly liquid debt instruments purchased with an initial maturity of three months or less to be cash equivalents.

Revenue Recognition - The Company recognizes revenue upon shipment of mineral products to customers, provided that the other conditions of sale as established by the Securities and Exchange Commission's Staff Accounting Bulletin ("SAB") No. 104, are satisfied:

    o    Persuasive evidence of an arrangement exists,
    o    Delivery has occurred, upon shipment when title passes, or services have been rendered,
    o    The seller's price to the buyer is fixed or determinable, and
    o    Collectibility is reasonably assured.

The Company evaluated reporting revenue in accordance with EITF 99-19 and determined that it was appropriate to report revenue on a gross basis (versus net basis) because the Company acts as a principal in its sales transactions and, among other factors,

    o    is the primary obligor in the arrangement
    o    has latitude in establishing price
    o    determines the product specifications, and
    o    significantly changes the product

Cost of Materials - Cost of materials, which consists of mining, processing and transportation costs, is stated at cost. The Company incurs all costs associated with the mining, processing and transportation of the Mineral from the time the Mineral is removed from the earth through all processing and warehousing. The mineral products are shipped FOB warehouse to customers. The actual acquisition cost of the Mineral is recorded as cost of goods sold and as a payable when the product is shipped, but is not due to be paid to the affiliates until after the

sale proceeds are collected from the Company's customers. Mineral inventory held for sale by the Company is, in fact, consigned raw mineral inventory owned by the Company's affiliates that has been mined, processed and transported at the Company's sole expense. The cost of the acquisition of the consigned raw mineral inventory is not recorded by the Company in the accompanying financial statements until the Company has sold the material to the customer. The Company had capitalized $1,245,758 of costs as of June 30, 2004 associated with the consigned inventory, excluding the cost of acquisition of the Mineral. The amount of costs above that are associated with finished goods totaled $978,387 as of June 30, 2004. The remaining costs were associated with "in process" inventory.

Property and Equipment - Property and equipment are recorded at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the estimated useful lives of three to seven years. Maintenance and minor replacements are charged to expense as incurred. Gains and losses on disposals are included in the results of operations

Long-Lived Assets - In accordance with the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets", the Company reviews its long-lived assets, including intangible assets, for impairment whenever events or changes in circumstances indicate that the related carrying amount may not be recoverable. Estimated losses are included in the results of operations.

9

<PAGE>

Research and Development Costs - Research and development costs are charged to expense as incurred. Equipment used in research and development with alternative uses is capitalized. Research and development costs include internal costs and payments to universities, consultants and laboratories for research on minerals, polymers, paint and coatings, and product processing techniques.

Fair Value of Financial Instruments - The carrying values of cash, accounts receivable, accounts payable and accrued expenses, none of which are held for trading, approximate fair value because of the immediate or short-term maturity of these financial instruments. The carrying amounts for the Company's long-term notes approximate fair value because current interest rates and terms offered to the Company are at current market rates.

Use of Estimates - The preparation of the Company's financial statements in conformity with generally accepted accounting principles requires the Company's management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Management has estimated the allowance for doubtful accounts, the liability for contingent interest on notes payable, and the price increase for Mineral costs payable to affiliates. Actual results could differ from those estimates.

Concentrations of Credit Risk - Financial instruments that potentially subject the Company to concentrations of credit risk consist of temporary cash investments and trade receivables. At times, the Company's cash account balances may be in excess of the maximum amount insured by the FDIC. Three customers accounted for approximately 94% of sales for the six months ended June 30, 2004. Three customers accounted for approximately 93% of accounts receivable at June 30, 2004.

Income Taxes - The Company accounts for income taxes in accordance with the

provisions of Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes" ("SFAS 109"), which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial statement and the tax basis of assets and liabilities using enacted rates in effect for the periods in which the differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

Basic and Diluted Loss Per Share - The Company uses SFAS No. 128, "Earnings Per Share" for calculating the basic and diluted loss per share. Basic loss per share is computed by dividing net loss attributable to common stockholders by the weighted average number of common shares outstanding. Diluted loss per share is computed similar to basic loss per share except that the denominator is increased to include the number of additional common shares that would have been outstanding if the potential common shares had been issued and if the additional common shares were dilutive. At June 30, 2004 and 2003, the outstanding number of potentially dilutive common shares totaled approximately 3,465,000 and 0 shares, respectively. However, as the Company has net losses, their effect is anti-dilutive and has not been included in the diluted weighted average earnings per share as shown on the Consolidated Statements of Operations.

Recently Issued Accounting Pronouncements:

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities" (an interpretation of Accounting Research Bulletin (ARB) No. 51, Consolidated Financial Statements). Interpretation 46 addresses consolidation by business enterprises of entities to which the usual condition of consolidation described in ARB-51 does not apply. The Interpretation changes the criteria by which one company includes another entity in its consolidated financial statements. The general requirement to consolidate under ARB-51 is based on the presumption that an enterprise's financial statement should include all of the entities in which it has a controlling financial interest (i.e., majority voting interest). Interpretation 46 requires a variable interest entity to be consolidated by a company that does not have a majority voting interest, but nevertheless, is subject to a majority of the risk of loss from the variable interest entity's activities or entitled to receive a majority of the entity's residual returns or both. A company that consolidates a variable interest entity is called the primary beneficiary of that entity. In December 2003, the FASB concluded to revise certain elements of FIN 46, primarily to clarify the required accounting for interests in variable interest entities. FIN-46R replaces FIN-46, that was issued in January 2003. FIN-46R exempts certain entities from its requirements and provides for special effective dates for entities that have fully or partially applied FIN-46 as of December 24, 2003. In certain situations, entities have the option of applying or continuing to apply FIN-46 for a short period of time before applying FIN-46R. In general, for all entities that were previously considered special purpose entities, FIN 46 should be applied for registrants who file under Regulation SX in periods ending after March 31, 2004, and for registrants who file under Regulation SB, in periods ending after December 15, 2004. The Company has relationships with various LLC's, that are related parties, that were established prior to 2003. The Company completed the process of evaluating if these entities are Variable Interest Entities in accordance with this pronouncement and have concluded the Company is in compliance.

10

<PAGE>

In December 2003, the Securities and Exchange Commission ("SEC") issued Staff
Accounting Bulletin ("SAB") No. 104, "Revenue Recognition." SAB 104 supersedes
SAB 101, "Revenue Recognition in Financial Statements." SAB 104's primary
purpose is to rescind accounting guidance contained in SAB 101 related to
multiple element revenue arrangements, superseded as a result of the issuance of
EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables."
Additionally, SAB 104 rescinds the SEC's Revenue Recognition in Financial
Statements Frequently Asked Questions and Answers ("the FAQ") issued with SAB
101 that had been codified in SEC Topic 13, Revenue Recognition. Selected
portions of the FAQ have been incorporated into SAB 104. While the wording of
SAB 104 has changed to reflect the issuance of EITF 00-21, the revenue
recognition principles of SAB 101 remain largely unchanged by the issuance of
SAB 104, which was effective upon issuance. The adoption of SAB 104 did not
impact the consolidated financial statements.

3.    PROPERTY AND EQUIPMENT

Property and equipment at June 30, 2004 consisted of the following:

| | |
|---|---:|
| Machinery and equipment | $ 130,227 |
| Computer equipment | 112,668 |
| Office equipment | 57,521 |
| | --------- |
| | 300,416 |
| Accumulated depreciation | (146,564) |
| | --------- |
| | $ 153,852 |
| | ========= |

4.    PURCHASE COMMITMENTS - RELATED PARTIES

The Company has entered into purchase agreements with Enviro Investment Group,
LLC ("EIG"), Red Rock Canyon Mineral, LLC ("Red Rock") and Valley Springs
Mineral, LLC ("Valley Springs"), (all "Affiliated Mineral Entities").

The EIG agreement provides for the purchase of all of the Mineral owned by EIG.
This agreement expires on March 31, 2017 and establishes minimum annual purchase
requirements by the Company at certain prices per pound. The agreement was
amended to require a minimum purchase amount by the Company of $125,000 per
year, from January 1, 2003 through the term of the original agreement. The
agreement states that the Company is responsible for all costs associated with
removing the Mineral from the property, as well as all costs related to
processing and transportation of the Mineral. Pursuant to the terms of the EIG
Mining Agreement, the Company may not sell or distribute products that are
competitive with the Mineral, other than Mineral from the Red Rock Canyon
Property, the Valley Springs Property or a property under common ownership with
EIG or those properties, until such time as the Company has purchased and paid
for at least 75% of the Mineral located on the EIG Property. Additionally,
pursuant to the EIG Mining Agreement, the Company granted EIG a non-terminable
worldwide, non-exclusive royalty free and paid up perpetual license to utilize
all of the Company's technologies relating to the Minerals from and after a
default by the Company under the EIG Mining Agreement or the termination, for
any reason, of the EIG Mining Agreement.

As of June 30, 2004, the Company owed EIG $680,460, all of which relates to the
purchase obligation. This amount includes the cost of Mineral sold to customers
but not yet paid for and the increased Mineral purchase payment due when the

customer's payment is received. Interest is not charged on this obligation. Purchases from EIG were $70,456 and $266,855 for the six months ended June 30, 2004 and 2003, respectively.

Under the Red Rock Canyon Mining Agreement, the Company is obligated to pay to Red Rock amounts per pound of Mineral excavated and sold from the Red Rock Canyon Property and is subject to cumulative minimum purchase requirements. Both the per pound payment and the minimum purchase requirements with respect to the Red Rock Canyon Property are identical to the requirements established for the EIG Property. However, any Mineral purchased from any Affiliated Mineral Entity shall be credited against the minimum requirement. The Red Rock Canyon Mining Agreement includes non-compete and license provisions identical to those pertaining to the EIG Property. The Company is also obligated to advance to Red Rock all amounts necessary to secure the rights relative to the Red Rock Property, all of which amounts will be treated as advances against per pound payment obligations. This has not been completed as of yet.

11

<PAGE>

Under the Valley Springs Mining Agreement, the Company is obligated to pay to Valley Springs amounts per pound of Mineral excavated and sold from the Valley Springs Property and is subject to cumulative minimum purchase requirements. Both the per pound payment and the minimum purchase requirements with respect to the Valley Springs Property are identical to the requirements established for the EIG Property. However, any Mineral purchased from any Affiliated Mineral Entity shall be credited against the minimum requirement. The Valley Springs Mining Agreement includes non-compete and license provisions identical to those pertaining to the EIG Property. The Company is also obligated to advance to Valley Springs all amounts necessary to secure the rights relative to the Valley Springs Property (including the payments to the land owners), all of which amounts will be treated as advances against per pound payment obligations. Under this provision no amount has been paid.

The Valley Springs Property has not previously been mined but is zoned for mining. The Company is processing the Valley Springs property for the owners to obtain mining permits and entitlement approval is expected by December 31, 2004. There is no guaranty that the Company will be successful in obtaining mining entitlements. Closing on the acquisition of mining rights to the Valley Springs property from the present landowner has not, as of August 2004, occurred.

The Company incurs all costs associated with the mining, processing and transportation of the Mineral from the time the Mineral is removed from the earth through all processing and warehousing. All costs are capitalized and shown as cost of materials on the balance sheet. The actual acquisition cost of the Mineral is recorded as cost of goods sold and as a payable when the product is shipped to its customer, but is not due to be paid to the Affiliated Mineral Entities until after the sale proceeds are collected from the Company's customers. Mineral inventory held for sale by the Company is, in fact, consigned raw mineral inventory owned by the Affiliated Mineral Entities that has been mined, processed and transported at the Company's sole expense. The cost of the acquisition of the consigned raw mineral inventory is not recorded by the Company in the accompanying financial statements until the Company has sold the material to the customer.

The Company does not have title or risk of loss on the cost of Minerals that are consigned by the Affiliated Mineral Entities.

5. NOTES PAYABLE

Notes payable at June 30, 2004 consisted of the following:

| | |
|---|---:|
| Private Offering - 9/1/99 Memorandum | $   608,428 |
| Private Offering - 3/19/01 Memorandum | 1,659,187 |
| Private Offering - 4/22/02 Memorandum | 2,967,044 |
| Private Offering - 2/24/03 Memorandum | 1,937,000 |
| Other notes payable | 700,000 |
| | 7,871,659 |
| Less: current portion | 5,934,659 |
| Non-current portion | $ 1,937,000 |

Notes payable mature as follows:

| | |
|---|---:|
| 2004 | $ 5,934,659 |
| 2005 | 1,937,000 |
| Total | $ 7,871,659 |

Private Offering - 9/1/99 Memorandum

12

<PAGE>

In September 1999, the Company initiated a $5,000,000 private offering of
promissory notes with an interest rate of 10% per annum. The original maturity
date of these notes was December 31, 2001. The balance in the amount of $608,428
of these notes was due and payable at December 31, 2002, for which the Company
is in default. The Company is required to make ongoing interest payments under
the same terms and conditions as the original $5,000,000 private offering. No
formal demand has been made by the note holders and all note holders have
continued to receive interest payments. The notes also provide for contingent
interest equal to $0.15 per pound on the first one billion pounds of the
Company's products sold and collected. The contingent interest will be shared
pro rata by the total notes issued and shall be paid quarterly in arrears. As of
June 30, 2004, all amounts for interest and contingent interest have been paid
or accrued.

Private Offering - 3/19/01 Memorandum

In March 2001, the Company initiated a $5,000,000 private offering of promissory
notes with an interest rate of 10% per annum. Accrued interest in the amount of
$279,354 that was due on December 31, 2002 was converted to principal. The notes
matured on December 31, 2003, but were extended at the Company's option to
December 31, 2004. The notes also provide for contingent interest equal to $0.10
per pound on the first five hundred million pounds of the Company's products
sold and collected. The contingent interest will be shared pro rata by the total
notes issued and shall be paid quarterly in arrears. As of June 30, 2004, all
amounts for interest and contingent interest have been paid or accrued.

Private Offering - 4/22/02 Memorandum

In April 2002, the Company initiated a $5,000,000 private offering of promissory
notes with an interest rate of 10% per annum. During 2002, $1,448,044 of notes
was issued. The offering concluded in February, 2003 after an additional
$1,519,000 of notes were issued, for a total amount raised of $2,967,044. The

notes mature on December 31, 2004 but may be extended by the Company to December 31, 2005. The notes also provide for contingent interest equal to $0.07 per pound on the first five hundred million pounds of the Company's products sold and collected. The contingent interest will be shared prorata by the total notes issued and shall be paid quarterly in arrears. As of June 30, 2004, all amounts for interest and contingent interest have been paid or accrued. These notes can be extended twelve months at the Company's option if interest for the fourth quarter of 2004 be paid by 11/30/04

Private Offering - 2/24/03 Memorandum

In February 2003, the Company initiated a $5,000,000 private offering of promissory notes with an interest rate of 10% per annum. During 2003, $1,542,000 of notes was issued. During the six months ended June 30, 2004, the Company issued $395,000 of additional notes, and received $357,300 in cash, net of offering costs of $37,700. The notes mature on December 31, 2005 but may be extended by the Company to December 31, 2006. The notes also provide for contingent interest equal to $0.07 per pound on the first five hundred million pounds of the Company's products sold and collected. The contingent interest will be shared prorata by the total notes issued and shall be paid quarterly in arrears. As of June 30, 2004, all amounts for interest and contingent interest have been paid or accrued. These notes can be extended twelve months at the Company's option if interest for the fourth quarter of 2005 be paid by 11/30/05

Other Notes Payable

The Company has notes payable to others, aggregating $700,000, with an interest rate of 16%, plus contingent interest based on product sales, due December 31, 2004. As of June 30, 2004, all amounts for interest and contingent interest have been paid or accrued.

6. ADVANCES FROM RELATED PARTIES

As of June 30, 2004 The Company has advances from related parties in the amount of $1,131,492. This amount is comprised of $100,000 from John Keller and $1,031,492 from Elgin Investments. Both advances are unsecured , non interest bearing and due on demand.

7. COMMON STOCK

During the six months ended June 30, 2004, the Company issued the following shares of common stock (see Note 11 - Subsequent Events):

13

<PAGE>

- o     Issued 801,953 shares for conversion of notes payable for a net amount of $1,239,300. During 2003, $1,021,998 of principal was assumed by Value Tech, LLC, Value Tech II, LLC, and Value Plus, LLC (collectively "Value Entities"), , for which the note holders agreed to the assumption. For the assumption the Value Entities were issued membership interest of the Company in an equal amount of the debt they assumed.

- o     Issued 20,000,000 shares for acquisition of Star Computing Limited.

- o     Issued 5,333,332 shares in a private placement for $2,000,000, before fees of $8,194.

o    Issued 2,343,333 shares upon exercise of warrants totaling
     $1,757,500.

8. WARRANTS

During February 2004, the Company completed a private placement of 5,333,332
shares of common stock at a price of $0.375 per share for $2 million. The
Company also issued to the investors warrants to purchase an aggregate of
5,333,332 shares of common stock at an exercise price of $0.75 per share. The
warrants are exercisable at any time until February 11, 2009.

In April 2004, the Company issued to a financial advisor 125,000 warrants,
exercisable for five years, to purchase shares of the Company's common stock at
$1.55 per share. The Company has accounted for the issuance of these warrants
using the fair value method pursuant to SFAS 123 using the Black-Scholes option
pricing model. The fair value of $160,000 which was expensed for these options
was estimated at the date of grant using a Black-Scholes option pricing model
with the following weighted-average assumptions for 2004: risk-free interest
rate of 4.25%; dividend yields of 0%; volatility factors of the expected market
price of the Company's common stock of 100%; and a weighted average expected
life of the option of 5 years.

The Black-Scholes option valuation model was developed for use in estimating the
fair value of traded options which have no vesting restrictions and are fully
transferable. In addition, option valuation models require the input of highly
subjective assumptions including the expected stock price volatility. Because
the Company's employee stock options have characteristics significantly
different from those of traded options, and because changes in the subjective
input assumptions can materially affect the fair value estimate, in management's
opinion, the existing models do not necessarily provide a reliable single
measure of the fair value of employee stock options.

The table below summarizes warrants outstanding as of June 30, 2004:

| | |
|---|---:|
| Warrants outstanding at December 31, 2003 | -- |
| Granted | 5,458,333 |
| Exercised at $0.75 per share | (2,343,333) |
| Cancelled | -- |
| Warrants outstanding and exercisable at June 30, 2004 | 3,115,000 |

9. COMMITMENTS

The Company has entered into purchase commitments for the Mineral. These
commitments are described in NOTE 4 - PURCHASE COMMITMENTS - RELATED PARTIES.

The Company leases its office and warehouse facilities under operating leases
that expire through 2010.

10. REVENUES

During the quarter ended June 30, 2004 revenue was $(92,100) directly due to a
significant credit memo and refund of $149,500 to a customer and only $57,400 of
revenue generated in the quarter. This refund was a voluntary buy back of
material and not a contractual obligation.

14

<PAGE>

11. PROPOSED ACQUISITIONS

Gitto|Global Compounding Operations

The Company, in March 2004, entered into an Asset Purchase Agreement with
Gitto|Global Corporation ("Gitto") and its shareholders and an affiliate of
Gitto pursuant to which the Company agreed to purchase certain assets used in,
and comprising, Gitto's compounding division for aggregate consideration of
approximately $51 million consisting of cash and assumption of certain
liabilities. Completion of the purchase transaction is subject to satisfactory
completion of due diligence, delivery of certain schedules, satisfaction of
various terms and conditions, successful completion of an audit of Gitto's
financial statements and the Company's securing financing in the full amount of
the purchase price. The Agreement has been amended on multiple occasions to
extend the closing date from May 31, 2004 to September 15, 2004.

In July 2004, the Company issued and deposited in escrow 3,000,000 shares of
its common stock for the benefit of Gitto in full satisfaction of its obligation
to deposit $2 million pursuant to the Asset Purchase Agreement. The shares
deposited in escrow were pledged to satisfy certain banking requirements of
Gitto and subject to Gitto's agreement to deposit in escrow a note payable to
the Company in the amount of $2.25 million to be delivered to the Company in the
event the shares are not returned to the Company.

On August 27, 2004, the Company notified Gitto Global Corporation of its
election to terminate the Asset Purchase Agreement pursuant to the Company's
rights under the Agreement. In conjunction with the termination of the Gitto
Asset Purchase Agreement, the Company made demand for the return of 3,000,000
shares of its common stock issued in escrow for the benefit of Gitto or, in the
event Gitto fails to deliver the shares, the delivery of a subordinated
promissory note in the amount of $2,250,000 deposited by Gitto in escrow for
delivery in the event the shares are not returned.

Indian Hill Processing Facility

In April 2004, we entered into an agreement to acquire from Indian Hill
Processing, LLC, the Indian Hill Processing Facility for $864,000, of which
$464,000 is payable at closing with the balance accruing interest at 10% per
annum and payable in monthly payment of $30,000 subject to acceleration in the
event of receipt of funding to the pay the balance. Commencement of operation of
the Indian Hill Processing Facility will require the purchase and installation
of processing equipment at an estimated cost of $1,250,000. Acquisition and
installation of equipment and commencement of operation of the Indian Hill
Processing Facility is not expected to occur for a number of months and the
closing may be delayed until 2005.

12. SUBSEQUENT EVENTS

In July 2004 Michael Handelman was hired to be the Chief Financial Officer. As
part of his compensation package options to purchase 50,000 shares were granted
under the 2004 Option Plan. The options vest over three years

In July 2004, the Company entered into a convertible debenture agreement for
receipt of $300,000. As part of the transaction, the Company issued 525,000 to
the note holder. The note calls for an interest rate of 8% per annum, with all
interest and principal due October 12, 2004.

In June 2004 Gary Denman was appointed to the Board of Directors of the Company. Dr. Denman is currently a private consultant working with Defense-related companies and agencies. Dr. Denman is a member of the AT&T Government Markets Advisory Board and a Member of the Air Force Scientific Advisory Board. Prior to these affiliations, Dr. Denman was President and Chief Executive Officer of GRC International, Inc. (GRCI) and a Director of GRCI. Dr. Denman joined GRCI as a Senior Vice President in 1995 and became Chief Operating Officer in 1997. Dr. Denman was also a member of the board of directors of Southern Research Institute. He was awarded options to purchase 60,000 shares and is fully vested.

In August 2004, the Company received a loan of $250,000 from an unaffiliated third party. The terms of the note are still being negotiated. In connection with the loan, the Company will issue 25, 000 shares as a broker fee to a third party.

15

<PAGE>

On August 26, 2004, Jess Rae Booth advised the Company's directors that he would be resigning as Chairman and Chief Executive Officer effective on the earlier of December 15, 2004 or the hiring of a successor Chief Executive Officer.

13. Restatement

Restatement Of The Three-Month and Six-Month Periods Ended June 30, 2004

The financial statements for the three-month and six-month periods ended June 30, 2004 have been restated to include an accrued liability for general and administrative expense. Additionally, the company corrected the presentation of related party advances from accounts payable and accrued expenses to prominently disclose as a separate line item on the balance sheet. The effect of these changes to the June 30, 2004 financial statements are as follows:

<TABLE>
<CAPTION>

| Statement of Operations: | For the Three Months Ended June 30, 2004 | | |
| --- | --- | --- | --- |
| | Reported | Adjustments | Restated |
| <S> | <C> | <C> | <C> |
| Net Loss | $ (3,263,930) | $ (111,456) | $(3,375,386) |
| Basic and diluted loss per share | $ (0.02) | | $ (0.02 |
| Basic and diluted loss per share | $ (0.02) | | $ (0.02 |

<CAPTION>

| Statement of Operations: | For the Six Months Ended June 30, 2004 | | |
| --- | --- | --- | --- |
| | Reported | Adjustments | Restated |
| <S> | <C> | <C> | <C> |
| Net Loss | $ 5,754,234) | $ (111,456) | $(5,865,690) |
| Basic and diluted loss per share | $ (0.04) | | $ (0.04 |
| Basic and diluted loss per share | $ (0.04) | | $ (0.04 |

<CAPTION>

```
                                              June 30, 2004
                              ----------------------------------------------
   Statement of Operations:        Reported      Adjustments      Restated
                                  ------------   -------------    ----------
<S>                               <C>            <C>              <C>
                                  ------------   -------------    ----------
 Accounts payable and accrued expenses  $  3,176,820   $ (1,020,037)   $ 2,156,783
                                  ============   ============     ==========
   Advances from related parties  $          0     1,131,492     $ 1,131,492
                                  ============   ============     ==========
   Stockholders' deficit          $ (9,726,121)      (111,456)    $(9,837,577)
</TABLE>                          ============   ============     ==========
```

16

<PAGE>

ITEM 2.   MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

This Form 10-QSB quarterly report of VitroTech Corporation (the "Company") for
the six months ended June 30, 2004, contains certain forward-looking statements
within the meaning of Section 27A of the Securities Act of 1933, as amended, and
Section 21E of the Securities Exchange Act of 1934, as amended, which are
intended to be covered by the safe harbors created thereby. To the extent that
there are statements that are not recitations of historical fact, such
statements constitute forward-looking statements that, by definition, involve
risks and uncertainties. In any forward-looking statement, where the Company
expresses an expectation or belief as to future results or events, such
expectation or belief is expressed in good faith and believed to have a
reasonable basis, but there can be no assurance that the statement of
expectation or belief will be achieved or accomplished.

Certain factors that could cause actual results or events to differ materially
from those anticipated are set forth in our Form 8-K/A for the year ended
December 31, 2003 under the caption "Risk Factors That May Affect Future
Results" within "Management's Discussion and Analysis or Plan of Operations" and
elsewhere herein and in our other reports filed from time to time with the
Securities and Exchange Commission.

Readers are cautioned not to place undue reliance on the forward-looking
statements contained herein, which speak only as of the date hereof. The Company
believes the information contained in this Form 10-QSB to be accurate as of the
date hereof. Changes may occur after that date, and the Company will not update
that information except as required by law in the normal course of its public
disclosure practices.

Additionally, the following discussion regarding the Company's financial
condition and results of operations should be read in conjunction with the
financial statements and related notes contained in Item 1 of Part 1 of this
Form 10-QSB, as well as the financial statements in Item 7 of Part II of the
Company's Form 10-KSB for the fiscal year ended December 31, 2003 and the
financial statements filed with the Company's Form 8-K/A, Amendment No. 2, dated
February 3, 2004, as amended May 3, 2004, as well as the Company's quarterly
report Form 10-QSB for the quarter ended March 31, 2004.

OVERVIEW

On February 3, 2004, we completed a reverse merger (the "Exchange") pursuant to

which Star Computing Limited acquired 100% of the stock of VitroCo, Inc. and
VitroTech Corporation in exchange for shares of common stock representing
approximately 85.7% of our common stock. Following the Exchange, and through
June 30, 2004, we (1) assumed as our principal plan of operations the business
of VitroCo, (2) terminated the prior operations of Star Computing, (3) changed
our name from Star Computing Limited to VitroTech Corporation, (4) carried out a
4-for-1 stock split, (5) sold, for $2 million, 5,333,332 shares of our common
stock (after giving effect to the stock split) and 5,333,332 common stock
purchase warrants exercisable at $0.75 per share (after giving effect to the
stock split), and (6) issued 2,343,333 shares of common stock for $1,757,500
pursuant to the exercise of warrants.

The Exchange has been accounted for as a recapitalization of Star with VitroCo
as the acquirer (a "reverse acquisition"). On this basis, subsequent to the
Exchange and going forward, the historical financial statements presented
herein, prior to the Exchange on February 3, 2004, are those of VitroCo and the
historical shareholders' equity, as of February 3, 2004, have been presented to
reflect the equivalent number of shares issued in the Exchange.

Readers should review the "Plan of Operations" discussion in the "Management's
Discussion and Analysis or Plan of Operation" in our Form 10-KSB for the year
ended December 31, 2003 for an overview of our principal revenue sources and
principal operating expenses and factors effecting our revenues and expenses.

During the first half of 2004, we implemented the Plan of Operations described
in our Form 10-KSB. We also devoted substantial management time and financial
resources to consummation of the Exchange, capital raising efforts, investor
relations programs, implementation of policies, procedures and systems designed
to facilitate our functioning as a publicly held company, establishing of
expanded distribution channels and evaluation of various acquisition strategies
with the intent of enhancing our production and distribution capabilities. We
also continued our ongoing efforts to close on the acquisition of rights
relating to the Mineral on the Valley Springs Property. Pursuant to those
efforts, our counsel has advised that the primary term of the agreement to
acquire the Mineral on the Valley Springs Property had expired and that any
party thereto could terminate the agreement. Notwithstanding the lapse of the
term to close, the parties continue to pursue the transaction and we continue to
believe that we will secure the rights with respect to the Valley Springs
Property on the terms described in our Form 8-K/A.

17

<PAGE>

All of the undertakings described above resulted in our experiencing
substantially higher operating expenses and reduced focus on sales during the
six months ended June 30, 2004 as compared to the same period in 2003.

CRITICAL ACCOUNTING POLICIES

The Company's discussion and analysis of its financial condition and results of
operations are based upon the Company's financial statements, which have been
prepared in accordance with accounting principles generally accepted in the
United States of America. The Company believes certain critical accounting
policies affect its more significant judgments and estimates used in the
preparation of its financial statements. The following describes the critical
accounting policies used in reporting our financial condition and results of
operations.

Revenue Recognition - We recognize revenue upon shipment of mineral products to

customers, provided that the other conditions of sale as established by the Securities and Exchange Commission's Staff Accounting Bulleting ("SAB") No. 104 are satisfied:

- o     Persuasive evidence of an arrangement exists,

- o     Delivery has occurred, upon shipment when title passes, or services have been rendered,

- o     The seller's price to the buyer is fixed or determinable, and

- o     Collectibility is reasonably assured.

We evaluated reporting revenue in accordance with EITF 99-19 and determined that it was appropriate to report revenue on a gross basis (versus net basis) because we act as a principal in sales transactions and, among other factors:

- o     are the primary obligor in the arrangement

- o     have latitude in establishing price

- o     determine the product specifications, and

- o     significantly change the product

Cost of Materials - Cost of materials, which consists of mining, processing and transportation costs, is stated at cost. We incur all costs associated with the mining, processing and transportation of the Mineral from tho time the Mineral is removed from the earth through all processing and warehousing. The mineral products are shipped FOB warehouse to customers. The actual acquisition cost of the Mineral is recorded as cost of goods sold and as a payable when the product is shipped, but is not due to be paid to the affiliates until after the sale proceeds are collected from our customers. Mineral inventory held for sale is, in fact, consigned raw mineral inventory owned by our affiliates that has been mined, processed and transported at our sole expense. The cost of the acquisition of the consigned raw mineral inventory is not recorded in the accompanying financial statements until we have sold the material to the customer. We had capitalized $1,245,758 of costs as June 30, 2004 associated with the consigned inventory, excluding the cost of acquisition of the Mineral. The amount of costs above that are associated with finished goods totaled $978,387 as of June 30, 2004. The remaining costs were associated with "in process" consigned inventory.

We evaluate our cost of material periodically to determine if there is any impairment in the value of such material costs. If an impairment is found to exist, we reduce the carrying amount of the cost of material to an amount determined to be market value. We review a number of factors in evaluating potential impairment of our cost of material including market prices and our ability to recover the cost of materials through the sale of Mineral. As of June 30, 2004, we determined that no impairment had occurred with respect to our cost of materials.

Impairment of Long-Lived Assets - We review all long-lived assets on a regular basis to determine if there has been an impairment in the value of those assets. If, upon review, it is determined that the carrying value of those assets may not be recoverable, we will record a charge to earnings and reduce the value of the asset on the balance sheet to the amount determined to be recoverable.

For purposes of evaluating recoverability of long-lived assets, the recoverability test is performed using undiscounted cash flows of the individual

assets compared to the related carrying value. If the undiscounted operating income is less than the carrying value, the amount of the impairment, if any, will be determined by comparing the carrying value of each asset with its fair value. Fair value is generally based on a discounted cash flow analysis.

Based on our review of our long-lived assets, during the six months ended June 30, 2004, we recorded no impairments of our long-lived assets.

18

<PAGE>

Valuation of Accounts Receivable - We review all of our accounts receivable on a regular basis to determine the collectability of each account based on age, response to collection efforts, and other factors. We establish a reserve for those accounts where collection seems doubtful. If a determination is made that the customer will definitely not pay, the amount is written off against the reserve.

Based on our review at June 30, 2004, the current reserve for uncollectible accounts receivable is adequate.

RESULTS OF OPERATIONS

The condensed consolidated financial statements of VitroTech as of June 30, 2004 include the accounts of the Company and its wholly-owned subsidiaries VitroCo, VitroTech Delaware and VitroCo Processing Incorporated ("VitroCo Processing"). VitroTech Delaware was incorporated on September 19, 2003, and had only minimal operations to date. VitroCo Processing was incorporated in Nevada on March 22, 2004, and had no operations. All significant inter-company accounts and transactions have been eliminated in consolidation. The June 30, 2003 financial statements reflect the operating results of certain assets and operations of Hi-Tech Environmental Products, LLC which were acquired by VitroCo in contemplation of the Exchange.

Revenue. Revenue for the six months ended June 30, 2004 was $133,770, a decrease of $1,638,355, or 92.5%, compared with $1,772,125 during the same period in the prior year. The reduction in revenues for the period was principally attributable to (1) the development and implementation of a revised sales and marketing strategy during the period and (2) a reduced focus on end-user sales to small and medium sized customers during the current period. For the quarter ended June 30, 2004, revenue was $(92,100) down $985,961 from the same quarter ended June 30, 2003 of $893,861 or 110.3%. The negative revenue for the quarter ended June 30, 2004 was directly due to a credit memo and refund of $149,500 which was only offset by $57,400 of revenue generated in the quarter.

The revised sales and marketing strategy developed during the quarter is designed to focus our efforts on three clearly defined channels, consisting of application specific sales, joint venture/strategic partnerships and acquisitions. Application specific sales entails identification of certain product applications and industries where we have developed a data base of proven performance enhancement and hiring a team of professionals with experience in the target industry to target potential customers operating in those target applications and industries. Joint venture/strategic partnership sales entails the establishment of joint venture or partnership relationships with key suppliers to the plastics industry, including resin manufacturers, masterbatchers and specialty compounders, to develop performance products in partnership with those suppliers wherein our product is added "up stream" of the end-users at the resin manufacturing stage, masterbatch production stage or compounding stage. Acquisitions entail identification and planned acquisition of

companies operating within the plastics industry where we can gain customers, capabilities and distribution channels and enhance profitability by introduction of our products in the acquired businesses' operations. While the development and implementation of our revised sales and marketing strategy is expected to require more time and entail greater expense than maintaining our prior direct sales model, which transition was a substantial cause of our decline in sales for the quarter, we believe that our revised strategy will better position us to gain broad market acceptance, grow sustainable recurring sales and service customers.

The change in focus on sales during the period reflected the investment of substantial time, money and resources by our sales and marketing team in development and ongoing implementation of the revised sales and marketing strategy and the devotion of substantial management and financial resources to completion of the Exchange, capital raising efforts and implementation of procedures and processes to facilitate functioning as a publicly held company and to facilitate anticipated growth.

Cost of Sales and Gross Margins. Cost of goods sold totaled $112,794 during the current period as compared to $666,154 during the same period in 2003, a decrease of 83.1%. Cost of goods sold during the current period included $61,594 of direct cost of mineral and $51,200 of processing and related costs. Cost of goods sold during the same period in 2003 included $266,885 of direct cost of mineral and $399,269 of processing and related costs. Cost of goods sold as a percentage of sales was 84.3% during the current period as compared to 37.6% in the 2003 period. The decline in cost of goods sold was attributable to the reduction in sales volume during the period. The increase in cost of goods sold as a percentage of sales was partially attributable to the payment of a higher per pound price for mineral during 2004 compared to 2003. Under the terms of our mineral purchase agreements, we paid $0.75 per pound for mineral mined and sold during 2003. During 2004, we paid $0.875 per pound for mineral. Additionally,

19

<PAGE>

the reduced gross margin percentage in 2004 reflects a change in the product mix and the associated cost of manufacturing the product. As a result of this change in product focus, our target gross margin percentage is 48% in future periods. For the quarter ended June 30, 2004, Cost of Goods Sold was $3,298 as compared to $375,087 for the same period ended June 30, 2003, a reduction of $371,789 or 99.12%, directly caused by the reduction in sales for the quarter.

The decrease in sales combined with the increase in our per pound cost of materials resulted in a reduction in our gross margins from $1,105,971 in the 2003 period to $20,977 during the six months ended June 30, 2004.

Selling, General and Administrative Expense. Selling, general and administrative expenses ("SG&A") increased to $5,125,985 in the six months ended June 30, 2004, compared with $2,942,782 in the prior year, an increase of 74.2%. The increase in SG&A is primarily attributable to costs associated with business development (consulting fees, sales staffing and travel), legal and accounting fees associated with the reverse merger, investor relations programs associated with becoming a public company and costs associated with implementation of our revised sales and marketing strategy, including investigation, due diligence and other costs associated with identification of acquisition candidates. Additionally during 2004, we began paying a royalty of $1.00 per pound of mineral sold and collected to Hi-Tech Environmental Products. Hi-Tech royalties totaled $42,740 during the quarter. For the quarter ended June 30, 2004 SG&A was $2,861,847 as compared to $1,831,190 for the same period ended June 30, 2003, an

increase of $1,030,657 or 56.3%

Research and Development Expense. Research and development expense for the six months ended June 30, 2004 was $127,516, compared with $259,665 for the same period in the prior year, a decrease of 49.1%. The higher R&D expense in the prior year reflected payments to universities for product research that has been completed. For the quarter ended June 30, 2004, R&D was $83,887 as compared to $106,994 for the same period ended June 30, 2003,a reduction of $23,107 or 21.6%

Interest Expense. Interest expense decreased $361,764, or 44.8% in the first six months of 2004 compared to the same period in 2003. Notes payable totaled $7,871,659 and $9,675,604 at June 30, 2004 and 2003, respectively. The decrease in interest expense reflects the decrease in notes payable as a result of debt conversions to equity and assumption of notes for equity. For the quarter ended June 30, 2004, interest was $240,036 as compared to $430,861 for the same period ended June 30, 2003,a reduction of $190,285 or 44.3%

FINANCIAL CONDITION

Liquidity and Capital Resources. At June 30, 2004, we had a cash overdraft of $61,380 and a working capital deficit of $8,581,165 as compared to a pro forma cash balance of $303,292 and a pro forma working capital deficit of $7,515,964 at December 31, 2003.

As discussed in the footnotes to the financial statements included herewith and in the financial statements included in our Form 8-K/A dated May 3, 2004 and Form 10-QSB for the quarter ended March 31, 2004 our losses, negative cash flows from operations and negative working capital raise substantial doubt about our ability to continue as a going concern.

In view of the matters described in the preceding paragraph, our continued operations are dependent upon our ability to raise capital and generate positive cash flows from operations. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or amounts and classifications of liabilities that might be necessary should we be unable to continue our existence.

o    During the six months ended June 30, 2004, we issued 5,333,332 shares in a private placement for $2,000,000, before fees of $8,194 and we issued 2,343,333 shares of common stock upon the exercise of warrants, for proceeds of $1,757,500

20

<PAGE>

In order to support our operations and capital commitments through December 31, 2004, we estimate that we will require $9,500,000 from operating cash flow, infusions of additional equity or debt or other sources. Additionally, we will likely require substantial additional capital to support the acquisition component of our revised sales and marketing strategy. We are continuing in our efforts to secure the necessary capital to support our operations and our acquisition strategy. In order to facilitate our capital raising efforts we have engaged, and expect to engage in the future, investment banking firms and financial advisors to assist in the evaluation and financing of our operations and prospective acquisitions. We presently have no firm commitments from third parties to provide such financing and there can be no assurance that we will receive such financing. Should we be unable to secure needed financing we may be unable to fully implement our planned operations and acquisitions, we may be required to curtail our operations in part or in whole.

Notes Payable. At June 30, 2004, our notes payable totaled $7,871,659, of which $5,934,659 represented current maturities reflected in our working capital deficit. $608,468 of those notes payable were in default at June 30, 2004. The balance of the notes, in the amount of $1,937,000, mature December 31, 2005, but may be extended by the Company to December 31, 2006.

Capital Expenditures and Commitments. We periodically purchase equipment and related items to support operations. During the quarter ended June 30, 2004, we purchased $33,612 of equipment. In addition to our needs for capital to support operations and routine capital expenditure requirements, we require capital to fund our proposed acquisition of, and commencement of processing operations at, the Indian Hill Processing Facility. Completion of the proposed acquisition of the Indian Hill Processing Facility will require a cash payment at closing of $464,000. The balance of the purchase price, in the amount of $400,000, will bear interest at 10% per annum and will be payable in monthly installments of $30,000, subject to mandatory prepayment to the extent that we secure additional capital. Commencement of operation of the Indian Hill Processing Facility will require the purchase and installation of processing equipment at an estimated cost of $1,250,000. Acquisition and installation of equipment and commencement of operation of the Indian Hill Processing Facility is not expected to occur for a number of months and the closing may be delayed until 2005.

The Company, in March 2004, entered into an Asset Purchase Agreement with Gitto Global Corporation ("Gitto") and its shareholders and an affiliate of Gitto pursuant to which the Company agreed to purchase certain assets used in, and comprising, Gitto's compounding division for aggregate consideration of approximately $51 million consisting of cash and assumption of certain liabilities. Completion of the purchase transaction is subject to satisfactory completion of due diligence, delivery of certain schedules, satisfaction of various terms and conditions, successful completion of an audit of Gitto's financial statements and the Company's securing financing in the full amount of the purchase price. The Agreement has been amended on multiple occasions to extend the closing date from May 31, 2004 to September 15, 2004.
In July 2004, the Company issued and deposited in escrow 3,000,000 shares of its common stock for the benefit of Gitto in full satisfaction of its obligation to deposit $2 million pursuant to the Asset Purchase Agreement. The shares deposited in escrow were pledged to satisfy certain banking requirements of Gitto and subject to Gitto's agreement to deposit in escrow a note payable to the Company in the amount of $2.25 million to be delivered to the Company in the event the shares are not returned to the Company.

On August 27, 2004, the Company notified Gitto Global Corporation of its election to terminate the Asset Purchase Agreement pursuant to the Company's rights under the Agreement. In conjunction with the termination of the Gitto Asset Purchase Agreement, the Company made demand for the return of 3,000,000 shares of its common stock issued in escrow for the benefit of Gitto or, in the event Gitto fails to deliver the shares, the delivery of a subordinated promissory note in the amount of $2,250,000 deposited by Gitto in escrow for delivery in the event the shares are not returned.

Operating Leases. At June 30, 2004, we, and our subsidiaries, were obligated under leases covering our executive offices, warehouses and other facilities. Such leases contain minimum rent provisions which provided for the payment of minimum aggregate annual rental payments of approximately $293,882 in 2004.

Contractual Obligations. Our only material contractual obligations requiring determinable future payments on our part are various notes payable and our leases relating to our executive offices and other facilities, each of which is described above.

OFF-BALANCE SHEET ARRANGEMENTS

We had no off-balance sheet arrangements or guarantees of third party
obligations at June 30, 2004.

21

<PAGE>

INFLATION

We believe that inflation has not had a significant impact on our operations
since inception.

ITEM 3.   CONTROLS AND PROCEDURES

We maintain disclosure controls and procedures (as defined in Exchange Act Rule
13a-15(e) and 15d-15(e)) that are designed to ensure that information required
to be disclosed in our Exchange Act reports is recorded, processed, summarized
and reported within the time periods specified in the Securities and Exchange
Commission's rules and forms, and that such information is accumulated and
communicated to our management, including our Chief Executive Officer and Chief
Financial Officer, as appropriate, to allow timely decisions regarding the
required disclosure.

In designing and evaluating the disclosure controls and procedures, management
recognizes that any controls and procedures, no matter how well designed and
operated, can provide only reasonable assurance of achieving the desired control
objectives, and management necessarily is required to apply its judgment in
evaluating the cost-benefit relationship of possible controls and procedures.

As required by SEC Rule 13a-15(b), we carried out an evaluation, under the
supervision and with the participation of our management, including our Chief
Executive Officer and Chief Financial Officer, of the effectiveness of the
design and operation of our disclosure controls and procedures as of the end of
the period covered by this report.

Based on the foregoing, our Chief Executive Officer and Chief Financial Officer
have concluded that our disclosure controls and procedures are effective to
provide reasonable assurance that information is recorded, processed, summarized
and reported within the time periods specified in the SEC's rules and forms, and
that such information is accumulated and communicated to our management,
including our Chief Executive Officer and Chief Financial Officer, as
appropriate, to allow timely decisions regarding the required disclosure.

Subsequent to filing our original report, our independent accountants,
Stonefield Josephson, Inc., reported to management and the Audit Committee that
they had not completed their review procedures with respect to the report and
that certain payroll tax liabilities had not been properly accrued. Stonefield
Josephson also advised management and the Audit Committee that it considered
this situation to be a material weakness. In response to the report of our
independent accountants, our management determined to restate our consolidated
financial statements as of and for the quarter and six months ended June 30,
2004, to properly record the underaccrued payroll tax liability.

In conjunction with the decision to restate our financial statements, management
re-evaluated our disclosure controls and procedures with respect to proper
payroll tax liability accrual and proper authorizations to be obtained and
procedures to be followed in connection with filing of reports with the SEC.

Subsequent to June 30, 2004, we took steps to identify, rectify and prevent the recurrence of the circumstances that resulted in our underaccrual of payroll tax liability and inadvertent filing of the Form 10-QSB prior to completion of the outside accountant's review, including establishment of new procedures designed to avoid a recurrence, education of accounting and management personnel and increasing emphasis on process compliance. We believe these enhancements to our system of internal controls and our disclosure controls and procedures will be adequate to provide reasonable assurance that the control objectives will be met.

PART II - OTHER INFORMATION

ITEM 2.   CHANGES IN SECURITIES

Sales of Unregistered Securities

22

<PAGE>

In April 2004, we issued an aggregate of 2,343,333 shares of common stock to accredited investors upon the exercise of outstanding warrants for which we received $1,757,500 in exercise proceeds.

The issuance of all shares of our common stock and warrants described above was pursuant to the exemption from registration provided by Section 4(2) of the Securities Act of 1933, as amended and related state private offering exemptions. All of the investors were Accredited Investors as defined in the Securities Act who took their shares for investment purposes without a view to distribution and had access to information concerning the Company and our business prospects, as required by the Securities Act.

In addition, there was no general solicitation or advertising for the purchase of our shares. All certificates for our shares contain a restrictive legend. Finally, our stock transfer agent has been instructed not to transfer any of such shares, unless such shares are registered for resale or there is an exemption with respect to their transfer.

No commissions were paid in connection with the issuances described above.

ITEM 3.   DEFAULTS UPON SENIOR SECURITIES

We are in default on $608,428 of original principal on our 9/1/99 private offering promissory notes. These notes were due and payable on December 31, 2002. We are required to make ongoing interest payments under the same terms and conditions as the original notes. The required interest has been paid or accrued through June 30, 2004.

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The Company had obtained the written consent of a majority of its stockholders of record as of April 15, 2004 to approve an amendment to the Company's Articles of Incorporation to authorize the issuance of up to 50,000,000 shares of Preferred Stock.

In April of 2004, the Company's Board of Directors adopted and approved, and by means of the Written Consent the shareholders adopted and approved, a stock option plan for the Company, the VitroTech Corporation 2004 Stock Option Plan (the "2004 Option Plan"), under which stock options awards may be made to

employees, directors and consultants of the Company.

ITEM 5.  OTHER INFORMATION

On August 26, 2004, Jess Rae Booth advised the Company's directors that he would
be resigning as Chairman and Chief Executive Officer effective on the earlier of
December 15, 2004 or the hiring of a successor Chief Executive Officer.

On August 27, 2004, the Company notified Gitto|Global Corporation of its
election to terminate the Asset Purchase Agreement pursuant to the Company's
rights under the Agreement. In conjunction with the termination of the Gitto
Asset Purchase Agreement, the Company made demand for the return of 3,000,000
shares of its common stock issued in escrow for the benefit of Gitto or, in the
event Gitto fails to deliver the shares, the delivery of a subordinated
promissory note in the amount of $2,250,000 deposited by Gitto in escrow for
delivery in the event the shares are not returned.

ITEM 6.  EXHIBITS AND REPORTS ON FORM 8-K

(a)        Exhibits

<TABLE>
<CAPTION>
       Exhibit No.                              Description
       ------------          ---------------------------------------------------
<S>                          <C>
       10.1                  Asset Purchase Agreement, dated March 31, 2004,
                             between VitroTech Corporation, Gitto Global
                             Corporation, Gary Gitto, Frank Miller and Charles
                             Gitto.
       10.2                  First Amendment, dated May 27, 2004, to Gitto Asset Purchas
       10.3                  Second Amendment, dated July 9, 2004, to Gitto Asset Purcha
       10.4                  Third Amendment, dated July 28, 2004, to Gitto Asset Purcha
       10.5                  Fourth Amendment, dated August 12, 2004, to Gitto Asset Pur
       31.1                  Section 302 Certification of CEO
       31.2                  Section 302 Certification of CFO
       32                    Section 906 Certifications
</TABLE>

(b) Reports on Form 8-K

 None

                                      23

<PAGE>

                                   SIGNATURES


In accordance with the requirements of the Exchange Act, the registrant caused
this report to be signed on its behalf by the undersigned, thereunto duly
authorized.


Date: August 27, 2004                         VITROTECH CORPORATION

                                              By: /s/ Jess Rae Booth
                                                  Jess Rae Booth
                                                  President and CEO

By: /s/ Michael Handelman
    Michael D. Handelman
    Chief Financial Officer

24

```
</TEXT>
</DOCUMENT>
```

Exhibit 19

July 2004 Note and
Related Documents

Part 2

## LIMITED NON-RECOURSE GUARANTY

TO: **CLINTON SAVINGS BANK** (the "Bank")

1.  Guaranty of Payment and Performance of Obligations: In consideration of the Bank's extending credit or otherwise in its discretion giving time, financial facilities or accommodations to **KINGSDALE CORP.**, a Massachusetts corporation (the "Customer"), the undersigned, **GARY C. GITTO** (the "Guarantor"), hereby unconditionally guarantees to the Bank that (a) the Customer will duly and punctually pay or perform, at the place specified therefor, or if no place is specified, at the Bank's Head Office or at the branch of the Bank where this Guaranty is given, all indebtedness, obligations and liabilities, direct or indirect, matured or unmatured, primary or secondary, certain or contingent, of the Customer to the Bank now or hereafter owing or incurred, including, but not limited to, all automated clearing house liabilities of the Customer to the Bank, all obligations of the Customer arising from any and all overdrafts in any deposit account of the Customer maintained with the Bank, arising, inter alia, from the issuance of checks against uncollected funds (including without limitation costs and expenses incurred by the Bank in attempting to collect or enforce any of the foregoing) which are chargeable to the Customer either by law or under the terms of the Bank's arrangements with the Customer accrued in each case to the date of payment hereunder (collectively the "Obligations" and individually an "Obligation"); and (b) if there is an agreement evidencing or executed and delivered in connection with any Obligation, the Customer will perform in all other respects strictly in accordance with the terms thereof. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Customer of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that the Bank first attempt to collect any of the Obligations from the Customer or resort to any security or other means of obtaining payment of any of the Obligations which the Bank now has or may acquire after the date hereof, or upon any other contingency whatsoever. Upon any default by the Customer in the full and punctual payment and performance of the Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option of the Bank, become forthwith due and payable to the Bank without demand or notice of any nature, all of which are expressly waived by the Guarantor. Payments by the Guarantor hereunder may be required by the Bank on any number of occasions.

2.  Guarantor's Further Agreement to Pay: The Guarantor further agrees, as the principal obligor and not as a guarantor only, to pay to the Bank forthwith upon demand, in funds immediately available to the Bank, all costs and expenses (including court costs and reasonable legal expenses) incurred or expended by the Bank in connection with this Guaranty and the enforcement hereof (the "Expenses") together with interest on the Expenses from the time such Expenses are incurred until payment at a per annum rate of interest of ten percent (10%).

3.  Limited, Non-Recourse Liability of Guarantor. Notwithstanding anything to the contrary contained herein, the sole remedy of the Bank against the Guarantor, pursuant to this Non-Recourse Guaranty, shall be the right of the Bank to set-off,

foreclose or otherwise realize upon any and all cash deposited with the Bank, including, without limitation, all cash in Account No. 800123242 pursuant to a Pledge Agreement of even date herewith from the Guarantor to the Bank, and the Bank shall have no other rights against Guarantor, or any of his assets, for any deficiency in the payment of the Obligations if the same shall exist after the exercise by the Bank of such rights.

The liability of the Guarantor hereunder is and shall be limited to the amount of all cash on deposit with the Bank when realized by the Bank upon the exercise of its rights under said pledge agreement and/or its set-off rights.

4.   Security; Set-off:  The Guarantor grants to the Bank, as security for the full and punctual payment and performance of the Guarantor's obligations hereunder, a continuing lien on and security interest in all securities or other property belonging to the Guarantor now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Guarantor or subject to withdrawal by the Guarantor; and regardless of the adequacy of any collateral or other means of obtaining repayment of the Obligations, the Bank may at any time and without notice to the Guarantor set off the whole or any portion or portions of any or all such deposits and other sums against amounts payable under this Guaranty, whether or not any other person or persons could also withdraw money therefrom.

5.   Bank's Freedom to Deal with Customer and Other Parties:  The Bank shall be at liberty, without giving notice to or obtaining the assent of the Guarantor and without relieving the Guarantor of any liability hereunder, to deal with the Customer and with each other party who now is or after the date hereof becomes liable in any manner for any of the Obligations, in such manner as the Bank in its sole discretion deems fit, and to this end the Guarantor gives the Bank full authority in its sole discretion to do any or all of the following things: (a) extend credit, make loans and afford other financial accommodations to the Customer at such times, in such amounts and on such terms as the Bank may approve, (b) vary the terms and grant extensions or renewals to Customer or to any such other party, (c) grant time, waivers and other indulgences in respect thereto, (d) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any security or guaranty or other means of obtaining payment of any of the Obligations which the Bank now has or acquires after the date hereof, (e) accept partial payments from the Customer or any such other party, (f) release or discharge, wholly or partially, any endorser or guarantor, and (g) compromise or make any settlement or other arrangement with the Customer or any such other party.

6.   Unenforceability of Obligations Against Customer; Invalidity of Security or Other Guaranties:  If for any reason the Customer has no legal existence or is under no legal obligation to discharge any of the Obligations undertaken or purported to be undertaken by it or on its behalf, or if any of the moneys included in the Obligations have become irrecoverable from the Customer by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantor to the same extent as if the Guarantor at all times had been the principal debtor on all such Obligations.  This Guaranty shall be in addition to any other guaranty or other security for the Obligations

and it shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security.

7. _Waivers by Guarantor:_ The Guarantor waives: notice of acceptance hereof, notice of any action taken or omitted by the Bank in reliance hereon, and any requirement that the Bank be diligent or prompt in making demands hereunder, giving notice of any default by the Customer or asserting any other right of the Bank hereunder. The Guarantor also irrevocably waives, to the fullest extent permitted by law, all defenses which at any time may be available in respect of the Guarantor's obligations hereunder by virtue of any homestead exemption, statute of limitations, valuation, stay, moratorium law or other similar law now or hereafter in effect.

8. _No Contest with Bank:_ So long as any Obligation remains unpaid or undischarged, the Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by the Bank) or by any means or on any other ground, claim any set-off or counterclaim against the Customer in respect of any liability of the Guarantor to the Customer or, in proceedings under the Bankruptcy Code or insolvency proceedings of any nature, prove in competition with the Bank in respect of any payment hereunder or be entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of the Customer or the benefit of any other security for any Obligation which, now or hereafter, the Bank may hold or in which it may have any share.

9. _Demands and Notices:_ Any demand or notices required or permitted hereunder shall be in writing and shall be effective when delivered in hand or mailed by registered or certified mail, return receipt requested as follows:

If to Bank:         Clinton Savings Bank
                    200 Church Street
                    Clinton, MA 01510
                    Attn: Michael D. Tenaglia, Senior Vice President

If to Guarantor:    Gary C. Gitto
                    51 Meyer Hill Drive, Unit 4
                    Acton, MA 01720

10. _Amendments, Waivers Etc.:_ No provision of this Guaranty can be changed, waived, discharged or terminated except by an instrument in writing signed by the Bank and the Guarantor expressly referring to the provision of this Guaranty to which such instrument relates; and no such waiver shall extend to, affect or impair any right with respect to any Obligation which is not expressly dealt with therein. No course of dealing or delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto.

11. _Miscellaneous Provisions:_ This Guaranty is intended to take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall inure to the benefit of the Bank and its

successors in title and assigns, and shall be binding on the Guarantor and the Guarantor's successors in title, assigns, and legal representatives.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as a sealed instrument on the __22__ day of __July__, 2004.

_____
Gary C. Gitto

-4-

**PLEDGE AGREEMENT**

To:  **CLINTON SAVINGS BANK** (the "Bank")

The undersigned, **GARY C. GITTO** (hereinafter referred to as the "Undersigned"), to secure all of the Obligations (as hereinafter defined) of the Undersigned under and pursuant to that certain Guaranty dated of even date herewith executed and delivered by the Undersigned to the Bank (the "Guaranty"), whereunder the Undersigned guaranteed all of the obligations of Kingsdale Corp. to the Bank, including, without limitation, a Revolving Credit Note dated of even date herewith in the original principal amount of $8,000,000.00, hereby and herewith pledges with and to the Bank the following, in addition to any and all other collateral granted to the Bank for the Obligations (as hereinafter defined):

Account No. 800123242 maintained by the Undersigned at the Bank (the "Account")

and hereby agrees with the Bank as follows:

1.    The Account, and all other securities and/or property belonging to or standing in the name of the Undersigned which the Undersigned has heretofore or may hereafter deposit with the Bank, shall constitute collateral security for any and all liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Undersigned including, but not limited to, obligations evidenced by the Guaranty (the "Obligations").

2.    The Bank is hereby fully authorized and empowered, on the non-performance or default of any of the Obligations and after having given three (3) days' prior notice thereof to the Undersigned, to transfer the Account to the Bank or its nominee, and apply the proceeds thereof as provided in the next sentence. After deducting all legal or other expenses and costs of collection of any of the Obligations and all legal or other expenses and costs of collection, storage, custody, sale and delivery of any collateral held for the Obligations, the residue of any proceeds of collection shall be applied to the payment of principal or interest on one or more of the Obligations, due or to become due, in such order of preference as the Bank may determine, proper allowance for interest on Obligations not then due being made, and any excess proceeds from said collateral shall be returned to the Undersigned.  The Bank shall also have, with respect to the Account, all the rights and powers that are given to the Bank with respect to collateral in the Guaranty.

3.    The Bank may, at its option, when the Obligations are due, demand, sue for, collect, or make any compromise or settlement the Bank deems desirable with reference to the collateral held hereunder.  The Bank shall have no duty as to the collection or protection of collateral held hereunder or any income thereon, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.  The Bank may exercise its rights with respect to the collateral held hereunder without resorting or regard to other security or sources of reimbursement for the Obligations.  No delay or omission on the Bank's part in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right and/or remedy on any future occasion.

4.    So long as any Obligation shall exist, the Undersigned waives any right to withdraw any sums from the Account.

5.    Except as specifically provided hereinabove, the Undersigned waives demand, notice, protest, notice of acceptance of this Agreement, notice of any additional Obligations, extensions granted, collateral received or delivered or other action taken in reliance hereon, all demands and notices in connection with the delivery, acceptance, performance, default or enforcement of any Obligation for which the Account is pledged and all other demands and notices of any description; and the Undersigned assents to any extension or postponement of the time of payment and any other indulgence, to any substitution, exchange or release of collateral and/or to the addition or release of any party or person primarily or secondarily liable on any of the Obligations.

6.    This Agreement is intended to take effect as a sealed instrument and shall inure to the benefit of the Bank and its successors and assigns and shall be binding upon the Undersigned and the successors and/or other legal representative(s) of the Undersigned.  The obligations of the Undersigned under this Agreement shall continue until all Obligations hereby secured shall have been performed or paid in full.

Executed as a sealed instrument this 23 day of July, 2004.

_____          _____
Witness                                   Gary C. Gitto

H:\DEB\MISC\PJO\Clinton Savings\kingsdale\Pledge Agmt Gitto.doc    2                    July 21 2004 4 33 PM

## PLEDGE AGREEMENT

To:  **CLINTON SAVINGS BANK** (the "Bank")

The undersigned, **GARY C. GITTO** (hereinafter referred to as the "Undersigned"), to secure all of the Obligations (as hereinafter defined) of the Undersigned under and pursuant to that certain Guaranty dated of even date herewith executed and delivered by the Undersigned to the Bank (the "Guaranty"), whereunder the Undersigned guaranteed all of the obligations of Kingsdale Corp. to the Bank, including, without limitation, a Revolving Credit Note dated of even date herewith in the original principal amount of $8,000,000.00, hereby and herewith pledges with and to the Bank the following, in addition to any and all other collateral granted to the Bank for the Obligations (as hereinafter defined):

Account No. 800123242 maintained by the Undersigned at the Bank (the "Account")

and hereby agrees with the Bank as follows:

1.    The Account, and all other securities and/or property belonging to or standing in the name of the Undersigned which the Undersigned has heretofore or may hereafter deposit with the Bank, shall constitute collateral security for any and all liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Undersigned including, but not limited to, obligations evidenced by the Guaranty (the "Obligations").

2.    The Bank is hereby fully authorized and empowered, on the non-performance or default of any of the Obligations and after having given three (3) days' prior notice thereof to the Undersigned, to transfer the Account to the Bank or its nominee, and apply the proceeds thereof as provided in the next sentence. After deducting all legal or other expenses and costs of collection of any of the Obligations and all legal or other expenses and costs of collection, storage, custody, sale and delivery of any collateral held for the Obligations, the residue of any proceeds of collection shall be applied to the payment of principal or interest on one or more of the Obligations, due or to become due, in such order of preference as the Bank may determine, proper allowance for interest on Obligations not then due being made, and any excess proceeds from said collateral shall be returned to the Undersigned.  The Bank shall also have, with respect to the Account, all the rights and powers that are given to the Bank with respect to collateral in the Guaranty.

3.    The Bank may, at its option, when the Obligations are due, demand, sue for, collect, or make any compromise or settlement the Bank deems desirable with reference to the collateral held hereunder.  The Bank shall have no duty as to the collection or protection of collateral held hereunder or any income thereon, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.  The Bank may exercise its rights with respect to the collateral held hereunder without resorting or regard to other security or sources of reimbursement for the Obligations.  No delay or omission on the Bank's part in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right and/or remedy on any future occasion.

4.    So long as any Obligation shall exist, the Undersigned waives any right to withdraw any sums from the Account.

5.    Except as specifically provided hereinabove, the Undersigned waives demand, notice, protest, notice of acceptance of this Agreement, notice of any additional Obligations, extensions granted, collateral received or delivered or other action taken in reliance hereon, all demands and notices in connection with the delivery, acceptance, performance, default or enforcement of any Obligation for which the Account is pledged and all other demands and notices of any description; and the Undersigned assents to any extension or postponement of the time of payment and any other indulgence, to any substitution, exchange or release of collateral and/or to the addition or release of any party or person primarily or secondarily liable on any of the Obligations.

6.    This Agreement is intended to take effect as a sealed instrument and shall inure to the benefit of the Bank and its successors and assigns and shall be binding upon the Undersigned and the successors and/or other legal representative(s) of the Undersigned.  The obligations of the Undersigned under this Agreement shall continue until all Obligations hereby secured shall have been performed or paid in full.

Executed as a sealed instrument this ⟨23⟩ day of July, 2004.

_____          _____
Witness                          Gary C. Gitto

Statistics for session 4:

                       Number of Host file processed:       1
Number of Host Service (DFS, ...) messages processed:       0
        Number of Acknowledgement messages processed:       0
                                                        ------
               Total Incoming queue count processed:        1

FEDLINE Incoming Processor (FLIP) ended normally.


User: A1CLT06   15:12:42   07/23/2004      FEDLINE STATION    :      SIGN ON       V2.60.80
SUCCESSFULLY SIGNED ON


User: A1CLT06   15:13:51   07/23/2004    Host Communications  :   Establish a Session   V2.60.80
HOST RESPONSE: .DFS05SI SIGN COMMAND COMPLETED
 - HOST ID = A1CLT06


User: A1CLT06   15:14:05   07/23/2004    Host Communications  :   Establish a Session   V2.60.80
** Fed-Line's Incoming Processor (FLIP) STARTING


User: FLIP    15:14:06   07/23/2004    FLIP PROCESSING ITEMS.
Processing session 2


#### 02 #### FT PROD ####    PT INCOMING        ####NORMAL MSG/ACCTG ENTRY####
{3100} Sender: 011500010 FLEET NATIONAL BK    {2000} Amount:       $30,122.81
{3400} Receiver: 211373115 CLINTON SAVINGS    {3600} Bus Function Code: CTR
{1510} Type Code:        1000
{5000} Originator:       D9455451124
                         GARY C GITTO
                         PO BOX 583
                         LUNENBURG        MA  014620000
{4200} Beneficiary:      D800123242
                         GARY GITTO
{4320} Ref for BNF:      040723001300S6
{1520} IMAD:             20040723A1QF148C005980
{3320} Sender Ref:       040723029326
{1110} Timestamp:        07231515FT01
{1120} OMAD:             20040723A1Q2361E00001007231515FT01
####################


Statistics for session 2:

        Number of Host Application messages processed:       1
Number of Host Service (DFS, ...) messages processed:       0
        Number of Acknowledgement messages processed:       0
                                                        ------
               Total Incoming queue count processed:        1

FEDLINE Incoming Processor (FLIP) ended normally.

User: A1CLT06  15:58:30  07/23/2004    FEDLINE STATION    :    SIGN ON    V2.60.80
SUCCESSFULLY SIGNED ON


User: A1CLT06  15:59:23  07/23/2004    Host Communications    :    Establish a Session    V2.60.80
HOST RESPONSE: .DFS0581 SIGN COMMAND COMPLETED
 - HOST ID = A1CLT06


User: A1CLT06  15:59:33  07/23/2004    FEDLINE STATION    :    Pick an Application    V2.60.80
** Fed-Line's Incoming Processor (FLIP) STARTING


User: FLIP    15:59:34    07/23/2004    FLIP PROCESSING ITEMS.
Processing session 2


#### 02 #### FT PROD #####    FT INCOMING    ####NORMAL MSG/ACCTG ENTRY####
{3100} Sender: 021000021 JPMCHASE         {2000} Amount:        $83,000.00
{3400} Receiver: 211373115 CLINTON SAVINGS  {3600} Bus Function Code: CTR
{1510} Type Code:        1000
{5000} Originator:       GARY C GITTO P O
                         BOX 583
                         LUNENBURG MA 01462-0583
{5100} Originator's FI:  BLEHMANER
                         LEHMAN INVESTMENT INC.
                         745 7TH AVENUE
                         TREASURY NETWORK MANAGEMENT
                         NEW YORK NY 10019-
{5200} Instructing FI:   BLEHMANBR054
{4200} Beneficiary:      D800123242
                         GARY C. GITTO
{4320} Ref for BNF:      SWP OF 04/07/23
{6400} BNF Info:         LEHMAN REF:F7P9P30
{1520} IMAD:             20040723B1QGC06C004481
{3320} Sender Ref:       8914100205PQ
{1110} Timestamp:        07231601FT01
{1120} OMAD:             20040723A1Q2361B00001207231601FT01
####################

OFAC-UK
7-23-04

Statistics for session 2:

        Number of Host Application messages processed:    1
Number of Host Service (DFS, ...) messages processed:     0
        Number of Acknowledgement messages processed:     0
                                                        ------
            Total Incoming queue count processed:         1

FEDLINE Incoming Processor (FLIP) ended normally.


User: A1CLT06  15:59:43  07/23/2004    FEDLINE STATION    :    Pick an Application    V2.60.80
SIGNED OFF

**CLINTON**
**SAVINGS BANK**
Customers 1st, for Generations

1851

DATE: _July 23 '04_

WE CREDITED YOUR ACCOUNT NO.: _8 - 123242_

| Description | | |
|---|---|---|
| _incoming wire_ | $ | 386,877.19 |
| | $ | |
| | $ | |

CREDIT

_Gary C. Gitto_

APP'D BY

_LK_

DEPT./BRANCH

_MLr_

# LIMITED NON-RECOURSE GUARANTY

## TO: CLINTON SAVINGS BANK (the "Bank")

1.  Guaranty of Payment and Performance of Obligations: In consideration of the Bank's extending credit or otherwise in its discretion giving time, financial facilities or accommodations to **KINGSDALE CORP.**, a Massachusetts corporation (the "Customer"), the undersigned, **TRADEX CORP.**, a Massachusetts corporation (the "Guarantor"), hereby unconditionally guarantees to the Bank that (a) the Customer will duly and punctually pay or perform, at the place specified therefor, or if no place is specified, at the Bank's Head Office or at the branch of the Bank where this Guaranty is given, all indebtedness, obligations and liabilities, direct or indirect, matured or unmatured, primary or secondary, certain or contingent, of the Customer to the Bank now or hereafter owing or incurred, including, but not limited to, all automated clearing house liabilities of the Customer to the Bank, all obligations of the Customer arising from any and all overdrafts in any deposit account of the Customer maintained with the Bank, arising, inter alia, from the issuance of checks against uncollected funds (including without limitation costs and expenses incurred by the Bank in attempting to collect or enforce any of the foregoing) to the date of payment hereunder (collectively the "Obligations" and individually an "Obligation"); and (b) if there is an agreement evidencing or executed and delivered in connection with any Obligation, the Customer will perform in all other respects strictly in accordance with the terms thereof. This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance by the Customer of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that the Bank first attempt to collect any of the Obligations from the Customer or resort to any security or other means of obtaining payment of any of the Obligations which the Bank now has or may acquire after the date hereof, or upon any other contingency whatsoever. Upon any default by the Customer in the full and punctual payment and performance of the Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option of the Bank, become forthwith due and payable to the Bank without demand or notice of any nature, all of which are expressly waived by the Guarantor. Payments by the Guarantor hereunder may be required by the Bank on any number of occasions.

2.  Guarantor's Further Agreement to Pay: The Guarantor further agrees, as the principal obligor and not as a guarantor only, to pay to the Bank forthwith upon demand, in funds immediately available to the Bank, all costs and expenses (including court costs and reasonable legal expenses) incurred or expended by the Bank in connection with this Guaranty and the enforcement hereof (the "Expenses") together with interest on the Expenses from the time such Expenses are incurred until payment at a per annum rate of interest of ten percent (10%).

-1-

3.  Limited, Non-Recourse Liability of Guarantor.  Notwithstanding anything to the contrary contained herein, the sole remedy of the Bank against the Guarantor, pursuant to this Non-Recourse Guaranty, shall be the right of the Bank to foreclose or otherwise realize upon (i) the Guarantor's interest in the inventory (the "Inventory") described in the security agreement of even date securing this Non-Recourse Guaranty granted to the Bank by the Guarantor and (ii) to foreclose or otherwise realize upon the Guarantor's interest in the real estate described in the mortgage of even date securing this Non-Recourse Guaranty granted to the Bank by the Guarantor (the "Mortgage") encumbering the real estate located at 140 Leominster-Shirley Road, Lunenburg, Massachusetts (the "Real Property"), and the Bank shall have no other rights against Guarantor, or any of its assets, for any deficiency in the payment of the Obligations if the same shall exist after the exercise by the Bank of its rights under said security agreement and after the exercise by the Bank of the Power of Sale granted in the Mortgage, and the application of any proceeds of the sale of the Inventory and of the Real Property to the Obligations.

The liability of the Guarantor hereunder is and shall be limited to the cumulative value of the Inventory and the Real Property when realized by the Bank upon the exercise of its rights under said security agreement and said Power of Sale.

4.  Action by Bank Against Real Estate: Notwithstanding anything to the contrary contained in this Guaranty, prior to instituting any foreclosure action under the Mortgage, the Bank shall have liquidated substantially all of the Inventory and substantially all of the other collateral granted to the Bank by the Borrower and other guarantors of the Obligations, provided however, (a) that from and after the date hereof, the Guarantor shall not have transferred any of Guarantor's assets (now or hereafter owned) in whole or in part to any other person or entity for consideration of less than fair market value; and (b) there shall be no legal impediment to the Bank exercising all of its rights against any such collateral including, but not limited to, the imposition of any automatic stay as the result of any proceedings under the Federal Bankruptcy Code or any state insolvency law affecting the Borrower; and (c) the Bank shall not be the subject of any action instituted against it seeking that it marshal the assets of the Borrower and the Guarantor for the benefit of any creditor of the Borrower.  If any of the events set forth in (a), (b) or (c) occur, the Bank may immediately proceed to take any and all appropriate action to enforce this Guaranty and to exercise its rights with respect to any and all collateral securing this Guaranty.

5.  Security; Set-off:  The Guarantor grants to the Bank, as security for the full and punctual payment and performance of the Guarantor's obligations hereunder, a continuing lien on and security interest in all securities or other property belonging to the Guarantor now or hereafter held by the Bank and in all deposits and other sums credited by or due from the Bank to the Guarantor or subject to withdrawal by the Guarantor; and regardless of the adequacy of any collateral or other means of obtaining repayment of the Obligations, the Bank may at any time and without notice to the Guarantor set off the whole or any portion or portions of any or all such deposits and other sums against

amounts payable under this Guaranty, whether or not any other person or persons could also withdraw money therefrom.

6.  Bank's Freedom to Deal with Customer and Other Parties: The Bank shall be at liberty, without giving notice to or obtaining the assent of the Guarantor and without relieving the Guarantor of any liability hereunder, to deal with the Customer and with each other party who now is or after the date hereof becomes liable in any manner for any of the Obligations, in such manner as the Bank in its sole discretion deems fit, and to this end the Guarantor gives the Bank full authority in its sole discretion to do any or all of the following things: (a) extend credit, make loans and afford other financial accommodations to the Customer at such times, in such amounts and on such terms as the Bank may approve. (b) vary the terms and grant extensions or renewals to Customer or to any such other party, (c) grant time, waivers and other indulgences in respect thereto, (d) vary, exchange, release or discharge, wholly or partially, or delay in or abstain from perfecting and enforcing any security or guaranty or other means of obtaining payment of any of the Obligations which the Bank now has or acquires after the date hereof, (e) accept partial payments from the Customer or any such other party, (f) release or discharge, wholly or partially, any endorser or guarantor, and (g) compromise or make any settlement or other arrangement with the Customer or any such other party.

7.  Unenforceability of Obligations Against Customer; Invalidity of Security or Other Guaranties: If for any reason the Customer has no legal existence or is under no legal obligation to discharge any of the Obligations undertaken or purported to be undertaken by it or on its behalf, or if any of the moneys included in the Obligations have become irrecoverable from the Customer by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantor to the same extent as if the Guarantor at all times had been the principal debtor on all such Obligations. This Guaranty shall be in addition to any other guaranty or other security for the Obligations and it shall not be prejudiced or rendered unenforceable by the invalidity of any such other guaranty or security.

8.  Waivers by Guarantor: The Guarantor waives: notice of acceptance hereof, notice of any action taken or omitted by the Bank in reliance hereon, and any requirement that the Bank be diligent or prompt in making demands hereunder, giving notice of any default by the Customer or asserting any other right of the Bank hereunder. The Guarantor also irrevocably waives, to the fullest extent permitted by law, all defenses which at any time may be available in respect of the Guarantor's obligations hereunder by virtue of any homestead exemption, statute of limitations, valuation, stay, moratorium law or other similar law now or hereafter in effect.

9.  No Contest with Bank: So long as any Obligation remains unpaid or undischarged, the Guarantor will not, by paying any sum recoverable hereunder (whether or not demanded by the Bank) or by any means or on any other ground, claim any set-off or counterclaim against the Customer in respect of any liability of the Guarantor to the Customer or, in proceedings under the Bankruptcy Code or insolvency proceedings of any nature, prove in competition with the Bank in respect of any payment hereunder or be

entitled to have the benefit of any counterclaim or proof of claim or dividend or payment by or on behalf of the Customer or the benefit of any other security for any Obligation which, now or hereafter, the Bank may hold or in which it may have any share.

10. Demands and Notices: Any demand or notices required or permitted hereunder shall be in writing and shall be effective when delivered in hand or mailed by registered or certified mail, return receipt requested as follows:

| If to Bank: | Clinton Savings Bank |
| | 200 Church Street |
| | Clinton, MA 01510 |
| | Attn: Michael D. Tenaglia, Senior Vice President |

| If to Guarantor: | Tradex Corp. |
| | 18 Nancy Court |
| | Leominster, MA 01453 |
| | Attn: Charles N. Gitto, Jr., President |

11. Amendments, Waivers Etc.: No provision of this Guaranty can be changed, waived, discharged or terminated except by an instrument in writing signed by the Bank and the Guarantor expressly referring to the provision of this Guaranty to which such instrument relates; and no such waiver shall extend to, affect or impair any right with respect to any Obligation which is not expressly dealt with therein. No course of dealing or delay or omission on the part of the Bank in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto.

12. Miscellaneous Provisions: This Guaranty is intended to take effect as a sealed instrument to be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and shall inure to the benefit of the Bank and its successors in title and assigns, and shall be binding on the Guarantor and the Guarantor's successors in title, assigns, and legal representatives.

IN WITNESS WHEREOF, **TRADEX CORP.**, has caused this Guaranty to be duly executed, under seal, and delivered by its corporate officer, thereunto duly authorized, this _23_ day of July, 2004.

**TRADEX CORP.**

By

_____
Witness

Charles N. Gitto, Jr., President and
Treasurer

-4-



## SECURITY AGREEMENT

THIS SECURITY AGREEMENT, dated July 23, 2004 is between **TRADEX CORP.**, a Massachusetts corporation (herein called "Debtor"), with a place of business at 18 Nancy Court, Leominster, Massachusetts 01453 and **CLINTON SAVINGS BANK**, a Massachusetts savings bank established under the laws of the Commonwealth of Massachusetts and having its principal place of business at 200 Church Street, Clinton, Massachusetts 01510 (herein called "Secured Party").

WHEREAS, Debtor has executed and delivered to the Secured Party an instrument of guaranty dated of even date herewith guaranteeing the obligations of its affiliate, **KINGSDALE CORP.**, a Massachusetts corporation, to and in favor of the Secured Party (the "Guaranty").

NOW THEREFORE, it is agreed as follows:

1. Definitions.

(a) The term "State", as used herein, means the Commonwealth of Massachusetts. All terms defined in the Uniform Commercial Code of the State ("UCC") and used herein shall have the same definitions herein as specified therein; provided, however, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term shall have the meaning herein as specified in said Article 9.

(b) "Obligations" means the Guaranty and any and all other obligations, liabilities, indebtedness, advances and loans owing by the Debtor to the Secured Party of every kind and description, direct or indirect, absolute or contingent, primary or secondary, secured or unsecured, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money.

2. Grant of Security Interest. To secure the timely payment, performance and observance of all of the Debtor's Obligations to Secured Party, Debtor hereby grants to Secured Party a continuing security interest in and pledges, assigns and grants to Secured Party a right of setoff against the following property of Debtor, wherever located, (including the proceeds, insurance proceeds and products thereof) whether now existing or owned by the Debtor or owned, acquired, created or arising hereafter (all of the same being hereinafter referred to as the "Collateral"):

all inventory ~~of the type described on Schedule 1~~ attached hereto, located at ~~140 Leominster-Shirley Road,~~ Lunenburg, Massachusetts.

The value of such inventory shall at all times equal or exceed $3,000,000.00, at cost.

Although proceeds are covered by this Agreement, the Secured Party has not authorized and does not authorize the sale or transfer of any of the Collateral by the Debtor except for the sale of obsolete machinery, equipment and furniture in the normal course of Debtor's business.

3. <u>Authorization to File Financing Statements</u>.  The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral as (i) all machinery, equipment and furniture of the Debtor or words of similar effect, regardless of whether any particular asset constituting any Collateral falls within the scope of Article 9 of the UCC or the Uniform Commercial Code of such jurisdiction, or (ii) being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Debtor is an organization, the type of organization and any organization identification number issued to the Debtor.  The Debtor agrees to furnish any such information to the Secured Party promptly upon request.  The Debtor also ratifies its authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction, including the State, any like initial financing statements or amendment thereto if filed prior to the date hereof.

4. <u>Representations, Warranties and Covenants</u>.  Debtor represents, warrants and covenants that:

(a)  It is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has the corporate power and authority to own its properties and to transact the business in which it is engaged;

(b)  It has the corporate power and authority to perform the Obligations and to execute, deliver and perform and consummate the transactions contemplated by this Security Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance of the Guaranty and this Security Agreement;

(c)   The Guaranty and this Security Agreement constitute the legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms;

(d)   The execution, delivery and performance of the Guaranty and this Security Agreement will not violate any law or regulation, or any order or decree of any court or governmental instrumentality, or any provision of the charter or by-laws of, or any securities issued by, the Debtor, and will not conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which the Debtor is a party or by which it is bound, and will not result in the creation or imposition of any lien, charge or encumbrance upon any of the property of the Debtor pursuant to the provisions of any of the foregoing;

(e)   No consent of any other person (including, without limitation, stockholders and creditors of the Debtor) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental instrumentality is required in connection with the execution, delivery, performance, validity or enforceability of the Guaranty or this Security Agreement;

(f)   The chief executive office of the Debtor and the office where Debtor keeps its books and records relating to the Collateral, and all locations of Collateral are at the addresses set forth on Exhibit "A" hereto;

(g)   Debtor will not change its state of incorporation or organization, its name, its mailing address, its organizational identification number (if it has one), its legal structure, its chief executive office, the office where its books and records are kept, or any locations of Collateral without prior written notice to and consent of Secured Party;

(h)   If the Debtor does not, as of the date hereof, have an organizational identification number but obtains one hereafter, the Debtor shall forthwith notify the Secured Party of such organization identification number;

(i)   Except for liens in favor of Secured Party and except for liens set forth on Exhibit "B" hereto annexed, the Debtor is the owner of the Collateral and the Collateral is free and clear of all liens and Debtor will not create or suffer to exist any lien on any of the Collateral;

(j)   Debtor will not assign, pledge, grant a security interest in, transfer, sell, lease or otherwise dispose of any Collateral, except for inventory sold or consumed in the ordinary course of Debtor's business;

(k)   The Collateral is being used, and will continue to be used, in Debtor's business and not for personal, family, household or farming use;

(l)   Debtor will use the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances and regulations;

(m)   The Collateral is now and shall remain personal property, and Debtor will not permit any Collateral to become a fixture without prior written notice to and consent of Secured Party at least thirty (30) days prior to the commencement of such use;

(n)   Debtor will keep the Collateral at all times insured by such insurance as Secured Party may from time to time reasonably require and in any event and without specific request by Secured Party will insure the Collateral against fire, including so-called extended coverage, theft and, in the case of any motor vehicle, collision.  The Debtor also shall maintain insurance of the kinds, covering the risks and in the relative amounts usually carried by companies engaged in businesses similar to Debtor.  All such insurance shall be written by such companies as Secured Party shall reasonably approve, the Secured Party and Debtor named as insureds and loss payees as their respective interests may appear.  All policies of insurance shall provide for not less than twenty (20) days' notice of cancellation, change, or termination to Secured Party and, if requested by Secured Party, all policies of insurance shall be delivered to and held by it until all of the Obligations have been fully paid, performed and observed.  Debtor shall provide to Secured Party, at least annually, certificates evidencing insurance;

(o)   Debtor will, at its sole cost and expense, perform all acts and execute all documents required by Secured Party from time to time to evidence, perfect, maintain or enforce Secured Party's security interest granted herein, or otherwise to carry out the provisions and purposes of this Security Agreement, including, but not limited to, all acts set forth in paragraph 5;

(p)   In its discretion, Secured Party may, at any time and from time to time, for the account of Debtor, pay any amount or do any act required of Debtor hereunder which Debtor fails to do or pay, and any such payment shall be deemed an Obligation payable on demand together with interest at the highest rate then payable on any of the Obligations;

three
(q)  Debtor has not, during the ~~five~~-year period prior to
the date hereof, been known by or used any tradename, fictitious
name or any corporate name other than Debtor's name as set forth
on Page 1 hereof, which is Debtor's exact legal name, and all
invoices in connection with or which evidence Debtor's accounts
receivable are billed under such corporate name;

(r)  If any proceeds of Collateral are received by Debtor
which, pursuant to the provisions hereof are to be received by or
turned over to Secured Party, Debtor shall not commingle such
proceeds with any of its other property, shall hold such proceeds
in trust for Secured Party and shall immediately deliver the same
to Secured Party in the form received;

(s)  All statements in the Perfection Certificate annexed
hereto as Exhibit "A" are true and correct; and

(t)  The Debtor has at all times conducted its business
and will from and after the date hereof conduct its business in
compliance with all applicable provisions of the federal Fair
Labor Standards Act, as amended, and with all applicable
provisions of federal, state and local statutes, ordinances and
regulations dealing with the control, shipment, storage and
disposal of oil, hazardous materials and hazardous substances.

5. Other Actions.  Further to insure the attachment,
perfection and first priority of, and the ability of the Secured
Party to enforce the Secured Party's security interest in the
Collateral, the Debtor agrees, in each case at the Debtor's own
expense, to take the following actions with respect to the
following Collateral:

(a)  Collateral in the Possession of a Bailee.  If any of
the Collateral is at any time in the possession of a bailee, the
Debtor shall promptly notify the Secured Party thereof and, if
requested by the Secured Party, shall promptly obtain an
acknowledgement from the bailee, in form and substance
satisfactory to the Secured Party, that the bailee holds such
Collateral for the benefit of the Secured Party and shall act
upon the instructions of the Secured Party, without the further
consent of the Debtor.

(b)  Other Actions as to any and all Collateral.  The
Debtor further agrees to take any other action reasonably
requested by the Secured Party to ensure the attachment,
perfection and second priority of, and the ability of the Secured
Party to enforce, the Secured Party's security interest in any
and all of the Collateral including, without limitation, (a)
executing, delivering and, where appropriate, filing financing
statements and amendments relating thereto under the Uniform
Commercial Code, to the extent, if any, that the Debtor's

signature thereon is required therefor, (b) causing the Secured
Party's name to be noted as Secured Party on any certificate of
title for a titled good if such notation is a condition to
attachment, perfection or priority of, or ability of the Secured
Party to enforce, the Secured Party's security interest in such
Collateral, (c) complying with any provisions of the statute,
regulation or treaty of the United States as to any Collateral if
compliance with such provision is a condition to attachment,
perfection or priority of, or ability of the Secured Party to
enforce, the Secured Party's security interest in such
Collateral, (d) obtaining governmental and other third party
consents and approvals, including, without limitation, any
consent of any licensor, lessor or other person obligated on
Collateral, (e) obtaining waivers from mortgagees and landlords
in form and substance satisfactory to Secured Party, and (f)
taking all actions required by any earlier versions of the
Uniform Commercial Code or by other law, as applicable in any
relevant Uniform Commercial Code jurisdiction, or by other law as
applicable in any foreign jurisdiction.

6. <u>Inspection of Collateral</u>.  Debtor shall at all reasonable
times and from time to time allow the Secured Party, by or
through any of its officers, or agents to enter the Debtor's
premises as listed on <u>Exhibit "A"</u> for the purpose of inspecting
the Collateral.

7. <u>Default, Remedies Upon Default</u>.  Upon the failure of the
Debtor to pay, perform or observe any Obligation, and at any time
thereafter, Secured Party may, without notice to or demand upon
Debtor, declare any and all Obligations immediately due and
payable and Secured Party shall have the following rights and
remedies (to the extent permitted by applicable law), in addition
to all rights and remedies of Secured Party under the Guaranty,
and all rights and remedies of a secured party under the Uniform
Commercial Code, all such rights and remedies being cumulative,
not exclusive and enforceable alternatively, successively or
concurrently, at such time or times as Secured Party shall deem
expedient:

(a)  Secured Party may at any time and from time to time,
with or without judicial process or the aid and assistance of
others, enter upon any premises in which any Collateral may be
located and, without resistance or interference by Debtor, take
possession of the Collateral, and/or dispose of any Collateral on
any such premises, and/or require Debtor to assemble and make
available to Secured Party at the expense of Debtor any
Collateral at any place and time designated by Secured Party
which is reasonably convenient to both parties, and/or remove any
Collateral from any such premises for the purpose of effecting
sale or other disposition thereof and/or sell, resell, lease,
assign and deliver, grant options for or otherwise dispose of any

Collateral in its then condition with or without following any commercially reasonable preparation or processing, at public or private sale or proceedings or otherwise, by one or more contracts, in one or more parcels or lots, at the same or different times, with or without having the Collateral at the place of sale or other disposition, for cash and/or credit, and upon any terms, at such place(s) and time(s) and to such person(s) as Secured Party deems best, all without demand, notice or advertisement whatsoever except where an applicable statute requires reasonable notice of sale or other disposition. Debtor hereby agrees that the sending of ten (10) days' notice (as provided in paragraph 17. hereof) shall be deemed reasonable notice thereof. If any Collateral is sold by Secured Party upon credit or for future delivery, Secured Party shall not be liable for the failure of the purchaser to pay for same and in such event Secured Party may resell such Collateral. Secured Party may buy any Collateral at any public sale and, if any Collateral is of a type customarily sold in a recognized market or is of the type which is subject to widely distributed standard price quotations, Secured Party may buy such Collateral at private sale and in each case may make payment therefor by any means, provided that payment is made in full by Secured Party upon the later of the time of such sale and the taking of delivery of such Collateral.

(b)    Secured Party may apply the cash proceeds actually received from any sale or other disposition of Collateral to the reasonable expense of retaking, holding, preparation for sale, selling, leasing and the like, to reasonable attorneys' fees and all legal, travel and other expenses which may be incurred by Secured Party in attempting to collect the Obligations or to enforce this Security Agreement, or in the prosecution or defense of any action or proceeding related to the subject matter of this Security Agreement; and then to the Obligations in such order and as to principal or interest as Secured Party may determine; and Debtor shall remain liable and will pay Secured Party, on demand, any deficiency remaining after the application of such cash proceeds, together with interest thereon at the rate of ten percent (10%) per annum and the balance of any expenses unpaid, with any surplus to be paid to Debtor, subject to any duty of Secured Party imposed by law to the holder of any other security interest in the Collateral known to Secured Party. Within a reasonable time following the application of cash proceeds, Secured Party shall provide Debtor with a reasonable accounting of the Obligations to which such proceeds have been applied.

8. Standards for Exercising Remedies. To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party (a) to fail to incur expenses reasonably

deemed significant by the Secured Party to prepare Collateral for disposition (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to remove liens or encumbrances on or any adverse claims against Collateral, (d) to advertise dispositions of Collateral through publications or media of general circulations, whether or not the Collateral is of a specialized nature, (e) to contact other persons, whether or not in the same business as the Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (f) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (g) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (h) to dispose of assets in wholesale rather than retail markets, (i) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Secured Party against risks of loss, collection or disposition of Collateral or to provide to the Secured Party a guaranteed return from the collection or disposition of Collateral, or (j) to the extent deemed appropriate by the Secured Party, to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Secured Party in the collection or disposition of any of the Collateral.  The Debtor acknowledges that the purpose of this paragraph 8. is to provide nonexhaustive indications of what actions or omissions by the Secured Party would not be commercially unreasonable in the Secured Party's exercise of remedies against the Collateral and that other actions or omissions by the Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this paragraph 8.  Without limitation upon the foregoing, nothing contained in this paragraph 8. shall be construed to grant any rights to the Debtor or to impose any duties on the Secured Party that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this paragraph 8.

9. Power of Attorney.  To effectuate the terms and provisions hereof, Debtor hereby designates and appoints Secured Party and each of its designees or agents as attorney-in-fact of Debtor, irrevocably and with power of substitution, with authority to:  (i) execute proofs of claim and loss; (ii) execute endorsements, assignments or other instruments of conveyance or transfer; (iii) adjust and compromise any claims under insurance policies or otherwise; (iv) execute releases; and (v) do all other acts and things necessary or advisable, in the sole discretion of Secured Party, to carry out and enforce this

Security Agreement and the Obligations.  All acts done under the foregoing authorization are hereby ratified and approved by the Debtor and neither Secured Party nor any designee or agent thereof shall be liable for any acts of commission or omission, for any error of judgment or for any mistake of fact or law except for Secured Party's gross negligence or wilful misconduct.  This power of attorney, being coupled with an interest, is irrevocable while any Obligations shall remain unpaid, unobserved or unperformed.

10.  <u>Care of Collateral</u>.  Secured Party shall have the duty to exercise reasonable care in the custody and preservation of any Collateral in its possession, which duty shall be fully satisfied if Secured Party accords such Collateral treatment substantially the same as that which it accords similar property owned by it.  Except for any claims, causes of action or demands arising out of Secured Party's failure to perform its agreements set forth in the preceding sentence, Debtor releases Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Security Agreement, the Obligations, the Collateral and its use and/or any actions taken or omitted to be taken by Secured Party with respect thereto, and Debtor hereby agrees to hold Secured Party harmless from and with respect to any and all such claims, causes of action and demands. Secured Party's prior recourse to any Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations.

11.  <u>Secured Party's Obligations and Duties</u>.  Anything herein to the contrary notwithstanding, the Debtor shall remain liable under each contract or agreement comprised in the Collateral to be observed or performed by the Debtor thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Security Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which the Secured Party may be entitled at any time or times.  The Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under §9-207 of the UCC or otherwise, shall be to deal with such Collateral in the same manner as the Secured Party deals with similar property for its own account.

12.  <u>Suretyship Waivers by Debtor</u>.  The Debtor waives demand, notice, protest, notice of acceptance of this Security Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description (except as specifically provided for herein).  With respect to both the Obligations and the Collateral, the Debtor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromise or adjustment of any thereof, all in such manner and at such time or times as the Secured Party may deem advisable.  The Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of any rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in paragraphs 11. and 12. hereof.  The Debtor further waives any and all other suretyship defenses.

13.  <u>Marshalling</u>.  The Secured Party shall not be required to marshal any present or future collateral security (including, but not limited to, this Security Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that it lawfully may, the Debtor agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights under this Security Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

14.  <u>Secured Party's Waivers</u>.  No act, omission or delay by Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise.  No single or partial waiver by Secured Party of any default or right or remedy which it may have shall operate as a waiver of any other of said defaults, rights or remedies or of the same default, right or remedy on a future occasion.

15.  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (without giving effect to the conflict of laws principles thereof).

16.  <u>Notices</u>.  All notices and other communications to any party hereunder shall be in writing and shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, or by a reputable courier delivery service and shall be given as follows:

if to the Debtor:                Tradex Corp.
                                 18 Nancy Court
                                 Leominster, MA   01453
                                 ATTN:  President

if to the Secured Party:         Clinton Savings Bank
                                 200 Church Street
                                 Clinton, MA 01510
                                 ATTN: Michael Tenaglia,
                                 Senior Vice President

or such other address as such party may hereafter specify by notice to the Secured Party and the Debtor.  Each such notice, request or other communication shall be effective (i) if given by certified mail, 72 hours after such communication is deposited with the post office, addressed as aforesaid, or (ii) if given by any other means (including, without limitation, by courier), when delivered at the address specified in this paragraph.

17.  <u>Amendments and Waivers; Partial Invalidity; Acknowledgment of Receipt</u>.  No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Security Agreement and to such provision, and executed by the party to be charged.  If any term of this Security Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.  Debtor acknowledges receipt of a copy of this Security Agreement.

18.  <u>Benefit of Agreement; Continuing Security Interest</u>.  This Security Agreement and all Obligations shall be binding upon the heirs, executors, administrators, successors and assigns of Debtor and shall, together with the rights and remedies of Secured Party hereunder, inure to the benefit of Secured Party, its successors, endorsees and assigns.  This Agreement shall create a continuing security interest in the Collateral which shall remain in full force and effect until payment in full of the Obligations.

19.   Counterparts.   This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original and all of which shall together constitute one and the same agreement.

20.   Captions.   The captions of the paragraphs of this Security Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Security Agreement.

IN WITNESS WHEREOF, the undersigned have executed or caused this Security Agreement to be executed as of the date first above set forth, as a sealed instrument.

TRADEX CORP.

By

Witness

CLINTON SAVINGS BANK

By:

Witness

Michael Tenaglia, Senior Vice President

3.    OTHER NAMES, ETC.

    (a)    The following is a list of all other names (including
        trade names or similar appellations) used by the
        Debtor, or any other business or organization to which
        the Debtor became the successor by merger,
        consolidation, acquisition, change in form, nature or
        jurisdiction of organization or otherwise, now or at
        any time during the past ~~five (5)~~ years:
                                    Three (3)

    (b)    Attached hereto as <u>Schedule 1</u> is the information
        required in paragraph 2 of this Certificate for any
        other business or organization to which the Debtor
        became the successor by merger, consolidation,
        acquisition, change in form, nature or jurisdiction of
        organization or otherwise, now or at any time during
        the past ~~five (5)~~ years:
                    Three (3)

4.    OTHER CURRENT LOCATIONS.

    (a)    The following are all other locations in which the
        Debtor maintains any books or records relating to any
        of the Collateral consisting of accounts, instruments,
        chattel paper, general intangibles or mobile goods:

    (b)    The following are all other places of business of the
        Debtor:

    (c)    The following are all other locations where any of the
        Collateral is located:

        140 Leominster-Shirley Road, Lunenburg, MA 01462

Exhibit "A"
to Security Agreement

PERFECTION CERTIFICATE

TRADEX CORP. ("Debtor")

CLINTON SAVINGS BANK ("Secured Party")

The undersigned, the President of the Debtor, hereby certifies, with reference to a certain Security Agreement dated July _____, 2004 (terms defined in such Security Agreement having the same meanings herein as specified therein), between the Debtor and the Secured Party, to the Secured Party as follows:

1.    NAME.  The exact legal name of the Debtor as that name appears on its Articles of Incorporation is as follows:

**TRASDEX CORPORATION**

2.    OTHER IDENTIFYING FACTORS.

    (a)    The following is the mailing address of the Debtor:

**18 Nancy Court, Leominster, MA   01453**

    (b)    If different from its mailing address, the Debtor's place of business or, if more than one, its chief executive office is located at the following address:

    (c)    The following is the type of organization of the Debtor: **corporation**

    (d)    The following is the jurisdiction of the Debtor's organization: **Commonwealth of Massachusetts**

    (e)    The following is the Debtor's state issued organizational identification number [state "None" if the state does not issue such a number]:

(d)    The following are the names and addresses of all
persons or entities other than the Debtor, such as
lessees, consignees, warehousemen or purchasers of
chattel paper, which have possession or are intended to
have possession of any of the Collateral consisting of
instruments, chattel paper, inventory or equipment:

5.    PRIOR LOCATIONS.

(a)    Set forth below is the information required by
paragraphs 4(a) or (b) of this Certificate with respect
to each location or place of business previously
maintained by the Debtor at any time during the past
five (5) years in a state in which the Debtor has
previously maintained a location or place of business
at any time during the past four (4) months:

(b)    Set forth below is the information required by
paragraphs 4(c) or (d) of this Certificate with respect
to each other location at which, or other person or
entity with which, any of the Collateral consisting of
inventory or equipment has been previously held at any
time during the past twelve (12) months:

IN WITNESS WHEREOF, I have hereunto signed this Certificate
this  23  day of July, 2004.

TRADEX CORP.

By: _____

## Exhibit "B"
### Permitted liens against Collateral

NONE

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Paul J. O'Riordan, Esq.
Seder & Chandler
339 Main Street
Worcester, MA 01608

pjoriordan@sederlaw.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TRADEX CORP. | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 18 Nancy Court | Leominster | MA | 01453 | |

| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | ORGANIZATION DEBTOR | corporation | Massachusetts | ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | ORGANIZATION DEBTOR | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CLINTON SAVINGS BANK | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 200 CHURCH STREET | CLINTON | MA | 01510 | |

4. This FINANCING STATEMENT covers the following collateral:

TRADEX CORP.

By:

All alumino-silicate (Vitrolite) located at
241 Willard St Leominster, MA,
Owner: Casey Transportation and Warehouse

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum | [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

70221-1-881029

MASSACHUSETTS REAL ESTATE MORTGAGE (BY CORPORATION) 89↓

Tradex Corp.  f/k/a Tradex Acquisition Corp. f/k/a The Gitto Corporation

a corporation duly established under the laws of   the Commonwealth of Massachusetts

having its usual place of business at    18 Nancy Court, Leominster, Worcester

County, Massachusetts, for consideration paid, grants to

Clinton Savings Bank                            of  200 Church Street, Clinton, MA

with **mortgage covenants**  to secure the payment of  that certain guaranty dated of  even
date herewith, executed by the undersigned in favor of Clinton Savings Bank
with respect to the obligations of Kingsdale Corp.  ~~to the maturity of~~  ~~DxNxMX~~

*Supplemental veclems*

*( Including but not limited to*
*9 revolving credit note in the*
*amount of $7,0...........*  ~~....................~~

~~jx~~                     ~~xxxxxxxx~~

~~semiannually,~~

~~expressible~~          ~~xxxxxxxxxxxxxxx~~

the land ~~MX~~ with the buildings thereon being known and numbered as
140 Leominster-Shirley Road, Lunenburg, MA
                    (Description and encumbrances, if any)

See Exhibit A attached hereto

*(sidebar, vertical)* 140 Leominster-Shirley Road, Lunenburg, MA

Worcester North
Registry of Deeds
Received&Recorded
INST# 20223
BK 5355 PG 342
TIME 11.02.330
DATE 2-26-04
John B. McLaughlin
Register of Deeds

This mortgage is upon the statutory condition,

for any breach of which the mortgagee shall have the statutory power of sale.

**In witness whereof,** the said ' Tradex Corp.

has caused its corporate seal to be hereto affixed and these presents to be signed, acknowledged and

delivered in its name and behalf by   Charles N. Gitto, Jr.

its  President and Treasurer             this        23rd         day of  July

in the year one thousand nine hundred and two thousand and four.

Signed and sealed in presence of                TRADEX CORP.

....................................................................            by  Charles N. Gitto, Jr., President
                                                              and Treasurer
                                                              ....................................................................

The Commonwealth of Massachusetts

Worcester,                 ss.                   July 23, 2004

Then personally appeared the above named  Charles N. Gitto, Jr., President and Treasurer  of Tradex Corp., proved to me through satisfactory evidence of identification which was MASS., and acknowledged the foregoing instrument to be the free act and deed of XXX Tradex Corp, Drivers License

before me,

Notary Public — XXXXXXXXXX

MARK C. BOLDUC

My commission expires     OCT  8     2004

EXTRACT FROM GENERAL LAWS, CHAPTER 183, SECTIONS 18, 19, 20, 21  AND AMENDMENTS THERETO

Section 18.    A deed in substance following the form entitled "Mortgage Deed" shall when duly executed have the force and effect of a mortgage deed to the use of the mortgagee and his heirs and assigns with mortgage covenants and upon the statutory condition and with the statutory power of sale, as defined in the three following sections, to secure the payment of the money or the performance of any obligation therein specified. The parties may insert in such mortgage any other lawful agreement or condition.

Section 19.    In a conveyance of real estate the words "mortgage covenants" shall have the full force, meaning and effect of the following words, and shall be applied and construed accordingly: "The mortgagor, for himself, his heirs, executors, administrators and successors, covenants with the mortgagee and his heirs, successors and assigns, that he is lawfully seized in fee simple of the granted premises; that they are free from all encumbrances; that the mortgagor has good right to sell and convey the same; and that he will, and his heirs, executors, administrators and successors shall, warrant and defend the same to the mortgagee and his heirs, successors and assigns forever against the lawful claims and demands of all persons; and that the mortgagor and his heirs, successors or assigns, in case a sale shall be made under the power of sale, will, upon request, execute, acknowledge and deliver to the purchaser or purchasers a deed or deeds of release confirming such sale; and that the mortgagee and his heirs, executors, administrators, successors and assigns are appointed and constituted the attorney or attorneys irrevocable of the said mortgagor to execute and deliver to the said purchaser a full transfer of all policies of insurance on the buildings upon the land covered by the mortgage at the time of such sale."

Section 20.    The following "condition" shall be known as the Statutory Condition, and may be incorporated in any mortgage by reference:

(CONDITION)

Provided, nevertheless, except as otherwise specifically stated in the mortgage, that if the mortgagor, or his heirs, executors, administrators, successors, or assigns shall pay unto the mortgagee or his executors, administrators or assigns the principal and interest secured by the mortgage, and shall perform any obligation secured at the time provided in the note, mortgage or other instrument or any extension thereof, and shall perform the condition of any prior mortgage, and until such payment and performance shall pay when due and payable all taxes, charges and assessments to whomsoever laid or assessed, whether on the mortgaged premises or on any interest therein, or on the debt or obligation secured thereby; shall keep the buildings on said premises insured against fire in a sum not less than the amount secured by the mortgage or as otherwise provided therein for insurance for the benefit of the mortgagee and his executors, administrators and assigns, in such form and at such insurance offices as they shall approve, and, at least two days before the expiration of any policy on said premises, shall deliver to him or them a new and sufficient policy in like place of the one so expiring, and shall not commit or suffer any strip or waste of the mortgaged premises or any breach of any covenant contained in the mortgage or in any prior mortgage, then the mortgage deed, as also the mortgage note or notes, shall be void.

Section 21.    The following "power" shall be known as the Statutory Power of Sale, and may be incorporated in any mortgage by reference:

(POWER)

But upon any default in the performance or observance of the foregoing or other condition, the mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises or such portion thereof as may remain subject to the mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises, then subject to the mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the mortgage, first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee-simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity.

(Please print or type)

Statute Form of

# Mortgage

(BY CORPORATION)

TRADEX CORP.

TO

CLINTON SAVINGS BANK

........................................................, 19.......

at ........... o'clock and ........... minutes ...........m

Received and entered with................................ Deeds

Book................ Page................

Attest:

........................................................ Register

FROM THE OFFICE OF

Paul J. O'Riordan, Esq.
SEDER & CHANDLER
339 Main Street
Worcester, MA  01608
(508)757-7721

RETURN TO ↑

HOBBS & WARREN, INC.

PUBLISHERS STANDARD LEGAL FORMS

BOSTON, MASS.

FORM 894

## EXHIBIT A

A certain tract of land, containing 17.151 acres, situated in Lunenburg, Mass. on the southeasterly side of Pioneer Drive and the southwesterly side of Leominster-Shirley Road, and being more particularly described as follows:

BEGINNING at the most westerly corner thereof, at a point on the southeasterly side of Pioneer Drive at land of Teodorico Vittorioso et al and at the Town Line between Lunenburg and Leominster;

THENCE northeasterly by a curve to left, radius 2530 feet, for a distance measured on the arc of 757.78 feet by the southeasterly side of Pioneer Drive to a point of tangent;

THENCE N. 14 - 20' E. - 224.93 feet by the southeasterly side of Pioneer Drive to a point of curve;

THENCE northeasterly to southeasterly by a curve to the right, radius 50 feet, for a distance measured on the arc of 92.56 feet by the southeasterly side of Pioneer Drive to a point of tangent on the southwesterly side of Leominster-Shirley Road;

THENCE S. 59 - 36' - 15" E. 388.93 feet by the southwesterly side of Leominster-Shirley Road to a point of curve;

THENCE southeasterly by a curve to the right, radius 2000 feet, for a distance measured on the arc of 189.57 feet by the southwesterly side of Leominster-Shirley Road to a point of tangent;

THENCE S. 54 - 10' - 25" E. - 455.78 feet by the southwesterly side of Leominster-Shirley Road to a corner at land of the Massachusetts Bay Transit Authority;

THENCE southwesterly by a curve to the left radius 1991.33 feet, more or less, for a distance measured on the arc of 289.62 feet, more or less, by last named land to a point of compound curvature;

THENCE southwesterly by a curve to the left, radius 2931.86 feet, more or less, for a distance measured on the arc of 732.52 feet, more or less, by last-named land to a corner at the Town Line between Lunenburg and Leominster;

THENCE N. 64 - 00' - 55" W. 525.90 feet by the Town Line and by land of the Massachusetts Bay Transit Authority and land or Teodorico Vittorioso et al to the point of beginning.

BEING shown on a plan entitled "Plan of Land in Lunenburg, Mass. owned by Associates Realty Trust" dated April 4, 1991 prepared by Whitman & Bingham Assoc. - Reg. Engineers &

Surveyors, 305 Whitney Street, Leominster, Mass. 01453 and recorded as Plan Book 348, Plan 10.

BEING the same premises described in a Deed dated April 8, 1991 and recorded with the Worcester Northern District Registry of Deeds in Book 2059, Page 249.

## PLEDGE AGREEMENT
### (Stock)

To: CLINTON SAVINGS BANK (the "Bank")

The undersigned, **GITTO GLOBAL CORPORATION** (hereinafter referred to as the "Undersigned"), to secure all of the Obligations (as hereinafter defined) of the Undersigned under and pursuant to that certain Guaranty dated June 16, 2004 of even date herewith executed and delivered by the Undersigned to the Bank (the "Guaranty"), whereunder the Undersigned guaranteed all of the obligations of Kingsdale Corp. to the Bank, including, without limitation, a Revolving Credit Note in the original principal amount of $8,000,000.00 dated of even date herewith, hereby and herewith pledges with and to the Bank, and delivers to the Escrow Agent in accord and subject to that certain Escrow Agreement, a copy of which is attached hereto as __Exhibit A__ (the "Escrow Agreement"), the following, in addition to any and all other collateral granted to the Bank for the Obligations:

3,000,000 shares of the common stock of VitroTech Corporation represented by certificate # 1127 ___ standing in the name of the Undersigned (the "Collateral")

and hereby agrees with you as follows:

1.    The above-listed securities and also all other securities and/or property belonging to or standing in the name of the Undersigned which the Undersigned has heretofore or may hereafter deposit with the Bank as collateral for all Obligations, shall constitute collateral security for the payment, performance and observance of all liability of the Undersigned pursuant to the Guaranty (the "Obligations").

2.    The Bank is hereby fully authorized and empowered on the non-performance of any of the Obligations and after having given three (3) days' prior notice thereof to the Undersigned, to sell, assign and deliver all of the Collateral, or any part thereof, or any substitutes therefor, or any additions thereto, at any Broker's Board, or at public or private sale, at the Bank's option, without advertisement or any further notice to the Undersigned or any other person, and the Bank, its officers and assigns may bid and become purchasers at any such sale, if public, or at any Broker's Board.  After deducting all legal or other expenses and costs of collection of the Obligations and all legal or other expenses and costs of collection, storage, custody, sale and delivery of collateral held hereunder the residue of any proceeds of collection or sale shall be applied to the payment of principal or interest on the Obligations, due or to become due, in such order of preference as the Bank may determine, proper allowance for interest on Obligations not then

CSB
EXHIBIT NO. 36
12-21-06 FOLEY

due being made, and any excess proceeds from the Collateral shall be returned to the Undersigned.

3.   Upon default in any of the Obligations, right is expressly granted to the Bank, at its option, and subject to the Bank having received the Collateral from the Escrow Agent appointed in the Escrow Agreement, to transfer at any time to the Bank, or its nominee, any securities held hereunder or apply it on the principal or interest due on any obligation secured hereby. The Bank shall also have, with respect to the Collateral, all the rights and powers that are given to the Bank with respect to collateral in any note or notes of the Borrower secured by the Collateral.

4.   Until the non-performance of any of the Obligations the Undersigned shall have the exclusive right to vote all of said shares.

5.   The Bank may, at its option, when the Obligations are due, demand, sue for, collect, or make any compromise or settlement the Bank deems desirable with reference to Collateral held hereunder.  The Bank shall have no duty as to the collection or protection of Collateral held hereunder or any income thereon, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.  The Bank may exercise its rights with respect to Collateral held hereunder without resorting or regard to other security or sources of reimbursement for the Obligations.  No delay or omission on the Bank's part in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right and/or remedy on any future occasion.

6.   Except as hereinabove specifically provided, the Undersigned waives demand, notice, protest, notice of acceptance of this Agreement, notice of any loans made, extensions granted, collateral received or delivered or other action taken in reliance hereon, all demands and notices in connection with the delivery, acceptance, performance, default or enforcement of any note for which any of the Collateral is pledged and all other demands and notices of any description, and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral and/or to the addition or release of any party or person primarily or secondarily liable on any of the Obligations.

7.   This Agreement is intended to take effect as a sealed instrument and shall inure to the benefit of the Bank and its successors and assigns and shall be binding upon the Undersigned and its successors and assigns.  The obligations of the Undersigned under this Agreement shall continue until all Obligations and liabilities of the Undersigned hereby secured

have been performed or paid in full.

EXECUTED this 23 day of July, 2004.

GITTO GLOBAL CORPORATION

By: _Frank Miller_

_____
Witness

### ESCROW AGREEMENT

THIS ESCROW AGREEMENT is dated as of the 23 day of July, 2004, by and among **CLINTON SAVINGS BANK**, a Massachusetts savings bank established under the laws of the Commonwealth of Massachusetts and having its principal place of business at 200 Church Street, Clinton, Massachusetts 01510 (the "Bank"), **GITTO GLOBAL CORPORATION**, a Massachusetts corporation with a place of business in 140 Leominster-Shirley Road, Lunenburg, MA 01462 ("Gitto Global"), and **MICHAEL P. ANGELINI** (the "Escrow Agent").

### W I T N E S S E T H

WHEREAS, Gitto Global has executed and delivered to the Bank a Guaranty dated June 16, 2004 (the "Guaranty"), whereunder Gitto Global has guaranteed the payment and performance of all obligations of Kingsdale Corp. ("Kingsdale") to the Bank (the "Kingsdale Obligations"), including, without limitation, Kingsdale's obligations pursuant to a Revolving Credit Note in the original principal amount of $8,000,000.00, dated of even date herewith; and

WHEREAS, as collateral security for its obligations under the Guaranty, Gitto Global has executed and delivered to the Bank a Pledge Agreement dated of even date herewith (the "Pledge Agreement"), whereunder Gitto Global has pledged 3,000,000 shares of the common stock of VitroTech Corporation ("VitroTech") to the Bank (the "Escrowed Shares") evidenced by Certificate No. 1127 (the "Certificate") and executed stock power(s); and

WHEREAS, the Pledge Agreement requires the delivery of the Certificate to the Escrow Agent; and

WHEREAS, the parties hereto desire to establish the terms and conditions pursuant to which such escrow arrangements will be established and maintained.

NOW, THEREFORE, in consideration of the premises and the covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Bank, Gitto Global and the Escrow Agent agree as follows:

1.    APPOINTMENT OF THE ESCROW AGENT.   The Bank and Gitto Global hereby appoint and designate the Escrow Agent as escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment, subject to the terms and conditions contained herein.

2.    DELIVERY OF ESCROWED SHARES.   Simultaneously with the execution of this Agreement, Gitto Global has delivered or caused to be delivered to the Escrow Agent the Certificate, to be held by the Escrow Agent pursuant to the terms and conditions of this Agreement.  The Escrow Agent acknowledges receipt of the Escrowed

CSB
EXHIBIT NO. 38
L. FOLEY

Shares and shall hold and distribute the Escrowed Shares as
provided herein.

3.    DIVIDENDS, ETC.  Any securities, cash or other property
distributable to Gitto Global in respect of or in exchange for
any of the Escrowed Shares, whether by stock dividends, stock
splits or otherwise, shall be delivered to the Escrow Agent, who
shall hold such securities in the Escrow Account.   Such
securities shall be issued in the name of Gitto Global and shall
be considered Escrowed Property for purposes hereof.

4.    DISPOSITION OF ESCROWED SHARES.

(a)   Upon the occurrence of the first to occur of the
following events, the Escrow Agent shall deliver the Escrowed
Shares as follows:

    i.  Upon delivery of written notice executed by an
officer of the Bank to the Escrow Agent that
there has been a default in the payment and/or
performance of the Kingsdale Obligations, the
Escrow Agent shall immediately deliver the
Escrowed Shares to the Bank.

    ii. Upon delivery of written notice executed by an
officer of the Bank to the Escrow Agent that
the Kingsdale Obligations have been paid in
full, the Escrow Agent shall deliver the
Escrowed Shares to Gitto Global.

5.    ESCROW AGENT.

(a)   DUTIES AND RESPONSIBILITIES.  The duties and
responsibilities of the Escrow Agent hereunder shall be limited
to those expressly set forth in this Agreement, and the Escrow
Agent shall not be bound in any way by any other contract or
agreement between the parties hereto, whether or not the Escrow
Agent has knowledge of any such contract or agreement or of the
terms or conditions thereof.  In the event the Escrow Agent shall
be uncertain as to any duties or responsibilities hereunder or
shall receive instructions from any of the parties hereto with
respect to the Escrowed Shares which in his belief are in
conflict with any of the provisions of this Agreement, he shall
be entitled to refrain from taking any action until he has
consulted with his counsel or he shall be directed to do so in
writing by the parties hereto or by order of a court of competent
jurisdiction in proceedings which the Escrow Agent or any other
party hereto shall be entitled to commence.  The Escrow Agent may
act upon the advice of his counsel in taking or refraining from
taking any action hereunder and may act upon any instrument or
other writing believed in good faith to be genuine and to be
signed and presented by the proper person or persons.

(b)   LIABILITY.  The Escrow Agent shall not be liable
to anyone for any damage, loss or expense incurred as a result of

any act or omission of the Escrow Agent, unless such damage, loss or expense is caused by the Escrow Agent's willful misconduct or gross negligence. Accordingly, and without limiting the foregoing, the Escrow Agent shall not incur any liability with respect to (a) any action taken or omitted under this Agreement, or (b) any action taken or omitted in reliance upon any instrument, including any written notice or instruction provided for herein, not only as to such notice's or instruction's due execution by an authorized person and as to the validity and effectiveness of such instrument, but also as to the truth and accuracy of any information contained therein.

(c) DISPUTES. In the event of a dispute between any of the parties hereto sufficient in the discretion of the Escrow Agent to justify his doing so, the Escrow Agent shall be entitled to tender the Escrowed Shares into the registry or custody of any court of competent jurisdiction located in Worcester County, Massachusetts, to initiate such legal proceedings as he deems appropriate, and pursuant thereto, to be discharged from all further duties and liabilities under this Agreement with respect to the Escrowed Shares so tendered. Any such legal action may be brought in any such court as the Escrow Agent shall determine to have jurisdiction with respect to such matter. The filing of any such legal proceedings shall not deprive the Escrow Agent of his rights to indemnification hereunder.

(d) ATTACHMENT. In the event all or any part of the Escrowed Shares shall be attached, garnished or levied upon pursuant to any court order, or the delivery thereof shall be stayed or enjoined by a court order, or any other order, judgment or decree shall be made or entered by any court affecting the Escrowed Shares or any part hereof or any act of the Escrow Agent, the Escrow Agent is authorized to obey and comply with all writs, orders, judgments or decrees so entered or issued by any such court, without the necessity of inquiring whether such court has jurisdiction; and if the Escrow Agent obeys or complies with any such writ, order, or decree, he shall not be liable to any of the parties hereto or any other person by reason of such compliance.

(e) LEGAL ACTION. The Escrow Agent shall have no duty to incur any out-of-pocket expenses or to take any legal action in connection with this Agreement or towards its enforcement, or to appear in, prosecute or defend any action or legal proceeding that would result in or might require him to incur any cost, expense, loss, or liability, unless and until he shall be indemnified with respect thereto in accordance with Section 5(f) of this Agreement.

(f) INDEMNIFICATION. Without determining or limiting any rights as between the Bank and Gitto Global, which rights shall exist outside this Agreement and not be prejudiced hereby, the Bank and Gitto Global jointly and severally hereby agree to indemnify and hold harmless the Escrow Agent against any and all cost, loss, damage, disbursement, liability, and expense,

including reasonable attorneys' fees, which may be imposed upon
or incurred by the Escrow Agent hereunder, or in connection with
the performance of his duties hereunder, including any litigation
arising out of this Agreement, or involving the subject matter
hereof, except only costs, losses, claims, damages,
disbursements, liabilities and expenses arising out of the Escrow
Agent's acts or omissions for which the Escrow Agent is adjudged
willfully malfeasant or grossly negligent by a final decree,
order or judgement of a court of competent jurisdiction from
which no appeal is taken within the applicable appeals period.

(g)  RESIGNATION.  The Escrow Agent, and the Escrow
Agent's successors hereinafter appointed, may at any time resign
by giving notice in writing to the Bank and Gitto Global and
shall be discharged of all duties hereunder upon the appointment
of a successor escrow agent which shall be appointed by mutual
agreement of the Bank and Gitto Global.  If the Bank and Gitto
Global are unable to agree on a successor escrow agent, any of
such parties may petition a court of competent jurisdiction to
appoint one.  From the date upon which the Escrow Agent sends
notice of any resignation until the acceptance by a successor
escrow agent appointed as provided herein, the Escrow Agent's
sole obligation hereunder shall be to hold the Escrowed Shares
delivered to him in accordance with this Agreement.  Any such
successor escrow agent shall deliver to the Bank and Gitto Global
a written statement accepting such appointment hereunder, and
thereupon he shall succeed to all the rights and duties of the
Escrow Agent hereunder and shall be entitled to receive the
benefit of the provisions set forth above.

(h)  ACKNOWLEDGEMENT OF REPRESENTATION.  The Bank and
Gitto Global acknowledge that the Escrow Agent's law firm,
Bowditch & Dewey, LLP, has represented the Bank and Gitto Global
in other matters.  Notwithstanding such representation, neither
the Bank, Gitto Global nor Kingsdale object to the Escrow Agent
acting as escrow agent.

6.  ESCROW AGENT FEES AND EXPENSES.  The Escrow Agent shall
be entitled to reasonable compensation for his services hereunder
as Escrow Agent and for reimbursement for his out of pocket costs
and expenses.  Such amounts, including attorneys' fees, shall be
borne one-half by the Bank and one-half by Gitto Global,
provided, however, that if the Escrow Agent's only actions
hereunder are to hold the Escrowed Shares and to distribute the
Escrowed Shares pursuant to Section 4 hereof and if there are no
disputes of any nature with respect to the subject matter hereof,
the Escrow Agent shall not be entitled to compensation, but shall
be entitled to reimbursement for his out of pocket costs and
expenses.

7.  TERMINATION OF AGREEMENT.  When all of the Escrowed
Shares shall have been distributed pursuant to the provisions of
this Agreement, this Agreement, except for the provisions of
Sections 5(b) and 5(f) hereof, shall terminate.

Agreement.

(c)   MODIFICATIONS AND AMENDMENTS.   The terms and provisions of this Agreement may be modified or amended only by written agreement executed by all parties hereto.

(d)   WAIVERS AND CONSENTS.   The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by written document executed by the party or parties entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar.  Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

(e)   ASSIGNMENT.   The rights and obligations under this Agreement may not be assigned by the parties hereto without the prior written consent of the other parties.

(f)   BENEFIT.   All statements, representations, warranties, covenants and agreements in this Agreement shall be binding on the parties hereto and shall inure to the benefit of the respective successors and permitted assigns of each party hereto.  Nothing in this Agreement shall be construed to create any rights or obligations except among the parties hereto, and no person or entity shall be regarded as a third-party beneficiary of this Agreement.

(g)   GOVERNING LAW.   This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the law of the Commonwealth of Massachusetts, without giving effect to the conflict of law principles thereof.

(h)   SEVERABILITY.   In the event that any court of competent jurisdiction shall determine that any provision, or any portion thereof, contained in this Agreement shall be unenforceable in any respect, then such provision shall be deemed limited to the extent that such court deems it enforceable, and as so limited shall remain in full force and effect.  In the event that such court shall deem any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

(i)   INTERPRETATION.   The parties hereto acknowledge and agree that: (i) each party and its or his counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party

was generally responsible for the preparation of this Agreement.

(j) EXPENSES. Except for the fees and expenses of the Escrow Agent which shall be paid as provided in Section 5, each of the parties hereto shall pay its or his own fees and expenses (including the fees of any attorneys, accountants, appraisers or others engaged by such party) in connection with this Agreement and the transactions contemplated hereby. All notices, requests, consents and other communications hereunder shall be deemed to have been given either (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (ii) if made by telex, telecopy or facsimile transmission, at the time that receipt thereof has been acknowledged by electronic confirmation or otherwise, (iii) if sent by overnight courier, on the next business day following the day such notice is delivered to the courier service, or (iv) if sent by registered or certified mail, on the fifth (5th) business day following the day such mailing is made.

(k) COUNTERPARTS. This Agreement may be executed in one or more counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

CLINTON SAVINGS BANK

By: _____

GITTO GLOBAL CORPORATION

By: _____

ESCROW AGENT:

_____
Michael P. Angelini

Accepted and Agreed as to
Paragraph 5(h).

KINGSDALE CORP.

By _____