**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

LASALLE BUSINESS CREDIT, LLC, f/k/a     )
LASALLE BUSINESS CREDIT, INC.,          )
                                        )
          Plaintiff,              )      CIVIL ACTION 05-10268-DPW
                                        )
   v.                                   )
                                        )
CLINTON SAVINGS BANK,                   )
                                        )
          Defendant.             )

**LASALLE BUSINESS CREDIT LLC'S RESPONSE IN OPPOSITION TO CLINTON
SAVING BANK'S MOTION FOR SUMMARY JUDGMENT**

### Introduction

Clinton Savings Bank ("Clinton") in its Motion for Summary Judgment ("Motion") does not dispute the fact that for over three years Charles Gitto, Gary Gitto, Frank Miller, and a number of other individuals engaged in a conspiracy (the "Conspiracy") in which they conducted the affairs of Kingsdale Corporation, a Massachusetts corporation doing business as J&J Chemical Distributors, Inc. ("J&J Chemical") through a pattern of racketeering activity, in violation of 18 USC § 1962(d). (Cmplt., ¶¶ 17-19) The principle feature of the Conspiracy was the use of the checking account J&J Chemical maintained at Clinton in a check-kiting scheme (the "Check-kite") conducted with Gitto Global Corporation ("Gitto Global"). (Cmplt., ¶¶ 20-22) Clinton also does not dispute that the operation of the Check-kite caused in excess of $11 million in damages to Plaintiff, LaSalle Business Credit, LLC ("LaSalle"), which had made a revolving loan to Gitto Global based upon Gitto Global's eligible accounts receivable and inventory. (Cmplt., ¶¶ 10, 20-33, 51)

Clinton's argument for summary judgment in its favor is that LaSalle cannot present facts from which a jury could conclude Clinton "intended, by its actions, to promote and continue a

check-kiting scheme" by J&J Chemical such that it can be held to have joined the Conspiracy (Count I) or aided and abetted the Conspiracy (Count II). (Clinton Motion, p. 3)

With respect to the RICO conspiracy claim, a jury could find from the facts that Clinton knowingly furthered and facilitated the Conspiracy and thereby became a member of it. After observing all of the signs that the J&J Chemical account was being employed in a check-kite, Clinton chose not to stop the Check-kite but to permit it to continue, having - as Clinton puts it - "crossed its fingers" that Gitto Global would be acquired in a transaction that would allow the deficit in the J&J Chemical account to be paid. The acquisition did not occur and the Check-kite collapsed. While Clinton may have acted entirely in the interest of ultimately minimizing or entirely avoiding any loss to it from the Check-kite, it nevertheless acted to further and facilitate the operation of the Check kite. The end sought by Clinton did not justify the means it chose.

For Clinton to face a trial for having aided and abetted the Check-kite, there must be facts from which a jury could conclude Clinton knowingly gave assistance to the Check-kite. By 2004, Clinton had unmistakable evidence that the J&J Chemical account was being used for a check-kite. Clinton nevertheless not only allowed the account to remain open, it provided credit to keep the account operating. This constitutes aiding and abetting that cannot be excused because it was also undertaken to protect the bank.

LaSalle in Court V of the Complaint has alleged that Clinton by knowingly permitting the Check-kite to operate over an extended period of time effectively represented to LaSalle that the J&J Chemical account was legitimate and assumed a duty to warn LaSalle that the account was not as it appeared. Clinton seeks summary judgment on this Count based upon numerous cases in which banks were held not liable for the damages caused by check-kites. To the contrary, those cases establish the basis for Clinton's liability to LaSalle. In the cases cited, the banks

acted promptly to freeze or close the check-kite accounts when they suspected or learned of the check-kites.  In contrast, Clinton actively supported the Check-kite and allowed it to continue. Because Clinton chose to support the Check-kite over a considerable period of time, Clinton must be held responsible for the damages suffered by LaSalle as a result.

Finally, Clinton seeks to have Counts III and IV (claims for fraudulent transfer and equitable subordination) dismissed without prejudice because Tradex' Chapter 11 bankruptcy trustee has now brought similar claims against Clinton.  The appropriate action in such a situation, however, is to stay these claims if and until there is a resolution of the bankruptcy trustee's claims.

## Summary Judgment Standard

For Clinton to obtain the summary judgment it seeks, Clinton must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Desmond v. Varrasso*, 37 F.3d 760, 763 (1st Cir. 1994).  In determining whether Clinton has met these requirements, this Court must draw all reasonable inferences from the facts in the manner most favorable to LaSalle.  *Id.*  In other words, Clinton's Motion must be denied "unless no reasonable trier of fact could draw any other inference from the totality of the circumstances revealed by the undisputed evidence" other than that proposed by Clinton.  *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 488 (1st Cir. 1992).

## Statement of Material Facts

**The Operation of LaSalle's Revolving Loan**

For Gitto Global to borrow under its revolving loan from LaSalle, Gitto Global needed both eligible inventory and accounts receivable.  In order to generate a basis for borrowing, Gitto Global inflated its accounts receivable by creating sales to fictitious customers and applying purported payments from funds received on J&J Chemical checks against the revolving loan.

Cash receipts would reduce the amount owed on the loan so that more money could be borrowed. Inflated receivables then created the basis to borrow additional money. (LaSalle St. Facts, ¶36)

In reliance upon the false information contained in the borrowing base certificates submitted by Gitto Global and the funds deposited from checks drawn upon the J&J Chemical account, LaSalle advanced funds to Gitto Global under the revolving loan. (LaSalle St. Facts, ¶32) Between July, 2002 and September, 2004, $1,009,659,366 in checks issued by J&J Chemical were deposited by Gitto Global. Based upon Gitto Global's monthly deposits of purported sale proceeds from J&J Chemical and the borrowing base certificates, LaSalle advanced $1,124,835,256 during that time frame. (LaSalle St. Facts, ¶34) As of May 19, 2006, there is due and owing from Gitto Global in excess of $32 million. (LaSalle St. Facts, ¶35)

**J&J Chemical Account Handling in 2002**

Clinton is a sophisticated bank that knew how to properly handle suspicious activity indicative of a check-kite. On April 12, 2002, checks deposited in the J&J Chemical account were returned by Clinton for insufficient funds. (Clinton St. Facts, ¶22) Frank Miller, who was the President of Gitto Global and the owner of J&J Chemical, was then contacted and a deposit was made to cover those checks. (Clinton St. Facts, ¶¶6, 23-24) On May 6, 7, 14, 18, 21, 22, and 31, 2002, checks written by Gitto Global deposited in the J&J Chemical account were again returned for insufficient funds. (LaSalle Rsp. to Clinton St. Facts, ¶25)

Clinton's response is most significant. Clinton changed the J&J Chemical account from a "no-float" to a "float" account, thereby requiring that funds had to be received on checks deposited in the J&J Chemical account before Clinton would pay checks drawn on the J&J Chemical account. Clinton knew that all deposits came from Gitto Global's account at LaSalle and all checks being written were to Gitto Global, which Clinton found was an "unusual"

situation.  (Clinton St. Facts, ¶28; LaSalle Rsp. to Clinton St. Facts, ¶28)  Therefore, to ensure deposits had cleared, Clinton monitored the J&J Chemical account daily by receiving daily statements from LaSalle Bank showing the check numbers, dollar amounts and the dates on items deposited in the Gitto Global account that had cleared.  Clinton reviewed each check deposited and determined whether to clear it.  (Clinton St. Facts, ¶¶27-28; LaSalle St. Facts, ¶10)

On November 26, 2002, Clinton, at Miller's request, restored the J&J Chemical account to a "no-float" status.  In agreeing to change the status, Clinton focused on the clearance of the Gitto Global checks that had been deposited in the J&J Chemical account, not on the source of those Gitto Global funds or that checks had been rejected on 15 separate days during the six month period for insufficient funds.  (Clinton St. Facts, ¶32; LaSalle St. Facts, ¶12)

**J&J Chemical Account Handling in 2003-2004**

After the "no float" status was restored, Clinton did not pay any attention to the account until daily deposits through the ATM reached $1,000,000 in July, 2003.  (LaSalle St. Facts, ¶14) Yet, the monthly account activity had escalated from $7,000,000 to $22,000,000.  (LaSalle St. Facts, ¶15)

In the middle to end of 2003, the President of Clinton, Steven Cash ("Cash"), noticed numerous fluctuations in daily deposit balances in excess of $1,000,000 at Clinton.  It was reported to Cash that this substantial activity involved J&J Chemical and that all checks written on the account or deposited in the account were between J&J Chemical and Gitto Global. (LaSalle Rsp. to Clinton St. Facts, ¶60-61)

In late 2003, Clinton also noticed a large deposit followed by a series of checks clearing the J&J Chemical account on the same day.  When told of this activity, Cash was concerned "about the potential for check-kiting".  (LaSalle St. Facts, ¶17)  Clinton met with Frank Miller who gave an explanation for the activity that Clinton did not understand, but more important to

Clinton, told them that the J&J Chemical account would be closed after January 1, 2004 when Gitto Global would be sold to a company in California, Vitrotech.  (LaSalle St. Facts, ¶18)  In mid-January, 2004, Cash again inquired as to the status of the J&J Chemical account and was told that it was still being resolved.  By this point, Cash was aware that LaSalle was financing Gitto Global's operation.  (LaSalle St. Facts, ¶19)  As of January, 2004, the monthly activity in the J&J Chemical account had escalated to $62,000,000.  (LaSalle St. Facts, ¶20)

In March, 2004, Cash determined that the use of the J&J Chemical account was acceptable because Frank Miller was a customer with whom the bank was familiar and had offered an explanation of the business purpose of the account, although Cash "couldn't fully comprehend" that explanation.  Although Cash recognized that if a check-kite is discovered "usually a hold is put on the account and no more activity is allowed", a hold was not instituted in March, 2004 despite Cash's concern that a crime was being committed by J&J Chemical. (LaSalle Rsp. to Clinton St. Facts, ¶83)

In April, 2004, Clinton had no liquidity and had to borrow $1 to $2 million per day from the Federal Home Loan Bank.  As a result, Christopher Gill ("Gill"), Clinton's chief financial officer, investigated and learned the lack of liquidity was caused by the need to cover uncollected funds in the J&J Chemical account.  Gill was told in a memorandum that "it looks as if he (Miller) is still 'playing games'".  (LaSalle Rsp. to Clinton St. Facts, ¶85)

In the beginning of May, 2004, Gill told Cash that Gill "felt it (the activity in the J&J Chemical account) was kiting."  Gill was directed to "back off".  (LaSalle Rsp. to Clinton St. Facts, ¶24)  On May 18, 2004, Gill wrote an e-mail to Michael Tenaglia about Miller's efforts to sell Gitto Global in which Gill said "I do not see what his kiting (let's call a spade a spade) has to do with the sale of the business. . . "  (LaSalle St. Facts, ¶22)  The next day, Gill questioned

whether the account was being used the way it was designed: "You talk about the intent of the account. Did we know that $4,000,000 was going to flow through the account several times a week? What kind of business has between $500,000,000 and $1,000,000,000 of cash flow a year?" Gill questioned how a little company in Lunenberg could be generating a $1 billion in sales. Later that day, Gill was told that there was a deposit in excess of $3,000,000 to cover checks of $2,500,000. The chief operations officer at Clinton, Michael Tenaglia ("Tenaglia"), stated "I know it smells, and I agree." (LaSalle Rsp. to Clinton St. Facts, ¶23)

Frustrated, Gill, in the last week of May, 2004, spoke with the Chairman of the Board of Clinton, John Davis, to tell him that Cash was not making the right decision. Gill said that the amount of activity and the size of the deposits in the account were not reasonable in view of the size of Gitto Global. He compared the activity to another company in Clinton that had 26 factories worldwide and sales of $900 million, whereas Gitto Global was tracking at $1 billion for a little company with one location. (LaSalle Rsp. to Clinton St. Facts, ¶25)

As of May, 2004, the monthly activity had risen to $74,000,000. Nonetheless, Clinton did not close the account, place funds in a suspense account or remove the "no-float" policy, as was done in 2002. (LaSalle Rsp. to Clinton St. Facts, ¶29)

Rather, in an effort to protect itself, on July 23, 2004, Clinton provided J&J Chemical with an $8,400,000 credit line for the sole purpose of providing payment for checks drawn on the J&J Chemical account against uncollected funds. The credit line was secured by various pieces of collateral. Part of the collateral was $1,200,000 removed from the J&J Chemical account and placed in a separate account against which Clinton took a collateral pledge. (Clinton St. Facts, ¶105; LaSalle St. Facts, ¶¶26-27)

Strikingly, Clinton continued to allow the account to be used to kite checks. With the no-float policy still in place, the monthly account activity increased to $89,000,000. (LaSalle St. Facts, ¶29) In fact, based on a three day float, the amount of checks paid against uncollected deposits during the three days previous to the last day of the month in April, 2004, was $9,400,000. That amount rose to $11,900,000 when Clinton returned checks for insufficient funds on September 16, 2004. (LaSalle St. Facts, ¶30)

<u>Argument</u>

### I.    The Facts Demonstrate that Clinton Participated in the RICO Conspiracy

LaSalle alleges in Count I of its Complaint that Clinton violated the RICO conspiracy statute (18 U.S.C. §1962(d)) in its dealing with J&J Chemical's use of its account for the Check-kite. Section 1962(d) makes it unlawful for any person to participate, directly or indirectly, in a conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity. The use of the mails to clear checks in a check-kiting scheme constitutes mail fraud under 18 U.S.C. §1341 and the requisite racketeering activity. *U.S. v. Foshee*, 569 F.2d 401 (5th Cir. 1978).

Clinton contends that LaSalle cannot prove that Clinton intended to facilitate the Check-kite scheme. Citing *U.S. v. Rodriguez-Alvarado*, 952 F.2d 586, 589 (1st Cir. 1991), Clinton proclaims that the "First Circuit differs from other Circuits, in that it requires that specific intent to defraud to be proved in a check-kite scheme, rather than inferring intent to defraud from the mere existence of a check-kite scheme." (Clinton Motion, p. 3)

While the First Circuit in *Rodgriguez-Alvarado* did state that "the mere existence of a check-kiting scheme by itself does not as a matter of law imply the intent necessary for a bank fraud conviction," the court, however, went on to recognize that "willfulness can rarely be proven by direct evidence since it is a state of mind, it is usually established by drawing reasonable inferences from available facts." *Id*. at 589; see also: *U.S. v. Vavlitas*, 9 F.3d 206,

213 (1st Cir. 1993).  "A jury may look to circumstantial evidence as proof of the requisite intent."

*Rodriguez-Alvarado*, 952 F.2d at 590.

To be liable as a conspirator, Clinton need only have adopted the goal of furthering or facilitating the Check-kite, which can be demonstrated through circumstantial evidence.  *U.S. v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004).  As the United States Supreme Court observed in *Salinas v. U.S.*, 522 U.S. 52, 65, 139 L.Ed.2d 352, 118 S.Ct. 469 (1997):

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion.  One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.

Clinton's only challenge to LaSalle's RICO conspiracy claim in Count I is that LaSalle supposedly cannot show that Clinton intended by its actions to promote the Check-kite.  (Clinton Motion, p. 4)  While Clinton recognizes at page 4 of its Motion that there are sufficient facts from which it can be inferred that Clinton knew the J&J Chemical account was being used to perpetrate the Check-kite ("While there may be material disputed facts concerning the extent of … [Clinton's] knowledge of J&J Chemical's check-kiting scheme"), it claims it can evade any liability because Clinton's actions were not intended to aid the Check-kite but "were directed toward protecting its own position and limiting its exposure."  Clinton does not dispute that as a result of the course of action it adopted, the Check-kite continued to operate and grow in magnitude.

For LaSalle to prove Clinton violated §1962(d), it must present evidence from which a jury could conclude Clinton knowingly agreed to perform services which facilitated in the operation of the Check-kite.  To understand the necessary proof, a review of *Frost National Bank v. Midwest Autohause, Inc.*, 241 F.3d 862 (7th Cir. 2001), is instructive.  There, plaintiff alleged

that the defendant bank was part of the check-kite scheme because it did not notify plaintiff about the scheme when it could have. The plaintiff alleged that the defendant bank effectuated the check-kite scheme by transferring the monies into a holding account and selectively paying checks out of that account. Plaintiff also contended that the defendant bank assisted the scheme by releasing funds from the holding account to the person who the bank knew was involved in criminal bank fraud.

The *Frost* court held that the defendant bank could not be found to have participated in the check-kite because it did not knowingly stand by and allow the scheme to continue. "It took appropriate steps to deal with the situation and stop the check-kiting scheme." *Id*. at 871. Thus, the court decided that the defendant bank "did not agree to facilitate any of Geekie's (account-holder) illegal actions." *Id*. Further, defendant bank's decision to set up a holding account and return the remainder of collected funds after paying all outstanding amounts for which defendant bank was liable was not illegal. *Id*.

In contrast, Clinton did not take appropriate steps to deal with the situation and stop the Check-kite. Clinton had knowledge of the Check-kite, but unlike the defendant bank in *Frost*, Clinton did not place the funds in a holding account or wait to pay checks once those checks cleared. It did nothing to stop the Check-kite. Although Clinton was indeed entitled to protect its interests, it was not entitled to follow a course that facilitated the continued operation of criminal conduct.

As the undisputed facts discussed below show, Clinton facilitated the activities of those who were operating the Check-kite. Clinton went from suspicions concerning the use of the J&J Chemical account to indisputable knowledge that the account was being used for the Check-kite. Yet, when it should have acted, it continued to facilitate the operation of the Check-kite.

In 2002, when Clinton initially became suspicious about the J&J Chemical account, Clinton changed the account from a no-float to a float account such that funds had to be available to cover each drawn check and closely monitored the account for six months. After the float requirement was changed on the J&J Chemical account in November, 2002, Clinton then noticed numerous fluctuations in the deposit balances in the J&J Chemical account in the middle to end of 2003. When told of this activity, the president of Clinton recognized "the potential for check-kiting." The monthly activity in the J&J Chemical account continued to escalate. In March, 2004, the president of Clinton was concerned that a crime was being committed by J&J Chemical, but accepted the explanation given for the business purpose of the account, even though the president still could not fully comprehend it.

By the spring of 2004, Clinton's chief financial and chief operations officers agreed that a check-kite was operating through the J&J Chemical account. Efforts to have their superiors take action, however, were rebuffed.

Ultimately, on July 23, 2004, Clinton, while fully aware of the use being made of the J&J Chemical accounts for the Check-kite, provided J&J Chemical with an $8,400,000 credit line for the sole purpose of providing payment for checks drawn on the account against uncollected funds. The credit line was secured by various pieces of collateral. Unlike the defendant bank in *Frost*, Clinton knowingly allowed the scheme to continue by paying checks on uncollected funds and allowing the amount of checks paid against uncollected funds to escalate. At the end of April, 2004, the amount of checks paid against uncollected deposits three days previous to the last day of the month was $9,400,000. By the time, Clinton took action to stop the Check-kite and returned checks for insufficient funds on September 16, 2004, the amount of checks paid

against uncollected deposits and the checks returned to LaSalle for insufficient funds had escalated to $11,900,000.

Clinton argues it cannot be found to have had a bad motive in allowing the Check-kite to continue because the interest payments and fees it received were so insubstantial. (Clinton Motion, p. 5) Of course, Clinton fails to point out that it took $1.2 million from J&J Chemical's account, which alone is substantial. Clinton's apparent argument that it cannot be found to have intentionally facilitated the Check-kite because it was economically senseless for it to do that cannot be accepted.

An argument similar to Clinton's was dealt with in *Firstar Bank v. Beemer Enters., Inc.*, 976 F.Supp. 1233 (N.D. Iowa 1997). There, in a RICO counterclaim brought by investors against plaintiff bank for its role in a check-kite scheme, the court reasoned that non-movant's theory must be <u>implausible</u> to entitle movant to summary judgment. *Id.* at 1240. The plaintiff bank argued that no national bank would tolerate a potential loss from a $22 million check-kite just to generate $1 million in "analysis fees". The court concluded that:

> the banks *did* benefit from [Morken's] check-kiting, because they did obtain analysis fees. Furthermore, the record is replete with evidence that Firstar officers could have and should have recognized the kite, but for one reason or another were persuaded to take no action, giving rise to a reasonable inference that they simply preferred to reap the benefits of the kite, while actively encouraging it, colluding in it, or tolerating it, in the belief that the kite would deflate itself with a sufficient injection of "good" funds.

*Id.* at 1241. The court held that "willful blindness while enjoying the benefits of the fee income is also a reasonable inference from the evidence." *Id.* at 1242. Thus, the claims of collusion were not so implausible as to entitle the defendant bank to summary judgment. *Id.*

Likewise, Clinton benefited through interest payments, fees and $1.2 million set aside from J&J Chemical's account which funds were the product of the Check-kite. The record is

clear that Clinton's officers knew of the Check-kite, but Steve Cash, its president, decided to tolerate it and collude in it while hoping that the company would be sold so as to cover the $8 million in credit extended by way of the "no float" policy. As in *Firstar*, the claims of collusion are not implausible.

Undisputed facts do not always point clearly to one inevitable conclusion. See *Desmond*, 37 F.3d at 764. And when undisputed facts are capable of supporting conflicting yet plausible inferences, then the choice between those inferences is not for the court on summary judgment, but for the trier of fact at trial. *Id*. The facts relied upon by LaSalle clearly support a plausible basis for a violation of RICO conspiracy. Clinton's Motion for Summary Judgment on Count I must necessarily be denied.

## II.     The Facts Support LaSalle's Claim that Clinton Aided and Abetted the Check-kite

As Clinton acknowledges on page 4 of its Motion, it can be found liable for aiding and abetting the check-kite scheme if Clinton, with knowledge that the Check-kite was being conducted, gave substantial assistance or encouragement to the Check-kite with the intent of assisting the Check-kite. See *Bamberg v. S. G. Cowan Securities Corp.*, 236 F. Supp. 2d 79, 90-91 (D. Mass. 2002). The facts support an inference that Clinton did precisely that.

Clinton's Motion does not challenge the existence of facts from which a jury could conclude Clinton knew that the J&J Chemical account was being used for the Check-kite. (Clinton Motion, p. 4) The facts also support a conclusion that Clinton rendered substantial assistance to the Check-kite. It is undisputed that the J&J Chemical account was an integral part of the Check-kite. A successful check-kite requires at least two bank accounts, and the J&J Chemical account was one of the two accounts used. By making that account available in 2003 and 2004, Clinton certainly provided critical direct assistance to the Check-kite.

Clinton seeks to avoid liability by asserting that its intent was not to aid the check-kiting scheme, that none of its officers or directors profited from the check-kite and that its board of directors did not desire to have "J&J Chemical continue its abuse of … [Clinton's] no-float policy for commercial accounts."  (Clinton Motion, p. 5)

Clinton cites *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 671-72 (S.D.N.Y. 1996), as having held that where a bank in allowing a check-kite is motivated by seeking lawful commissions, it will not be deemed to have provided substantial assistance to the check-kite. (Clinton Motion, p. 5)  Clinton misconstrues *Pereira*.  The precise statements in *Pereira* is that "assistance is *less likely* to be deemed substantial if the defendant was motivated by a lawful goal, such as the generation of commissions, independent of that which motivated the primary wrongdoer."  *Id*. at 671-72; emphasis added.  "Less likely to deemed" does not mean will not be deemed.

The statement in *Pereira* must also be understood in its context.  The case arose from the wrongdoing of Payroll Expenses Corporation ("Payroll"), which had operated an on-site check-cashing service for employees of companies that retained it.  The companies that hired Payroll provided Payroll with the amounts needed to cash the payroll checks.  Payroll began converting the funds provided by its customers.  To cover up its conversion of its customer's funds, Payroll engaged in a check-kite.  When the banks, which had been indulgent in other aspects of Payroll's accounts, uncovered the check-kite, they froze Payroll's accounts within two days.  *Id*. at 653-54, 664-65.  The customers alleged that the banks had "aided and abetted Payroll's conversion of their property, Payroll's breach of its fiduciary duty to the Customers, and Payroll's fraud."  *Id*. at 671.

The statement in *Peeira* relied upon by Clinton was to the effect that the bankers' continuance of Payroll's accounts for the fees they received would likely not be indicative of substantial assistance in Payroll's conversion of the customer's funds because the maintenance of the accounts did not substantially assist in Payroll's conversion of its customer's funds. The conversion was separate from the check-kite.

When the issue is the knowing execution of transfers that effectuate a fraud, the party who assists in the transfers has been held to have aided and abetted the fraud. *Pereira* was distinguished on this basis in *Twenty First Century LP v. Labianca*, 19 F. Supp. 2d 35, 42 (E.D.N.Y. 1998), in which the defendant was held liable for aiding and abetting breaches of fiduciary duties by having submitted false invoices. See also *Resolution Trust Corporation v. Spagnoli*, 811 F. Supp. 1005, 1014 (D.N.J. 1993) (wife aided and abetted husband's receipt of bribes by endorsing bribe payment checks).

Unlike *Peeira*, Clinton did not freeze J&J Chemical's account. Clinton aided and abetted the Check-kite by allowing it to continue unabated. Clinton's Motion as to Count II must be denied since LaSalle can present facts to establish its claim.

## III.    Clinton Assumed a Duty to LaSalle to Follow Sound Banking Practices and Breached that Duty

LaSalle, in Count V of its Complaint, alleges that Clinton, by continuing to honor J&J Chemical's checks payable to Gitto Global when Clinton knew the funds were the product of the Check-kite, thereby represented to LaSalle that the J&J Chemical account had collected funds and assumed a duty to disclose the Check-kite to LaSalle. Clinton breached that duty by facilitating and profiting from the Check-kite in the form of fees, interest and the ultimate seizure of $1.2 million from the account (and seizure of funds from other pledgors), which significantly damaged LaSalle. Clinton argues that LaSalle cannot prove that Clinton intended by its actions

to "promote or nourish" the Check-kite because the undisputed facts reveal that Clinton only intended to protect itself both from J&J Chemical's abuse of Clinton's no-float policy and from possible suit if the sale of J&J Chemical and Gitto Global did not take place.  (Clinton Motion, p. 6)  Clinton describes its conduct as one constituting "in-action" in handling the J&J Chemical account.  (Clinton Motion, p. 7)  This "in-action", Clinton maintains, was merely to place it "in the best position to avoid losses."  (Clinton Motion, p. 9)

However, Clinton's conduct went far beyond mere "in-action".  As Clinton recognizes, it did notice unusual activity which it concluded constituted check-kiting.  It did seek to convert the relationship to a short-term lending relationship and took collateral to protect itself.  It is what Clinton did not do that creates liability.

"Check-kiting" is the practice of opening one or more accounts in several banks and "checks are drawn on one account and deposited in the other when neither account has any substantial funds."  *Mid-Cal Nat'l Bank v. Federal Reserve Bank*, 590 F.2d 761, 762 (9th Cir. 1979).  Taking advantage of the delay in the check collection process, checks are exchanged daily between these accounts, which continually show credits of "uncollected funds."  The kite will collapse when one of the banks refuses to honor a check drawn upon "uncollected funds."  The bank first stopping the kite usually suffers the least loss.

Generally, banks allow customers to write checks on funds posted to their accounts which have not been finally paid by the bank upon which those funds were drawn.  These are known as "uncollected funds."  The process of collecting those funds generally takes a couple of days.  *Town & Country State Bank v. First State Bank*, 358 N.W.2d 387, 390 (Minn. 1984).  There is a fine line between the illegal act of "check-kiting" and the legal act of writing checks upon "uncollected funds."

Clinton is correct that generally there is no duty for a bank to warn another of a check-kite. Clinton relies upon case authority where the bank warned of a check-kite does nothing to assist it, and instead, takes steps to discontinue it. See: *Frost National Bank v. Midwest Auto House, Inc.*, *supra* (upon identifying check-kite scheme, funds were placed in a holding account and checks were paid when cleared); *Citizens Nat'l Bank v. First Nat'l Bank*, 347 So.2d 964 (Miss. 1977) (within weeks of discovering the check-kite, the bank protected itself by returning all checks unpaid and accepting deposits to cover the loss); *Cumis Insur. Soc., Inc. v. Windsor Bank & Trust Co.*, 736 F.Supp. 1226 (Conn. 1990) (upon suspicion of a check-kite scheme, the bank warned its customer and stopped the check-kite); *Pennsylvania Nat'l Turf Club v. Bank of West Jersey*, 385 A.2d 932 (App. Div. N.J. 1978) (although the bank unknowingly created a situation in which the check-kite scheme could operate, the bank had no knowledge of the scheme and upon suspicion, it took steps to stop the kite); *City Check Cashing, Inc. v. Manufacturers Hanover Trust Co.*, 764 A.2d 411 (N.J. 2001) (bank did not respond prior to the midnight deadline, but did not breach a duty under the Uniform Commercial Code in connection with the handling of checks).

Hence, courts have uniformly held that if a bank is following sound banking practices, it has no duty to disclose the check-kite. See: *E.G. Banks v. Everett Nat'l Bank*, 305 Mass. 178, 25 N.E.2d 177 (1940); *Alta Vista State Bank v. Kobliska*, 897 F.2d 930 (8th Cir. 1990). Unsafe and unsound banking practices "encompass what may be generally viewed as conduct deemed contrary to accepted banking operations which might result in abnormal risk or loss to a banking institution or shareholder." *First Nat'l Bank of Bellaire v. Comptroller of Currency*, 697 F.2d 674, 685 (5th Cir. 1983). "It appears that the only duty of a bank in this regard is to stop a kite after it has been discovered." *Mid-Cal Nat'l Bank*, 590 F.2d at 764.

In trying to claim it had no duty to disclose the Check-kite, Clinton relies strongly on *Sharp Int'l Corp. v. State Bank and Trust Co.*, 403 F.3d 43 (2nd Cir. 2005). (Clinton Motion, p. 9) That case, however, is inapposite.

There, the bank that had extended a line of credit began to suspect fraud. Although the loan was current and within credit limits, the bank began to take precautionary measures to protect itself. After the bank confirmed the fraudulent practices of the principals of the borrower, the bank "arranged quietly for the [principals] to repay the State Street loan from the proceeds of new loans from unsuspecting lenders." *Id*. at 47. While the borrower tried to refinance, the bank gave no warnings, blew no whistles, ignored inquiring calls, preserved the line of credit when it had the right to foreclose and gave needed consents to the new loans. *Id*. The court held that the bank was merely protecting itself, did not take any affirmative action to substantially assist the fraud and had no duty to inform anyone of the fraud since the bank was not required to do so. *Id*. at 51.

Clinton is not the lender here. It was not merely waiting to be repaid by new financing. It was the depository institution where the Check-kite originated. While Clinton had a right to attempt to minimize its losses from the Check-kite, it did not have a right to abandon safe and sound banking practices by feeding and extending the Check-kite. Clinton's actions prolonged the Check-kite. Unlike the bank in *Sharp Int'l*, Clinton did not merely make arrangements to extricate itself from the risk. It compounded the fraud by allowing it to escalate. When Clinton went beyond good faith and common decency by promoting the Check-kite through continuing to pay checks on uncollected funds when it knew the purpose for which the checks were issued, Clinton breached a duty to LaSalle. *City Check Cashing, Inc.*, 764 A.2d at 417-418.

While Clinton claims that its conduct constitutes "in-action" as the bank in *Sharp Int'l*, that is farthest from the truth. "In-action" would have constituted closing the account, stopping the payment of checks on uncollected funds. By Clinton keeping the account open and continuing to pay checks on uncollected funds with knowledge that this constituted a check-kite, Clinton did indeed provide the stepping stone to liability.

Finally, Clinton argues that LaSalle was in a better position to discover the Check-kite and its failure to do so prevents recovery. In essence, Clinton is maintaining that as a matter of law, LaSalle's own negligence defeats its ability to recover. "Only in a rare case may a judge rule as a matter of law that a Plaintiff's contributory negligence bars recovery." *Mirick v. Galligan*, 372 Mass. 146, 151, 360 N.E.2d 1045 (1977). This is not such a case particularly because of the importance of the degree of negligence by each party in the determination of fault under comparative negligence. *King v. Costco Wholesale Corp.*, 2005 Mass. Super. Lexis 47, *8 (Sup. Ct. Mass., Jan. 31, 2005).

The undisputed facts do demonstrate the Clinton assumed a duty to warn LaSalle and by not doing so, should be held liable. As such, summary judgment is not warranted on Count V of LaSalle's Complaint.

## IV.    A Dismissal of Counts III and IV of the Complaint is not Warranted at This Time

Counts III and IV of the Complaint assert fraudulent transfer and equitable subordination claims against Clinton, in which LaSalle seeks to avoid the mortgage that Tradex granted to Clinton in July, 2004 on Tradex's real estate and to subordinate that mortgage to LaSalle's later recorded attachment on the property. Clinton seeks to have those counts dismissed without prejudice because Tradex's Chapter 11 trustee has brought similar claims against Clinton in an adversary proceeding in the bankruptcy proceeding.

The law is clear that a bankruptcy petition does not strip creditors of their rights to avoid transfers. Their rights are stayed during the pendency of the bankruptcy proceeding and then reposed in the creditors upon conclusion of the proceeding if the claims are not adjudicated. *In re: Chabot*, 100 B.R. 18, 23 (Bkrtcy. C.D. Cal. 1989) Since the Tradex bankruptcy trustee's claims have not be adjudicated, then LaSalle's claims are not required to be dismissed, only stayed.

## <u>Conclusion</u>

For the foregoing reasons, LaSalle Business Credit, LLC, requests that the Court deny the Motion of Clinton Savings Bank for Summary Judgment in its entirety.


Dated:  May 30, 2006                              Respectfully submitted,

                                                  LASALLE BUSINESS CREDIT, LLC


                                                  By:_____/s/ Patrick W. Manzo_____
                                                          One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz Cooper Chartered
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone:  (312) 346-1300
Fax:  (312) 782-8416

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 30, 2006.

_____/s/ Patrick W. Manzo_____