**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LASALLE BUSINESS CREDIT, LLC, f/k/a ) <br> LASALLE BUSINESS CREDIT, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CLINTON SAVINGS BANK, ) <br> ) <br> Defendant. ) | CIVIL ACTION 05-10268-DPW |

**PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL
UNDISPUTED FACTS IN OPPOSITION TO MOTION OF
CLINTON SAVINGS BANK FOR SUMMARY JUDGMENT**

LaSalle Business Credit, LLC, f/k/a LaSalle Business Credit, Inc. ("LaSalle"), by its attorneys, hereby submits its Response to the Statement of Material Undisputed Facts of Clinton Savings Bank ("Clinton"), pursuant to local rule 56.1, in which LaSalle shall set forth only those facts that it disputes and additional undisputed facts that were not submitted by Clinton.

**Clinton's Statement of Undisputed Facts[1]**

25.   In May 2002, multiple checks, totaling $1,118,250.00 and deposited in the J&J Account, were returned to CSB because of insufficient funds.  Paulhus Affidavit, Exh. 4.

**RESPONSE:**  Denied that the amount totaled $1,118,250.  Rather, on May 6 and 7, 2002, Gitto Global checks in the total amount of $131,250.41, each of which had been deposited in the J&J Chemical account, were returned for insufficient funds and the J&J Chemical account was charged $262,502.50 on May 9, 2002 (including $2.50 fee).  On May 14, 18, 21 and 22, 2002, checks written by Gitto Global totaling $525,000 and deposited in the J&J Chemical account were all returned for insufficient funds.  On May 31, 2002, four checks totaling

---

[1] This response is supported by (a) the Affidavit of Eric S. Rein and the discovery documents attached thereto as exhibits ("Rein Affidavit") (b) the Affidavit of Alyssa Whelpley ("Whelpley Affidavit"), (c) the affidavit of Craig R. Jalbert ("Jalbert Affidavit"); and (d) the affidavit of Joseph R. Costanza ("Costanza Affidavit").

$131,250 were returned in the J&J Chemical account with a $10.00 fee assessed.  (Rein Aff., ¶3, Ex. 1)

30.    In the period May 29, 2002 through November 26, 2002, the daily activity in the J&J Account was approximately $300,000.00 per day.  Williams Depo., p. 15, line 18 through p. 26, line 1.

**RESPONSE:**  Denied.  The summary of the daily activity reveals that the daily activity ranged from $48,000 to $1,500,000.  (Rein Aff., ¶3, Ex. 2)

40.    As a part of the July 2002 field examination, the field examiner requested telephone verifications of Gitto Global's accounts receivable balances.  On July 25, 2002, Deakin represented to the field examiner that he had called the top seven customers of Gitto Global, including Hitachi Cable, Inc. ("Hitachi"), Zebulon Industries, Inc. ("Zebulon"), J-Tan Sales and Marketing, Inc. ("J-Tan"), Velco Chemicals, Inc. ("Velco"), and Color Compounds and Consultants, Inc. ("CCC") (collectively, the "False Gitto Customers"); however, the field examiner was not on the phone with Deakin.  Deakin represented to the field examiner that the people with whom he spoke verified the account receivable balances; however, Deakin never called any of the False Gitto Customers and misrepresented his conversations with False Gitto Customers to the examiner.  10/21/04 Stillwell Affidavit, ¶45; 12/6/04 Stillwell Affidavit, Exh. Q.

**RESPONSE:**  Denied.  Deakin testified that he did not assist LaSalle in getting receivable confirmations.  In fact, he did not know what LaSalle did to confirm receivables.  LaSalle did endeavor to confirm accounts receivable balances with Gitto Global customers.  On July 25, 2002, LaSalle participated in phone verifications with the top 7 receivable customers.  (Whelpley Aff., ¶6; Deakin dep., p. 209:21-23, pp. 469:11-470:19)

42.  Neither the field examiner nor LBC, in July 2002, took any action to verify accounts receivable balances beyond the phone calls reported to the field examiner by Deakin and the faxed letters received from Pellegrine.

**RESPONSE:**  Denied.  LaSalle did take actions to confirm accounts receivable balances with Gitto Global customers.  On July 25, 2002, LaSalle participated in phone verifications with the top 7 receivable customers.  (Whelpley Aff., ¶6)

60.    In late October 2003, Cash noticed fluctuations in deposit balances and requested that Tenaglia look into such fluctuations.  Cash Depo., p. 24, lines 8-21; Tenaglia Depo., p. 20, line 22 to p. 21, line 12.

**RESPONSE:** Denied. In the middle to end of 2003, Steven Cash noticed from a daily officers' report numerous fluctuations in excess of $1 million in deposit balances at Clinton. Such fluctuations were large for Clinton. Cash requested that Michael Tenaglia inquire about the activity with the objective to have it cease. (Cash dep., pp. 24:8-26:1, p. 26:12-19, pp. 28:20-29:1)

61. Tenaglia reviewed daily activity reports and discovered that daily deposits and withdrawals in the J&J Account were substantial. Tenaglia Depo., p. 21, line 13 to p. 22, line 9.

**RESPONSE:** Denied. When Tenaglia reported back to Cash, he was told that the substantial account involved J&J Chemical and that all checks being written on the account or deposited in the account were between J&J Chemical and Gitto Global. (Cash dep., pp. 30:24-31:4, p. 31:17-24)

72. In January 2004, Gitto Global was in default of reporting covenants in the Loan Agreement because it had not submitted financial information for periods after August 2003, and covenant compliance certificates for the periods ended June 30, 2003, September 30, 2003 and December 31, 2003. In addition, Gitto Global owed a year-end audited financial statement to LBC. McGee Affidavit, Exh. 4, LBC 001892.

**RESPONSE:** Denied that Gitto Global was in default. Rather, Gitto Global was not in compliance with the Loan Agreement. The failure to observe a covenant constitutes an Event of Default under Section 15(b) of the Loan Agreement. But, it does not constitute a default until LaSalle declares it so. Upon the occurrence of an Event of Default, LaSalle may exercise remedies under Section 16 of the Loan Agreement.

83. In March 2004, Cash had suspicions about the use of the J&J Account for check-kiting, but concluded that the use of J&J Account was probably legitimate because of Miller continued provision of information regarding the activity and the pending sale, his perception of Miller as an individual, and the fact that the activity and balance in the J&J Account seemed to fluctuate rather than steadily increase. Cash Depo., p. 53, line 20 to p. 57, line 22.

**RESPONSE:** Denied. Cash was not aware that the fluctuations were occurring daily in deciding to take no action. His decision was based on Miller being a customer that the bank was

familiar with and Miller's explanation of the business purpose involved, which Cash "couldn't fully comprehend." Although, Cash recognized that if a check kite is discovered "usually a hold is put on the account and no more activity is allowed." In March, 2004, Cash "had a concern" that a crime was being committed by J&J Chemical. (Cash dep., pp. 54:23-56:2, p. 57:2-5, p. 130:16-21)

85.  In April 2004, CSB was required to borrow money from the Federal Reserve to cover the daily activity in the J&J Account. Azorandia Depo., p. 23, line 17, to p. 24, line 24.

**RESPONSE:** Denied. In April, 2004, Clinton had no liquidity, no cash and it had to borrow $1-2 million per day from the Federal Home Loan Bank. As a result, Christopher Gill asked Sheila Azorandia to determine the cause of the lack of liquidity, which she determined was the need to cover uncollected funds in the J&J Chemical account. Gill then asked Azorandia to review the activity in the J&J Chemical account. Azorandia told Gill on May 3, 2004 after reviewing the activity that "it looks as if he (Miller) is still 'playing' games." (Gill dep., pp. 11:21-12:13; Azorandia dep., p. 23:20-23, p. 24:4-18, p. 26:5-7; Rein Aff., ¶3, Ex. 26)

107.  As of May 27, 2004, Gitto Global was in default of reporting covenants in the Loan Agreement because it had not submitted financial information for February 2004 and March 2004, and had not submitted a covenant compliance certificate for the periods ended March 31, 2004. McGee Affidavit, Exh. 4, LBC 001866.

**RESPONSE:** Denied that Gitto Global was in default. Rather, Gitto Global was not in compliance with the Loan Agreement. The failure to observe a covenant constitutes an Event of Default under Section 15(b) of the Loan Agreement. But, it does not constitute a default until LaSalle declares it so. Upon the occurrence of an Event of Default, LaSalle may exercise remedies under Section 16 of the Loan Agreement.

**Plaintiff's Statement of Additional Undisputed Material
Facts in Opposition to Motion for Summary Judgment**

**J&J Chemical Account Activity in 2002**

1.      In March, 2001, after the J&J Chemical account was opened, nearly all of the deposits were for $262,500 and were comprised of checks drawn on the account of Gitto Global Corporation ("Gitto Global") at Guaranty Bank and payable to J&J Chemical. Checks drawn on the account that month were all payable to Gitto Global. (Rein Aff., ¶3, Ex. 1)

2.      Over the next year, most deposits in the J&J Chemical account were of even and like amounts, although escalating in September, 2001, January, 2002 and March, 2002. As the deposited amounts increased, so did the number and total amounts of the checks drawn against the account. While the daily totals of deposits and checks drawn against the account did not exactly match, their amounts were relatively close. The monthly activity for the first year of the account is summarized below:

| Month | Checks/Debits | Deposits/Credits | Balance |
|---|---|---|---|
| March | 2,201,395.66 | 2,477,485.00 | 276,089.34 |
| April | 4,539,068.76 | 4,419,500.00 | 156,520.58 |
| May | 5,519,242.18 | 5,643,750.00 | 281,028.40 |
| June | 5,349,148.22 | 5,118,750.00 | 50,630.18 |
| July | 2,573,755.67 | 2,931,370.00 | 408,244.51 |
| August | 4,912,599.43 | 4,790,625.00 | 286,270.08 |
| September | 5,584,211.15 | 5,731,250.00 | 433,308.93 |
| October | 4,612,342.83 | 4,200,000.00 | 20,966.10 |
| November | 4,173,477.75 | 4,200,000.00 | 47,488.35 |
| December | 5,404,668.19 | 5,381,250.00 | 24,,070.16 |
| January | 8,016,464.74 | 8,006,250.00 | 13,855.42 |
| February | 8,485,930.91 | 8,531,250.00 | 59,174.51 |
| March | 15,459,705.08 | 15,421,875.00 | 21,344.43 |
| **Totals** | 76,832,010.57 | 76,853,355.00 | |

(Rein Aff., ¶3, Ex. 1)

3. During the first year of the account, on six occasions, four in June 2001 and two in March 2002, checks were presented for payment against insufficient funds. (Rein Aff., ¶3, Ex. 1)

4. On April 19, 2002, a deposit of $500,000 was made to the J&J Chemical account consisting of two $250,000 checks, one each from Frank Miller and Gary Gitto drawn on their individual accounts at Fleet. (Rein Aff., ¶3, Ex.3)

5. After checks deposited in the J&J Chemical account were returned on May 22, 2002, Bobbi-Jo Williams contacted Joseph Guercio to inform him of the returned items in May and the placement of a hold on the account. Guercio contacted Frank Miller who explained that Gitto Global was in the process of switching its bank accounts to another bank and the checks that were being deposited were from the new account that had not yet been established. Since Guercio felt comfortable with the explanation, the no float hold was released. (Williams dep., pp. 16:1-18:4)

6. On May 24, 2002, two wire transfers of $250,000 each were received by Clinton for deposit into the J&J Chemical account, one from Gary Gitto and the other from Frank and Maria Miller. (Rein Aff., ¶3, Ex. 4)

7. On June 4-6, 2002, five wire transfers totaling $890,000 were received in the J&J Chemical account from the Lehman Investment accounts of Gary, Charles and Nancy Gitto. As a result, a total balance of between $1.5 and $3 million was maintained in the J&J Chemical account until late July, 2002, when both the amounts of deposits and account balances began to decline. (Rein Aff., ¶3, Ex. 5)

8. On July 29, 2002, $100,000 was wire transferred from the J&J Chemical account to Frank Miller's account at Fleet. (Rein Aff., ¶3, Ex. 6)

9. On November 13, 2002, additional funds were deposited into the J&J Chemical account from two wire transfers, one for $130,000 from Frank Miller's account at Fleet and the other for $100,000 from Equitech Technologies, LLC. (Rein Aff., ¶3, Ex. 7)

10. For the six months that a four day hold was placed on the J&J Chemical account, Gitto Global provided Clinton with a daily statement from Guaranty Bank and subsequently LaSalle Bank showing the check numbers, dollar amount and the date when items deposited in the Gitto Global account had cleared. Williams would review each check deposited and determine whether to clear it. She saw that all checks deposited into the J&J Chemical account were from Gitto Global and all checks written from J&J Chemical account were to Gitto Global. Williams found this unusual. (Deakin dep., pp. 123:7-127:11; Williams dep., pp. 20:12-21:24, p. 24:1-16)

11. The monthly activity in the J&J Chemical account for the period from April, 2002 through November, 2002 is summarized as follows:

| Month | Checks/Debits | Deposits/Credits | Returns/Rejects | Balance |
|---|---|---|---|---|
| March | | | | 21,344.43 |
| April | 7,167,953.25 | 7,410,875.00 | | 264,266.18 |
| May **(1)** | 1,432,609.10 | 1,812,480.82 | 1,050,000.00 | 644,137.90 |
| June **(2)** | 9,674,726.37 | 11,738,375.00 | | 2,707,786.53 |
| July **(3)** | 12,736,220.08 | 11,196,150.00 | | 1,167,716.45 |
| August | 4,642,118.93 | 3,824,800.00 | 203,640.00 | 350,397.52 |
| September **(4)** | 3,705,922.78 | 3,777,025.00 | 402,695.20 | 421,499.74 |
| October | 8,356,543.93 | 8,582,200.00 | 1,925,374.20 | 647,155.81 |
| November **(5)** | 8,079,529.39 | 8,133,875.00 | 1,112,810.56 | 701,501.42 |
| **Totals** | **55,795,623.83** | **56,475,780.82** | **3,644,519.96** | |

**(1)** Checks/Debits amount includes $1,050,000.00 of returned deposit checks.
**(2)** Deposits/Credits amount includes $889,950.00 of incoming wire transfers net of fees.
**(3)** Checks/Debits amount includes a $100,000.00 wire transfer to Frank Miller plus a $15.00 fee.
**(4)** Checks/Debits amount includes a $100,000.00 wire transfer to Frank Miller plus a $15.00 fee.

**(5)** Deposits/Credits amount includes $230,000.00 of incoming wire transfers.

(Rein Aff., ¶3, Ex. 1)

12.    In deciding to remove the no float hold from the J&J Chemical account, Clinton focused on the clearance of Gitto Global checks that had been deposited in the J&J Chemical account, not on the source of those Gitto Global funds. There was also no consideration given to the following rejected checks due to insufficient funds.

| Date | Rejected Checks |
|---|---|
| August 20, 2002 | 203,640.00 |
| September 6, 2002 | 110,460.00 |
|  | 113,364.00 |
| September 12, 2002 | 78,300.00 |
|  | 100,571.20 |
| October 2, 2002 | 73,428.50 |
|  | 84,632.00 |
| October 8, 2002 | 73,521.00 |
|  | 81,263.00 |
| October 9, 2002 | 72,070.30 |
|  | 73,200.00 |
| October 10, 2002 | 72,625.40 |
|  | 96146.12 |
| October 11, 2002 | 72,315.73 |
|  | 96120.00 |
| October 17, 2002 | 78,300.00 |
|  | 96,120.00 |
| October 28, 2002 | 81,236.00 |
|  | 87,000.00 |
|  | 98,072.70 |
| October 29, 2002 | 142,020.00 |
|  | 173,580.00 |
| October 30, 2002 | 69,600.00 |
|  | 71,020.00 |
|  | 73,160.00 |
|  | 78,881.00 |
|  | 81,062.45 |
| November 5, 2002 | 351,214.29 |
| November 7, 2002 | 358,786.27 |
| November 12, 2002 | 402,810.00 |

(Williams dep., pp. 18:23-19:19; Rein Aff., ¶3, Ex. 1)

13.  From July, 2002 to November, 2002, the following is a summary of checks paid against uncollected funds during the three days prior to the last day of the month.

| July 2002 | 895,615.65 |
| August 2002 | 843,060.00 |
| September 2002 | 693,274.59 |
| October 2002 | 705,946.27 |
| November 2002 | 1,089,330.15 |

(Rein Aff., ¶3, Ex. 1)

14.  After the hold was removed from the J&J Chemical account in November 2002, Williams did not review the account until deposits through the ATM reached $1 million, which was in July, 2003.  (Williams dep., p. 26:7-16; Rein Aff., ¶3, Ex. 1)

**J&J Chemical Account Activity in 2003**

15.  The escalation in the J&J Chemical account activity for the period from December, 2002 through October, 2003 is summarized below:

| **Month** | **Checks/Debits** | **Deposits/Credits** | **Rejects** | **Balance** |
|---|---|---|---|---|
| November | | | | 701,501.42 |
| December | 7,715,082.38 | 7,061,600.00 | | 48,019.04 |
| January | 8,394,494.92 | 8,487,150.00 | | 140,674.12 |
| February | 11,024,717.31 | 10,945,025.00 | | 60,981.81 |
| March | 13,867,255.84 | 13,919,200.00 | | 112,925.97 |
| April **(1)** | 12,724,667.84 | 12,633,880.00 | 3,912,004.00 | 22,138.13 |
| May | 14,206,726.29 | 14,276,450.00 | 8,184,525.30 | 91,861.84 |
| June | 17,155,037.75 | 17,123,500.00 | 11,304,451.85 | 60,324.09 |
| July | 22,838,865.34 | 22,835,750.00 | 15,328,081.50 | 57,208.75 |
| August | 29,344,057.67 | 29,456,000.00 | 18,832,801.92 | 169,151.08 |
| September | 33,980,433.20 | 33,841,500.00 | 26,222,462.75 | 30,217.88 |
| October | 54,245,936.52 | 54,643,872.50 | 34,324,325.29 | 428,153.86 |
| **Totals** | **225,497,275.06** | **225,223,927.50** | **118,108,652.61** | |

**(1)** Checks/Debits include two outgoing wire transfers totaling $325,000.00 to Frank Miller at Fleet.

(Rein Aff., ¶3, Ex. 1)

16. Based on a three day float, the amount of checks paid against uncollected funds during the three days previous to the last day of the month from December, 2002 through October, 2003 is as follows:

| December 2002 | 1,145,110.80 |
| January 2003 | 1,441,775.50 |
| February 2003 | 1,710,814.74 |
| March 2003 | 2,068,498.02 |
| April 2003 | 1,960,234.20 |
| May 2003 | 1,409,816.40 |
| June 2003 | 3,723,018.30 |
| July 2003 | 2,636,655.55 |
| August 2003 | 4,115,083.65 |
| September 2003 | 5,814,446.90 |
| October 2003 | 7,381,910.93 |

(Rein Aff., ¶3, Ex. 1)

17. In late 2003, Tenaglia noticed a large deposit followed by a series of checks clearing the J&J Chemical account on the same day. Tenaglia told Steven Cash of the observed activity and they were both concerned "about the potential for check kiting." (Tenaglia dep., pp. 20:22-23:14; Cash dep., p. 24:10-21, p. 26:12-19 and p. 54:4-8)

18. On December 1, 2003, Clinton met with Miller to review the activity in the J&J Chemical account, which had risen to $2-3 million per day. Clinton thought the activity was "unusual" and had gotten too large for a bank Clinton's size. Recollections of Miller's subsequent explanation differed from the attendees of the meeting. Michael Tenaglia said that the activity between the Gitto Global and J&J Chemical accounts were the result of licensing – one company licensed to purchase certain raw materials and the other licensed to process the raw materials. On the other hand, Robert Paulhus recalled that Miller explained that the activity was due to licensing agreements with certain vendors and/or customers and to enable materials to be acquired from certain vendors when those vendors knew that the materials would be sold to a

competitor. The activity was also based on the advice of accountants. Paulhus did not understand this explanation. Nonetheless, both Tenaglia and Paulhus recall that Miller was asked to stop the activity and Miller asked that Clinton wait until Gitto Global could be sold to a company in California, Vitrotech, after the first of the year when the J&J Chemical account would also be closed. (Tenaglia dep., pp. 24:1-26:16; Paulhus dep., pp. 11:21-13:21)

**J&J Chemical Account Activity in 2004**

19. In mid-January, 2004, Cash again inquired as to the status of the J&J Chemical account. Tenaglia told Cash that it was still being resolved. At this time, Cash was aware LaSalle was the lender to Gitto Global and a bank account was maintained there. (Cash dep., p. 35:1-15, p. 119:4-17)

20. A summary of the activity on the J&J Chemical checking account from November, 2003 through April, 2004 is as follows:

| Month | Checks/Debits | Deposits/Credits | Rejects | Balance |
|---|---|---|---|---|
| October | | | | 428,153.86 |
| November | 46,517,702.35 | 46,501,000.00 | 32,174,780.50 | 411,451.51 |
| December | 57,710,507.81 | 57,355,442.00 | 43,024,201.95 | 56,385.70 |
| January | 61,948,732.19 | 62,332,719.99 | 2,800,890.70 | 440,373.50 |
| February **(1)** | 60,908,320.30 | 60,807,403.00 | | 339,456.20 |
| March **(2)** | 76,765,564.83 | 76,740,585.75 | | 314,477.12 |
| April | 83,368,031.93 | 86,465,893.50 | | 3,412,338.69 |
| **Totals** | **387,218,859.41** | **390,203,044.24** | **777,421,903.65** | |

**(1)** Checks/Debits include an outgoing wire transfer for $100,000.00 to Frank Miller at Fleet
**(2)** Checks/Debits include an outgoing wire transfer for $100,000.00 to Frank Miller at Fleet

(Rein Aff., ¶3, Ex. 1)

21. Based on the three day float, the amount of checks paid against uncollected deposits during the three days previous to the last day of the month from November, 2003 through April, 2004 was as follows:

| November 2003 | 5,549,269.55 |
| December 2003 | 8,430,667.05 |
| January 2004 | 9,298,236.95 |
| February 2004 | 10,187,565.05 |
| March 2004 | 11,257,677.65 |
| April 2004 | 9,416,339.10 |

(Rein Aff., ¶3, Ex. 1)

**Awareness of Check-kiting**

22. On May 18, 2004, Gill told Tenaglia that "I do not see what his kiting (let's call a spade a spade) has to do with the sale of the business. And the sufficient amount would have to be in excess of 4 million! . . ." (Rein Aff., ¶3, Ex. 27)

23. Tenaglia complained that Gill was contending that Tenaglia was delaying or unwilling to make a decision and was at fault for putting the bank at risk. In reply, on May 19, 2004, Gill questioned the reasoning that the account was being used the way it was designed. "You talk about the intent of the account. Did we know that 4 million was going to flow through the account several times a week? What kind of business has between 500 and 1 billion dollars of cash flow a year?" Gill questioned how a little company in Lunenberg could be generating a billion dollars in sales. Later that day, Tenaglia told Gill that there was a deposit in excess of $3 million to cover checks of $2.5 million. He admitted, however, "I know it smells and I agree." (Rein Aff., ¶3, Ex. 8)

24. In the beginning of May, 2004, Gill also told Cash that he "felt it was kiting." Cash told Gill to back off. Although Cash knew that J&J Chemical was writing checks to Gitto Global and the amount was being covered by deposits of checks from Gitto Global, Cash asserts he did not consider it check kiting because the amounts of the checks written and deposits matched. (Gill dep., p. 15:11-12, 20-23, p. 40:16; Cash dep., pp. 63:13-64:1)

25. Frustrated when Cash told him to "back off", Gill approached John Davis, the Chairman of the Board of Clinton, the last week of May, 2004 to tell him about the suspicious activity and that Cash was not making the right decision. Gill also told Davis that the size of the activity and size of the deposits was not reasonable in view of the size of Gitto Global. He compared the activity to Nypro International in Clinton that had 26 factories worldwide and sales of $900 million, whereas Gitto Global was tracking at $1 billion for a little company with one location. (Gill dep., p. 19:1-22, p. 26:1-11)

**Clinton's Efforts to Protect Interest**

26. On July 23, 2004, Clinton provided J&J Chemical with an $8.4 million credit line for the sole purpose of providing payment for checks drawn on the account. The line was only to be utilized if checks drawn against uncollected funds were returned. It was not a loan, only a way to cover uncollected funds. In almost 30 years of banking experience, Joseph Guercio had never documented a similar transaction. (Guercio dep., p. 26:7-10)

27. This credit line was secured by various pieces of collateral. As Guercio indicated, "we really didn't care what the collateral was and we weren't thinking in terms of perfecting it. We will just take whatever they'll give us. I mean, we looked at it that we already had exposure so whatever collateral we could get that would lessen the exposure we are going to take." (Guercio dep., pp. 22:7-23:15)

28. Part of the collateral was $1.2 million removed from the J&J Chemical account and deposited in a separate account against which Clinton took a collateral pledge. (Rein Aff., ¶3, Ex. 9)

29. A summary of the activity on the J&J Chemical account from May, 2004 through September, 2004 is as follows:

| Month | Checks/Debits | Deposits/Credits | Rejects | Balance |
|---|---|---|---|---|
| April | | | | 3,412,338.69 |
| May | 74,131,285.94 | 71,827,717.00 | | 1,108,769.75 |
| June | 84,155,014.86 | 84,252,605.00 | | 1,206,359.89 |
| July **(1)** | 89,369,054.05 | 88,196,355.00 | | 33,660.84 |
| August | 87,854,187.51 | 87,844,944.00 | | 24,417.33 |
| September | 39,983,218.33 | 39,958,801.00 | | 0 |
| **Totals** | **375,492,760.69** | **372,080,422.00** | | |

**(1)** Checks/Debits includes a $1.2 million transfer to a Clinton controlled account assigned as collateral for the $8.4 J&J Chemical revolving credit note.

(Rein Aff., ¶3, Ex. 1)

30. Based on a three day float, the amount of checks paid against uncollected deposits during the three days previous to the last day of the month for May, 2004 through September, 2004 is the following:

| May 2004 | 10,616,315.00 |
|---|---|
| June 2004 | 8,264,822.25 |
| July 2004 | 12,360,314.15 |
| August 2004 | 11,980,223.15 |
| September 2004 | 11,979,507.30 |

(Rein Aff., ¶3, Ex. 1)

31. Between September 13-17, 2004, Gitto Global deposited into the Fleet blocked account over $12,000,000 in additional checks from the J&J Chemical account made payable to Gitto Global. The bank wired those funds to LaSalle in three separate wire transfers. LaSalle advanced approximately $4,000,000 in response to Gitto Global's request for advances in reliance on these deposits. When J&J Chemical did not pay the amount of its revolving loan, Clinton dishonored $11,890,588 in checks drawn on the J&J Chemical account that Gitto Global

had deposited in the Fleet Bank account and Fleet Bank returned the checks for insufficient funds, resulting in an overdraft in the Fleet Bank account. (Stilwell Aff., ¶¶22-24)

**LaSalle Financing**

32.  LaSalle, in reasonable reliance upon the false information contained in the borrowing base certificate submitted by Gitto Global, advanced funds to Gitto Global in accordance with the Loan Agreement and the LaSalle revolving loan. Gitto Global, on a daily basis, deposited numerous checks into the Fleet blocked account that it purportedly received as payment of invoices for goods sold. Unbeknownst to LaSalle, the vast majority of these checks were drawn upon the J&J Chemical account. Between July, 2002 and September, 2004, Gitto Global disbursed $1,024,543,246 to J&J Chemical, which funds were deposited in the J&J Chemical account. (Jalbert Aff., ¶4; Stilwell Aff., ¶¶16-17, 20)

33.  Fleet Bank, on a daily basis, transferred the funds from the Fleet blocked account to a controlled disbursement account for Gitto Global at LaSalle Bank which funds were then applied to pay down the revolving loan. As funds were applied daily against the LaSalle revolving loan, funds became available for LaSalle to advance to Gitto Global which were deposited to the LaSalle account of Gitto Global. LaSalle advanced funds on the revolving loan, relying on (a) the funds transferred from the Fleet blocked account and (b) the representations in the daily borrowing base certificates. Between July, 2002 and September, 2004, $1,009,659,366 in checks issued by J&J Chemical from its account were deposited in the Fleet blocked account by Gitto Global. This amount was reflected on Gitto Global's books as inflated sales figures to fictitious customers and overstated sales to one legitimate customer. (Jalbert Aff., ¶¶6-7; Stilwell Aff., ¶¶18-20)

34.  Based upon Gitto Global's monthly deposits of purported sales proceeds from J&J Chemical, LaSalle advanced $1,124,835,256 on the revolving loan based upon the funds

transferred from the Fleet blocked account and representations in the borrowing base certificates. (Stilwell Aff., ¶38)

35.     As of May 30, 2006, there as due and owing from Gitto Global $31,704,428.40 plus interest and costs. (Costanza Aff., ¶4)

**Account Receivable Fraud**

36.     In order to borrow under the line of credit at LaSalle, there needed to be availability. In order to artificially create availability, Gitto Global would inflate accounts receivable from fictitious customers and boost sales volume by applying payments against the loan from cash receipts received from J&J Chemical. The cash receipts would reduce the amount owed on the loan so that more money could be borrowed and the receivables created the basis to borrow additional money. (Deakin dep., pp. 82:5-83:18, pp. 89:21-90:20)

37.     Each day, William Deakin would prepare a daily report based upon checks written the prior day and a separate page for checks that were mailed but not yet deposited for payment. This daily report would be given to Frank Miller so he could determine how much in fictitious sales needed to be put on the borrowing base so that there would be availability. He also needed to determine how much to pay down on the borrowing base to obtain that availability. Miller would then tell his wife, Maria Miller, how much in fictitious sales to "generate" on the books and tell Rita Bartlett what volume or amount of checks she should write to J&J Chemical. (Deakin dep., pp. 60:8-61:11, pp. 62:8-63:6)

38.     Rita Bartlett would then prepare checks payable to J&J Chemical. These checks were invariably to be under $100,000 so that there would be same day availability. Deposits also were to be less than $4,000,000 a day so that there could be same day credit. (Deakin dep., pp. 64:9-65:3)

39. After Bartlett prepared the checks, she would give them to Janice Chaisson who would make out reciprocal checks for the same dollar amount from J&J Chemical payable to Gitto Global. (Deakin dep., pp. 64:11-65:16)

40. Frank Miller or William Deakin would deposit the checks written from Gitto Global to J&J Chemical in the J&J Chemical account at Clinton by depositing with a teller or in an ATM. The ATM deposit would be made if the bank was closed. (Deakin dep., pp. 65:17-66:21)

41. To support the fictitious sales by Gitto Global, Frank Miller would direct Maria Miller to create fictitious sales orders for the amount of money that he needed that day. Maria Miller would then create invoices for fictitious customers. The invoices would then instruct Dean Childs what the sales orders numbers were and he would prepare the shipping documents. Janice Chaisson would then go into the computer and print the invoices. The computer system would automatically generate an aging once the invoice was entered into the system. (Deakin dep., pp. 85:6-86:9, pp. 88:23-89:6; Chaisson dep., pp. 34:8-35:20, pp. 39:23-40:3)

42. J&J Chemical invoices were only printed when a bank auditor requested a particular item and wanted to see where it was purchased. (Deakin dep., p. 90:1-9)

43. The fictitious customers were J-Tan Sales and Marketing, Hemisphere Distribution, Color Compounds & Consultants, Velco Chemical, Zebulon, and Hitachi. These sales were segregated by customer code 99. (Chaisson dep., pp. 40:11-41:3; Deakin dep., p. 38:10-21)

44. In order to prepare daily borrowing base certificates to LaSalle, Janice Chaisson would input the amount of sales and amount of deposits for the day. This information would come from the sales report and would include actual and fictitious sales. The deposits included

deposits from J&J Chemical and other customers. Originally, Chaisson would fax the borrowing base certificate and later e-mail them to LaSalle. Janice Chaisson began sending the borrowing base certificates two or three months after LaSalle provided the financing. Before that time, Bill Deakin was furnishing the borrowing base certificates. Accompanying the borrowing base certificate would be a summary of the sales which included the fictitious sales. (Deakin dep., pp. 41:17-22, 82:9-83:9, pp. 242:1-243:2; Chaisson dep., pp. 30:23-31:7, pp. 67:3-68:12, pp. 72:17-73:5, pp. 75:12-15)

**Inventory Misrepresentation**

45.     There were several ways in which Gitto Global was misrepresenting its inventory. First, it would mark the product packaging with the product code for a more expensive product. Frank Miller would also instruct David Minardi to change the identity of the compounds that were being produced. Although the proper fabrication formula would be followed, the lot number and identity of the product would be changed. Hence, a product would be produced, but the label on the product would indicate a different, more expensive product from the product actually contained in the package. (Minardi dep., pp. 17:1-18:5, pp. 24:6-25:13; Fuller dep., p. 58:6-11)

46.     Gitto Global also overstated the cost of inventory on the valuation. Maria Miller would instruct Robyn Merchant to adjust the physical count on her inventory reports. Maria Miller would also tell Merchant to increase the price of the product. Merchant would then generate a new report with these changes. As a result, Gitto Global overstated the amount of expensive products, such as Viton B-600, actually in inventory. This overstatement, in turn, would significantly inflate the value of Gitto Global's inventory. (Merchant dep., pp. 44:10-45:24; Deakin dep., p. 119:2-7)

47. Gitto Global would also deceive the bank auditors by giving them an invoice showing that J&J Chemical was the supplier of the Viton B-600. (Deakin dep., pp. 195:34-196:4) The inventory values of Vitrolite products would also be changed by adjusting the value of the products and pounds in inventory every month. (Merchant dep., p. 33:11-15)

48. In addition, the Vitrolite product was included in inventory although it had been consigned and not sold to Gitto Global by Vitrotech. (Fuller dep., p. 59:8-10; Deakin dep., pp. 216:1-217:19)

Dated: May 30, 2006

Respectfully submitted,

LASALLE BUSINESS CREDIT, LLC

By: /s/ Patrick W. Manzo
   One of its attorneys

Christopher J. Panos (BBO# 555273)
Patrick W. Manzo (BBO# 651891)
Craig and Macauley Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA  02210
Phone: (617) 367-9500
Fax:   (617) 742-1788

Eric S. Rein
John L. Conlon
Bethany N. Schols
Schwartz Cooper Chartered
180 N. LaSalle Street, Suite 2700
Chicago, IL  60601
Phone: (312) 346-1300
Fax: (312) 782-8416

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 30, 2006.

/s/ Patrick W. Manzo